UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

NATHAN LING,

    PLAINTIFF,

VS                  CIVIL ACTION NO: 3:20-CV-233

CAMPBELL COUNTY, TENNESSEE;
JUSTIN CRABTREE; DAKOTA WILLIAMS;
SEAN BROWN; JOSHUA MILLER, in their
individual and official capacities;
and JOHN DOES, names and identities
not yet known,

    DEFENDANTS.


PRETRIAL DISCOVERY DEPOSITION OF:
DAKOTA WILLIAMS
TAKEN ON DECEMBER 13, 2022


\* \* \* THIS STYLE PAGE IS CONTINUED \* \* \*

Hicks Court Reporting ● Sally Hicks ● P.O. Box 8323, Gray, TN 37615 ● 423-741-3366

```
APPEARANCES:

FOR PLAINTIFF:          TONY SEATON, ESQ.

                        Tony Seaton And Associates
                        118 East Watauga Avenue
                        Johnson City, TN 37601
                        (423) 282-1041


FOR DEFENDANTS:         ARTHUR F. KNIGHT, III, ESQ.

                        Taylor & Knight, GP
                        800 South Gay Street, Suite 600
                        Knoxville, TN 37929
                        (865) 971-1701
```

*Hicks Court Reporting* ● *Sally Hicks* ● *P.O. Box 8323, Gray, TN 37615* ● *423-741-3366*

1  A.  When I arrived on scene I seen Deputy
2  Minor down a small embankment, or hill, whatever
3  you'd like to refer to it as, trying to pull somebody
4  out from under a vehicle.  I went down to where he
5  was and attempted to help him get the Defendant out
6  from under the vehicle, appeared to be unconscious.
7  Q.  Okay.  And was it just you and Minor and
8  Douglas at the time?
9  A.  It was just me and Minor down at the
10  time.
11  Q.  Well, wasn't Douglas there?
12  A.  Yes, Sir.  There were other individuals.
13  I believe he was out with them.
14  Q.  Pardon?
15  A.  I believe he was out with the other
16  individuals that were in the vehicle.
17  Q.  Okay.  And so tell me what you and Minor
18  did.
19  A.  Once we got him out from under the
20  vehicle I heard a loud commotion coming up from
21  behind me, turned around and there was a female
22  subject running, screaming profanities.  Advised her
23  to stop multiple times, she did not, at which time
24  she was taken to the ground.
25  Q.  So the female was coming down, right?

```
 1    vehicle?
 2         Q.   Yes.
 3         A.   Okay.
 4         Q.   And -- is that true?
 5         A.   I believe so, yes, Sir.
 6         Q.   Okay.  And that they had the EMS car
 7    here.
 8         A.   Uh-huh (affirmative).
 9         Q.   Okay?  Brought Ling from here to here
10    for EMS to check him out.
11         A.   Okay.
12         Q.   Okay?  Where were you parked?
13         A.   I would've been behind the EMS there.
14         Q.   Okay.
15         A.   They pulled up in front of me.
16         Q.   So you put the female in the back of
17    your car?
18         A.   Yes, Sir.
19         Q.   Did you stay on the scene?
20         A.   Yes, Sir.
21         Q.   Okay.  And what else transpired on the
22    scene?
23         A.   After they had got Mr. Ling up to the
24    EMS workers they were trying to check him out.  He
25    was belligerent kicking, spitting.  I couldn't make
```

```
 1        Q.   Okay.  But you didn't have any part --
 2   you don't recall whether or not...?
 3        A.   I don't recall helping carry him to the
 4   patrol car, no.
 5        Q.   Okay.  Did you see Mr. Crabtree, or
 6   excuse me, Mr. Ling the entire time until he was
 7   transported to the department?
 8        A.   The entire time?
 9        Q.   Yeah.
10        A.   No, Sir.
11        Q.   Did you see him, did you, did you see
12   him leave the scene?
13        A.   Yes, Sir.  I was behind Mr. Crabtree
14   when he left.
15        Q.   Okay.
16        A.   I pulled out behind him.
17        Q.   Do you recall anyone ever hitting Mr.
18   Ling?
19        A.   No, Sir.
20        Q.   Do you recall anyone ever abusing him in
21   any way?
22        A.   No, Sir.
23        Q.   Okay.  So you went to the jail with the
24   female?
25        A.   Yes, Sir.
```

```
 1        Q.    Uh-huh.
 2        A.    ...I usually refer to it as intake, so
 3  when I entered that room they were, I believe, Deputy
 4  Crabtree, Deputy Brown and maybe another CO...
 5        Q.    Uh-huh.
 6        A.    ...was struggling with Mr. Ling on the
 7  ground.
 8        Q.    And what did you do?
 9        A.    I went in there and asked for a female
10  CO to step out with the inmate I had, put gloves on
11  and attempted to help them control Mr. Ling.
12        Q.    Did you have gloves?
13        A.    Not in my pocket.  I believe I got some
14  off the desk.
15        Q.    Were they just medical gloves?
16        A.    Latex, latex medical, yeah.
17        Q.    Okay.  They weren't the, they weren't
18  the Kevlar gloves?
19        A.    No, Sir.
20        Q.    The tactical gloves?
21        A.    No, Sir.
22        Q.    Did you ever put any tactical gloves on
23  while you were there?
24        A.    No, Sir.
25        Q.    All right.  And while you were in the
```

```
 1        Q.   Okay.  So at that point in time you
 2   hadn't seen them hitting him?
 3        A.   Correct.  I had no idea what had
 4   happened prior to my arrival.
 5        Q.   Okay.  All right.  And is this you again
 6   coming in?
 7        A.   Yes, Sir.
 8        Q.   Putting on the gloves?
 9        A.   Yes, Sir.
10        Q.   Is he being combative?
11        A.   Doesn't appear he's, at the time, no.
12        Q.   So what are you doing at this point?
13        A.   At this time I'm trying to help restrain
14   his leg.
15        Q.   And why would you restrain him if he's
16   not being combative?
17        A.   At the point in time to that is when I
18   stated he was being combative.
19        Q.   Is he being combative now?
20        A.   I can't see if he's trying to lift off
21   or not at the point in time when I was there.  I do
22   recall him kicking Miller and going to assist him in
23   keeping his legs down.  He's just raising up off of,
24   what appeared to be his shoulders there.  There he's
25   kicking me.  Looks like we're struggling with him
```

