| | | |
|---|---|---|
| **NATHAN LING,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO. 3:20-cv-00233** |
| | ) | |
| **CAMPBELL COUNTY, TENNESSEE,** | ) | **Judge Atchley** |
| **et al.,** | ) | |
| | ) | **Magistrate Judge McCook** |
| **Defendants.** | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANTS' CAMPBELL COUNTY, TENNESSEE AND DAKOTA WILLIAMS' MOTION FOR SUMMARY JUDGMENT

Comes now the Plaintiff, by and through counsel, and files this memorandum of law in support of Plaintiff's response in opposition to Defendants Campbell County, Tennessee and Dakota Williams' Motion for Summary Judgment.[1]

## STATEMENT OF FACTS

On the morning of June 2, 2019, Nathan Ling was transported from the Campbell County Correctional Center to the emergency department at LaFollette Medical Center and then airlifted to the University of Tennessee Medical Center where he was diagnosed with a pneumothorax (collapsed lung); orbital fracture (bones surrounding the eye socket); maxillary fracture (bridge between the cranial base and the dental plate); nasal bone fracture; closed fracture of the greater tuberosity of the left humerus (prominent area of bone at the top of the humerus); and traumatic brain injury. (Affidavit of Greg Winston ¶ 5).

---

[1] Defense counsel also represents Sean Brown in both his official and individual capacities. See Docs. 20 and 32.

The chief deputy under the Sheriff stated that at the time the Campbell County Sheriff's department had training, supervision and culture issues. (Chief Deputy Goins Dep. p. 59). Campbell County Sheriff's Department provided medical care to inmates only from 6 am until 11 pm. After hours nurses were told to be available "on call". (Sheriff Goins Dep. p. 52; Willoughby, Dep. pp. 18-19). Corporal Sean Brown who was in charge of the Campbell County Jail on the evening of June 2, 2019, stated that when he would call the "on call" nurse the call always went to voicemail so he assumed that the line was not operational. Corporal Brown stated that had happened on at least three occasions before so he did not call the nurse the night about Mr. Ling's condition. (Corporal Brown Dep. p. 63-64). The personnel at the Campbell County Sheriff's Department received no training on assessing whether individual inmates or arrestees need to be hospitalized. (Sheriff Goins Dep. pp. 126-127). The personnel at the Campbell County Sheriff's Department received no training to recognize serious medical conditions or needs of inmates. (Chief Deputy Goins Dep. p. 61; Deputy Williams Dep. p. 65).

Although new hires were given the policy manual, they were not tested on the manual, and they only had to sign off that they had reviewed it. (Deputy Miller Dep. pp. 15-16). The Sheriff's Department provided no assistance or training with regard to their training manual in excess of 400 pages. (Deputy Crabtree Dep. p. 13). There was no training provided to the correction officers concerning the responsibility to intervene in the event another officer was abusing an inmate or arrestee. (Corporal Brown Dep. p. 69). Corporal Brown was not given any training on how to be a supervisor except for being given a stack of paperwork. (Corporal Brown Dep. p. 20). The Sheriff's Department did not provide any training to new hires on the use of excessive force. (Corporal Brown Dep. p. 29; Deputy Miller Dep. pp. 16-17). The Sheriff's Department did not provide any training on how to handle a combative detainee or a situation

similar to the incident involving the plaintiff. (Corporal Brown Dep. pp. 100-101; Deputy Standridge Dep. p. 49).

Deputy Joshua Miller testified that Campbell County had a strict requirement that correctional officers not go around their chain of command. (Deputy Miller Dep. pp. 24-25). Correctional officers were not trained on seeking medical care for injured inmates, but were trained to report what they observed to their direct supervisor. (Deputy Miller Dep. pp. 24-25). Corporal Brown testified that detainees often were not taken to the hospital even if their "hand swelled up" or "they've lost all mobility in their arm". (Corporal Brown Dep. p. 62).

Sheriff Goins admitted that "it look[ed] to be" that a culture of violence existed in the Cambpell County Sheriff's Department towards combative detainees. (Sheriff Goins Dep. p. 138). Deputy Miller testified that a culture existed of not reporting the bad conduct of fellow officers due to the fear of being called a "blue falcon" and a snitch. (Deputy Miller Dep. pp. 53-54). Deputy Miller testified that officers such as Deputy Fox and Corporal Brown "loved having uses of force. Loved it." Deputy Miller further testified that they made a game out of use of force and bragged about being in use of force situations. (Deputy Miller Dep. pp. 73-74).

**The Incident – June 1 and 2, 2019**

Nathan Ling, a resident of Michigan, was arrested and charged with evading arrest on June 1, 2019. The underlying arrest was made based on a call from a citizen's 911 report of a suspicious vehicle in the area of Wildwood Circle in LaFollette, Tennessee. Mr. Ling attempted to flee, but arrested soon thereafter. (Deputy Crabtree Dep. p. 34). After being cleared by EMS personnel, Mr. Ling was handcuffed with his hands behind his back, and transported to jail by Deputy Justin Crabtree. (Deputy Crabtree Dep. p. 30). Upon arrival at the Campbell County Correctional Center, Deputy Crabtree removed Mr. Ling from the back seat of his cruiser and

then threw him aggressively toward the floor of the sally port. (Deputy Crabtree Dep. p. 37).

