# EXHIBIT A

## *Jenkins v. Obion Cnty.*

United States District Court for the Western District of Tennessee, Eastern Division

October 20, 2022, Decided; October 20, 2022, Filed

No. 20-cv-01056-STA-atc

**Reporter**

2022 U.S. Dist. LEXIS 191596 *; 2022 WL 12029395

JENNIFER LOUISE JENKINS, Administrator ad Litem of the ESTATE OF STERLING L. HIGGINS, Plaintiff, v. OBION COUNTY, TENNESSEE; ROBERT THOMAS ORSBORNE, Individually; MARY BROGGLIN, Individually; WAYLON SPAULDING, Individually; and, BRENDON SANFORD, Individually, Defendants.

**Subsequent History:** Appeal dismissed by *Jenkins v. Obion Cnty., 2022 U.S. App. LEXIS 36898 (6th Cir., Dec. 16, 2022)*

**Prior History:** *Jenkins v. Obion Cty., 2020 U.S. Dist. LEXIS 177503, 2020 WL 5800754 (W.D. Tenn., Sept. 28, 2020)*

**Counsel:** **[*1]** For Jennifer Louise Jenkins, Administrator ad Litem of the | Estate of | Sterling L. Higgins, Estate Plaintiff: Edwin Budge, BUDGE & HEIPT PLLC, Seattle, WA USA; Erik Heipt, BUDGE & HEIPT PLLC, Seattle, WA USA; David L. Cooper, LAW OFFICE OF DAVID L. COOPER, P.C., Nashville, TN USA.

For Obion County, Tennessee, Defendant: James I. Pentecost, PENTECOST, GLENN & MAULDIN, PLLC, Jackson, TN USA; John D. Burleson, RAINEY KIZER REVIERE & BELL, Jackson, TN USA; Nathan Daniel Tilly, PENTECOST, GLENN & MAULDIN, PLLC, Jackson, TN USA.

For Robert Thomas Orsborne, Defendant: John D. Burleson, RAINEY KIZER REVIERE & BELL, Jackson, TN USA; Matthew Robert Courtner, RAINEY KIZER REVIERE & BELL, PLC - Jackson, Jackson, TN USA; Milton Dale Conder, Jr., RAINEY KIZER REVIERE & BELL, Jackson, TN USA; R. Dale Thomas, RAINEY KIZER REVIERE & BELL, PLC - Jackson, Jackson, TN USA.

For Mary Brogglin, Defendant: James I. Pentecost, PENTECOST, GLENN & MAULDIN, PLLC, Jackson, TN USA; John D. Burleson, RAINEY KIZER REVIERE & BELL, Jackson, TN USA; Nathan Daniel Tilly, PENTECOST, GLENN & MAULDIN, PLLC, Jackson, TN USA.

For Waylon Spaulding, Defendant: James I. Pentecost, PENTECOST, GLENN & MAULDIN, PLLC, Jackson, TN USA; **[*2]** John D. Burleson, RAINEY KIZER REVIERE & BELL, Jackson, TN USA; Nathan Daniel Tilly, PENTECOST, GLENN & MAULDIN, PLLC, Jackson, TN USA.

For Brendon Sanford, Defendant: James I. Pentecost, PENTECOST, GLENN & MAULDIN, PLLC, Jackson, TN USA; John D. Burleson, RAINEY KIZER REVIERE & BELL, Jackson, TN USA; Nathan Daniel Tilly, PENTECOST, GLENN & MAULDIN, PLLC, Jackson, TN USA.

**Judges:** S. THOMAS ANDERSON, CHIEF UNITED STATES DISTRICT JUDGE.

**Opinion by:** S. THOMAS ANDERSON

# Opinion

## ORDER PARTIALLY GRANTING AND PARTIALLY DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Jennifer Louise Jenkins has filed this action as the administrator ad litem of the Estate of Sterling L. Higgins ("the Decedent"). She alleges in her amended complaint (ECF No. 37) that Defendants Obion County, Tennessee, Union City, Tennessee, and their employees Robert Thomas Orsborne, Mary Brogglin,[1] Waylon Spaulding, and Brendon Sanford, in their individual capacities, violated the civil rights of the Decedent during his pretrial detention and subsequent death. Defendants Obion County, Brogglin, Spaulding, and Sanford have filed a motion for summary judgment.[2] (ECF No. 100.) Plaintiff has filed a response

---

[1] The Clerk of the Court is directed to change the spelling of Defendant's name on the docket sheet to "Mary Brogglin."

[2] The Court has received a notice of settlement as to

to the motion (ECF No. 109), and Defendants **[\*3]** have filed a reply to the response. (ECF No. 120.) For the reasons set forth below, Defendants' motion is **PARTIALLY GRANTED** and **PARTIALLY DENIED**.

After Defendants filed their motion for summary judgment, they filed a motion in limine to exclude the opinion of Plaintiff's expert, Michael Leonesio, an expert on generally accepted law enforcement practices. The motion in limine was referred to the Magistrate Judge for determination, and, on April 1, 2022, she entered an order partially granting and partially denying Defendants' motion. (ECF No. 135.) Neither party appealed that ruling. The parties have updated their filings after the ruling by the Magistrate Judge. (ECF Nos. 138, 140.)

In making its decision on the present motion, in accordance with the Magistrate Judge's decision, the Court will not consider Leonesio's testimony as to any legal conclusions on matters of law or legal standards, including legal mandates and whether something is "objectively reasonable" under the Constitution or case law, since whether Defendants' actions were reasonable is the ultimate issue. However, the Court will allow Leonesio to testify "to the prevailing law enforcement industry standards that may **[\*4]** have informed his ultimate conclusions" and "whether Defendants acted consistently with those standards" in accordance with the Magistrate Judge's decision. (Mag. J. Ord. pp. 8-9, ECF No. 135.) The Magistrate Judge also found that Leonesio should not be permitted to offer opinions that rely on specialized medical knowledge because he is not qualified "to offer medical opinions consistent with *Federal Rule of Evidence 702*" (*id.* p. 10), and the Court will adhere to this decision.

## Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. When deciding a motion for summary judgment, the Court must review all the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in favor of the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. The Court

"may not make credibility determinations or weigh the evidence." *Laster v. City of Kalamazoo, 746 F.3d 714, 726 (6th Cir. 2014)*.

When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some **[\*5]** "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*; *Eastham v. Chesapeake Appalachia, L.L.C., 754 F.3d 356, 360 (6th Cir. 2014)*. These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. The Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id. at 251-52*. The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex, 477 U.S. at 322*.

## Statement of Material Undisputed Facts

Pursuant to the Local Rules of this Court, Defendants have prepared a statement of material undisputed facts (ECF No. 100-2) "to assist the Court in ascertaining whether there are any material facts in dispute." *Local Rule 56.1(a)*. Plaintiff has responded to Defendants' statement and has attached her own statement of facts. (ECF No. 109-1.) Defendants have responded to Plaintiff's statement of facts. (ECF No. 121.) Additionally, both parties have submitted recordings of the **[\*6]** events of the night in question. (ECF Nos. 105, 111.)

A fact is material if it "might affect the outcome of the lawsuit under the governing substantive law." *Baynes v. Cleland, 799 F.3d 600, 607 (6th Cir. 2015)* (citing *Wiley v. United States, 20 F.3d 222, 224 (6th Cir. 1994)*, and *Anderson, 477 U.S. at 247-48*). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson, 477 U.S. at 248*. For purposes of summary judgment, a party asserting that a material fact is not genuinely in dispute must cite to particular parts of the materials in the record and show that the materials

---

Defendant Orsborne only.

fail to establish a genuine dispute or that the adverse party has failed to produce admissible evidence to support a fact. *Fed. R. Civ. P. 56(c)(1)*. Here, as the nonmoving party, Plaintiff must respond to Defendants' statement of fact "by either (1) agreeing that the fact is undisputed; (2) agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (3) demonstrating that the fact is disputed." *Local Rule 56.1(b)*. Additionally, Plaintiff may "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." *Fed. R. Civ. P. 56(c)(2)*.

If Plaintiff asserts that a genuine dispute of material fact exists, she must support her contention with a "specific **[*7]** citation to the record." *Local Rule 56.1(b)*. If a party fails to demonstrate that a fact is disputed or fails to address the opposing party's statement of facts properly, the Court will "consider the fact undisputed for purposes" of ruling on the motion. *Fed. R. Civ. P. 56(e)(2)*; *see also* *Local Rule 56.1(d)* ("Failure to respond to a moving party's statement of material facts, or a non-moving party's statement of additional facts, within the time periods provided by these rules shall indicate that the asserted facts are not disputed for purposes of summary judgment."). Under *Rule 56 of the Federal Rules of Civil Procedure*, the Court "need consider only the cited materials" but has discretion to "consider other materials in the record." *Fed. R. Civ. P. 56(c)(3)*. In the present case, both parties object to certain portions of the opposing party's statement of facts.

The Court finds that there is no genuine dispute as to the following material facts, unless otherwise noted.[3]

During the early morning hours on March 25, 2019, Officer Robert Orsborne of the Union City Police Department arrested Sterling Higgins at the Pockets Market in Union City, Tennessee. After he arrested Higgins, Orsborne transported Higgins in his vehicle to the Obion County Jail in Union City. They arrived at the Sally Port of the Jail shortly before **[*8]** 01:44:00 a.m. Correctional Officers Waylon Spaulding, Mary Brogglin, Brendon Sanford, and Stormy Travis[4] were working at the Jail at this time.

After Orsborne and Higgins exited Orsborne's vehicle,

Higgins ran around the Sally Port.[5] Higgins entered the Jail at approximately 1:45:46 a.m. Higgins entered the foyer of the Jail in handcuffs as Orsborne walked in behind him. Orsborne led Higgins from the foyer of the Jail to a door leading into a hallway in the booking area of the Jail. At the time Higgins entered the Jail, none of the correctional officers on shift knew the circumstances surrounding Higgins's arrest.

As Higgins entered the booking hallway, Brogglin directed him to walk down the hallway to the booking counter. Higgins did not comply with Brogglin's directive. Higgins started yelling, "That's her. She's got a gun!" Higgins grabbed Brogglin, and Brogglin pushed him away from her. Higgins, who remained handcuffed, then grabbed Brogglin by her hair.[6]

Spaulding approached Higgins as Higgins pulled Brogglin's hair and ordered Higgins to let go of her hair.[7] Sanford approached Spaulding and Higgins at approximately 01:46:51 a.m. Spaulding pulled Higgins off Brogglin. Higgins and Spaulding **[*9]** fell to the floor.[8] This occurred no later than 1:46:55 a.m. Higgins is seen on video moving his legs and "squirming."[9] During this time, Higgins was on his back and handcuffed, with Spaulding on top of him.

Because Higgins continued moving his legs, Sanford retrieved shackles to place on Higgins's legs. Brogglin, Sanford, and Orsborne placed the shackles on Higgins. However, Higgins continued kicking and "flailing around."[10] Orsborne stepped on Higgins's right leg.

---

[3] The facts are stated for the purpose of deciding this motion only.

[4] Officer Travis is not a party to the lawsuit.

[5] Plaintiff clarifies that Higgins "briefly" ran around the Sally Port. (Pl's Resp to Defs' St. of Mat. Fct. ¶ 5.)

[6] The parties disagree as to whether Higgins lunged at and then grabbed Brogglin by her jacket with his left hand (Defs' St. of Mat. Fct. ¶ 12) or whether he "briefly grasped" Brogglin's jacket with his left hand. (Pl's Resp at ¶ 12.)

[7] The parties dispute whether Higgins "pulled out a handful of hair out of Brogglin's scalp." (Pl's St. of Mat. Fct. ¶ 4; Defs' Resp. at ¶ 4.)

[8] Plaintiff contends that Higgins went to the ground after Orsborne performed "a knee strike with the goal of taking him down." (Pl's Resp. to Defs' St. of Mat. Fct. ¶ 9.)

[9] Defendants maintain that Higgins was trying to get away from Spaulding (Defs' St. of Mat. Fct. ¶¶ 22-25), while Plaintiff contends that Higgins moved his legs and "squirmed" as a result of being deprived of oxygen due to having Spaulding's hands around his neck. (Pl's Resp. at ¶ 25.)

[10] Plaintiff again responds that Higgins's leg movements were caused by a deprivation of oxygen. (Pl's Resp. to Defs' St. of

Orsborne weighed 247 pounds and had on fifteen to twenty pounds of police gear. By 1:49:05 a.m. Higgins's legs had been shackled together by Sanford, Brogglin, and Orsborne. Higgins was now handcuffed and leg-bound on his back on the floor of the jail. He remained handcuffed and leg-bound either by leg shackles or in the restraint chair from that point forward.

Higgins started spitting at Spaulding.[11] Spaulding ordered Higgins to stop spitting.[12] After Higgins began spitting, Brogglin left the hallway to look for a spit mask but was unable to find one. Spaulding placed his hands on Higgins's jaw area[13] and held Higgins's face away from him.[14] Spaulding asked Sanford to bring a cloth to wipe the spit off him. Sanford retrieved a cloth [*10] and returned to the scene at approximately 01:52:17 a.m. Subsequently, Higgins stopped moving.[15]

The decision was made to put Higgins in a restraint chair, and Brogglin retrieved the restraint chair. Spaulding and Sanford lifted Higgins off the floor and put him in the restraint chair, and Spaulding, Sanford, and Brogglin strapped him in. At 01:58:33.084 to 01:58:52.808 a.m., video shows some movement of Higgins's head as officers are strapping and tightening his body into the chair and manipulating the chair. It is unclear whether the movement was voluntary or involuntary.

At approximately 2:01:30, Orsborne performed a sternum rub[16] on Higgins and did not get a reaction from him.[17] Higgins was breathing in some manner while restrained in the restraint chair prior to entering Cell 15.[18]

Spaulding wheeled Higgins into Cell 15, a cell in the booking area, at approximately 02:01:48 a.m. Officers decided to place Higgins in Cell 15 because a camera was installed in there. From approximately 2:02:07 to 02:02:40 a.m., officers observed Higgins through the window of his cell. Higgins was alone in Cell 15 and strapped in the restraint chair. At approximately 2:03:20 a.m., Sanford peered into Higgins's [*11] cell door to check on him. Spaulding, Sanford, and Orsborne then entered Cell 15 and did not observe Higgins's chest expanding, nor were they able to detect a pulse.

Because they did not observe Higgins breathing, officers directed Brogglin to call for EMS. Subsequently, Brogglin called dispatch and requested that EMS be sent to the Jail. Orsborne called his supervisor, Sergeant Simmons, to inform him that Higgins appeared to be nonresponsive and to ask whether he should call for an ambulance. Orsborne called dispatch and requested that EMS be sent to the Jail. After both Orsborne and Brogglin called for EMS, Spaulding

---

[11] Plaintiff claims that, at most, Higgins spat at Spaulding twice and within a minute of being taken to the floor by Spaulding. (Pl's Resp. to Defs' St. of Mat. Fct. ¶ 32.)

[12] Plaintiff contends that Spaulding gave Higgins an "ultimatum" and said "dude, do not do that again" and "you will regret it" if you do it again. (Pl's Resp. to Defs' St. of Mat. Fct. ¶ 33. Defendants deny that Spaulding told Higgins that he was going "to regret it" or that he gave Higgins an "ultimatum. (Defs' Resp. to Pl's St. of Mat. Fct. ¶ 11.)

[13] The parties dispute at what time Spaulding's hands first made contact with Higgins' jaw area. Defendants contend it was at 01:48:36 a.m. (Defs' St. of Mat. Fct. ¶ 37) while Plaintiff states it was at 1:48:49 a.m. (Pl's Resp to ¶ 37.) They also disagree as to the length of time Spaulding had his hands on Higgins's jaw area. (Defs' St. of Mat. Fct. ¶ 38; Pl's Resp. to ¶ 38), and whether Spaulding ever grabbed Higgins's neck and/or throat. (Pl's St. of Mat. Fct. ¶ 28; Defs' Resp. to ¶ 28.) The parties dispute whether Spaulding had his hands around Higgins's throat and/or neck and placed pressure on those body parts at any time. (Pl's St. of Mat. Fct. ¶ 15; Defs' Resp. at ¶ 15.)

[14] Plaintiff describes this as "hyperextend[ing] his head and neck, and forc[ing] his mouth shut." (Pl's Resp. to Defs' St. of Mat. Fct. ¶ 36.)

[15] The parties dispute why Higgins quit moving and at what time he stopped moving voluntarily. (Pl's St. of Mat. Fct. ¶¶ 31-33; Defs' Resp. to ¶¶ 31-33); (Defs' St. of Mat. Fct. ¶ 90; Pl's Resp. to ¶ 90.)

[16] For the purpose of deciding this motion, the Court has defined a "sternum rub" as "consist[ing] of using the knuckles to cause a degree of pain at the subject's sternum area by a vigorous and forceful rubbing of that area with the knuckles. It causes pain at a level that is calculated to determine whether the subject is conscious or can be brought to consciousness." *See* Ashford v. Brady, 2011 U.S. Dist. LEXIS 49776, 2011 WL 1789984, at *2 (M.D. Pa. May 10, 2011).

[17] Plaintiff contends that, in addition to the sternum rub, video shows that the officers (including Spaulding) were repeatedly checking for a pulse and pushing Higgins's limp head from side to side. (Pl's Resp. to Defs' St. of Mat. Fct. ¶ 65.)

[18] Defendants indicate that Higgins was breathing normally, while Plaintiff maintains that Higgins may have exhibited "agonal breathing,"— a medical emergency which is a brain reflex associated with cardiac arrest and a signal of imminent death, which produces sounds that are sometimes described as snoring, groaning, or moaning. (Defs' St. of Mat. Fct. ¶ 64; Pl's Resp. to ¶ 64.)

administered Narcan to Higgins through his nostril. No one summoned medical aid until 2:04:07 a.m. at the earliest. While waiting for medics, Defendants left Higgins in the restraint chair.[19]

On March 24, 2019, Orsborne, the arresting officer, was certified in CPR while Spaulding, Brogglin, Sanford, and Travis, the jail officers, had not received CPR training. These four jail officers regularly worked that shift together.[20] If a CPR-trained officer called in sick for a shift, the County had no written policy to ensure the substitution of a CPR-trained replacement.[21]

EMS arrived **[\*12]** at the Jail after 02:14 a.m. Medics began performing CPR on Higgins at approximately 02:16:03 a.m. Subsequently, EMS transported Higgins to a nearby hospital. Higgins was pronounced dead at 2:52 a.m. The Medical Examiner concluded that Higgins died of "excited delirium due to methamphetamine toxicity."[22]

The specific time that Higgins went into cardiac arrest cannot be determined. If someone is moving his fingers, he is likely not in cardiac arrest.

Higgins sustained hemorrhage of the left omohyoid muscle.[23]

---

[19] Defendants do not dispute this but maintain that they were in the process of removing Higgins from the restraint chair when the medics arrived. (Defs' Resp. to Pl's St. of Mat. Fct. ¶ 55.)

[20] Defendants state that more than four officers worked each jail shift. (Defs' Resp. to Pl's St. of Mat. Fct. ¶ 81.) However, they have not provided the Court with the names of the other officers who allegedly worked the relevant shift or stated whether those officers were trained in CPR.

[21] Defendants state that the Jail's written policy required assigning a minimum of at least one staff member on each shift who was trained in first aid and CPR. (Defs' Resp. to Pl's St. of Mat. Fct. ¶ 82.) Defendants explain that, on the night in question, the officer with first aid and CPR training assigned to work called in sick. (Defs' St. of Mat. Fct. ¶¶ 108-109; Defs' Resp. to Pl's St. of Mat. Fct. ¶ 79.) According to Defendants, if Chief Treece learned the shift was not staffed by a CPR-trained officer, he would find a replacement who was CPR-trained. It does not appear that a replacement was found for the night in question.

[22] Plaintiff disputes that this was Higgins's actual cause of death although she acknowledges that this was the Medical Examiner's conclusion. (Pl's Resp. to Defs' St. of Mat. Fct. ¶ 80.)

[23] Plaintiff contends that this was caused by pressure that was applied to the neck by Spaulding while Higgins was alive,

The core series of events — from the point Higgins entered the Jail until his body was taken away by medics — was captured on the Obion County Jail Surveillance Camera system. Due to the variable image refresh rate of the Jail's video footage, the original video data from the Jail does not completely reproduce the experiences of the officers at the time of the events.[24] Due to the variable image refresh rate of the video footage, it is impossible to know if Higgins's chest was rising and falling at any specific point in time based upon observing the video footage.[25]

On the video, Orsborne is seen wearing a Union City Police uniform with a patch on the right shoulder while Sanford is wearing **[\*13]** a short-sleeve shirt with a star emblem over his left breast.

Until 1:48:45 a.m., Spaulding and Higgins are out of view of the camera. Beginning at 1:48:45 a.m. — and continuing for the duration of the events — Spaulding and Higgins are in the camera's view.

The Tennessee Corrections Institute ("TCI") establishes the minimum standards for local jails, lock-ups, workhouses and detention facilities in the State of Tennessee.

At all times relevant, the Obion County Jail's policy on the **_use of force_** stated, in part, as follows:

> **_Use of force_** shall be restricted to instances of

---

while Defendants deny that Spaulding placed pressure on his neck. (Pl's St. of Mat. Fct. ¶ 22; Defs' Resp. to ¶ 22.) Plaintiff contends that Higgins also suffered bilateral hemorrhagic sclera. (Pl's St. of Mat. Fct. ¶ 23.)

[24] The video data produced at the Jail was recorded at a variable image refresh rate with sudden and random change of timing intervals between images. The parties dispute whether the video is "fit for the purpose of assessing force." (Defs' St. of Mat. Fct. ¶ 86; Pl's Resp. to ¶ 86.)

[25] Plaintiff's forensic video professional, Conor McCourt, prepared a clarified, cropped version of the video showing the events in detail from 1:48:45 to 1:54:29 a.m., which Plaintiff contends captures the exact same events on the original video but in close-up with two viewing panes. Defendants object to this cropped version on the ground that it contains "significant timing errors, resulting in variable playback speeds that do not represent the original playback data and that further misrepresent the motion and speed of depicted events." Defendants also assert that "the original video recording does not accurately reproduce human movement from image to image, and is not fit for the purpose of assessing force or pressure." (Pl's St. of Mat. Fct. ¶ 14; Defs' Resp. to ¶ 14.)

justifiable self-defense, protection of others, protection of property, prevention of escapes and to ensure compliance with lawful orders. The amount of force applied shall only be as much as is reasonable and necessary to control a given situation. In no event is the force justifiable as punishment.

At all times relevant, the Obion County Jail's policy on the **_use of force_** is stated, in part, as follows:

Physical force may be utilized when a lesser amount of force is inadequate to control a situation. It will be probable that from time to time, staff of the Center will be required to place their hands on an individual in **[*14]** order to control resistive, destructive or violent behavior. This will be accomplished with the utmost care and consideration of the subject in question.

At all times relevant, Obion County's **_Use of Force_** Policy allowed officers to use the amount of force necessary to take someone in control and to use only the amount of force necessary to be able to accomplish bringing that person under control.

At all times relevant, the Obion County Jail's policy on the use of an emergency restraint chair is stated, in part, as follows:

The Emergency Restraint Chair (E.R.C.) is intended to help control combative, self destructive, or potentially violent detainees. If used properly it can reduce the risk of physical harm to both the **_detainee_** and staff. Violent behavior may mask dangerous medical conditions therefore detainees must be monitored for and provided with medical treatment if needed. Detainees should not be left in the Emergency Restraint Chair for more than two hours. The Emergency Restraint Chair should never be used as a means of punishment.

At all times relevant, the Obion County Jail's Restraint Chair policy required close observation of the individual while they are in the chair. At all **[*15]** times relevant, the Obion County Jail's Restraint Chair policy allowed the use of a restraint chair to prevent injury to the individual arrested and the officers around him.

At all times relevant, the Obion County Jail's policy on providing detainees access to medical care is stated, in part, as follows: "Necessary medical services will be provided as needed to all inmates incarcerated in the Obion County Detention Center. This can include, but is

not limited to, first aid, doctor office visits, treatment in the emergency room, or admittance to the hospital."

At all times relevant, the Obion County Jail's policy on providing detainees access to medical care is stated, in part, as follows: "There will be a minimum of one (1) staff member on each shift who will be trained in first aid and C.P.R."

At all times relevant, the Obion County Jail's policy on providing detainees access to medical care is stated, in part, as follows: "During the intake process, the inmate will be screened for any serious health care or mental health problems, including obvious wounds, illness and medication use. This information will be properly documented."

In March 2019, the Jail contracted with Nurse Practitioner **[*16]** Renee Terrell to provide medical care to the detainees of the Jail. Nurse Terrell served as an "on-call" nurse for the Jail. Nurse Terrell was on "24-hour standby" if there was a medical emergency or if something was deemed a medical emergency.

At all times relevant, Obion County Jail officers had the authority to call 911 and request an ambulance or emergency services at any time they believed there was a medical emergency.

At all times relevant, the Obion County Jail's policies, including its **_use of force_** policies, restraint chair policies, and access to medical care policies were approved by TCI.

The Jail's training program was accredited by TCI at all times relevant. At all times relevant, the Obion County Jail was fully accredited by TCI.

Brendon Sanford was hired by Obion County as a correctional officer on February 20, 2019. On March 24, 2019, Sanford had not completed TCI training, but TCI standards did not require him to have completed his TCI basic training at that point in time.

All Obion County officers who are assigned to the Obion County Jail are expected to complete TCI training pursuant to the law of Tennessee.[26] Newly hired correctional officers at the Jail are expected to **[*17]**

---

[26] Plaintiff agrees that the officers are supposed to, eventually, as a condition of continued employment receive this training but deny that all officers on the relevant shift received the requisite TCI training as of March 25, 2019. (Pl's Resp. to Defs' St. of Mat. Fct. ¶ 112.)

undergo on-the-job training for up to ten weeks after they are first hired under the guidance of a Field Training Officer.[27]

The Obion County Jail required all its officers to undergo at least forty hours of TCI in-service training every year.