1  trying to keep him under control.
2  Q. And who was hitting him there?
3  A. Can you refer to...?
4  Q. This, this fellow right here.
5  A. That'd be Sean Brown.
6  Q. Okay. Did you see him hitting him?
7  A. Yes, Sir, I did.
8  Q. All right. Let's look at it again. And
9  you saw that, didn't you?
10 A. From that angle, no, Sir.
11 Q. Okay. You didn't see him hitting him?
12 A. No, Sir.
13 Q. Okay. Had you seen that you would've
14 stopped him?
15 A. A rib strike is not something that we're
16 trained to do. It's not something that I consider
17 very appropriate. It's, at times I've seen it used.
18 Q. Is it excessive?
19 A. Depends on the situation.
20 Q. Well, in that situation is it excessive?
21 A. In that situation he's resisting at that
22 point in time.
23 Q. And he's cuffed behind his back?
24 A. It's -- he's cuffed behind his back.
25 Yes, Sir. I don't -- I would not have struck him in

1  A.  Together as a whole, that's -- I don't
2  agree with your statement there.
3  Q.  Well, all, I just I'm asking you the
4  question.
5  A.  Yeah.  Well, if you want to separate it
6  out, I feel like you've got a different point of view
7  from every officer there.
8  Q.  Who's in charge?
9  A.  Of that scene directly?  It's Mr.
10 Crabtree's inmate, and I believe Brown was a
11 supervisor at the jail.
12 Q.  Okay.  So you're not in charge?
13 A.  Correct.
14 Q.  All right.  And so if you see abuse
15 going on at that point in time do you have a
16 responsibility to report it?
17 A.  Yes, Sir.
18 Q.  All right. And do you feel that all
19 this treatment of Mr. Ling is appropriate?
20 A.  Not all of it, no.
21 Q.  What part of it is appropriate?
22 A.  Well, if you want to look at the point
23 of view where you paused it here,...
24 Q.  Okay.
25 A.  ...I was looking at the door, I'm facing

```
1   you?
2        A.   I have seen the blood.  Yes, Sir.
3        Q.   Okay.  Well, where did you think it was
4   coming from?
5        A.   I had no idea where it was coming from.
6        Q.   Were, up to this point in time were you
7   concerned about his health or safety?
8        A.   About his what?
9        Q.   Health or safety?
10       A.   Health or safety?
11       Q.   Uh-huh.
12       A.   I didn't know exactly what was going on
13  with him health-wise.  I was under the impression
14  that EMS cleared him to -- from the scene.  Standard
15  protocol for the jail would be for them to have a
16  jail nurse check on the inmate.
17       Q.   But you've got this trail of blood here,
18  okay?
19       A.   Correct.
20       Q.   And so at this point in time you weren't
21  concerned about his safety?
22       A.   With that amount of blood?
23       Q.   Yeah.
24       A.   No, Sir.
25       Q.   Okay.
```

```
 1   had custody of Mr. Ling.  It would be up to Brown, if
 2   he's already signed off on the intake, for them to
 3   get Mr. Ling medical treatment if he needed it.
 4         Q.   So that's not your job?
 5         A.   He's never under my custody, no.
 6         Q.   So it's not your job?
 7         A.   I'm not saying it's not my job to get
 8   him medical attention.  It's -- he's not in my
 9   custody.  I can't just go over and move an inmate
10   from the jail to go take them to a medical facility
11   or get medical treatment without either a supervisor
12   telling me to do so or some sort of orders.
13         Q.   Well, I understand that, but don't you
14   have a responsibility as a human being, if you see
15   somebody that is, that is in this kind of condition
16   to say, doesn't he need medical treatment?
17         A.   Well, from my understanding the jail was
18   going to get him that.  Was going to get him that
19   though...
20         Q.   But you were wrong?
21         A.   Get him that.  I don't know from -- I
22   can't attest to anything I knew after this fact.
23         Q.   Well, let's, let's go here.  Were you
24   aware of all his injuries?
25         A.   Ah, no, Sir.
```