Deputy Crabtree shoved Mr. Ling against the wall and door at the jail's entrance before entering the jail's intake area. (Deputy Crabtree Dep. p. 38). Deputy Crabtree placed one hand on Mr. Ling's left arm and one behind his neck, and then slammed Mr. Ling's head against the counter and metal window frame. (Deputy Crabtree Dep. p. 38; Sheriff Goins Dep. pp. 62-63). When Mr. Ling attempted to raise himself up, Deputies Crabtree and Miller and Corporal Brown slammed Mr. Ling to the floor. (Deputy Miller Dep. pp. 65-66). While Mr. Ling was handcuffed and restrained on the floor, Deputy Crabtree proceeded to strike Mr. Ling in the face two times. As a result of these blows, Mr. Ling's nose began to bleed profusely onto the floor. (Deputy Crabtree Dep. pp. 40-42). Miller and Brown and Deputy Dakota Williams then joined in with Deputy Crabtree in keeping Mr. Ling pinned against the floor. (Deputy Miller Dep. p. 31). Corporal Brown and Deputy Williams struck Mr. Ling as he lay restrained on the floor. (Deputy Williams Dep. p. 34, 40-41). A spit mask was placed over Mr. Ling's head. (Corporal Brown Dep. p. 80). Deputy Crabtree took a photograph of Mr. Ling in this degrading and emasculating position. (Deputy Crabtree Dep. p. 51).

After approximately 15 minutes, Mr. Ling was taken from the intake room to the decontamination and shower area. (Deputy Standridge Dep. pp. 36-37). While in the shower area, Mr. Ling was calm. (Deputy Miller Dep. p. 46). Deputies Miller and Standridge removed the spit mask from Mr. Ling's head and attempted to wash his face. (Deputy Miller Dep. p. 46). When Corporal Brown saw that the spit mask had been removed, he became angry and ordered the spit mask to be put back on Mr. Ling's head. (Deputy Miller Dep. p. 46). While the officers attempted to put the spit mask back on to Mr. Ling, Deputy Dakota Williams struck Mr. Ling three times in the lower back. (Deputy Miller Dep. pp. 46-47).

Corporal Brown ordered Mr. Ling to be placed alone in the negative pressure cell. (Corporal Brown Dep. p. 92). Sheriff Goins testified that the only purpose for putting Mr. Ling in the negative pressure cell was for "punishment." (Sheriff Goins Dep. p. 117). Mr. Ling was finally freed from the handcuffs when he was placed alone in the negative pressure cell. (Deputy Miller Dep. p. 49). Mr. Ling was left alone in the negative pressure cell, still wearing the spit mask, and alternated between states of motionless and lying in the fetal position. (Deputy Standridge Dep. p. 40). As Mr. Ling lay on the floor, he lost control of his bladder and urinated on himself. (Sheriff Goins Dep. p. 139). Deputy Standridge would open the cell door from time to time, but he only checked to make sure that Mr. Ling was still breathing. (Deputy Standridge Dep. p. 40). Mr. Ling was not provided with any medical care until approximately 7:14 a.m., when a nurse arrived at the facility. (Corporal Brown Dep. pp. 102-103).

Corporal Brown did not attempt to get the plaintiff medical care because he was not trained to do so, and he was not aware of a policy requiring it. (Corporal Brown Dep. pp. 60-62). Upon hearing about the incident, Deputy Crabtree's supervisor Sargeant Owens sent Crabtree the following text message: "Fuck that guy. Play stupid gaems win stupid prizes. Welcome to TN!" (Sheriff Goins Dep. pp. 106-107). Corporal Brown reviewed the incident reports and ordered deputies Miller and Standridge to make changes to their reports. (Deputy Miller Dep. pp. 63-68; Deputy Standridge Dep. p. 51).

## LAW AND ARGUMENT

### I. STANDARD OF REVIEW

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(a). When considering a motion for summary judgment, the Court must construe the evidence

and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). The Court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Where "a party fails to support an assertion of fact or fails to properly address another party's assertion of fact," the Court may treat the fact as undisputed. *Fed. R. Civ. P.* 56(e)(2). A fact is "material" if the underlying substantive law identifies the fact as critical. Anderson, 477 U.S. at 248. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id*. A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id*. at 249.

II.     **DEFENDANT CAMPBELL COUNTY, TENNESSEE IS LIABLE TO PLAINTIFF FOR FAILING TO TRAIN THEIR OFFICERS AND MAINTAINING AN UNCONSTITUTIONAL CUSTOM OF NOT PROVIDING MEDICAL CARE TO INJURED DETAINEES**

The United States Supreme Court has determined that when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [complained of] injury [,]" municipalities and other local governments are considered a "person" for purposes of § 1983. *Monell v. New York City Dept. of Social Serv.*, 436 U.S. 658, 694 (1978). "Under § 1983, local governments are responsible only for their own illegal acts" and may not be held vicariously liable for the actions of their employees. *D' Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014) (quoting *Connick v. Thompson*, 563 U.S. 51, 60 (2011)).