In accordance with TCI standards, all Obion County Jail officers are expected to undergo forty hours of TCI basic training within one year of being hired.[28]

Obion County Jail's regular training included training on the **_use of force_** in compliance with TCI standards. Obion County Jail's **_use of force_** policy allowed officers to use only the amount of force necessary to take someone in control and to use only the amount of force necessary to be able to accomplish bringing that person under control.

At all times relevant to this action, Mary Brogglin and Waylon Spaulding were TCI certified.

Obion County Sheriff Karl Jackson is the final policymaker for the Obion County Jail. Chief Treece is the officer in charge of training for the Jail. Sheriff Jackson, in his official capacity, believes that his three officers followed the policies and expectations of the Obion County Sheriff's Office based on his understanding of the facts, the Medical Examiner's findings, **[*18]** and the TBI's determination that none of the officers engaged in wrongdoing. He believes that his officers' actions were in compliance with County Jail policies and expectations in all respects.

Analysis

Plaintiff's claims brought under _42 U.S.C. § 1983_ allege that Defendants violated Higgins's constitutional rights to adequate medical care and to be free from unreasonable force. Plaintiff also seeks to hold the individual defendants liable under Tennessee state law due to actions that allegedly resulted in the intentional, reckless, or otherwise unlawful death and pre-death suffering of Higgins. _Section 1983_ imposes liability on any "person who, under color of any statute, ordinance, regulation, custom or usage, of any State" subjects

another to "the deprivation of any rights, privileges, or immunities secured by the Constitution or laws." _42 U.S.C. § 1983_. In order to prevail on such a claim, a _§ 1983_ plaintiff must establish "(1) that there was the deprivation of a right secured by the Constitution and (2) that the deprivation was caused by a person acting under color of state law." _Wittstock v. Mark A. Van Sile, Inc., 330 F.3d 899, 902 (6th Cir. 2003)_. "_Section 1983_ is not the source of any substantive right, but merely provides a method for vindicating federal rights elsewhere conferred." _Humes v. Gilless, 154 F. Supp. 2d 1353, 1357 (W.D. Tenn. 2001)_.

In their motion for **[*19]** summary judgment, Defendants assert that (1) Defendant Obion County cannot be held liable under _Monell v. New York City Dept. of Social Serv., 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)_, and (2) Defendants Spaulding, Brogglin, and Sanford are entitled to qualified immunity.

Municipality Liability

Generally, local governments such as Defendant Obion County are not considered to be "persons" under _§ 1983_ and, thus, are not subject to suit. _Monell, 436 U.S. at 691_. However, when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [complained of] injury [,]" municipalities and other local governments are considered a "person" for purposes of _§ 1983_. _Id. at 694_; see also _Bd. Of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown, 520 U.S. 397, 403, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)_ (citing _Monell_). "Under _§ 1983_, local governments are responsible only for their own illegal acts" and may not be held vicariously liable for the actions of their employees. _D' Ambrosio v. Marino, 747 F.3d 378, 386 (6th Cir. 2014)_ (quoting _Connick v. Thompson, 563 U.S. 51, 60, 131 S. Ct. 1350, 179 L. Ed. 2d 417 (2011)_). That is, _§ 1983_ liability does not attach to a municipality based on the actions of its employee tortfeasors under the doctrine of respondeat superior; instead, such liability may only be imposed on the basis of the municipality's own custom or policy. _Monell, 436 U.S. at 691_.

Thus, Plaintiffs who seek to impose liability on local governments under _§ 1983_ must prove that an action pursuant to an official **[*20]** policy or custom caused their injury. _Id._ "[T]he official policy must be 'the moving force of the constitutional violation' in order to establish the liability of a government body," _Polk Cnty. v._

---

[27] Plaintiff acknowledges this expectation but denies that this, in fact, occurred. (Pl's Resp. to Defs' St. of Mat. Fct. ¶ 113.)

[28] Plaintiff again acknowledges this expectation but denies that all officers on the relevant shift received TCI training as of March 25, 2019. (Pl's Resp. to Defs' St. of Mat. Fct. ¶ 115.)

*Dodson, 454 U.S. 312, 326, 102 S. Ct. 445, 70 L. Ed. 2d 509 (1981)* (quoting *Monell, 436 U.S. at 694*), and that body may be held liable only for constitutional violations resulting from its official policy. *Pembaur v. City of Cincinnati, 475 U.S. 469, 478 n. 6, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986)* (citations omitted). Official municipal policy includes the decisions of a government's lawmakers or the acts of its policymaking officials. *Id. at 480 - 481 (1986)*. A municipality's "policies" are "decisions of its duly constituted legislative body or those officials whose acts may fairly be said to be those of the municipality," *Bryan Cnty., 520 U.S. at 403-04*, while a "custom" is a practice that, while not formally approved, "may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Id. at 404*. A custom can be one of action or inaction and need not be formally approved by the entity. *City of Canton v. Harris, 489 U.S. 378, 389, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)*.

Absent proof it resulted from an unconstitutional policy or custom, a county is not liable for a single incident resulting in a constitutional violation. *Oklahoma City v. Tuttle, 471 U.S. 808, 823-824, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985)*. Furthermore, a county is not liable unless there is an "affirmative link between the policy and the particular constitutional violation **[*21]** alleged" or "causal connection." *Id.* Thus, a plaintiff must "identify the policy, connect the policy to the municipality itself, and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't, 8 F.3d 358, 364 (6th Cir. 1993)*.

In her amended complaint, Plaintiff asserts claims against Defendant Obion County under the following theories: Obion County (1) maintained unconstitutional policies and customs, (2) failed to appropriately train its officers, and (3) ratified the alleged unconstitutional conduct of its employees. (ECF No. 37 ¶¶ 61, 62, 64, 65, 69). Defendant has moved for summary judgment on all these theories. In her response, Plaintiff states that she is not seeking liability under a ratification theory, and she does not point to any evidence in the record showing that Defendant maintained unconstitutional written policies. To the contrary, the undisputed evidence shows that, at all times relevant, the Jail was fully accredited by the TCI, and the Jail's written policies that governed the **_use of force_**, the use of restraint chairs, and detainees' access to medical care were approved by the TCI.

Therefore, the Court grants summary judgment on

claims that Obion County's written policies **[*22]** did not comport with constitutional standards and that Obion County ratified the unconstitutional conduct of its employees. However, as explained below, the Court denies summary judgment on Plaintiff's claim that Obion County did not adequately train its officers and that Obion County had a custom of not ensuring compliance with its written policy of requiring at least one staff person on duty to be trained in CPR.

Plaintiff's failure to train claim is based on the alleged failure of Obion County to train its officers on (1) the constitutional limits on the **_use of force_** against inmates or detainees, (2) the dangers associated with compressing a person in the area of the neck or on any form of restraint-related asphyxia or suffocation, (3) the obligation to summon medical care for detainees with serious medical conditions; (4) when to call for medical assistance for a **_detainee_** in need particularly in a restraint situation, (5) the use of the restraint chair and under what circumstances to remove an inmate who is no longer moving from the restraint chair, (6) the duty to intervene in a fellow officer's use of excessive or unreasonable force, and (7) accommodating detainees exhibiting **[*23]** signs of mental illness or drug intoxication. The Court has grouped (3), (4), and (7) because these claims all relate to training on ensuring that inmates/detainees are provided with appropriate medical care. The Court has also grouped (1), (2), (5), and (6) in that the alleged failure to train in these areas relates to the **_use of force_**.

Clearly Higgins was entitled to receive medical care and to be free from excessive force, and there are disputed issues of fact in the record as to whether he received the requisite medical care and whether he was subjected to excess force as discussed below in the analysis of the claims against the individual officers.[29] There are also disputed issues of fact also discussed below as to whether Defendants' actions led to Higgins' death. However, to defeat summary judgment, Plaintiff must also show that there are disputed issues of fact showing that Defendant County failed to train its officers

---

[29] The parties have presented disputed issues of fact as to whether Higgins's death was the result of "excited delirium due to methamphetamine toxicity," as determined by the Medical Examiner, or whether Higgins died from asphyxia or suffocation as opined by Plaintiff's experts J.C. Upshaw Downs, M.D., and Allecia Wilson, M.D. (Pl's Exhibits, ECF Nos. 109-2, 109-12.) A jury could find that Higgins was deprived of his constitutional rights to medical care and to be free from excessive force, which resulted in his death.

in the provision of necessary medical care for detainees and inmates and in the use of excessive force.

"[A] local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official **[\*24]** government policy for purposes of _§ 1983_." _Connick, 563 U.S. at 61_. To succeed on a failure to train or supervise claim, a plaintiff must prove: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury. _Ellis v. Cleveland Mun. Sch. Dist., 455 F.3d 690, 700 (6th Cir. 2006)_.

As evidence of Defendant Obion County's alleged failure to train, Plaintiff points to the deposition testimony of Officers Spaulding and Sanford who testified they could recall no specific training in the areas of the constitutional limits on the **_use of force_** against inmates or detainees; the dangers associated with compressing a person in the area of the neck or on any form of restraint-related asphyxia or suffocation; any constitutional obligation to summon medical care for detainees with serious medical conditions; when to call for medical assistance for a **_detainee_**; any duty to intervene in a fellow officer's use of excessive or unreasonable force; and accommodating detainees exhibiting signs of mental illness or drug intoxication. (Pl's Resp. to Defs' Mot. pp. 13-14, ECF No. 109.) Plaintiff also points to the testimony of Obion County Sheriff **[\*25]** Karl Jackson who was the final policymaker for the Jail at the time of the relevant events. Sheriff Jackson was not aware of any training teaching officers about the dangers of restraining people by the neck or throat. (_Id._ at p. 14.)

Michael Leonesio, an expert about generally accepted law enforcement standards, opined that Defendant Spaulding "demonstrated no understanding of the concepts of objective reasonableness, control versus compliance, compressional asphyxia, or the relationship between the need for force and the amount of force used." (Leonesio Rep. pp. 13-14, ECF No. 109-11.) He testified that Obion County gave its officers no more than a single hour of training on the **_use of force_**, which was "clearly not enough time to cover the material and assure that officers have a satisfactory level of understanding." (_Id._ at p. 17.) He further testified that the training plan lacked any performance objectives or measurable training goals and was "deficient in quantitative or competency-based testing methods."

(_Id._)

Lori Roscoe, Ph.D., an expert on correctional healthcare standards, reviewed the evidence and opined that the Jail officers had no training in the basic medical skills required **[\*26]** to determine if an individual had a health condition requiring further assessment by a medical professional, particularly since there was no regular nurse on duty (and none on the shift in question), and that officers were supposed to have the necessary skills to identify serious medical conditions, such as those exhibited by Higgins. (Roscoe Rep. pp. 6, 8 -10, ECF No. 109-17.) She also opined that the Jail officers were inadequately trained on assessing and responding to inmates with serious health conditions, which placed individuals at the jail at unacceptable risk of injury or death. (_Id._)[30]

There are also disputed issues of fact as to whether the officers were adequately trained in the use of excessive force and the duty to intervene based on the testimony of the individual county officers as to their lack of training and based on the testimony of Plaintiff's expert Leonesio, also summarized above.

The testimony of the officers and Sheriff Jackson, as well as the testimony of Plaintiff's experts, could lead the jury to find that Defendant County failed to train its officers in the provision of necessary medical care for detainees and inmates and in the use of excessive force. **[\*27]** Specifically, from Roscoe's testimony, as summarized above, the trier of fact could find that Defendant Obion County failed to adequately train its officers in how to identify mentally ill arrestees and provide for their medical care and/or those suffering from restraint-related asphyxia or suffocation and that failure was the "moving force" that resulted in Higgins's death and the violation of his constitutional rights.[31] _See_

---

[30] The Sixth Circuit permits the use of expert testimony in establishing failure to train claims. _See Russo v. City of Cincinnati, 953 F.2d 1036, 1047 (6th Cir. 1992)_ ("Especially in the context of a failure to train claim, expert testimony may prove the sole avenue available to plaintiffs to call into question the adequacy of a municipality's training procedures.").

[31] Defendants contend that the individual county officers did not know about Higgins's mental health issues. However, a jury could find that, based on Higgins's erratic behavior as he was being booked at the Jail, the officers should have been alerted to possible mental health issues. In his report, Plaintiff's expert Dr. Downs noted that Higgins "displayed unusual behaviors which would be reasonably concerning for

*Amerson v. Waterford Twp., 562 F. App'x 484, 491 (6th Cir. 2014)* (reiterating that, to sustain § 1983 municipal liability, the plaintiff must establish that the inadequate training was the moving force behind the violation of his constitutional rights).

Having pointed to disputed facts concerning the adequacy of the training provided by Obion County, Plaintiff must show that there are facts from which the jury could find that the inadequacy was the result of the municipality's deliberate indifference. As explained in *Connick*,

> In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. A municipality's culpability for a deprivation of rights is at its most tenuous [when] a claim turns [*28] on a failure to train. *See Oklahoma City v. Tuttle, 471 U.S. 808, 822-823, 105 S. Ct. 2427, 85 L. Ed.2d 791 (1985)* (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*"). To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Canton [v. Harris, 489 U.S. 378, 388, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)]*. Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id. at 389, 109 S. Ct. 1197*.

*Connick, 563 U.S. at 61*.

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bryan Cty., 520 U.S. at 410*. Thus, when municipal policymakers are on actual or constructive notice that a particular omission in their training program causes its employees to violate citizens' constitutional rights, the municipality (in this case Obion County) may be deemed deliberately indifferent if the policymakers choose to retain that program. *Id. at 407*. The entity's

"policy of inaction" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to [*29] violate the Constitution." *Canton, 489 U.S. at 395* (O'Connor, J., concurring in part and dissenting in part). A less stringent standard of fault for a failure-to-train claim "would result in de facto respondeat superior liability on municipalities ...." *Id. at 392; see also Pembaur, 475 U.S. at 483* ("[M]unicipal liability under § 1983 attaches [when] - and only [when] - a deliberate choice to follow a course of action is made from among various alternatives by [the relevant] officials ...").

For a finding of deliberate indifference, a plaintiff ordinarily must "show prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Savoie v. Martin, 673 F.3d 488, 495 (6th Cir. 2012)* (citation omitted). "Alternatively, [a] plaintiff[ ] could show deliberate indifference through evidence of a single violation of federal rights, accompanied by a showing that the [entity] had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." *Campbell v. City of Springboro, Ohio, 700 F.3d 779, 794 (6th Cir. 2012)* (citing *Plinton v. Cnty. of Summit, 540 F.3d 459, 464 (6th Cir. 2008)* (requiring a "showing that the [c]ity had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation" [*30] under a single-violation theory).

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers ... can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Canton, 489 U.S. at 390*.

Here, there is no evidence in the record showing "prior instances of unconstitutional conduct demonstrating that [Defendant Obion County] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." However, the "recurring situation" theory of liability does not require Plaintiff to show that Defendant had actual or constructive notice that its officers were deficiently

---

mental aberration." (Downs Rep. p. 11, ECF No. 109-2.) Furthermore, the officers' use of Narcan on Plaintiff indicates that they perceived that he may have been suffering from a drug overdose.

trained. *See Shadrick v. Hopkins Cty., Ky., 805 F.3d 724, 739 (6th Cir. 2015)* (citing *Connick*). Instead, to survive summary judgment, Plaintiff must point to evidence in the record showing that Defendant County failed to train Defendant Officers "to handle recurring **[*31]** situations presenting an obvious potential for such a violation." *Bryan Cnty., 520 U.S. at 409.* Plaintiff must set forth facts to indicate that there was a "likelihood that the situation would recur" and that it was predictable "that an officer lacking specific tools to handle that situation would violate citizens' rights." *Id.*

The Court finds that there is evidence in the record which, if believed by the trier of fact, shows "a likelihood that the situation would recur" — in this case "the situation" being both the need for staff to recognize emergency conditions and to secure medical care for detainees in need and the need for an officer to subdue a ***detainee***. The jury could find that the "need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, [that] the policymakers of the [County] can reasonably be said to have been deliberately indifferent to the need." *Canton, 489 U.S. at 390.*

If the jury finds in favor of Plaintiff on the cause of Higgins's death, the jury could further find that Spaulding's lack of training as to the constitutional limits of force needed to subdue an inmate was a moving force behind Higgins's death. The jury could also find that, **[*32]** had Brogglin and Sanford been trained as to when to intervene as a fellow officer is using excessive force, Higgins's death would not have occurred.[32] The jury could also find that Defendant Officers' alleged inadequate training as to when to call for emergency medical services was a moving force behind Higgins's death. That is, the jury could find that proper training would have prevented Higgins's death and that the County "could reasonably foresee that [its] employee's wrongful act would follow from the lack of training." *Gambrel v. Knox Cnty., Kentucky, 25 F.4th 391, 409 (6th Cir. 2022)* (citation omitted).[33]

Viewing the evidence in the light most favorable to the non-movant, the Court finds that Plaintiff has presented sufficient evidence to survive summary judgment on her failure to train claim, and this portion of Defendants' motion is denied.

As previously determined, Defendant Obion County is entitled to summary judgment on any claim that its written policies were unconstitutional. Its written policies as to the use of excessive force and the restraint chair and the provision of medical care were in accordance with TCI standards. However, a jury could find that Defendant had a custom of not complying with its written policy for the provision **[*33]** of medical care — specifically the provision of CPR.

It is well-settled that pretrial detainees have a right under the *Fourteenth Amendment* to adequate medical treatment. *See generally Estate of Carter v. City of Detroit, 408 F.3d 305, 311 (6th Cir. 2005); Britt v. Hamilton Cnty., 531 F. Supp. 3d 1309, 1322 (S.D. Ohio 2021),* aff'd, *2022 U.S. App. LEXIS 3852, 2022 WL 405847 (6th Cir. Feb. 10, 2022).* Defendant points out that the Jail's written policy provided that medical services, including emergency medical services, would be provided as needed to all detainees. The Jail contracted with Nurse Practitioner Renee Terrell to provide medical care to the detainees of the Jail. Pursuant to her contract, Nurse Terrell was on "emergency call" for the Jail at all times. Jail officers possessed the authority to contact Nurse Terrell or other medical professionals if a ***detainee*** was in need of emergency medical care and/or summon Emergency Medical Services ("EMS") when necessary. Although Plaintiff complains of the length of time it took Defendant Officers to call EMS, she has pointed to no facts to show that there was a custom of failing to call Nurse Terrell or delaying EMS calls. However, Plaintiff has pointed to evidence from which a jury could find that the County had a custom of not complying with its own written policy for the provision of CPR to detainees in crisis.

It is undisputed that Obion County's written **[*34]** policy required at least one CPR-trained and certified staff

---

[32] The Court is in no way making findings as to the cause of Higgins's death or the events leading to his death.

[33] This case does not present the same scenario as in *Gambrel* in which the allegation was that the officers "gratuitously beat" the decedent and "later shot him for no reason." *25 F.4th at 410.* In *Gambrel*, the Sixth Circuit determined that "[b]ecause the need for training against this allegedly intentional misconduct was not 'obvious,' Gambrel

cannot prove deliberate indifference through a single misdeed alone." *Id.* Here, Officer Spaulding claims that he was trying to subdue Higgins, in particular to stop him from spitting. If the jury finds that Officer Spaulding choked Higgins while trying to subdue him (instead of merely pushing away his chin and jaw), the jury could also find that adequate training in the ***use of force*** would have prevented Officer Spaulding from doing so.

member per shift and that none of the jail officers on the relevant shift had this required training or certification. Defendant claims that Ralph Molands, a CPR-certified officer, was assigned to work the night shift at the Jail on March 24, 2019, and into the morning hours of March 25, 2019, but prior to his shift beginning, Molands called in sick. However, Defendant has provided no evidence about the scheduled shift to support this claim, and Defendant Spaulding testified that the officers working the shift in question — none of whom were CPR-trained — were the ones who regularly worked that shift together. Moreover, even accepting the assertion that a CPR-trained officer called in sick for the shift in question, the jury could find that Obion County had a custom of not ensuring the substitution of a CPR-trained replacement. And, the jury could find that, if Obion County had not had such a custom, a CPR-trained replacement would have been present on the night in question, and this would have resulted in prompt medical aid to Higgins which, the jury could find, would have saved his life.[34]

According to Plaintiff's medical **[*35]** expert, Dr. Matthew Delaney,

> In terms of a particular patient's odds of surviving an out of hospital cardiac arrest, the most important, and often the only alterable, factor is the time between cardiac arrest and the start of high-quality CPR. Previous studies have reported that a patient's odds of survival following a cardiac arrest decrease up to 5% for each minute that passes between collapse and the start of resuscitative efforts. Even if there is some delay between a patient's cardiac arrest and the arrival of EMS, the available medical literature tells us that CPR from bystanders is associated with an almost doubled rate of survival. In this case while it may be hard to generate an exact estimate of Mr. Higgins's survival if he had been treated by the staff of the jail, very clearly his odds of survival would have been significantly higher had the staff made any attempts to perform CPR.

(Delaney Rep. p. 5 (footnotes omitted), ECF No. 109-13.)

Defendant points out that an officer is not under a

constitutional obligation to render CPR. *See Stevens-Rucker v. City of Columbus, 739 F. App'x 834, 846 (6th Cir. 2018)*. Rather, "[d]ue process requires that police officers seek the necessary medical attention for a **_detainee_** when he or she has been injured . . **[*36]** . by either promptly summoning the necessary medical help or by taking the injured **_detainee_** to a hospital." *Id.*; *see also Tatum v. City and Cnty. of S.F., 441 F.3d 1090, 1099 (9th Cir. 2006)* (holding that "a police officer who promptly summons the necessary medical assistance has acted reasonably for purposes of the *Fourth Amendment*, even if the officer did not administer CPR.").[35] However, whether the officers failed by not rendering CPR is not at issue in this claim, although the jury could find that implicit in the policy to have a CPR-trained officer on duty at all times was an obligation to actually provide CPR if the situation so warranted. Instead, the issue is whether a jury could find that Defendant Obion County violated the constitutional and civil rights of Higgins by having a custom of not complying with its own policy of staffing CPR-certified officers on each shift.[36] The Court determines that a jury could so find.

Defendant contends that, even if Plaintiff could show prior instances of Jail officers failing to provide its detainees access to medical care, she still cannot establish liability because she cannot show that an Obion County policymaker acquiesced in such conduct. A municipality can be shown to have a "custom" causing constitutional violations **[*37]** only if the plaintiff offers proof of a policymaking officials' knowledge and acquiescence to the established practice. *Monell, 436 U.S. at 690-691*. It is only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under *§ 1983*." *Id. at 694*. In other words, in order to establish that a government's "custom" caused the constitutional deprivation at issue, the plaintiff must prove that the proper policymaking officials acknowledged and acquiesced in the custom. *See e.g., Spears v. Ruth, 589 F.3d 249, 256 (6th Cir. 2009)* ("A municipality can be shown to have a 'custom' causing constitutional

---

[34] When Orsborne's supervisor, Talmadge Simmons, arrived at the Jail after receiving a phone call from Orsborne, he instructed the officers to get Higgins out of the restraint chair and start CPR. According to Simmons, "I couldn't understand why it hadn't already been done, but I said we've got to start CPR." (Simmons Dep. p. 4, ECF No. 109-14.)

[35] In this case, there is a disputed issue of fact as to whether Defendant Officers "promptly" summoned emergency help as discussed below.

[36] Defendant notes that Union City Officer Orsborne was CPR-certified. (SUMF ¶ 110). Orsborne's certification is not relevant to the issue at hand.

violations...provided that the plaintiff offers proof of policymaking officials' knowledge and acquiescence to the established practice."); *Memphis, Tenn. Area Local, Am. Postal Workers Union, AFL-CIO v. City of Memphis, 361 F.3d 898, 902, 86 Fed. Appx. 137 (6th Cir. 2004)* ("A municipal 'custom' may be established by proof of the knowledge of policymaking officials and their acquiescence in the established practice.").

Here, Plaintiff has pointed to evidence in the record from which a jury could find that Sheriff Jackson, an Obion County policymaker, approved and/or acquiesced in a custom of not ensuring that an officer trained in CPR was on duty **[*38]** on each shift as required by its written policy. Sheriff Jackson testified in his deposition that he fully approved of his officers' actions and inactions and believed they "went by policy." Accordingly, the Court denies summary judgment on Plaintiff's claim that Obion County had a custom of not following its written policy of making sure that at least one CPR-certified officer was on duty and that this custom led to the denial of Higgins's constitutional rights.

In summary, Defendant Obion County is granted summary judgment on Plaintiff's claims that its written policies violated Higgins's rights and on the claim that it ratified the actions of the individual officers. Summary judgment is denied on Plaintiff's failure to train claim and on the claim that Obion County had a custom of not ensuring that someone trained in CPR was on duty at the Jail during each shift.

Individual Liability

Officers Brogglin, Sanford, and Spaulding are sued as individuals. Plaintiff claims that Spaulding subjected Higgins to excessive force and that Sanford and Spaulding violated Higgins's rights by failing to intervene. Plaintiff also claims that the officer defendants failed to provide Higgins with proper **[*39]** medical care in violation of his civil rights. Defendants have responded that they are immune from suit under the doctrine of qualified immunity.

"The doctrine of qualified immunity protects government officials from liability for civil damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Wood v. Moss, 572 U.S. 744, 757, 134 S. Ct. 2056, 188 L. Ed. 2d 1039 (2014)* (quoting *Ashcroft v.*

*al—Kidd, 563 U.S. 731, 735, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)*) (internal quotation marks omitted). A right is clearly established if "the right's contours are sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *City of Escondido, Calif. v. Emmons, 139 S. Ct. 500, 503, 202 L. Ed. 2d 455 (2019)* (quoting *Kisela v. Hughes, 138 S. Ct. 1148, 1152, 200 L. Ed. 2d 449 (2018)* (per curiam)). Practically speaking, "a body of relevant case law is usually necessary to clearly establish the answer." *Dist. of Columbia v. Wesby, 138 S. Ct. 577, 581, 199 L. Ed. 2d 453 (2018)*. Once qualified immunity is raised, the plaintiff bears the burden to prove that the defendant is not entitled to it. *Chappell v. City of Cleveland, 585 F.3d 901, 907 (6th Cir. 2009)*. Thus, to determine whether qualified immunity is warranted, a court must first ask (1) whether the alleged facts, taken in a light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right; and (2) whether the constitutional **[*40]** right was clearly established in the specific context so that a reasonable official would understand that he is violating that right. *Saucier v. Katz, 533 U.S. 194, 202, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)*.[37]

Although it is well-settled that the right to be free from excessive force is clearly established, the *Emmons* Court expounded on the need for specificity in establishing the contours of that right.