*Hicks Court Reporting* ● Sally Hicks ● P.O. Box 8323, Gray, TN 37615 ● 423-741-3366

Case 3:20-cv-00233-CEA-JEM   Document 112-5   Filed 10/17/23   Page 11 of 19
PageID #: 626

1  Q.  Okay.  I want you to assume that they
2  shattered his eye socket.
3  A.  Okay.
4  Q.  Broke his nose, broke his mouth, broke
5  his jaw and broke his shoulder.
6  A.  Okay.
7  Q.  That he had a traumatic brain injury.
8  A.  Okay.
9  Q.  Would you feel that he should be treated
10 by a doctor or a medical facility at that point in
11 time?
12 A.  Knowing those injuries, yes, Sir.
13 Q.  Okay.
14 A.  But at the time I hadn't witnessed
15 anything that would've caused some injuries as that.
16 Q.  Well, I mean, could -- what are -- are
17 you not concerned about somebody bleeding like that
18 in the floor?
19 A.  So that amount of blood, if he did in
20 fact have a busted nose, is not uncommon.
21 Q.  So a busted nose wasn't going to bother
22 you?
23 A.  Not as far as me taking him and getting
24 him medical treatment.  That would've been the
25 supervisor...

1  Q. Well, or suggesting. What I'm saying
2  don't you have a responsibility to suggest...?
3  A. To suggest? Brown's the supervisor.
4  Q. Okay. So not your job?
5  A. He outranks me. As far as medical
6  treatment it would've been up to him to get Mr. Ling
7  medical treatment.
8  Q. All right. Still resisting?
9  A. Doesn't appear to be.
10 Q. So it wouldn't occur to you at this
11 point in time that this particular gentleman needed
12 medical attention?
13 A. Again, from my understanding Brown was
14 going to be getting medical attention, and that the
15 jail had a nurse, if not there, at least on call.
16 Q. Okay. Well, were you aware that Brown
17 never got him any medical attention and put him in
18 the neg cell until 7 o'clock the next morning?
19 A. Not at the time, no, I was not aware.
20 Q. Would you have condoned that?
21 A. No, Sir.
22 Q. That would've been depriving him of
23 medical attention, wouldn't it?
24 A. Yes, Sir.
25 Q. Was, is it clear that he needed medical

1  A. Possibly at booking, or at the bathroom,
2  one,...
3  Q. Okay.
4  A. ...I'd venture to guess.
5  Q. Does he appear to be unsteady on his
6  feet there? Nobody -- there's just one person
7  holding him up.
8  A. Yeah, it looks like he's...
9  Q. About fell, didn't he?
10 A. Yeah, but he was held up by the other
11 officer though.
12 Q. Pardon?
13 A. Looks like the other officer was holding
14 him up.
15 Q. Do you think that at that point in time
16 he needed medical attention?
17 A. At that point in time?
18 Q. Yeah.
19 A. Like I said, from the get-go I presumed
20 the understanding that the nurse jail (sic) would be
21 checking him out, and it would be determined what was
22 wrong with him at that point in time.
23 Q. But did -- do you as an officer feel
24 that he needed medical attention at that point in
25 time?