A plaintiff who seeks to impose liability on local governments under § 1983 must prove that an action pursuant to an official policy or custom caused their injury. *Monell*, 436 U.S. at 691. "[T]he official policy must be 'the moving force of the constitutional violation' in order to establish the liability of a government body," *Polk Cnty. v. Dodson*, 454 U.S. 312, 326 (1981) (quoting *Monell*, 436 U.S. at 694), and that body may be held liable only for constitutional violations resulting from its official policy. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 n. 6, (1986) (citations omitted). Official municipal policy includes the decisions of a government's lawmakers or the acts of its policymaking officials. *Id*. at 480 - 481. A local government's "policies" are "decisions of its duly constituted legislative body or those officials whose acts may fairly be said to be those of the municipality," *Bd. Of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403-04 (1997), while a "custom" is a practice that, while not formally approved, "may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Id*. at 404. A custom can be one of action or inaction and need not be formally approved by the entity. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). A plaintiff is required to "identify the policy, connect the policy to the municipality itself, and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993).

In this case, the plaintiff is not making a claim that Campbell County, Tennessee maintained unconstitutional written policies. Rather, the plaintiff's claims are that Campbell County (1) failed to properly train its officers, and (2) maintained unconstitutional customs.

### A. FAILURE TO TRAIN OFFICERS

Campbell County failed to train its officers on (1) the constitutional limits on the use of force against detainees, (2) the duty to intervene in a fellow officer's use of excessive or

unreasonable force, and (3) the requirement that injured detainees be given medical care.

"[A] local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick*, 563 U.S. at 61. To succeed on a failure to train or supervise claim, a plaintiff must prove: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury. *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).

A recently decided case that is on point is *Jenkins v. Obion Cnty.*, No. 20-cv-01056-STA-atc, 2022 U.S. Dist. LEXIS 191596 (W.D. Tenn. 2022). In *Jenkins*, officers in the Obion County jail placed a recently arrested detainee in a restraint chair after he became combative. *Id*. at *8-10. Shortly after placing the detainee alone in a cell, the detainee stopped breathing and died from delirium due to methamphetamine toxicity." *Id*. at *11-12. Chief United States District Judge S. Thomas Anderson denied Obion County's motion for summary judgment after finding that it failed to adequately trained its officers in the use of force based in large part on the testimony of two officers that they could not recall receiving training on the use of force against detainees. *Id*. at *24. The *Jenkins* Court further determined that issues of fact existed as to whether the officers were properly trained on providing medical care to inmates who were subjected to excessive force. In so finding, the Court stated:

> The testimony of the officers and Sheriff Jackson, as well as the testimony of Plaintiff's experts, could lead the jury to find that Defendant County failed to train its officers in the provision of necessary medical care for detainees and inmates and in the use of excessive force. Specifically, from Roscoe's testimony, as summarized above, the trier of fact could find that Defendant Obion County failed to adequately train its officers in how to identify mentally ill arrestees and provide for their medical care and/or those suffering from restraint-related asphyxia or suffocation and that failure was the "moving force" that resulted in Higgins's

death and the violation of his constitutional rights.

*Id*. at *26-27.

In this case, correctional officers received minimal training that consisted of being given the policy manual, four days of classroom training and then some on-the-job training. Although the new hires were given the policy manual, they were not tested on the manual, and they only had to sign off that they had reviewed it. As stated by Deputy Joshua Miller:

```
14        Q.      And did you sign a piece of paper saying
15   that you received it?
16        A.      Yes.
17        Q.      And did you read it?
18        A.      I skimmed over it and we went over a few
19   things when we were in that class.
20        Q.      Okay.
21        A.      But that was it. It was more like of a,
22   she picked a spot and then was like follow along, and
23   then -- but other than that, I did not.
24        Q.      Okay. So did anybody go over in detail
25   that policy and procedure manual with you?
1         A.      No, not in detail.
2         Q.      Did anybody ever question you to
3    determine whether or not you understood that policy
4    and procedure manual?
5         A.      No.
```

Joshua Miller Dep. pp. 15-16. The training at the supervisory level was less than minimal, as explained by Corporal Brown:

```
12        Q.      Okay. So any of the other training that
13   you got was just a coworker that just...?
14        A.      Just figuring it out.
15        Q.      Okay.
16        A.      Yeah. My supervisor training kind of
17   stemmed on here's a stack of papers. Just sign your
18   name and make sure they're in this order. And they
19   gave you, like a checklist. And they were like
20   that's pretty much it.
…..
11        Q.      Okay. And during, when they first
12   promoted you to corporal and left you in charge of
```

```
13      the jail, did you get any training?
14              A.      Like I said, it was more of a, hey,
15      here's a stack of papers, sign your name, make sure
16      they're in order.
17              Q.      Okay. That was your supervisor
18      training?
19              A.      Yes. Yes, yes.
```

(Corporal Brown Dep. pp. 20, 41).