> "This Court has repeatedly told courts ... not to define clearly established law at a high level of generality." *Kisela, 584 U.S., at ___, 138 S. Ct., at 1152* (internal quotation marks omitted). That is particularly important in excessive force cases, as we have explained:
>
> > "Specificity is especially important in the *Fourth Amendment* context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal

---

[37] In *Pearson v. Callahan, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)*, the Court "reconsider[ed] the procedure required in *Saucier* [and concluded] that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."

doctrine, here excessive force, will apply to the factual situation the officer confronts. Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue....

"[I]t does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then [*41] remit the case for a trial on the question of reasonableness. An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id., at , 138 S. Ct., at 1153* (quotation altered).

*Emmons, 139 S. Ct. at 503*.

Here, Plaintiff identifies the contours of her excessive force claim as an officer "kneeling on the body of a handcuffed [***detainee***] and gripping him by the neck — forcibly keeping his mouth closed and hyperextending his head and neck" and "[f]or five-and-a-half minutes ... remain[ing] in this position — maintaining significant pressure on the neck of [***detainee***], compressing his blood vessels, and cutting off his oxygen supply" and "continu[ing] to kneel on [the ***detainee***'s] torso and exert substantial pressure on his neck for an additional two minutes after he became unresponsive."[38] (*Id.*)

Plaintiff is correct that Higgins had a clearly established right not to be "gratuitously assaulted [and choked] while fully restrained and subdued."[39] *See Kidis v. Reid, 976 F.3d 708, 720 (6th Cir. 2020)* ("And while it was conceivable that Moran would need to apply some force to arrest Kidis safely, there was no conceivable need for [*42] Moran to knee strike, choke, and punch Kidis once Moran was on top of Kidis while Kidis was making no effort to resist arrest. Once Moran had physical control over the surrendering and unresisting Kidis, Moran's subsequent aggression violated Kidis's clearly

established right to be free from excessive force." (citing *Coley v. Lucas County, 799 F.3d 530, 540 (6th Cir. 2015)* (explaining that pretrial detainees have "a clearly established right not to be gratuitously assaulted while fully restrained and subdued" and "assaults on subdued, restrained and nonresisting ... arrestees ... are impermissible")). Moreover, "the ***use of force*** after a suspect has been incapacitated or neutralized is excessive as a matter of law." *Michalski v. Sonstrom, 2018 U.S. Dist. LEXIS 172414, 2018 WL 4853525, at *2 (E.D. Mich. Oct. 5, 2018)*, *aff'd*, *773 F. App'x 299 (6th Cir. 2019)* (citing *Shreve v. Jessamine Cty. Fiscal Court, 453 F.3d 681, 687 (6th Cir. 2006)*; *Champion v. Outlook Nashville, Inc., 380 F.3d 893, 902 (6th Cir. 2004)* (citing cases); *Phelps v. Coy, 286 F.3d 295, 301 (6th Cir. 2002)* ("[T]here was simply no governmental interest in continuing to beat [plaintiff] after he had been neutralized, nor could a reasonable officer have thought there was.").

Viewing the evidence in the light most favorable to Plaintiff, the Court finds that she has set forth sufficient facts to establish a genuine issue of material fact as to whether Officer Spaulding used excessive and unjustified force against Higgins after Higgins was subdued and fully restrained and whether his actions were [*43] objectively unreasonable. Whether a reasonable officer in Spaulding's position would have known that the force he used violated Higgins's rights turns on the question of where Spaulding's hands were during the encounter. The jury could find, after looking at the Jail's surveillance tapes, that Officer Spaulding had his hands around Higgins's neck and/or throat after he was subdued as opposed to Spaulding's claim that he merely placed his hands on Higgins's chin to keep Higgins from spitting on him. Lending support to Plaintiff's claim of excessive force are the opinions of Plaintiff's experts J.C. Upshaw Downs, M.D., and Allecia Wilson, M.D., that Higgins sustained hemorrhage of the left omohyoid muscle as the result of pressure being placed on his neck and/or throat and that he died from asphyxia or suffocation. Dr. Downs opined that Higgins "sustained significant neck trauma with significant bleeding into the muscle layers within the neck, near the airway" along with additional physical findings consistent with strangulation. (Downs Rep. p. 11, ECF No. 109-2.)

Accordingly, summary judgment is denied on the excessive force claim.

The Court turns next to Plaintiff's claim that Officers [*44] Brogglin and Sanford violated Higgins's rights by failing to intervene during Spaulding's

---

[38] Plaintiff acknowledges that the early efforts to subdue Higgins, *e.g.*, pulling Higgins away from Brogglin, the scuffle on the floor, and the placing of leg restraints on Higgins, do not constitute excessive force. (Pl's Resp. p. 19.)

[39] The parties dispute at what point Higgins was "subdued and fully restrained."

interactions with Higgins, especially when he allegedly choked Higgins.[40] It is undisputed that law enforcement officers can be held liable when another officer uses excessive force in their presence if they are aware of the excessive force and fail to intervene. *See Bunkley v. City of Detroit, Michigan, 902 F.3d 552, 565 (6th Cir. 2018)* (noting that, in *Bruner v. Dunaway, 684 F.2d 422 (6th Cir. 1982)*, the Sixth Circuit relied on *Smith v. Ross, 482 F.2d 33 (6th Cir. 1973)* (per curiam), in holding that an officer could be liable for failing to intervene in an excessive force case).

Here, the parties agree that "a police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Turner v. Scott, 119 F.3d 425, 429 (6th Cir. 1997)* (citing *Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994)*). Officers cannot be held liable for a failure to intervene if they lacked "a realistic opportunity to intervene and prevent harm." *Wells v. City of Dearborn Heights, 538 F. App'x 631, 640 (6th Cir. 2013)* (citing *Ontha v. Rutherford Cnty., Tenn., 222 F. App'x 498, 507 (6th Cir. 2007)*). "Generally the issue of whether an officer had sufficient time to intervene or was capable of preventing the harm is a question of fact for the jury unless, based on all the evidence, a reasonable jury could not possibly **[*45]** conclude otherwise." *Bunkley, 902 F.3d at 566*.

Plaintiff has pointed to video evidence in the record from which the trier of fact could find that Officer Spaulding had his hands around Higgins's neck/throat for approximately five minutes. Based on video evidence,[41] the jury could find that Officers Brogglin and Sanford were present during this encounter and assisted with shackling Higgins's legs. The jury could also find that each officer was present for at least part of Spaulding's encounter with Higgins and perceived Spaulding's alleged use of excessive force and yet did not intervene

to stop him. Therefore, Officers Brogglin and Sanford are not entitled to qualified immunity of Plaintiff's failure to intervene claim.

Finally, Plaintiff claims that the individual officers violated Higgins's right to medical care, specifically in being deliberately indifferent to his serious medical needs and failing to provide medical care. Defendants contend that they are entitled to qualified immunity on Plaintiff's claim.

The *Eighth Amendment* prohibits cruel and unusual punishments. This protection "includes a right to be free from deliberate indifference to an inmate's serious medical needs." *Brawner v. Scott Cnty., Tennessee, 14 F.4th 585, 591 (6th Cir. 2021)* (citing *Richmond v. Hug, 885 F.3d 928, 937 (6th Cir. 2018)*). However, the *Eighth Amendment* does not apply to **[*46]** pretrial detainees like Higgins. *Graham ex rel. Est. of Graham v. County of Washtenaw, 358 F.3d 377, 382 n.3 (6th Cir. 2004)*. Instead, pretrial detainees have a constitutional right to be free from deliberate indifference to serious medical needs under the *Due Process Clause of the Fourteenth Amendment*. *Griffith v. Franklin Cnty., Kentucky, 975 F.3d 554, 566 (6th Cir. 2020)*.

Until recently, courts "analyzed *Fourteenth Amendment* pretrial **_detainee_** claims and *Eighth Amendment* prisoner claims 'under the same rubric.'" *Brawner, 14 F.4th at 591* (citation omitted). The *Eighth-Amendment* framework for deliberate indifference claims has an objective and a subjective component. *Griffith, 975 F.3d at 567*. "The objective component requires a plaintiff to prove that the alleged deprivation of medical care was serious enough to violate the [Constitution]," while the subjective component requires a plaintiff to show that "each defendant subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk by failing to take reasonable measures to abate it." *Id. at 567-68* (quoting *Rhinehart v. Scutt, 894 F.3d 721, 737 (6th Cir. 2018)*).

Relying on the Supreme Court's decision in *Kingsley v. Hendrickson, 576 U.S. 389, 135 S. Ct. 2466, 192 L. Ed. 2d 416 (2015)*,[42] the Sixth Circuit Court of Appeals in

---

[40] The failure to intervene claim is based on the jury's first finding for Plaintiff on her excessive force claim. If the jury finds against Plaintiff on her excessive force claim, then she cannot prevail on her failure to intervene claim.

[41] Defendants continue to maintain that Plaintiff should not be allowed to rely on video footage to create an issue of fact because the video submitted by Plaintiff has an image refresh rate that does not reproduce motion accurately. Defendants may challenge the accuracy of the video at trial.

[42] In *Kingsley*, the Supreme Court compared the standard for excessive force claims brought by pretrial detainees under the *Due Process Clause of the Fourteenth Amendment* to excessive force claims brought by convicted prisoners under the *Eighth Amendment*. *576 U.S. at 400*. The Court was asked to determine "whether, to prove an excessive force claim, a

*Brawner* concluded that *Kingsley* required "modification of the subjective prong of the deliberate-indifference test for pretrial detainees." *Id. at 596* ("Given *Kingsley*'s clear delineation between claims brought by convicted prisoners under the *Eighth Amendment* and claims brought by pretrial detainees under [*47] the *Fourteenth Amendment*, applying the same analysis to these constitutionally distinct groups is no longer tenable.") The *Brawner* Court modified the second prong of the deliberate indifference test applied to pretrial detainees to require only recklessness: "A pretrial *detainee* must prove 'more than negligence but less than subjective intent — something akin to reckless disregard.'" *Id. at 597* (quoting *Castro v. County of Los Angeles, 833 F.3d 1060, 1071 (9th Cir. 2016)* (en banc)). Thus, a plaintiff must prove that the defendant acted "deliberately (not accidentally), [and] also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* (citation and quotation marks omitted).

The parties disagree about which standard should be used to analyze Plaintiff's claim. Defendants point out that, at the time of the incident, the Sixth Circuit applied the pre-*Kingsley* analysis standard to a pre-trial inmate's claims that officers failed to provide him with medical care. They argue that, at the time of the incident, the officers could not have known that an objective 'reckless disregard' for a *detainee*'s medical condition could lead to a constitutional rights violation."[43]

Plaintiff has correctly responded that the Sixth Circuit rejected the [*48] same argument in *Hopper v. Plummer, 887 F.3d 744 (6th Cir. 2018)*, where defendants facing excessive force claims based on pre-*Kingsley* conduct argued for qualified immunity because

---

pretrial *detainee* must show that the officers were subjectively aware that their *use of force* was unreasonable, or only that the officers' use of force was objectively unreasonable." *Id. at 391-92*. The Court answered that the proper standard was objective based on the differences between the *Due Process Clause* and the *Cruel and Unusual Punishments Clause. Id. at 400* ("The language of the two Clauses differs, and the nature of the claims often differs. And, most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all[.]"). However, the Court did not "address whether an objective standard applies in other *Fourteenth Amendment* pretrial-detainment contexts[,]" such as deliberate indifference. *Brawner, 14 F.4th at 592*. The Sixth Circuit answered that question in *Brawner*.

[43] *Kingsley* was decided in 2015; the incident occurred in 2019; and *Brawner* was decided in 2021.

it would not have been clear to them that claims against them would be governed by an objective standard. "[W]e have rejected this argument before because 'a defendant is not entitled to qualified immunity simply because the courts have not agreed upon the precise formulation of the [applicable] standard.'" *Id. at 755-56* (citations omitted). "Rather, the relevant question under the clearly established prong is whether defendants had notice 'that [their] conduct was unlawful in the situation [they] confronted.'" *Id. at 756* (quoting *Saucier, 533 U.S. at 202*).

Therefore, this Court must determine whether the individual officers were deliberately indifferent to Higgins's serious medical needs using the guidance provided by *Brawner* and its progeny as set forth in *Trozzi v. Lake Cnty., Ohio, 29 F.4th 745 (6th Cir. 2022)*.

> [A] plaintiff must satisfy three elements for an inadequate-medical-care claim under the *Fourteenth Amendment*: (1) the plaintiff had an objectively serious medical need; (2) a reasonable officer at the scene (knowing what the particular jail official knew at the time of the incident) would have understood that the *detainee*'s medical needs subjected the *detainee* to an excessive [*49] risk of harm; and (3) the prison official knew that his failure to respond would pose a serious risk to the pretrial *detainee* and ignored that risk. This third inquiry faithfully applies *Kingsley, 576 U.S. at 396, 135 S.Ct. 2466* (recognizing that liability for a constitutional tort, even one that includes an objective inquiry, must still be "purposeful or knowing" and that criminal "recklessness" might suffice, ensuring that there is a sufficiently culpable mental state to satisfy the "high bar" for constitutional torts grounded in a substantive due process violation. In practice, that may mean that a prison official who lacks an awareness of the risks of her inaction (because, for example, another official takes responsibility for medical care, a medical professional reasonably advised the official to not act, the official lacked authority to act, etc.) cannot have violated the *detainee*'s constitutional rights.

*Trozzi, 29 F.4th at 757-58* (citations omitted). "Put another way," on summary judgment, the Court must determine whether the plaintiff "has presented sufficient evidence for a reasonable jury to conclude that: (1) a reasonable officer (knowing what the particular jail official knew at the time of the incident) would have known [the *detainee*] [*50] was suffering from a serious

medical need[44] that posed an excessive risk to [his or] her health; and (2) [the officers] knew that non-intervention would create an unjustifiably high risk of harm to [the **detainee**'s] health and ignored that risk." *Id. at 758*.[45] The Court finds that Plaintiff has presented sufficient evidence to defeat summary judgment on this claim.

The Court first finds that there is evidence in the record from which a jury could find that the individual county officers should have known of Higgins' serious medical needs and that they posed an excessive risk to his health. There are two different points during the incident in question in which Higgins might be said to have had a serious medical need. The first was when Officer Orsborne arrested Higgins and brought him to the Jail. Viewing the evidence in the light most favorable to the Plaintiff, the jury could find that Higgins's erratic behavior upon entering the Jail would have put a reasonable officer on notice that Higgins had mental health issues and/or had possibly ingested drugs which posed an excessive risk to his health. Evidence that the officers did believe that Higgins had ingested drugs is shown by the deposition testimony **[*51]** of Spaulding. According to Spaulding, Higgins was "grunting and moaning" as the officers were putting him in the restraint chair. (Spaulding Dep. p. 35, ECF No. 109-5.) The officers suspected that Higgins had overdosed on drugs ("It was a suspected overdose.") (*Id.* at p. 38.) Eventually the officers administered Narcan to Higgins. The jury could find the officers' failure to administer Narcan sooner created an unjustifiably high risk of harm to Higgins, and they knew of this risk and yet ignored that risk until it was too late.

The next point was when, according to Plaintiff, Higgins's "lifeless" body was dragged to the restraint chair. Defendants contend that Higgins was not "lifeless" because the video shows some movement on the part of Higgins during this time. Plaintiff counter that the movement was not volitional and, instead, was "agonal breathing." Regardless of whether the

movement was volitional or not, the jury could find that reasonable officers would have known that Higgins was in acute distress at least from the moment that Spaulding released him and that this acute distress constituted a serious medical need that posed an excessive risk to his health and yet they ignored **[*52]** this risk.

For example, it is undisputed that, after Higgins stopped spitting, he went "still or nearly still." (Spaulding Dep. p. 40, ECF No. 109-5.) Plaintiff's experts confirm that Higgins ceased moving and went unresponsive and lost consciousness at approximately the same time that he quit spitting. (DeLaney Rep., ECF No. 109-13; Leonesio Rep., ECF No. 109-11; Wilson Rep. ECF No. 109-12.)

In particular, Dr. Matthew Delaney noted that

> [o]n video, the last obvious movement from Mr. Higgins occurs at around minute 1:52 while he is still on the ground. At this point Officer Spaulding still has hands on Mr. Higgins's chin/neck/throat area. While we don't know if Mr. Higgins has a pulse at this point it is very clear that his clinical condition has quite suddenly changed as he has stopped obvious movement and is no longer responsive. This is the first point where Mr. Higgins clearly needs a medical evaluation and also the point at which a medical evaluation would have most likely been beneficial. Most likely his loss of consciousness was related to the actions taken by officers while he was on the ground. The available evidence would strongly argue that evaluating and treating a patient **[*53]** with CPR shortly after they become unresponsive would result in the best possible outcome.

(Delaney Rep. at p. 5, ECF No. 109-13.) The jury also could view the video as showing that Higgins was not combative, and was, in fact, unresponsive and motionless for approximately two minutes leading up to and including being put in the restraint chair.

It took approximately five to seven minutes for the officers to strap Higgins in the restraint chair. (Spaulding Dep. p. 23, ECF No. 109-5.) Sanford did not see Higgins move while he was putting him in the restraint chair. (Sanford Dep. p. 18, ECF No. 109-9.) Sanford did not feel a pulse while Higgins was in the cell and cannot remember if he felt one while Higgins was still in the hallway. (Sanford Dep. at p. 20.) While Higgins was in the restraint chair, Officer Travis observed a "white-appearing substance around his nose or mouth" but assumed the "substance" was Higgins's teeth. (Travis

---

[44] A medical need is objectively serious if it "one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Phillips v. Roane County, 534 F.3d 531, 540 (6th Cir. 2008)*.

[45] The Court is mindful that generally it must evaluate each officer individually, see *Trozzi, 29 F.4th at 758*; however, in this particular case, the parties have not differentiated between the actions of the officers as to the medical indifference claim.

Dep. p. 6, ECF No. 109-6.)

Orsborne testified that at some point he saw Spaulding go to Higgins and "jiggle" his head for a moment, and Higgins's "head just fell right back to the same place it had been." (Orsborne Dep. p. 14, ECF No. 109-3.) Orsborne also testified **[*54]** that, even after Higgins failed to respond to the sternum rub, the officers were "still unsure of "his condition" and it did not appear "at this point that medical treatment should at least be considered" even though Higgins was nonresponsive. (*Id.* at p. 16.) He also testified that he did not check for a pulse because the other officers had done so. (*Id.* at p. 17.) The jury could find that the execution of the sternum rub contradicted the officers' claim that they did not believe that Higgins was in distress.[46]

All of this evidence combined, viewed in the light most favorable to Plaintiff, could lead the jury to find that the actions of the officers show that they knew that Higgins was suffering from a serious medical need that posed an excessive risk to his health and that not calling for emergency services sooner would create an unjustifiably high risk of harm to Higgins and yet they ignored that risk until it was too late. For these reasons, summary judgment is denied on Plaintiff's medical indifference claim.

State Law Claims

Because most of Plaintiff's federal claims remain pending, the Court will retain supplemental jurisdiction over Plaintiff's state law claims. *See* 28 U.S.C. § 1367 (a) (authorizing **[*55]** district courts to exercise supplemental jurisdiction over "claims that are so related to claims in the action within [the courts'] original jurisdiction that they form part of the same case or controversy.")

Summary and Conclusion

Defendants' motion for summary judgment is **PARTIALLY GRANTED** and **PARTIALLY DENIED**. The motion is granted on Plaintiff's claim that Defendant Obion County's written policies violated Higgins's rights and on the claim that the County ratified the actions of

the individual officers. The motion is denied on all other claims.

**IT IS SO ORDERED**.

**/s/ S. Thomas Anderson**

S. THOMAS ANDERSON

CHIEF UNITED STATES DISTRICT JUDGE

Date: October 20, 2022.

_____

---

[46] If the officers did, in fact, believe that Higgins had "calmed down" prior to being placed in the restraint chair and they did not detect any signs of distress, it is puzzling why they felt the need to execute a sternum rub.

# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

NATHAN LING,                          )
                             )
       **Plaintiff,**               )
                             )    **Case No.: 3:20-cv-00233**
**vs.**                                )
                             )    **Judge Charles E. Atchley, Jr.**
**CAMPBELL COUNTY, TENNESSEE,** )
**et al.,**                            )
                             )
       **Defendants.**              )

## AFFIDAVIT OF GREG WINSTON

I, Greg Winston, being duly sworn, say:

1. I have personal knowledge of all matters herein, I am over the age of eighteen years old and I am otherwise competent to give this affidavit.

2. I am an expert witness hired to give objective opinions about the incident involving Nathan Ling on June 1-2, 2019.

3. I am certified by the United States Department of Justice to perform audits to evaluate their compliance with the Federal Prison Rape Elimination Act of 2003, as well as the American Correctional Association to perform audits of the operation and functions of jails and prisons of all sizes throughout the United States. I have performed audits of approximately 30 jails and prisons (county, state and federal) during my work as a consultant.

4. Nathan Ling was violently assaulted by numerous officers of the Campbell County Sheriff's Department without legal justification while his hands were cuffed behind his back. This can be seen in the surveillance video of the Campbell County Sheriff's

1

Department on the night in question. The sheriff (Robbie Goins) at the time was not involved until the next day after which he viewed the surveillance footage. Based upon his review of the CCTV footage it was Sheriff Goins' opinion that excessive force was used numerous times in violation of the department's policies.

5. Following the abuse, the medical records indicated that Nathan Ling suffered serious injuries including fractures to his eye socket, nose, mouth, cheek, jaw, ribs and shoulder. It was confirmed that Mr. Ling had a traumatic brain injury directly as a result and was life flighted the next morning to the University of Tennessee hospital.

6. I was asked to determine whether there was a custom or culture of violence and indifference and a lack of training and supervison in the Campbell County Sheriff's Department in June of 2019. It is my opinion that a culture or custom of indifference and failure to train and supervise had developed in the department based on the testimony of many of the officers as well as Sheriff Robbie Goins.

7. Sheriff Goins specifically testified that it was apparent that the officers as well as the supervisors should have known that excessive force was being used against Mr. Ling. Sheriff Goins said that every officer had a duty to intervene as well as report the abuse. Based upon the video evidence of the severe abuse of Mr. Ling, no one attempted to intervene to stop the abuse. Further, according to Sheriff Goins, no one reported the abuse to any supervisor or to the sheriff. (Goins Depo. P. 60-61).

8. There was also a culture of indifference and supervision in that one officer (Joshua Miller) testified in his deposition that it was the culture of the Campbell County Sheriff's Department not to tell on other officers who committed excessive force acts. Mr. Miller elaborated by stating that if you told on other officers, you would be called a "blue

2

falcon" and a snitch. As a result Mr. Miller was intimidated from reporting to supervisors about officers' misconduct or use of excessive force. (Miller Depo. P. 53-54).

9. Nathan Ling was severely beaten and abused by different officers while he was handcuffed behind his back. Other officers either participated or failed to intervene in the abuse as shown by the sheriff's department surveillance video. Following the abuse, it was apparent that Mr. Ling was bleeding profusely and unable to stand without assistance. Some of the officers testified that he was unable to talk. The officers then placed Mr. Ling in a solitary cell in a fetal position without regard to his serious medical needs. These officers were young and inexperienced and obviously lacked the training and supervision to operate a correctional facility in accordance with constitutional standards. It was the opinion of Sheriff Goins that the officers placed Mr. Ling in the cell to punish him. (Goins Depo. P. 117). In my opinion this is indicative of the lack of training and supervision and resulting indifference culture that had been allowed to build and exist in the Campbell County Sheriff's Department.

10. Additionally, after Officer Justin Crabtree and others had beaten Mr. Ling with his hands cuffed behind his back, Mr. Crabtree began taking cell phone pictures of Mr. Ling laying in the floor with large amounts of blood in the floor, handcuffed behind his back and a mesh spit mask over his head. Cell phones were not permitted inside the jail and Crabtree made no attempt to conceal his possession of the contraband cellphone. Mr. Crabtree then began sending the picture to numerous other officers including his supervisor. The supervisor under the chief deputy (Matt Wasson) confirmed that this photograph was sent for purposes of bragging about the abuse. Wasson, Depo p. 35. No

3

officer or supervisor attempted to stop this activity and no one was disciplined for disseminating this cruel photograph or possession of the contraband cellphone. (Wasson Depo. P. 36).

Another officer confirmed that the next day that Officer Crabtree and Jailer Sean Brown were "gloating" by showing the picture of Ling to others. (Miller Depo. P. 38).

In my opinion, this is indicative of the indifferent culture that had been allowed to build and exist in the Campbell County Sheriff's Department.

11. The Campbell County Sheriff's Department had no policy for medical staff available after 11 pm each night. The only medical assistance available was supposedly an "on call" nurse. The jailer in charge, Sean Brown, testified that he had attempted to call the "on call" nurse on three prior occasions and that the call always went to voice mail. Officer Brown therefore assumed that no medical assistance was available. It is my opinion that the lack of resources available for meaningful medical assistance to inmates was a serious problem that lends itself to serious injury or death. At no time did the supervisor or other officers attempt to summon emergency services. This would indicate an indifferent attitude toward providing arrestees and inmates with necessary and constitutionally adequate medical assistance.