1  A. Yes, Sir, and I was under the
2  understanding that he was going to get that medical
3  attention.
4  Q. Right.
5  A. This just jumped forward quite a bit,
6  did it not?
7  Q. Yeah.
8  A. Okay.
9  Q. Are you in here?
10 A. Yes, Sir.
11 Q. I don't think we need to watch the rest
12 of that.
13 (PLAYING OF VIDEO CEASES)
14 Q. So after he left the intake room...?
15 A. Uh-huh (affirmative).
16 Q. ...you and a couple of others took him
17 to the shower, right?
18 A. Yes, to decontaminate the pepper spray.
19 Q. Okay. And there's no cameras in the
20 shower, are there?
21 A. Correct.
22 Q. And you and Joshua Miller and Standridge
23 took him to the shower, right?
24 A. Correct.
25 Q. All right. And you said that before

```
 1    taking him to the shower that he needed medical
 2    attention, didn't you?
 3         A.   Yes, I was understanding the jail would
 4    be getting him medical attention.
 5         Q.   Okay.  And you told the TBI agent that
 6    you hit him in the back with an open palm while he
 7    was in the shower.
 8         A.   To force him to the ground once he
 9    started, I believe he was spitting on another
10    officer.
11         Q.   Okay.  And if Joshua Williams (sic) said
12    that you hit him in the back with a fist three times,
13    he's wrong?
14         A.   I used that open palm.
15         Q.   So if Joshua Williams (sic) said that
16    you hit him in the back with a fist three times he's
17    wrong?
18         A.   I'm not sure of a Joshua Williams.  Are
19    you referring to Miller?
20         Q.   I'm sorry.  Yeah, Joshua Miller.
21         A.   Yes, Sir.  I used an open palm.
22         Q.   Okay.  So did you hit him three times?
23         A.   Don't recall hitting him three times.  I
24    believe it was once.
25         Q.   Could've been three?
```

```
 1   mask in and applied it to Mr. Ling."
 2        A.   Yes, Sir.
 3        Q.   "I believe he was handcuffed during this
 4   time because they didn't take the handcuffs off until
 5   he came out of the shower."
 6        A.   Be correct.
 7        Q.   All right.  So you hit him with him
 8   handcuffed behind his back, right?
 9        A.   With an open palm to force him to the
10   ground to regain conformance.
11        Q.   Uh-huh.  And you, didn't you tell me a
12   minute ago that it's never appropriate to hit
13   somebody when they're, when they're handcuffed behind
14   their back?
15        A.   With a rib strike?
16        Q.   Pardon?
17        A.   With a rib strike?
18        Q.   Any kind.  I mean, do you think it's
19   ever appropriate to hit anybody...
20        A.   There are compliance strikes that we are
21   taught.  Yes, Sir.
22        Q.   Okay.  So you think it's appropriate to
23   do that?
24        A.   With compliance strikes that are taught
25   through our defense tactics training, yes, Sir.
```

Hicks Court Reporting ● Sally Hicks ● P.O. Box 8323, Gray, TN 37615 ● 423-741-3366
Case 3:20-cv-00233-CEA-JEM   Document 112-5   Filed 10/17/23   Page 17 of 19
PageID #: 632

1  Q. Okay.
2  A. Can I get some water?
3  Q. Yeah, if you want to take a break just a
4  second, I'm about finished. I just need to look at a
5  couple little things.
6  (OFF THE RECORD)
7  COURT REPORTER: We are back on the record.
8  CONTINUING, DIRECT EXAMINATION BY MR. SEATON:
9  Q. You said to the TBI agent, "I believe I
10 walked with Mr. Ling as he was placed into the neg
11 cell. After that I didn't deal with him anymore."
12 True?
13 A. I feel like it, yes, Sir.
14 Q. Okay. And so as you assisted putting
15 him in the neg cell,...?
16 A. Uh-huh (affirmative).
17 Q. ...where was the nurse?
18 A. I couldn't answer that one.
19 Q. Well, where was the medical treatment
20 that you said that you assumed was going to occur?
21 A. It's up to the jail staff to call. They
22 have a nursing office down near the, pardon me, male
23 housing side...
24 Q. Well, did you...?
25 A. ...of the facility.

```
 1        Q.   When you're putting him in the neg cell
 2   were you putting him in there to, to be detained?
 3        A.   Yes, Sir, that's why you're in jail.
 4        Q.   So where, where or when was he going to
 5   get the medical treatment?
 6        A.   That's not for me to determine, Sir.
 7        Q.   Not your job?
 8        A.   Again, I was under the impression that
 9   he was going to be getting medical attention from the
10   jail.  I've seen numerous inmates placed in holding
11   cells, and then medical would get up there as soon as
12   they can.  That facility holds hundreds of inmates.
13        Q.   So was he in a serious condition when
14   you all put him in neg cell?
15        A.   I have no idea.
16        Q.   You have no idea?
17        A.   I'm not a medical professional.  I could
18   not tell you if he was in serious condition or if
19   it's minor condition or he was perfectly fine.
20        Q.   As an officer do you have a
21   responsibility to make certain that people are not in
22   a serious medical condition before you put them in a
23   cell?
24        A.   If he's under my custody,...
25        Q.   Yes.
```

Case 3:20-cv-00233-CEA-JEM   Document 112-5   Filed 10/17/23   Page 19 of 19
PageID #: 634