<em><u>a.      Use of force against detainees.</u></em>

Campbell County did not train its officers on the limits on the use of force against

detainees.   The most senior officer at the time of the incident, Corporal Sean Brown, testified

that he did not remember receiving any training on use of excessive force. (Deputy Brown Dep.

p. 29).  As further explained by Corporal Brown, despite being the most senior official at the jail

during the incident with the plaintiff, he had no training or knowledge on how to handle a

combative inmate:

```
5               Q.      ....  But if there
6       had been no damage done, the escalation of the
7       incident wouldn't have mattered?
8               A.      Correct.
9               Q.      True?
10              A.      Correct. But when I'm 20, I'm not
11      thinking that way.
12              Q.      Okay.
13              A.      Like, everything that is there, I'm
14      thinking as a 20 year old, not knowing what I'm
15      doing, not having formal training, I don't know what
16      needs to be done, or how to do it, or what to look
17      for. So I was kinda stuck in a rock and a hard place
18      on, am I doing what I need to do.
....
3               Q.      Because the thought process that you had
4       then was, I'm afraid of what my supervisor's going to
5       say because this incident escalated.
6               A.      Right. It was my first escalated
7       incident, first combative incident...
8               Q.      Sure.
9               A.      ...that I hadn't had another corporal
```

|    |    |    |                                                        |
|----|----|----|--------------------------------------------------------|
| 10 |    |    | there who had done it, been through it, knew what to    |
| 11 |    |    | do, how to do it, you know, guiding me through. And     |
| 12 |    |    | so I was trying to be the corporal and do like my       |
| 13 |    |    | other corporals did. And trying to be the corporal      |
| 14 |    |    | that people are like, oh, yeah, you know, we'll go to   |
| 15 |    |    | Brown, you know, type thing.                            |
| 16 | Q. |    | But it wouldn't have mattered had he not                |
| 17 |    |    | been so injured?                                        |
| 18 | A. |    | Correct. And I know that now.                           |
| 19 | Q. |    | Uh-huh.                                                 |
| 20 | A. |    | I didn't then.                                          |
| 21 | Q. |    | Okay.                                                   |
| 22 | A. |    | That's what I'm getting at. I didn't                    |
| 23 |    |    | know that then.                                         |

(Corporal Brown Dep. pp. 100-101). Deputy Joshua Miller testified that he received no training

on use of force prior to the incident:

|    |    | |                                                   |
|----|----|-|---------------------------------------------------|
| 19 | Q. | | So the use of force section, you said             |
| 20 |    | | that you looked at it after the Ling incident?    |
| 21 | A. | | Yes.                                              |
| 22 | Q. | | Had you ever looked at it before?                 |
| 23 | A. | | I had not.                                         |
| 24 | Q. | | Okay. And had you ever had any training           |
| 25 |    | | on use of force at all?                           |
| 1  | A. | | Did not.                                          |
| 2  | Q. | | Okay. Had you ever had any training on            |
| 3  |    | | combative individuals?                            |
| 4  | A. | | No.                                               |

(Deputy Miller Dep. pp. 16-17). Deputy Alexander Standridge testified that the training was

inadequate and he was not prepared to handle the situation:

|    |     | |                                               |
|----|-----|-|-----------------------------------------------|
| 14 | Q.  | | So how would you prevent that? How            |
| 15 |     | | would you keep this from happening again?     |
| ….. |   | |                                               |
| 22 | A….. | | This type of scenario,                       |
| 23 |     | | from my training personally, I was never prepared to |
| 24 |     | | properly handle it or know what to do during it. |

(Alexander Standridge Dep. p. 49).

> _b._      _The duty to intervene in a fellow officer's use of excessive or unreasonable force._

Campbell County did not train its officers to intervene if a fellow officer used excessive or unreasonable force against a detainee. At the time, there was no written policy to train and instruct new hires to intervene if they witnessed excessive or unreasonable force. Sheriff Robert Goins testified that at the time, the only thing an officer should have done would be to report the behavior to a supervisor:

```
14        Q.     So have you -- you know, my question was,
15     what is the responsibility of the other officers if
16     they see an officer...?
17        A.     To report that.
18        Q.     Okay. To report that to whom?
19        A.     To their supervisor, to me.
```

(Sheriff Goins Dep. at p. 60). Corporal Brown confirmed that no training was provided to jail staff to intervene if they witnessed excessive or unreasonable force:

```
14        Q.     Were you ever trained to intervene in
15     the event that another officer was using excessive
16     force?
17        A.     No.
```

(Sean Brown Dep. at p. 69). Correctional officers did not know how to act in this situation because they received no training on what to do. Furthermore, because Sean Brown was the corporal on duty that night, the correctional officers were to report any incident directly to Sean Brown. Deputy Miller testified that the correctional officers felt that they were not allowed to go outside of their chain of command:

```
2        Q.     And your supervisor was Sean Brown?
3        A.     Yes.
4        Q.     How strict, we went over this chain of
5     command with you a second ago about there being Sean
6     Brown, then the Sergeant Catie Wilson, Lieutenant
7     Mallory Campbell and then the Captain Stoney Love.
8     How strict was that chain of command?
9        A.     It was pretty strict. I...
10        Q.     So you couldn't go above Sean Brown?
11        A.     No.
```

```
12          Q.      Okay.
13          A.      Normally, there especially, I remember
14   multiple occasions I had tried to just talk to the
15   sergeant or something. They would -- their response
16   was, did you talk to your corporal.
17          Q.      Okay.
18          A.      And I would be like no, or yes, and they
19   was like, well, you need to talk to them.
```

(Joshua Miller Dep. at p. 24).