12. There was a serious lack of training and supervision of these patrol officers and corrections officers. Many officers stated that they had no training on excessive force, intervening when another officer was abusing an inmate/arrestee, the overall policy manual of the sheriff's department, when to recognize serious medical needs, and supervisory training. These training concepts are essential when a sheriff department undertakes to arrest and incarcerate individuals with the potential use of any amount of

4

force. It is obvious that the lack of this training lead to the Mr. Ling being severely beaten and his medical needs being ignored by numerous officers of the Campbell County Sheriff's Department. It should have been apparent to the sheriff as a policy maker that these results could follow, and his sworn testimony validates this conclusion

13. The lack of supervision is evident from the testimony of the supervisors (Matt Wasson and Michael Owens). Both of these individuals received the picture of Nathan Ling taken by Justin Crabtree and disseminated to other officers. Neither of these supervisors attempted to stop the activity, although both admitted that this was wrong and unprofessional. Owens (direct supervisor over Crabtree) also admitted that he engaged in text messages with Crabtree that stated "We're just covering our asses" in response to telling Crabtree to keep his mouth shut. Sean Brown, the twenty year old left in charge of the jail, asked other officers (Alex Standridge and Joshua Miller) to change their reports of the events of the night in question. Sean Brown was the corporal supervisor over Standridge and Miller. It is my opinion, that this is indicative of the culture of indifference, failure to follow policy and total breakdown of accountability that had been permitted to build and exist in the Campbell County Sheriff's Department.

11-07.2023

Greg Winston

5

SWORN TO AND SUBSRCIBED before me, the undersigned notary public for the State
and County aforesaid, this the ___7th___ day of ___NOV___, 2023.

_____
Notary Public

My commission expires: __12/02/2024__.

FREDERICK C ALEXANDER
Notary ID #130919746
My Commission Expires
December 2, 2024

6

# EXHIBIT C

NATHAN LING,

      PLAINTIFF,

VS                CIVIL ACTION NO: 3:20-CV-233

CAMPBELL COUNTY, TENNESSEE;
JUSTIN CRABTREE; DAKOTA WILLIAMS;
SEAN BROWN; JOSHUA MILLER, in their
individual and official capacities;
and JOHN DOES, names and identities
not yet known,

      DEFENDANTS.

PRETRIAL DISCOVERY DEPOSITION OF:

ROBERT KEITH "ROBBIE" GOINS

TAKEN ON JULY 26, 2022

* * * THIS STYLE PAGE IS CONTINUED * * *

*Hicks Court Reporting* ● *Sally Hicks* ● *P.O. Box 8323, Gray, TN 37615* ● *423-741-3366*

1    use of force and all of our policies for the road

2    officers are the same.

3            Q.  All right.  So you say that you -- well,

4    let me back up.  It's my understanding that there was

5    -- you did not have 24, a 24 hour nurse at the time?

6            A.  We did not.

7            Q.  All right.  But you had a 24, you had a

8    nurse on call for 24 hours?  True?

9            A.  Yes.

10           Q.  So you could've called a nurse, or they

11   could've called a nurse that night, right?

12           A.  Yes.

13           Q.  And so now you have a nurse there that's

14   on, that's on the premises for 24 hours a day?

15           A.  Yes.

16           Q.  All right.  And you've not changed any

17   policies or procedures or training procedures in

18   terms of the road officers?

19           A.  No.

20           Q.  All right, Sir.  So...

21           A.  Not that I'm aware of.  If they're -- I

22   can't remember anything that we've changed...

23           Q.  All right.

24           A.  ...on that side.

25           Q.  So if nothing has changed, what's going

1          Q.  Fair enough.  I'm not trying to hold you

2     to that.

3          A.  Yes.

4          Q.  Okay.  So if Ling is struck in the face

5     by an officer before he ever gets into the patrol

6     car, and let's say it's by Crabtree, you had two,

7     five other officers watching that?  True?

8          A.  True.

9          Q.  All right.  So what's the, what's the

10    practice in the, in the sheriff's department of, if

11    an officer is abusing their position, what are other

12    officers' responsibilities?

13         A.  They should -- well, in this case, their

14    supervisor was there.  If Owens...

15         Q.  Their supervisor?  Okay.

16         A.  Mikey Owens.  If you have -- Mikey was

17    there, he should have stopped that.

18         Q.  Now...

19         A.  I don't know if he was actually there.

20         Q.  Yes, he was.

21         A.  Was he?

22         Q.  Yes, he was.  Yes, yes, yes.  I've got...

23         A.  I was -- can I say what I was told...?

24         Q.  Certainly.

25         A.  ...what happened there?

1    Q.   Okay.

2    A.   I mean, there was no need for it.

3    Q.   Well, you mentioned that his supervisor

4  was there.

5    A.   Should've, if -- who, Mike Owens?

6    Q.   Mike Owens.  Uh-huh (affirmative).

7    A.   I didn't recall if he was at the scene or

8  not, but he texted, he sent him a picture of the guy.

9  Somebody should've called us and said, hey, Crabtree

10  has sent me a picture of this guy in the jail, and we

11  should have went down that night and done something

12  about it the night of.  But I didn't know about that

13  'til the next day when I saw the video.

14    Q.   So have you -- you know, my question was,

15  what is the responsibility of the other officers if

16  they see an officer...?

17    A.   To report that.

18    Q.   Okay.  To report that to whom?

19    A.   To their supervisor, to me.

20    Q.   All right.

21    A.   They know that they can talk to me.

22    Q.   All right.  So Sergeant Owens was

23  Crabtree's immediate supervisor?

24    A.   Yes.

25    Q.   All right.  And Sergeant Owens knew what

*Hicks Court Reporting* ● *Sally Hicks* ● *P.O. Box 8323, Gray, TN 37615* ● *423-741-3366*

1  was going on.  Would Sergeant Owens have had a

2  responsibility to report that on up to the

3  lieutenant?

4          A.  He did.  He does.

5          Q.  Okay.  And did he do that?

6          A.  I'm not sure.

7          Q.  Okay.  Would Sergeant Owens have a

8  responsibility, if he saw Crabtree abusing his

9  position, to stop him?

10          A.  Yes.

11          Q.  All right.  What would the other

12  officers, would they have any responsibility, Minor,

13  Douglas, Williams or Tackett?

14          A.  Every one on scene that was there had a

15  responsibility to report that.

16          Q.  All right.  And so assuming that Ling was

17  -- that -- let me back up, 'cause I, you know, again,

18  and you correct me if I use the wrong words, but if

19  Ling -- if an officer used excessive force on

20  Ling...?

21          A.  Uh-huh (affirmative).

22          Q.  ...at the scene, who all reported that?

23          A.  Nobody, to my knowledge.

24          Q.  Okay.  So did they all violate company,

25  or department policy?

*Hicks Court Reporting  ●  Sally Hicks  ●  P.O. Box 8323, Gray, TN 37615  ●   423-741-3366*

1          A.  Yes.

2          Q.  All right.  And would that be indicative

3     of a culture or practice that the department has

4     developed?

5          A.  I don't want to say that, to say that we

6     have a practice of doing this.  I try to maintain and

7     run a professional department.  I don't condone this

8     type of acts.

9          Q.  Okay.  Well, let's move on to when he got

10    to the sally port.  Now we know when he got to the

11    sally port, he was, you said that he was -- you saw

12    in the video he was pulled out with excessive force?

13         A.  Yes.

14         Q.  All right.  And I don't know who all was

15    in the sally port, but I do know in the booking room,

16    and I went over these individual officers, Crabtree,

17    Brown, Standridge, Miller and Williams were all there

18    in the booking room.  All right?

19         A.  Uh-huh (affirmative).

20         Q.  Now the first indication that I had that

21    Ling was abused was when Crabtree threw him down on

22    the counter.  Do you recall that?

23         A.  I do now.

24         Q.  Okay.

25         A.  Yeah.

1        Q.   And would you call that also excessive

2   use of force when he was handcuffed behind his back?

3        A.   It was.

4        Q.   And he ran his head into the wall?

5        A.   Uh-huh (affirmative).

6        Q.   Into the counter?

7        A.   Uh-huh (affirmative).

8        Q.   Yes?

9        A.   Yes.

10       Q.   Okay.  And did any of those officers, you

11  know, we don't have Owens there at the time, but did

12  any of those officers report to you or to any of

13  their, any of their superiors that the officers were

14  abusing their positions?

15       A.   I don't recall if they did.

16       Q.   Okay.  When they report those type, when

17  they're required to report those kinds of things, are

18  they required to fill out a written report or just to

19  contact their immediate supervisor and just give an

20  oral report?

21       A.   They should fill out a -- well, if

22  they're, if they're just reporting it?

23       Q.   Yes.

24       A.   Just report it to their immediate

25  supervisor.

*Hicks Court Reporting* ● *Sally Hicks* ● *P.O. Box 8323, Gray, TN 37615* ● *423-741-3366*

1    do on that.

2         Q.  Okay.

3         A.  I just -- and I can't recall what we

4    disagreed on, but -- and I'm under oath here, and I

5    remember that we had a disagreement on something, but

6    it wasn't nothing that he was justifying what

7    Crabtree done or what happened that night or that,...

8         Q.  Well, okay.

9         A.  ...that night and up until the morning,

10   the whole situation from beginning to end.

11        Q.  Okay.  I recall you saying something to

12   the effect that he felt that the use or that the

13   force was reasonable under the circumstances.

14        A.  And like with -- I'm thinking what he was

15   talking about was like what Dakota did.  You know,

16   I'm talking, he thought that holding the legs down

17   and things like that were justifiable.  I think

18   Dakota done what was -- he come in at the, from what

19   I remember, he come in at the last minute there and

20   was trying to help somebody.  And I think there was

21   another -- with the other officer and some people

22   there that we maybe had a disagreement on that why

23   this continued, you know.  When this started, why

24   didn't -- it's just too much.

25        Q.  Uh-huh (affirmative).

1    opinion.

2    (VIDEO ENDS)

3    CONTINUING, DIRECT EXAMINATION BY MR. SEATON:

4        Q.   At what point in time did you feel that

5    he needed the medical attention?

6        A.   When they strike him in the face and

7    blood goes across the room.

8        Q.   Okay.

9        A.   My opinion.

10       Q.   Okay.  And they should've taken him to

11   the hospital at that point in time?

12       A.   Yes.

13       Q.   He was in serious condition, it looked

14   like?

15       A.   Appears to me.

16       Q.   You don't -- where's that remote?  Here,

17   I've got it.

18       MR. KNIGHT:  That's something my wife would

19   do.  Where's the remote?  You've got it.

20       Q.   All right.  So you don't have any

21   cameras in the shower, right?

22       A.   No.

23       Q.   All right.  And so we have a camera in

24   the sally port, got a camera in the, next to the

25   booking room.

*Hicks Court Reporting  ●  Sally Hicks  ●  P.O. Box 8323, Gray, TN 37615  ●  423-741-3366*

1    that I don't tolerate it, but that did happen.  And I

2    can't go back and say, well, you know, after that

3    I've done this, this and this.  There should -- I

4    guess I could've done more afterwards.

5         Q.   Were you aware that Sergeant Owens had

6    conversations with Crabtree where he told him to keep

7    his mouth shut with the TBI investigation?

8         A.   No.

9         Q.   Okay.  Let's take a look at that.  There

10   you go, Counsel.  So I want you to assume that the

11   TBI obtained Crabtree's phone records, okay?

12        A.   Uh-huh (affirmative).  Right.

13        Q.   And that these are the phone records and

14   that we have transcribed those phone records.  And if

15   you would, just kinda review these.  These are text

16   messages.

17        A.   Right.

18        Q.   Okay?  So it starts out on June the 2nd

19   at 2019, at 12:07 am with Crabtree saying, "Well,

20   Sarge, I done the damn thing", right?

21        A.   Yes.

22        Q.   And Owens responds, "Fuck him.  Was he

23   bleeding in the back of the car or was that all snot

24   and shit?"  Crabtree says, "I'm not sure, lol.  I'm

25   getting the back of the car cleaned anyway just in

*Hicks Court Reporting* ● *Sally Hicks* ● *P.O. Box 8323, Gray, TN 37615* ● *423-741-3366*

1   case." Owens, "Good."

2       Then at 6:08 am, or excuse me, 6:08 pm that

3   day, Owens, "Fuck that guy. Play stupid games, win

4   stupid prizes. Welcome to Tennessee." Crabtree, "I

5   agree, but I thought I was going to get fired. What

6   can I say though. I take after my sarge when it

7   comes to fighting."

8       Then two days later Owens says, "Don't say

9   another word to a soul about what happened that

10  night. The nurse already wrote a statement about you

11  and showing that picture you took. I'll need you to

12  print every picture you took. They have you on video

13  taking pictures." Crabtree, "I only took one, I

14  swear, and I deleted it. I'm freaking out." Owens,

15  "Chill out. A busted nose doesn't cause brain

16  damage. We're just covering our asses." Right?

17       A.  Uh-huh (affirmative). Yes.

18       Q.  So what's your thoughts about Owens and

19  Crabtree's conversations?

20       A.  Paints a totally different picture of

21  things that I knew about that night and reactions

22  from the sergeant on shift.

23       Q.  Uh-huh (affirmative).

24       A.  He is, he's actually condoning what he,

25  what had happened, and encouraging him in ways to

1          A.   I thought they did call her.

2          Q.   Okay.  Well, she came in at 7 and said

3  this is my regular shift.

4          A.   They called somebody.

5          Q.   Okay.

6          A.   There was someone called.  I don't -- I

7  was told that.

8          Q.   Okay.

9          A.   They may not have.

10         Q.   All right.  And so you didn't read her

11 statement where she said when she first saw Ling she

12 was shocked?

13         A.   No.

14         Q.   Okay.  Would that surprise you?

15         A.   No.

16         Q.   Okay.  She was probably shocked at his

17 medical condition?

18         A.   Yes.

19         Q.   All right.  So the officers that placed

20 him into this neg cell, do you feel that they were

21 doing it to punish Ling further?

22         A.   Yes, it would have to be punishment.

23         Q.   Okay.  And when -- what is the, what is

24 the procedure -- is there any -- well, let me back

25 up.  Is there any written policy or procedure for

*Hicks Court Reporting* ● *Sally Hicks* ● *P.O. Box 8323, Gray, TN 37615* ● *423-741-3366*

1          Q.   No, I don't want to interrupt you.

2          A.   No.   That's, that's -- this -- that's my

3    opinion of, you know, instead of just him being in

4    there left alone.

5          Q.   So are you saying it's the

6    responsibility of the sheriff's department to

7    assess...?

8          A.   Yes.

9          Q.   Let me finish.   To -- is it, are you

10   saying it's the responsibility of the sheriff's

11   department to assess someone's medical condition

12   before they incarcerate them?

13         A.   Yes.

14         Q.   All right.   And especially if someone

15   has been severely injured?

16         A.   Yes.

17         Q.   All right.   And you said that it was

18   very clear that Mr. Ling had been severely injured?

19         A.   It appears in the video that he is.

20         Q.   All right.   So are your corrections

21   officers trained to -- let me back up.   When you say

22   we have a procedure whereby the officer goes by and

23   checks, one of the officers said we're supposed to

24   check on them hourly.   Was that true?

25         A.   I'm not sure, I'm not exactly sure on

1    that you take a photo and share with anybody. They

2    should've been working toward getting him some help

3    medically instead of laying, let him lay there like

4    he was, like he was.

5         Q.   Okay. I know that Crabtree was

6    prosecuted and Sean Brown was prosecuted. There were

7    others that were charged but dismissed. Were you

8    aware of that?

9         A.   Dakota?

10        Q.   Uh-huh (affirmative).

11        A.   Williams?

12        Q.   Uh-huh (affirmative).

13        A.   I don't know about the others. I know

14    that, the ones that were charged and I know that Mr.

15    Crabtree served some time. I don't know if Brown, if

16    he has yet or if he's been sentenced to any time yet.

17        Q.   Did you have an opinion as to whether or

18    not others should've been charged and convicted?

19        A.   No.

20        Q.   Okay. Fair enough. Under what

21    circumstances should your personnel know that someone

22    needs to be hospitalized?

23        A.   I, I don't understand. What do you...?

24        Q.   Well, under what circumstances, I

25    mean,...

1          A.   I mean, should, should they have -- at

2   what point does someone know?  Is that what you're

3   asking?

4          Q.   Yeah.  Do they have any training on

5   that?

6          A.   No.

7          Q.   Okay.

8          A.   I mean, it's kind of, how would you have

9   to have training on that?  That?

10         Q.   You're referring to...?

11         A.   Common sense.

12         Q.   You're referring to the video?

13         A.   Yes, the video.

14         Q.   Yes.

15         A.   Excuse me.  The video, in that situation

16   how would you -- how could you not know that?

17         Q.   So...

18         A.   It's obvious.

19         Q.   So you're saying it was obvious that Mr.

20   Ling needed immediate medical attention and should've

21   been taken to the hospital?

22         A.   In my opinion, yes.

23         Q.   All right.  Is there any written

24   policies, or do you just rely upon the nurses to

25   generally make those determinations?

1    his neck?  I don't know.

2        Q.   Would that, if deputies in your

3    department are doing that, would it indicate to you

4    that you've got a culture of violence to combative

5    arrestees?

6        A.   It looks it, it looks to be.

7        Q.   Yeah.  Okay.  And then there's one last

8    little thing I want to, right here.

9        A.   Yeah.

10       Q.   Do you want to look at the rest of that

11   report?

12       A.   Yes.

13       Q.   Okay.  Let's make that report Exhibit

14   Number 3.

15             (WHEREUPON, EXHIBIT NUMBER 3, Tennessee

16             Bureau of Investigation Summary Report,

17             IS ADMITTED)

18       Q.   Just a couple other questions.  The

19   medical that you provide for inmates, you said, is

20   now 24/7.

21       A.   Uh-huh (affirmative).

22       Q.   As opposed to when Ling was there you

23   only had medical at certain hours?

24       A.   Yes.

25       Q.   And did you get additional funding for

1    that?  How did that come about?

2        A.   Our funding increased a little bit, but

3    this company that we're with now, they, that's

4    something they provide, so...

5        Q.   Okay.  So this -- the change from the

6    on-call medical to the 24/7 medical wasn't a result

7    of this Ling matter?

8        A.   No.

9        Q.   Okay.

10        A.   No.

11        Q.   There was a, a James White, are you

12    familiar with him, a corrections officer?

13        A.   Yes.

14        Q.   Okay.  And he stated that he assisted

15    the next morning, he and there was an officer

16    Boiger...?

17        A.   Yes.

18        Q.   ...with him, and the two of them, I

19    think, took Ling to the emergency room?  Is that what

20    you recall?

21        A.   Yeah.

22        Q.   And do you recall Officer White saying

23    that Ling had urinated on himself and was unable to

24    communicate other than to grunt?

25        A.   Yes.

# EXHIBIT D

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

AT KNOXVILLE


NATHAN LING,

        PLAINTIFF,


VS                  CIVIL ACTION NO:  3:20-CV-233


CAMPBELL COUNTY, TENNESSEE;

JUSTIN CRABTREE; DAKOTA WILLIAMS;

SEAN BROWN; JOSHUA MILLER, in their

individual and official capacities;

and JOHN DOES, names and identities

not yet known,

        DEFENDANTS.


PRETRIAL DISCOVERY DEPOSITION OF:

SEAN BROWN

TAKEN ON JUNE 8, 2023


* * * THIS STYLE PAGE IS CONTINUED * * *

*Hicks Court Reporting*  ● *Sally Hicks*  ● *P.O. Box 8323, Gray, TN 37615*  ●  *423-741-3366*

```
 1         A.   At, like the very start.

 2         Q.   Okay.

 3         A.   I want to say she did pepper spray

 4   training.

 5         Q.   Okay.

 6         A.   Maybe one or two times.

 7         Q.   Okay.

 8         A.   But outside of that, I can't recall any

 9   more.

10         Q.   Any training from Catie Wilson?

11         A.   No.

12         Q.   Okay.  So any of the other training that

13   you got was just a coworker that just...?

14         A.   Just figuring it out.

15         Q.   Okay.

16         A.   Yeah.  My supervisor training kind of

17   stemmed on here's a stack of papers.  Just sign your

18   name and make sure they're in this order.  And they

19   gave you, like a checklist.  And they were like

20   that's pretty much it.

21         Q.   So are you talking about the policy

22   manual, the 700 page policy manual?

23         A.   No.  No, no, no.

24         Q.   Okay.  I'm sorry.

25         A.   So each shift, you had to do, like, I
```

*Hicks Court Reporting* ● *Sally Hicks* ● *P.O. Box 8323, Gray, TN 37615* ● *423-741-3366*

```
 1    inmates.  So that's the general overview of what that
 2    was that I remember.
 3             Q.   Okay.  Any other training?
 4             A.   Not that I can think of.
 5             Q.   Okay.  Did you have training on the use
 6    of excessive force?
 7             A.   Not that I remember, no.
 8             Q.   Okay.  You mentioned that you were
 9    firearm certified?
10             A.   Correct.
11             Q.   How long did that take?
12             A.   Like to get the certification?
13             Q.   Uh-huh.  Yeah.
14             A.   Or like how long I was there before I
15    got it?
16             Q.   No.  How long did it take to get the
17    certification?
18             A.   A few hours.
19             Q.   Okay.  And during your time as a
20    corrections officer or a corporal, did you carry a
21    firearm?
22             A.   Not within the facility.  No.
23             Q.   Okay.  So what was the purpose of
24    getting the certification?
25             A.   So when you take them to, like hospitals
```

1      the corporal?

2              A.    Yes.  That is correct.

3              Q.    And you would be in charge of the jail

4      each time that you had your own shift?

5              A.    Correct.

6              Q.    Okay.  How many shifts would you work a

7      week?

8              A.    Five.

9              Q.    Okay.

10             A.    Sometimes six.

11             Q.    Okay.  And during, when they first

12     promoted you to corporal and left you in charge of

13     the jail, did you get any training?

14             A.    Like I said, it was more of a, hey,

15     here's a stack of papers, sign your name, make sure

16     they're in order.

17             Q.    Okay.  That was your supervisor

18     training?

19             A.    Yes.  Yes, yes.

20             Q.    Okay.  And was there any formal

21     training?

22             A.    No, like, supervisor training, like,

23     hey, this is how you should be as a manager. You

24     know, this is blah blah blah blah blah. It was here's

25     a stack of papers, sign your name, make sure they're

*Hicks Court Reporting  ●  Sally Hicks  ●  P.O. Box 8323, Gray, TN 37615  ●  423-741-3366*

1    A.    Correct.

2    Q.    Anyone else?

3    A.    No.

4    Q.    Okay.  Do you think that Nathan Ling had

5    a serious medical condition?

6    A.    At the time, I did not.

7    Q.    Okay.  At what time?

8    A.    When Justin had hit him in the nose I

9    did not.

10    Q.    Uh-huh.

11    A.    So at that jail, and this is totally

12    unrelated, but I've seen people where they've been in

13    fights and they've cut their hand, and it's swelled

14    up like this...

15    Q.    Uh-huh.

16    A.    ...and they won't take them to the

17    hospital.

18    Q.    Uh-huh.

19    A.    And so with that information in the back

20    of my mind, it's like, okay, he's got a broke nose,

21    like, that's all I thought he had at the time.  It

22    was -- that's the only place I saw him hit.  And so

23    it's like, okay, it's not life or death, it's not

24    this or that.  It can wait until the morning when

25    there's more people here that if he does become

*Hicks Court Reporting* ● *Sally Hicks* ● *P.O. Box 8323, Gray, TN 37615* ● *423-741-3366*

1   combative, we can control him in a better way.

2          Q.   Okay.  Did you see Justin Crabtree slam

3   his head up against the block wall in the sally port?

4          A.   I saw him push him up against the door,

5   but I didn't realize that he had bounced his head.

6   No, not until I watched the video.

7          Q.   Okay.  Do you think that that's what

8   happened now?

9          A.   Yes.

10          Q.   Okay.  And there was quite a bit of

11   blood in the trap room, right?

12          A.   Correct.

13          Q.   He wasn't very responsive to you by the

14   time you got him in the negative pressure cell,

15   right?

16          A.   He didn't speak to me at all from the

17   time we had gotten him out of the car.

18          Q.   Okay.

19          A.   So I didn't think anything else of it.

20   I just thought that he was done fighting.

21          Q.   There was a time when I watched the

22   video where they, where they were moving Ling from

23   the trap room into the main area of the jail and he

24   looked like he was very unsteady on his feet.

25          A.   I don't recall.

*Hicks Court Reporting* • *Sally Hicks* • *P.O. Box 8323, Gray, TN 37615* • *423-741-3366*

1        Q.   Well, we'll show, we'll look at the

2    video here in a minute.  So you never, at any point

3    in time, recognized that he was in need of serious

4    medical treatment?

5        A.   At the time, no.

6        Q.   Okay.  The blood wasn't an indicator for

7    you?

8        A.   I just thought it was from the nose, is

9    really, like I thought he had broke his nose.

10        Q.   Did you examine him?

11        A.   No.  I didn't know what to look for,

12    or...

13        Q.   Sure.

14        A.   You know, I just thought it was a broke

15    nose.  Like, we didn't have medical staff on shift,

16    and so it wasn't like I could be like, hey, we need

17    medical here.  And again, I've seen people, their

18    hand swelled up, they're not going to the hospital,

19    they've lost all mobility in their arm over it.  Why

20    am I calling an ambulance when they're not even

21    sending them for that, you know.

22        Q.   So you didn't think his condition was

23    severe at all?

24        A.   No.  I just thought he had a broke nose

25    at the time.

1             Q.   Allison Willoughby was the nurse, right?

2             A.   That came in, correct.

3             Q.   All right.  And she told us, you know,

4   we've already taken,...

5             A.   Correct.

6             Q.   ...I'm going to say 25 depositions,

7   okay?

8             A.   Uh-huh (affirmative).

9             Q.   And in her deposition, she said that she

10  was on call for 24/7, on call 24/7.  Were you never

11  told that?

12           A.   I don't know about that.  I know we had

13  an on-call nurse.

14           Q.   Okay.

15           A.   But every time that I had contacted or

16  tried to contact them in the past, they never

17  answered, it just went to a voicemail.  And so I just

18  naturally assumed that that line was not operational.

19           Q.   And on how many occasions do you think

20  that you had called a nurse before when they wouldn't

21  respond to you?

22           A.   At least three.

23           Q.   Okay.

24           A.   Three prior to that.

25           Q.   So based upon the fact that three times

1  before you'd never gotten a response, you decided not

2  to call any nurse that night?