<u>c.      *The requirement that injured detainees be given medical care.*</u>

Campbell County did not train its officers to ensure that injured detainees were given

medical care. According to Corporal Brown:

```
4           Q.      Okay. Do you think that Nathan Ling had
5    a serious medical condition?
6           A.      At the time, I did not.
7           Q.      Okay. At what time?
8           A.      When Justin had hit him in the nose I
9    did not.
10          Q.      Uh-huh.
11          A.      So at that jail, and this is totally
12   unrelated, but I've seen people where they've been in
13   fights and they've cut their hand, and it's swelled
14   up like this...
15          Q.      Uh-huh.
16          A.      ...and they won't take them to the
17   hospital.
18          Q.      Uh-huh.
19          A.      And so with that information in the back
20   of my mind, it's like, okay, he's got a broke nose,
21   like, that's all I thought he had at the time. It
22   was -- that's the only place I saw him hit. And so
23   it's like, okay, it's not life or death, it's not
24   this or that. It can wait until the morning when
25   there's more people here that if he does become
1    combative, we can control him in a better way.
....
6           Q.      Okay. The blood wasn't an indicator for
7    you?
8           A.      I just thought it was from the nose, is
9    really, like I thought he had broke his nose.
10          Q.      Did you examine him?
```

```
11            A.      No. I didn't know what to look for,
12     or...
13            Q.      Sure.
14            A.      You know, I just thought it was a broke
15     nose. Like, we didn't have medical staff on shift,
16     and so it wasn't like I could be like, hey, we need
17     medical here. And again, I've seen people, their
18     hand swelled up, they're not going to the hospital,
19     they've lost all mobility in their arm over it. Why
20     am I calling an ambulance when they're not even
21     sending them for that, you know.
```

(Sean Brown Dep. at pp. 60-62).  Ultimately, Sean Brown testified that his failure to seek

medical attention was the lack of training on what to do in this situation:

```
13            A.      Like, everything that is there, I'm
14     thinking as a 20 year old, not knowing what I'm
15     doing, not having formal training, I don't know what
16     needs to be done, or how to do it, or what to look
17     for. So I was kinda stuck in a rock and a hard place
18     on, am I doing what I need to do.
```

(Corporal Brown Dep. p. 100).  Deputy Miller testified that when a nurse was not at the jail, the

proper action was to report to a supervisor:

```
4             Q.      Okay. And what training did you receive
5      on when you -- well, what did they tell you to do if
6      you didn't have a nurse?
7             A.      Report it to the supervisor, and then
8      they would use their discretion to contact a nurse or
9      send them to the hospital.
```

(Deputy Miller Dep. p. 24).  Deputy Alexander Standridge testified that after Ling was beaten,

there was no discussion about seeking medical care because he did not know if he could:

```
9             Q.      So there's no discussion about getting
10     him medical help?
11            A.      No, Sir.
12            Q.      Was he clearly in need of medical help?
13            A.      Yes, Sir.
14            Q.      Were they hoping he was going to lay
15     down in that cell and die?
17            A.      I'm unsure on that. Every so often, one
```

```
18      of us would peek in and check on him. He never left
19      that final position, after the shower when we laid
20      him into the cell in the fetal position, he never
21      moved.
22          Q.    All night?
23          A.    All night. There was a few times I
24      opened the cell to make sure he was breathing. I
25      wasn't really sure if I could do anything else.
```

(Deputy Standridge Dep. p. 40).

Similar to the case in *Jenkins*, the failure to train on use of force, the duty to intervene, and the requirement to provide medical care to injured detainees will be reasonably found by the jury to be the "moving force" as to why this incident occurred.   It is clearly apparent that these officers such as Miller and Standridge would have intervened and sought medical care if they had been trained to do so.   However, no training was ever provided.   That is the "moving force" for why this incident happened.

**B.    DEFENDANT CAMPBELL COUNTY'S FAILURE TO ADEQUATELY TRAIN THEIR OFFICERS WAS THE RESULT OF DELIBERATE INDIFFERENCE**

Based on the evidence, a reasonable jury could find that the failure to train the officers was the result of Cambell County's deliberate indifference.  In *Connick v. Thompson*, 563 U.S. 51, (2011)), the Supreme Court explained when a municipality's actions amount to deliberate indifference:

> In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. A municipality's culpability for a deprivation of rights is at its most tenuous [when] a claim turns on a failure to train. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 822-823, (1985) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in Monell"). To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Canton v. Harris*, 489 U.S. 378, 388 (1989). Only then "can such a shortcoming be properly thought of

as a city 'policy or custom' that is actionable under § 1983." *Id*. at 389.