3          A.   Correct.

4          Q.   On June the 2nd?

5          A.   Correct.

6          Q.   You didn't feel like it would do any

7  good?

8          A.   Correct.  I didn't think that it would

9  get any contact from anybody.  And you know, it's a

10  broke nose, or at least that's what I thought at the

11  time.

12          Q.   Uh-huh.  Did you at any point in time

13  attempt to talk with Mr. Ling to see if he had a head

14  injury or was responsive?

15          A.   No.  Because he wasn't responding when I

16  was speaking to him prior to.

17          Q.   So why wouldn't that have been an

18  indicator to you that he had a serious medical

19  condition?

20          A.   What do you mean?

21          Q.   Well, if somebody's not responding to

22  me...

23          A.   Before he had even been hit or anything

24  else, he wasn't speaking to me.  I'd introduced

25  myself and was like, hey, do you have anything that's

*Hicks Court Reporting* ● *Sally Hicks* ● *P.O. Box 8323, Gray, TN 37615* ● *423-741-3366*

1       that's when he had yanked him out like that.

2            Q.   So, well, it appeared to me that the

3       patrol car had just pulled in and Crabtree climbs

4       out.  I mean, there wasn't a whole lot of time in

5       between...?

6            A.   Right.

7            Q.   ...him jerking him out, right?

8            A.   Correct.

9            Q.   All right.  But you did see him kicking

10      at windows?

11           A.   Yes.

12           Q.   Okay.  Let me ask another question.

13           A.   Okay.

14           Q.   Were you ever trained to intervene in

15      the event that another officer was using excessive

16      force?

17           A.   No.

18           Q.   Okay.  Do you think that you would've

19      ever intervene with an officer that you thought was

20      using excessive force?

21           A.   I wouldn't even know how to do so.  I

22      would like to.

23           Q.   Okay.

24           A.   But doing so, I don't know what I

25      would've done or how I would've done it.

1      A.   Not in this current section of the

2   video.

3      Q.   Tell me any time you think that he is

4   resisting.  And here, we're starting to see a lot of

5   the blood, right?

6      A.   Correct.

7      Q.   Okay.  And who just came in?  That

8   was...

9      A.   Which one?  With the black shirt or...?

10     Q.   Black shirt and white, black hat?

11     A.   I think that was Standridge.

12     Q.   Okay.  And then standing up here...?

13     A.   That's Dakota Williams.

14     Q.   Yeah.  That's right.  Okay.  So what's

15  going on here?  Why do we have four officers?

16     A.   At this point I was just waiting on

17  somebody to tell me where we need to go from that

18  point.

19     Q.   Okay.

20     A.   I was trying to make sure that he was

21  calmed down.  I was talking to him, trying to figure

22  out, you know, what we're going to do.  And then he

23  was spitting at the time.  And so we were trying to

24  avert him from spitting on us while I was having

25  somebody get a spit mask.

*Hicks Court Reporting*  ●  *Sally Hicks*  ●  *P.O. Box 8323, Gray, TN 37615*  ●  *423-741-3366*

1          A.   No.

2          Q.   Okay.  Whose decision was it to put him

3     in the negative pressure cell?

4          A.   That was the cell that we had open.

5          Q.   But why wouldn't you put him in a

6     regular cell?

7          A.   Because dispatch has said that he was

8     combative.

9          Q.   Okay.

10         A.   And at the time, tunnel vision.  I

11    thought he was combative.

12         Q.   Okay.  So was it your decision to put

13    him in the negative pressure cell?

14         A.   It was the cell that we had open.  I

15    wasn't going to put him in another cell with other

16    inmates.

17         Q.   But was it your decision to do that?

18         A.   Yes.

19         Q.   Okay.  All right.  Fair enough.  But he

20    wasn't combative now, right?

21         A.   Not at this point, no.

22         Q.   Was he unconscious?

23         A.   No.  No.  He was still walking and stuff

24    with us.

25         Q.   Did you attempt to have any conversation

1    how to do it efficiently.  Wilson and I never really

2    saw eye-to-eye to begin with.  And so it was one of

3    those thoughts of, okay, what's the reprimendation

4    (sic) that's going to come.  You know, what's going

5    to happen now?  You know, this, that and the other

6    thing, type thing, and so it was, again, 20 years old

7    and I had a fear for supervisors, you know.

8         Q.   Sure.

9         A.   Like, getting yelled at, or making the

10   wrong call, or doing something that shouldn't be

11   done.  You know, I just wanted to be a good

12   supervisor.  And so trying to figure out how to do

13   that, I didn't really, I wouldn't say clash, but I

14   wouldn't really see eye-to-eye with Wilson.  No

15   matter what I did, it was never good.  And so it was

16   one of those things of, what am I going to say?  You

17   know, how am I going to make this less of a yelling

18   and more of an adult conversation?  You know, and it

19   was more of that kind of fear than, you know, at the

20   time.

21        Q.   Well, if there was no damage done, it

22   wouldn't have mattered how escalated the situation

23   had gotten?  True?

24        A.   What do you mean?

25        Q.   Well, the damage is to his head.

1         A.   Correct.

2         Q.   To his brain.  To his eye socket, his

3 nose,...

4         A.   Correct.

5         Q.   ...his mouth, et cetera.  But if there

6 had been no damage done, the escalation of the

7 incident wouldn't have mattered?

8         A.   Correct.

9         Q.   True?

10        A.   Correct.  But when I'm 20, I'm not

11 thinking that way.

12        Q.   Okay.

13        A.   Like, everything that is there, I'm

14 thinking as a 20 year old, not knowing what I'm

15 doing, not having formal training, I don't know what

16 needs to be done, or how to do it, or what to look

17 for.  So I was kinda stuck in a rock and a hard place

18 on, am I doing what I need to do.

19        Q.   Well, but it appears to me that what

20 you're saying is you were aware of the damage that

21 had been done.

22        A.   I'm aware now.

23        Q.   Okay.

24        A.   So everything that I'm telling you is

25 the thought process that I had then.

1         Q.   And that's what I want to talk about.

2         A.   Right.

3         Q.   Because the thought process that you had

4  then was, I'm afraid of what my supervisor's going to

5  say because this incident escalated.

6         A.   Right.  It was my first escalated

7  incident, first combative incident...

8         Q.   Sure.

9         A.   ...that I hadn't had another corporal

10  there who had done it, been through it, knew what to

11  do, how to do it, you know, guiding me through.  And

12  so I was trying to be the corporal and do like my

13  other corporals did.  And trying to be the corporal

14  that people are like, oh, yeah, you know, we'll go to

15  Brown, you know, type thing.

16         Q.   But it wouldn't have mattered had he not

17  been so injured?

18         A.   Correct.  And I know that now.

19         Q.   Uh-huh.

20         A.   I didn't then.

21         Q.   Okay.

22         A.   That's what I'm getting at.  I didn't

23  know that then.

24         Q.   Well, what I'm trying to understand is,

25  why you, even without any medical training, would not

1    have understood how serious his medical condition

2    was.  With all the blood, with the fact you saw his

3    head getting slammed up against a block wall, against

4    a window, him unsteady on his feet, and you lay him

5    down, and he's not responding.  How do you not

6    understand he needs medical attention?

7              A.    I wasn't adding the dots together.

8              Q.    Okay.

9              A.    You know, again, I had tunnel vision,

10   and I wasn't thinking clearly.

11             Q.    And once he was put into that cell, he

12   was left there until 7 am the next morning, right?

13             A.    I believe so.

14             Q.    No one ever opened the door to look at

15   him to see if he was responsive?

16             A.    That is correct.

17             Q.    I asked one of the other officers, I

18   said, "So did you all decide to just drop him in

19   there until he died?"  What's your response to that?

20             A.    I wouldn't say until he died.  It was

21   more so until somebody who knew what they needed to

22   do got there.  You know, first shift was all the

23   senior people.  And so it was four or five hours

24   until first shift started rolling in, start telling

25   them what's going on, try to formulate some kind of

1    plan, you know.

2            Q.    Plan to do what?

3            A.    To go from there.  I didn't know what to

4    do.  That's the thing.  Like, I had no idea.  I

5    didn't know.

6            Q.    But you wouldn't call your sergeant,

7    Catie Wilson, because you didn't see eye-to-eye with

8    her?

9            A.    It wasn't that I didn't see eye-to-eye

10   with her.  It was more so, again, she, you call her,

11   and it's like, okay, hey, he got hit in the face.  Oh

12   well, he's probably got a broke nose.  Why are you

13   calling me at midnight, 1 o'clock?  You know, that

14   was what I thought the response would've been.  And

15   so I was like, I don't want to get yelled at, don't

16   want to be this, don't want to be that.  You know,

17   she's going to be here in a few hours.  I'll talk to

18   her then.

19           Q.    You didn't want to call her because you

20   felt like she would yell at you for calling her?

21           A.    Correct.

22           Q.    All right.  But that was your job,

23   right?

24           A.    What was my job?

25           Q.    To call her if you needed help?

# EXHIBIT E

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

AT KNOXVILLE


NATHAN LING,

       PLAINTIFF,

VS                CIVIL ACTION NO:  3:20-CV-233

CAMPBELL COUNTY, TENNESSEE;
JUSTIN CRABTREE; DAKOTA WILLIAMS;
SEAN BROWN; JOSHUA MILLER, in their
individual and official capacities;
and JOHN DOES, names and identities
not yet known,

       DEFENDANTS.


PRETRIAL DISCOVERY DEPOSITION OF:

JOSHUA MILLER

TAKEN ON JULY 26, 2022


\* \* \* THIS STYLE PAGE IS CONTINUED \* \* \*


*Hicks Court Reporting* ● *Sally Hicks* ● *P.O. Box 8323, Gray, TN 37615* ● *423-741-3366*

1       Q.   Okay.  Did you get a copy of the policy

2   and procedure manual?

3       A.   Yes.

4       Q.   Okay.  Will you hand him Exhibit 1.

5   There's about 450 pages there.  Is that what you got

6   you think?

7       A.   Yes.  Yeah, it was in a binder.

8       Q.   Okay.  And just, if you would just -- I

9   don't want you to read it or anything, but just

10   glance through it.  Just is it, does it look like

11   that's what you got?

12       A.   Yeah, this is pretty, if not the same

13   thing or very close to it, yeah.

14       Q.   And did you sign a piece of paper saying

15   that you received it?

16       A.   Yes.

17       Q.   And did you read it?

18       A.   I skimmed over it and we went over a few

19   things when we were in that class.

20       Q.   Okay.

21       A.   But that was it.  It was more like of a,

22   she picked a spot and then was like follow along, and

23   then -- but other than that, I did not.

24       Q.   Okay.  So did anybody go over in detail

25   that policy and procedure manual with you?

1        A.    No, not in detail.

2        Q.    Did anybody ever question you to

3  determine whether or not you understood that policy

4  and procedure manual?

5        A.    No.

6        Q.    Okay.  Was there anything, I know you

7  said that you skimmed it, but was there anything in

8  it that concerned you, bothered you or anything like

9  that?

10        A.    The only things that I really looked at,

11  I remember at one point I looked at use of force, but

12  that was after the incident.  Because after that

13  whole thing had happened I was really shooken up and

14  -- but -- and then other than that, it was dress

15  code.  'Cause I was having issues with fitting in the

16  shirt that they had given me and they told me to wear

17  it anyways, but it was like a belly shirt and I

18  didn't wear it so I got in trouble for it.

19        Q.    So the use of force section, you said

20  that you looked at it after the Ling incident?

21        A.    Yes.

22        Q.    Had you ever looked at it before?

23        A.    I had not.

24        Q.    Okay.  And had you ever had any training

25  on use of force at all?

Case 3:20-cv-00233-CEA-JEM   Document 125-4   Filed 11/07/23   Page 66 of 119
PageID #: 862

1        A.   Did not.

2        Q.   Okay.  Had you ever had any training on

3    combative individuals?

4        A.   No.

5        Q.   Okay.  How to handle those situations?

6        A.   Never.  The only thing that I knew what

7    to do was what Brown had told me, and that was pretty

8    much it.

9        Q.   And he was your supervisor?

10        A.   Yes.

11        Q.   He was a sergeant?

12        A.   He was a corporal.

13        Q.   A corporal?  That's what...

14        A.   And the corporals, the corporals there

15    are pretty much the sergeants.  They're the ones that

16    are over the entire shift at all times.

17        Q.   Okay.  Excuse me.  And you said that you

18    went to work there in March of 2019?

19        A.   I believe so, yes.

20        Q.   All right.  And so you know this

21    occurred June the 2nd of 2019.

22        A.   Yes.

23        Q.   So you'd been there maybe three to four

24    months?

25        A.   Yeah, it was right at two, 'cause I had

*Hicks Court Reporting* ● *Sally Hicks* ● *P.O. Box 8323, Gray, TN 37615* ● *423-741-3366*

1   shortly after that they had gained 24 hour nursing.

2          Q.    After the Ling incident?

3          A.    Yeah.

4          Q.    Okay.  And what training did you receive

5   on when you -- well, what did they tell you to do if

6   you didn't have a nurse?

7          A.    Report it to the supervisor, and then

8   they would use their discretion to contact a nurse or

9   send them to the hospital.

10         Q.    And what were you to report to a

11  supervisor?

12         A.    Just the situation, like what was wrong

13  with them, what had -- what they had said had

14  happened to them or what was going on with them and

15  anything that they had said was happening or

16  something you had noticed, like if you'd noticed a

17  cut or something and it was new or blacked eye or

18  anything like that, then you would just let the

19  supervisor know.  And that was as far as it went with

20  us unless there was an actual nurse there, that we

21  could just take them straight to the nurse.

22         Q.    Okay.  And so again, what I want to

23  focus on is when you don't have a nurse what you're

24  told to do.

25         A.    Just go to your supervisor and then they

*Hicks Court Reporting* ● *Sally Hicks* ● *P.O. Box 8323, Gray, TN 37615* ● *423-741-3366*

```
 7   Mallory Campbell and then the Captain Stoney Love.
 8   How strict was that chain of command?
 9            A.   It was pretty strict.   I...
10            Q.   So you couldn't go above Sean Brown?
11            A.   No.
12            Q.   Okay.
13            A.   Normally, there especially, I remember
14   multiple occasions I had tried to just talk to the
15   sergeant or something.   They would -- their response
16   was, did you talk to your corporal.
17            Q.   Okay.
18            A.   And I would be like no, or yes, and they
19   was like, well, you need to talk to them.
20            Q.   So on the night that Ling, the Ling
21   incident happened, was there any other higher up
22   there above corporal?
23            A.   No.
24            Q.   Okay.   So was Sean Brown the only
25   corporal?
```

*Hicks Court Reporting  ●  Sally Hicks  ●  P.O. Box 8323, Gray, TN 37615  ●  423-741-3366*

1  doing it, so next thing you know they had dropped him

2  back on his back and pretty forcefully just kind of

3  just -- he's in handcuffs still and just dropped him

4  back on his back. And at that time Brown said hold

5  his legs. And so we were trying to just restrain

6  him, keep him from fighting, kicking, anything like

7  that, was all that I was of knowledge on doing. And

8  that was when Standridge had got down and Crabtree

9  and Brown was on one arm and Standridge was on the

10  other, and I was trying to hold both of his legs, and

11  he was just squirming and groaning and -- because he

12  had already, looked like to me that he was already

13  beat up kind of. He had snot coming off of him,

14  super sweaty, covered in mud and dirt and grass and

15  it had already looked like he was fighting with

16  somebody before he even come in to the trap. And I

17  had these gloves on and he was just sliding around

18  and I'm trying to just hold his legs still to keep

19  him from kicking from anyone, and at that time I

20  don't recall -- yeah. So he was on his back and

21  Crabtree had come back in and he had like these nylon

22  gloves on that him and Brown were known to use all

23  the time, and they had -- were like, mainly to

24  protect you from sticking and poking when you're

25  patting someone down. But they had some that had

1   they just -- Crabtree had like leg sweeped him kinda

2   and just threw him down on his back.

3           Q.   Did you see Crabtree slam his head up

4   against the window and down on the counter when they

5   first got in?

6           A.   I do not recall.  Because I was, like I

7   said, I was the one holding the door.

8           Q.   Sure.

9           A.   I had pushed it open and just kinda got

10  out of the way while everybody was storming in.

11          Q.   Okay.

12          A.   I know that his head, when he was

13  holding it, was kind of, it was like right on the

14  window frame.

15          Q.   Uh-huh (affirmative).

16          A.   So I'm not sure if he had hit it before.

17  I just heard the noise of him going down on the

18  counter.  I don't know if it was the counter or if

19  he'd hit his head on the window or anything.

20          Q.   And you said...

21          A.   I have no idea.

22          Q.   Okay.  You said he already looked

23  bloody, like he'd been in a fight when he first came

24  in?

25          A.   Yes.  He was kind of swelled, like you

1      A.    In my opinion I don't believe so,

2  because it, I can't really go to him about something

3  that he had done.

4      Q.    Okay.

5      A.    And that it had to go above him, 'cause

6  I couldn't really be like, hey -- I mean I had to, in

7  small group conversation later that night he'd come

8  back towards the back and was checking on me and was

9  like, how you doing and stuff like that, and I was

10  like, I'm really shook up about it.  I was like, it's

11  all just a lot to take in and a lot that had

12  happened.  And I had asked him how he was doing and

13  he said that he was just up in booking, was all he

14  said.  He's just sitting up there.

15      Q.    What did, what did you say to Catie

16  Wilson, Sergeant Catie Wilson?

17      A.    I just said that there was a bad

18  incident and I was, just didn't know what to do or

19  say or anything about it.  I was like, it was just a

20  lot had happened and I didn't necessarily agree with

21  it and didn't know how to talk to her about it.  And

22  she just, she was like, well, I'll talk to you a

23  little bit later about it.  And she was like, and

24  then just kinda walked out of her office.  'Cause

25  that's when the new corporal had come in, and the

1    nurse were in there checking on him, and so I just

2    walked out of the office and I went over to the cell

3    to see how he was doing and to ask the nurse, like

4    what -- like how he was.  And he seemed very scared

5    of anyone, as of the nurse, anyone.  And he was, I

6    mean, swelled up.  He had pee'd on himself when he

7    was laying in the floor and he wasn't really making

8    full sentences or anything, like he looked really,

9    really bad.  And I asked Boyer who was the corporal

10   of the day shift, and I asked him if they needed me

11   to do anything and he said, no, he said just go home.

12   And so that was when I had left.

13           Q.   What time was that?

14           A.   A little after 7.

15           Q.   Okay.  And so Sergeant Catie Wilson, she

16   just said I'll take care of it?

17           A.   She just said that she would talk to me

18   later about it.

19           Q.   Did...

20           A.   And I never heard from her, never talked

21   to her.  She was -- we had never -- I don't -- she

22   will say that she never, that she had something

23   against me but I feel -- she was the main reason why

24   I had left Campbell County to begin with.  Like she

25   was, never saw eye-to-eye with anyone, it seemed

1    kinda trying to bathe him.  We were trying to get the
2    -- we had turned the water on and I was wiping his
3    back and trying to just get him, trying to clean him
4    up a little bit from everything, trying to get the
5    blood off of him.  And Standridge had pulled his spit
6    mask off and so he was just letting the water run.
7    He was just as calm as could be and we were both like
8    trying to talk to him, like hey, man, how does this
9    feel?  Are you all right, and stuff like that.  And
10   he had, Brown had kinda, I guess, he walked up behind
11   us and seen that he didn't have his spit mask on and
12   he hated that.  So he wanted it back on, so he went
13   and got another one and he was, he said that they
14   needed to get the spit mask back on him, and at that
15   time that's when Dakota had walked into the booking
16   area where we were trying to wash him off and I had
17   kinda just backed up out of the way.  'Cause there
18   was five people trying to stand in this one man
19   bathroom, and Standridge was on his right, Brown was
20   on his right, and Dakota was on his left.  And he
21   said, I can't get the spit mask on him, going to have
22   to take him to the ground, and at that time, that's
23   when they were like kinda, he was bent over like
24   this, like down trying to keep his head away from
25   them, and he, that's when Dakota had hit him in the

*Hicks Court Reporting* ● *Sally Hicks* ● *P.O. Box 8323, Gray, TN 37615* ● *423-741-3366*

1   lower back.  He said, get down, and like kinda just

2   done like three hits like that.

3           Q.   Uh-huh (affirmative).

4           A.   I don't think it was real forceful...

5           Q.   Uh-huh (affirmative).

6           A.   ...but had done it in his lower back and

7   they, him and Brown had pretty much got him down on

8   the ground and put the spit mask on him.  And then he

9   was like, ah, well, that's enough and they picked him

10  up and just walked him over to the neg cell.

11          Q.   So how did they, how did they get him to

12  to the ground?  Did they knock him to the ground

13  or...?

14          A.   They pretty much just kind of -- after

15  he had kinda hit him in the lower back like that, and

16  they were on each side, I don't know if there was a

17  leg sweep.  That's what I could imagine would've

18  happened, 'cause he was just, I mean, he was kinda

19  going into the fetal while standing and they just,

20  both just kinda used their weight and pushed on him

21  and pushed him.

22          Q.   Did he hit his head?

23          A.   Not that I recall.

24          Q.   Okay.  So...

25          A.   It was kind of like on, he kind of fell

*Hicks Court Reporting  ●  Sally Hicks  ●  P.O. Box 8323, Gray, TN 37615  ●  423-741-3366*

1  shower and then you've got the counter that goes

2  around and then the left hand side, like in that

3  corner, is the neg cell where they put him.

4        Q.   Okay.  And when they put -- who had a

5  hold of him putting him into the neg cell?

6        A.   Williams and Brown.

7        Q.   Okay.  And what were you and Standridge

8  doing?

9        A.   Just walking behind of him.

10       Q.   Okay.  And did you watch them put him in

11 the neg cell?

12       A.   Yes.  They just walked him in and sat

13 him -- actually, I don't recall what had -- I don't

14 know if they -- I know that they had to get the

15 handcuffs off of him, so they had -- they were trying

16 to get him, they wanted him on the ground.  I'm not a

17 hundred, I'm pretty sure that they put him on the

18 ground but it wasn't, he was just, had kinda chilled

19 out, and they had put him on the ground and just got

20 the handcuffs off of him, told him, don't move until

21 we leave the room and they backed up out of the room

22 and then just shut the door.

23       Q.   Well, were you in the room?

24       A.   I was not.  I was standing like right at

25 the door.

1    had recommended for him to get there, come there, and

2    to get him on his shift.

3         Q.   So was it -- it was -- was it clear to

4    you that he'd been brutally beaten?

5         A.   Yes.

6         Q.   By Crabtree and Brown?

7         A.   Yeah.

8         Q.   Okay.  And you know, no one said, let's

9    take him to the hospital?

10        A.   Not specifically.  It was just asked if

11   he was going and he responded with no.

12        Q.   This is Sean Brown?

13        A.   Yeah.

14        Q.   Did you fear speaking up, saying this

15   guy needs to go to the hospital?

16        A.   Kind of, yes.  It was -- and, 'cause I

17   mean, Brown was not really a person that you could go

18   up and talk to.

19        Q.   Okay.  Was it pretty much the culture in

20   the sheriff's department that you don't tell on

21   anybody?  You don't...?

22        A.   Pretty much.  That was verbally put in

23   by just the COs that were there.  They would call you

24   a blue falcon if you'd said anything about anybody,

25   and said that you were pretty much a snitch and

3           Q.   Tell me about that.

4           A.   There was multiple situations where he

5     would, he would come and be mad about somebody saying

6     something about what was going on, like what he had

7     done or something, and it would be like an anonymous

8     tip, and he was like, they ain't nothing but a blue

9     falcon and I can't stand MF-ers like that and stuff

10    like that?

11          Q.   Who is he?

12          A.   Brown.

13          Q.   Okay.

14          A.   He, that was like his go-to phrase, was

15    calling people a blue falcon if they were saying

16    anything that he didn't agree with and would be

17    against anyone else that worked in law enforcement

18    pretty much.

19          Q.   Well, were there ever supervisors other

20    than Brown that had that same culture mentality?

21          A.   Supervisors?  No.  COs?  Yes.  Like just

22    regular COs, there was quite a few.  There was...

23          Q.   Correction officers?

24          A.   Yes.

25          Q.   Okay.

1          A.    ...or anything like that.  I just know

2     that he was actively just kind of twist and turning,

3     kicking his legs and stuff like that during the time.

4     I don't know if any, like I said, any of it was with

5     malicious intent or anything.  That to me is unknown.

6     I just know of him resisting, but it wasn't...

7          Q.    I have one report here that you -- it

8     says, "Officer Miller was notified by Corporal Brown

9     that there was a combative male coming to the

10    facility and we need", I'll show it to you here in

11    just a second.

12         A.    Okay.

13         Q.    Did -- is this the report you think that

14    Corporal Brown told you that you needed to change?

15    Or did he help you in any way?  And that's the only

16    copy I've got of that, Counsel.

17         A.    Oh, that's okay.

18         Q.    I was apologizing to him.

19         A.    Oh, I'm sorry.  I'm sorry.  Yeah, this

20    is the one that he had helped me with, yeah.

21         Q.    So he had you change parts of that

22    report?

23         A.    Yes.

24         Q.    And would you tell me what part of that

25    report is incorrect because he asked you to change

*Hicks Court Reporting* ● *Sally Hicks* ● *P.O. Box 8323, Gray, TN 37615* ● *423-741-3366*

1    it?

2              A.    The -- I'm not sure it has, Standridge

3    -- there's one part that I know a hundred percent, if

4    it's on here.  Let's see, it's -- so the part where

5    he had...

6              BY MR. SEATON:  Let's do this before you do

7    that.  Can we make some copies of that?

8              MR. KNIGHT:  Sure.

9              MR. SEATON:  Let's do three copies of both of

10   those.  That's a different one too.  Yeah, and just

11   do them black and white so my highlight doesn't show.

12             MR. SMITH:  Let's go off the record.

13             MR. SEATON:  Yeah.

14             COURT REPORTER:  We'll go off the record.

15   (OFF THE RECORD)

16             COURT REPORTER:  We're going back on the

17   record.