*Id*. at 61.

To prove deliberate indifference, a plaintiff ordinarily must "show prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Savoie v. Martin*, 673 F.3d 488, 495 (6th Cir. 2012) (citation omitted). "Alternatively, [a] plaintiff[ ] could show deliberate indifference through evidence of a single violation of federal rights, accompanied by a showing that the [entity] had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." *Campbell v. City of Springboro, Ohio*, 700 F.3d 779, 794 (6th Cir. 2012) (citing *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008).

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers ... can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Canton*, 489 U.S. at 390.

Looking at the district court's analysis in *Jenkins v. Obion Cnty.*, the Court found that this single instance of a constitutional violation of not providing medical care to a detainee was sufficient to deny Obion County's motion for summary judgment.   As stated by the Court:

> The Court finds that there is evidence in the record which, if believed by the trier of fact, shows "a likelihood that the situation would recur" — in this case "the situation" being both the need for staff to recognize emergency conditions and to secure medical care for detainees in need and the need for an officer to subdue a detainee. The jury could find that the "need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, [that] the policymakers of the [County] can reasonably be said to have been deliberately indifferent to the need." Canton, 489 U.S. at 390.

If the jury finds in favor of Plaintiff on the cause of Higgins's death, the jury could further find that Spaulding's lack of training as to the constitutional limits of force needed to subdue an inmate was a moving force behind Higgins's death. The jury could also find that, had Brogglin and Sanford been trained as to when to intervene as a fellow officer is using excessive force, Higgins's death would not have occurred. The jury could also find that Defendant Officers' alleged inadequate training as to when to call for emergency medical services was a moving force behind Higgins's death. That is, the jury could find that proper training would have prevented Higgins's death and that the County "could reasonably foresee that [its] employee's wrongful act would follow from the lack of training." *Gambrel v. Knox Cnty., Kentucky*, 25 F.4th 391, 409 (6th Cir. 2022) (citation omitted).

*Jenkins* at \*31-32.

In the case at bar, Plaintiff does not have evidence of Campbell County engaging in a long history of civil rights violations. However, this single instance is sufficient for Campbell County to be found by the jury to have been deliberately indifferent. Stating the holding of *Jenkins* differently to apply to this case: If the jury finds in favor of Plaintiff on the cause of Ling's serious injuries, the jury could further find that the officers lack of training as to the constitutional limits of force needed to subdue an inmate was a moving force behind Ling's injuries. The jury could also find that had the officers been trained as to when to intervene as a fellow officer is using excessive force, Ling's injuries would not have occurred. The jury could also find that Defendant Officers' inadequate training as to when to call for emergency medical services was a moving force behind the worsening and permanency of Ling's injuries. That is, the jury could find that proper training would have prevented Ling's injuries and that Campbell County "could reasonably foresee that [its] employee's wrongful act would follow from the lack of training." *Gambrel*, 25 F.4th at 409.

### C. UNCONSTITUTIONAL CUSTOM OF NOT ENSURING COMPLIANCE WITH WRITTEN POLICY OF REQUIRING THAT MEDICAL ATTENTION BE MADE AVAILABLE TO INJURED DETAINEES BECAUSE THERE EXISTED A CULTURE OF VIOLENCE.

As admitted by Sheriff Robert Goins, the evidence in this case shows that a culture of violence existed in Campbell County towards detainees that were considered "combative." This culture of violence led to the custom of failing to comply with written policies that required that medical attention be made available to injured detainees.

A municipality can be shown to have a "custom" causing constitutional violations only if the plaintiff offers proof of a policymaking officials' knowledge and acquiescence to the established practice. *Monell*, 436 U.S. at 690-691. It is only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id*. at 694. District courts in this Circuit have determined that when the sheriff approves of the excessive force by officers, that is sufficient to establish knowledge and acquiescence. *See Jenkins*, No. 20-cv-01056-STA-atc, (W.D. Tenn. 2022).

Here, Sheriff Goins acquiesced and approved of the excessive force used by Defendant Dakota Williams:

```
11          Q.      Okay. I recall you saying something to
12    the effect that he felt that the use or that the
13    force was reasonable under the circumstances.
14          A.      And like with -- I'm thinking what he was
15    talking about was like what Dakota did. You know,
16    I'm talking, he thought that holding the legs down
17    and things like that were justifiable.
```

(Sheriff Goins Dep. at p. 79). The Sixth Circuit Court of Appeals has long recognized that "striking a neutralized suspect who is secured by handcuffs is objectively unreasonable." *Schreiber v. Moe*, 596 F.3d 323, 332 (6th Cir. 2010). Defendant Williams struck the plaintiff at least once in the booking area and then three more times in the shower. The sheriff's testimony that the defendant's conduct was justifiable sufficiently meets the burden of showing that a

policymaking official had knowledge and acquiesced to this excessive force.