18             MR. SEATON:  Have you got them, Art?

19             MR. KNIGHT:  Yeah.

20   CONTINUING, DIRECT EXAMINATION BY MR. SEATON:

21             Q.    All right.  So the one that says, "the

22   general comment" and the -- says up at the top, "Page

23   2 of 3, Jacket Number 31042."  Got it?

24             A.    Yes.

25             Q.    So what is it that you said that your

*Hicks Court Reporting* ● *Sally Hicks* ● *P.O. Box 8323, Gray, TN 37615* ● *423-741-3366*

1    supervisor told you to change?

2            A.    One of the main ones was where Dakota

3    had hit him in the shower.

4            Q.    Uh-huh (affirmative).

5            A.    I had originally had that on there and

6    he said not to put it in.

7            Q.    Okay.

8            A.    And then whenever we was talking about,

9    like some of the stuff that had went into detail kind

10   of like his actions, like how he was acting, I

11   remember he had asked me to change how it was worded.

12   I'm not a hundred percent sure, it's been so long on

13   what exactly, but I do know for a fact that the one

14   part with Dakota in it, he had said not to put it in

15   there, 'cause he didn't put it in his or something

16   like that.

17           Q.    So it says in here in that first

18   paragraph, the very last couple sentences, it says,

19   "Road Officer Crabtree placed Inmate Ling on the

20   search counter in the trap and advised Inmate Ling to

21   stop resisting and Ling did not comply." Was that

22   true?

23           A.    That was, that was when I was talking

24   about he had told him, he said, stop -- well, I guess

25   he did.  I do not recollect that, but I do know that

1    he had told him to spread his legs and stuff like

2    that and he wasn't doing it.

3         Q.   Okay.

4         A.   And that's when they did take him to the

5    ground.

6         Q.   So, and then the next sentence says,

7    "Road Officer Crabtree and Corporal Brown then placed

8    Inmate Ling on the ground in a prone position to try

9    to get him in compliance.  Once Inmate Ling was

10   placed onto the ground he started kicking Corporal

11   Brown and myself."  Was that true?

12        A.   He was just kicking his legs.  I'm not a

13   hundred percent sure if he did actually kick us or

14   anything.  I don't recall.

15        Q.   Well, see, I don't recall you saying

16   that he was resisting or kicking you all.  I remember

17   you saying...

18        A.   Yeah.

19        Q.   ...that he was just moving his legs.

20        A.   Yeah, he was just kinda, it was more of

21   like a squirm, I mean.

22        Q.   Okay.  Well, did Corporal Brown tell you

23   to put in there that he was resisting?

24        A.   He had told -- Corporal Brown had

25   already wrote up his, his report.

*Hicks Court Reporting* • *Sally Hicks* • *P.O. Box 8323, Gray, TN 37615* • *423-741-3366*

1      Q.    Uh-huh (affirmative).

2      A.    And he had given it to me and said that

3    I needed to look at it and pretty much do it the way

4    that he had done it.  But then I had put other things

5    in and then he said I didn't word them right or, like

6    I said about the Dakota part, he had said just don't

7    put that in.  But he had already wrote up his and had

8    given it to me and said to use his and just put what

9    he had put pretty much, and then add what I had done,

10    is the gist of it.

11      Q.    Okay.  And did you do that?

12      A.    I did.

13      Q.    You did what you were told?

14      A.    Yeah.

15      Q.    All right.  And the report that you put

16    together here, were those pretty much words of

17    Corporal Brown or were they your words?

18      A.    Ah, I would say most of it would've been

19    Brown, but just mainly the parts of when, when I was

20    involved, like I was holding his legs and stuff like

21    that, that was what was the only things that were

22    added to it or changed or anything.

23      Q.    Okay.  Well, there's an awful lot of

24    words in here about him not complying,...

25      A.    Yeah, yeah.

1          Q.   ...about him being combative, et cetera,

2    that you didn't tell me when I, when we were first

3    talking about...

4          A.   Yeah.

5          Q.   ...the whole situation.

6          A.   Yes, and that's mainly because I don't

7    remember.  Like I said, the reason why I don't

8    remember what I wrote on here is because most of it

9    wasn't my words.

10         Q.   Was not your words?

11         A.   No.

12         Q.   All right.

13         A.   That's why I don't recall much of

14   anything except for the one part that I did actually

15   write, and then he'd said not to put in.

16         Q.   All right.

17         A.   And then the rest from what I did tell

18   you was from my memory on how I had perceived it and

19   how I had felt about it pretty much, and especially

20   after having all of the, all of this more time of

21   being a correctional officer and seeing how things

22   were supposed to be handled and how they should be

23   handled and why things go the way they do.  That's, I

24   mean, looking back on it, it's a really bad situation

25   and it never should've been done that way.  Nothing

1          A.    And I remember discussing with some of

2     the people on shift, like Fox, I had discussed with

3     him about how, how the report was done, and he said

4     that it shouldn't have been done that way.

5          Q.    All right.

6          A.    And he said it's your memory, what you

7     saw, what you did, what you know.

8          Q.    Who said that?

9          A.    Fox.

10         Q.    Okay.

11         A.    And then from then on I just, they

12    either liked my report or they didn't like it.  I put

13    what I knew and what I had seen and what I had done

14    and what happened.

15         Q.    So after you explained to me about these

16    gloves and the different folks, not only in the

17    corrections facility using them as well as you know

18    of one road officer that used them, would you say

19    that there was a culture of violence to combative

20    people in the Campbell County Sheriff's Department?

21         A.    I guess it depended on who the

22    correction officer was.  There was some that enjoyed

23    the uses of forces and wanted them.  And, for

24    instance, Fox and Brown were like the two main ones

25    that I had worked with that just loved having uses of

1  force.  Loved it.

2        Q.   Okay.

3        A.   They, I remember they had, even at one

4  point, mentioned making a game out of it and trying

5  to have -- or if they did have a use of force, one

6  use of force every day of the week, and then at the

7  end of the week it was like, oh, I need a prize.  Why

8  don't we go out and get some ice cream or something.

9        Q.   Who said that?

10       A.   Fox and Brown.  They would talk about

11 it.  They would, like I said, gloat about being in

12 uses of forces.  I guess it made them feel bigger.

13       Q.   Was that known to the supervisors?

14       A.   I'm not a hundred percent on that.

15       Q.   Do you know if it was known to the

16 sheriff?

17       A.   A hundred percent not.  I never met the

18 sheriff the whole time I was there.

19       Q.   Okay.  Was the sheriff a hands-off type

20 of sheriff?

21       A.   Yeah.  I had never -- like I had seen

22 pictures of him and that was it.

23       Q.   Okay.

24       A.   Like I'd, I'd never seen him, never had

25 words with him, didn't even -- I couldn't even tell

# EXHIBIT F

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

AT KNOXVILLE


NATHAN LING,

        PLAINTIFF,

VS                    CIVIL ACTION NO:  3:20-CV-233

CAMPBELL COUNTY, TENNESSEE;
JUSTIN CRABTREE; DAKOTA WILLIAMS;
SEAN BROWN; JOSHUA MILLER, in their
individual and official capacities;
and JOHN DOES, names and identities
not yet known,

        DEFENDANTS.


PRETRIAL DISCOVERY DEPOSITION OF:

ALEXANDER STANDRIDGE

TAKEN ON APRIL 25, 2023


* * * THIS STYLE PAGE IS CONTINUED * * *

1    phone, but I never got a copy of it.

2         Q.   And what did Brown say when you saw it

3    on his phone?

4         A.   He had just showed it to me.  He said,

5    hey, this was from the other night.  I just looked at

6    it and went back on about my business.

7         Q.   Was he proud of it?

8         A.   He didn't seem proud, but he didn't seem

9    upset.

10        Q.   But I don't, I don't get it.  It's like,

11   why would you show somebody else that picture unless

12   you're either proud of it or you're thinking, oh, I'm

13   getting in, I'm going to get into trouble or

14   something like that?

15        A.   I'm unsure.

16        Q.   Okay.  Did anybody ever brag about that

17   night?

18        A.   No, Sir.

19        Q.   Okay.  Let's continue watching.  So were

20   you in that room with them until they moved him?

21        A.   I believe so.

22        Q.   Uh-huh.  Did you go to the shower with

23   him?

24        A.   Yes, Sir.

25        Q.   Okay.  So who all went to the shower

1    with him?

2         A.   Me and Miller at first, and the officer

3    on his legs there, right?

4         Q.   Right.  Joshua Miller?

5         A.   Yes, Sir.

6         Q.   And wasn't there another officer?

7         A.   I believe Dakota had came in after we

8    took the mask off.

9         Q.   Let me stop you right there.  I want to

10   back this up just a hair.  So tell me what's going on

11   in this conversation, because I see some animation of

12   fighting going on.

13        A.   I believe they were talking about what

14   had happened on the road prior to getting inside of

15   there.

16        Q.   Okay.  Let's watch that.  Were they

17   laughing about it?

18        A.   Crabtree and Brown was, yes.

19        Q.   Okay.  What were they saying?

20        A.   They were going over everything that had

21   just happened on the floor and laughing at some of

22   it, questioning some other parts of it.

23        Q.   What were they laughing at?

24        A.   Mainly the use of force that was needed.

25        Q.   At their use of force?

*Hicks Court Reporting* ● *Sally Hicks* ● *P.O. Box 8323, Gray, TN 37615* ● *423-741-3366*

1    stand up, true?

2          A.   Correct.

3          Q.   Well, this is just when they put him in

4    the neg cell?

5          A.   Correct.

6          Q.   Were you involved in this?

7          A.   Yes, that is me there helping them get

8    him down.

9          Q.   Whose decision was it to put him in that

10   cell?

11         A.   I don't recall.

12         Q.   Did anyone discuss him needing medical

13   treatment?

14         A.   No, Sir.

15         Q.   None at all?  Why?

16         A.   I'm unsure.  A lot of their worry was

17   what are they going to say in the morning when first

18   shift got there.  Brown, I believe, did not want to

19   wake Sergeant Wilson.  I don't remember his exact

20   words, but I know he said in the gist of, she's got

21   to come in in the morning anyways.  He can wait.

22         Q.   So why were they concerned about what

23   first shift was going to say?

24         A.   I believe it was just due to the

25   incident itself, how it escalated so far.

1      Q.   Uh-huh.

2      A.   I believe they were just worried if

3   there was consequences or not.

4      Q.   Consequences for what?

5      A.   For the actions that they went with

6   during the whole incident.

7      Q.   For beating Mr. Ling?

8      A.   Yes, Sir.

9      Q.   So there's no discussion about getting

10  him medical help?

11     A.   No, Sir.

12     Q.   Was he clearly in need of medical help?

13     A.   Yes, Sir.

14     Q.   Were they hoping he was going to lay

15  down in that cell and die?

16          MR. KNIGHT:  Object to form.

17     A.   I'm unsure on that.  Every so often, one

18  of us would peek in and check on him.  He never left

19  that final position, after the shower when we laid

20  him into the cell in the fetal position, he never

21  moved.

22     Q.   All night?

23     A.   All night.  There was a few times I

24  opened the cell to make sure he was breathing.  I

25  wasn't really sure if I could do anything else.

1    someone said another officer was put in the hospital

2    over it for just a small injury.  I'm unsure if that

3    was Crabtree's aggression, was seeing another officer

4    hurt and was taking it out on him, or if it was just

5    something else or just too much use of force because

6    he could.  But I do believe whatever happened prior

7    to getting to the jail is what escalated it most.

8          Q.    Well, what bothers me is not that you

9    have one officer or maybe even two officers that use

10   excessive force.  What bothers me is you've got all

11   this excessive force being used and everybody else is

12   standing and watching.

13         A.    It wasn't right.

14         Q.    So how would you prevent that?  How

15   would you keep this from happening again?

16         A.    To prevent it, for training purposes to

17   new hires, I'd go more in depth on police brutality

18   and proper ways to handle situations like this.

19   There was a little bit of talk and training on how to

20   handle somebody resisting, but nothing, nothing they

21   taught really clicked.  It was just minor, he's

22   moving a bit, just hold him.  This type of scenario,

23   from my training personally, I was never prepared to

24   properly handle it or know what to do during it.

25         Q.    So I saw a lot of things go wrong in

1          Q.   And another is nobody wanted to

2   intervene to assist the inmate.

3          A.   Correct.

4          Q.   After the incident occurred, you had to

5   fill out an incident report, right?

6          A.   Yes, Sir.

7          Q.   And what did Sean Brown ask you to

8   change on your incident report?  Do you recall?

9          A.   I do not recall.

10        Q.   Okay.  Well, Sean Brown said in his

11  statement to the TBI that he had you change your

12  statement and he had Joshua Miller change their

13  statement.  You don't recall that?

14        A.   I recall him asking us to change

15  something in it.  I don't recall what it was.

16        Q.   Okay.

17        A.   I couldn't even tell you what was on my

18  report at this point.

19        Q.   All right.  And then did you change it

20  according to what he told you?

21        A.   I believe so.

22        Q.   Do you know if the incident report that

23  you filled out was accurate even after he told you

24  what to change?

25        A.   I'm unsure of it.

# EXHIBIT G

# LING V CAMPBELL COUNTY, ET AL

## Sheet 1 Page 1

```
        UNITED STATES DISTRICT COURT
        EASTERN DISTRICT OF TENNESSEE
               AT KNOXVILLE


NATHAN LING,

        PLAINTIFF,

VS                      CIVIL ACTION NO:  3:20-CV-233

CAMPBELL COUNTY, TENNESSEE;
JUSTIN CRABTREE; DAKOTA WILLIAMS;
SEAN BROWN; JOSHUA MILLER, in their
individual and official capacities;
and JOHN DOES, names and identities
not yet known,

        DEFENDANTS.



    PRETRIAL DISCOVERY DEPOSITION OF:
              JUSTIN CRABTREE
         TAKEN ON DECEMBER 12, 2022




     * * * THIS STYLE PAGE IS CONTINUED * * *
```

## Page 3

```
                   INDEX

STYLE PAGE                          PAGE 1-2

INDEX & EXHIBITS                    PAGE 3

PRELIMINARIES                          PAGE 4

DIRECT EXAMINATION BY MR. SEATON    PAGE 5-77

CERTIFICATE                         PAGE 78

                   EXHIBITS

EXHIBIT 7 - SEARCH HISTORY ON CELL    PAGE
    PHONE OF MR. CRABTREE

EXHIBIT 8 - PHOTOGRAPH TAKEN BY       PAGE
    MR. CRABTREE

EXHIBIT 9 - PLEA AGREEMENT ENTERED       PAGE
    IN CRIMINAL CASE
```

## Page 2

```
APPEARANCES:

FOR PLAINTIFF:       TONY SEATON, ESQ.

                     Tony Seaton And Associates
                     118 East Watauga Avenue
                     Johnson City, TN 37601
                     (423) 282-1041


FOR DEFENDANTS:      ARTHUR F. KNIGHT, III, ESQ.

                     Taylor & Knight, GP
                     800 South Gay Street, Suite 600
                     Knoxville, TN 37929
                     (865) 971-1701
```

## Page 4

```
1       The Discovery Deposition of JUSTIN CRABTREE
2   was taken by audio-visual means, by agreement, as
3   upon notice given, at the offices of Taylor & Knight,
4   GP, 800 South Gay Street, Suite 600, Knoxville,
5   Tennessee on the 12th of December.
6       The witness was sworn by Sally Hicks,
7   Licensed Court Reporter in and for the State of
8   Tennessee.  It is agreed that Sally Hicks, Licensed
9   Court Reporter, may take this deposition by
10  electronic recording equipment; transcribe the same
11  to typewriting, and affix the signature of the
12  witness hereto.
13      This deposition was taken for the purpose of
14  discovery and/or for use in evidence at any trial,
15  hearing or proceeding involving this matter and for
16  all purposes allowed or allowable under the pretrial
17  discovery statutes, and the Tennessee Rules of Civil
18  Procedure, its taking subject only to those
19  objections for incompetency, irrelevancy and
20  immateriality.
21      All other formalities are expressly waived.
22
23  (WITNESS IS SWORN)
```

## Hicks Court Reporting
### (423) 741-3366

Sheet 4    Page 13

```
1        A.  I mean, they went over it some during
2   in-service and things of that nature, but it wasn't
3   something that we went over every day, if that's what
4   you're asking.
5        Q.  Well, did you ever go through the
6   450 page training manual in-depth with anyone?
7        A.  No.  Not that I recall.
8        Q.  All right.  You were, you said you were
9   hired by, or during the tenure of Sheriff Goins,
10  right?
11       A.  Yes, Sir.
12       Q.  And did you have any kind of relationship
13  with him?
14       A.  Not other than just knowing who he was.
15  I mean, my father-in-law stripes the cars, and he
16  does the cars for the county and, you know, Jacksboro
17  City and all the local police departments.  So I mean
18  I'd see him in the shop every now and then and wave
19  at him and say hi, but as in a personal relationship,
20  no, I had none.
21       Q.  Did you have any kind of professional
22  interaction with him while you worked there?
23       A.  While I worked there?
24       Q.  Uh-huh.
25       A.  I mean, if I seen him, we said hi, he
```

Page 14

```
1   asked how things were.  That was about it.  To say
2   that I went, never sat in his office and we talked
3   about how each other's day was, no.  I mean, I never
4   really spoke with the sheriff.
5        Q.  Was -- who did you report to?
6        A.  At the sheriff's office?
7        Q.  Uh-huh.
8        A.  At the time my sergeant would've been
9   Michael Owens.
10       Q.  Okay.  And what kind of relationship did
11  you have with Mr. Owens?
12       A.  I mean, we were friends.  He, he was a
13  groomsman at my wedding.  I mean, we were pretty
14  close at the time, you know, but we worked together.
15  You know, we were, we were always with one another.
16  So...
17       Q.  You were always with one another?
18       A.  I mean, I worked with him, he worked with
19  me, you know.  I was always on his shift.  So, you
20  know, other than on Saturday and Sunday when he was
21  off, you know, we were always on shift together, so
22  we become pretty good friends through work.
23       Q.  He was quite a bit older than you?
24       A.  Yes, Sir.
25       Q.  Okay.
```

Page 15

```
1        A.  Well, I don't want to say quite a bit
2   older than me.  I don't want to insult him in any
3   way, but...
4        Q.  Okay.  And who did you report to -- I
5   mean, my understanding at the time, the lieutenant
6   was Matt Wasson?
7        A.  I believe.
8        Q.  Okay.  And the chief deputy was Jeremy
9   Goins?
10       A.  Yes, Sir.
11       Q.  And they didn't have a captain at the
12  time?
13       A.  I think it was a detective captain.  I
14  think John Long might've been listed as captain.
15       Q.  Okay.
16       A.  But he took care of the detectives more
17  than -- he wasn't really on our side.  He was on, you
18  know, the detective side of things.
19       Q.  Was that a strict chain of command?  Or
20  could you feel free to, if you had a problem, go
21  straight to the sheriff or straight to Robbie Goins?
22       A.  No.  I'd never go straight to the sheriff
23  or even to Jeremy.
24       Q.  Uh-huh.
25       A.  You know, I would always try and go my
```

Page 16

```
1   chain of command, so like my corporal first and then
2   my sergeant, or if my corporal wasn't there, I'd
3   reach out to my sergeant, you know.  It was, it was
4   normally relate our issues to them and then go from
5   there.
6        Q.  Who was your corporal?
7        A.  Joshua Jeffers.
8        Q.  Okay.  But you didn't have any problems
9   skipping the chain from Jeffers to Owens?
10       A.  I never really had to, had to worry about
11  it.  Josh always answered most of my questions, but
12  if Josh was, you know, out of town, on vacation or
13  something of that, you know, I would, I would go to
14  my sergeant just so I wasn't bothering the corporal,
15  you know, while he was on vacation or whatever it may
16  be.
17       Q.  Uh-huh.  Why were you terminated from the
18  Campbell County Sheriff's Department?
19       A.  I was not in the zone that I was supposed
20  to be in.
21       Q.  Uh-huh.
22       A.  And I was talking to somebody I wasn't
23  supposed to be talking to, and that was a female at
24  the time.
25       Q.  And who was it you weren't supposed to be
```

# LING V CAMPBELL COUNTY, ET AL

**Pretrial Discovery Deposition of: Justin Crabtree**

1   Q.  After you?
2   A.  ...after I did.  Yes, Sir.
3   Q.  All right.
4   A.  They got there, if I recall right, it was
5   about the same time that the ambulance got there.
6   Q.  Okay.  And so you walked up to where they
7   were, and you said that it looked like Cody Douglas
8   was trying to get him out from underneath the truck?
9   A.  If I recall right, yes, Sir.
10  Q.  All right.  And so what did you do?
11  A.  I helped Cody pick him up by the
12  shoulders.
13  Q.  Okay.
14  A.  And...
15  Q.  Did anybody punch him?
16  A.  No, Sir.
17  Q.  Did anybody punch him at all while,
18  before you all left that area?
19  A.  No, Sir.  Not that I recall.
20  Q.  Okay.
21  A.  He did get pepper sprayed after the,
22  after the EMTs give him a sternum rub.  He started
23  trying to bite them and spit at them, and he was
24  kicking and was being non-compliant with what they
25  were asking him to do, what officers were asking him

1   to do.
2   Q.  Was he, was he handcuffed behind his back
3   at that time?
4   A.  Yes, Sir.
5   Q.  And who pepper sprayed him?
6   A.  I can't recall.  I just remember smelling
7   the pepper spray.
8   Q.  Was it Sergeant Owens?
9   A.  It could've been.  I, I can't say whether
10  it was or not.  Like I said, it was -- everything
11  kinda runs together when you're in a situation like
12  that.
13  Q.  Okay.  And were you trained to pepper
14  spray someone if they, and I know you didn't do it,
15  but I'm not saying you did.
16  A.  Yes, Sir.
17  Q.  But were you trained to pepper spray
18  somebody if you have them handcuffed behind their
19  back?
20  A.  To say I can remember what my pepper
21  spray training standards were, I can't.  You know,
22  I've not been refreshed on them in three, four years.
23  I, I can't say whether I was or not because I can't
24  remember.
25  Q.  Okay.

1   A.  I mean honestly, I...
2   Q.  But when you've got somebody with their,
3   that are cuffed with their hands behind their back,
4   they're pretty well subdued, aren't they?
5   A.  Well, I mean, he can kick me, he can bite
6   me, he can spit on me, and I can still get diseases
7   from his spit and his actions.  So, I mean...
8   Q.  Do you think that justifies hitting him?
9   A.  Every action has a reaction, and
10  sometimes they're right, and sometimes they're wrong,
11  but when you're in a situation where things run
12  together, you know, you make an action based off of
13  that time.
14  Q.  Yeah.
15  A.  You know, I can look back now, and we're
16  sitting here right now, you know, I'm not going to,
17  I'm not going to say I was right or I was wrong.  I
18  can say I've got a million scenarios that I can play
19  in my head, and I can make things turn a million
20  different ways, but at that moment, at that time, I
21  acted to a reaction, and I'm sure if Sergeant Owens
22  was the one that pepper sprayed him, he did too.
23  Q.  Okay.  So you didn't feel like you did
24  anything wrong in this whole evening?
25  A.  Are you talking about now, or are you

1   talking about then?
2   Q.  Either one?
3   A.  Like I said, I, I wished I could play a
4   scenario back where I could give you an answer and
5   say I was right or I was wrong, but I'm sitting where
6   I'm sitting right now.  I, I pled guilty to those
7   charges, and I walk with those every day for the rest
8   of my life, so, yeah...
9   Q.  But other than the charges, do you think
10  that you did something wrong to Mr. Nathan Ling?
11  A.  At the time, I acted off of an instinct.
12  Now I wished I would've handled things differently.
13  Q.  What would you have done differently?
14  A.  I would've just let him fight.  I
15  would've walked out and just -- if he wants to run
16  around and fight inside of a secured trap, I would've
17  just let him run around and fight inside a secured
18  trap.  If he tried to hurt his self or was in a
19  position to hurt his self, then I would have
20  intervened, but instead of fighting back, I would've
21  just let him spit in the floor and spit on the walls
22  and do what he wanted to do, and I would've watched
23  him through a secured glass.  He was secured inside
24  of the trap.  You know, I could've walked into the
25  office, and if he wanted to run around until he

**Hicks Court Reporting**
**(423) 741-3366**

# LING V CAMPBELL COUNTY, ET AL

## Sheet 9    Page 33

1  calmed down, let him run around until he calmed down.
2     Q. What was his condition before he got into
3  your patrol car?
4     A. He was screaming, kicking, fighting,
5  yelling.
6     Q. But he wasn't unconscious, was he?
7     A. No.
8     Q. Okay.
9     A. No, Sir.
10    Q. And was he, was he coherent?
11    A. He was saying stuff to us, and he was
12 answering questions. I mean, he...
13    Q. Okay.
14    A. He said quite a few obscene words to me.
15    Q. What did he say?
16    A. Do you want me to repeat them verbatim?
17    Q. Sure. Sure.
18    A. "Fuck you. You're a pig. Let me the
19 fuck go. Fuck you." You know, I mean, he repeated
20 that several times over and over again, and even on
21 the way to the, to the jail, he was in the back seat
22 of my car. We sat him upright inside the car like a
23 normal person, and he rolled on his side and began to
24 kick, try and kick the windows of the back seat of
25 the patrol car out,...