Additionally, the leadership of the Campbell County jail were aware that they did not provide 24-hour nursing, and they were further aware that they did not provide any training to their staff to recognize when detainees had serious medical conditions. Sheriff Goins testified that Campbell County did not provide 24-hour medical care. (Sheriff Goins Dep. at p. 52). Nurse Willoughby testified that Campbell County Sheriff's Department provided medical care to inmates only from 6 am until 11 pm. After hours nurses were told to be available "on call." (Willoughby Dep. at pp. 18-19). Sheriff Goins admitted that the jail staff received no training on assessing whether detainees and inmates needed to be taken to the hospital. (Sheriff Goins Dep. at pp. 126-127). The chief deputy, Jeremy Goins, testified that he did not know if jail personnel received any trained to recognize serious medical conditions or needs of inmates. (Chief Deputy Goins Dep. at p. 61). Defendant Deputy Williams confirmed that he never received any training to recognize when an inmate had a serious medical condition. (Williams Dep. at p. 65). Despite Campbell County having a policy of having a nurse "on call" after hours, Corporal Brown said that they never answered his calls, and he simply chose not to call them on the night of the Ling incident because he assumed the line was not operational:

```
1          Q.     Allison Willoughby was the nurse, right?
2          A.     That came in, correct.
….
9          Q.     And in her deposition, she said that she
10    was on call for 24/7, on call 24/7. Were you never
11    told that?
12         A.     I don't know about that. I know we had
13    an on-call nurse.
14         Q.     Okay.
15         A.     But every time that I had contacted or
16    tried to contact them in the past, they never
17    answered, it just went to a voicemail. And so I just
18    naturally assumed that that line was not operational.
19         Q.     And on how many occasions do you think
```

```
20      that you had called a nurse before when they wouldn't
21      respond to you?
….
24              A.      Three prior to that.
25              Q.      So based upon the fact that three times
1       before you'd never gotten a response, you decided not
2       to call any nurse that night?
3               A.      Correct.
4               Q.      On June the 2nd?
5               A.      Correct.
6               Q.      You didn't feel like it would do any
7       good?
8               A.      Correct. I didn't think that it would
9       get any contact from anybody. And you know, it's a
10      broke nose, or at least that's what I thought at the
11      time.
```

(Corporal Brown Dep. at pp. 63-64).  Corporal Brown also confirmed that inmates often did not

receive medical care:

```
4               A.      You know, I just thought it was a broke
15      nose. Like, we didn't have medical staff on shift,
16      and so it wasn't like I could be like, hey, we need
17      medical here. And again, I've seen people, their
18      hand swelled up, they're not going to the hospital,
19      they've lost all mobility in their arm over it. Why
20      am I calling an ambulance when they're not even
21      sending them for that, you know.
```

(Sean Brown at p. 62).

Finally, a culture of violence had been allowed to develop against detainees who were

considered "combative."  Although Sheriff Goins denied knowing about it, the sheriff admitted

that "it looks to be" that this culture of violence existed at the time.  (Sheriff Goins Dep. at p.

138).  This culture of violence was revealed by the actions that occurred immediately after the

incident.   Upon hearing about the cruel beating that Mr. Ling endured, Justin Crabtree's

supervisor Sargeant Owens approval of Crabtree's actions, and sent him the following text

message: "Fuck that guy. Play stupid gaems win stupid prizes.  Welcome to TN!"  Additionally,

Deputies Miller and Standridge testified that Corporal Brown ordered them to make changes to their incident reports. (Miller Dep. at pp. 63-68; Standridge Dep. at p. 51).

For these reasons, the defendants' motion for summary judgment as to Campbell County's municipal liability should be denied.

## III. DEFENDANT DAKOTA WILLIAMS IS NOT ENTITLED TO QUALIFIED IMMUNITY.

Defendants argue that Deputy Dakota Williams is entitled to qualified immunity because even though he struck the plaintiff at least once in the booking area, and then multiple times in the shower, he did not "cause" an injury and he did not observe the uses of force by Justin Crabtree and Sean Brown. Defendants' arguments are meritless.

To determine whether qualified immunity is warranted, a court must first ask (1) whether the alleged facts, taken in a light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right; and (2) whether the constitutional right was clearly established in the specific context so that a reasonable official would understand that he is violating that right. *Saucier v. Katz*, 533 U.S. 194, 202, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). In assessing an excessive-force claim, a district court must construe all of the facts in the record in the light most favorable to the plaintiff. See *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004), cert. denied, 544 U.S. 975 (2005). After this is done, "the question whether the defendant's actions were objectively unreasonable is 'a pure question of law.'" *Chappell v. City of Cleveland*, 585 F.3d 901, 909 (6th Cir. 2009) (quoting *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007)). The Sixth Circuit has repeatedly held that "striking a neutralized suspect who is secured by handcuffs is objectively unreasonable." *Schreiber v. Moe*, 596 F.3d 323, 332 (6th Cir. 2010).

Here, the plaintiff had the established right to be free from excessive use of force. Each

instance of Defendant Williams using force in striking the plaintiff's leg or back was completely unnecessary. As shown by the video evidence, the defendant should have been intervening to protect the plaintiff from the excessive force of Defendants Crabtree and Brown; instead the defendant struck the plaintiff in the leg and failed to intervene. Deputy Miller testified that the plaintiff was calm in the shower area, and Defendant Williams struck him in the back three times while the plaintiff was bent over. The use of force during this time was objectively unreasonable. The defendant is not entitled to qualified immunity.