## Page 34

1     Q. Uh-huh.
2     A. ...while shouting, you know, "Fuck you.
3  Let me out of here. I didn't do nothing fucking
4  wrong," things of that nature.
5     Q. Okay. But do you have any opinion as to
6  whether or not he had any serious head injury before
7  he got into your car?
8     A. I have no idea what was wrong with him.
9  I know the EMS people checked him out, and they said
10 he was good to go to jail, and so I trust their
11 intuition. They're the ones that are medically
12 trained, not me.
13    Q. All right. So they checked him out, and
14 they, they cleared you to take him to the jail as
15 opposed to them feeling the need to take him to the
16 hospital?
17    A. Yes, Sir.
18    Q. So did that tell you that he was in, in,
19 he was medically in good shape?
20    A. That's what they said.
21    Q. Okay.
22    A. He was, he was moving, he was acting. I
23 mean if they say he's medically cleared, you know...
24    Q. Okay. Now I want you to assume that the
25 injuries that he got were it shattered the orbit of

## Page 35

1  his eye.
2     A. Yes, Sir.
3     Q. It broke his nose. It broke his upper
4  mouth. His jaw was broken, and his shoulder was
5  broken.
6     A. Okay.
7     Q. Did all that occur after you put him in
8  your squad car?
9     A. I would assume not. If he's run into the
10 back of a pickup truck, I would assume that some of
11 it happened then.
12    Q. Well, what would you've -- you said that
13 there wasn't any blood, right?
14    A. No.
15    Q. Did you say there wasn't any blood?
16    A. Not when -- when I arrived on scene?
17    Q. Right.
18    A. I don't recall seeing any blood on scene.
19    Q. All right. Did you recall seeing any
20 blood when you put him in your car?
21    A. No, Sir.
22    Q. All right, Sir. So, and you said that he
23 was combative, he was answering questions, et cetera?
24    A. Yeah.
25    Q. And the EMS had checked him out and said

## Page 36

1  he can go to jail?
2     A. Yeah. They said take him to jail. Yes,
3  Sir.
4     Q. All right. So how did he get all these
5  injuries, do you think?
6     A. Sir, I couldn't answer that question for
7  you.
8     Q. Didn't, didn't have anything to do with
9  what you did to him?
10    A. If two strikes to the nose caused all
11 those injuries, then I'm not, I'm not sure what you
12 want me to say. There's no way that -- I struck him
13 twice to the nose with a closed fist, no more than
14 two times tops.
15    Q. Okay.
16    A. And, you know, I know when we went inside
17 of the, when we went inside of the trap, I pushed him
18 up against the counter, but I don't think I shattered
19 his orbital bone or his mouth or...
20    Q. Did you slam him up against the wall and
21 the counter?
22    A. I didn't really slam him. I mean I, I
23 pushed him up against the counter.
24    Q. Do you feel that that was using excessive
25 force at the time?

**Hicks Court Reporting**
**(423) 741-3366**

**Sheet 10   Page 37**

```
1            A.  At the time or now?
2            Q.  Either one.
3            A.  At the time, no.  I was acting off of
4   reaction.  Now, like I said earlier, I wished I would
5   have done things differently.
6            Q.  Have you seen these videos?
7            A.  I have.
8            Q.  Okay.  And who did you watch them with?
9            A.  I watched them during my court case.
10           Q.  Okay.  We're only going to watch about
11  ten minutes of one.
12           A.  Yes, Sir.
13  (PLAYING OF VIDEO)
14           Q.  Is this you coming into the sally port?
15           A.  Yes, Sir.
16           Q.  Okay.  The sally port is the garage,
17  right?
18           A.  Yes, Sir.
19           Q.  All right.  Is that you there?
20           A.  Yes, Sir.
21           Q.  Okay.  Is that you dragging him out of
22  the car?
23           A.  Yes, Sir.
24           Q.  Is that excessive force?
25           A.  He was laying on his back.  There was no
```

**Page 38**

```
1   other way to get him out of the car.
2            Q.  An did you just slam him up against the
3   wall there?
4            A.  I pushed him up against the wall.  Yes, I
5   did.
6            Q.  Okay.  And you had him with his handcuffs
7   behind his back, right?
8            A.  Yes, Sir.
9            Q.  Is this you?
10           A.  Yes, Sir.
11           Q.  Oh, that's you hitting him, hitting his
12  head up against the counter and the, and the side of
13  the window?
14           A.  It is.
15           Q.  Okay.  Is that excessive force?
16           A.  It could be seen as it, yes, Sir.
17           Q.  All right.  Were you mad?
18           A.  I don't recall what I felt at the time.
19           Q.  Okay.
20           A.  I do know right there I was telling him
21  he needed to stop what he was doing and be compliant,
22  and he didn't answer my question.
23           Q.  All right.  So this is you on the left
24  side?
25           A.  Yes, Sir.
```

**Page 39**

```
1            Q.  Okay.  With the hat on?
2            A.  Yes, Sir.
3            Q.  All right.  And who -- all right.  So
4   this is Josh Williams, the big, thick, big heavyset
5   fellow, right?
6            A.  I couldn't recall if it was.  I, I can't
7   say if it was or not.  I...
8            Q.  Okay.  Who's this other fellow here on
9   the right?
10           A.  I think that's Sean.
11           Q.  Sean Brown?
12           A.  I think so.  Yes, Sir.
13           Q.  Okay.  All right.  So what's Sean Brown
14  doing?  Oh, do you want to -- pull that back just a
15  little bit.  So, so what's Sean Brown doing with his
16  head down and his arms behind his back?
17           A.  He was getting ready to search him in.
18           Q.  Well, but is he abusing him?
19           A.  I mean, at the time, no.  He's being
20  still.  I mean...
21           Q.  So he's pushing, but he's pushing his
22  arms up behind his neck, right?
23           A.  I'm not sure if he was or not.  Could you
24  rewind that and I'll tell you?
25           Q.  Sure.  Uh-huh.  Have you ever been in
```

**Page 40**

```
1   that position before, where somebody's pushing your
2   arms back up?  Do you think that might break
3   somebody's shoulder?
4            A.  I'm not sure.
5            Q.  All right.  What did you just get a hold
6   of?
7            A.  What was it?
8            Q.  What did you just get a hold of?  Let's
9   rewind it again.  We'll watch it as many times...
10           A.  May I take a drink real quick?
11           Q.  Certainly.  So what, what did you just
12  get a hold of?  His hair?
13           A.  His neck.  I had his neck.
14           Q.  Whoa.  Did it look like you just hit him
15  once there?
16           A.  I may have.
17           Q.  You may have?
18           A.  I can't recall, Sir.
19           Q.  Okay.  Well, let's look at it again.
20  Boom.  Did that look like a hit to you?
21           A.  It does.
22           Q.  Okay.  Can I have just a second?  Let's
23  take a break for just a minute.
24           COURT REPORTER:  We'll go off the record.
25  (OFF THE RECORD.)
```

**Hicks Court Reporting**
**(423) 741-3366**

## Sheet 11    Page 41

```
1           COURT REPORTER:  We're back on the record.
2           MR. SEATON:  I hear your dog.
3           MR. KNIGHT:  You've got the screensaver with
4  the dog.
5           MR. SEATON:  I know.  Mine.  It's one of
6  mine.
7  CONTINUING, DIRECT EXAMINATION BY MR. SEATON:
8           Q.  All right.  Let's keep watching.
9  (PLAYING OF VIDEO CONTINUES)
10          A.  Yes, Sir.  There was two strikes.
11          Q.  And why was he -- it didn't look like he
12 was resisting.  Why was he taken to the ground?
13          A.  I know he was pulling away from Sean.
14          Q.  Okay.
15          A.  But I...
16          Q.  Let's keep watching.
17          A.  ...couldn't tell you, Sir.
18          Q.  And who's coming in?
19          A.  I don't recall.
20          Q.  Okay.  Does there appear to be blood
21 there?
22          A.  There is.  Yes, Sir.
23          Q.  Okay.  And did that blood -- when did
24 that blood start?  Do you recall?
25          A.  It looked like it started after the
```

## Page 42

```
1  second strike.
2           Q.  Okay.  By you?
3           A.  Yes, Sir.
4           Q.  Okay.  And tell me about these gloves you
5  all got on.
6           A.  What do you want to know about them?
7           Q.  I mean, are these just black, plastic
8  gloves, or are they tactical gloves?
9           A.  They were tactical gloves, but I wore
10 them for everything.
11          Q.  Okay.  Were they issued by the
12 department?
13          A.  No, Sir.
14          Q.  Where did they come from?
15          A.  I bought them.  Everything that I had as
16 a police officer I bought on my own.
17          Q.  Okay.
18          A.  Except for my duty weapon, which the
19 department issues.
20          Q.  Did they tell you it was okay to have
21 your own tactical gloves?
22          A.  As far as I know, it was okay.
23          Q.  Okay.
24          A.  I mean, everybody bought their own stuff.
25 They never said no.
```

## Page 43

```
1           Q.  Uh-huh.
2           A.  ...So, I mean...
3           Q.  Were they the same type of gloves that
4  Sean Brown had on?
5           A.  I don't recall what kind of gloves Sean
6  had on.
7           Q.  Well, I mean I'm seeing both of you with
8  these gloves on here.
9           A.  Yeah.  I, I don't recall what kind of
10 gloves Sean had on.
11          Q.  And the tactical gloves, they've got this
12 Kevlar in the knuckles?
13          A.  It wasn't Kevlar.  It was more of a
14 hollow plastic.
15          Q.  Okay.  But it was, it was something that
16 you could use as a weapon?
17          A.  It was just to protect your knuckles from
18 getting busted.
19          Q.  If you hit somebody in the face?
20          A.  I mean, for whatever reason.
21          Q.  Okay.  Let's keep watching.  A lot of
22 blood there, right?
23          A.  (NO AUDIBLE RESPONSE).
24          Q.  Yes?
25          A.  I mean I -- yeah.
```

## Page 44

```
1           Q.  So do you think that those strikes were
2  enough to have caved in his orbital cavity or his
3  nose or his mouth or his jaw?
4           A.  It would've been his nose 'cause that's
5  where I struck him at.
6           Q.  Okay.  Do you know who this is coming in?
7  Is that Sean Brown?
8           A.  I'm not sure.  Wait, which person?
9           Q.  Okay.  The one squatting down with the
10 black hat.
11          A.  I don't recall who that was.
12          Q.  And who's up, standing up?  Do you know?
13          A.  Putting gloves on right now?
14          Q.  Uh-huh.
15          A.  That would've been Dakota.
16          Q.  Dakota Williams?
17          A.  Yes, Sir.
18          Q.  And is he putting on tactical gloves,
19 too?
20          A.  I don't recall what kind of gloves he was
21 putting on.
22          Q.  Okay.  At the booking room, and this is
23 what -- I guess we're calling this the trap?
24          A.  This is what -- yeah.  That's what they
25 refer to it as the trap.
```

**Sheet 13  Page 49**

1  you see another officer being abusive to an inmate,
2  don't you have a responsibility to stop that?
3  　　　A. Yes, Sir.
4  　　　Q. And did you attempt to stop it in any
5  way?
6  　　　A. It doesn't appear as though as I did.
7  No, Sir.
8  　　　Q. Okay, Sir. And do you have a, do you
9  have an, did you have an obligation to report abuse
10  of inmates?
11  　　　A. Yes, Sir.
12  　　　Q. Did you report any of that?
13  　　　A. No, Sir. I did not.
14  　　　Q. Okay. Can you tell me what's going on
15  here? Why somebody's holding his head down and...?
16  　　　A. I'm assuming because he was still jerking
17  around.
18  　　　Q. All right. Who is that? Did you see
19  three strikes there?
20  　　　A. Yes, Sir.
21  　　　Q. Okay. There's another one, two strikes.
22  And everybody in there has got their tactical gloves
23  on, right?
24  　　　A. I, I can't speak and say that they were
25  or not. Some of them wore rubber gloves. Some of

**Page 50**

1  them wore tactical gloves.
2  　　　Q. Okay.
3  　　　A. I'm -- I can't say what they were wearing
4  because I really didn't pay attention to their hands.
5  　　　Q. So do you know who this is in the middle
6  that's standing on him, hitting him?
7  　　　A. Right here in the middle?
8  　　　Q. Yeah.
9  　　　A. Like I said, I would assume that it was,
10  it was Mr. Brown.
11  　　　Q. Okay.
12  　　　A. Because the other two, I couldn't tell
13  you what their names were.
14  　　　Q. Okay. Still seeing even more blood on
15  the ground, aren't we?
16  　　　A. Yes, Sir. And that's from him wiggling
17  across the ground.
18  　　　Q. All right. So is that Mr. Brown stepping
19  over him?
20  　　　A. Where at?
21  　　　Q. On the right side of the screen.
22  　　　A. With his belt in the air right here?
23  　　　Q. Uh-huh.
24  　　　A. I would assume so. Yes, Sir.
25  　　　Q. Okay. Does it look like Mr. Ling is

**Page 51**

1  resisting?
2  　　　A. At this time?
3  　　　Q. Uh-huh.
4  　　　A. No, Sir.
5  　　　Q. And is that you?
6  　　　A. Right here?
7  　　　Q. Yeah. Over top of him now?
8  　　　A. Yes, Sir.
9  　　　Q. Okay. Who's that?
10  　　　A. I'm assuming that's Sean. I couldn't
11  tell you. I really couldn't tell.
12  　　　Q. Do you think that Mr. Ling was in need of
13  immediate medical attention at this point?
14  　　　A. Yes, Sir.
15  　　　Q. Okay. And this is seven minutes into
16  this video. He's certainly not resisting now, is he?
17  　　　A. No, Sir.
18  　　　Q. Does it look like he's unconscious?
19  　　　A. He was still moving around, but I mean,
20  yeah, in that light, yeah, it looks like he's
21  unconscious.
22  　　　Q. Now is this you taking a picture of him?
23  　　　A. Yes, Sir.
24  　　　Q. What was the purpose of that?
25  　　　A. I sent it to my sergeant.

**Page 52**

1  　　　Q. For what purpose?
2  　　　A. I guess just to let him know what was
3  going on at the time.
4  　　　Q. Is that the only picture you took?
5  　　　A. Yes, Sir.
6  　　　Q. Who all did you send that picture to?
7  　　　A. I sent it to my sergeant's phone.
8  　　　Q. And who was your sergeant?
9  　　　A. Michael Owens.
10  　　　Q. Is he the only one that received that?
11  　　　A. As far as I know he was.
12  　　　Q. Okay. Did you keep a copy of that
13  picture?
14  　　　A. No, Sir. I deleted it.
15  　　　Q. Do you know of any -- now what's going on
16  here?
17  　　　A. Well, what is it?
18  　　　Q. I'm sorry. Let me back that up. You're
19  putting your gloves back on, right?
20  　　　A. Yes, Sir. Probably not to get blood on
21  my hands.
22  　　　Q. So what's going on here? What were you
23  demonstrating there?
24  　　　A. I couldn't tell you. I don't recall.
25  　　　Q. Well, it looks like some sort of

# EXHIBIT H

# LING V CAMPBELL COUNTY, ET AL

## Sheet 1   Page 1

```
         UNITED STATES DISTRICT COURT
         EASTERN DISTRICT OF TENNESSEE
                AT KNOXVILLE


NATHAN LING,

         PLAINTIFF,

VS                      CIVIL ACTION NO:  3:20-CV-233

CAMPBELL COUNTY, TENNESSEE;
JUSTIN CRABTREE; DAKOTA WILLIAMS;
SEAN BROWN; JOSHUA MILLER, in their
individual and official capacities;
and JOHN DOES, names and identities
not yet known,

         DEFENDANTS.



    PRETRIAL DISCOVERY DEPOSITION OF:
            DAKOTA WILLIAMS
         TAKEN ON DECEMBER 13, 2022



        * * * THIS STYLE PAGE IS CONTINUED * * *
```

## Page 3

```
                      INDEX

STYLE PAGE                          PAGE 1-2

INDEX & EXHIBITS                    PAGE 3

PRELIMINARIES                          PAGE 4

DIRECT EXAMINATION BY MR. SEATON    PAGE 5-71

CERTIFICATE                         PAGE 72


                   EXHIBITS

(NO EXHIBITS ADMITTED)
```

## Page 2

```
APPEARANCES:

FOR PLAINTIFF:      TONY SEATON, ESQ.

                    Tony Seaton And Associates
                    118 East Watauga Avenue
                    Johnson City, TN 37601
                    (423) 282-1041


FOR DEFENDANTS:     ARTHUR F. KNIGHT, III, ESQ.

                    Taylor & Knight, GP
                    800 South Gay Street, Suite 600
                    Knoxville, TN 37929
                    (865) 971-1701
```

## Page 4

```
1        The Pretrial Discovery Deposition of DAKOTA
2   WILLIAMS was taken by audio-visual means, by
3   agreement, as upon notice given, at the offices of
4   Taylor & Knight, GP, 800 South Gay Street, Suite 600,
5   Knoxville, Tennessee on the 13th of December, 2022.
6        The witness was sworn by Sally Hicks,
7   Licensed Court Reporter in and for the State of
8   Tennessee.  It is agreed that Sally Hicks, Licensed
9   Court Reporter, may take this deposition by
10  electronic recording equipment; transcribe the same
11  to typewriting, and affix the signature of the
12  witness hereto.
13       This deposition was taken for the purpose of
14  discovery and/or for use in evidence at any trial,
15  hearing or proceeding involving this matter and for
16  all purposes allowed or allowable under the pretrial
17  discovery statutes, and the Tennessee Rules of Civil
18  Procedure, its taking subject only to those
19  objections for incompetency, irrelevancy and
20  immateriality.
21       All other formalities are expressly waived.
22
23  (WITNESS IS SWORN)
```

**Hicks Court Reporting**
(423) 741-3366

# LING V CAMPBELL COUNTY, ET AL

## Sheet 9 — Page 33

1  Q.  Okay.  And then did you get the female
2  out and take her in?
3  A.  No, Sir.  Once I exited my vehicle I
4  heard a loud commotion going on from inside the
5  intake area.  I walked over to the door, I looked
6  through the window, seen them fighting with Mr. Ling
7  on the ground.  At which time I buzzed the door, a CO
8  opened it, I stepped in there and asked for a female
9  CO to step outside with the female.  I don't recall
10  her name right now.  Just to make sure she was safe
11  and secure, wasn't really, you know, didn't hurt
12  herself or kick out the windows or anything like
13  that.  And I applied gloves and tried to help get Mr.
14  Ling under control.
15  Q.  Okay.  And is it your testimony that Mr.
16  Ling was combative getting out of the car?
17  A.  Getting out of the car, I don't know.  I
18  wasn't there.
19  Q.  Okay.  Was it -- so there's a, there's a
20  door from the sally port into the trap room, right?
21  A.  Yes, Sir.
22  Q.  All right.  And at what point in time
23  did you enter that room?
24  A.  When I entered the trap room, as you
25  call it,...

## Page 34

1  Q.  Uh-huh.
2  A.  ...I usually refer to it as intake, so
3  when I entered that room they were, I believe, Deputy
4  Crabtree, Deputy Brown and maybe another CO...
5  Q.  Uh-huh.
6  A.  ...was struggling with Mr. Ling on the
7  ground.
8  Q.  And what did you do?
9  A.  I went in there and asked for a female
10  CO to step out with the inmate I had, put gloves on
11  and attempted to help them control Mr. Ling.
12  Q.  Did you have gloves?
13  A.  Not in my pocket.  I believe I got some
14  off the desk.
15  Q.  Were they just medical gloves?
16  A.  Latex, latex medical, yeah.
17  Q.  Okay.  They weren't the, they weren't
18  the Kevlar gloves?
19  A.  No, Sir.
20  Q.  The tactical gloves?
21  A.  No, Sir.
22  Q.  Did you ever put any tactical gloves on
23  while you were there?
24  A.  No, Sir.
25  Q.  All right.  And while you were in the

## Page 35

1  search room, you call it the search room, right?
2  A.  Intake, is usually what I refer to it
3  as.
4  Q.  Intake room?
5  A.  Yeah.
6  Q.  Yeah.  While you were in the intake room
7  is it your opinion that Mr. Ling was being combative?
8  A.  Yes, Sir.
9  Q.  All right.  Let's take a look at it.
10  Have you reviewed the video?
11  A.  Ah, it's been a long time.
12  Q.  But you have seen it?
13  A.  Yes, Sir.
14  Q.  All right.  And what I'm going to
15  represent to you is, a lot of this has been edited.
16  We're only going to look at 13 minutes of it.
17  A.  Okay.
18  Q.  And if you feel that at any point in
19  time we have left anything critical out, you can say,
20  Tony, it looks like we've left something critical
21  out, okay?
22  A.  Okay.
23  Q.  And I'll represent to you that what this
24  appears to be is the, is Justin Crabtree coming in
25  with the patrol car.

## Page 36

1  A.  Okay.
2  (VIDEO BEING PLAYED)
3  Q.  And is this ordinarily the way you get
4  somebody out of a patrol car?
5  A.  No, Sir.
6  Q.  Did it appear he was being abused
7  getting out of the patrol car?
8  A.  Better word for it?  Reword?
9  Q.  Did it appear that he was being abused
10  when he was getting, when he was being got out of the
11  patrol car?
12  A.  When he was yanked from the patrol unit,
13  yes, Sir.
14  Q.  Is that abusive?
15  A.  I don't -- it's not conducive of
16  training, no.
17  Q.  Okay.  It's excessive force, isn't it?
18  A.  Ah, it's...
19  MR. KNIGHT:  Object to form.
20  Q.  You can answer.
21  A.  I feel like it's excessive to pull him
22  out like that, yes.
23  Q.  Okay.  It's not the way you do things,
24  true?
25  A.  No, that is not the way we're trained.

## Hicks Court Reporting
### (423) 741-3366

**Sheet 10    Page 37**

```
1       Q.   All right.  And this is in your intake
2    room?
3       A.   Yes, Sir.
4       Q.   And here he's slammed into the, the
5    counter and then up against the window?
6       A.   Yes, Sir.
7       Q.   You're not in at this point in time?
8       A.   No, Sir, I'm not.
9       Q.   Okay.  Do you feel that that's abusive?
10      A.   That's definitely not the way we're
11   trained and not something I would do.
12      Q.   Okay.  If you saw that would you stop
13   it?
14      A.   Yes, Sir.
15      Q.   Okay.  Is that your responsibility as a
16   police officer?
17      A.   Yes, Sir.
18      Q.   And it's also your responsibility if you
19   saw it to report it.  True?
20      A.   Correct.
21      Q.   And so does it appear that the, that the
22   fellow on the left is Justin Crabtree?
23      A.   Yes, Sir.
24      Q.   And the heavyset fellow in the middle is
25   Joshua Miller?
```

**Page 39**

```
1    this intake room.
2       A.   I can tell that Deputy Crabtree is
3    having to pull him forward.
4       Q.   Does it appear he's being combative?
5       A.   At that very moment, no.
6       Q.   Okay.
7       A.   Right there he comes off the table,
8    which is standard with being combative.
9       Q.   And does it look, does it appear that
10   Mr. Crabtree's hitting him in the head?
11      A.   Yes, Sir.
12      Q.   Are you trained to do that?
13      A.   No, Sir.
14      Q.   And are you seeing the blood?
15      A.   Yes, Sir, I do.
16      Q.   Did you see the blood before he was
17   slammed down on the counter and thrown on the floor
18   and hit?
19      A.   Not -- no, Sir.
20      Q.   Okay.
21      A.   That's when I enter.
22      Q.   Pardon?
23      A.   I've just entered the scene there.
24      Q.   Okay.  That's you?
25      A.   Yeah, after.
```

**Page 38**

```
1       A.   Yes, Sir.
2       Q.   And the one on the right, is that Sean
3    Brown?
4       A.   From that angle I cannot tell if that's
5    Brown, or if the other one on the other side of
6    the...
7       Q.   Okay.
8       A.   ...intake room is Brown.
9       Q.   And so he's got his arms pushed up
10   behind his back?
11      A.   Correct.
12      Q.   You think that that's a good way to
13   break somebody's shoulder?
14      A.   I've never attempted to break anybody's
15   shoulder by that.  It's a good way to enforce their
16   upper extremities down...
17      Q.   Okay.
18      A.   ...on the table.
19      Q.   All right.  So is that, is that what
20   he's doing, is -- well, let me ask you, did it appear
21   that Mr. Ling was being combative at that point?
22      A.   Can you play it back, please?
23      Q.   Certainly.  Well, let's go back a little
24   further.  I want you to tell me if it appears that
25   Mr. Ling was being combative at any point in time in
```

**Page 40**

```
1       Q.   Okay.  So at that point in time you
2    hadn't seen them hitting him?
3       A.   Correct.  I had no idea what had
4    happened prior to my arrival.
5       Q.   Okay.  All right.  And is this you again
6    coming in?
7       A.   Yes, Sir.
8       Q.   Putting on the gloves?
9       A.   Yes, Sir.
10      Q.   Is he being combative?
11      A.   Doesn't appear he's, at the time, no.
12      Q.   So what are you doing at this point?
13      A.   At this time I'm trying to help restrain
14   his leg.
15      Q.   And why would you restrain him if he's
16   not being combative?
17      A.   At the point in time to that is when I
18   stated he was being combative.
19      Q.   Is he being combative now?
20      A.   I can't see if he's trying to lift off
21   or not at the point in time when I was there.  I do
22   recall him kicking Miller and going to assist him in
23   keeping his legs down.  He's just raising up off of,
24   what appeared to be his shoulders there.  There he's
25   kicking me.  Looks like we're struggling with him
```

**Sheet 11  Page 41**

1  trying to keep him under control.
2  Q. And who was hitting him there?
3  A. Can you refer to...?
4  Q. This, this fellow right here.
5  A. That'd be Sean Brown.
6  Q. Okay. Did you see him hitting him?
7  A. Yes, Sir, I did.
8  Q. All right. Let's look at it again. And
9  you saw that, didn't you?
10  A. From that angle, no, Sir.
11  Q. Okay. You didn't see him hitting him?
12  A. No, Sir.
13  Q. Okay. Had you seen that you would've
14  stopped him?
15  A. A rib strike is not something that we're
16  trained to do. It's not something that I consider
17  very appropriate. It's, at times I've seen it used.
18  Q. Is it excessive?
19  A. Depends on the situation.
20  Q. Well, in that situation is it excessive?
21  A. In that situation he's resisting at that
22  point in time.
23  Q. And he's cuffed behind his back?
24  A. It's -- he's cuffed behind his back.
25  Yes, Sir. I don't -- I would not have struck him in

**Page 42**

1  the ribs.
2  Q. Okay. Do you feel -- when is there,
3  when is there an appropriate time to strike somebody
4  in the ribs if they're cuffed behind their back?
5  A. If they're cuffed behind their back I
6  don't feel like there's an appropriate time to strike
7  one in the ribs.
8  Q. And if they do that it's excessive?
9  A. I don't feel it's appropriate. I don't
10  know if excessive would be the correct word.
11  Q. Well, would you have a responsibility to
12  stop it if you saw it?
13  A. If I felt that it was excessive, yes.
14  Q. Okay. Do you know who the -- oh, that's
15  Sean Brown there, right?
16  A. It is.
17  Q. And who is this fellow on the, there?
18  Do you know?
19  A. I believe that's Alex Standridge.
20  Q. Okay. So do you feel like Mr. Ling is
21  being treated appropriately by all those officers
22  with him on the floor, bleeding and handcuffed behind
23  his back?
24  A. By every officer?
25  Q. By all of them together?