Defendant Dakota Williams in not entitled to qualified immunity because he failed to intervene to protect the plaintiff, and he further failed to ensure that the plaintiff was afforded medical attention. The Sixth Circuit Court of Appeals has consistently held that law enforcement officers can be held liable when another officer uses excessive force in their presence if they are aware of the excessive force and fail to intervene. *See Bunkley v. City of Detroit, Michigan*, 902 F.3d 552, 565 (6th Cir. 2018). "A police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997) (citing *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). "Generally the issue of whether an officer had sufficient time to intervene or was capable of preventing the harm is a question of fact for the jury unless, based on all the evidence, a reasonable jury could not possibly conclude otherwise." *Bunkley*, 902 F.3d at 566.

Here, the defendant observed and had reason to know that excessive force was being used, and he had the opportunity and means to prevent the harm from occurring. It must be pointed out that Defendant Williams also engaged in excessive force during this incident, so he

had the means and opportunity to prevent his own actions.  The duration that the plaintiff was in the booking area was 15 minutes, 11 seconds.  The defendant entered the intake area at 1 minute, 20 seconds.  At this time, the defendant could see the blood on Mr. Ling's face and on the floor.  At 2:30, the defendant was positioned next to Corporal Brown when Brown struck the plaintiff two times.  It is immediately after witnessing Corporal Brown strike the plaintiff two times that Defendant Williams struck the plaintiff in the leg. Defendant Williams was also present when Defendant Crabtree took the demeaning photograph of the plaintiff, which was then circulated with many jail staff and supervisors.  Defendant Williams stayed in the intake area until 13 minutes, 40 seconds.  At no time did the defendant try to invervene to protect the plaintiff.  After observing the plaintiff's condition for over ten minutes, including the plaintiff's difficulty walking and talking, the defendant continued to fail to intervene when excessive force was used in the shower area.  Despite testimony that the plaintiff was calm, the defendant did not intervene when Corporal Brown ordered that the spit mask be put back on the plaintiff's head.  Deputy Miller testified that it was during this time when Defendant Williams struck the plaintiff three times in the back.   Defendant Williams could have intervened at any time to prevent further abuse from occurring.  Most importantly, he could have prevented his own use of force from occurring.

Finally, Defendant Dakota Williams failed to ensure that the plaintiff was given medical attention.  It is well-settled that pretrial detainees have a right under the Fourteenth Amendment to adequate medical treatment. *See generally Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 (6th Cir. 2005).  On summary judgment, the Court must determine whether the plaintiff "has presented sufficient evidence for a reasonable jury to conclude that: (1) a reasonable officer (knowing what the particular jail official knew at the time of the incident) would have known

[the detainee] was suffering from a serious medical need that posed an excessive risk to [his or] her health; and (2) [the officers] knew that non-intervention would create an unjustifiably high risk of harm to [the detainee's] health and ignored that risk." *Trozzi v. Lake Cnty., Ohio*, 29 F.4th 745, 758 (6th Cir. 2022).

Here, it was obvious that the plaintiff was in desperate need of medical attention. The moment the defendant observed the plaintiff, he could clearly see that the plaintiff was bleeding profusely. Sheriff Goins testified that the plaintiff should have been taken to the hospital immediately after he was struck in the face. (Sheriff Goins Dep. at p. 98). Sheriff Goins agreed that it was "obvious" that the plaintiff needed immediate medical attention. *Id*. at 72. Instead, the defendant was complicit in leaving the plaintiff in the negative pressure cell alone for several hours without any medical attention. At no time did the defendant, or any of the other officers, discuss the possibility of the plaintiff needing medical treatment. (Standridge Dep. at 39-40). The fact is that the seriousness of the plaintiff's medical condition was obvious, it was obvious that non-intervention created an unjustifiably high risk of harm, and Defendant Williams ignored the risk. For these reasons, Defendant Dakota Williams is not entitled to qualified immunity.

IV.     **STATE LAW CLAIMS**

Pursuant to 28 U.S.C. § 1367(a), this Court is authorized to exercise supplemental jurisdiction over state law claims if the claims "are so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy." Therefore, this Court is authorized to retain jurisdiction over Plaintiff's state law claims.

<u>**CONCLUSION**</u>

For the foregoing reasons, Plaintiff respectfully requests that the Court enter an Order denying the defendants' Motion for Summary Judgment.

Respectfully submitted,

*/s/ Tony Seaton*
Tony Seaton, BPR #7279
Garza Law Firm
118 E. Watauga Ave.
Johnson City, TN 37601
Phone: (423) 282-1041
Fax:    (423) 282-0967
Email:  tseaton@garzalaw.com
Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of November, 2023, a copy of the foregoing was filed electronically using the Court's ECF system.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U. S. Mail.  Parties may access this filing through the Court's electronic filing system.

*/s/ Tony Seaton*
Counsel for Plaintiff