**Page 43**

1  A. Together as a whole, that's -- I don't
2  agree with your statement there.
3  Q. Well, all, I just I'm asking you the
4  question.
5  A. Yeah. Well, if you want to separate it
6  out, I feel like you've got a different point of view
7  from every officer there.
8  Q. Who's in charge?
9  A. Of that scene directly? It's Mr.
10  Crabtree's inmate, and I believe Brown was a
11  supervisor at the jail.
12  Q. Okay. So you're not in charge?
13  A. Correct.
14  Q. All right. And so if you see abuse
15  going on at that point in time do you have a
16  responsibility to report it?
17  A. Yes, Sir.
18  Q. All right. And do you feel that all
19  this treatment of Mr. Ling is appropriate?
20  A. Not all of it, no.
21  Q. What part of it is appropriate?
22  A. Well, if you want to look at the point
23  of view where you paused it here,...
24  Q. Okay.
25  A. ...I was looking at the door, I'm facing

**Page 44**

1  the wall still trying to control Mr. Ling's legs.
2  Q. Uh-huh.
3  A. So there's no way for me to be able to
4  see Mr. Ling's head and/or the rib strikes that Sean
5  Brown just done through Miller.
6  Q. Did you have access to leg shackles?
7  A. Leg shackles, the jail should have. I'm
8  not issued a pair, no.
9  Q. But they would have them at the jail,
10  right?
11  A. They would have them at the jail.
12  Correct.
13  Q. So why wouldn't you just put leg
14  shackles on him instead of pinning him down with five
15  officers?
16  A. Ah, couldn't answer as to why they
17  didn't have leg shackles out there. Until you were
18  able to get a higher level of restraint...
19  Q. Okay.
20  A. ...that's used, that's the best way to
21  be able to control somebody.
22  Q. All right. So you weren't aware that
23  he's being hit, right?
24  A. Correct.
25  Q. But you're seeing all this blood, aren't

**Sheet 17  Page 65**

1  A. ...yes, Sir.
2  Q. Okay. It wouldn't take a rocket
3 scientist to realize that that man was in serious
4 need of medical condition,...?
5  MR. KNIGHT: Object to the form.
6  Q. ...or medical help, would it?
7  A. Again, I'm not a medical professional.
8 I've never had any medical training. I couldn't tell
9 you if he was in serious or minor condition.
10  Q. Okay. He's got blood all over himself.
11  A. Ah, blood's, it pulls up pretty quickly.
12  Q. Unsteady on his feet.
13  A. Correct.
14  Q. And slammed up against the...
15  A. Which I was not aware of at the time.
16  Q. Okay. Did you see the bruising around
17 his eyes and nose and his mouth?
18  A. Bruising? At that time, no, Sir.
19  Q. Or the swelling or the cuts?
20  A. I noticed some blood on his face. Yes,
21 Sir.
22  Q. Okay. But you couldn't determine if he
23 was in serious need of medical care?
24  A. Correct.
25  Q. So you disagree with Sheriff Robbie

**Page 66**

1 Goins if Sheriff Robbie Goins said, "He needed
2 medical treatment just as soon as I saw blood flying
3 from his face"?
4  A. I would agree with him stating that the
5 nurse needed to be checking him out following that
6 incident, yes.
7  Q. Okay. Did you receive any of the
8 pictures that Justin Crabtree or Sean Brown sent out?
9  A. Not that I recall.
10  Q. Did you receive any text messages after
11 you left the jail?
12  A. From...?
13  Q. Any of the officers?
14  A. I really don't recall what kind of text
15 messages I received. It was common on first shift to
16 have a shift text going.
17  Q. Well, what I'm talking about is about
18 this incident, not just general text messaging.
19  A. I recall the next day hearing about him
20 being transported to UT.
21  Q. For what?
22  A. Ah, they said he had a brain bleed.
23  Q. What does that mean to you?
24  A. That it's pretty -- just that he's got
25 some sort of brain bleed. I don't know what that

**Page 67**

1 would refer to as far as a medical term or what the
2 in-depth description of it would be.
3  Q. Uh-huh.
4  A. Again, I've not had an medical treat
5 (sic), any medical training to know any further
6 terminology with that.
7  Q. So you don't, you don't have any
8 understanding at all what a brain bleed means?
9  A. I understood it's a head injury.
10  Q. Okay. Serious head injury?
11  A. Again, I, without looking it up, no, I
12 do not know.
13  Q. Okay. Are you aware that a traumatic
14 brain injury can create some serious debilitating
15 issues for people for the rest of their lives?
16  MR. KNIGHT: Object to the form.
17  A. Again, I don't know anything about
18 medical professional.
19  Q. Do you feel that all of your treatment
20 of Mr. Ling that evening was appropriate?
21  A. All of my treatment?
22  Q. Yes.
23  A. Yes, Sir.
24  Q. All right, Sir. And would you want
25 yourself to be treated that way?

**Page 68**

1  A. Again, on my treatment, yes, Sir.
2  Q. Okay. You don't feel like you were
3 complicit in any of their activities?
4  A. Reword the word complicit for me.
5  Q. Yeah. You don't feel like that you were
6 a part of this ganging up on Mr. Ling while he was in
7 the jail, causing all these serious injuries?
8  A. I don't believe I caused any injuries to
9 Mr. Ling, no. If you're referring to ganging up, I
10 was unaware of him being struck in the face and his
11 head rammed into the window, whatever you want to
12 call that. I don't agree with either of those.
13  Q. Okay. Were you charged with state
14 crimes over this?
15  A. Yes, Sir.
16  Q. And what were you charged with?
17  A. Official misconduct, official oppression
18 and misdemeanor assault.
19  Q. And what resulted from those charges?
20  A. A nolle pros from the district
21 attorney's office, stating they didn't have enough
22 evidence to prosecute me on the charges. It's been
23 expunged off my record.
24  Q. Okay. Did you plead guilty before...?
25  A. No, Sir.

# EXHIBIT I

## Sheet 1  Page 1

```
          UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF TENNESSEE
                   AT KNOXVILLE


NATHAN LING,

          PLAINTIFF,

VS                     CIVIL ACTION NO:  3:20-CV-233

CAMPBELL COUNTY, TENNESSEE;
JUSTIN CRABTREE; DAKOTA WILLIAMS;
SEAN BROWN; JOSHUA MILLER, in their
individual and official capacities;
and JOHN DOES, names and identities
not yet known,

          DEFENDANTS.



     PRETRIAL DISCOVERY DEPOSITION OF:
               JEREMY GOINS
          TAKEN ON DECEMBER 12, 2022



     * * * THIS STYLE PAGE IS CONTINUED * * *
```

## Page 2

```
APPEARANCES:

FOR PLAINTIFF:       TONY SEATON, ESQ.

                     Tony Seaton & Associates
                     118 East Watauga Avenue
                     Johnson City, TN 37601
                     (423) 282-1041


FOR DEFENDANTS:      ARTHUR F. KNIGHT, III, ESQ.

                     Taylor & Knight, GP
                     800 South Gay Street, Suite 600
                     Knoxville, TN 37929
                     (865) 971-1701
```

## Page 3

```
                    INDEX

STYLE PAGE                          PAGE 1-2

INDEX & EXHIBITS                    PAGE 3

PRELIMINARIES                           PAGE 4

DIRECT EXAMINATION BY MR. SEATON    PAGE 5-66

CERTIFICATE                         PAGE 67


                  EXHIBITS

(NO EXHIBITS ADMITTED)
```

## Page 4

```
1          The Pretrial Discovery Deposition of JEREMY
2    GOINS was taken by audio-visual means, by agreement,
3    as upon notice given, at the offices of Taylor &
4    Knight, GP, 800 South Gay Street, Suite 600,
5    Knoxville, Tennessee on the 12th of December, 2022.
6          The witness was sworn by Sally Hicks,
7    Licensed Court Reporter in and for the State of
8    Tennessee.  It is agreed that Sally Hicks, Licensed
9    Court Reporter, may take this deposition by
10   electronic recording equipment; transcribe the same
11   to typewriting, and affix the signature of the
12   witness hereto.
13         This deposition was taken for the purpose of
14   discovery and/or for use in evidence at any trial,
15   hearing or proceeding involving this matter and for
16   all purposes allowed or allowable under the pretrial
17   discovery statutes, and the Tennessee Rules of Civil
18   Procedure, its taking subject only to those
19   objections for incompetency, irrelevancy and
20   immateriality.
21         All other formalities are expressly waived.
22
23   (WITNESS IS SWORN)
```

**Hicks Court Reporting**
**(423) 741-3366**

Sheet 15  Page 57

1   A.  What's on -- I did not know the extent
2   of the injuries.  I would, I would believe it had
3   happened there, yes.
4   Q.  Okay.  And would you agree with the
5   sheriff when he says it's never justified for
6   officers to watch an arrestee being abused without
7   reporting it?
8   A.  Yes.
9   Q.  And would you agree with him when he
10  says, if officers are not reporting abuse then this
11  could also become a culture?
12  A.  Yes.  I'm sorry.  I didn't know this was
13  on.
14  (PHONE VIBRATING)
15  Q.  Okay.  What do you think, if you were
16  reinstated as the, as the chief deputy of Campbell
17  County tomorrow, what do you think should change, if
18  anything, to stop something like this from ever
19  happening again?
20  A.  Well, I'll be honest with you, it's
21  definitely a training issue in that situation.  And,
22  you know, as more you're talking, yes, it could
23  definitely be a culture issue as the more we talk
24  about this.  A more defined policy for the officers
25  to understand.  And supervision, mid-level

Page 58

1   supervision also and changes in the upper
2   administration also.
3   Q.  So it could be a hiring issue also too,
4   true?
5   A.  I don't know if I understand what you
6   mean.
7   Q.  Well, my understanding that most of the,
8   most of the road officers were in the early 20s.  Was
9   that true?
10  A.  I would -- I, don't want to mis-speak.
11  There were younger officers, some, yes.  I don't know
12  about all.  You talking about with that situation?
13  Q.  Yeah.  I haven't deposed anybody, I
14  don't think, that's over, that was over 25 at the
15  time of the incident.
16  A.  I think that's, that's -- the only
17  person that I could think of that, within that group
18  of people that you mentioned would be Mike Owens.
19  Q.  Right.
20  A.  He's probably older than me honestly.  I
21  can't -- yeah.  So, yes, I remember them being
22  younger.
23  Q.  So you possibly had a hiring issue, a
24  training issue, a supervision issue?  True?
25  MR. KNIGHT:  Object to the form.

Page 59

1   A.  As far as a hiring issue in law
2   enforcement it's, it's, it seems to be as a trend
3   it's younger officers now.  And, and so I don't know
4   if that's an issue.  It's just what you get from the
5   police academies now, is younger, younger law
6   enforcement officers.
7   Q.  You all don't require people to go to
8   the academy, do you?
9   A.  To, to work full time on the road?
10  Q.  Yeah.
11  A.  Yes.  Well, we did.  I don't know what,
12  if they do now.  There were some part time officers
13  that worked, that worked under 25 hours a week that
14  were allowed to work and things like that.  The
15  sheriff would allow them to work.
16  Q.  Okay.
17  A.  But if they had like full time they had
18  to graduate from the law enforcement academy.
19  Q.  Okay.  All right.  Fair enough.  So you,
20  you say that there's a supervision issue and a
21  training issue?
22  A.  Yes.
23  Q.  And a culture issue?
24  MR. KNIGHT:  Object to the form.
25  A.  With that group?  Yes.  I can't

Page 60

1   holistically say that everybody, 'cause I don't want
2   to lump everybody into one category but it's
3   possible, yes.
4   Q.  Okay.  What do you consider to be
5   excessive force?
6   A.  When it's, when force is overused.  When
7   it's not necessary.
8   Q.  Okay.  Such as?  Give me an example.
9   A.  I mean, if we're talking about this
10  situation,...
11  Q.  Uh-huh.
12  A.  ...that was unnecessary.  I feel like
13  there's examples of it everyday.  I mean, striking
14  someone when they don't -- when they're confined or
15  using force against anyone, you know, that's
16  confined.  Or something that's used for -- can't
17  think of the word.  Using force without trying to
18  gain, for a reason for gaining compliance.  Like, I
19  mean, if you're not, if that's not your objective to
20  gain compliance, force is unnecessary.
21  Q.  Okay.  At the time you all did not have
22  24 hour nurses, correct?
23  A.  I can't -- I don't know on that side of
24  that.
25  Q.  But I want you to assume that's

Sheet 16   Page 61

```
1    what everyone's testified to.
2         A.   Okay.
3         Q.   That there was not 24 hour nurses.  Did
4    you all eventually change that policy?
5         A.   That -- from my understanding there's a
6    nurse 24/7, and has been for like, I think after,
7    days after I left or when I was leaving I think that
8    changed at some point.  I don't know the date.  But
9    there is a, there was a nursing staff.
10        Q.   And you know if there was any training
11   of the officers to recognize serious medical
12   conditions or needs?
13        A.   I don't know.  I don't know.
14        Q.   Okay.  You would agree that medical
15   treatment should never be withheld...?
16        A.   Never.
17        Q.   ...to be used as a punishment?
18        A.   Never.
19        Q.   Okay.  During the time you were there do
20   you feel, did you feel that the county was or that
21   the, excuse me, the sheriff's department was properly
22   funded by the county?
23        A.   I feel like most law enforcement
24   agencies are underfunded.
25        Q.   Okay.
```

Page 62

```
1         A.   And I'm not trying to get around that
2    question.  I'm not.  I, I -- there's always room for
3    improvement and more money needed.  Honestly yes,
4    that would be my answer to that.
5         Q.   But do you think that they were fairly
6    seriously underfunded?
7         A.   Seriously underfunded?
8         Q.   Yeah.  To where you couldn't hire decent
9    officers, you couldn't train decent officers to work,
10   you know.
11        A.   I feel like that higher wages in, in
12   that, things like that bring in more qualified people
13   sometimes.
14        Q.   Uh-huh.
15        A    So in that sense, yes.
16        Q.   So you said that you've reviewed the
17   video, right?
18        A.   Yes.
19        Q.   'Cause I'll be happy, and we've
20   actually, we've actually culled it down to about 12
21   minutes.
22        A.   I have.  I've seen it.
23        Q.   Okay.  So you've seen it.  And there's
24   no question but that Mr. Ling was in custody...?
25        A.   He was in custody, yes.
```

Page 63

```
1         Q.   ...at the time he was being abused?
2         A.   Yes.
3         Q.   He was arrested, correct?
4         A.   Yes.
5         Q.   And when they pulled into the sally
6    port, he was -- there was no way for him to have
7    escaped?  The sally port was secure, I guess, is what
8    I'm trying to say?
9         A.   Yeah, once they closed the door to the
10   back side of the sally port where you can enter is
11   secured completely, yes.
12        Q.   And I want you to assume that there was
13   no nurse at the jail but there was one on call.
14        A.   Okay.
15        Q.   Okay?  And you've reviewed the video
16   where Mr. Ling was just totally disoriented, haven't
17   you?
18        A.   Yes.
19        Q.   All right.  And you agree that he needed
20   immediate medical attention?
21        A.   He needed medical attention, yes.
22        Q.   He needed immediate medical attention?
23        A.   Yes.
24        Q.   Okay.  And that if Sean Brown, who was
25   involved in the altercations, was the supervisor
```

Page 64

```
1    making the decision, there's something wrong there?
2    True?
3         A.   That, that's not a good situation.
4         Q.   Okay.  And did it appear that he was,
5    that Mr. Ling was deliberately denied medical care?
6         A.   Yes.
7         Q.   Okay.  Has this ever happened before
8    that you know of?
9         A.   Not that I'm aware.  No, Sir.
10        Q.   I'm just about through.
11        A.   No, you're fine.
12        Q.   People usually like to know when I'm
13   about done.  So did you tell me that you had not
14   reviewed the TBI conclusions and summation?
15        A.   I've never been privy to those ever.  I
16   left the agency.
17        Q.   Okay.
18        A.   So I never saw that past that point
19   so...
20        Q.   Okay.  Did you ever have any further
21   discussions with Sheriff Goins once the TBI made
22   their determinations?
23        A.   No.  Not that I remember, no.
24        Q.   Okay.  And you are aware that they
25   prosecuted about four of those individuals?
```

# EXHIBIT J

# LING V CAMPBELL COUNTY, ET AL

**Sheet 1   Page 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

NATHAN LING,

      PLAINTIFF,

VS              CIVIL ACTION NO:  3:20-CV-233

CAMPBELL COUNTY, TENNESSEE;
JUSTIN CRABTREE; DAKOTA WILLIAMS;
SEAN BROWN; JOSHUA MILLER, in their
individual and official capacities;
and JOHN DOES, names and identities
not yet known,

      DEFENDANTS.

PRETRIAL DISCOVERY DEPOSITION OF:
    ALLISON WILLOUGHBY
    TAKEN ON DECEMBER 13, 2022

\* \* \* THIS STYLE PAGE IS CONTINUED \* \* \*

---

**Page 2**

APPEARANCES:

FOR PLAINTIFF:         TONY SEATON, ESQ.

                Tony Seaton And Associates
                118 East Watauga Avenue
                Johnson City, TN 37601
                (423) 282-1041

FOR DEFENDANTS:     ARTHUR F. KNIGHT, III, ESQ.

                Taylor & Knight, GP
                800 South Gay Street, Suite 600
                Knoxville, TN 37929
                (865) 971-1701

---

**Page 3**

INDEX

STYLE PAGE                   PAGE 1-2

INDEX & EXHIBITS            PAGE 3

PRELIMINARIES               PAGE 4

DIRECT EXAMINATION BY MR. SEATON   PAGE 5-56

CERTIFICATE                 PAGE 57

                    EXHIBITS

(NO EXHIBITS ADMITTED)

---

**Page 4**

1       The Pretrial Discovery Deposition of ALLISON
2  WILLOUGHBY was taken by audio-visual means, by
3  agreement, as upon notice given, at the offices of
4  Taylor & Knight, GP, 800 South Gay Street, Suite 600,
5  Knoxville, Tennessee on the 13th of December, 2022.
6       The witness was sworn by Sally Hicks,
7  Licensed Court Reporter in and for the State of
8  Tennessee.  It is agreed that Sally Hicks, Licensed
9  Court Reporter, may take this deposition by
10  electronic recording equipment; transcribe the same
11  to typewriting, and affix the signature of the
12  witness hereto.
13       This deposition was taken for the purpose of
14  discovery and/or for use in evidence at any trial,
15  hearing or proceeding involving this matter and for
16  all purposes allowed or allowable under the pretrial
17  discovery statutes and the Tennessee Rules of Civil
18  Procedure, its taking subject only to those
19  objections for incompetency, irrelevancy and
20  immateriality.
21       All other formalities are expressly waived.
22
23  (WITNESS IS SWORN)

---

**Sheet 5  Page 17**

1  Q. Okay. That's yes?
2  A. Yes.
3  Q. And so Fast Access is a different company
4  than CHET?
5  A. Uh-huh (affirmative). There was three, I
6  worked for three different companies...
7  Q. All right.
8  A. ...while I was at the, the 8-1/2 years I
9  was at the jail.
10  Q. Okay.
11  A. Three different companies took the
12  contract.
13  Q. Okay. But they would just say hey, we're
14  going to be the new kid on the block with the
15  contract, but we want you to continue to stay here?
16  A. Yes, uh-huh.
17  Q. All right.
18  A. The sheriff and administration usually
19  had a part in that. We would like to keep our nurses
20  if, you know, if you would be willing, and they
21  always were.
22  Q. Okay. And so how did the shifts work if
23  you had four nurses?
24  A. In 2019, at that time I'm not really
25  certain. That's why I don't remember if Jodi worked

**Page 18**

1  there or not. We rotated days. I had so many
2  different shifts there I honestly cannot remember,
3  'cause like my shift changed multiple, multiple
4  times. I went from weekends to Monday, Tuesday,
5  Friday, Saturday, Sunday and then Wednesday, Thursday
6  the next week. And at that time I really don't
7  recall the exact days I was working.
8  Q. But in general, how did they staff the
9  jail? Did they staff it...?
10  A. From 6 in the morning 'til like around 11
11  o'clock at night.
12  Q. Okay. Seven days a week?
13  A. So you would have -- yes. So you would
14  have two nurses a day.
15  Q. Okay. 6 am 'til 11 pm?
16  A. Uh-huh (affirmative).
17  Q. All right. So if you were working as one
18  of those two nurses, you'd come in at 6 and then
19  leave at...
20  A. I would come in at 6 and usually leave
21  around 2:30 or a little bit later according to what
22  the need was.
23  Q. Okay. And so what were the instructions
24  after hours?
25  A. We took turns of being on call.

**Page 19**

1  Q. Okay.
2  A. The nurses did.
3  Q. All right. And when you were on call,
4  what did that mean?
5  A. If the officer didn't know what to do,
6  they would call us and asked our suggestion on what
7  to do.
8  Q. Okay. And would there be occasion when
9  they would call you and you would actually have to
10  get up in the middle of the night and go to the jail?
11  A. There has been, I have went to the jail
12  in the middle of the night. Not with Fast Access,
13  not with that company. Because they had nurse
14  practitioners on call, and I believe our officers
15  could call them too, if I'm not mistaken.
16  Q. Okay. And were you willingly available
17  any time anybody called you?
18  A. Oh, yes.
19  Q. Were you pleasantly available any time
20  anybody called you?
21  A. Yes.
22  Q. All right.
23  A. Yes.
24  Q. Did you have a good relationship with the
25  supervisors at the Campbell County...?

**Page 20**

1  A. Yes.
2  Q. ...Sheriff's Department?
3  A. Uh-huh (affirmative).
4  Q. Was there anybody other than potentially
5  Stoney Love that you didn't have a good relationship
6  with?
7  A. No. I loved my job.
8  Q. Okay. And when they would call you,
9  would it be the corporals or the sergeants, or would
10  it be officers?
11  A. Usually it was a corporal.
12  Q. Usually a corporal would call you?
13  A. Uh-huh (affirmative).
14  Q. All right.
15  A. Yeah. 'Cause during the night it was
16  mainly just regular CO's and corporals. There wasn't
17  -- I think they later on got a nighttime sergeant,
18  but they didn't at that time, I'm almost positive.
19  Q. And so I was told that there were four
20  corporals, Kathy Walden, Nicky Wells, Sean Brown and
21  Joel Boyer. Do those names ring a bell?
22  A. Uh-huh (affirmative).
23  Q. All right. And you had a good working
24  relationship with all of those?
25  A. Yes.

# EXHIBIT K

NATHAN LING,

       PLAINTIFF,

VS                CIVIL ACTION NO: 3:20-CV-233

CAMPBELL COUNTY, TENNESSEE;
JUSTIN CRABTREE; DAKOTA WILLIAMS;
SEAN BROWN; JOSHUA MILLER, in their
individual and official capacities;
and JOHN DOES, names and identities
not yet known,

       DEFENDANTS.

PRETRIAL DISCOVERY DEPOSITION OF:

MATTHEW WASSON

TAKEN ON APRIL 25, 2023

* * * THIS STYLE PAGE IS CONTINUED * * *

*Hicks Court Reporting* ● *Sally Hicks* ● *P.O. Box 8323, Gray, TN 37615* ● *423-741-3366*

1          Q.  So tell me what you would tell him to

2     make certain that none of this ever happens again.

3          A.  Well, first of all, one change that we

4     have made in the department is, once again, we have a

5     24 hour medical staff.

6          Q.  Okay.

7          A.  So that's, as far as somebody, if they

8     are injured, where they are checked on pretty

9     regularly.  I can't speak on behalf of a lot of what

10    goes on in the jail.  My short term, my short term as

11    the chief deputy, I didn't -- we had a jail

12    administrator, we had a lieutenant, sergeants that

13    took care of the day-to-day jail activity.  I mainly

14    worked on the budgetary issues for the jail.  So I

15    can't tell you a whole lot about the jail environment

16    and things like that.  On the patrol side of things

17    was something that I'm more, more apt to dealing

18    with.  During this time we had incorporated more use

19    of force training within the department, and it's

20    just been made aware that this kind of behavior --=

21    everybody's familiar with this incident, how it

22    happened, everybody is aware of it.  So we've, we've

23    made sure that we've explained to supervisors and

24    things like that.  We've actually, as part of our

25    current use of force policy, there's a duty to

1    intervene section within the new use of force policy,

2    so that we have made steps in the direction to try to

3    prevent something like this from happening again

4    because we don't want this to happen.  You know, it's

5    a black eye, not only on our sheriff's department,

6    but the law enforcement community as a whole.  So I

7    feel like we've made, we've made, you know, steps in

8    the direction of trying to correct this from

9    happening again.

10        Q.  So when I watched this video with Sheriff

11   Robbie Goins, he said that it appeared to him that

12   most of these injuries had to be caused by the abuse

13   he received at the jail.  Do you agree or disagree?

14        MR. KNIGHT:  Object to the form.

15        Q.  Or you can say I don't know.

16        A.  I don't.  I mean, I'm not a medical

17   professional by no means.  I can't tell you.  I don't

18   know what the extent of his injuries were prior to

19   coming to the jail.

20        Q.  Okay.

21        A.  So I can't really say.

22        Q.  But just from watching the video?

23        A.  I'd see him -- let me clarify here.  I

24   don't know what the extent of his injuries were to

25   begin with.  So there's a traumatic brain injury