```
 1            IN THE UNITED STATES DISTRICT COURT

 2           FOR THE EASTERN DISTRICT OF TENNESSEE

 3                     KNOXVILLE DIVISION

 4    ---------------------------------------------------------
                                     :
 5    NATHAN LING,                   :
                                     :
 6             Plaintiff,            :
                                     :
 7    v.                             :        3:20-CV-233
                                     :
 8    CAMPBELL COUNTY, TENNESSEE,    :
                                     :
 9             Defendant.            :
                                     :
10    ---------------------------------------------------------
                                Knoxville, Tennessee
11                              January 30-February 1, 2024

12            BEFORE:  THE HONORABLE CHARLES E. ATCHLEY, JR.
                       UNITED STATES DISTRICT JUDGE
13
      APPEARANCES:
14
              FOR THE PLAINTIFF:
15
              ANTHONY A. SEATON
16            THOMAS J. SMITH
              GARZA LAW FIRM
17            118 East Watauga Avenue
              Johnson City, Tennessee 37601
18

19            FOR THE DEFENDANT:

20            ARTHUR F. KNIGHT, III
              TAYLOR & KNIGHT
21            800 South Gay Street
              Suite 600
22            Knoxville, Tennessee 37929

23

24                            JURY TRIAL
25                            TESTIMONY
```

1                    INDEX OF PROCEEDINGS

2   ALEXANDER STRANDRIDGE
        Direct Examination by Mr. Seaton .................. 6
3       Cross-Examination by Mr. Knight .................. 52
        Redirect Examination by Mr. Seaton .............. 64
4       Recross-Examination by Mr. Knight ............... 67

5   CODY DOUGLAS
        Direct Examination by Mr. Smith .................. 69
6       Cross-Examination by Mr. Knight .................. 79
        Redirect Examination by Mr. Smith ............... 85
7
    JUSTIN CRABTREE
8       Direct Examination by Mr. Seaton .................. 87
        Cross-Examination by Mr. Knight .................. 146
9       Redirect Examination by Mr. Seaton .............. 161
        Recross-Examination by Mr. Knight ............... 162
10
    ROBBIE GOINS
11      Direct Examination by Mr. Seaton ................ 164
        Cross-Examination by Mr. Knight ................. 197
12
    STONEY LOVE
13      Direct Examination by Mr. Seaton ................ 205
        Cross-Examination by Mr. Knight ................. 224
14      Redirect Examination by Mr. Seaton .............. 235
        Recross-Examination by Mr. Knight ............... 240
15
    TRACI SWANSON
16      Direct Examination by Mr. Seaton ................ 241
        Cross-Examination by Mr. Knight ................. 261
17
    MICHAEL BEEHAN
18      Direct Examination by Mr. Seaton ................ 268
        Cross-Examination by Mr. Knight ................. 273
19      Redirect Examination by Mr. Seaton .............. 277
        Recross-Examination by Mr. Knight ............... 278
20      Direct Examination by Mr. Knight ................ 671

21  JOHN HANNON
        Direct Examination by Mr. Seaton ................ 281
22      Cross-Examination by Mr. Knight ................. 310

23  ZACH FARRAR
        Direct Examination by Mr. Seaton ................ 318
24

25

1          INDEX OF PROCEEDINGS (CONTINUED)

2    SEAN BROWN
         Direct Examination by Mr. Seaton ................ 321
3        Cross-Examination by Mr. Knight ................. 364
         Redirect Examination by Mr. Seaton ............. 386
4        Recross-Examination by Mr. Knight .............. 395

5    MICHAEL GALLOWAY
         Direct Examination by Mr. Smith ................ 398
6        Cross-Examination by Mr. Knight ................ 408
         Redirect Examination by Mr. Smith ............. 411
7        Recross-Examination by Mr. Knight .............. 412

8    MATT WASSON
         Direct Examination by Mr. Seaton ............... 413
9        Cross-Examination by Mr. Knight ................ 429

10   ROBERT BOHM
         Direct Examination by Mr. Smith ................ 440
11       Cross-Examination by Mr. Knight ................ 465

12   ALLISON WILLOUGHBY
         Direct Examination by Mr. Seaton ............... 474
13       Cross-Examination by Mr. Knight ................ 498

14   COURTNEY WHATLEY
         Direct Examination by Mr. Smith ................ 501
15       Cross-Examination by Mr. Knight ................ 510

16   CATIE WILSON
         Direct Examination by Mr. Seaton ............... 514
17       Cross-Examination by Mr. Knight ................ 527
         Redirect Examination by Mr. Seaton ............. 531
18       Recross-Examination by Mr. Knight .............. 533

19   JOEL BOYER
         Direct Examination by Mr. Smith ................ 534
20       Cross-Examination by Mr. Knight ................ 548

21   JEREMY GOINS
         Direct Examination by Mr. Seaton ............... 557
22       Cross-Examination by Mr. Knight ................ 583
         Redirect Examination by Mr. Seaton ............. 593
23       Recross-Examination by Mr. Knight .............. 600

24

25

1
INDEX OF PROCEEDINGS (CONTINUED)

2
GREG WINSTON
    Direct Examination by Mr. Smith .................. 603
3    Cross-Examination by Mr. Knight ................. 637
    Redirect Examination by Mr. Smith .............. 642
4    Recross-Examination by Mr. Knight .............. 645

5
JOSHUA MILLER
    Direct Examination by Mr. Seaton ............... 648
6    Cross-Examination by Mr. Knight ................. 660
    Redirect Examination by Mr. Seaton ............. 666
7    Recross-Examination by Mr. Knight .............. 667

8
MALLORY CAMPBELL
    Direct Examination by Mr. Knight ............... 679
9    Cross-Examination by Mr. Seaton ................. 686
    Redirect Examination by Mr. Knight ............. 697

10

11
PLAINTIFF'S EXHIBITS

12

| NUMBER | DESCRIPTION | RECEIVED |
|---|---|---|
| 1 | Campbell County Policies & Procedures Manual | 176 |
| 6 | Aerial View with Markings by Douglas | 71 |
| 8 | Photo of Ling Bleeding on Intake Floor | 114 |
| 12 | Messages Between Crabtree & Owens | 132 |
| 27 | Dr. Todd Abel CV | 438 |
| 29 | Robert Bohm CV | 464 |
| 30A | Robert Bohm Earnings Table 1 | 447 |
| 30B | Robert Bohm Earnings Table 2 | 450 |
| 30C | Robert Bohm Earnings Table 3 | 453 |
| 30D | Robert Bohm Earnings Table 4 | 458 |
| 31 | Michael Galloway CV | 408 |
| 32 | Gregory Winston CV | 608 |
| 33 | Courtney Whatley CV | 510 |
| 34A | Courtney Whatley Cost Summary, Option 2 | 506 |
| 34B | Courtney Whatley Cost Summary, Option 1 | 508 |
| 35 | Photo of Nathan Ling, 2011 | 253 |
| 36 | Photo of Nathan Ling, 2012 | 254 |
| 37 | Photo of Nathan Ling, Senior Picture | 255 |
| 38 | Photo of Nathan Ling with Diploma | 258 |
| 39 | Photo of Nathan Ling with Sister | 257 |
| 48 | 13-Minute Condensed Jail Videos | 15 |

13
14
15
16
17
18
19
20
21
22
23
24
25

1

<u>PLAINTIFF'S EXHIBITS (CONTINUED)</u>

2

| NUMBER | DESCRIPTION | RECEIVED |
|--------|-------------|----------|
| 55 | Summation of TBI Report | 289 |
| 56 | CCSD Chain of Command | 16 |
| 57 | Dr. Todd Abel (Neurosurgereon) Video Depo | 438 |

3

4

5

6

- - -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Prior proceedings were heard but not

2    requested to be transcribed herein.)

3    THE COURT:  Mr. Seaton, call your first

4    witness.

5    MR. SEATON:  Your Honor, we'll call Alexander

6    Standridge.

7    THE COURT:  All right.

8    THE COURTROOM DEPUTY:  Sir, if you'll come up

9    this way.

10    MR. SEATON:  Come right up here.

11    (The witness was duly sworn.)

12    THE COURT:  All right.  Mr. Seaton, whenever

13    you're ready.

14    MR. SEATON:  Thank you, Your Honor.

15    <u>ALEXANDER STANDRIDGE</u>,

16    called as a witness at the instance of the parties,

17    having been first duly sworn, was examined, and

18    testified as follows:

19    <u>DIRECT EXAMINATION</u>

20    BY MR. SEATON:

21    Q.    Would you tell the ladies and gentlemen of the

22    jury your -- your full name, sir.

23    A.    Alexander Standridge.

24    Q.    And what do you do now?

25    A.    I'm a tow truck driver and part of rescue squad

1    for Campbell County.

2    Q.        All right, sir.  And did you originally work

3    for Campbell County Sheriff's Department?

4    A.        I did.

5    Q.        And how old were you at the time?

6    A.        If I remember correctly, roughly 19, 20 years

7    old.

8    Q.        All right, sir.  And why did you -- or how did

9    you come about getting a job with Campbell County?

10   A.        A friend of mine was there and said it was a

11   good career to go into.

12   Q.        Okay.  And so drawing your attention to the --

13   when this happened -- this was June the 1st of 2019 --

14   how long had you been at the department?

15   A.        Two, three months probably.  Not very long.

16   Q.        Okay.  You'd been there two to three months.

17   And would you tell the ladies and gentlemen of the jury

18   what type of training that you had to become --

19   you -- you were a corrections officer; correct?

20   A.        Yes, sir.

21   Q.        And so a corrections officer is -- doesn't he

22   basically work in the jail?

23   A.        Yes, sir.

24   Q.        You don't -- you're not on the road with a gun

25   and that type of thing.

1    A.        No, sir.

2    Q.        All right, sir.  And as a correction officer,

3    tell them what type of training you received.

4    A.        My training was, if I remember correctly, about

5    two weeks in classroom.  Mainly just paperwork is what

6    they taught us.  There was no hands-on, nothing like

7    that.

8    Q.        Okay.  And when you say "there was no

9    hands-on," what do you mean?

10   A.        Learning to defend yourself or deescalate a

11   situation such as what happened.

12   Q.        When you say "deescalate a situation such as

13   what happened," can you give us a little more detail

14   about that?

15   A.        Basically like an aggressor that would come in

16   and want to fight or something.  They -- they didn't

17   teach us how to properly defend within legal limits or

18   the route to take to deescalate that situation.

19   Q.        Okay.  Did they teach you anything about

20   medical training?

21   A.        No, just, I believe, basic CPR.

22   Q.        Did they teach you anything about how to assess

23   someone for a serious medical condition?

24   A.        Not that I remember.

25   Q.        Did they teach you anything about how to

1  provide medical --

2  A.        Not that I remember.

3  Q.        -- medical assistance to somebody?

4            I want to -- let's pull up -- can we pull up

5  Exhibit 56 first.

6            This is Exhibit Number 56.  And is this your

7  picture at the very bottom?

8  A.        Yes, sir.

9  Q.        All right, sir.  And so would it be fair to say

10 that you were low on the totem pole of -- at the

11 sheriff's department?

12 A.        Yes, sir.

13 Q.        You were -- there wasn't anybody underneath

14 you --

15 A.        No, sir.

16 Q.        -- in the chain of command; right?

17 A.        I believe I was one of the newest ones at the

18 time.

19 Q.        And Joshua Miller, there's a picture of him

20 right next to you?

21 A.        Yes, sir.

22 Q.        He was involved in this -- in this incident

23 too, wasn't he?

24 A.        Yes, sir.

25 Q.        All right.  And then above that, would that be

1  your supervisor, Sean Brown?

2  A.       For that night, yes, sir.

3  Q.       And does this chain of command -- is this chain

4  of command accurate?  Sean Brown would have reported to

5  Catie Wilson, the sergeant?

6  A.       Yes, sir.

7  Q.       Who would have reported to Mallory Campbell,

8  the lieutenant?

9  A.       Yes, sir.

10  Q.       Who would have reported to the chief, Stoney

11  Love, reporting to the sheriff --

12  A.       Yes, sir.

13  Q.       -- right?

14          And we didn't list all the officers there.

15  There's 27 other officers.  But, basically, this is the

16  chain of command of the people that were involved in

17  this -- in this incident; correct?

18  A.       Yes, sir.

19          MR. SEATON:  All right.  So we won't introduce

20  this at this point.  We'll introduce it later.

21  BY MR. SEATON:

22  Q.       So if you would, I want to show you -- let's

23  look at the video, if we could, Joseph.

24          You were working the jail that evening; right?

25  A.       Yes, sir.

1    Q.        You weren't out on the road where -- where

2    Nathan Ling was --

3    A.        No, sir.

4    Q.        -- arrested; right?

5    A.        No, I was in the jail.

6    Q.        All right.  And who were you working with?

7    A.        Sean Brown, Deputy Miller, not too sure on who

8    was inside working as well.  I just know who was there

9    hands-on with me.

10   Q.        Okay.  And when you went to work for the

11   Campbell County Sheriff's Department, what did they tell

12   you the requirements to go to work there were?

13   A.        High school diploma.

14   Q.        Okay.  How much were you paid?

15   A.        I don't remember exact.  I believe it was

16   between 12 and 14 an hour.

17   Q.        Okay.  And so why were you working this late

18   night shift?

19   A.        That was the shift they offered me.  And at the

20   time, I was good friends with Sean Brown, so we thought

21   it would be fun to work together.

22   Q.        So did he encourage you to work for the

23   Campbell County Sheriff's Department?

24   A.        Yes, sir.

25   Q.        All right.  And so after you went to work for

1  the Campbell County Sheriff's Department, did you have

2  any other training?  They've talked about this TCI

3  training.  Have you had --

4  A.       No, sir, I never got sent for it.

5  Q.       Okay.  Did they give you their training manual?

6  A.       I'm unsure if they did or didn't.  I remember

7  getting a small booklet, but it was mainly like

8  insurance and stuff like that.

9  Q.       So you don't recall getting this 450-page

10 training manual -- operations manual?

11 A.       No, sir.

12 Q.       Did they go over an operations manual with you?

13 A.       I'm unsure if they did or didn't.

14 Q.       So what's the first thing that you knew was

15 going to happen before this car pulls into the garage?

16 We call the garage the "sally port," don't we?

17 A.       Yes, sir.

18 Q.       Okay.  What's the first thing that you knew

19 this evening was happening?

20 A.       At that point on -- it was -- the road deputy

21 hollered in over the radio that there was a combatant

22 coming in, to have corrections officers up at the front

23 and ready.

24 Q.       And what does that mean, there was a combative

25 coming?

1  A.       It means there's an aggressive civilian coming

2  in that is fighting.

3  Q.       All right.  And so did they tell you that he

4  was cuffed in the back of a cruiser behind him?

5  A.       No, sir.

6  Q.       He was cuffed behind his back?

7  A.       No, sir.

8  Q.       All right.  And so did you and Sean Brown go to

9  the sally port, go to the garage?

10  A.       Yes, sir.

11  Q.       And so here's the first part of that video.

12  And I think we can see here -- this is the -- the timing

13  is 32:33.  So this would have been about a little after

14  midnight?

15  A.       Yes, sir.

16  Q.       All right.  "00" signifying midnight; right?

17  A.       Yes, sir.

18  Q.       For those of us that -- I don't do real well

19  with military time.

20          But -- but I'm wondering -- so, Joseph, can we

21  run part of that video.

22          (The video was played in open court, and the

23          proceedings continued as follows:)

24  BY MR. SEATON:

25  Q.       All right.  Let's --

1          THE COURT:  Mr. Seaton, this is not in

2     evidence.

3          MR. SEATON:  We're getting ready to put it into

4     evidence.

5          THE COURT:  Okay.  They can't see it until --

6          MR. SEATON:  Oh.

7          THE COURT:  I don't know what your goal is.

8     Until it goes into evidence, they won't see it.

9          MR. SEATON:  Okay.

10         THE COURT:  Including the first thing you

11    showed.

12    BY MR. SEATON:

13    Q.     Okay.  Have you reviewed this video?

14    A.     Yes, sir.

15    Q.     And we went through it in deposition; correct?

16    A.     Yes, sir.

17    Q.     And it is -- does it accurately show what

18    happened that evening?

19    A.     Yes, sir.

20         MR. SEATON:  All right.  We'd move that into

21    evidence.  This is Exhibit Number 48, yes.

22         THE COURT:  Plaintiff's 48?

23         MR. SEATON:  Yes.

24         THE COURT:  Mr. Knight?

25         MR. KNIGHT:  I'm sorry, Your Honor.

1        THE COURT:  You have an objection?

2        MR. KNIGHT:  To Plaintiff's 48, no, Your Honor.

3        THE COURT:  All right.  So ordered.

4        (Plaintiff's Exhibit 48

5        received into evidence.)

6        MR. SEATON:  So then let's go ahead and --

7   I -- I appreciate you telling me the protocol of the

8   court.

9   BY MR. SEATON:

10  Q.        Let's go ahead and -- you have -- you have

11  identified this Campbell County Sheriff's Department --

12       THE COURT:  Mr. Seaton.

13       MR. SEATON:  Yes?

14       THE COURT:  When you ask questions, stand

15  behind the podium, please, sir.

16       MR. SEATON:  Yes, sir.

17       THE COURT:  It's because it has microphones on

18  it, and our court reporter can hear it --

19       MR. SEATON:  Yes, sir.

20       THE COURT:  -- and the jurors can hear.

21       MR. SEATON:  Yes, sir.

22       THE COURT:  When you're walking around the

23  courtroom, they have difficulty.

24  BY MR. SEATON:

25  Q.        So I wanted to go back to Exhibit Number 56.

1  Is this the way that you understand the sheriff -- the

2  Campbell County Sheriff's Department chain of command to

3  operate?

4  A.      Yes, sir.

5          MR. SEATON:  We would move that into evidence,

6  Your Honor.

7          THE COURT:  All right.  Mr. Knight?

8          MR. KNIGHT:  No objection.

9          THE COURT:  So ordered.

10         What exhibit number is it?

11         MR. SEATON:  56.

12         THE COURT:  Plaintiff's 56 is published to the

13 jury.

14         (Plaintiff's Exhibit 56

15         received into evidence.)

16         (Off-the-record discussion between

17         plaintiff's counsel.)

18         MR. SEATON:  All right.  Joseph, let's go back

19 to the very beginning of the -- of the video, if we

20 could.

21 BY MR. SEATON:

22 Q.      Okay.  So, again, we're -- we're looking at --

23 at Exhibit 48, which is the 13 minutes of the condensed

24 video of the whole evening; correct?

25 A.      Yes, sir.

1   Q.       And you -- you say that you have watched this

2   video.  It is an accurate depiction of what happened

3   that evening?

4   A.       Yes, sir.

5   Q.       All right, sir.  Go ahead and -- and tell us,

6   as this first starts, where you are and who the other

7   officer is.

8           MR. SEATON:  Go ahead, Joseph.

9           (The video was played in open court, and the

10           proceedings continued as follows:)

11   BY MR. SEATON:

12   Q.       Who are these other officers walking there?

13   A.       The one that you see right there with the hat's

14   me.

15   Q.       Okay.

16   A.       The other one that stepped outside the bay and

17   back in is Sean.

18   Q.       That's Sean Brown?

19   A.       Yes, sir.

20   Q.       All right.  So that's your supervisor; right?

21   A.       Yes, sir.

22   Q.       All right.  Who is the police officer -- the

23   patrol officer?

24   A.       Justin Crabtree.

25   Q.       All right.  All right.  Let's stop right there.

1    So what happens right there?  Do you recall?

2  A.      Yes, sir.  At that point, Justin Crabtree

3  didn't really explain anything going on.  He proceeded

4  to drag him out where you can't see in the video

5  footage.  Justin Crabtree proceeded to take his face and

6  bash it into the bricks.

7  Q.      So Justin Crabtree gets him out of the patrol

8  car --

9  A.      Yes, sir.

10  Q.      -- right?

11    And did Sean Brown tell you that it was your

12  all's responsibility once that person -- that detainee

13  got to the jail that was then supposed to be handed to

14  you?

15  A.      No, sir, I was unaware.

16  Q.      All right.  What was your reaction to the way

17  that Justin Crabtree got him out of the vehicle?

18  A.      For a split second, I froze.  I wasn't okay

19  with the actions that I had seen that quickly.

20  Q.      Had you ever been trained to stop officers if

21  they -- if they go beyond what they should be doing in

22  terms of --

23  A.      No, sir.

24  Q.      -- abuse?

25    And so the -- you know, again, the video is

1  going to show that ladder.  It doesn't show what's going

2  on against the block wall.  Tell them again what -- what

3  you saw happen.

4  A.       By the time Officer Crabtree had Nathan Ling

5  there against the wall, he grabbed him by the back of

6  the head and smashed his face several times into that

7  wall.

8  Q.       How many times do you recall?

9  A.       I don't recall.  I just know there was a couple

10  good hits.

11  Q.       And before that occurred -- Joseph, can we back

12  up just a hair.  Just where Nathan's standing.  There

13  you go.

14          So -- so at that point in time, did you observe

15  whether or not Nathan Ling was bleeding or had abrasions

16  to his head or anything like that?

17  A.       At the time, he was not bleeding.  The bleeding

18  started shortly after the wall.

19  Q.       All right.  Could you have -- could you tell

20  whether or not he had had a head injury?

21  A.       No, sir.

22  Q.       All right, sir.  Did he otherwise appear

23  normal?

24  A.       Very agitated and angry, but I didn't see

25  nothing medically wrong at that time.

1  Q.      All right.  So was he resisting when he got out
2  of the -- of the patrol car?
3  A.      Yes, sir.  When they rolled in, he was -- we
4  could hear him kicking and screaming and still fighting.
5  Q.      But as they pulled him out by the handcuffs
6  behind his back, was he resisting?
7  A.      It appeared he was still trying to wiggle
8  around.  Unsure if he was really trying to fight or try
9  to get relief.
10  Q.      All right.  So just to be clear, where Nathan
11  is standing there in the red shorts, to the right would
12  be you with the cap on?
13  A.      Yes, sir.
14  Q.      And to the left would be Sean Brown?
15  A.      Yes, sir.
16          MR. SEATON:  All right.  Go ahead, Joseph, if
17  you would.
18          (The video was played in open court, and the
19          proceedings continued as follows:)
20          MR. SEATON:  So let's stop right there.
21  BY MR. SEATON:
22  Q.      What is this room?
23  A.      That is where we would bring people in to
24  search and dress out to book into the jail.
25  Q.      All right.  And is that room just right off of

1   the garage or the sally port?

2   A.      Yes, sir.

3   Q.      And what is that room otherwise called other

4   than a search room?

5   A.      I can't really remember what they called it.

6   Q.      Did you ever hear it referred to as "the trap"?

7   A.      Yes, sir.

8   Q.      Okay.  So it's a search or a trap room.  I

9   don't know what "trap" means, but --

10  A.      Yes, sir.

11  Q.      Okay.  And is that where you would bring all

12  detainees in first to search them before you actually

13  put them into the jail area?

14  A.      Yes, sir.

15  Q.      All right, sir.  And so when you bring him into

16  the search or the trap room, should that be the

17  responsibility of the jail administration folks as

18  opposed to this patrol officer?

19  A.      I believe it should have been.

20  Q.      All right, sir.

21          MR. SEATON:  Go ahead, Joseph, if you would.

22          (The video was played in open court, and the

23          proceedings continued as follows:)

24  BY MR. SEATON:

25  Q.      What happened just there?  Let's -- let's stop

1  the -- what happened right there?

2  A.        Officer Crabtree brought him in forcefully and

3  proceeded to slam his face and drag him and --

4  Q.        Did he slam his head up against that steel

5  window casing?

6  A.        I can't really remember if he did or didn't.

7            MR. SEATON:  Back it up just a hair.

8            (The video was played in open court, and the

9            proceedings continued as follows:)

10           THE WITNESS:  I just know he was slamming him

11  down.

12  BY MR. SEATON:

13  Q.        Let's look at it real closely again.

14           MR. SEATON:  Go ahead.

15           (The video was played in open court, and the

16           proceedings continued as follows:)

17           MR. SEATON:  All right.  Let's stop right

18  there.

19  BY MR. SEATON:

20  Q.        And so the officer in the very far right of the

21  picture is whom?

22  A.        Talking about the lower right side?

23  Q.        Yes.

24  A.        I believe that is Miller.

25  Q.        Okay.  So that would be -- on the -- on the

1  chain of command, that would be the other fellow

2  officer; right?

3  A.      Yes.

4  Q.      And then you are the one with the hat on?

5  A.      Yes, sir.

6  Q.      All right.  And then who's right behind you

7  that's holding on to Nathan Ling?

8  A.      Sean Brown.

9  Q.      Okay.  So that's the three of you, the jail

10  administration officers there; right?

11  A.      Yes, sir.

12  Q.      All right, sir.  And then who's the one on the

13  left in the green uniform?

14  A.      Officer Crabtree.

15  Q.      All right.  So is it fair for me to understand

16  that the patrol officers have green uniforms on and the

17  correctional officers have the black uniforms on?

18  A.      Yes, sir.

19          MR. SEATON:  All right.  Go ahead, Joseph.

20          (The video was played in open court, and the

21          proceedings continued as follows:)

22  BY MR. SEATON:

23  Q.      And, again, we're still at about 12:33 that

24  evening.  Yes?

25  A.      Yes, sir.

1   Q.      Okay.

2           (The video was played in open court, and the

3           proceedings continued as follows:)

4           MR. SEATON:  So stop, if we would.

5   BY MR. SEATON:

6   Q.      What just occurred there?

7   A.      It appeared things had gotten a lot worse.  I

8   wasn't in the room.  I'm unsure of what led to that type

9   of force.

10  Q.      Okay.  So you had left the room?

11  A.      Yes, sir.

12  Q.      All right, sir.  Why had you left the room?

13  A.      Sean Brown asked me to get a spit mask out of

14  our --

15  Q.      Uh-huh.

16  A.      -- supply closet.  He was -- he had a lot of

17  snot and blood coming from his face after --

18  Q.      Okay.

19  A.      -- what happened in the sally port.

20          MR. SEATON:  All right.  Go ahead, Joseph.

21          (The video was played in open court, and the

22          proceedings continued as follows:)

23  BY MR. SEATON:

24  Q.      If you weren't in the room, you know, we'll

25  just go through this.  Then I'll ask the other officers

 1   what actually occurred here.

 2           Who is this coming in?

 3   A.      That is me.

 4           MR. SEATON:  Okay.  All right.  Stop just a

 5   second.

 6   BY MR. SEATON:

 7   Q.      So the green officer on the far left, heavyset,

 8   is?

 9   A.      Crabtree.

10   Q.      And the green officer on the right coming in,

11   who is that?

12   A.      Officer Williams.  Dakota Williams.

13   Q.      All right.  So that would have been -- you got

14   Justin Crabtree over here and Dakota Williams here?

15   A.      Yes, sir.

16   Q.      All right, sir.

17           MR. SEATON:  Go ahead, Joseph.

18           (The video was played in open court, and the

19           proceedings continued as follows:)

20   BY MR. SEATON:

21   Q.      Do you know why -- stop just a second.

22           Do you know why Justin Crabtree is standing on

23   him at this point?

24   A.      I do not, sir.

25   Q.      You're in the room?

1   A.      It -- he was squiggling a lot, trying to move

2  around.  As of standing on top of him, I did not see

3  that necessary.

4   Q.      Did you tell me in deposition that he was

5  basically just trying to survive?

6   A.      Yes, sir.

7   Q.      That -- he wasn't resisting, was he?

8   A.      No, sir.

9           MR. SEATON:  Go ahead, Joseph.

10         (The video was played in open court, and the

11         proceedings continued as follows:)

12  BY MR. SEATON:

13   Q.      And is this putting the spit mask on him?

14   A.      No, sir.  My right hand is on top of his head

15  trying to keep it down while my other left hand was on

16  his shoulder.

17   Q.      Is this --

18   A.      Sean -- Sean Brown was forcing his head down to

19  try to stay put by putting his hand into his face there.

20   Q.      All right.  And who's hitting him there?

21   A.      Dakota Williams.

22   Q.      Now, when there were two people -- let's --

23  let's stop, Joseph, just a -- just a second.  Let's go

24  back just a little bit.

25         Looks like there was -- the -- the middle black

1  officer was hitting him, and it looks like the one on

2  the back with the black vest and green outfit was

3  hitting him.

4           Pull it back just a hair.  Right there.

5           Who was that?

6  A.       Sean Brown.

7  Q.       Okay.  And then that's Dakota Williams in

8  the -- behind him?

9  A.       Yes, sir.

10 Q.       All right.  And, again, he's not resisting, is

11 he?

12 A.       It didn't appear so.

13 Q.       Okay.

14           (The video was played in open court, and the

15           proceedings continued as follows:)

16 BY MR. SEATON:

17 Q.       Who's hitting him there?  Is that Sean Brown?

18 A.       Could you rewind it for me?

19 Q.       Sure, uh-huh.

20           (The video was played in open court, and the

21           proceedings continued as follows:)

22 BY MR. SEATON:

23 Q.       Sean Brown?

24 A.       Yes, sir.

25 Q.       Okay.  Would it be -- would -- hold on a

1    second, Joseph.

2              Would it be fair to say that Nathan Ling was

3    not resisting at all after they got him out of the

4    patrol car?

5    A.        By the time he was into the search room or the

6    trap, it was clear he wasn't resisting.

7    Q.        Well, he certainly wasn't resisting after he

8    got his face smashed up against the block wall, was he?

9    A.        No.

10             MR. SEATON:  All right.  Go ahead, Joseph.

11             (The video was played in open court, and the

12             proceedings continued as follows:)

13             MR. SEATON:  Let's stop just a second.

14   BY MR. SEATON:

15   Q.        Who is this lady?  Do you know?

16   A.        I'm unsure to be honest.

17   Q.        Okay.  And was she also a correction officer?

18   A.        Yes, sir.

19   Q.        And was it apparent that there was blood all

20   over the floor?

21   A.        Yes, sir.

22   Q.        And was it apparent that nobody, including her,

23   was objecting to what was going on with Nathan Ling?

24   A.        Yes, sir.

25   Q.        And nobody was attempting to intervene?

 1  A.        No, sir.

 2           MR. SEATON:  All right.  Go ahead, Joseph.

 3           (The video was played in open court, and the

 4           proceedings continued as follows:)

 5  BY MR. SEATON:

 6  Q.        Can you tell us what's going on here?

 7  A.        At that point, he was still trying to move

 8  around.  Every now and then he'd have a moment of rest

 9  and a burst of energy would come out and he'd try to

10  move a bit.

11  Q.        So move or resist?

12  A.        Move.

13  Q.        Thank you.

14           (The video was played in open court, and the

15           proceedings continued as follows:)

16  BY MR. SEATON:

17  Q.        Is this you?

18  A.        No, sir.  That's Sean Brown.

19  Q.        That's Sean Brown.

20           All right.  Let's stop just a second.

21           This spit mask business -- what's a spit mask?

22  A.        It's kind of like a mesh cloth.

23  Q.        Yeah.

24  A.        Basically, it goes over the face and you can

25  still breathe through it like normal, but any liquids

1   will be stuck to your face with you.  It won't --

2   Q.       The picture that I saw of him, it looked like

3   it was like a nylon stocking over his face?

4   A.       Similar.

5   Q.       All right.  And I think you told me -- I -- I

6   took your deposition; right?

7   A.       Yes, sir.

8   Q.       All right.  And you -- you were sworn to tell

9   the truth, and you told the truth to me; right?

10  A.       Yes, sir.

11  Q.       And I think you told me in that deposition that

12  Nathan Ling wasn't spitting?

13  A.       No, sir.

14  Q.       And that the purpose of putting that spit mask

15  over him was because he was bleeding so much?

16  A.       Yes, sir.

17  Q.       And that y'all didn't want to get blood on you,

18  or Sean Brown didn't want to get blood on y'all?

19  A.       I'm not sure.  I was under the impression he

20  was trying to spit, but after the way he was moving, he

21  wasn't spitting.  It was being slung.

22  Q.       And was pepper spray being used on him while

23  he's cuffed behind his back?

24  A.       Yes, sir.

25  Q.       How many times was pepper spray used on him?

1    A.       I know of at least once.

2    Q.       Okay.

3    A.       During all of it, I ended up getting hit with

4    some of it.  And a lot of things I just don't really

5    remember too well.

6    Q.       What -- what does pepper spray do?

7    A.       It's supposed to disorient a person to

8    degress [sic] and try to calm them down a bit or regain

9    the situation, but it just stings a lot.  That's about

10   it.

11   Q.       That's what I meant.  I apologize.  I asked a

12   bad question.

13            What does -- if you pepper spray me in my face,

14   what does it do to me?

15   A.       It just stings your eyes a lot.  If you're

16   allergic to it, you could have reactions that are -- can

17   be severe or mild.

18   Q.       Okay.  And you said that as you were involved

19   in this that some of the pepper spray got back on you.

20   It got --

21   A.       Yes, sir.

22   Q.       -- into your face?

23            MR. SEATON:  Okay.  Go ahead, Joseph.

24            (The video was played in open court, and the

25            proceedings continued as follows:)

1  BY MR. SEATON:

2  Q.        I know we speeded some of this up again to get

3  to 13 minutes.  We're now at -- at 41.  Probably about

4  11 minutes?

5  A.        Yes, sir.

6            MR. SEATON:  All right.  Stop right there.

7  BY MR. SEATON:

8  Q.        Tell me what's happening.

9  A.        Officer Crabtree was getting ready to take a

10 picture.

11 Q.        And did he say why he's getting ready to take a

12 picture?

13 A.        No, sir.

14 Q.        Did he send you a copy of that picture?

15 A.        No, sir.

16 Q.        Did you eventually see that picture?

17 A.        Yes, sir.

18 Q.        All right.  Was it circulated around to other

19 officers and supervisors?

20 A.        I know it was shown around.  I'm not sure if it

21 was sent around.

22 Q.        Okay.  And I also want to ask you about the

23 gloves that Officer Brown -- was he using gloves

24 when -- when he was trying to subdue Nathan?

25 A.        I'm unsure.

1  Q.       Okay.

2  A.       I don't remember if it was his personal gloves

3  or if they were latex like we usually wore.

4  Q.       So the latex gloves are like what you see in

5  the hospital; right?

6  A.       Yes, sir.

7  Q.       The other gloves are tactical gloves?

8  A.       Yes, sir.

9  Q.       And you all -- they weren't furnished by the

10 department?

11 A.       No, sir.

12 Q.       You all would actually go to this Greene's --

13 A.       Greene's Military.

14 Q.       -- Greene's Military and buy them yourselves;

15 right?

16 A.       Yes, sir.

17 Q.       And tell me about these tactical gloves.

18 A.       I know the majority that we looked for when

19 getting them was to prevent sharp objects getting into

20 our skin, such as needles and things like that, when

21 searching or dealing -- dealing with inmates that came

22 in.

23 Q.       Tell us about the knuckles.  Let's get to the

24 meat.

25 A.       The knuckles?

1   Q.        Yeah.

2   A.        I know they have some that have Kevlar on them.

3   As far as I know, we weren't allowed to have Kevlar.  I

4   wasn't too sure on it for the most part.  The type of

5   gloves I normally seen officers have were just regular

6   leather-type cloth material that were puncture proof.

7   Q.        But the Kevlar could be used as a weapon;

8   right?  Kind of like --

9   A.        Yes, sir.

10  Q.        -- nunchucks or steel --

11          MR. KNIGHT:  Object to the speculation of

12  "could."

13          MR. SEATON:  Okay.

14          THE COURT:  Sustained.

15          MR. SEATON:  Fair enough.

16  BY MR. SEATON:

17  Q.        Did Brown have a reputation in terms of being a

18  fighter, being violent?

19  A.        Not really.

20  Q.        Okay.  I thought you said that when I -- when I

21  took your deposition that Brown was always a fighter,

22  that he took jujitsu -- jujitsu lessons?

23  A.        He played off as one, but he's not really an

24  aggressor.

25  Q.        Okay.

1          (The video was played in open court, and the

2          proceedings continued as follows:)

3  BY MR. SEATON:

4  Q.      Did y'all know that all this was videotaped?

5  A.      I was aware there was security footage.

6  Q.      Okay.  So tell me what's going on here.

7  A.      They were talking about the incident, that

8  Crabtree was with -- with him on the road before coming

9  into the station.

10 Q.      Were they reenacting what had happened?

11 A.      I believe so.  I can't remember all too well on

12 it.

13 Q.      Are you down where Ling is on the right-hand

14 corner?

15 A.      Yes, sir.

16 Q.      Okay.  And what are you doing at that time?

17 A.      I was just holding on to his neck and back

18 there.

19 Q.      Okay.

20 A.      At that point, there was no movement hardly at

21 all from him.

22 Q.      Was he unconscious?

23 A.      No, sir.

24 Q.      Was he talking?

25 A.      No, sir.

1   Q.      How do you know he wasn't unconscious?

2   A.      He would still move his eyes around and --

3   Q.      Okay.

4   A.      -- I could hear him spitting stuff out of his

5   mouth to clear his throat.

6   Q.      So what's going on here with Crabtree and with

7   Sean Brown?

8   A.      I believe they were talking about everything

9   that just happened.

10  Q.      Okay.  Were they laughing?

11  A.      I'm unsure.

12  Q.      You don't recall?

13  A.      No, sir.

14  Q.      What's happening here?

15  A.      We were getting ready to move him into the

16  showers to try and clean him up.

17  Q.      How's --

18  A.      I believe it was the shower.

19  Q.      I'm sorry?

20  A.      I believe it was the shower.  We either put him

21  in the holding cell or the shower first.  Can't remember

22  which one was first.

23  Q.      How's his balance?

24  A.      Not well at first and a little off.

25  Q.      Can you tell us why they were trying to sweep

1  his legs out from underneath him?

2  A.         We were trying to keep a stable position to

3  fully search him before entering the main facility.

4              (The video was played in open court, and the

5              proceedings continued as follows:)

6  BY MR. SEATON:

7  Q.         How is his balance?

8  A.         It's pretty bad.

9  Q.         Was he talking at that point?

10  A.         He was mumbling a little bit, wasn't really

11  talking much at all.

12  Q.         So where's he going?

13  A.         I believe the shower.

14  Q.         Okay.  And you went with him to the shower?

15  A.         Yes, sir.

16             MR. SEATON:  All right.  Let's stop right there

17  for a minute, Joseph.

18  BY MR. SEATON:

19  Q.         Because this is going into the next cell;

20  right?

21  A.         Yes, sir.

22  Q.         All right.  So we don't have any video of the

23  shower; right?

24  A.         Correct.

25  Q.         You went into the shower, Standridge went into

1  the shower?

2  A.        Miller.  Miller.

3  Q.        Miller went into the shower.  Who else?

4  A.        At first it was just me and Miller.

5  Eventually, things escalated inside, and Deputy Williams

6  came in to assist us.

7  Q.        So you and Miller and then Officer Williams;

8  right?

9  A.        That I recall, yes.

10  Q.        All right.  And when you say "things escalated"

11  in the -- in the shower --

12  A.        Yes, sir.

13  Q.        -- was he still handcuffed behind his back?

14  A.        I can't remember completely if he was or

15  wasn't.

16  Q.        Did they ever take the handcuffs off of him

17  before they put him into the solitary neg cell?

18  A.        I'm unsure.

19  Q.        Okay.

20  A.        I don't believe they did.

21  Q.        Well, as I just watched the video and watched

22  y'all walking him out where he can barely stand up, how

23  does all the sudden he become -- or -- or the -- the

24  "situation escalated" was your words.

25  A.        I was in the shower with him trying to undress

 1  him and remove the spit mask to clean him up and try to

 2  get him in fresh clothing.  Once the spit mask came off,

 3  he proceeded to spit at us and started throwing himself

 4  into us, trying to push us.

 5  Q.      Okay.  And so what did you do?

 6  A.      Well, I took him to the ground.  Deputy Miller

 7  froze and backed out, didn't really provide assistance.

 8  I believe Williams came in and assisted me.  I'm trying

 9  to gain control.

10  Q.      Okay.  And are you aware that what Officer

11  Williams says is different than what you're saying in

12  terms of him being combative in the shower room?

13  A.      No, sir, I'm not aware.

14  Q.      All right.

15          MR. KNIGHT:  Objection to the form.

16  Argumentative.

17          THE COURT:  I'm sorry.  I'm sorry.  Is there an

18  objection?

19          MR. KNIGHT:  Yes, Your Honor.  Officer Williams

20  can testify for himself.

21          MR. SEATON:  I'll withdraw the question.

22          THE COURT:  All right.  Sustained.

23  BY MR. SEATON:

24  Q.      So up to this point in time, who intervened to

25  stop the abuse?  Was he getting abused, in your opinion?

1   A.      Yes, sir.

2   Q.      All right.  And was he abused from the time

3   that they got him out of the patrol car?

4   A.      I would like to think the situation before

5   leading up at the jail could have been resolved

6   differently.  I do believe the abuse started out on the

7   road before they got to the facility there.

8   Q.      So you think officers were abusing --

9           MR. KNIGHT:  Objection, Your Honor.

10  Speculation.  He was not even there.

11          MR. SEATON:  Well --

12          THE COURT:  Your response?

13          MR. SEATON:  Let me -- let me see if I can --

14          THE COURT:  Sustained.

15          MR. SEATON:  Okay.

16  BY MR. SEATON:

17  Q.      So what would have led you to have believed

18  that he had been abused before he got to the -- to the

19  jail?

20  A.      Just the condition that he was in and

21  everything when he arrived, what I had heard happened

22  with allegedly him getting rammed into a vehicle by his

23  head.

24          MR. KNIGHT:  Objection.  Hearsay, Your Honor.

25          THE COURT:  Sustained.

1  BY MR. SEATON:

2  Q.       All right, sir.  So let's go to -- you're there

3  in the jail.  And when did anybody -- you -- you said

4  that he was abused the entire time that he was in the

5  jail; right?

6  A.       That's what I believe, yes.

7  Q.       And when did anybody attempt to intervene to

8  stop any of the abuse by other officers?

9  A.       No one ever did.

10 Q.       Did anyone even discuss stopping the abuse?

11 A.       No, sir.

12 Q.       And as he is laying there on the floor with the

13 blood on the floor, when did anybody talk about getting

14 him some medical assistance?

15 A.       I don't recall anybody talking about it.

16 Q.       Did anyone talk about calling 9-1-1?

17 A.       Not that I recall.

18 Q.       Or calling the on-call nurse?

19 A.       Not that I recall.

20 Q.       All right.  So how did he -- who made the

21 decision to put him in this neg cell?  Let's talk about

22 the neg cell for a second.  The neg cell I think y'all

23 told me in deposition was a negative pressure.  In other

24 words, it takes the air out of the room or something

25 like that?

1    A.       I've heard a little bit about it.  I didn't

2    know too much about the room itself.

3    Q.       Well, let's just talk about it.  It's a

4    solitary cell; right?

5    A.       Yes, sir.

6    Q.       There's nothing in it; right?

7    A.       Yes, sir.

8    Q.       There's not even a bench in it; right?

9    A.       There's kind of like a bench in there.

10   Q.       Okay.  There's no bedding or anything like

11   that?

12   A.       No, sir.

13   Q.       All right.  There's a drain in it.  I'm -- I'm

14   assuming that you use it as a drunk tank too?

15   A.       Yes, sir.

16   Q.       All right, sir.  So who decides to put him into

17   this solitary cell?

18   A.       I was unsure on whose idea it was.

19   Q.       All right.  Were you still involved in all of

20   this?

21   A.       Yes, sir.

22   Q.       You were still involved when they put him into

23   the solitary cell?

24   A.       Yes, sir.

25   Q.       You -- you don't know who made the decision?

1   A.      I was just following everyone else.

2   Q.      Okay.  So when they put him into the solitary

3   cell, did you help bring him in there?

4   A.      I believe so, sir.

5   Q.      Was he resistant?

6   A.      No, sir.

7   Q.      Was he combative?

8   A.      No, sir.

9   Q.      Was he coherent?

10  A.      Vaguely.

11  Q.      And what do you mean?

12  A.      He -- it seemed like he could hear us and was

13  understanding what's going on, but --

14  Q.      Uh-huh.

15  A.      -- was not responsive verbally.  At that point,

16  it seemed like he was just going with the motions.

17  Q.      Okay.  And so as he -- or as y'all bring him

18  into the solitary cell, what happens?

19          MR. SEATON:  Let's just go ahead and roll the

20  video.

21          (The video was played in open court, and the

22          proceedings continued as follows:)

23  BY MR. SEATON:

24  Q.      Is that Officer Miller there on the right?

25  A.      Yes, sir.

1    Q.      And is that Sean Brown there in the green

2  pants?

3    A.      Yes, sir.

4    Q.      Okay.  That's pulling his legs out?

5    A.      That was me, sir.

6    Q.      That was you.

7           Okay.  What's happening here?

8    A.      We took control of his body to remove the

9  cuffs.  That was a safety precaution in case he did try

10  to fight back without the handcuffs on him.

11    Q.      Okay.  So I'm looking at the time.  It's about

12  30 minutes after he's first brought into that --

13    A.      Yes, sir.

14    Q.      -- search room.

15           (The video was played in open court, and the

16           proceedings continued as follows:)

17           MR. SEATON:  So let's stop right there.

18  BY MR. SEATON:

19    Q.      So did anybody discuss whether or not they were

20  just going to put him in that cell and let him die?

21    A.      Not that I recall.

22    Q.      Did anybody discuss getting him some medical

23  treatment?

24    A.      I'm unsure.

25    Q.      Was it clear to you as an officer that he

1  needed serious medical treatment?

2  A.        Yes, sir.

3  Q.        Was there any discussion about calling the

4  nurse?

5  A.        I think there was.  I'm not too sure on it.

6  Q.        All right.  Now, I think you told me in

7  deposition that you weren't real clear on who was in

8  charge that night?

9  A.        Yes, sir.

10 Q.        Why was that?

11 A.        At the time, it was -- a lot of things to me

12 within the facility was confusing for myself.  I just

13 listened to everyone above me.  I didn't really look to

14 see who's in charge during my time there.  I just looked

15 to my superior for the duty I was told to do or

16 something and tried to make sure my job was right and do

17 what was needed.

18 Q.        But you didn't understand, did you -- or did

19 you understand the chain of command?

20 A.        At that time, I understood Sergeant Wilson and

21 Mallory Campbell and Stoney Love -- I had known that

22 Sean Brown was starting to move into a superior position

23 with them, was unsure, though, if it was official or

24 not.

25 Q.        But were any of these people -- the sergeant,

1  lieutenant, or chief jailer -- there that evening?

2  A.      No.

3  Q.      Was there anybody there that you considered a

4  seasoned professional?  Professionally trained

5  supervisor there?

6  A.      I believe there was two or three that I've seen

7  take charge and have the leadership authority there.

8  Q.      No, I'm talking about that evening.

9  A.      Yes.

10  Q.      Who was it?

11  A.      Sean Brown.  I knew he was being put into a

12  position.  I believe there was two female officers

13  inside the booking area that was there a lot longer and

14  had more authority over certain things.

15  Q.      They were there that evening?

16  A.      I believe so.

17  Q.      But they weren't involved?

18  A.      They weren't hands-on with it, no.

19  Q.      And they didn't make any decisions?

20  A.      No.

21  Q.      Were they available to be -- find out if he

22  needed medical treatment?

23  A.      They were at the front desk there, yes.

24  Q.      Okay.  I asked you in deposition how you felt

25  that we could keep this from happening again.  Do you

 1   remember your response?

 2   A.        Vaguely.

 3   Q.        That y'all needed better training on --

 4   A.        Yes, sir.

 5   Q.        -- intervention?

 6   A.        Yes, sir.

 7   Q.        Abusiveness?

 8   A.        Yes, sir.

 9   Q.        Brutality?

10   A.        Yes, sir.

11   Q.        That you didn't really have any serious

12   training at all on that?

13   A.        The most training I remember is paperwork.

14   Q.        All right.  Now, you left the sheriff's

15   department right after this happened; right?

16   A.        Shortly after, yes.

17   Q.        And I think you told us that you had -- you had

18   gone to the sheriff's department about three months

19   before this occurred; right?

20   A.        Roughly in that time frame.  I'm not sure on

21   the exact time or dates that I was there.

22   Q.        All right.  And you left when?

23   A.        Shortly after all of this had taken place, I

24   went back into concrete work.

25   Q.        Why did you leave?

1    A.       After seeing what I thought they let slide, I

2    wasn't okay with any type of workforce that could do

3    that to somebody.  I made a very firm decision that law

4    enforcement was not for me and I had no interest in it.

5    Q.       And when you were told to put together a report

6    about what happened that evening, the -- the excessive

7    force and all; right?

8    A.       Yes.

9    Q.       Who told you to do that?

10   A.       Sean Brown.  I believe Sergeant Wilson the

11   following day --

12   Q.       Okay.

13   A.       -- reminded me on it.  There was a few people

14   that asked about it and made sure that I had made a

15   report.

16   Q.       And Sean Brown called you later and said he

17   wanted you to change your report?

18   A.       He helped me articulate it to word it a little

19   better.  During that time, my reports on any incident

20   weren't the greatest.  I was still learning how to

21   properly fill those out.

22           MR. SEATON:  Let me have just a second.

23   BY MR. SEATON:

24   Q.       One last question.  Do you feel that if you had

25   the proper training that you would have intervened?

1    A.      Yes, sir.

2    Q.      And do you feel that if you'd had the proper

3    training to assess his medical condition, you would have

4    insisted that he get medical treatment?

5    A.      Yes, sir.

6    Q.      All right.  If you would -- thank you.  If you

7    would answer any questions Mr. Knight has.

8            THE COURT:  Mr. Knight, do you have quite a bit

9    of cross-examination?

10           MR. KNIGHT:  I'm sorry, Your Honor?

11           THE COURT:  Do you have quite a bit of

12   cross-examination?

13           MR. KNIGHT:  No, I don't.

14           THE COURT:  'Cause it's 12:21, and I'm trying

15   to decide whether or not I want to send our jurors to

16   lunch before we do cross-examination.  How much do you

17   think you have?

18           MR. KNIGHT:  No more than 20 minutes.  It's

19   entirely up to the Court.

20           THE COURT:  I'm sorry.  I can't hear.

21           MR. KNIGHT:  It's entirely up to the Court.

22           THE COURT:  I tell you what, why don't we break

23   for lunch --

24           MR. KNIGHT:  Okay.

25           THE COURT:  -- since it's gotten into the lunch

1  hour, and we will come back.  Mr. Knight, you can do

2  your cross-examination.  It's -- I have 12:22.  Let's

3  come back about 1:40 and be ready to go.  Okay?

4          Thank you all very much.

5          Jury out.  Then I'll --

6          THE COURTROOM DEPUTY:  Yes, sir.

7          (The proceedings were held outside the

8          presence of the jury, as follows:)

9          THE COURT:  Please have a seat.

10          THE WITNESS:  Do I stay up here?

11          THE COURT:  No -- stay, yes.

12          All right.  Sir, I'm going to excuse you until

13  after lunch.  Let me remind you you're not to speak to

14  anybody about your testimony --

15          THE WITNESS:  Yes, sir.

16          THE COURT:  -- or allow anyone to speak to you.

17          THE WITNESS:  Yes, sir.

18          THE COURT:  Any issues with me letting him go?

19          You can step down.

20          All right.  Gentlemen, we'll come back.  Then

21  just a couple of things -- you're -- you're free -- free

22  to go.

23          Couple of things.  Look, the Court -- the Court

24  recognizes that everyone gets a little rusty.  Just make

25  sure we move our exhibits into evidence, that they do

1  not go to the jury until you move them into evidence,

2  and they're not going to the jury until you move them.

3              MR. SEATON:  I understand.  And I apologize.

4              THE COURT:  It's -- it's nothing to apologize

5  for.

6              MR. SEATON:  Yeah.  Yeah.

7              THE COURT:  Everybody gets a little rusty about

8  it, but just to make sure you understand that.

9              Second thing is to both -- both parties, stay

10 as close as you can to the podium.  And when it comes

11 time for closing argument -- I didn't say anything

12 during your opening statements, but I'll allow you to --

13 you need to stay within an arm's reach of your -- of the

14 podium in the center.  Those rules are in place for a

15 reason.

16             MR. SEATON:  Yes, sir.

17             THE COURT:  Just a reminder.

18             MR. SEATON:  Thank you, sir.

19             THE COURT:  And we'll come back at 1:40.

20             All right.  Thank you.

21             (Luncheon recess.)

22             THE COURT:  Before I bring the jury in, is

23 there anything we need to do?  No?  Okay.

24             All right.  Ms. Laster, will you bring the jury

25 in.

1          THE COURTROOM DEPUTY:  Yes, sir.

2          (The proceedings were held in the presence of

3          the jury, as follows:)

4          THE COURT:  All right.  Please be seated.

5          Okay.  Mr. Knight, whenever you're ready.

6                    CROSS-EXAMINATION

7    BY MR. KNIGHT:

8    Q.     Mr. Standridge, we're about to start your

9    cross-examination.  Before I start, you had given a

10   deposition in this case; correct?

11   A.     Yes, sir.

12   Q.     And in the deposition, you had sworn to tell

13   the truth, the whole truth, and nothing but the truth;

14   correct?

15   A.     Yes, sir.

16   Q.     Just like you've done today; correct?

17   A.     Yes, sir.

18   Q.     Mr. Standridge -- it was up here.  But when you

19   were questioned by Mr. Seaton, you testified that you

20   had two weeks of training, and Mallory Campbell was the

21   one who was -- Lieutenant Campbell was the one

22   conducting the training?

23   A.     Yes, sir.

24   Q.     Okay.  And she is directly under -- was

25   directly under Stoney Love; correct?

1    A.        I believe so.

2    Q.        And now the administration has completely

3    changed.  We have a new sheriff, new jail administrator,

4    new -- all kinds of elected officials.  Would you agree?

5    A.        Well, I do with the sheriff.  I didn't know

6    they restructured the jail administration.

7    Q.        You knew there was a new mayor?

8    A.        Not -- honestly, I don't pay attention to

9    those.

10   Q.        Okay.  Now, when -- when the officers -- I

11   don't know who radioed in.  They radioed in they had a

12   combative individual; correct?

13   A.        Yes, sir.

14   Q.        And when you were in the sally port with Sean

15   Brown, you could hear Mr. Ling screaming, kicking,

16   yelling; correct?

17   A.        Yes, sir.

18   Q.        You had absolutely no idea what you were

19   facing, did you?

20   A.        No, sir.

21   Q.        And you had absolutely no idea what had

22   happened out at the scene; correct?

23   A.        No, sir.

24   Q.        And you had absolutely no idea what Mr. Ling

25   may or may not have on him; correct?

1   A.      Correct.

2   Q.      And when Mr. -- when Deputy Crabtree pulled

3   Mr. Ling out of the sally port, you weren't going to

4   intervene, were you?

5   A.      No, sir.

6   Q.      I mean, that was -- Deputy Crabtree had ahold

7   of Mr. Ling and pushed him into the search trap;

8   correct?

9   A.      Yes, sir.

10  Q.      And he pushed him up against the counter;

11  correct?

12  A.      Yes, sir.

13  Q.      You weren't going to intervene at that point,

14  were you?

15  A.      No, sir.

16  Q.      I mean, there -- there was no way you could

17  have?

18  A.      No, sir.

19  Q.      Oh, as part of your training with Lieutenant

20  Campbell -- and -- and I think this was touched on with

21  Mr. Seaton about whatever gloves you use or not use.

22  They were concerned about correctional officers

23  protecting themselves; correct?

24  A.      I believe so.

25  Q.      Because inmates will fight you.  Is that not

1  correct?

2  A.         Yes, sir.

3  Q.         They will spit at you?

4  A.         Yes, sir.

5  Q.         They will cuss you?

6  A.         Yes, sir.

7  Q.         They will do whatever they can to be disruptive

8  to you; correct?

9  A.         Yes, sir.

10  Q.         Including disrespecting your authority;

11  correct?

12  A.         Yes, sir.

13  Q.         Not doing what you want them to do?

14  A.         Correct.

15  Q.         Have you ever had anybody show up that said,

16  wow, this is a great place to be.  I'm going to do

17  everything that you want me to do?

18  A.         No, sir.

19  Q.         So just so I'm clear, the context -- when

20  Crabtree drives up, you have no idea what the context

21  was out there, what Mr. Ling's history was, what he had

22  done out there, if any officers had been injured out

23  there, or anything; correct?

24  A.         No, sir, not until it was over with.

25  Q.         Okay.  And I was interested -- you are now a

 1    member of the Campbell County Rescue Squad?

 2    A.        In the process of joining.  Technically

 3    LaFollette, but all of Campbell County, yes.

 4    Q.        Okay.  Technically joined.  How long have you

 5    been there?

 6    A.        About two weeks.  Still going through

 7    paperwork, getting everything straightened out with

 8    that.

 9    Q.        EMT or --

10    A.        No.  No, just volunteer service.

11    Q.        And that's in an ambulance; correct?

12    A.        No.

13    Q.        It's not?

14    A.        No.  Rescue squad is a -- basically, like

15    mountain rescues, things where EMTs and fire would need

16    extra help with.

17    Q.        Somebody needs help, you're going to be called

18    to -- you may be called to go help them; correct?

19    A.        Yes, sir.

20    Q.        And I'm sorry.  Did you say Campbell County or

21    LaFollette?

22    A.        They service all of Campbell County.  That's

23    just what I've called them.  But they're technically

24    LaFollette Rescue.

25    Q.        Okay.  And do they have ambulances?

1   A.      No, sir.

2   Q.      Have you ever seen an ambulance?

3   A.      Yes, sir.

4   Q.      Have you ever been inside an ambulance?

5   A.      Yes, sir.  When I was in Williamsburg, I took

6   EMT classes and done a lot of ride-alongs and worked

7   with the city fire department.

8   Q.      Williamsburg, Kentucky?

9   A.      Yes, sir.

10  Q.      Okay.  And when you were in Williamsburg,

11  Kentucky doing ride-alongs, the ambulance personnel were

12  there to respond to people in aid; correct?

13  A.      Yes, sir.

14  Q.      Respond to check people out; correct?

15  A.      Yes, sir.

16  Q.      And they weren't there to abuse anybody, were

17  they?

18  A.      No, sir.

19  Q.      One thing struck me when I was looking at that

20  video.  There were times where -- well, there was one

21  time that you aren't even in the room; correct?

22  A.      Correct.

23  Q.      And I think I saw in that video where Mr. Ling

24  had actually pulled up off the counter.  I -- I know --

25  I don't know if you saw that or not.  But you weren't in

1    the room?

2    A.       Correct.

3    Q.       But there are times wherein you, Josh Miller,

4    Dakota Williams, and -- well, I'm sorry -- Sean Brown

5    and Justin Crabtree were all on Mr. Ling; is that

6    correct?

7    A.       Yes, sir.

8    Q.       And there were times where no one was on

9    Mr. Ling; correct?

10   A.       Yes, sir.

11   Q.       Is it fair to say that during the times that

12   you all were on Mr. Ling -- whether holding his legs,

13   holding his head down -- that he was moving?

14   A.       Not the whole time.

15   Q.       So why would you be doing that?

16   A.       I was just following the others at that point.

17   Q.       I mean -- I mean, was he -- you said -- I think

18   you -- you said earlier in his direct that he was

19   squiggling around?

20   A.       Yes, sir.

21   Q.       Of course, Mr. Ling's not here, so we don't

22   know what his intent is.  And you didn't know his intent

23   at that time, did you?

24   A.       No, sir.

25   Q.       And, in fact, when you took him back to be

1  decontaminated at the shower, you couldn't handle it by
2  yourself, could you?
3  A.        No, sir.
4  Q.        And Josh Miller, who's kind of a big size teddy
5  bear couldn't handle it either, could he?
6  A.        No, sir.
7  Q.        So you had to have Dakota Williams come in and
8  do a back strike to get him to comply to get pepper
9  spray off of him; correct?
10 A.        I remember Dakota assisting me in there.  I'm
11 not sure what he had done to really help.  It was --
12 Q.        But you needed him; correct?
13 A.        I did need him, yes.
14 Q.        Because the situation had escalated; correct?
15 A.        Yes, sir.
16 Q.        Meaning Mr. Ling had started to resist again;
17 correct?
18 A.        Yes, sir.
19 Q.        You said that -- I don't -- I don't envision
20 that pepper spray is any fun.
21 A.        I'm sorry?
22 Q.        I don't envision being sprayed with pepper
23 spray is any fun.
24 A.        No.
25 Q.        And I don't believe you had any fun having any

1  of it on you; correct?

2  A.       No.  Thankfully, it wasn't the first time, so

3  it's something I could handle somewhat.

4  Q.       Okay.  And I don't envision any officer would

5  want pepper spray being on any part on them.

6  A.       No, sir.

7  Q.       Correct?

8           So your understanding -- I believe you told

9  Mr. Seaton that it was designed to deescalate the

10  situation?

11  A.       From my understanding, yes.

12  Q.       There are also times in the video that I saw

13  that Joshua Miller had Mr. Ling's legs and you had his

14  head area?

15  A.       Correct.

16  Q.       Are you telling this jury that you were abusing

17  Mr. Ling at that time?

18  A.       I am not saying that.

19  Q.       You weren't abusing him, were you?

20  A.       No, sir.

21  Q.       And after you came back from the deescalation

22  from the shower, Mr. Ling was placed into what we'll

23  call the "negative pressure cell"; correct?

24  A.       Correct.

25  Q.       And you saw everything on film from the

1  negative pressure cell and the search trap.  Were you

2  able to see that?

3  A.        Yes, sir.

4  Q.        And when Mr. Ling was placed in the negative

5  pressure cell, was anybody hitting him, laying on him,

6  waylaying him, anything like that?

7  A.        No, sir.

8  Q.        There's been a lot of talk -- in fact, the

9  claims against the county are there's no training.  Do

10 you remember on page 39 and 40 of your deposition where

11 Sean Brown was a little concerned about what may happen

12 in the morning shift?

13 A.        I don't recall it too --

14 Q.        A little worried about what they may think of

15 what occurred that night?

16 A.        I don't recall it too -- too well.

17 Q.        Before I get to that, when he -- when Mr. Ling

18 was placed in the negative pressure cell, you felt like

19 that he had a serious medical condition; correct?

20 A.        Correct.

21 Q.        And previously you said that you had never been

22 trained about that, so how would you know he had a

23 serious medical condition?

24 A.        I know someone shouldn't be laying there that

25 long without moving.

1  Q.        And to your credit, periodically you would
2  check on him during the night; correct?
3  A.        Correct.
4  Q.        Okay.  And in the morning about 6:30, the nurse
5  came in; correct?
6  A.        I believe so.
7  Q.        And is it your understanding that he was taken
8  to LaFollette Medical Center, then to the University of
9  Tennessee?
10 A.        I knew he went to LaFollette.  I didn't know
11 what happened after.
12 Q.        Okay.  Let me just show you -- and I'm not
13 picking on you.  I just -- is it not showing up?
14 A.        I have no visual.
15           THE COURTROOM DEPUTY:  I switched the feed.  It
16 will be there in just a second.
17           MR. KNIGHT:  Okay.
18 BY MR. KNIGHT:
19 Q.        Question at line 15, paragraph -- or page 39,
20 line 15, "No, not at all.  Why?"
21           Answer:  "I'm unsure.  A lot of their worry was
22 what they were going to say in the morning when first
23 shift got there.  Brown, I believe, did not want to
24 make" -- "wake Sergeant Wilson.  I don't remember his
25 exact words, but I know he said the gist of it is she's

1  going to come in in the morning.  Always [sic] he can

2  wait."

3          Doesn't that imply to you that Mr. Brown

4  certainly had some idea that he was going to have to

5  answer for what had -- what was laying in the negative

6  pressure cell?

7  A.      My understanding is he was worried about the

8  situation, but I was unaware how severe the situation

9  was going to get or --

10  Q.      Okay.

11  A.      -- could get.

12  Q.      And you don't like Mr. Brown, do you?

13  A.      It's an on and off friendship.  He's one of the

14  very few that's been there for me my whole life and --

15  Q.      You had a falling out with him, though, didn't

16  you?

17  A.      A little bit, but it happens.

18  Q.      And I think that at some point he was bragging

19  about being with one of your ex-girlfriends or your

20  ex-wives, and you didn't appreciate that?

21  A.      Yes.

22  Q.      No doubt in your mind Sean Brown knew that he

23  could have called the on-call nurse; correct?

24  A.      I believe he could have, yes.

25  Q.      And there's no doubt in your mind that he could

1  have called 9-1-1; correct?

2  A.      I believe so, yes.

3  Q.      And there's no doubt in your mind that he could

4  have placed that man in a cruiser, if he wanted to, and

5  taken him to LaFollette Hospital; is that correct?

6  A.      I'm unsure if we had access to use cruisers

7  like that.

8  Q.      Anything -- any vehicle or have them come get

9  him.  Any doubt in your mind that -- that Mr. Brown knew

10  that?

11  A.      I believe he could have done something.

12  Q.      He knew that, didn't he?  Otherwise, he

13  wouldn't have been where he was?

14  A.      Correct.

15  Q.      You agree?

16  A.      Yeah.

17          MR. KNIGHT:  Thank you.

18          THE COURT:  Are you finished, Mr. Knight?

19          MR. KNIGHT:  Yes.  I'm sorry.

20          THE COURT:  Do you have any redirect?

21          MR. SEATON:  Just a -- just a few questions,

22  Your Honor.

23                  REDIRECT EXAMINATION

24  BY MR. SEATON:

25  Q.      So you said that -- when he was asking you

1  questions that Mr. Brown could have called 9-1-1, the

2  hospital, et cetera; right?

3  A.      Correct.

4  Q.      And you and Miller and Dakota Williams and

5  Justin Crabtree could have suggested you call 9-1-1 or

6  get him some medical treatment; right?

7  A.      We could have, yes.

8  Q.      But nobody did that, did they?

9  A.      No, sir.

10 Q.      Okay.  And you say that you weren't trained to

11 do that; right?

12 A.      No, sir.

13 Q.      You were not trained to do that, were you?  No?

14 A.      No, sir.

15 Q.      Okay.  Now, in the video, was there ever any

16 place that we watched that we showed to the jury -- that

17 13-minute video -- was there any place where Nathan Ling

18 was resisting?

19 A.      In the video, the only thing I seen that could

20 have been resisting was when they pulled into the sally

21 port when he was brought out of the vehicle.

22 Q.      Okay.  But what I saw when they pulled him out

23 of the vehicle is Justin Crabtree grabbing him by the

24 arms and jerking him out of the -- of the cruiser.

25         Did you --

1  A.        Correct.

2  Q.        -- feel that he was resisting when Justin

3  Crabtree was doing that?

4  A.        Not when he was being drug out.  Afterwards --

5  Q.        Okay.

6  A.        -- a little bit, yes.

7  Q.        So was there any other place in the 13-minute

8  video that you say that Nathan Ling was resisting that

9  we can see?

10  A.        I would not say he was resisting.

11  Q.        All right.  But you say that he was resisting

12  before he got to the jail and before we got on video;

13  right?  And --

14  A.        Word of mouth.

15  Q.        And then you say that he's resisting when

16  he's -- when he's in the shower room where there's no

17  video; right?

18  A.        Correct.

19  Q.        All right.  And when Mr. Knight asked you the

20  question of, well, gosh, you know, Justin Crabtree

21  brings him out of the car, you could have intervened, I

22  agree with that.  You couldn't have intervened when he

23  first jerks him out of the -- of the car.

24          But you could have -- at least at that point in

25  time, you or Mr. Brown or Mr. Miller could have said,

1    let's stop mistreating this guy; right?

2    A.        Correct.

3    Q.        And then when he slammed his face up against

4    the block wall a couple times, you -- you sure could

5    have objected to that, couldn't you?

6    A.        Correct.

7    Q.        Yeah.

8              And then when he had -- had -- had him down on

9    the floor and they're pounding him with their fists and

10   he's not resisting, you could have intervened, couldn't

11   you?

12   A.        Correct.

13   Q.        All right.  And at no time did you suggest that

14   they stop?

15   A.        No, sir.

16   Q.        And at no time did you suggest that they get

17   him medical treatment?

18   A.        No, sir.

19              MR. SEATON:  All right.  Thank you so much.

20              THE COURT:  All right.  Any recross?

21              MR. KNIGHT:  Just briefly.

22                    RECROSS-EXAMINATION

23   BY MR. KNIGHT:

24   Q.        The reason there's no camera in the shower --

25   there's a privacy concern, is there not?

1    A.       I believe so.

2    Q.       And regardless -- and I guess we'll just have

3    to go on the video.  Is -- there's movement back and

4    forth by Mr. Ling; correct?

5    A.       Correct.

6    Q.       Whether you call it "resisting," "quiver,"

7    whatever you call it --

8    A.       Correct.

9    Q.       -- there's movement.  And that's why you're

10   there; correct?

11   A.       Correct.

12   Q.       And there's no way you could have either

13   prevented Justin Crabtree from hitting, pushing him into

14   the wall of the sally port or the counter, or the punch,

15   is there?

16   A.       With how new I was and the reputation road

17   officers had, I did not want to speak out of --

18   Q.       Did you think you were ever in a position to

19   stop that?

20   A.       Not entirely, no.

21            MR. KNIGHT:  Thank you.

22            THE COURT:  All right.  Thank you, sir.

23            Call your next witness.

24            MR. SEATON:  He -- he brought up one other

25   matter.  May I ask --

1       THE COURT:  No, sir.

2       MR. SEATON:  Okay.

3       THE COURT:  We're done.

4       Call your next witness.

5       MR. SEATON:  We'll call Cody Douglas, Your

6  Honor.

7       (The witness was duly sworn.)

8       THE WITNESS:  Thank you, ma'am.

9       THE COURT:  Whenever you're ready.

10      MR. SMITH:  Thank you, Your Honor.

11                    CODY DOUGLAS,

12  called as a witness at the instance of the parties,

13  having been first duly sworn, was examined, and

14  testified as follows:

15                  DIRECT EXAMINATION

16  BY MR. SMITH:

17  Q.      Please state your name, sir.

18  A.      Cody Douglas.

19  Q.      Mr. Douglas, what is it that you currently do?

20  A.      I'm a state trooper in Tennessee.

21  Q.      Okay.  And in June 2019, what were you doing at

22  the time?

23  A.      I worked with the Campbell County Sheriff's

24  Office as a sheriff.

25  Q.      Do you remember the incident involving Nathan

```
 1  Ling?

 2  A.        Yes, sir.

 3  Q.        Tell us what you remember about that night.  It

 4  had recently -- you had recently come on shift, if I

 5  remember right?

 6  A.        I don't recall.  It's been -- it's been quite a

 7  while, but I believe so.

 8  Q.        Okay.  You remember it was around --

 9  A.        Excuse me.

10  Q.        -- midnight?

11  A.        It was nighttime, yes, sir.

12  Q.        What do you remember about why you got out to

13  the scene?

14  A.        We called out to -- I got called out to the

15  scene in reference to a suspicious vehicle parked next

16  to a residence.

17  Q.        Do you remember where the scene was?

18  A.        It was off State Route 63 in Campbell County.

19  I don't remember the actual lane.  It was something

20  lane.  I can't remember the name.

21  Q.        Would the Wildwood Circle --

22  A.        Yes, sir.  Wildwood Circle, yes.

23  Q.        And when we took your deposition, do you

24  remember seeing an aerial photograph of the scene?

25  A.        No, sir.
```

1          MR. SMITH:  Okay.  Pull up Plaintiff's

2     Number 6.

3     BY MR. SMITH:

4     Q.          Were you familiar with the scene before -- when

5     you got there, with Wildwood Circle?  Were you familiar

6     with that area?

7     A.          Oh, yes, sir.  Yes --

8     Q.          Okay.

9     A.          -- sir.  Sorry.

10          MR. SMITH:  All right.  Your Honor, I'd like to

11    move Plaintiff's Number 6 into evidence.

12          THE COURT:  Okay.  What is it?

13          MR. KNIGHT:  No objection.

14          MR. SMITH:  It's the picture of the scene.

15          MR. KNIGHT:  No objection.

16          THE COURT:  Okay.  So ordered without

17    objection.

18          (Plaintiff's Exhibit 6

19          received into evidence.)

20          THE COURT:  Publish it to the jury.

21    BY MR. SMITH:

22    Q.          Officer Douglas, can you see that picture?

23    A.          Yes, sir.

24    Q.          Okay.  Now, who is the first officer to arrive

25    at the scene?

1    A.       That would be me.

2    Q.       Okay.  Can you tell us what you did when you

3    got to the scene?

4    A.       I pulled in, observed the vehicle.  I believe

5    it was backed in 'cause I had to go down there and get

6    the tag off of it.  Make contact with the individuals in

7    the car.  They had told me that they had been -- didn't

8    have nowhere to go, been sleeping in the car, had pulled

9    over to rest.

10   Q.       Okay.  There's some markings on this photograph

11   here.  Do you remember where the vehicle was positioned?

12   A.       If my mind serves me correctly, sir, they -- I

13   believe they was on this concrete pad.

14   Q.       Where there's a checkmark, it looks like --

15   A.       Yes.

16   Q.       -- that's made on this image here?

17   A.       Yes, sir.

18   Q.       Okay.  Thank you, sir.

19            Continue, please.  After you made contact with

20   them, did other officers arrive?

21   A.       Yes, sir.

22   Q.       Who was the officer that showed next?

23   A.       John Minor.

24   Q.       Okay.  What did John Minor do when he got to

25   the scene?

1  A.          He pulled up, he approached the car, and was

2  speaking to them.  I was in my vehicle running checks on

3  the car and had got everybody's information.

4  Q.          Okay.  What happened next that you can

5  remember?

6  A.          Vehicle had come back stolen from NCIC.  We

7  done a warrant check on Mr. Ling.  He had a positive

8  hit.  The -- Deputy Minor had a radio.  It was loud, you

9  know.  You can hear it.  When he come back -- "Are you

10 clear?  Copy" -- he took off, bolted, ran.

11         There's a residence next to this place.  It's a

12 residential area anyway.  It's dark.  Can't see.  He

13 took off.  He -- we took off running after him.  I

14 believe Minor even fell.  I think I remember seeing him

15 fall.  Probably tripped over a rock or -- I don't -- I

16 don't know what it was.

17         I shot around back behind the house.  I located

18 him laying like he was knocked out, like a laceration --

19 or not a laceration.  Sorry.  Like a mark on his

20 forehead.  I don't remember seeing a lot of blood or

21 anything like that, but he was just like -- he was

22 knocked out cold.  There was a pickup truck -- there was

23 a red pickup truck.  I remember that.

24 Q.          All right.

25 A.          So --

1    Q.       Let me take you just a little further back.  It

2    was dark?

3    A.       Yes, sir.

4    Q.       It was about close to midnight?

5    A.       Yes, sir.

6    Q.       Okay.  Now, you saw Officer Minor fall?

7    A.       Yes, sir.

8    Q.       But you lost track of Nathan Ling?

9    A.       Yes, sir.

10   Q.       Okay.  And, in fact, you were trying to go

11   which way around the house --

12   A.       Yes, sir.

13   Q.       -- to go after him?

14            And it just happened that you stumbled upon --

15   not stumbled.  But you located Mr. Ling --

16   A.       Yes, sir.

17   Q.       -- on the ground?

18   A.       Yes, sir.

19   Q.       And he was unresponsive?

20   A.       Yes, sir.

21   Q.       And on this picture here, is he -- is it

22   accurate to say that the star image -- that blue with

23   the star in the middle is about where he was located?

24   A.       Yes, sir.

25   Q.       Okay.  Now, once you locate Mr. Ling, is he

1  handcuffed?  What do you do next?

2  A.        No, he's not handcuffed.  He was -- he was

3  knocked out cold.  I radioed.  Some other deputies have

4  arrived -- had arrived too, and then we notified EMS and

5  everything.

6  Q.        Who is the other officers that arrived?

7  A.        Sergeant Mikey Owens -- Mike Owens, Dakota

8  Williams, and I -- I can't recall.  I know Justin

9  Crabtree, but I don't remember him.  I -- I don't -- I

10 don't remember who was actually "there" there.  I -- I

11 know the names that's involved in this case, but I don't

12 remember who all was there.

13 Q.        Several?

14 A.        Yes, sir.

15 Q.        Okay.  Do you all try and get medical help for

16 Mr. Ling?

17 A.        Yes, sir.

18 Q.        At what point when you located him did you call

19 for EMS?

20 A.        Well, we got him -- we got him up off the

21 ground, tried to wake him up, got him up.  He come to

22 and was -- was fighting, trying to bite us, spitting.  I

23 was closing my eyes.  I didn't want spit in my eyes.

24 They got him handcuffed.  I don't remember who.

25          The EMS was going to try to give him treatment,

1  but he tried to bite them, and he was fighting

2  everybody.

3  Q.      He was -- he was being --

4  A.      Yes, sir.

5  Q.      -- pretty resistant?

6  A.      Pretty resistant.  They got him in the back of

7  the car, and I stayed at the scene because I had to deal

8  with a juvenile and a female that was there as well.

9  Q.      Those were his companions?

10  A.      Yes, sir.

11  Q.      Mr. Ling's companions?

12  A.      That was with him.

13  Q.      Okay.  From the time you found Mr. Ling, what

14  was the time you think it was that he regained some

15  consciousness?

16  A.      Probably not even five minutes.

17  Q.      So just a couple minutes?

18  A.      The -- just a few minutes.

19  Q.      Just knocked out?

20  A.      Yeah.

21  Q.      Okay.  Was he coherent?

22  A.      I'm sorry?

23  Q.      Was he coherent?  Was he talking?

24  A.      I don't remember if he said anything or not.

25  Q.      Now, EMS arrived on scene.  How many paramedics

1  were there?

2  A.        I do not remember.

3  Q.        Was it more than one?

4  A.        I can't -- I can't remember, sir.

5  Q.        You and another officer assisted Mr. Ling back

6  up to where the ambulance was?

7  A.        Yes, sir.

8  Q.        Okay.  And did they take a look at him?

9  A.        I mean, I don't know how many there was.

10  They -- they attempted to, but he was trying to bite

11  them.  He was trying -- he was fighting.  He was

12  resistant.

13  Q.        Did he seem to be in a daze?

14  A.        Oh, I mean, you could call it that, yes, sir.

15  Q.        Okay.  Who was it that made the decision to

16  transport Nathan Ling to the jail?

17  A.        I -- I don't remember.  I mean, Sergeant Mikey

18  Owens was on scene, but I don't -- I mean,

19  that's normally -- we tried to get him medical

20  attention, couldn't, so had to transport him to the

21  jail.  They had to -- he was fighting even not wanting

22  to get in the car.  So --

23  Q.        Were you --

24  A.        -- at that point, I still -- I remained at the

25  scene 'cause I had to deal with the vehicle getting

1    towed, the juvenile, and -- and the female.

2    Q.        Did you feel that Nathan Ling was seriously

3    injured at the scene?

4    A.        At that time, just -- abrasion is what I was

5    trying to say earlier.  Sorry, Your Honor.  Abrasion on

6    his head.  That's all I seen right on his forehead right

7    here on the --

8    Q.        Nothing else that you noticed besides a --

9    A.        Just an abrasion.

10   Q.        -- mark?

11   A.        A scuffle on his head, yes, sir.

12   Q.        Other than that, you did not feel he was in any

13   medical jeopardy?

14   A.        No, sir.

15   Q.        Did you feel it was the right decision that he

16   be transported to the jail and not to a hospital?

17   A.        I didn't make that decision.  Again, I -- the

18   sergeant was on scene.  His injuries -- they tried to

19   give him treatment.  He wouldn't let them.  So we took

20   him.  We had -- I got him in the car, and they took him

21   to the jail.

22   Q.        Did you agree with that decision?

23   A.        At the time, yes, sir.

24   Q.        Okay.  Did you go with Nathan Ling or the other

25   officer to the jail?

1  A.       No, sir.

2  Q.       Did you -- you don't know anything about what

3  happened that night besides what you heard later?

4  A.       Yes, sir.

5  Q.       Okay.  Did anyone at the scene suggest that

6  Nathan Ling needed further medical treatment?

7  A.       No.

8  Q.       That's all I have.  Please answer any questions

9  defense counsel has.

10          THE COURT:  Any cross-examination?

11          MR. KNIGHT:  Very little, Your Honor.

12                     CROSS-EXAMINATION

13 BY MR. KNIGHT:

14 Q.       Trooper Douglas?

15 A.       Yes, sir.

16 Q.       Okay.  You're a certified police officer;

17 correct?

18 A.       Yes, sir.

19 Q.       And I believe that before working at Campbell

20 County, you worked at LaFollette Police Department;

21 correct?

22 A.       Yes, sir.

23 Q.       And they had a field training program?

24 A.       Yes, sir.

25 Q.       Eight weeks; correct?

1    A.       I had to go through eight weeks of police

2    academy through Walter State.  Sent myself for college

3    credit, got hired on at Walter City.

4    Q.       But to get -- when you went to Walter State,

5    the State certifies you as POST certified; correct?

6    A.       Yes, sir.

7    Q.       And then you went to LaFollette and then to

8    Campbell County; correct?

9    A.       Yes, sir.

10   Q.       And in order to keep your certification, you

11   have to attend 40 hours of in-service training per year;

12   correct?

13   A.       That is correct, sir.  Excuse me.

14   Q.       Now, back in June of 2019, I believe we're

15   talking about late Saturday, early Sunday morning?

16   A.       I couldn't tell you the day -- what day it was,

17   sir.

18   Q.       It was at night; correct?

19   A.       It was nighttime, yes, sir.

20   Q.       Which you were working the night shift, I

21   assume?

22   A.       Night shift, midnight.

23   Q.       And John Minor, I believe you said, was the

24   first on the scene?

25   A.       No, sir, I was the first one on scene.

1  Q.      Okay.  But John Minor ended up on the scene;

2  correct?

3  A.      Yes, sir.

4  Q.      And he ended up injured and having to go to

5  LaFollette Medical Center; correct?

6  A.      I'm not sure what -- I know he fell.

7  Q.      Okay.

8  A.      I'm not sure if he got -- he got treatment or

9  not.

10 Q.      Okay.

11 A.      I couldn't tell you.

12 Q.      And you were asked several times when

13 you -- you were called out to the scene; correct?

14 A.      I was dispatched, yes, sir.

15 Q.      So normally when somebody is dispatched,

16 someone calls 9-1-1 asking for law enforcement help;

17 correct?

18 A.      Yes, sir.

19 Q.      And did it appear to you that one of the

20 property owners there felt that this Ford Focus or

21 whatever it was that was stolen was trespassing on

22 somebody's land?

23 A.      I -- they called in, said it was a suspicious

24 vehicle, yes, sir.

25 Q.      And it came back stolen; correct?

1    A.        Yes, sir.

2    Q.        And it came back that Mr. Ling was wanted for a

3    felony in Michigan; correct?

4    A.        I don't recall what the warrants was for at

5    this time.  I don't.  But he was wanted.  He had a

6    warrant on him --

7    Q.        And when he --

8    A.        -- issued on him.

9    Q.        -- heard that, he took off; correct?

10   A.        Yes, sir.

11   Q.        And at some point -- nobody, I guess, knows

12   really what happened -- we find Ling around a truck;

13   correct?

14   A.        Yes, sir.

15   Q.        With an abrasion on his head?

16   A.        Yes, sir.

17   Q.        And at that point, did you all who were out

18   there at the scene, Campbell County, laugh, or did you

19   try to make fun of him, or did you try to get him some

20   medical attention?

21   A.        We tried to get him medical attention, sir.

22   Q.        And an ambulance showed up; correct?

23   A.        Yes, sir.

24   Q.        And they were to evaluate Mr. Ling; correct?

25   A.        I'm sorry?

1  Q.        And they were to -- the purpose was to get

2  Mr. Ling evaluated; correct?

3  A.        Yes, sir.

4  Q.        Just in case he needed further treatment;

5  correct?

6  A.        Yes, sir.

7  Q.        And that did not happen; correct?

8  A.        Yes, sir.

9  Q.        He spit, bit, and yelled at the ambulance

10  personnel; correct?

11  A.        He was -- he was -- he was fighting, yes, sir.

12  He was very uncooperative.

13  Q.        Was he uncooperative with the officers?

14  A.        Yes, sir.

15  Q.        Was he uncooperative when the officers led him

16  to the cruiser?

17  A.        Yes, sir.

18  Q.        And was he uncooperative while he was there in

19  the cruiser?

20  A.        Yes, sir.

21  Q.        Was the young woman that he was with

22  uncooperative with the officers?

23  A.        She come down there -- come to find now that --

24  I just remembered this.  She come down there yelling,

25  and I think one of the other deputies told her to get

1  back, get back.  I reckon one of them -- I believe -- I

2  believe she got arrested too, if I'm not mistaken, for

3  disorderly maybe.

4  Q.       Did anyone out at the scene do anything that

5  you would consider to be abuse of Mr. Ling?

6  A.       No, sir, not that I seen.  No, sir.

7  Q.       Did you?

8  A.       No, sir.

9  Q.       And you never went to the jail; is that

10  correct?

11  A.       I didn't go in the jail.  I went to the

12  sheriff's office, which is connected to the jail, but I

13  had the juvenile with me, sir.

14  Q.       All right.  And you had to go through DCS?

15  A.       DCS, yes, sir, 'cause he was a runaway, I

16  believe.  I believe he was a runaway.

17  Q.       So we had a stolen vehicle, a runway, and

18  somebody who was wanted in the state of Michigan?

19  A.       Yes, sir.

20  Q.       That's what you were encountering that night;

21  correct?

22  A.       Yes, sir.

23           MR. KNIGHT:  That's all I have.  Thank you,

24  Judge.

25           THE COURT:  All right.

1      THE WITNESS:  Thank you, sir.

2      THE COURT:  Any redirect?

3      MR. SMITH:  One --

4      THE COURT:  -- Mr. Smith?

5      MR. SMITH:  One -- one question, Your Honor.

6                    REDIRECT EXAMINATION

7  BY MR. SMITH:

8  Q.      Officer Douglas, if any officer at the scene

9  had suspected that Nathan Ling was having a traumatic

10 brain injury or any further serious medical issues,

11 would you all have suggested that he go to the hospital

12 rather than the jail?

13 A.      We -- well, that's why we had EMS come out

14 there to evaluate Mr. Ling.

15 Q.      And they left pretty quickly?

16 A.      I don't recall how fast they left.

17 Q.      Well, once they had done their job and had

18 finished, you all were comfortable that he was in no

19 medical danger and should appropriately go to the jail?

20 A.      Yes, sir.

21 Q.      If anyone -- if you had suspected he had a

22 traumatic brain injury that needed further treatment,

23 would you have recommended he go to the -- to the

24 hospital?

25 A.      Well, if I'd have known that, yes, sir, but I'm

1  not trained to know that.

2  Q.       And none of the other officers at the scene

3  thought he should go to the hospital, just go to the

4  jail?

5  A.       I can't answer for them, but I'd say no.

6  Q.       Thank you, sir.

7  A.       Yes, sir.

8  Q.       I believe that's why you had EMS come out

9  there; is that correct?

10  A.       Yes, sir.

11  Q.       Because you're not a medical doctor?

12  A.       Yes, sir.

13  Q.       You're not a nurse; correct?

14  A.       That's correct.

15  Q.       They're trained to evaluate arrestees, are they

16  not?

17  A.       Yes, sir.

18  Q.       And they're trained to tell you whether or not

19  they're okay to go to jail or they should go to the

20  hospital; is that correct?

21  A.       Yes, sir.

22  Q.       I wonder what would have happened if he'd have

23  gone to the hospital.

24           MR. SMITH:  Thank you.

25           THE COURT:  Thank you, sir.

1          THE WITNESS:  Thank you, Your Honor.

2          THE COURT:  Call your next witness.

3          MR. SEATON:  Justin Crabtree.

4          (The witness was duly sworn.)

5                    JUSTIN CRABTREE,

6    called as a witness at the instance of the parties,

7    having been first duly sworn, was examined, and

8    testified as follows:

9                    DIRECT EXAMINATION

10   BY MR. SEATON:

11   Q.        If you would tell the ladies and gentlemen of

12   the jury your name.

13   A.        Justin Crabtree.

14   Q.        And where do you live, sir?

15   A.        I live in Campbell County, Tennessee.

16   Q.        All right, sir.  Are you currently employed?

17   A.        Yes, sir.

18   Q.        What do you do?

19   A.        I do core drilling for the State of Tennessee.

20   Q.        All right, sir.  Now, you were hired by

21   Campbell County to be -- to become a road officer;

22   correct?

23   A.        Yes, sir.

24   Q.        And how old were you at the time?

25   A.        I don't recall right off the top of my head.  I

1  was in my early 20s, I remember.

2  Q.      Okay.  And -- well, so to give you a point of

3  reference, this was June -- this event happened on June

4  the 1st of 2019.  Were you hired a year or two before,

5  or what do you recall?

6  A.      I think it was a few months -- within the same

7  year, 2019, if I recall right.

8  Q.      So 2019 -- if your date of birth was

9  February 22nd of 1995, you would have been 24?

10 A.      Yes, that would be correct.  Yes, sir.

11 Q.      All right.  So you had just been hired a couple

12 months before this happened?

13 A.      I think it was -- I don't -- I don't want to

14 lie, say I know for sure, but I think it's more toward

15 the first of the year, if I recall right.

16 Q.      Well, we're not going to call you a liar.  We

17 just want you to testify to what you --

18 A.      Yes, sir.  I -- I -- I can't remember.  I don't

19 remember the exact date of hire.  I just remember that

20 I'd been working for a few months with the sheriff's

21 department.  Yes, sir.

22 Q.      All right.  And you had gone to Walter State,

23 which is our community college in Morristown; correct?

24 A.      Yes, sir, correct.  Yes, sir.

25 Q.      And you had gone to an eight-week training

1    course for road officers; right?

2    A.        Yes, sir, correct.

3    Q.        And when you got to Campbell County, you didn't

4    get any training after that, did you?

5    A.        Not other than their -- just their yearly

6    in-service, no, sir.

7    Q.        Right.

8              And as a matter of fact, when I asked you --

9    when I took your deposition, I said, "Did you get any

10   different training when you went to Campbell County?"

11             And you said, "I don't even think at the

12   county they showed me the ropes."

13   A.        I -- I don't recall them -- no, sir.

14   Q.        All right.  So -- and then I asked you --

15   I said, "So you don't get any training?"

16             You said, "They just handed me the keys to the

17   car and said 'You're going to zone two.'"

18   A.        Yes, sir.

19   Q.        Right?

20             So -- all right.  They also had this policy

21   manual, and I'd asked you in deposition -- I said,

22   "Did" -- "Did you ever see this policy manual?"  Right?

23   A.        Yes, sir, I remember that.

24   Q.        And what was your response to that?

25   A.        I -- if I recall correctly, I said I hadn't --

1    I hadn't been issued one.  I didn't see it.

2    Q.       So you'd never even been given the policy

3    manual?

4    A.       Not that I recall, no, sir.

5    Q.       All right.  And nobody ever went over things in

6    the operations or policy manual with you; right?

7    A.       Not that I recall, no, sir.

8    Q.       All right, sir.  So let's talk a little bit

9    about what happened on June the 1st of 2019.

10   A.       Yes, sir.

11   Q.       You've been very straightforward with us in

12   deposition, haven't you?

13   A.       I -- I would assume, sir.  Yes, I give you all

14   the answers that I knew.  Yes, sir.

15   Q.       All right, sir.  And you were the officer

16   called -- or you were -- you were called out along with

17   some other road officers to check -- to check out these

18   three individuals in this neighborhood?

19   A.       Yes, sir.

20   Q.       And you weren't the original officer.  I think

21   that Cody Douglas was the -- was the officer assigned.

22   He and John Minor; right?

23   A.       Yes, sir.  They got there before I did.

24   Q.       All right.  And when you got to the scene, they

25   told you to take Nathan Ling to the jail in Minor's car?

1   A.      Yes, sir, it was Minor's car.  It wasn't mine.

2   He had got injured.  And they took my car, so I took

3   his.

4   Q.      All right.  So they asked you, after Mr. Ling

5   is handcuffed behind his back, to put him in the car and

6   take him to the jail; right?

7   A.      Yes, sir.

8   Q.      And was there a cage in between the front and

9   the back?

10  A.      Yes, sir.

11  Q.      All right.  And so did anybody ride with you?

12  A.      No, sir.

13  Q.      All right.  And so before -- before you took

14  him to the jail, you weren't one of the first people

15  there.  That was Minor and -- and Cody Douglas that just

16  testified?

17  A.      Yes, sir.

18  Q.      You came up a little bit later?

19  A.      Yes, sir.

20  Q.      All right.

21  A.      It was, I would say, anywhere from 10, 15

22  some-odd minutes after they'd arrived on scene because

23  it wasn't an emergency call at the time, so I wasn't

24  driving -- you know, there was --

25  Q.      Sure.

1  A.        -- somebody on scene at the time.  I wasn't in

2  a hurry to get there because the situation was at hand

3  at the time.

4  Q.        All right, sir.  So you didn't see Nathan Ling

5  run or fall; right?

6  A.        No, sir, I -- I got there after the fact.

7  Q.        All right.  And did you get there after EMS had

8  cleared him to go to jail instead of the hospital?

9  A.        No, sir, I was there when they located him next

10 to the truck.

11 Q.        Okay.

12 A.        And when we called EMS, I was -- I was there,

13 and then I was there when EMS was on scene when they got

14 him to come to and then from there to when we put him in

15 the car.  Then I took him to the jail.

16 Q.        Okay.  And I think you told me in your

17 deposition that he wasn't bleeding; right?

18 A.        Not at the time, no, sir.

19 Q.        And he had come to.  He was conscious and

20 talking; right?

21 A.        He wasn't talking.  He was -- he was yelling

22 and kicking, yes.  But he was conscious.

23 Q.        Okay.  But he's conscious.  And you really had

24 no idea if he had been injured when he fell or whatever

25 had happened; right?

1  A.       EMS just said he was cleared to go to the jail.

2  Q.       Okay.  And so did you watch EMS actually

3  examine him?

4  A.       Yes, sir.

5  Q.       All right.  So they examined him and said he's

6  cleared to go?

7  A.       Yes, sir.

8  Q.       All right.  Excuse me.  I'm sorry.

9           So your sergeant was there; right?

10 A.       Yes, sir.

11 Q.       And your sergeant's name is Mikey Owens; right?

12 A.       Yes.  Michael Owens, yes, sir.

13 Q.       And Michael Owens was not only -- he was your

14 supervisor; right?

15 A.       Correct, yes, sir.

16 Q.       And not only was he your supervisor, he was a

17 real good friend of yours?

18 A.       Yes, sir, he was.

19 Q.       He was the best man at your wedding?

20 A.       He wasn't the best man.  He was one of my

21 groomsmen.

22 Q.       I'm sorry.  One of your groomsmen.  I stand

23 corrected.

24 A.       Yes, sir.

25 Q.       My daughter would kick me for saying that.

1    So when -- when the supervisor was there, did

2    you see him pepper spray Mr. Ling with his hands cuffed

3    behind his back?

4    A.    Yes, sir, he did.

5    Q.    Okay.  And did y'all ever consider putting

6    shackles on Mr. Ling?  Leg shackles?

7    A.    We didn't have any shackles, no, sir.

8    Q.    Okay.  So you -- can we pull up the video?

9          (Off-the-record discussion between

10         plaintiff's counsel.)

11   BY MR. SEATON:

12   Q.    You have -- this will be Exhibit Number 56.

13   Excuse me.  I'm sorry.  This will be Exhibit Number 48.

14         You have seen the 13-minute condensed video

15   that we pulled from the video footage; right?

16   A.    Yes, sir.

17   Q.    And is it your impression that this video

18   footage accurately shows what happened?

19   A.    Yes, sir.

20   Q.    Okay.  We didn't leave anything out, did we?

21   A.    No, sir.  I mean, there's no video inside of

22   the vehicle and -- and that type of stuff when I'm

23   pulling up.  But as to what happened when I got him out

24   of the car and onward, yes, sir, it's completely

25   accurate.

1    Q.       All right, sir.

2            MR. SEATON:  And that's Exhibit Number 48 that

3    we previously introduced.

4            Go ahead and roll it, Joseph, if you would.

5            (The video was played in open court, and the

6            proceedings continued as follows:)

7    BY MR. SEATON:

8    Q.       And these are the two jail officers that were

9    there at the time; right?

10   A.       Yes, sir.

11   Q.       That would have been -- hold on just a second.

12   Stop for -- for a second.

13           So that would have been Sean Brown?

14   A.       Yes, sir, I recall him being there.

15   Q.       And Alexander Standridge?

16   A.       I can't tell you for sure on him.  I --

17   Q.       All right.

18   A.       -- don't recall.

19   Q.       All right.  But there's two --

20   A.       There are two --

21   Q.       -- jail officers?

22   A.       -- jail officers, yes, sir.

23           (The reporter requests only one person

24           speak at a time.)

25           MR. SEATON:  Oh, I'm sorry.  Thank you.  Thank

1  you.  Fuss at -- fuss at me when I do that.

2          THE WITNESS:  I apologize.

3  BY MR. SEATON:

4  Q.      Huh?

5  A.      I apologize.

6  Q.      Oh, that was my fault.

7  A.      Okay.

8  Q.      So you get to the jail.  And is it your

9  responsibility to hand off the prisoner to the jail

10  administration once you get to the sally port?

11  A.      Yes and no.  I mean, there's been times that --

12  yeah, you're the one who pulls them out and hands them

13  to the jail administration.  Sometimes the jail

14  administration will come out and get them out of the

15  car.  It's -- it's everybody's responsibility there

16  to -- to take care of what's at hand.  Once he's in that

17  sally port, you know, he's part of -- he -- he's going

18  to jail.  So I've seen both ways.

19          But I can't recall if it's exactly my priority

20  to hand him off 'cause I'd had times where jailers would

21  come out, get him out of the car, and take them in.  I

22  sign the paperwork and leave.

23  Q.      Well, let's look at that for just a second.

24  You know, in the sally port or the garage there, you got

25  a door; right?

1    A.       Yes, sir.

2    Q.       And if you put that garage door down, you're

3    secured; right?

4    A.       Yeah.  Yes, sir.

5    Q.       And you had him handcuffed behind his back,

6    didn't you?

7    A.       Yes, sir.

8    Q.       And do you agree with Sheriff Goins when he --

9    when he's going to testify that after you put

10   handcuffs -- after you handcuff someone behind their

11   back that the fight is over?

12   A.       That's what we've been taught, yes, sir.

13   Q.       All right.  And that you shouldn't abuse him

14   after that?

15   A.       I agree, yes, sir.

16            MR. SEATON:  All right.  Go ahead, Joseph, if

17   you would.

18            (The video was played in open court, and the

19            proceedings continued as follows:)

20   BY MR. SEATON:

21   Q.       Is this you getting out of the car?

22   A.       Yes, sir.

23   Q.       All right.  And is this you jerking Mr. Ling

24   out of the back?

25   A.       Yes, sir.

1          MR. SEATON:  And would you stop right there.

2     BY MR. SEATON:

3          Would you tell us why you jerked him out like

4     that?

5     A.     When I -- when I pulled him out, you could see

6     that I had my hand up under his shoulder.  His head was

7     actually laying against this part of my door, so the

8     driver's side door, and he was kicking the window of the

9     passenger side -- the back passenger side.  So he wasn't

10    sitting up in the seat like we're sitting right now.

11    Q.     Sure.

12    A.     He was laying down on his back kicking the

13    window.

14    Q.     Okay.  And so -- so that's why you jerked him

15    out with his arms back behind his back?

16    A.     Yes, because he was laying on top of his arms

17    in the back of the vehicle.

18    Q.     All right, sir.  And then where we are on -- in

19    this particular photograph there, they are -- there's a

20    video camera looking directly at the ladder and you

21    cannot see the block wall.

22         Assuming that Jailer Miller and Jailer Brown

23    say that you slammed his -- or excuse me -- Jailer

24    Brown, the supervisor, and Alexander Standridge.

25    Assuming that they say you slammed his face up against

1  the block wall two to four times, is that what happened?

2  A.        No, sir.  I -- I slammed him against the wall,

3  but not two to four times.  And it wasn't his face.  I

4  was pushing more of his upper body area.  If his face

5  did hit the wall, then it did, but that wasn't the

6  intention.  No, sir.

7  Q.        Okay.  Do you know if his face hit the wall?

8  A.        I can't recall, no, sir.

9  Q.        All right, sir.  When we saw him first get out

10 of the car, there wasn't any blood on him; right?

11 A.        No, sir.

12 Q.        There was no blood in your car; right?

13 A.        No, sir.

14 Q.        And so when did the bleeding start?

15 A.        After I struck him in the nose twice when we

16 were inside of the -- inside of what we call "the trap,"

17 but it's where inmates get searched in.

18 Q.        So you don't think if his face went up, I

19 guess, against the block wall that that's where he

20 started bleeding?

21 A.        No, sir.  He wasn't bleeding when we took him

22 inside.

23 Q.        Do you remember me talking to you about all the

24 injuries he had?

25 A.        I do, yes, sir.

1   Q.      And -- excuse me.  That's what I want you to

2   tell these folks on the jury is how can you know -- we

3   talked about the -- the -- the shattered facial bones;

4   right?

5   A.      Yes, sir.

6   Q.      And we talked about the -- the -- the shattered

7   eye -- the left shattered eye socket; right?

8   A.      Yes, sir.

9   Q.      And the shattered jaw?

10  A.      Yes, sir.

11  Q.      And is it your testimony that you think that

12  that was caused by you hitting him twice?

13  A.      No, sir, 'cause I struck him in the nose.

14  Q.      Okay.  So wouldn't it make more sense if you --

15  if his face got slammed up against the block wall,

16  that's probably going to cause those issues?

17  A.      Possible, as well as when he ran into the back

18  of a pickup truck.

19  Q.      Okay.  Well, you told us that -- that -- we

20  don't know that he ran into the back of a pickup truck,

21  do we?

22  A.      I -- I don't, but I know that's where he was

23  laying, and that's what I was told, so --

24  Q.      All right.  And we know that EMS cleared him?

25  A.      Yes, sir.

1  Q.      And we know that he didn't bleed?

2  A.      Not at the time, no, sir.

3  Q.      Right.

4          Then he was still resistive in your -- in your

5  patrol car; right?

6  A.      Yes, sir.

7  Q.      All right.  So do -- would you agree with the

8  sheriff that most likely all of his injuries were caused

9  from the abuse he received at the jail?

10 A.      I can't agree with that, no, sir.  But --

11 Q.      Okay.

12 A.      -- I just know what I -- what I done.

13 Q.      Okay.

14 A.      So --

15 Q.      What did you done [sic]?

16 A.      I put him against the wall, and then when I

17 took him in the trap, I put him against the counter.

18 And then, like I said, shortly after, I struck him in

19 the nose twice.

20 Q.      So you think -- and that's where -- that's

21 where my disconnect is.  Striking him in the nose twice.

22 He's got all of these major fractures.

23 A.      Yes, sir.

24 Q.      And you think that caused it, or you think the

25 block wall caused it?

1    A.       I can't give you that answer.  I'm not a

2    medical doctor, sir.  I apologize.

3    Q.       Well, let's -- I'm sorry.  Let's watch it.

4            (The video was played in open court, and the

5            proceedings continued as follows:)

6    BY MR. SEATON:

7    Q.       Is that you?

8    A.       Yes, sir.

9    Q.       Now -- all right.  Stop that just a second.

10           Did you ram his head up against the -- the

11   steel casing of the window?

12   A.       That wasn't the window.  That was the counter

13   that his head hit, sir.

14   Q.       But it looked to me like his head went across

15   the counter into the steel casing window?

16   A.       Well, that's because he was still pushing that

17   direction.  I didn't throw him into the window.  He was

18   still moving that direction.

19   Q.       Well, what was the purpose of slamming his head

20   down on the -- on the counter?

21   A.       I have no answer for that, sir.

22           MR. SEATON:  Okay.  Go ahead, Joseph.

23           (The video was played in open court, and the

24           proceedings continued as follows:)

25   BY MR. SEATON:

1  Q.      So what's the purpose of pushing his arms up

2  back behind his back and then throwing him on the floor?

3  A.      You mean when I raised his arms up?

4  Q.      Uh-huh.

5  A.      Just a form of -- of keeping him from moving

6  back up, like standing back up.  By pushing his arms, it

7  pushes him back forward.

8          MR. SEATON:  Go ahead.  A little bit more.

9          (The video was played in open court, and the

10         proceedings continued as follows:)

11  BY MR. SEATON:

12  Q.      All right.  Now we see blood here; right?

13  A.      Yes, sir.

14  Q.      This is before you hit him; right?

15  A.      No, sir, that -- I -- I struck him right there.

16         MR. SEATON:  All right.  Let's -- let's go back

17  just a little bit.

18         (The video was played in open court, and the

19         proceedings continued as follows:)

20         THE WITNESS:  Right there.

21         MR. SEATON:  All right.  Stop that just a

22  second.

23  BY MR. SEATON:

24  Q.      That didn't look like something that's going to

25  shatter people's bones in their face when you did this,

1  did it?

2  A.        No, sir.

3  Q.        All right.  But all the sudden we've got all

4  this blood; right?

5  A.        Yes, sir.

6          MR. SEATON:  All right.  Go ahead, Joseph.

7          (The video was played in open court, and the

8          proceedings continued as follows:)

9          MR. SEATON:  So let's stop right there.

10  BY MR. SEATON:

11  Q.        You got Dakota Williams on the far left; right?

12  He's another road officer; right?

13  A.        Yes, sir.

14  Q.        Another patrol officer.

15          Then you next to him; right?

16  A.        Yes, sir.

17  Q.        And then you've got Joshua Williams [sic] on

18  the far right?

19  A.        I would assume so.  I'm not sure, sir.

20  Q.        All right.  And then Sean Brown over top of

21  him?

22  A.        Yes, sir.

23          MR. SEATON:  All right.  Go ahead, Joseph.

24          (The video was played in open court, and the

25          proceedings continued as follows:)

1  BY MR. SEATON:

2  Q.      Got a pretty good set of blood at this point;

3  right?

4  A.      Yes, sir.

5  Q.      All right.

6          (The video was played in open court, and the

7          proceedings continued as follows:)

8  BY MR. SEATON:

9  Q.      And why are you standing on him?

10 A.      To keep his shoulders from moving back and

11 forth.

12         MR. SEATON:  All right.  Let's stop just a

13 second.

14 BY MR. SEATON:

15 Q.      So was he resisting?

16 A.      Not at that time.  I was trying to hold him in

17 a stationary position.

18 Q.      Was he resisting any time after you got him

19 into that trap room?

20 A.      I mean, yeah.  He jerked away from the

21 corrections officer right there and tried to move away

22 from us and --

23 Q.      So you felt like -- was he -- was he resisting,

24 or was he being combative?

25 A.      I mean, they're both the same word in my

 1    opinion.

 2    Q.       Okay.  Fair enough.

 3           And assuming that your other officers that are

 4    here are going to say that he wasn't resisting, can you

 5    help me reconcile that?

 6    A.       I can't.  Everybody's entitled to their own

 7    opinion.

 8           MR. SEATON:  All right.  Go ahead.

 9           (The video was played in open court, and the

10           proceedings continued as follows:)

11    BY MR. SEATON:

12    Q.       And did you have tactical gloves on at the

13    time?

14    A.       I believe I did right there, yes, sir.

15           MR. SEATON:  All right.  Let's stop just a

16    second.

17    BY MR. SEATON:

18    Q.       So these tactical gloves are gloves that are

19    not given to you by the department; right?

20    A.       No, the department doesn't issue --

21    Q.       You all get this from Greene's Military; right?

22    A.       I actually think I ordered mine offline.

23    Q.       Okay.

24    A.       I don't think I bought them from Greene's.

25    Q.       They've got Kevlar in the knuckles; right?

 1  A.      No, those that I had were leather on the top.

 2  Q.      Okay.

 3  A.      And they had plastic.  But I -- I don't know if

 4  it was Kevlar or just plastic.

 5  Q.      But it protects your knuckles; right?

 6  A.      Yes, sir.

 7  Q.      If you're hitting somebody, it's going to

 8  protect your knuckles?

 9  A.      Yeah, from more than just hitting somebody.

10  But yeah, that's the general --

11          MR. SEATON:  All right.  Go ahead.

12          (The video was played in open court, and the

13          proceedings continued as follows:)

14  BY MR. SEATON:

15  Q.      Who's hitting him there?

16  A.      I've kind of lost track of where everybody was,

17  so I'm not sure.

18  Q.      All right.  So let's stop just a second.

19          So the guy in the middle is?

20  A.      Is that still Sean Brown?

21  Q.      I think so.

22  A.      If he's the one in the middle, then he would

23  have been the one that's --

24  Q.      Did you see the one strike behind him?

25  A.      It would have been Dakota.

1          I did, yes --

2    Q.        Yeah.

3    A.        -- sir.

4    Q.        You got quite a bit of blood now, don't you?

5    A.        Yes, sir.

6    Q.        Would you agree that he's in need of immediate

7    medical attention at this point?

8    A.        Yes, sir.

9    Q.        All right.

10          (The video was played in open court, and the

11          proceedings continued as follows:)

12          MR. SEATON:  Joseph, you can probably speed

13    that up like twice -- yeah, let's speed up.

14          All right.  Stop.

15    BY MR. SEATON:

16    Q.        So we saw Sean Brown hitting him a couple more

17    times; right?

18    A.        Yes, sir.

19    Q.        All right.  That's not what's caused the blood,

20    though, is it?

21    A.        No, sir.

22          MR. SEATON:  All right.  Keep going.

23          (The video was played in open court, and the

24          proceedings continued as follows:)

25    BY MR. SEATON:

1  Q.      And who's -- who's the woman here?

2  A.      At the door?

3  Q.      Uh-huh.

4  A.      If I recall right at that time -- no -- no,

5  that ain't Officer Thomas.  I'm not -- I don't recall

6  who that is to be honest with you.

7  Q.      Corrections officer?

8  A.      Yeah, it's a corrections officer.  I thought

9  maybe it was Officer Thomas who was there at one time,

10 but I -- that don't look like her, so I don't recall

11 exactly who it is.

12         (The video was played in open court, and the

13         proceedings continued as follows:)

14         MR. SEATON:  Just stop it there.

15 BY MR. SEATON:

16 Q.      And you told me in deposition at this point in

17 time, you felt that you all were abusing him; right?

18 A.      I don't recall what I said in my deposition.

19 If you can --

20 Q.      Well, do you -- would you tell the ladies and

21 gentlemen of the jury, do you think he was abused at

22 this point in time?

23 A.      I believe we could have handled things

24 differently at that time.

25 Q.      Okay.  You believe you could have handled

1  things differently.  But do you think that you abused

2  him?  Do you think any officer abused him at this point

3  in time?

4  A.       Like I said, I believe we could have handled

5  things differently and been less aggressive.

6  Q.       Well, you know that -- that the damages and the

7  injuries caused to that man are for the rest of his

8  life, don't you?

9  A.       Yes, sir.

10 Q.       And it was caused by what happened to him once

11 he got in the jail, wasn't it?

12 A.       I can't -- I can't tell you that because,

13 again, I was told he ran into the back of a pickup truck

14 and had other things going on.  So I -- I can't say it

15 happened for sure in the jail.

16          I know obviously when I struck him in the nose

17 that caused an injury, but the rest of it, I can't speak

18 for it because I'm not a doctor.  I don't -- I don't

19 know exactly -- I don't know.  I can't tell you exactly

20 what caused all that.  I'm not going to say it was this

21 or that because I'm not sure.

22 Q.       Had -- had you been trained by Campbell County

23 to intervene if another officer was abusing an inmate or

24 detainee --

25 A.       I don't recall.

Crabtree - Direct Examination

1   Q.        -- would you have?

2   A.        Yes, sir, I should have.

3   Q.        Okay.  You should have?

4   A.        Yes, sir.

5   Q.        And had you been trained by Campbell County to

6   assess people as to whether or not they needed medical

7   treatment?

8   A.        Was I or should --

9   Q.        Yeah.

10  A.        -- I have been?

11  Q.        Was -- was you -- were you?

12  A.        No, sir.  I -- I mean, I -- just by looking at

13  somebody, you try and guess what's wrong with them

14  and -- and hope that you know what's going on.  But, I

15  mean, I'm not -- I'm not a doctor by any means, so I

16  can't say this is what's wrong with him.  I know --

17  Q.        So let's go back to your next question.  Should

18  you have been?

19  A.        Should I have been trained?

20  Q.        Yes.

21  A.        I'd like to have been trained, yes, sir.  I

22  mean, if that's what you're asking, I would have liked

23  to have been because that's a helpful thing to have.

24  Q.        Well, you know we've got a man in serious need

25  of medical treatment.  True?

1   A.      True.

2   Q.      And nobody there suggested that he get medical

3   treatment, did they?

4   A.      No, sir.

5   Q.      Nobody insisted that the abuse stop, did they?

6   A.      No, sir.

7   Q.      And nobody insisted that they call 9-1-1 or

8   take him to the hospital?

9   A.      No, sir.

10  Q.      And don't you wish you'd had better training to

11  have done that?

12  A.      I do.

13  Q.      And had you had better training, you would have

14  done that, wouldn't you?

15  A.      Yes, sir.

16  Q.      All right, sir.

17          MR. SEATON:  Keep going, Joseph.  Go ahead and

18  speed it up.

19          (The video was played in open court, and the

20          proceedings continued as follows:)

21  BY MR. SEATON:

22  Q.      Whose decision was it to put a spit mask on

23  him?

24  A.      I don't recall whose decision it was.

25  Q.      Wasn't yours?

1    A.        No, sir.

2    Q.        Okay.

3              (The video was played in open court, and the

4              proceedings continued as follows:)

5    BY MR. SEATON:

6    Q.        All right.  Tell us what's going on here.

7    A.        I took a picture of him laying there, and I

8    sent it to my sergeant.

9    Q.        Why?

10   A.        Just to let him know what was going on.  It was

11   in bad taste, I agree, but --

12   Q.        Was it because you were proud of what you'd

13   done?

14   A.        No, sir.

15   Q.        Who else did you send it to other than your

16   sergeant?

17   A.        I don't recall.

18   Q.        Did you tell your sergeant that this should not

19   be -- or that this should be confidential?

20   A.        No, sir.

21   Q.        Were you aware that it got sent around all

22   through the department?

23   A.        No, sir, I wasn't.

24   Q.        And when you say it was in bad taste, were

25   you -- were you told not to do things like this?

1    A.      No, it's just something that I should hold

2    myself to a higher standard than that.

3    Q.      Thank you.

4            MR. SEATON:  Let's pull up Exhibit Number 8.

5            (Off-the-record discussion between

6            plaintiff's counsel.)

7    BY MR. SEATON:

8    Q.      So do you recognize this picture?

9    A.      I believe that's the one you showed me during

10   my deposition, is it not?

11   Q.      Right.

12   A.      Yes.

13   Q.      Is it -- is it the picture that you took with

14   your cell phone?

15   A.      I believe so, yes, sir.

16           MR. SEATON:  All right.  We would move that

17   into evidence, Your Honor.  Exhibit Number 8.

18           MR. KNIGHT:  No objection.

19           THE COURT:  So ordered without objection.

20           (Plaintiff's Exhibit 8

21           received into evidence.)

22           THE COURT:  Plaintiff's 8?

23           MR. SEATON:  Yes.

24   BY MR. SEATON:

25   Q.      And so this shows the blood on the floor;

1  right?

2  A.        Yes, sir.

3  Q.        It shows Mr. Ling with the nylon spit mask on;

4  right?

5  A.        Yes, sir.

6  Q.        It shows him still handcuffed behind his back;

7  right?

8  A.        Yes, sir.

9  Q.        Looks like he's unconscious, doesn't it?

10  A.        By the picture, yes, sir.  But I believe he was

11  still conscious at that time.  Yes, sir.

12  Q.        Did you have any conversation with him during

13  the -- during the 30 minutes that was going on on that

14  floor?

15  A.        Not other than -- when he was on the floor, did

16  you say?  No, sir.

17  Q.        Did you have any conversation with him at

18  all -- coherent conversation with him?

19  A.        In terms of -- of like through the whole

20  process?

21  Q.        Yes.

22  A.        Yes, sir.  When I put him against the counter,

23  you can see me lean down, and -- and I was talking in

24  his ear.  And I said, "Hey, you know, this is" --

25  "You're not helping yourself in this situation.  Just

1  let it go.  Let's" -- "Let's move on with life."

2          And he said, "Okay."  So he coherently

3  acknowledged me.

4  Q.      So this is when you had him leaned over when

5  you threw him down on the counter?

6  A.      Yes, sir.

7  Q.      All right.  And so --

8  A.      That was the last conversation I had with him.

9  Q.      All right.  So was -- was it at that point in

10 time that he completely stopped being resistant?

11 A.      No.  Shortly after that, he jerked away from

12 the corrections officer.

13 Q.      He jerked away from the corrections officer?

14 A.      Yeah, I believe it -- it shows him jerk away

15 and move my direction.  That's when we grabbed ahold of

16 him and pushed his arms up.

17 Q.      All right, sir.  When you -- when you sent this

18 picture to your supervisor, do you know whether or not

19 he notified his supervisor or the sheriff?

20 A.      I have no idea, no, sir.

21 Q.      All right, sir.  Did he know -- and we're going

22 to talk about your text messages here in a minute.

23 A.      Okay.

24 Q.      But he didn't object to -- to receiving that

25 picture, did he?

1    A.       Not that I recall, no, sir.

2    Q.       He didn't tell you, "That's inappropriate,

3    Justin"?

4    A.       No, sir.

5             MR. SEATON:  All right.  Let's go back to the

6    video, Justin -- or excuse me.  Your name's Joseph.  So

7    go ahead and -- and play that.

8             (The video was played in open court, and the

9             proceedings continued as follows:)

10            MR. SEATON:  And go ahead and speed it up a

11   little bit.  All right.  Stop.  Yeah.  Let's -- let's --

12   let's go ahead and do regular speed at this point.

13   BY MR. SEATON:

14   Q.       So here you've got Dakota Williams facing us;

15   right?

16   A.       Yes, sir.

17   Q.       What is it you're demonstrating here?

18   A.       I don't remember.  I mean, it was a

19   conversation between two guys, but I -- I don't recall

20   what it was about.

21   Q.       Well, let's stop for just a second.

22            What do you mean it was a conversation?  There

23   were -- there were four other officers in that room?

24   A.       I mean, obviously at the time, I'm just talking

25   to Dakota.  I don't know who this guy is over here.

1  Q.       Did -- did you know that you all were being

2  videotaped in that jail?

3  A.       Yeah, we knew there were cameras in there.

4  Q.       Okay.  So what were you demonstrating when

5  you're doing this?

6  A.       It's -- I'm not sure, sir.

7  Q.       Were you laughing?

8  A.       I don't recall.

9  Q.       Probably?

10  A.       I don't -- I don't recall.

11          MR. SEATON:  Okay.  Go ahead, Justin [sic].

12          (The video was played in open court, and the

13          proceedings continued as follows:)

14  BY MR. SEATON:

15  Q.       And on your right in the lower corner, is that

16  Sean Brown?

17  A.       Over -- over in the right corner, did you say?

18  Q.       Yeah.

19  A.       Yeah, that looks like him.  Yes, sir.

20  Q.       Okay.  Any idea what we're talking about here

21  when you're --

22  A.       I don't recall.

23          MR. SEATON:  Okay.  All right.  Speed it up,

24  Joseph.  Slow it down.

25          (The video was played in open court, and the

1          proceedings continued as follows:)

2    BY MR. SEATON:

3    Q.      So at this point in time, does it look like

4    he's steady on his feet?

5    A.      No, sir.

6    Q.      Why do you think he's not steady on his feet?

7    A.      I can't give you an answer to that, sir.

8    Q.      Well, is it because he's had the you-know-what

9    beaten out of him?

10   A.      I mean, it could be, yes, sir.

11   Q.      Okay.  And why are we leaning him up and trying

12   to jerk his legs out from underneath him here?

13   A.      I can't answer for those officers, sir.

14   Q.      Are you no longer in the room?

15   A.      No, I've -- I've left.

16   Q.      Okay.  Fair enough.

17           (The video was played in open court, and the

18           proceedings continued as follows:)

19           MR. SEATON:  Speed it up just a hair.  All

20   right.  Slow it down.  There.

21   BY MR. SEATON:

22   Q.      So it looks like he loses his balance -- almost

23   loses his balance there; right?

24   A.      Yes, sir.

25   Q.      Okay.  Is it your opinion that at that point in

1  time, he's in critical need of medical care?

2  A.      He needed -- he needed an ambulance, yes, sir.

3  Q.      He needed what?

4  A.      An ambulance, yes, sir.

5  Q.      He needed an ambulance.

6          And did you help take him into the solitary

7  cell and lay him down?

8  A.      I believe I took his handcuffs off of him, yes,

9  sir.

10 Q.      All right.  And what was the conversation about

11 getting him medical treatment?

12 A.      I don't recall one, sir.

13 Q.      What was the conversation about calling 9-1-1

14 or the hospital?

15 A.      I don't recall one, sir.

16 Q.      Was there a conversation about we're worried

17 about what the next shift is going to say because this

18 condition -- this situation had escalated so much?

19 A.      Not with me present, no, sir.

20 Q.      Okay.  Did anybody suggest assisting this man?

21 A.      Not while I was --

22 Q.      Do you know if he was left to just die in the

23 cell?

24 A.      I -- once I left, I went to do my paperwork,

25 sir.  I don't -- I don't know what they did afterward.

1        MR. SEATON:  That's good.  You can go ahead and

2   pull that down.

3   BY MR. SEATON:

4   Q.        So you went to do -- you can pull them both

5   down.

6             You went to do your paperwork?

7   A.        Yes, sir, I --

8   Q.        What paperwork did you go do?

9   A.        Well, I had to -- I had to do an incident

10  report, I believe.

11  Q.        Okay.

12  A.        If I recall right, I wrote -- I wrote warrants

13  for assault on an officer.  And I -- I can't remember if

14  I wrote the warrants on him for -- for running or -- I

15  think he was in possession of a stolen vehicle as well.

16  I don't -- I don't remember if I wrote those warrants,

17  but I remember I had paperwork to do.

18  Q.        What officer did he assault?

19  A.        When you spit at officers, sir, that is

20  assault.

21  Q.        All right.  And so if some of your co-officers

22  are going to testify that he never spit at anybody,

23  would you dispute that?

24  A.        I mean, I would suggest that somebody put the

25  spit mask on him for a reason.

1  Q.      All right.  One of the officers has testified

2  that they put the spit mask on him -- this was Alexander

3  Standridge -- because he was bleeding.

4          MR. KNIGHT:  Your Honor, this is argumentative.

5  He can testify as to what he observed.

6          MR. SEATON:  I'm just asking him what --

7          THE COURT:  Ask him what he observed.

8          MR. SEATON:  Yeah.  Okay.

9  BY MR. SEATON:

10 Q.      So -- so after you said that you went -- you

11 went to do your reports.  And you decided that you're

12 going to charge him with assaulting an officer because

13 he spit at somebody; right?

14 A.      Yes, sir.

15 Q.      Who did he spit at?

16 A.      Everybody in that room that was -- I'm trying

17 to think of the word that -- I want to say exposed --

18 exposed to his human spit.  That's assault because if he

19 has some kind of disease, we can catch that, and then I

20 take it home to my wife, and they take it home to their

21 wives, and so on.  That's assault.  If we get spit on

22 and it goes in their system, that's assault.

23 Q.      Did you put on your warrant that he spit at

24 every individual officer there and --

25 A.      I believe I charged him with assault of an

1  officer four or five times, yes, sir.

2  Q.       Let me finish my question --

3  A.       Yes, sir.

4  Q.       -- so we don't talk over each other.

5           But did you put in your -- in your warrant that

6  he spit on every individual officer there and that's why

7  you were charging him with assault?

8  A.       I don't recall what I put in my warrant.

9  Q.       So after you did your paperwork, what did you

10 do?

11 A.       I would assume I went back on patrol.  I

12 don't -- I don't recall really what I did.

13 Q.       Do you recall staying around the jail the next

14 day?

15 A.       No, sir.

16 Q.       You weren't there the next morning?

17 A.       No, sir.

18 Q.       Okay.  What time did you get off?

19 A.       If I was -- I come in at 11:00, so 7:00.

20 Q.       You got off at 7:00?

21 A.       Would have been 7:00, yes, sir.

22 Q.       And you don't remember when Nurse Willoughby

23 came to the jail?

24 A.       I remember speaking with Nurse Willoughby, but

25 I don't remember why I was there.  I don't know if I was

1  finishing my paperwork.  Because her office and the jail

2  are connected --

3  Q.       All right.

4  A.       -- so if I had left my car parked there or

5  something, I may have passed her or something at that

6  point.  But I don't remember being back inside the jail.

7  No, sir.

8  Q.       But you do remember the nurse coming into work

9  at 6:00 or 7:00 a.m. that morning; right?

10  A.       Yes, sir.

11  Q.       And did you tell her at that point in time that

12  you had a man that was severely injured in the solitary

13  cell?

14  A.       I let her know what had happened that night.  I

15  don't know if I worded it like that.

16  Q.       What did you tell her?

17  A.       That we got in an altercation and I knew that

18  his nose was busted because he was bleeding.

19  Q.       And did you show -- show her a picture?

20  A.       I don't recall if I showed her a picture.  I

21  don't know, sir.

22  Q.       You don't recall showing her a picture and

23  saying to her -- her, "This busted nose is" -- "is

24  courtesy of me"?

25  A.       No, sir, I don't recall.

1  Q.      So you just thought that you'd busted his nose?

2  A.      Yes, sir.

3  Q.      And that there was no other injuries other than

4  that?

5  A.      Yes, sir.

6  Q.      And did you see him when he came out of the --

7  of the cell?

8  A.      Like the next day?

9  Q.      Yeah.

10 A.      No, sir.

11 Q.      Okay.  So you didn't see Officer Joel Boyer

12 taking him to the hospital?

13 A.      No, sir, I wasn't there.

14 Q.      All right.  And you weren't there when -- when

15 the nurse -- when -- when Joel Boyer finally said you

16 need to go check on this guy?

17 A.      No, sir, I wasn't there.

18 Q.      Sean Brown didn't tell her to go check on the

19 guy; right?

20 A.      Yes, sir.

21 Q.      You didn't tell her to go check on the guy;

22 right?

23 A.      I let her know what had happened, but I didn't

24 say, "Hey, you need to go in there and check on him,"

25 no.

1  Q.       You just said he had a busted nose?

2  A.       Yes, sir.

3  Q.       Right?

4  A.       That's all that I knew of.

5  Q.       And had you checked on him after you had put

6  him in the -- into the solitary cell that evening -- I

7  think you all dropped him in the cell about 1:00 --

8  1:00 a.m.; right?

9  A.       When -- like when I walked out after taking his

10 handcuffs, did I check on him again?  Is that what

11 you're asking?

12 Q.       Right.  Right.

13 A.       No, sir.

14 Q.       So you all dropped him in the cell about

15 1:00 a.m.; right?

16 A.       I don't remember what time it was, no, sir.

17 Q.       All right.  Just assume that it was about

18 1:00 a.m.  Okay?

19 A.       That's fine, yes, sir.

20 Q.       And to your knowledge, you never said anything

21 to Sean Brown or anybody else?  We ought to keep an eye

22 on that guy?

23 A.       No, sir.

24 Q.       All right.  And to your knowledge, nobody ever

25 did?

1   A.        Not that I'm -- I couldn't answer because I

2   wasn't there.

3   Q.        Okay.  And when you all laid him down into that

4   solitary cell, he was basically unconscious, wasn't he?

5   A.        He wasn't moving around, no, sir.

6   Q.        Did you have any more conversations with him?

7   A.        No, sir.

8   Q.        Did he respond at all?

9   A.        I didn't say anything to him at that time,

10  so --

11  Q.        Did you see the video for the rest of the

12  evening where he didn't move?

13  A.        I think you showed it to me in deposition, but

14  I don't want to say yes because I don't --

15  Q.        Okay.

16  A.        -- really recall.

17  Q.        Okay.  And you told me in your deposition that

18  you felt it was seriously abusive to put a nearly

19  unconscious man in serious need of medical treatment in

20  a cell till the next morning?

21  A.        I don't recall that, but if that's what you're

22  saying I said, then I agree.

23  Q.        Would you like to see it?

24  A.        If -- if -- if that's what you're saying I

25  said, then I agree with you.

1  Q.      Okay.  I think you told us earlier that you got

2  a responsibility as an officer to stop abuse if

3  somebody -- if -- if you see another officer abusing

4  someone; right?

5  A.      Yes, sir.

6  Q.      And you didn't try to stop any of it?

7  A.      No, sir.

8  Q.      All right.  And you actually have -- have an

9  obligation or a duty to report abuse of an officer,

10 don't you?

11 A.      Yes, sir.

12 Q.      You never filed any reports of any abuse that

13 evening?

14 A.      No, sir.

15 Q.      Correct?

16         This matter was investigated by the Tennessee

17 Bureau of Investigation; correct?

18 A.      Yes, sir.

19 Q.      And that was the first -- was that the first

20 time that you were aware that anybody was doing an

21 investigation?

22 A.      I don't recall for sure, but I think so, yes,

23 sir.

24 Q.      Well -- all right.  So let -- let me back you

25 up.  So do you recall whether anybody from the jail, the

1  sheriff -- let me -- let me step back just a second.

2  Let's pull up Exhibit 56, if we could, Joseph.

3  So is this a picture of the chain of command

4  with the sheriff's department when you worked there?

5  A.  Yes, I believe so.

6  Q.  All right, sir.  And basically, it shows Robbie

7  Goins is the sheriff, Jeremy Goins is chief deputy on

8  the left?

9  A.  Yes, sir.

10 Q.  Stoney Love, the chief jailer on the right;

11 right?

12 A.  Yes, sir.

13 Q.  All right.  So you fell under the umbrella of

14 Jeremy Goins, chief deputy; right?

15 A.  Yes, sir.

16 Q.  And your immediate supervisor, as you said, was

17 Michael Owens?

18 A.  Yes, sir.

19 Q.  And above that was Lieutenant Matt Wasson;

20 right?

21 A.  Yes, sir.

22 Q.  And so did any of these individuals above

23 you -- Mike Owens, Matt Wasson, Jeremy Goins, or Robbie

24 Goins -- ever sit you down and say we need to

25 investigate what happened that night and I want to

1  know --

2  A.        No, sir.

3  Q.        Nobody interviewed you, did you -- from -- from

4  the sheriff's --

5  A.        No.

6  Q.        -- department?

7  A.        No, sir.

8  Q.        So why is it you think that the TBI got

9  involved?

10 A.        I have no idea, sir.  I don't -- I don't know.

11 Q.        Had you ever been -- I'm sorry.  I don't -- my

12 apologies.

13           Had you -- had you ever been investigated by

14 the Tennessee Bureau of Investigation before?

15 A.        No, sir.

16 Q.        And so when that happened, what was your

17 response?

18 A.        I was going to -- sorry.  I was going to

19 cooperate with whatever they needed from me.  That's --

20 Q.        Okay.

21 A.        -- cooperation.  You have to --

22 Q.        Well, you were pretty upset that evening,

23 weren't you?

24 A.        Which evening?

25 Q.        The evening that it happened.

1  A.        Oh, like the next morning?

2  Q.        No.  No, the evening right after it happened.

3  Didn't you start texting Michael Owens?

4  A.        Oh, yes, sir.  I don't recall what I was upset

5  about, but yes, I was upset.

6  Q.        Okay.  Well, let's -- let's look at that.

7            That's going to be Exhibit Number 12, I

8  believe.  What did we say, Joseph?

9            Have you seen this series of text messages

10 before?

11 A.        Yes, sir.

12 Q.        And these are text messages between you and

13 your sergeant, Michael Owens; correct?

14 A.        Yes, sir.

15           MR. SEATON:  All right.  And if you'll just

16 scroll through it real quickly, Joseph, to let him look

17 through there and make certain that these are --

18           (Off-the-record discussion between counsel.)

19           MR. SEATON:  I'm going to let him look through

20 it first.  All right.  Let's go back to the -- the top.

21 BY MR. SEATON:

22 Q.        So these were your text messages?

23 A.        Yes, sir.

24 Q.        And the text messages were gotten by the TBI;

25 right?

1    A.        I would assume so, yes, sir.

2    Q.        So they came when they were doing their

3    investigation and said, hey, I want to see your phone,

4    and I want to see your supervisors's phone; right?

5    A.        They wrote a search warrant for them, and I

6    just gave them to them, and they did what they needed to

7    do.

8    Q.        All right.  And is this an accurate reflection

9    of the messages going on between you and the supervisor?

10   A.        Yes, sir.

11            MR. SEATON:  We would publish that, Your Honor,

12   as Exhibit Number 12.

13            MR. KNIGHT:  No objection, Your Honor.

14            THE COURT:  All right.  So ordered without

15   objection.

16            (Plaintiff's Exhibit 12

17            received into evidence.)

18   BY MR. SEATON:

19   Q.        All right.  Let's try to run through it real

20   quickly.  What we've tried to do is to highlight what

21   you said in yellow and highlight what he said in orange.

22            His cell phone -- or your cell phone was the

23   494-1139; correct?

24   A.        Yes, sir.

25   Q.        And his cell phone was the 201-5424; right?

 1   A.        I guess.  I don't know his number by heart.

 2   Q.        All right.  Fair enough.

 3             So the time period here is it's -- it's

 4   February the 6th -- or the time stamp is February

 5   the 6th of 2019 -- no.  Excuse me.  June the 2nd.  It

 6   goes backwards; right?

 7   A.        I guess so.  I'm not sure.

 8   Q.        All right.  So that would make sense; right?

 9   A.        Yeah, that would make more sense.  Yes, sir.

10   Q.        Okay.  So at -- at June -- on June the 2nd at

11   2019, at 5:07 Greenwich Mean Time -- okay.  That's

12   midnight.  We're five hours --

13   A.        Oh, I thought it meant like military time.

14   Q.        Right.

15             So at a little -- a little after -- a little

16   after midnight, you send Sergeant Owens a text, and you

17   say what?

18   A.        "Well, Sergeant, I done the damn thing."

19   Q.        And he says, "Fuck him"; right?

20   A.        Yes, sir, that's what we said.

21   Q.        And he says, "Was he bleeding in the back of

22   the car, or was that all snot and shit?"

23             And what did you say?

24   A.        I said, "I'm not sure.  I'm getting the back of

25   my car cleaned anyway just in case."

1    Q.        "Good."

2    A.        You want me to --

3    Q.        Yeah, keep going.

4    A.        "I know I punched him and it was like a

5    waterfall of blood."

6    Q.        He said, "Does the girl calm down?"

7    A.        And I said, "Yes, she finally quit."

8    Q.        And what did you say?

9    A.        Is that top one mine or --

10   Q.        Yes, I think so.

11   A.        I said, "Fuck, man.  Talk about a sick stomach.

12   That will kill a man's day."

13   Q.        What was that all about?

14   A.        Well, obviously I wasn't happy about what had

15   happened.

16   Q.        Okay.  And he said, "Yeah, I agree.  It's

17   probably the meth to be honest.  You can't hit someone

18   like that and give them brain damage."

19             And what did you say?

20   A.        I said, "Why fuck no.  Sergeant said the only

21   reason that they got in trouble is because of that

22   stupid Eric Jones bullshit Mallory is still on."

23   Q.        Okay.  "I agree.  And I hate for any of them to

24   get in trouble because" -- "'cause fuck that I know of,

25   they didn't do shit wrong"; right?

1    A.       Yes, sir.

2    Q.       And then your response?

3    A.       "No, none of" -- I think I meant "us" -- "did.

4    He was hopped up on meth and wouldn't stop.  He was

5    responsive and everything.  And his nose was busted, not

6    broke or anything.  There's no point in taking him to

7    the hospital."

8    Q.       And there wasn't any -- any mention in any

9    reports or by any officers that there was any meth

10   involved, any alcohol involved, or any marijuana

11   involved; correct?

12   A.       No, sir.

13   Q.       Okay.  So let's keep going.

14            So "LMAO.  Fuck that guy."  Who said that?

15   A.       I'm assuming that's -- that's Sergeant Owens.

16            MR. SEATON:  All right.  Keep going.

17   BY MR. SEATON:

18   Q.       So this is Sergeant Owens.  "Play stupid games,

19   win stupid prizes.  Welcome to Tennessee."

20            What's he mean?

21   A.       I couldn't speak for him, sir.

22   Q.       Okay.  You said what?

23   A.       "I agree, but damn, I thought I was going to

24   get fired or some shit."

25            That next one is mine too?

1  Q.      Yep.

2  A.      I said, "Damn, man.  Dakota needs to not tell

3  me that shit.  Did Douglas get ahold of you?"

4  Q.      He said, "Yes."

5          You said?

6  A.      Is that next one mine?

7  Q.      Yeah.

8  A.      I said, "10-4.  He getting it took care of.

9  What can I say" -- "What can I say, though?  I take

10 after my sarge when it comes to fighting."

11 Q.      Tell us what you mean by that.

12 A.      It was just a distasteful text message between

13 two friends.

14 Q.      Well, what does it mean when I -- when it -- it

15 says, "I take after my sergeant when it comes to

16 fighting"?

17 A.      Like I said, it's just a distasteful text

18 message between two friends.

19 Q.      But what does it mean?

20 A.      I mean, nothing particular.

21 Q.      Well, are you --

22 A.      I mean --

23 Q.      Were you both -- were -- you both have a

24 reputation of being big fighters in the jail?

25 A.      Not particularly, no, sir.

1    Q.        Well, you had to reference something about your

2    sergeant being a fighter; right?

3    A.        I would assume so, yes, sir.

4              MR. SEATON:  Okay.  Let's go, Joseph.

5    BY MR. SEATON:

6    Q.        "Don't say another word to a soul about what

7    happened the other night."

8              That's him saying that to you -- your

9    supervisor saying that to you; right?

10   A.        Yeah.

11   Q.        And what did you say?

12   A.        I said, "I'm fine with that.  I'm sick of

13   hearing about it."

14   Q.        And then he says, "The fucking jail nurse has

15   already wrote a statement about a statement you made and

16   showing that pic you took"; right?

17   A.        Yeah.

18   Q.        The pic was the one we showed that -- where you

19   were taking him in -- in the -- in the -- in the trap

20   room or the search room; right?

21   A.        Yes, sir.

22   Q.        All right.  And then you say, "What the fuck.

23   I'll have to call you later."

24             And then the supervisor says, "I need you to

25   print every picture you took.  They have you on video

1  taking pictures"; right?

2  A.        Yeah.

3  Q.        What did you respond?

4  A.        I said, "Damn, man.  I only took that one, I

5  swear to God.  I swear to you, Sergeant.  And I even

6  deleted it.  It's like" -- "it's in my deleted photos."

7          MR. SEATON:  Keep going, Joseph.

8  BY MR. SEATON:

9  Q.        Then you say?

10  A.        "Dude, I'm freaking the fuck out."

11  Q.        And he says, "I swear to God" -- or no, you --

12  this is you.  Continue.  Go ahead.

13  A.        "I swear to God, I" -- "I only took that one

14  picture."

15  Q.        And it says, "Don't freak out."  And then he --

16  and that's you; right?

17  A.        Yes, sir.

18  Q.        You say?

19  A.        "Just call me as soon as possible.  This is new

20  to me and it's hard for me not to freak out.  I

21  literally just took one picture.  I swear."

22  Q.        And he says, "Ha ha.  Chill out.  A busted nose

23  didn't cause brain damage."

24          And then he says what?

25  A.        "We're just covering our asses."

1  Q.        What do you think your supervisor was telling

2  you at that point in time?

3  A.        I just took it after that this was -- this was

4  normal protocol that I was having to do these things.

5  Q.        So it's normal protocol to cover your asses?

6  A.        I mean, some people call it covering your ass

7  when you go by protocol, yes, sir.

8  Q.        Okay.  Is that appropriate as -- as an officer?

9  A.        Probably not, but this is on a personal cell

10  phone between -- between two friends, so --

11  Q.        All right.

12  A.        -- it wasn't in a professional --

13  Q.        Well, you're saying that it's untruthful stuff?

14  A.        No, I'm saying it -- it -- it -- it was two

15  friends texting on my personal cell phone and his

16  personal cell phone.  We wasn't in a professional

17  setting at the time.

18  Q.        Okay.  But it tells the people of the jury what

19  your all's intent were, doesn't it?

20  A.        Yeah, I guess.

21  Q.        Okay.  And you say -- let's see.  I guess this

22  is you.

23  A.        Is that next one mine?

24  Q.        Yeah.

25  A.        "I know, man.  But that freaked me out.  I

1  swear to you that was the only picture I took."

2  Q.        And he said, "They watched the video and said

3  you were good.  Just making statements to people about

4  it is your only issue, but not a huge deal.  Just don't

5  talk to anyone anymore."

6          And I think that's the end of it; right?

7  A.        If that's it, yes, sir.

8          MR. SEATON:  All right.  You can pull that

9  down.

10  BY MR. SEATON:

11  Q.        Sergeant Michael Owens, do you still stay real

12  tight with him?

13  A.        No, sir.

14  Q.        Not at all?

15  A.        I don't hardly talk to anybody that I used to

16  work with anymore.

17  Q.        All right.

18  A.        Once everything happened, I separated myself

19  from everyone.

20  Q.        Okay.  And are you aware that he is now

21  Campbell County Jail superintendent of the entire jail?

22  A.        No, sir.

23  Q.        You weren't aware of that.

24          Now, you weren't terminated because of this,

25  were you?

1  A.      No, sir.

2  Q.      You weren't disciplined?

3  A.      No, sir.

4  Q.      You weren't even written up?

5  A.      Not that I recall, no, sir.

6  Q.      And it was only after the TBI did the

7  investigation that you were charged; right?

8  A.      Yes, sir.

9  Q.      And after you were charged -- what were you

10  charged with?

11  A.      Aggravated assault and official oppression.

12  Q.      Okay.  Aggravated assault against Nathan Ling?

13  A.      Yes, sir.

14  Q.      And what does "official oppression" mean?

15  A.      I've not really looked into it too much, but I

16  think it's almost like official misconduct.

17  Q.      Abusing your position as an officer?

18  A.      Yes, sir.

19  Q.      All right, sir.  And after you pled guilty to

20  that, they sentenced you to 90 -- 91 days?

21  A.      Yes, I served 91 days.  Yes, sir.

22  Q.      You served 91 days.

23          And you did -- you were able to do that at the

24  county to which you wanted to pick; right?

25  A.      I believe so.  At -- I wanted to go to Scott

1   County, yes, sir.

2   Q.      So you were able to pick where you went to jail

3   at Scott County; right?

4   A.      Yes, sir.

5   Q.      And you were able to do work release -- you

6   said 60, 80 hours a week -- and just go report to the

7   jail and -- and spend the night there; right?

8   A.      I spent every bit of my time there except when

9   I was at work, yes, sir.

10  Q.      Well, how much -- I think you told me you

11  worked 80 hours per week, seven days per week; right?

12  A.      If they asked me to work, I worked.  I mean,

13  it -- we -- I worked in a factory, so anybody who works

14  at a factory knows that you never stop working.  It's

15  every day, every hour, every bit that they can squeeze

16  out of you, you work.

17  Q.      But 80 hours a week is going to be about

18  12 hours a day; right?

19  A.      It was normally, yeah.

20  Q.      So you were able to go do your work, spend the

21  night there.  That's all you had to do?

22  A.      The whole day there 'cause I worked night

23  shift.

24          MR. SEATON:  Okay.  If I can have just a

25  second, Your Honor?

1          THE COURT:  Yes, sir.

2    BY MR. SEATON:

3    Q.        Do you know -- you -- you said that you filled

4    out the warrants on Ling?

5    A.        Yeah, I filled out some of them.  I don't know

6    if those were the only charges brought before him, no.

7    Q.        And did you prosecute him?

8    A.        I think the charges were dropped.

9    Q.        Why were the charges dropped?

10   A.        The district attorney's office didn't inform me

11   of that.

12   Q.        Okay.  All right.  Answer any questions

13   Mr. Knight has.

14           THE COURT:  I'm going -- I'm going to take our

15   afternoon break.  It's 3:20.  Let's take a break.  Try

16   to come back -- I've got 3:19.  Let's get started about

17   3:30, maybe a minute or two after that, and then try to

18   wrap up for the day about 5:00.

19           (The proceedings were held outside the

20           presence of the jury, as follows:)

21           THE COURT:  Have a seat.  Have a seat, please.

22           Ms. Laster, hand -- hand a copy of that to

23   Mr. Seaton and a copy of that to Mr. Knight.

24           Gentlemen, I know you've reviewed this, but

25   just as a refresher, that's one of our local rules.

1  Let's read them again and make sure that we follow them

2  if we can.  All right?

3          MR. SEATON:  What -- what am I doing wrong?

4          THE COURT:  I'm sorry?

5          MR. SEATON:  What am I doing wrong?

6          THE COURT:  Look --

7          MR. SEATON:  I know I --

8          THE COURT:  -- gentlemen, first of all, we're

9  going to stay behind the podium.

10         MR. SEATON:  Okay.

11         THE COURT:  I can't hear when you walk out from

12  behind the podium.

13         MR. SEATON:  Yes, sir.

14         THE COURT:  You look at that.  We're going to

15  stay behind the podium.  There's reasons for that.

16         MR. SEATON:  I understand.

17         THE COURT:  There's a microphone there.  It

18  records what you have to say.  I can hear it.  The court

19  reporter can hear it.  The jury can hear it.  The

20  audience can hear it.  Those are there for a reason.

21  Okay, Mr. Seaton?

22         MR. SEATON:  I am not arguing.

23         THE COURT:  Mr. Knight, no more facial

24  expressions.  Understood?

25         MR. KNIGHT:  Understood.

1            THE COURT:  All right.  Gentlemen, it's federal
2    court.  Let's act like we're in federal court.
3            MR. SEATON:  I understand that, Your Honor.
4    And I apologize.  I just -- sometimes I -- you know, you
5    just get disconnected.  And I don't mind you all fussing
6    at me.
7            THE COURT:  Understood.  Understood.
8            MR. SEATON:  Yeah.
9            THE COURT:  Now, don't speak to anyone.  No
10   one's to speak to you until you get back on the stand
11   and they ask you questions.  All right?
12           THE WITNESS:  Yes, sir.
13           THE COURT:  All right.  Let's adjourn court.
14           (Brief recess.)
15           THE COURT:  All right.  Are we ready for the
16   jury?
17           MR. SEATON:  Yes, Your Honor.
18           THE COURT:  All right.
19           (The proceedings were held in the presence of
20           the jury, as follows:)
21           THE COURT:  All right.  Please be seated.
22           Mr. Knight, are you ready for
23   cross-examination?
24           MR. KNIGHT:  Yes, Your Honor.
25           THE COURT:  Whenever you're ready.

1     CROSS-EXAMINATION

2   BY MR. KNIGHT:

3   Q.       Mr. Crabtree, what shift were you working that

4   night?

5   A.       Third shift.

6   Q.       And third shift, that's 11:00 to 7:00?

7   A.       11:00 to 7:00, yes, sir.

8   Q.       11:00 p.m. to 7:00 a.m. in the morning?

9   A.       Yes, sir.

10  Q.       And you were called to this residence; is that

11  correct?

12  A.       Yes, sir.

13  Q.       And you encountered a red Ford Focus; is that

14  correct?

15  A.       I don't recall what color and what type of

16  vehicle it was.

17  Q.       It -- it contained Mr. Ling, Ms. McDaniel, and

18  a juvenile; correct?

19  A.       Yes, sir.

20  Q.       And is it your understanding that the vehicle

21  came back stolen?

22  A.       Yes, sir, it did come back stolen.

23  Q.       And did it come to -- is it your understanding

24  that Mr. Ling, once he found out that you all knew that

25  he had charges against him in Michigan, fled on foot?

1  A.        He did.  The dispatcher notified them, and they

2  immediately after said he was running.

3  Q.        Okay.  And did you give chase?

4  A.        I did not give chase, no, sir.

5  Q.        Did you see John Minor give chase?

6  A.        I did not, sir.

7  Q.        Okay.  Now, at the time that you were on duty

8  in -- on third shift in June 2019, you were

9  POST-certified; correct?

10 A.        I was, yes, sir.

11 Q.        You had been to Walter State Police Academy;

12 correct?

13 A.        Yes, sir.

14 Q.        And you had done your 40 hours of in-service

15 training; correct?

16 A.        Yes, sir.

17 Q.        And that met all the requirements Tennessee law

18 spells out to be a police officer?

19 A.        Yes, sir.

20 Q.        Is that correct?

21 A.        Yes, sir, correct.

22 Q.        You're no longer a police officer, are you?

23 A.        No, sir.

24 Q.        You can't be a police officer, can you?

25 A.        No.  My POST certification is gone.  I -- I

1   surrendered it.

2   Q.        You are no longer certified?

3   A.        No, I surrendered my certification.

4   Q.        Okay.  Now, I was looking at that video again.

5   And when you pulled Mr. Ling from the vehicle --

6   A.        Yes, sir.

7   Q.        -- would you please tell the jury what Mr. Ling

8   had done up until that point?

9   A.        At that point from when we put him into the

10  back of the vehicle and until the time that I'd got him

11  to the jail, he had kicked and screamed and -- do you

12  want me to say --

13  Q.        I want you to say what he said.

14  A.        "Fuck you.  Let me out of here.  Fuck you.  Let

15  me out of here" and continued to kick and scream and

16  yell the whole way there, which, thus, is why he was

17  laying the way that he was when I pulled him out of the

18  vehicle.

19  Q.        Now, at some point out at the point of arrest,

20  I'll call it "out in the field," an ambulance was

21  called; correct?

22  A.        Yes, sir.

23  Q.        And I think there was some conjecture back and

24  forth whether or not Mr. Ling had run into the back of a

25  truck.  Regardless, he had an abrasion on his forehead;

1  correct?

2  A.      By "abrasion," you mean like a bump, not --

3  Q.      Yeah, whatever.

4  A.      Yes, sir.  It wasn't bleeding, but it was

5  swelled up.  Yes, sir.

6  Q.      Okay.  And the ambulance was called to check

7  him out; correct?

8  A.      Yes, sir.

9  Q.      And did Mr. -- how did Mr. Ling react to the

10  ambulance coming to check him out?

11  A.      He wasn't very happy about it.  He kicked,

12  screamed, tried to bite them at one point, and I believe

13  that's when Sergeant Owens pepper sprayed him.

14  Q.      Okay.  And did you call the ambulance --

15  A.      I don't recall.

16  Q.      -- out to the scene, or do you remember?

17  A.      I -- I don't recall.

18  Q.      Okay.  Now, back to the sally port.  When you

19  were -- before you got to the sally port, was Mr. Ling

20  saying anything to you on the ride to the jail?

21  A.      Like I'd referred to earlier, he'd say, you

22  know, "fuck me.  Let me out of here.  Fuck me.  Let me

23  out of here" and continued to kick my windows.  But --

24  Q.      Okay.

25  A.      But in terms of like a personal conversation, I

1  don't recall.

2  Q.       Now, when you -- you saw the video where you

3  pulled him out of -- of the vehicle in the sally port;

4  correct?

5  A.       Yes, sir.

6  Q.       Were you upset?

7  A.       Yes, sir.

8  Q.       Were you mad at Mr. Ling?

9  A.       I -- I was pretty upset at the time, yes, sir.

10 Q.       Okay.  And there's no definitive showing of you

11 hitting Mr. Ling or -- or pushing Mr. Ling into the

12 wall.  There apparently is a red ladder there.  But my

13 understanding from your testimony is that it was a

14 possibility; correct?

15 A.       Yeah, but it wasn't his head.  I know for sure

16 I didn't put his head against that wall.

17 Q.       Okay.  You threw him in the search trap;

18 correct?

19 A.       Yes, sir.

20 Q.       And with regard to the corrections officers who

21 were waiting for you at the sally port, were you the one

22 who radioed to them to say that you had a combative

23 inmate on the way?

24 A.       Yes, sir, I let them know as I was pulling in.

25 Q.       Okay.  And you had control of Mr. Ling;

1    correct?

2    A.        Yeah, he couldn't go anywhere.  He was there in

3    the back seat of my car.

4    Q.        Those corrections officers, they weren't going

5    to intervene, were they?

6    A.        They didn't appear to, no.

7    Q.        Okay.  You wouldn't have let them intervene,

8    would you?

9    A.        If I could handle it on my own without them

10   having to worry about it, yes, sir, I -- I was going to

11   try and handle it myself.

12   Q.        And you did handle it on your own, didn't you?

13   A.        Yes, sir.

14   Q.        You handled it on your own when you went into

15   the search trap; correct?

16   A.        Yes, sir.

17   Q.        And when Mr. Ling's face or head went into the

18   counter, that was you; correct?

19   A.        Yes, sir.

20   Q.        And the officer -- the corrections officers

21   were there; correct?

22   A.        Yes, sir.

23   Q.        And is it fair to say that the -- well, the

24   corrections officers, they weren't on the scene;

25   correct?

1   A.      No, sir.

2   Q.      So they had no idea what they were going to

3   expect?

4   A.      No.  No, sir.

5   Q.      All right.  You were asked a series of

6   questions, whether or not you could have or should have

7   called an ambulance at the jail.  Do you recall that?

8   A.      Yes, sir.

9   Q.      And I believe we've talked about the last time

10  you tried to call an ambulance for Mr. Ling; correct?

11  A.      Yes, sir.

12  Q.      And as we sit here today, seeing that

13  videotape, is it your testimony that you only thought

14  that the blood was present because of the punches to the

15  nose?

16  A.      Yes, sir.

17  Q.      And how many punches to the nose did you give

18  Mr. Ling?

19  A.      Two.

20  Q.      That was inappropriate, wasn't it?

21  A.      Inappropriate?

22  Q.      Yes.

23  A.      Yes, sir.

24  Q.      You weren't trained to do that, were you?

25  A.      No, sir.

1   Q.      In fact, when you go through basic police

2   school, you're trained in defensive tactics; correct?

3   A.      Yes, sir.

4   Q.      And that's the force continuum; correct?

5   A.      Yes, sir.

6   Q.      Explain to the jury what the force continuum

7   is.

8   A.      I don't recall what it was particularly at this

9   time.  I mean, I --

10  Q.      Well, it -- does it include punching somebody

11  in the face?

12  A.      No, sir.

13  Q.      Officer presence?  Do you recall that?

14  A.      Yes, sir.

15  Q.      That if an officer is present, then some --

16  then the person ought to respect authority and follow

17  what the officer has to say; correct?

18  A.      Yes, sir.

19  Q.      Mr. Ling didn't do that, did he?

20  A.      No, sir.

21  Q.      And do you recall open hand controls?

22  A.      I don't, no, sir.

23  Q.      When you're using your open hand to -- or -- or

24  hitting on pressure points of someone's body?

25  A.      Oh, yeah, like when I lifted his arms up to

 1   keep him from going backwards to keep him leaning

 2   forward on the counter.  Yes, sir.

 3   Q.      Okay.  And also in police school, you're

 4   taught, you know, to respect people's constitutional

 5   rights; correct?

 6   A.      Yes, sir.

 7   Q.      And respect the laws of the state of Tennessee

 8   and United States; is that correct?

 9   A.      Yes, sir.

10   Q.      And this is an eight-week course; correct?

11   A.      Yes, sir.

12   Q.      And you're continually trained throughout the

13   year for 40 hours; correct?

14   A.      Yes, sir.

15   Q.      On those -- whatever subjects are being taught;

16   correct?

17   A.      Yes, sir.

18   Q.      And that may be certification of the use of a

19   Taser or the use of pepper spray.  You have to be

20   qualified on firearms, don't you?

21   A.      Yes, sir.

22   Q.      Now, Mr. Crabtree, after the TBI investigation,

23   you were criminally charged; correct?

24   A.      Yes, sir.

25   Q.      Aggravated assault; correct?

1    A.        Yes, sir.

2    Q.        And whether it was official misconduct or

3    official oppression, we don't know; correct?

4    A.        It was official oppression for sure.  I just --

5    I don't know what the exact --

6    Q.        Well, the prosecutor charged you; correct?

7    A.        Yes, sir.

8    Q.        And we're talking about a district attorney;

9    correct?

10   A.        Yes, sir.

11   Q.        And he took it to a grand jury, and you were

12   charged; correct?

13   A.        Yes, sir.

14   Q.        And it was the prosecutor who decided on your

15   sentence; correct?

16   A.        Yes, sir, I believe.

17   Q.        It was the prosecutor who decided that you

18   spent 91 days in jail; correct?

19   A.        It was supposed to be 90.  They mistyped, I

20   think, and it was an extra day added on.

21   Q.        So you got one extra day?

22   A.        I got one extra day, yes, sir.

23   Q.        And it was the prosecutor who allowed you to

24   spend your time where you wanted to spend your time;

25   correct?

1   A.        Yeah, they agreed to that in the work release

2   so I wouldn't lose my house and I was able to pay my

3   bills.

4   Q.        Okay.  Do you recall when you were sentenced,

5   Mr. Crabtree?

6   A.        Like what happened that day?

7   Q.        Yeah.  Well, people testifying for and against

8   you.

9   A.        I do.

10  Q.        Mr. Ling was there, wasn't he?

11  A.        I believe so, yes, sir.

12  Q.        He's not here today, though, is he?

13  A.        I don't --

14  Q.        Do you see him?

15  A.        -- see him.  No, sir.  But he looked different

16  that day than what I recall him being.  So if he was

17  here, I'm -- I'm not sure I would recognize him.

18  Q.        So he was able to find the person that caused

19  all the damage and testify against you; correct?

20  A.        He did testify against me, yes, sir.

21  Q.        There was some mention of -- of illicit drugs,

22  methamphetamine or -- or something that may have been

23  ingested by Mr. Ling?

24  A.        Yes, sir.

25  Q.        Did Mr. Ling possess some -- some kind of

1  superhuman strength during this time?

2  A.        Not that I'm aware of, but sometimes you deal

3  with people that just -- they're -- they move around

4  like that I guess is the way that I'd word it.  I

5  mean --

6  Q.        Was he strong?

7  A.        I can't say if he was or not.  I mean, he -- he

8  was able to move when we had ahold of him, so --

9  Q.        Okay.  And I think at various times in that

10  video that we've seen over and over again, there are

11  periods of time where he's moving and when he's not

12  moving; correct?

13  A.        Yes.  Yes, sir.

14  Q.        Is it fair to say that when he's moving, it's

15  capable of being resistance; correct?

16  A.        Oh, yeah, 'cause he was moving the people that

17  was on top of him, which I think at the time was --

18  Q.        Of course, we don't know for sure because we

19  can't ask Mr. Ling what his intent was?

20  A.        No, sir.

21  Q.        But he was moving; correct?

22  A.        Yes, sir.

23  Q.        And that's your job in terms of you're there to

24  make sure everything is under control; is that correct?

25  A.        Yes, sir.

1   Q.        One of the exhibits that you were shown --

2             (Off-the-record discussion between counsel.)

3             MR. KNIGHT:  I can't remember the number of it.

4             MR. SEATON:  56.

5             MR. KNIGHT:  56.  I think it's been published

6   to the jury.

7   BY MR. KNIGHT:

8   Q.        This is the former administration of Campbell

9   County; is that correct?

10  A.        Yes, sir.

11  Q.        That's the former sheriff; correct?

12  A.        Yes, sir.

13  Q.        He was the sheriff at the time, but he's no

14  longer sheriff; correct?

15  A.        No, sir.

16  Q.        And when you're talking about deputy sheriffs,

17  officers, you're listed -- your picture's there, Dakota

18  Williams' picture is there.  But what we haven't seen is

19  that there are 12 other deputies; correct?

20  A.        Yes, sir.

21  Q.        And Mr. Owens, who is --

22            THE COURT:  Mr. Knight.

23  BY MR. KNIGHT:

24  Q.        -- who is a friend of yours --

25            THE COURT:  Mr. Knight.

1    MR. KNIGHT:  I'm sorry.

2    THE COURT:  If you'd like to bring that up

3  closer to -- you can certainly do that.  It's also an

4  exhibit that you can have published to them.  It's --

5  there's an electronic version.  This is why we use the

6  electronic system.

7    MR. KNIGHT:  Okay.

8    THE COURT:  You can bring the -- the easel up

9  if you'd like.

10  BY MR. KNIGHT:

11  Q.    Okay.  Can you see that, Mr. Crabtree?

12  A.    Yes, sir.

13  Q.    This is Exhibit 55.

14    In addition to your friend, Mr. Owens, there

15  are three other sergeants; correct?

16  A.    Yes, sir.

17  Q.    And then above him, there's a lieutenant;

18  correct?

19  A.    Yes, sir.

20  Q.    And then above him, there is an unfilled

21  position of captain; correct?

22  A.    Yes, sir.

23  Q.    Then there's a chief deputy; correct?

24  A.    Yes, sir.

25  Q.    Then on the jail side, we've heard from

1  Mr. Standridge, and I believe Mr. Williams is on there.

2  But there are 27 other officers; correct?

3  A.        Yes, sir.

4  Q.        And there are three other corporals other than

5  Sean Brown; correct?

6  A.        Yes, sir.

7  Q.        And then there's -- Catie Wilson at the time

8  was a sergeant; correct?

9  A.        Yes, sir.

10  Q.        And then Lieutenant Mallory Campbell is above

11  Ms. Wilson; correct?

12  A.        Yes, sir.

13  Q.        And then the jail administrator at the time was

14  Stoney Love; correct?

15  A.        Yes, sir.

16  Q.        Okay.  Does that comprise the administration at

17  the time?

18  A.        Like, does that -- is that who was there?

19  Q.        Yes.

20  A.        Yes, sir.

21  Q.        Do you have any familiarity with what training

22  these correction officers went through or who did it?

23  A.        No, not really.

24  Q.        Okay.  This prosecution that you went through,

25  was it public?

1    A.    When I was prosecuted for my --

2    Q.    Yes.

3    A.    -- charges?  Yes, sir.  I mean, it was --

4    Q.    Was it before a judge?

5    A.    Yes, sir.

6    Q.    There's a district attorney there?

7    A.    Yes, sir.

8    Q.    You have a lawyer there?

9    A.    Yeah.

10   Q.    And there are witnesses there for and against

11   you; correct?

12   A.    Yes, sir.

13   Q.    But it was out in the public just like we are

14   here; correct?

15   A.    Yes, sir.

16   Q.    So people knew -- people, if they wanted to,

17   knew that you were being sentenced that day; correct?

18   A.    Yes, sir.

19         MR. KNIGHT:  Thank you.

20         THE COURT:  Thank you, Mr. Knight.

21         Any redirect?

22                    REDIRECT EXAMINATION

23   BY MR. SEATON:

24   Q.    Mr. Crabtree, there was no evidence whatsoever

25   that Mr. Ling had ingested or was involved in any drugs

1  or alcohol that night, was there?

2  A.      Not that I'm aware of, no, sir.

3  Q.      Thank you.  Thank you.

4                  RECROSS-EXAMINATION

5  BY MR. KNIGHT:

6  Q.      He was never tested, was he?

7  A.      Not that I'm aware of, no, sir.

8              THE COURT:  Thank you.

9              THE WITNESS:  Thank you, Your Honor.

10             THE COURT:  All right.  Call your next witness,

11 please.

12             MR. SEATON:  Sheriff Robbie Goins, Your Honor.

13             THE COURT:  All right.

14             MR. KNIGHT:  Your Honor, may we have a quick

15 sidebar, please?

16             THE COURT:  Certainly.  Does it affect bringing

17 this witness in?  Let's go ahead and bring our witness

18 in, get him sworn, and then -- please be seated.

19             (The witness was duly sworn.)

20             (A sidebar discussion was held between the

21             Court and counsel, outside the hearing of

22             the jury, as follows:)

23             MR. KNIGHT:  We're quitting at 5:00?

24             THE COURT:  Thereabouts.  I mean, I'm not going

25 to go much past 5:00.

1          MR. KNIGHT:  I mean, I don't know how long he's

2   going to take with Sheriff Goins, but we've got Stoney

3   Love out there, who's a former jail administrator.

4          MR. SEATON:  I don't think we'll get to him

5   'cause the sheriff will be here a little while.

6          MR. KNIGHT:  Should we let him go or -- Stoney,

7   or did they come together?  I don't know.

8          THE COURT:  It's --

9          MR. SEATON:  Just have him come back.

10         THE COURT:  You know, if -- if the witness is

11  almost finished and it goes past 5:00, then I'll let it

12  go so we can finish and -- and they can go about their

13  day, but if it's going to go a long time, we'll just

14  have to come back.

15         MR. SEATON:  What he's saying is we're going to

16  call --

17         THE COURT:  I understand --

18         MR. SEATON:  Okay.

19         THE COURT:  -- what he's saying.

20         MR. SEATON:  Okay.

21         THE COURT:  So I'm -- you know, but I -- I try

22  to quit around 5:00 'cause they've got stuff they need

23  to do.

24         MR. KNIGHT:  Yeah.  Sure.  Thank you.

25         THE COURT:  Thank you.

1          (At the conclusion of the sidebar conference,

2          the proceedings continued in open court as

3          follows:)

4          THE COURT:  All right.  Whenever you're ready,

5   Mr. Seaton.

6          MR. SEATON:  Thank you, Your Honor.

7                    ROBBIE GOINS,

8   called as a witness at the instance of the parties,

9   having been first duly sworn, was examined, and

10  testified as follows:

11                 DIRECT EXAMINATION

12  BY MR. SEATON:

13  Q.     Good afternoon.

14         You are -- you are the former sheriff of

15  Campbell County?

16  A.     Yes.

17  Q.     And your name is Robbie Goins?

18  A.     Yes.

19  Q.     Tell -- tell -- I guess, for the record, what's

20  your full name?

21  A.     It's Robert Keith Goins.

22  Q.     All right, sir.  And you were sheriff for how

23  long at Campbell County?

24  A.     From 2010 to 2022.

25  Q.     Okay, sir.  12 years?

1    A.        12 years, yes, sir.

2    Q.        All right, sir.  And someone else ran against

3    you and -- and was elected?

4    A.        Yes.

5    Q.        All right, sir.  And you were the sheriff when

6    this occurred with -- with Nathan Ling, were you not?

7    A.        Yes.

8    Q.        All right, sir.  You had started as a

9    corrections officer, I guess, in your -- in your career

10   as a law enforcement --

11   A.        Yes, sir.

12   Q.        And your jail had received certifications from

13   time to time?

14   A.        Yes.

15   Q.        And they'd lost certifications?

16   A.        Yes, if we had, it was for a period -- we

17   actually didn't lose it.  It would be a period of time

18   that we had.  Maybe they would come in and inspect and

19   then we had a period of time to correct some of the

20   problems.

21   Q.        Okay.  And I think that you told me

22   when -- when I -- when I asked you on deposition --

23   A.        Uh-huh.

24   Q.        -- back in 2019, you all were hiring road

25   officers at $15 per hour and corrections officers at $11

1   per hour?

2   A.        Yes.

3   Q.        All right, sir.  And basically, to apply -- I

4   saw one of your fliers.  It said "high school education

5   and be 18 years of age"?

6   A.        Yes.

7   Q.        All right, sir.

8             The -- if we can pull up Exhibit 56.

9             And so based upon what you had told me in your

10  deposition and based upon what the chief jailer had told

11  me and the chief deputy, I had put together kind of a

12  chain of command.  It -- it -- can you tell us whether

13  or not this is accurate?

14  A.        It appears to be accurate, yes.

15  Q.        All right, sir.  And one of the things that I

16  guess I got confused about when I was going back through

17  depositions was -- was whether or not Jeremy Goins as

18  the chief jailer -- or excuse me -- as a chief deputy

19  was over the chief jailer, or were those two separate

20  departments?

21  A.        I -- for me, I kept them separate.

22  Q.        Okay.  All right.  That's fair enough 'cause I

23  just couldn't --

24  A.        Yeah.

25  Q.        I had seen references to the fact that

1    everybody deferred back to Jeremy Goins.

2              Now, Jeremy Goins being the chief deputy, no

3    relation to you; correct?

4    A.        Correct.

5    Q.        All right.  And then there was another Goins

6    that was -- that was a part of the department?

7    A.        Josh Goins maybe at the time.

8    Q.        I had a -- I apologize.  Jordan Goins?

9    A.        Jordan Goins.

10   Q.        Does that ring a bell?

11   A.        It does not, but he worked --

12   Q.        Corrections?

13   A.        Corrections possibly, yes.

14   Q.        But he's no relation either; right?

15   A.        No.

16   Q.        All right, sir.  Under this command structure,

17   you -- you operated a different department for the road

18   officers or the patrol officers than you did for the

19   corrections or the jail; correct?

20   A.        Wouldn't really be what you would call a

21   different department.  Just -- it was separate --

22   Q.        Okay.

23   A.        -- you know, 'cause there's two different --

24   two different things happening there.

25   Q.        In this chain of command as we have outlined it

1   here, if an officer had a particular problem, he should

2   go -- he or she should go to the next higher-up;

3   correct?

4   A.      Yes.

5   Q.      So in other words, if Joshua Miller had a

6   problem, he would go to Sean Brown; right?

7   A.      Yes.

8   Q.      And then Sean Brown would be required to report

9   to Catie Wilson; right?

10  A.      Yes.

11  Q.      So Joshua Miller would not complain directly to

12  Catie Wilson?

13  A.      Yes.

14  Q.      All right, sir.  Now, can we agree that all

15  communities have a right to expect law enforcement to

16  train their officers in order to protect us all?

17  A.      Yes.

18  Q.      And can we agree that all communities have a

19  right to expect law enforcement to treat all persons

20  within their custody humanely?

21  A.      Yes.

22  Q.      All right, sir.  Now I want to play a clip for

23  you of the deposition when I took it.

24          MR. SEATON:  And can we pull up that first

25  clip?

1  (Off-the-record discussion between

2  plaintiff's counsel.)

3  MR. SEATON:  It's a clip of his deposition,

4  Your Honor.  Is that an issue in terms of admitting --

5  THE COURT:  Have you moved it into evidence?

6  MR. SEATON:  It's not been moved into evidence,

7  but it's -- it's his deposition that can be used for any

8  purpose.

9  THE COURT:  Well, it still has to be in the

10  evidentiary record.  I mean, what -- what purpose are

11  you offering it for?

12  MR. SEATON:  You know, again, it's -- it's his

13  deposition, and it can be used in evidence, you know,

14  for any purpose whatsoever.

15  THE COURT:  I understand.  But what are you --

16  are you -- are you -- are you trying to impeach him?

17  MR. SEATON:  No.

18  THE COURT:  Are you offering it to refresh his

19  recollection?

20  MR. SEATON:  No, sir.

21  THE COURT:  Okay.  You're just going to put it

22  up like your case in chief.  You want to play it?

23  MR. SEATON:  Okay.

24  THE COURT:  All right.  Any objection to that?

25  MR. KNIGHT:  No, Your Honor.

1          THE COURT:  All right.  So ordered.

2          (The video was played in open court, and the

3          proceedings continued as follows:)

4  BY MR. SEATON:

5  Q.      You were very forthcoming with us at that

6  deposition; correct?

7  A.      Yes.

8  Q.      And as a matter of fact -- you can pull that

9  down if you want to.

10         As a matter of fact, you said, after I got into

11  some more of the -- of the meat of it, that there were

12  four employees that did wrong; right?

13  A.      I can't recall.

14  Q.      Okay.  But you said Justin Crabtree for sure?

15  A.      Uh-huh.

16  Q.      Sean Brown for sure?

17  A.      Uh-huh.

18  Q.      And then you said, you know, in your

19  deposition, that there were two others?

20  A.      Yes.

21  Q.      All right, sir.  And what the officers did

22  wrong, I think you told me, was, number one, dragging

23  him out of the car the way they drug him out of the car;

24  right?

25  A.      Absolutely, yes.

1    Q.        And pulling him out by his clothing.  You

2    said -- you said they were mistreating him?

3    A.        Yes.

4    Q.        And handcuff -- handcuffed behind his back, he

5    was assaulted by fist strikes; right?

6    A.        Yes.

7    Q.        And they took pictures of him, and you said

8    that was absurd?

9    A.        It is, yes.

10   Q.        All right, sir.  Slamming his head into the

11   block wall you said was wrong?

12   A.        Yes.

13   Q.        And standing on someone's chest while he's down

14   on the floor was excessive force; correct?

15   A.        Yes.

16   Q.        All right, sir.  And in all of that -- when you

17   watched the video -- the first time you watched it --

18   this was on a Saturday night when all this occurred.

19   Saturday night, Sunday morning; right?

20   A.        Right.

21   Q.        And did you watch it at first on Monday?

22   A.        Yes.

23   Q.        All right.

24   A.        I'm thinking before lunch.

25   Q.        All right, sir.  And if your chain of

1  command -- I think that -- let me pull that up so I

2  don't have to go back and forth.  Can you see that okay?

3          In your chain of command, I think that you told

4  me that Chief Deputy Jeremy Goins and Chief Jailer

5  Stoney Love had already watched the video; right?

6  A.      Yes.

7  Q.      And they felt that the force that was used

8  against Nathan Ling was justified?

9  A.      I think that -- I can't say for Stoney Love,

10  but Jeremy -- I think he and I have some disagreements

11  about that, that he -- he -- he thought that some of the

12  things that happened there were justified, and I

13  disagreed with him.  I disagreed with the whole --

14  everybody's opinion on it.  I thought the whole thing

15  was wrong is what I meant --

16  Q.      And --

17  A.      -- when I saw it.

18  Q.      And you were the boss?

19  A.      Yeah.

20  Q.      Yes.

21          So you got to overrule him?

22  A.      Yeah.

23  Q.      All right, sir.  And during the video that you

24  watched, you never saw anybody intervene, did you?

25  A.      Right.

1  Q.      And you never -- and you saw six people

2  standing in that booking room at one point in time;

3  right?

4  A.      Yes.

5  Q.      None of them intervened?

6  A.      No.  No.

7  Q.      All right.  And no one took him to the hospital

8  or called 9-1-1?

9  A.      Not until later.

10 Q.      Okay.  Well, that was the next morning at --

11 A.      Right.

12 Q.      -- 7:00 a.m.; right?

13 A.      Right.

14 Q.      And all of them are going to say that they

15 weren't trained to intervene.  Do you disagree with

16 that?

17 A.      I disagree with that.  I do disagree.

18 Q.      All right.  Do you disagree with the fact that

19 these corrections officers are going to say that they

20 weren't trained to do this or they weren't trained to

21 intervene because they'd only been there for a couple of

22 months?

23 A.      That's a possibility.

24 Q.      Okay.  So if -- if at the bottom -- on the

25 bottom right there, if Joshua Miller and Alex Standridge

1   says they didn't have the TCI training, they only had a

2   little bit of on-the-job training, then they wouldn't

3   have been trained to -- to handle a situation like this?

4   A.      That -- that would be correct.

5   Q.      All right, sir.  And would you agree that most

6   of these officers were under the age of 24?

7   A.      Yes.

8   Q.      All right.  And the younger officers in the

9   department were getting the late shifts; right?

10  A.      I don't know that for certain.  I would say

11  yes.

12  Q.      Okay.  And you agree that you had -- you -- I

13  think you told me that the jail was about a 250-plus

14  capacity or -- or you usually had 250-plus people in

15  that jail every day?

16  A.      Yes.

17  Q.      All right.  And that at the time, there was no

18  medical care provided whatsoever from 11:00 p.m. until

19  6:00 a.m.?

20  A.      That's correct.

21  Q.      All right, sir.  And I think that you told me

22  that you agreed that once someone crosses the -- the

23  threshold of a jail, it's the jail administration's

24  responsibility for that arrestee or inmate; correct?

25  A.      Correct.

1  Q.      It's no longer a road officer's responsibility?

2  A.      If something were to take place right inside

3  intake, I mean, they would assist, but from that point

4  forward, usually the jail administration would take care

5  of the person who's been arrested.

6  Q.      And that would be especially so if somebody was

7  seriously injured.  True?

8  A.      Correct.

9  Q.      All right.  And if you got somebody in your

10 jail who is seriously injured, don't you have protocol

11 or policy by which they're supposed to be checked on at

12 least hourly and sometimes even more often than that?

13 A.      Uh-huh, yes.

14 Q.      Yes?

15         MR. SEATON:  Now, Your Honor, I'm going to --

16 I'm going to plead ignorance to this.  This is a -- this

17 is the policy manual.  May I hand that to him?

18         THE COURT:  She'll take it.  Ms. Laster will

19 take it.

20         You're going to ask him to identify it, I

21 assume?

22         MR. SEATON:  Sure.

23 BY MR. SEATON:

24 Q.      And do you recognize this?

25 A.      No.

1   Q.      You don't recognize this?

2   A.      Let me -- let me back up.  It doesn't look in

3   the same binder, but it's -- I -- I guess it's the same

4   thing.

5   Q.      I agree.  I put it in -- in a different binder.

6   A.      Okay.  That's -- that's the only thing that I

7   see different.

8   Q.      Sure.

9   A.      Yeah.

10  Q.      But is it essentially the Campbell County

11  operations manual?

12  A.      It appear -- it appears to be, yes.

13  Q.      All right.  And it's about 450 pages, isn't it?

14  A.      Yeah.

15  Q.      All right, sir.

16          MR. SEATON:  And what we would ask is that this

17  be admitted into evidence.  It's Exhibit Number 1.

18          THE COURT:  Any objection?

19          MR. KNIGHT:  None, Your Honor.

20          THE COURT:  So ordered.

21          (Plaintiff's Exhibit 1

22          received into evidence.)

23  BY MR. SEATON:

24  Q.      And so we've heard numerous officers -- I know

25  you haven't been in the courtroom, but we've heard

1  numerous officers who have said that they were never

2  trained on that manual.  Do you have any knowledge about

3  that?

4  A.      They should have been.  They should have signed

5  for a copy of it and received a copy of it.  And our

6  administration would use this during our in-service to

7  teach, so they should have been, yes.

8  Q.      But there's a big difference between handing

9  somebody a manual and training them on it, isn't there?

10 A.      I agree, yes.

11 Q.      And you're unaware of whether or not they were

12 actually trained on the manual?

13 A.      Yes.

14 Q.      All right, sir.  And I think that you told me

15 in deposition that whenever Campbell County Sheriff's

16 Department takes someone into custody or crosses the

17 threshold of the jail that you're responsible for their

18 well being, are you not?

19 A.      Yes.

20 Q.      You're not only responsible for the well being,

21 but you're responsible to assess their well being?

22 A.      Yes.

23 Q.      And if they need medical care, you're

24 responsible to provide that?

25 A.      Yes.

 1  Q.       Because somebody that's under your all's care
 2  or arrest or whatever, they can't just walk out and go
 3  to the doctor, can they?
 4  A.       That's correct.
 5  Q.       All right, sir.  And I think I had asked you
 6  after you had reviewed -- we can take that down.
 7           After we -- you had reviewed the jail video,
 8  the 13-minute jail video, that this man was in need of
 9  serious medical attention; right?
10  A.       Right.
11  Q.       And you said it was obvious he had a very
12  serious condition?
13  A.       Correct.
14  Q.       Right?
15           And I think you even told -- told me in
16  deposition that as soon as the blood flew, he should
17  have gotten medical attention right then?
18  A.       That's correct.
19  Q.       And you watched in there -- in those videos
20  where six people are just standing back and watching?
21  A.       Yes.
22  Q.       All right, sir.  Is it your position today that
23  they were all just rogue officers?
24  A.       It -- it was a combination of corrections and
25  road officers, wasn't it?

1    Q.       I'm sorry.  I -- I used the wrong terminology.

2    Okay.  What I meant -- I -- I used the terminology of

3    "rogue officers," "rogue" being people that just didn't

4    follow any of their training.

5            Is it your position that all six of these

6    officers just didn't follow any of their training?

7    A.       I guess it would have to be if nobody

8    intervened.

9    Q.       Okay.  And if they said that they weren't

10   trained to intervene, would you disagree with them?

11   A.       It's possible that some of them weren't, but,

12   you know, that comes down to, in my opinion, just common

13   sense.  Something's going on like that, you don't stand

14   there.  You say something or you stop it.

15   Q.       Sure.

16   A.       You know, it's just -- I don't think you would

17   have to be trained to know that wasn't right.

18   Q.       And if the officers say they weren't trained to

19   assess medical conditions, you disagree?

20   A.       No.

21   Q.       Okay.  And they weren't trained to provide

22   medical care or to call 9-1-1 or to -- to get someone to

23   the hospital?

24   A.       I would disagree.

25   Q.       All right, sir.  Now, you also told me that

1    most, if not all, of his injuries had to be caused by

2    the abuse he received in the jail?

3    A.       Can I --

4    Q.       Sure.

5    A.       I had asked the -- the -- what had happened

6    that -- that -- to him that morning --

7    Q.       Uh-huh.

8    A.       -- and heard something about him running into a

9    truck, and I had questioned some of the folks there.

10   Did you not think that this guy may be suffering from a

11   head injury?  I mean, we see that -- we see that a lot.

12   You know, people in a car accident, you know, or any

13   kind of call we'd answer, we might see somebody with a

14   head injury, and they would act differently.

15            And I questioned, why did not -- didn't

16   anybody, you know, take him to the hospital when we

17   could have took him to the hospital instead of -- you

18   know, there was an ambulance, from what I gathered, on

19   the scene where this took place.  If they couldn't take

20   him, why didn't we take him if he had a head injury?

21   And that was one of my -- one of the things I questioned

22   everybody about, you know, why that wasn't addressed,

23   why that wasn't brought up.

24   Q.       Well, as a matter of fact, the sole

25   investigation done by your department was by Chief

1  Deputy Goins and Lieutenant Wasson; right?

2  A.        Yes.

3  Q.        And what they did is they went out there to the

4  scene the next day to see if they could find some

5  indentations or something, some damage to the truck so

6  we could pin it all on the truck; right?

7  A.        Uh-huh.

8  Q.        "Yes"?

9  A.        I -- I don't know if -- if you would say "pin

10 it on the truck," but, you know, just because there

11 wasn't any indentation or any dents -- we have witnesses

12 that saw him hit the truck from what I understood that

13 morning.

14 Q.        I'm sorry.  You said that there weren't any

15 witnesses that saw --

16 A.        That there -- there might have been witnesses.

17 Somebody saw him hit the truck because, you know, they

18 were talking about that he ran into a truck.  They told

19 me.  And so --

20 Q.        Well, what we've got now in the trial so far,

21 we had Cody Douglas and John Minor, the first two

22 officers there.

23 A.        Uh-huh.

24 Q.        And neither one of them saw him hit the truck.

25 Do you know of anybody that saw Nathan Ling hit a truck?

1  A.      I can't -- I couldn't say a particular person,

2  but I know that that was brought up.

3  Q.      Right.

4          And so in terms of the investigation, they went

5  out there to find out if he'd hit a truck?

6  A.      Right.

7  Q.      Right?

8          All right.  And that's all they've done; right?

9  A.      (No audible response.)

10 Q.      But going back to what I was asking, you

11 didn't -- you know, you and I talked in your deposition

12 and you were -- you were very forthcoming with me, and I

13 appreciate that so much, sir.

14         But during that deposition, you said -- you

15 know, we talked -- we talked about the fact that his

16 head was slammed against the block wall; right?

17 A.      Uh-huh.

18 Q.      And that they -- and they -- and we do need to

19 say "yes" or "no" 'cause she will fuss about that.

20 A.      Yes.

21 Q.      And we saw him getting struck by fists numerous

22 times?

23 A.      Yes.

24 Q.      Saw him get slammed down on the counter; right?

25 A.      Yes.

1   Q.      And then we saw when he first gets out of the

2   vehicle, there's no blood on him; right?

3   A.      Right.

4   Q.      And so if -- all of this blood starts -- starts

5   gushing after he gets into the search room or the trap

6   room; right?

7   A.      Right.

8   Q.      All right.  That's what I asked you.  "So would

9   you agree that most, if not all, of his injuries had to

10  be caused by the abuses he received at the jail?"

11          And you said "Yes."

12  A.      Yes.

13  Q.      And is that your testimony today?

14  A.      It is, yes.

15  Q.      All right, sir.  Now, the negative pressure

16  cell is basically a solitary cell.  You said it's a cell

17  smaller than the drunk tank; right?

18  A.      Yes.

19  Q.      There's nothing in it; right?

20  A.      Right.

21  Q.      All right.  And there was no reason that he

22  should have been put in it?

23  A.      Right.

24  Q.      And that you felt that the officers put him

25  there to punish him?

1  A.        Yes.

2  Q.        And you still believe that today?

3  A.        Yes.

4  Q.        All right, sir.  And that's not what you're

5  about, is it?

6  A.        It is not.

7  Q.        But it was about -- it was obviously what some

8  of those officers in the department were --

9  A.        Yes.

10  Q.        All right, sir.  Now, after Chief Deputy Goins

11  and Lieutenant Wasson went out to the scene and talked

12  with the neighbors, why was the investigation dropped at

13  that point?

14  A.        To the best of my knowledge, we were going to

15  let the TBI take it, hand it over to them.

16  Q.        Well -- but the TBI didn't get involved until a

17  month and a half later after Nathan Ling's mother

18  complained; right?

19  A.        Right.

20  Q.        So was the department never going to do any

21  investigation?

22  A.        I would -- I would not let that -- I don't know

23  how to answer that.  I -- I can't remember.

24  Q.        All right, sir.  And as a matter of fact, when

25  I took your deposition, you talked about -- we talked

1    about the 482-page report that the TBI did.  And did you

2    tell me that you'd never read it?

3    A.        I haven't.

4    Q.        And to your knowledge, nobody in the department

5    ever read it, did they?

6    A.        No.

7    Q.        Why would that be?

8    A.        I can't answer that.  I don't know.

9    Q.        But after you reviewed that video, you knew

10   that there had been some serious wrongs, didn't you?

11   A.        Yes.

12   Q.        And you knew that he was seriously injured?

13   A.        Yes.

14   Q.        You knew about his shattered face and his

15   traumatic brain injury and all of that?

16   A.        Yes.

17   Q.        Yes?

18             And you knew that one of your officers had

19   taken him to LaFollette Medical Center and then had --

20   and then they had to Life Flight him to the University

21   of Tennessee?

22   A.        Yes.

23   Q.        So weren't you concerned as the sheriff of the

24   department of getting down to what happened and getting

25   to the root cause of this problem?

1   A.      Yes.

2   Q.      How were you going to do that?

3   A.      Well, in a period -- I can't remember.  I was

4   trying to think last night exactly what day we

5   terminated Mr. Crabtree, and I can't remember.

6   Q.      I can -- if you want me to refresh your memory,

7   he was terminated months later for an incident where he

8   was seeing some woman while he was in a patrol car.

9   A.      I -- I don't know how -- the time frame it was,

10   but yes, that's -- that's true.

11   Q.      All right.  So after all of this occurred, none

12   of those officers were terminated, were they, because of

13   this Ling event?

14   A.      No.

15   Q.      Okay.

16   A.      No.

17   Q.      And none of them were disciplined?

18   A.      No.

19   Q.      Nobody was demoted?

20   A.      No.

21   Q.      And there was no write-ups about it; correct?

22   A.      Not that I can recall.

23   Q.      All right, sir.  And, you know, in terms of the

24   training, if someone says, I've gotten the training --

25   I'm 20 years old, I've got the training, but I don't

1  feel comfortable in it --

2            A JUROR:  Sorry.

3  BY MR. SEATON:

4  Q.       -- would you feel that that's adequate for a

5  department to -- to do?

6  A.       Yes.

7  Q.       Okay.  So if -- if you give them a certain

8  minimal level of training and they don't feel confident

9  that they know what they're doing, you feel like

10 anything that they do wrong is going to be their fault?

11 A.       It wouldn't be.

12 Q.       Pardon?

13 A.       It wouldn't be.

14 Q.       It would be?

15 A.       It would not be.

16 Q.       All right.  Do you know whether or not Justin

17 Crabtree felt he was confident in his training?

18 A.       I don't.

19 Q.       Do you know whether or not Sean Brown felt he

20 was confident in his training as a supervisor over the

21 jail?

22 A.       I don't.

23 Q.       And you are aware that he was left in charge of

24 your entire 250-plus-person jail that night?

25 A.       Apparently he was, yes.

1  Q.      All right, sir.  Was that pretty standard?

2  A.      If he was a supervisor, yes, I would say so.

3  Q.      All right, sir.  And he had only been on the

4  job -- he was age 20 at the time; right?

5  A.      Right.

6  Q.      All right.  Justin Crabtree was age 24?

7  A.      I guess -- yeah, I guess so.  Yes.

8  Q.      Dakota Williams was age 22?

9  A.      Yes.

10  Q.      Alexander Standridge was 20?

11  A.      I don't know their ages for sure.

12  Q.      Joshua Miller was age 22.

13         So would you agree with me -- will you pull

14  that next slide up.  Yeah, there you go.

15         So would you agree with me that these were the

16  five officers primarily involved in this event?

17  A.      Yes.  Yes.

18  Q.      And the corporal here, if he said he was age 20

19  and his training was three days and his supervisor

20  training was none -- of course, I think that -- I think

21  that the corporal there was actually TCI trained; right?

22  A.      Yes.

23  Q.      And that -- the -- the TCI training is the

24  Tennessee Correction Institute?

25  A.      Yes.

1   Q.      It's -- it's a 40-hour course.  That's a

2   one-week course?

3   A.      Yes.

4   Q.      Right?

5           And do you all follow up that training at all,

6   or do you just assume that that's good enough?

7   A.      They -- they would do a yearly in-service.

8   Q.      Uh-huh.  How long does that take?

9   A.      I think it was 40 hours a year.

10  Q.      Pardon?

11  A.      40 hours a year.

12  Q.      Okay.  And this Alexander Standridge says that

13  he got two weeks on the job and two weeks of classroom.

14  Would you disagree with that?

15  A.      No, I wouldn't.

16  Q.      Okay.  And Sean Brown says that his supervisor

17  training in order to be the supervisor of your entire

18  250-person jail consisted of just signing some papers,

19  no other training.

20  A.      I wouldn't think that's correct, but I -- I'm

21  not going to doubt what he says.

22  Q.      All right.  And so was that your

23  responsibility, or was it the responsibility of Stoney

24  Love, the chief jailer?

25  A.      Yes, it was.  It would be Stoney's.

1   Q.      All right.  So it's his responsibility to make

2   certain all of these people are -- are trained; right?

3   A.      Yes.

4   Q.      But eventually, the buck stops with you as the

5   sheriff?

6   A.      Yes.

7   Q.      Fair enough.

8   A.      Okay.

9           MR. SEATON:  Yes.  All right.  You can pull

10  that down, Joseph.

11  BY MR. SEATON:

12  Q.      So I think in terms of --

13          THE COURT:  Mr. Seaton.

14          MR. SEATON:  Yes, sir.

15          THE COURT:  Was that an animated or changed

16  version of Exhibit 56?

17          MR. SEATON:  Yes, sir.

18          THE COURT:  You can't change an exhibit.  If

19  you're going to change an exhibit, it's a new exhibit.

20          MR. SEATON:  We're just using it for

21  demonstrative purposes.  We're -- we don't intend to

22  introduce it.

23          THE COURT:  Let's move on.

24          MR. SEATON:  Okay.

25  BY MR. SEATON:

1   Q.      So you told me that every officer has a

2   responsibility not to abuse citizens; right?

3   A.      Right.

4   Q.      And that every officer has a responsibility to

5   intervene if another officer is abusing someone; right?

6   A.      Right.

7   Q.      As a matter of fact, they don't have a

8   responsibility.  They have a duty, don't they?

9   A.      Yes.

10  Q.      And was that hammered into them or not?

11  A.      Yes, they -- every employee there always knew

12  where I stood on it because I was very vocal about it.

13  I was vocal with my supervisors.  My supervisors knew

14  where I stood on how to treat somebody.

15  Q.      Uh-huh.

16  A.      You know, I've been in law enforcement since

17  the 1990s, and I never had to treat anybody the way that

18  Mr. Ling was treated, you know, the whole time I --

19  and -- and having someone handcuffed and be abused like

20  that just -- it's just not what a professional law

21  enforcement officer should be doing.

22  Q.      Now, also, you had a supervisor over Justin

23  Crabtree by the name of Michael Owens; right?

24  A.      Yes.

25          MR. SEATON:  And can we pull up Exhibit 8.

1  BY MR. SEATON:

2  Q.        And you were aware that Justin Crabtree had

3  taken this picture of Nathan Ling laying in the floor?

4  A.        I knew he had taken a picture, but I didn't --

5  I never seen that.

6  Q.        You never seen that one?

7  A.        No.

8  Q.        All right.  And so I want you to assume that

9  that's the picture that Justin Crabtree has identified

10  and said that he sent to Mikey Owens, the supervisor;

11  right?

12  A.        I guess so, yes.

13  Q.        All right, sir.  And that's against your policy

14  or protocol, isn't it?

15  A.        Yes.

16  Q.        And as a matter of fact, what responsibility

17  would the sergeant have had once he received that

18  picture?

19  A.        If he wasn't there, he should be on his way

20  there to investigate what's going, what's happening to

21  this guy, why he's in that situation.

22  Q.        But he didn't do that, did he?

23  A.        Not to my knowledge, no.

24  Q.        And does he also have the responsibility or a

25  duty to report that one of his officers is abusing an

1  inmate?

2  A.        Yes.

3  Q.        By taking these pictures?

4  A.        Yes.

5  Q.        He never reported that, did he?

6  A.        No.

7  Q.        And as a matter of fact, you know that that

8  photograph got passed around among some other

9  supervisors; right?

10 A.        I don't know that.  I know that I just heard

11 that there was a photograph taken.  Well, I -- let me

12 back up.  The way I knew that was watching the video,

13 and -- and I seen Crabtree with his phone up and started

14 questioning what's he doing and heard that he might --

15 he had either videoed or took a picture.  I had never

16 seen them, and I don't know who got them.

17 Q.        And you became knowledgeable of the fact that

18 Sergeant Mike -- Michael Owens, the supervisor, also

19 pepper sprayed Nathan Ling while he was cuffed behind

20 his back?

21 A.        I -- I may have known that.  I don't remember.

22 Q.        Okay.  You said that that was wrong, though,

23 didn't you?

24 A.        Yes.

25 Q.        And you said that no matter how resistive

1  Nathan Ling was that you don't abuse somebody with their

2  cuffs behind their -- with their hands cuffed behind

3  their back; right?

4  A.        I think I said that's where it should stop --

5  Q.        Right.

6  A.        -- when someone's handcuffed.

7  Q.        And I think you told me that there were other

8  ways that they could have dealt with him; right?

9  A.        Right.

10  Q.        You said you could have put leg shackles on him

11  too; right?

12  A.        Yes.

13  Q.        Okay.  You said they could have cuffed him to

14  the bench there in the -- in the booking room -- not the

15  booking room, but the --

16  A.        It would be the booking area, yes.

17  Q.        Okay.  Right?

18  A.        Yes.

19  Q.        But they didn't do any of that, though, did

20  they?

21  A.        No.

22  Q.        And I think that I had also shown you in the

23  deposition the text message from the supervisor, Mikey

24  Owens, where he said, "We're just covering our asses";

25  right?

1    A.      Yes.

2    Q.      And you felt that was very inappropriate?

3    A.      Yes.

4    Q.      All right, sir.  And are you aware that he is

5    today the jail -- the jail administrator of Campbell

6    County?

7    A.      That's what I -- that's what I had heard.

8    Q.      Would you have made him your jail administrator

9    knowing what you know now?

10   A.      No.

11           MR. SEATON:  Can we play that next clip?

12           THE COURT:  And what is this?

13           MR. SEATON:  This is another clip of his

14   original deposition.

15           THE COURT:  I understand that you're not

16   objecting to this; right?

17           MR. KNIGHT:  That's correct.

18           THE COURT:  All right.  I'm going to let it in,

19   but I encourage you to read Rule 32 at the end --

20           MR. SEATON:  Of -- of --

21           THE COURT:  Federal Rules of Civil Procedure.

22           MR. SEATON:  Of the admissibility of the

23   deposition of a party deponent's deposition?

24           THE COURT:  Yes.

25           MR. SEATON:  Okay.

```
 1            THE COURT:  He's not objecting to it, so you
 2   may proceed.
 3            (The video was played in open court, and the
 4            proceedings continued as follows:)
 5   BY MR. SEATON:
 6   Q.       So if -- that was your testimony in the
 7   deposition; right?
 8   A.       Yes.
 9   Q.       All right, sir.  And so if Crabtree says, "I
10   take after my sergeant when it comes to fighting," what
11   did that mean to you?
12   A.       He's influenced by the supervisor, it sounds to
13   be.
14   Q.       And he's influenced by his supervisor who is
15   violent?
16   A.       It sounds that way.  I'm not -- I never had
17   seen anything that Mr. Owens had done to raise my
18   eyebrow, and I'm not saying that it -- it couldn't have
19   happened.
20   Q.       All right.  Fair enough.
21            I've got one last little clip I want to show
22   you.
23            THE COURT:  Any objection?
24            MR. KNIGHT:  No, Your Honor.
25            THE COURT:  So ordered.
```

1          (The video was played in open court, and the

2          proceedings continued as follows:)

3          MR. SEATON:  That's -- we're speeding it up.

4          (The video was played in open court, and the

5          proceedings continued as follows:)

6    BY MR. SEATON:

7    Q.      Thank you, sir.

8    A.      Uh-huh.

9          (Off-the-record discussion between counsel.)

10         THE COURT:  Any cross-examination?

11         MR. KNIGHT:  Yes, Your Honor, briefly.

12                    CROSS-EXAMINATION

13   BY MR. KNIGHT:

14   Q.      Former Sheriff Goins, when you were -- were

15   referring -- when -- at the very beginning of your

16   testimony, Mr. Seaton implied that your facility had

17   been decertified.

18         Correct me if I'm wrong.  The TCI, Tennessee

19   Correctional Institute, shows up, surprise inspections,

20   inspects all aspects of your facility, including

21   personnel, and notes if you have any deficiencies.  If

22   you do, then you get 60 days, and they tell you they're

23   coming back and they better be fixed?

24   A.      Correct.

25   Q.      And that's what you were telling this jury,

1  that you've never lost certification?

2  A.       Yes, and the jail was not even -- it never even

3  had a certification until we started working toward

4  getting it.

5  Q.       So you -- your administration obtained

6  certification?

7  A.       Yes, I don't think the Campbell County Jail had

8  ever in its existence had a --

9  Q.       So, according to the State of Tennessee, your

10  facility was certified?

11  A.       Yes.

12  Q.       When you were looking at your department when

13  you ran it back in 2019 in the middle of the night,

14  Mr. Seaton pointed out five individuals that he had an

15  issue with, Mr. Standridge, Mr. Miller, Dakota Williams,

16  Sean Brown, Justin Crabtree.

17          It's fair to say Justin Crabtree was criminally

18  indicted after an investigation by the TBI; correct?

19  A.       Correct.

20  Q.       Sean Brown as well; correct?

21  A.       I think, yes.

22  Q.       Dakota Williams initially until there was a

23  determination that the force he utilized was reasonable;

24  correct?

25  A.       Correct.

1    Q.       Sean -- Standridge and Miller never were

2    criminally investigated by the TBI, or if they were,

3    they were not indicted for any criminal offense; is that

4    correct?

5    A.       Right.  That's correct.

6    Q.       Now, former Sheriff Goins, did you ever

7    withhold any information from the Tennessee Bureau of

8    Investigation?

9    A.       No.

10   Q.       Ever doctor any of the video that we've seen?

11   A.       No.

12   Q.       Ever refuse the Tennessee Bureau of

13   Investigation any piece of paper that they asked for?

14   A.       No.

15   Q.       Would you -- fair -- is it fair to say that

16   your agency fully cooperated with the Tennessee Bureau

17   of Investigation with respect to Mr. Ling's incident?

18   A.       Yes.

19   Q.       You indicated that this is not what Campbell

20   County is about; is that correct?

21   A.       Correct.

22   Q.       That you fire people for utilizing verbal

23   language you -- you did not agree with; is that correct?

24   A.       Correct.

25   Q.       And I think we've seen ad nauseam the chain of

```
 1   command.  And at that time, you were the sheriff;
 2   correct?
 3   A.        Correct.
 4   Q.        You had a chief deputy, and you had a jail
 5   administrator; correct?
 6   A.        Correct.
 7   Q.        You also had video cameras installed in the
 8   jail; correct?
 9   A.        Correct.
10   Q.        You also lobbied to have the county purchase or
11   expend monies so you could have professional nursing
12   staff at the jail; is that correct?
13   A.        Yes, and we got that also.
14   Q.        And you were shown Exhibit 1, which is a very
15   thick policy and procedure.  Is there anything inside
16   that policies and procedures that you're trained on that
17   it's okay to punch somebody in the nose?
18   A.        No.
19   Q.        Is there anything in those policies and
20   procedures -- jail, road, otherwise -- that someone is
21   to be denied medical care?
22   A.        No.
23   Q.        Have you ever even heard of a situation like
24   Ling happening during your administration?
25   A.        No.
```

1  Q.        Or since?

2  A.        No.

3  Q.        Is it fair to say that you did not agree with

4  what occurred from the time Crabtree pulled Mr. Ling

5  from his vehicle -- I can't -- I think it was John

6  Minor's vehicle -- in the sally port of the jail?

7  A.        Did I disagree with it?

8  Q.        Yes.

9  A.        Yes, I disagreed with it.

10 Q.        You indicated that a lot of this gets back to

11 common sense.  What did you mean by that?

12 A.        As -- as in the whole situation?

13 Q.        Uh-huh.

14 A.        Common sense would tell you that you need --

15 someone needed to stop what was happening there.  I

16 don't think that you would have to have 40 hours worth

17 of training to see that this guy needed some help and

18 what was going on needed to stop.

19 Q.        Have you ever been provided any information as

20 to the exact cause of Mr. Ling's brain bleed, brain

21 injury?

22 A.        I -- I'm sorry.  Could you repeat that?

23 Q.        Have you ever been provided with any document

24 or evidence which details the exact cause or when it

25 occurred of Mr. Ling's brain injury?

1  A.        I don't think I have, no.

2  Q.        I think we discussed the photograph you deemed

3  inappropriate; correct?

4  A.        Correct.

5  Q.        And things that you deemed inappropriate that

6  night would not have gone on well with you is what I'm

7  saying -- what I'm hearing?

8  A.        That's correct.

9  Q.        And the fact that some lower level employees

10 may think that it's okay, it's not okay with regard to

11 the administration of the sheriff's department?

12 A.        That's correct.

13 Q.        And is it fair to say that if you were ever put

14 on notice that anyone thought any part of this video was

15 okay, there would be remediation and training?

16 A.        Yes.

17          MR. KNIGHT:  I believe that's all, Your Honor.

18          THE COURT:  Thank you.

19          Any redirect?

20          MR. SEATON:  No, Your Honor.

21          THE COURT:  Sheriff, thank you.

22          THE WITNESS:  Thank you.

23          (Subsequent proceedings were heard but

24          not requested to be transcribed herein.)

25          END OF PROCEEDINGS

```
 1              (The proceedings were held outside the
 2              presence of the jury, as follows:)
 3              THE COURT:  All right.  Good morning,
 4    gentlemen.
 5              MR. SEATON:  Good morning.
 6              MR. SMITH:  Good morning.
 7              MR. KNIGHT:  Good morning.
 8              THE COURT:  Is there anything we need to
 9    discuss or go over before we bring our jury in?
10              MR. SEATON:  I don't think so.  I had a little
11    logistical thing with Ms. Laster, and she's got me all
12    cleared up, so --
13              THE COURT:  Mr. Knight?
14              MR. KNIGHT:  No, Your Honor.
15              THE COURT:  Okay.  Gentlemen, did you all --
16    not that we need to discuss it here, but I want to make
17    sure you received the Court's proposed jury instructions
18    and verdict form.
19              MR. SMITH:  We did, Your Honor.
20              THE COURT:  Should have been emailed to you.
21              MR. KNIGHT:  I believe -- yes, Your Honor.
22              THE COURT:  Okay.  Excellent.  All right.  Just
23    be looking at those and -- as we head towards a charge
24    conference.
25              All right.  Ms. Laster, would you bring our
```

1   jury in, please.

2            THE COURTROOM DEPUTY:  Yes, sir.

3            MR. SEATON:  Your Honor, we do feel that we're

4   going to get through tomorrow.

5            THE COURT:  Okay.  You think we -- we'll be

6   able to get it to the jury tomorrow?

7            MR. SEATON:  I don't know if we'll get it to

8   the jury tomorrow, but I know we can get our proof

9   finished by tomorrow.

10           THE COURT:  Okay.  All right.

11           (The proceedings were held in the presence of

12           the jury, as follows:)

13           THE COURT:  Please be seated.

14           Good morning.  Welcome back.

15           A JUROR:  Thank you.

16           THE COURT:  Everyone ready to get started?  All

17  right.

18           All right.  Mr. Seaton, call your next witness,

19  please.

20           MR. SEATON:  We'll call Captain Stoney Love,

21  Your Honor.

22           THE COURT:  Captain Stoney Love.

23           (The witness was duly sworn.)

24           THE COURT:  Mr. Seaton, whenever you're ready.

25                          STONEY LOVE,

1  called as a witness at the instance of the parties,

2  having been first duly sworn, was examined, and

3  testified as follows:

4  <u>DIRECT EXAMINATION</u>

5  BY MR. SEATON:

6  Q.    Good morning, sir.

7  A.    Good morning.

8  Q.    Tell us your full name.

9  A.    Stoney Dewayne Love.

10 Q.    Okay, sir.  And are you currently employed?

11 A.    I am.

12 Q.    And where are you employed?

13 A.    LaFollette Utilities.

14 Q.    Okay.  How long have you been there?

15 A.    It's part time.  I started June of '22.

16 Q.    Okay.  So you originally were employed by the

17 Campbell County Sheriff's Department?

18 A.    Yes, sir.

19 Q.    And you were their chief jailer?

20 A.    I was the captain of the jail, yes, sir.

21 Q.    Captain?  I'm sorry.

22 A.    Captain, yes, sir.

23 Q.    Okay.  And would -- would that be the person

24 that is over all of the jail and the corrections?

25 A.    Correct, yes, sir.

1   Q.      All right, sir.  And if you would -- we're

2   showing you what we've marked as Exhibit Number 56.

3   A.      Uh-huh.

4   Q.      Does that appear to be the correct chain of

5   command for the Campbell County Sheriff's Department?

6   And you may not know the left side of the road officers.

7   But on your side, it's got you underneath Robbie Goins;

8   correct?

9   A.      Correct, yes, sir.

10  Q.      And then Mallory Campbell would have been the

11  lieutenant under you?

12  A.      That's correct, yes, sir.

13  Q.      And she would have been basically in charge of

14  training?

15  A.      She was, yes, sir.

16  Q.      Okay.  And then underneath that was Catie

17  Wilson, who was a sergeant; correct?

18  A.      Correct, yes, sir.

19  Q.      And then you had three other corporals, then

20  Sean Brown?

21  A.      That's correct, yes, sir.

22  Q.      And under Sean Brown was Alexander Standridge

23  and Joshua Miller?

24  A.      Correct, yes, sir.

25  Q.      All right.  And you reported directly to Robbie

1   Goins?

2   A.        I actually reported directly to Jeremy Goins.

3   Q.        To Jeremy Goins?  Okay.

4   A.        Yes, sir, the chief deputy.

5   Q.        All right.  Okay.  Because we had Robbie Goins

6   in here yesterday, and he --

7   A.        Correct.

8   Q.        -- said that he kept the two apart.  He said

9   that you didn't report to -- to --

10  A.        I did --

11  Q.        -- Jeremy.

12  A.        -- report directly to the chief.

13  Q.        Okay.  So the chief deputy would have been over

14  you?

15  A.        Correct.

16  Q.        All right.  So this -- this -- according to

17  your testimony, this chain of command would be a little

18  off kilter because you -- Jeremy Goins should be in

19  between you two?

20  A.        Correct, yes, sir.

21  Q.        All right, sir.  But the rest of it is correct;

22  right?

23  A.        Yes, sir.

24  Q.        All right, sir.  And I think that you told me

25  when you -- when you went to work for the Campbell

 1  County Sheriff's Department, what sort of training did

 2  you have?

 3  A.      When I actually started in '17, I went to the

 4  police academy.  Basic police academy.

 5  Q.      You --

 6  A.      I was a school resource officer.

 7  Q.      Okay.  You started in 2017?

 8  A.      Actually, late 2016.  I went to the academy in

 9  2017, yes, sir.

10  Q.      Okay.  And so your first position there was as

11  a school resource officer --

12  A.      Correct.

13  Q.      -- being in schools?

14  A.      That's correct.

15  Q.      Watching for the safety of -- of the children;

16  right?

17  A.      Yes, sir, correct.

18  Q.      All right, sir.  And then tell us how you

19  worked through the ranks.

20  A.      The position as a captain of the jail came

21  open, and with my experience in management and managed

22  private security company for years, he offered me the

23  position, and I accepted it.

24  Q.      All right.  So you went directly from a school

25  resources officer up to the captain over the -- over

1   the --

2   A.       That's correct.

3   Q.       -- jail?

4   A.       Yes, sir.

5   Q.       All right, sir. And what training did Campbell

6   County offer you to become the jail administrator?

7   A.       As far as a jail administrator class or

8   anything, there was nothing. I went to basic TCI

9   school, which is basic correction officers school.

10   Q.       But you had no training whatsoever to be the

11   administrator?

12   A.       No, sir.

13   Q.       All right, sir. Now, when you were first --

14   let me back up.

15           When did you say you first became the captain?

16   Is "jail administrator" okay for me to use?

17   A.       Yes, sir, that's fine.

18   Q.       Okay. When did you first become the jail

19   administrator?

20   A.       November of 2018.

21   Q.       Okay.

22   A.       Toward the end of November 2018.

23   Q.       All right. So that was about seven months

24   before this incident occurred if this incident --

25   A.       That's --

1  Q.      -- occurred on June the 1st of 2019?

2  A.      That's correct, yes, sir.

3  Q.      All right, sir.  And at that point in time,

4  y'all had no medical personnel after 11:00?

5  A.      That is correct, yes, sir.

6  Q.      All right.  And so from 11:00 to 6:00 a.m.,

7  there was nobody in the jail at all medically?

8  A.      Medically, no, sir.  They were on call if we

9  needed them, but --

10  Q.      All right.

11  A.      -- there was no one there.

12  Q.      All right.  And so you all had contracted with

13  a medical company --

14  A.      Yes, sir.

15  Q.      -- to provide --

16  A.      That's correct, yes, sir.

17  Q.      And essentially, what they -- they do is give

18  you a nurse?

19          I went --

20  A.      Yes, sir.

21  Q.      -- away from the -- I apologize.

22  A.      They provided a nurse, yes, sir.

23  Q.      So they provided a nurse for you during the

24  day, but then at night there was nobody?

25  A.      That is correct, yes, sir.

1   Q.      And then occasionally a doctor would come in

2   once or twice a month?

3   A.      That -- that's correct, yes.

4   Q.      All right.

5   A.      And -- along with the just general needs for

6   the inmates.

7   Q.      Okay.  And you agreed with me, I think, when I

8   took your deposition, that it is your all's

9   responsibility -- once you detain someone and take them

10  across the threshold of the jail, it's your all's

11  responsibility for their health and well being?

12  A.      That is correct, yes, sir.

13  Q.      All right.  And it's your responsibility to

14  assess them?

15  A.      That's correct.

16  Q.      And if any harm comes to them during -- during

17  their stay in the jail, it's your responsibility to

18  provide medical treatment?

19  A.      Yes, sir, it is.

20  Q.      All right, sir.  So the -- the Ling incident --

21  again, you know, I mentioned that it happened on

22  January -- June the 1st of 2019.  You weren't -- you

23  weren't on duty that night; right?

24  A.      No, sir, I was not.

25  Q.      And as a matter of fact, as we look at this

1  chain of command, was Sean Brown the only person over

2  the jail that evening?

3  A.       I don't recall.  I'm sure he was, but he --

4  being a corporal, yes, sir, he probably was the only --

5  Q.       All right, sir.  And if Sean Brown was over the

6  jail, then I'm assuming Mallory Campbell wasn't there

7  and Catie Wilson wasn't there, and no other sergeants or

8  anybody else?

9  A.       That's correct, yes, sir.

10  Q.       All right, sir.  And how many people were in

11  the jail?  How many people would y'all house at a time?

12  A.       Max capacity is 322.

13  Q.       Uh-huh.

14  A.       At that time, I -- I have no idea how many was

15  in there.

16  Q.       Okay.  Sheriff Goins said that, generally

17  speaking, y'all had 250-plus?

18  A.       That's -- that's accurate, yes, sir.  It

19  would --

20  Q.       On average --

21  A.       -- vary.

22  Q.       -- you would have 250 people in that jail?

23  A.       That's correct.

24  Q.       All right, sir.  Now, you said that you weren't

25  there during that incident.  It happened, you know, I

1   think, on a Saturday night; right?

2   A.        To my knowledge, yes, sir.

3   Q.        And tell the ladies and gentlemen of the jury

4   how you first came to know that this -- all this had

5   occurred.

6   A.        I received a text from Sergeant Wilson around

7   11:00 on -- on Sunday.  I was in church and received a

8   text from her about taking Mr. Ling to the -- to the

9   hospital and the incident.  And then I vaguely

10  remember -- that's -- that's all I remember from that.

11  Q.        Okay.  And you said that you were in church?

12  A.        I was.

13  Q.        10:00, 11:00?

14  A.        It was 10:30, 11:00.  Somewhere in that range.

15  Q.        All right.  And what did she say?  You were

16  just taking an inmate to the hospital?

17  A.        I don't even recall what she said.

18  Q.        Were you alarmed?

19  A.        Yeah, I was a little -- a little surprised,

20  yes, sir.  I forwarded it on to Chief Goins.

21  Q.        Why were you surprised?

22  A.        Well, it was 11:00 during the day.

23  Q.        I understand.  But, I mean, what was surprising

24  about her saying that somebody needed to go to the

25  hospital?

1  A.       Well, typically -- I think maybe possibly they

2  LifeStarred him out, and she typically would let us know

3  if anything like that -- you know, as far as that

4  seriousness.

5  Q.       Okay.  So they LifeStarred him, put him on a

6  helicopter --

7  A.       Right.

8  Q.       -- and took him to the UT Medical Center was

9  alerting to you?

10 A.       That -- yes, sir.

11 Q.       Okay.

12 A.       That's serious.

13 Q.       All right.  And so did you -- you got the text

14 from, you said, Catie Wilson?

15 A.       That's correct, yes, sir.

16 Q.       And what did you do in response to that?

17 A.       I forwarded it on to Chief Goins.

18 Q.       Okay.  And then what did you do?

19 A.       That's -- that's -- I don't recall anything

20 else after that.

21 Q.       So you didn't go in and try to figure out what

22 was going on?

23 A.       Not at the time, no, sir.

24 Q.       All right, sir.  And so what else did you find

25 out about it after Catie Wilson had -- had sent you the

1   text message?

2   A.          Nothing that day.  Nothing really, to my

3   knowledge.

4   Q.          So --

5   A.          I don't recall anything else.  You know, it's

6   been a while.

7   Q.          Fair enough.  Yes, it has been a while, and

8   I -- I appreciate that.

9               So it has been -- what? -- five years now;

10  right?

11  A.          Pretty close, yes, sir.

12  Q.          Right.

13              So after you get this text message, did you go

14  in at all on Sunday?

15  A.          I don't recall going.

16  Q.          Okay.  Do you recall whether or not you

17  discussed anything further or you just handed it off to

18  your chief deputy?

19  A.          I don't recall a conversation with him on

20  Sunday.

21  Q.          All right.  So what happened -- what's the next

22  thing that happened that -- where you became involved in

23  this thing?

24  A.          We started gathering video and -- from there

25  and watched the video, and Chief Goins took over the

1  investigation from there.

2  Q.        Okay.  And did you watch the video?

3  A.        I did, yes, sir.

4  Q.        Did you watch it on Monday morning?

5  A.        It was Monday, yes, sir.

6  Q.        All right.

7  A.        I think -- I'm pretty sure it was on Monday.

8  It took IT a little while to gather all the -- the

9  video.  I'm pretty sure it was on Monday.

10  Q.        And how much of the video did you watch?

11  A.        I actually don't recall.  I know the -- the

12  video in the trap, the video in the drunk tank is what I

13  recall seeing.

14  Q.        Okay.  Well, there was video in the sally port

15  of the garage?

16  A.        Okay.

17  Q.        And there was video in the trap or the search

18  room?

19  A.        Yeah.  And -- and I -- I'm sure if there was

20  video presented, I -- I witnessed all of the video.

21  Q.        So do you think you watched it all?

22  A.        I -- I think so, yes, sir.  Everything --

23  Q.        All right.

24  A.        -- that was presented to me.

25  Q.        And what's your response to it?

1  A.      It wasn't a good video to watch.

2  Q.      We understand that.  But what was your response

3  as the administrator of the jail to the video to watch?

4  A.      I followed my chain of command, you know.

5  Jeremy Goins was handling the investigation.  I did

6  nothing at that point.

7  Q.      Okay.  You -- you made no recommendations?

8  A.      Not at that point in time.  He -- he was in

9  charge.

10  Q.      Okay.  Did you do any investigation at all?

11  A.      No, sir.

12  Q.      Did you suggest that the department get

13  involved in an investigation of your officers in the

14  jail?

15  A.      Well, at that time, they were involved, so I --

16  you know, Chief Goins was responsible.  He was -- he was

17  my -- see, in my chain of command, he was handling the

18  investigation from there, so I didn't have to suggest

19  anything.

20  Q.      Well, did you feel that there needed to be an

21  investigation?

22  A.      Oh, yes, sir.

23  Q.      Pardon?

24  A.      Yes, sir.

25  Q.      Okay.  So do you know what investigation was

1  undertaken by Chief Goins?

2  A.       I know he was handling the investigation, yes,

3  sir.

4  Q.       But do you know what he did?

5  A.       I don't know all he did, no, sir.

6  Q.       Okay.  And do -- did you ever see a report of

7  the investigation that Chief Goins did?

8  A.       No, sir, I -- I don't recall seeing it.

9  Q.       Okay.  You are aware that the Tennessee Bureau

10  of Investigation came in and did their investigation?

11  A.       That's correct, yes, sir.

12  Q.       All right, sir.  And you were aware -- or let

13  me ask you.  Were you aware that they came up with a

14  482-page report of the investigation?

15  A.       No, I never saw it.

16  Q.       Okay.  So you never saw that investigation?

17  A.       I did not.

18  Q.       You never read it?

19  A.       No, sir.

20  Q.       Wouldn't you have been interested in knowing

21  what all had occurred and what the investigation showed?

22  A.       I guess so, yeah.  Looking back, yeah.

23  Q.       Okay.  Did -- as a result of this Ling incident

24  and as a result of these -- or this investigation here,

25  did anything change?

1  A.      We changed our medical.  We went to
2  around-the-clock medical staff.
3  Q.      Okay.
4  A.      We changed -- actually changed contractors.
5  Q.      And y'all also had a 450-page policy manual;
6  right?
7  A.      Correct, yes, sir.
8  Q.      And did you change any of the policies or
9  procedures of the jail?
10  A.      To -- to my knowledge, no.
11  Q.      All right, sir.  The training that the officers
12  had -- you said -- and -- and I want to understand this.
13  I did a little bit of military.  Not much.  Kind of like
14  ROTC, and I understand a little bit of chain of command.
15  But how strict is the chain of command?
16  A.      Well, try -- trying to make it very strict to
17  follow the chain of command.  I am prior military and
18  been in law enforcement and security my entire life, so
19  I wanted a strict chain of command to -- to --
20  Q.      All right.  And so under your chain of command,
21  you said that Mallory Campbell, this lady right -- can
22  you see this?
23  A.      Yes.
24  Q.      Okay.  But you said Mallory Campbell was the
25  trainer?

1    A.       That's correct.

2    Q.       Did you oversee her training?

3    A.       I did.  Well, she had a training curriculum,

4    so --

5    Q.       Okay.

6    A.       -- me being in charge, yes.

7    Q.       You were in charge of her training.  But did --

8    did you actually follow and look at and make suggestions

9    to her trainings?

10   A.       At that point, I don't recall if I did --

11   Q.       Okay.

12   A.       -- or didn't.

13   Q.       All right.  And if Alexander Standridge and

14   Joshua Miller -- the two young men below Sean Brown,

15   they said that they were there that evening; right?

16   A.       Yes, sir, they were.

17   Q.       And -- and they were involved?

18   A.       Yes, sir.

19   Q.       And were you -- did you have any idea what

20   their training was?

21   A.       From -- I don't know how long they had been

22   there.  I know the initial training -- once they're

23   hired, they go through a week of in-class training and

24   then on-the-job training with a veteran officer or

25   supervisor until they're ready to be released on their

1    own.

2    Q.       And if they say that they were never trained to

3    intervene in the event an officer was abusing someone,

4    would you disagree?

5    A.       I would.

6    Q.       Okay.  Did you see that training?

7    A.       I saw the curriculum.

8    Q.       Okay.

9    A.       You know -- and, again, that's been some time.

10   Q.       And if they say that they were not trained to

11   assess the medical needs of an inmate in -- in -- in

12   distress, would you disagree with that?

13   A.       Well, I mean, at that point, common sense

14   should have said he needed some medical training [sic],

15   but I'm not going to dispute what they're saying.  I

16   wasn't there that night, so --

17   Q.       Well, did you tell me that after all of this

18   occurred that the way we could prevent it again is

19   better training?

20   A.       Sure.  Absolutely.

21   Q.       You felt that the training was deficient then?

22   A.       Well, obviously we needed to add some -- some

23   different perspective at that point more focused toward

24   the care of the inmate.

25   Q.       Who was disciplined under your command over

1   this Ling incident?

2   A.      No one at the time, no.

3   Q.      Was anyone ever disciplined?

4   A.      To my knowledge, no.

5   Q.      Was ever -- was anyone ever terminated?

6   A.      Due to this incident?

7   Q.      Yes.

8   A.      To my knowledge, no.

9   Q.      Okay.  And was anyone ever written up?

10  A.      To my knowledge, no.

11  Q.      Was that a mistake?

12  A.      Again, the chief deputy was handling the

13  investigation.  I -- I could not discipline one of my

14  employees if he's not disciplined by someone over there

15  because that brings up another -- you know, another

16  issue.

17  Q.      Explain that to me.

18  A.      Employment -- I mean, I can't terminate someone

19  or discipline them if someone else is doing the same

20  thing and they get their -- it was -- in my mind, if

21  he's not going to discipline, I'm not going to go

22  against what he's doing essentially was my thought.

23  Q.      So the five individuals that were involved in

24  this are the five people -- or the four people at the

25  bottom of this chain of command; right?

1  A.        Yes, sir.

2  Q.        On the road side would have been Justin

3  Crabtree, Dakota Williams; right?

4  A.        Yes, sir.

5  Q.        And then on the jail side would have been

6  Alexander Standridge, Joshua Miller, and Sean Brown;

7  right?

8  A.        Yes, sir.

9  Q.        And is it your opinion or testimony to the jury

10 today that all of these officers went outside of their

11 training and just went rogue on you?

12 A.        I -- I feel like that, yes, sir.

13 Q.        All five of them?

14 A.        I feel like that.

15 Q.        All right.  And when you watched that video,

16 there was another young woman that came into the trap

17 room at some point in time.  Did you see that?

18 A.        Shoot.  I don't recall.  I mean --

19 Q.        Okay.  But she -- she stood by and observed the

20 whole thing; right?

21 A.        You know, I do recall -- I think it was a

22 fairly new officer.  I don't remember her name.

23 Q.        Okay.

24 A.        It's been some time.  Yeah.  Actually --

25 Q.        So would she have been trained to intervene and

1  to give him medical assistance?

2  A.      Should have, yes.

3  Q.      Okay.  So she went off the rails too; right?

4  A.      I would think.

5  Q.      All right, sir.  I believe that's all I have.

6  Thank you.  Thank you, sir.

7  A.      Yes, sir.  Thank you.

8          THE COURT:  Cross-examination?

9          MR. KNIGHT:  Yes, Your Honor.

10                    CROSS-EXAMINATION

11  BY MR. KNIGHT:

12  Q.      Mr. Love, what is your background?  I guess

13  that you were an SRO in 2016; correct?

14  A.      Yes, sir.

15  Q.      And that is a school resource officer.  And you

16  go -- and you're POST certified for that; is that

17  correct?

18  A.      Correct, yes, sir.

19  Q.      Prior to becoming an SRO, what was your

20  background?

21  A.      I was a branch manager for a local security

22  company.

23  Q.      Which security company?

24  A.      Securitas.  I was the East Tennessee branch

25  manager for Securitas.

1   Q.        What does that entail?

2   A.        It's a private security -- an armed security --

3   well, unarmed, but it was a private security company.

4   Q.        Okay.  And was that the first job that you had?

5   A.        No, sir.  No.  I started -- I was in the

6   military from '83 to '87.

7   Q.        Which branch?

8   A.        Air Force.  And then --

9   Q.        But your first law enforcement job was in?

10  A.        '88.

11  Q.        Well -- '88?

12  A.        '88.  I started with Campbell County Sheriff's

13  Department in '88, and I left in '94.

14  Q.        What did you do there?

15  A.        I was a -- I started in corrections and then

16  dispatch.

17  Q.        You were a corrections officer?

18  A.        I was.

19  Q.        Like the ones we've seen on the video?

20  A.        Yes, sir.

21  Q.        And so you come back as an SRO --

22  A.        Correct.

23  Q.        -- is that correct?

24  A.        Yes, sir.

25  Q.        I assume from '88 to '94, you got to know

 1   Sheriff -- former Sheriff Goins?

 2   A.        Yes, sir, we worked together.

 3   Q.        You become the jail administrator in

 4   November -- did you say 2018?

 5   A.        Yes, sir, correct.

 6   Q.        And I assume that you held that position until

 7   the election?

 8   A.        That's correct.

 9   Q.        And that would have been around September

10   the 1st of 2000- --

11   A.        Yes.

12   Q.        -- -22?

13   A.        I left August 26th, '22.

14   Q.        Okay.  You said that you were in church when

15   you got word from Catie Wilson; is that correct?

16   A.        Yes, sir.

17   Q.        And had you ever seen anything like this when

18   you looked at the video?

19   A.        No, sir.  No, I hadn't.

20   Q.        And since then, have you ever heard of anything

21   like this?

22   A.        No, sir.

23   Q.        You were asked about -- by Mr. Seaton if you

24   had a medical person; correct?

25   A.        Yes, sir.

1  Q.        And Nurse Allison Willoughby was primarily at

2  the jail?

3  A.        That is correct.

4  Q.        And she was on --

5  A.        Yes, sir.

6  Q.        She was on call 24/7 a day?

7  A.        Yes, sir.  There were several nurses, but she

8  was the primary nurse there.

9  Q.        Okay.  So it -- it was a -- the county

10 contracted with -- do you remember the name of the

11 service?

12 A.        At that time, Quality Correctional

13 Healthcare --

14 Q.        Okay.

15 A.        -- I think was the name.

16 Q.        And they provided the inmate healthcare;

17 correct?

18 A.        Yes, sir.

19 Q.        But the county entered into a contract meaning

20 the county paid them to do that; correct?

21 A.        Correct, yes, sir.

22 Q.        And then when Mr. Seaton asked you, the county

23 ensures the medical care when someone crosses the

24 threshold into the jail, that means paying for all their

25 medical expenses; is --

1   A.      That's correct.

2   Q.      -- that correct?

3   A.      Yes, sir.  That's correct.

4   Q.      That includes Mr. Ling's medical expenses --

5   A.      That's correct.

6   Q.      -- correct?

7           And I think you testified now that you -- you

8   no longer use Quality, but you use another company; is

9   that correct?

10  A.      I think it's -- Fast Access Healthcare was

11  there when I left.  I'm assuming they're still there.

12  Q.      Okay.  They provided 24/7 --

13  A.      That's correct, yes, sir.

14  Q.      They were there 24/7; correct?

15  A.      Yes, sir.

16  Q.      And even under -- under Quality, there was a

17  doctor visit --

18  A.      There was.

19  Q.      -- once a month or once every two months,

20  whatever it was?

21  A.      Yes, sir.  I don't remember the -- the time

22  frame, but I know we got a visit from either a PA or a

23  doctor.

24  Q.      And, of course, it's subject to the nurse

25  whether she wants to call a doctor or nurse practitioner

 1  or anything like that if there's something she can't

 2  handle?

 3  A.        That's correct, yes, sir.

 4  Q.        You were asked by Mr. Seaton about the capacity

 5  at the jail, and you said it was 322?

 6  A.        Yes, sir.

 7  Q.        Approximately 250 inmates at a time?

 8  A.        That's probably an average at that time, yes,

 9  sir.

10  Q.        And I guess the inmates consisted of all types.

11  People charged --

12  A.        Yes.

13  Q.        -- with murder, people charged with DUI, people

14  who were arrested, people not showing up for court,

15  people --

16  A.        Yes.

17  Q.        Just the gamut of things?

18  A.        Yes, sir.  Yes, sir.

19  Q.        People who were not -- who needed to be more

20  confined; correct?

21  A.        Correct, yes, sir.

22  Q.        Now, the county encompasses LaFollette,

23  Jackboro, Cariville, Jellico?

24  A.        That's correct.

25  Q.        And -- and various unincorporated --

1    A.      Uh-huh.

2    Q.      -- areas?

3    A.      Yes, sir.

4    Q.      Is that correct?

5    A.      Yes, sir.

6    Q.      Is it correct to say that the county is

7    approximately 500 square miles?

8    A.      That's probably accurate, yes, sir.

9    Q.      And whenever someone gets arrested, they get

10   brought to the Campbell County Jail; correct?

11   A.      Yes, sir, that's correct.

12   Q.      And who pays for the Campbell County Sheriff's

13   Department and jail?

14   A.      The county.

15   Q.      The county is made up of?

16   A.      All the cities that you just mentioned.  The

17   county financing, that's who pays for everything.

18   Q.      And how do -- how does the county get the money

19   to pay for that?

20   A.      It's taxpayers.

21   Q.      Citizens?

22   A.      That -- yes.

23   Q.      Citizens of Campbell County?

24   A.      That's correct, yes, sir.

25   Q.      You indicated to the jury, to Mr. Seaton that

1  the first person who initiated the investigation was

2  Chief Deputy Jeremy Goins; is that correct?

3  A.      Yes, sir, correct.

4  Q.      And then the TBI became involved; is that

5  correct?

6  A.      Yes, sir.

7  Q.      And when the TBI became involved or when Jeremy

8  Goins was involved, did anybody withhold any information

9  from either one?

10  A.      To my knowledge, no.  I never -- the TBI

11  investigator never spoke to me once.

12  Q.      Okay.  Never had to ask you for a document

13  or --

14  A.      Never asked me for anything.

15  Q.      -- a piece of video or anything; correct?

16  A.      Nothing.

17  Q.      You were asked by Mr. Seaton about the policy

18  and procedure manual, which is 450 pages.  I guess

19  you -- I know that you were a certified police officer;

20  correct?

21  A.      Yes, sir.

22  Q.      You also went through the Tennessee Correction

23  Institute training; correct?

24  A.      Yes, I did.

25  Q.      Is there anything in any of that training that

1  allows someone -- for the Campbell County -- if I'm a
2  Campbell County Sheriff's deputy, to punch somebody in
3  the face a couple of times?
4  A.      No, sir.
5  Q.      Is there any -- is there anything in the -- you
6  were a corrections officer, and you've been through TCI
7  training.  Is there any training that you are aware of
8  that allows any corrections officer to put somebody in a
9  drunk tank and then not check on them?
10 A.      No, sir.
11 Q.      In fact, state law requires that they be
12 checked every -- irregularly every hour.  Is that not
13 correct?
14 A.      That's correct, yes, sir.
15 Q.      You were asked about this chain of command, and
16 we -- I guess we're to believe that there's just these
17 two individuals down here.  But there -- down here,
18 there are 27 other correctional officers; correct?
19 A.      Yes, sir.
20 Q.      And three other corporals other than Mr. Brown;
21 is that correct?
22 A.      Correct.  Correct, yes, sir.
23 Q.      12 other just general deputies other than
24 Mr. Crabtree and Mr. Williams; is that correct?
25 A.      Correct, yes, sir.

1   Q.       And three other sergeants other than Mr. Owens;
2   is that correct?
3   A.       Yes, sir.
4   Q.       I think you indicated that you were surprised
5   when you -- I assume you were more than surprised when
6   you saw the video?
7   A.       I was, yes, sir.
8   Q.       Is that how, if I want to be a Campbell County
9   corrections officer or Campbell County deputy,
10  I'm -- I'm trained to act?
11  A.       No, sir, that's not -- that's not how you're
12  trained to act.
13  Q.       A lot has been made of the nurse not being
14  there for six hours.  Well, when the nurse got there,
15  she immediately took Mr. Ling to LaFollette Medical
16  Center; correct?
17  A.       To my knowledge, yes, sir.
18  Q.       And LaFollette Medical Center had Mr. Ling
19  transported to UT Medical Center; correct?
20  A.       Correct, yes, sir.
21  Q.       That's a trauma unit --
22  A.       That's --
23  Q.       -- correct?
24  A.       Yes, sir.
25  Q.       And so in the Campbell County Jail, if a nurse

1   happened to be there, I mean, he was going to have to be

2   transferred out anyway?

3   A.      Yes, sir.

4   Q.      Being a corrections officer, in your TCI

5   training and -- and just your on-the-job training,

6   whatever, you feel like you had a pretty good grasp of

7   what it took to be a corrections officer?

8   A.      Yes, sir.

9   Q.      I mean, it's checking the inmates; correct?

10  A.      Yes, sir.

11  Q.      Dispensing medication; correct?

12  A.      That's correct, yes, sir.

13  Q.      It's dispensing food --

14  A.      Yes, sir.

15  Q.      -- correct?

16  A.      Yes, sir.

17  Q.      And who pays for the food?

18  A.      The county, taxpayers.

19  Q.      And -- and in terms of just staffing a

20  sheriff's department, who pays for that?

21  A.      Again, taxpayers.

22  Q.      In your -- Mr. Love, Mr. Seaton asked you about

23  the chain of command.  Is this a needed department in

24  Campbell County?

25  A.      It is, yes, sir.

1   Q.       Just like the road department, school

2   department --

3   A.       Yes, sir.

4   Q.       -- whatever?

5   A.       Yes, sir.

6   Q.       Campbell County Sheriff's Department -- I guess

7   the goal is to keep people who can't obey by the rules

8   of society off the road?

9   A.       That's correct, yes, sir.

10          MR. KNIGHT:  Thank you.

11          THE COURT:  Any redirect?

12          MR. SEATON:  Yes, please, Your Honor.

13                    REDIRECT EXAMINATION

14  BY MR. SEATON:

15  Q.       So did you see any of these officers involved

16  after this incident?

17  A.       Gosh, I don't recall.

18  Q.       I mean -- but you worked with them; right?

19  A.       Oh, I mean, I'd see them in -- yes, sir.

20  Q.       Over a period of time, you -- you saw these

21  officers that you all kept and --

22  A.       Yes, sir.  Yes, sir.

23  Q.       And kept employed; right?

24  A.       Yes, sir.

25  Q.       And were you not concerned?

1  A.        Sure.   Absolutely.

2  Q.        Did you express your discontent with the

3  sheriff or with the chief deputy?

4  A.        I -- I don't recall having a conversation with

5  them about it.

6  Q.        But you were all right with continuing to work

7  with these officers that you're saying have gone

8  completely off the rails?

9  A.        I'm not going to say I was all right with it,

10 but, again, I had no control over it.

11 Q.        But it looks to me like you were in charge?

12 A.        Not necessarily, no, sir.

13 Q.        Okay.  Well --

14 A.        I --

15 Q.        That's fair.  That's fair.

16          And when you saw the video, instead of saying

17 that you were surprised, wouldn't it better to say you

18 were shocked?

19 A.        Well, I mean, if you want to use that word,

20 yes, sir, I was.

21 Q.        The nurse was shocked --

22 A.        Sure.

23 Q.        -- when she went into the cell to find him;

24 right?

25 A.        Yes, sir.

1  Q.      You know, because every one of these officers

2  not only had a duty not to punch somebody, but if they

3  saw another officer punch them, they had a duty to stop

4  it; right?

5  A.      That's correct, yes, sir.

6  Q.      Not a responsibility, but a duty?

7  A.      That -- that is correct, yes, sir.

8  Q.      All right.  And they had a duty to assess

9  and -- and make suggestions that he be assessed

10 medically or taken to the hospital?

11 A.      Yes, sir.

12 Q.      So you got six officers you're saying went off

13 the rails; right?

14 A.      Yes, sir.

15 Q.      Should counties be held accountable

16 when -- when someone's life is destroyed because of

17 events like this?

18 A.      That's not --

19         MR. KNIGHT:  Your Honor, objection.  That's for

20 the jury to decide.

21         THE WITNESS:  Yes, that's -- that's not a

22 decision --

23         THE COURT:  Hold on.  We have an objection.

24         What's your objection?

25         MR. KNIGHT:  Should counties be held

1  accountable?  You know, that's for the jury to decide

2  based upon what the Court --

3          THE COURT:  Your objection is the question goes

4  to the ultimate issue?

5          MR. KNIGHT:  Yes.

6          THE COURT:  Sustained.

7          MR. SEATON:  Fair enough.

8  BY MR. SEATON:

9  Q.      So -- so why did you leave Campbell County

10  Sheriff's Department?

11  A.      Sheriff Goins was who I worked for.  I did not

12  want to continue working there for a new sheriff.

13  Q.      Okay.

14  A.      I worked with him.  I didn't want to work for

15  him.

16  Q.      Pardon me?

17  A.      I worked with him.  I didn't want to work for

18  him.

19  Q.      I'm not following that.

20  A.      Well, we worked together as SROs.

21  Q.      Oh, okay.  I see.

22  A.      So we -- we had worked together, and I did not

23  want to work for him.

24          MR. SEATON:  And pull back 56.

25  BY MR. SEATON:

1  Q.       And were you aware of who replaced you?

2       MR. KNIGHT:  Objection.  Relevance.  We're

3  talking about 2019.  He was the jail administrator.

4  That's what controls in the situation.

5       THE COURT:  Why is it relevant?

6       MR. SEATON:  It's -- it's relevant that --

7  we've already talked about it before as to whether or

8  not Michael Owens, the supervisor over Justin Crabtree,

9  had replaced him.

10       THE COURT:  I'm going to overrule the

11  objection.

12       Now, Mr. Seaton, I'm going to give you a little

13  bit of latitude on this, but let's focus and stick to

14  the issues.

15       MR. SEATON:  I'm close.

16       THE WITNESS:  Yes, Michael Owens is the current

17  jail administrator, to my knowledge.

18  BY MR. SEATON:

19  Q.       And -- and he was -- he was put there by the

20  current sheriff?

21  A.       That's correct, sir.

22  Q.       Now, I asked you this question in deposition.

23  I said, "You know, to me, the big question is if

24  nothing" -- "If there's never any consequences because

25  of this failure that evening, what keeps it from

1  happening again?"

2        Do you remember your response?

3  A.       I don't.

4  Q.       So if -- you said, "I agree with that, and I

5  don't have an answer for that."

6  A.       Yeah.

7  Q.       Still?

8  A.       Yes, sir.

9  Q.       All right.  So we don't know how to keep it

10  from happening again?

11  A.       Not at this point, no, sir.

12  Q.       All right.  Thank you so much.

13  A.       Yes, sir.  Thank you.

14        MR. KNIGHT:  Briefly, Your Honor.

15                    RECROSS-EXAMINATION

16  BY MR. KNIGHT:

17  Q.       Since we've been over this Owens thing over and

18  over and over again, you ever heard anything about

19  this -- anything like Ling happening under Mr. Owens?

20  A.       Not to my knowledge, no.

21  Q.       And in terms of consequences, Crabtree was

22  criminally charged, indicted, and went to jail; is that

23  correct?

24  A.       Correct, yes, sir.  To my knowledge, yes, sir.

25  Q.       He's no longer a police officer?

1   A.      He is no longer, no, sir.

2   Q.      And Sean Brown was criminally indicted and pled

3   guilty; is that correct?

4   A.      To my knowledge, yes, sir.

5   Q.      And they should have been; right?

6   A.      Yes, sir.

7   Q.      Thank you.

8          THE COURT:  Thank you.  Thank you.

9          MR. SEATON:  The next witness is Traci Swanson.

10         THE COURT:  Traci Swanson.

11         (The witness was duly sworn.)

12         THE COURT:  Whenever you're ready, Mr. Seaton.

13         MR. SEATON:  Yes, Your Honor.

14                    TRACI SWANSON,

15   called as a witness at the instance of the parties,

16   having been first duly sworn, was examined, and

17   testified as follows:

18                DIRECT EXAMINATION

19   BY MR. SEATON:

20   Q.      Good morning.

21   A.      Good morning.

22   Q.      Tell the ladies and gentlemen of the jury your

23   name.

24   A.      My name is Traci Marie Swanson.

25   Q.      And, Traci, what do you do?

1  A.      I am a caregiver.

2  Q.      And in what capacity are you a caregiver?

3  A.      Medical assistant.

4  Q.      Okay.  And where do you live?

5  A.      I live in Falmouth, Michigan.

6  Q.      Where is Falmouth, Michigan?  You drive three

7  hours north of Detroit to get there?

8  A.      It is.  I can show on my hand.  Right here in

9  Michigan.

10  Q.      Okay.  Northern Michigan?

11  A.      Yes, Northern Michigan.

12  Q.      All right.

13  A.      Around Houghton Lake.

14  Q.      Pardon me?

15  A.      Houghton Lake.

16  Q.      And you're currently married to Eric?

17  A.      Yes.

18  Q.      All right.  Nathan Ling is your son?

19  A.      Yes.

20  Q.      All right.  And so tell the ladies and

21  gentlemen of the jury what happened, how you first found

22  out that there was a problem in LaFollette, Tennessee.

23  A.      I was receiving phone calls from Caitlin.

24  Q.      Who is Caitlin?

25  A.      Caitlin was his friend at the time.

1  Q.      Okay.  And so Caitlin, was she the lady that

2  was with him as they were going down?

3  A.      Yes, sir.

4  Q.      All right.  And what -- as a result of what

5  Caitlin said to you, what did you do?

6  A.      I didn't answer the phone call.

7  Q.      Okay.

8  A.      It was a collect call.

9  Q.      All right.  So stay focused with me.  What

10 did -- what's the first thing that you knew had happened

11 in this situation, and what did you do?

12 A.      I was driving myself to work.

13 Q.      Okay.

14 A.      And I got a phone call from the sheriff's

15 department stating my son had fallen and hit his head on

16 a bumper and was in the hospital.

17 Q.      And was this the Campbell County Sheriff's

18 Department?

19 A.      Yes, sir.

20 Q.      And do you know who called you?

21 A.      Corporal Stoney.

22 Q.      Okay.  Would it have been Stoney Love?

23 A.      Stoney Love.

24 Q.      All right.  And so as a result of that

25 conversation, what did you do?

1  A.        Headed down to Tennessee.

2  Q.        All right.  Did you get in the car and drive?

3  A.        Yes, sir.

4  Q.        All right.  And so what was your understanding

5  of Nathan's condition?

6  A.        That he was fine.

7  Q.        And where was he?

8  A.        In the Tennessee University Hospital.

9  Q.        All right.  So tell them what all transpired.

10 Tell -- tell -- tell us what all you did and what you

11 found out.

12 A.        I showed up at the hospital.  We came in

13 through the emergency room.  They stated that my son was

14 not there.  I knew he was there because the corporal

15 told me that's where he was at.  And a nurse called down

16 and said that it would be okay if I went upstairs to see

17 him.  He was in ICU.

18 Q.        And what was his condition?

19 A.        Poor.

20 Q.        Pardon me?

21 A.        Poor.

22 Q.        Poor?

23 A.        Critical.

24 Q.        Describe it.

25 A.        He was connected to multiple machines,

1  unconscious, partial coma.

2  Q.        And so how -- how many days after he was in the

3  jail that Saturday night do you think that was?

4  A.        This was June 4th --

5  Q.        Okay.

6  A.        -- when I got the phone call.

7  Q.        So about three days later?

8  A.        Three days later.

9  Q.        All right.  And so he wasn't able to -- to

10  speak with you?

11  A.        No, sir, not for days.

12  Q.        All right.  And so did you stay in the hospital

13  with him?

14  A.        Yes, I did.

15  Q.        Did you find out how he got there?

16  A.        Yes.

17  Q.        Tell me.

18  A.        Airlifted.

19  Q.        All right.  But, I mean, you're told that your

20  son is in the hospital.

21  A.        Yes.

22  Q.        And you go and you find him in ICU in --

23  A.        Yes.

24  Q.        -- critical condition.

25  A.        Yes.

1   Q.      Did you have questions about how he got there,

2   why -- why his -- was he in the hospital in critical

3   condition?

4   A.      They did not state.

5   Q.      Well, did you have questions as a mother?

6   A.      Yes, I did.

7   Q.      And how -- so -- so how did you go about

8   finding out what happened?

9   A.      I went back to the jail.

10  Q.      Okay.

11  A.      And I asked questions and got nowhere.

12  Q.      Do you know who you talked to at the jail?

13  A.      No, it was an officer behind the desk, which

14  was --

15  Q.      Okay.

16  A.      -- laughing at the situation.

17  Q.      And so after you went to the -- to the jail to

18  figure out what was going on, what did you do next?

19  A.      I went back to the hospital.

20  Q.      And then -- and then what did you do to find

21  out what had happened, what occurred?  How did you get

22  answers?

23  A.      How did I get answers?

24  Q.      How did you get answers to what had happened to

25  Nathan Ling?

1    A.        I got answers from the Tennessee Bureau

2    investigator.

3    Q.        Is that the first person that you called?

4    A.        No.

5    Q.        Tell us.

6    A.        My husband and I drove around and, you know,

7    we're not from here, so we went to the state department.

8    We went to the state police, couldn't get nowhere.  And

9    I didn't want to give up, so I called the district

10   attorney's office, and they told me that he was being

11   charged with multiple felonies.  And that really upset

12   me, so, therefore, I went and contacted a few attorneys

13   to see if I could get more answers.

14   Q.        Okay.  And when you say they told you that he

15   was being charged with multiple felonies, is this --

16   "he" being Nathan Ling?

17   A.        Yes.

18   Q.        All right.  And so what happened after you

19   talked with the district attorney?

20   A.        He told me that I would have to contact the

21   Probation Department to talk to his public defender.

22   Q.        But other than his criminal issues, how did you

23   find -- how did you -- how did the TBI investigation

24   come about?

25   A.        The TBI investigation came about because I

 1  didn't want to give up and I needed answers.  And when

 2  they -- when they called me, he visited me in Michigan.

 3  Q.      Who did?

 4  A.      The Tennessee Bureau investigator.

 5  Q.      He came to Michigan to --

 6  A.      Yes, sir.

 7  Q.      -- see you?

 8  A.      He flew to --

 9  Q.      All right.

10  A.      -- Michigan to see me.

11  Q.      All right.  And was this about a month and a

12  half later?

13  A.      Correct.

14  Q.      And so did you give the investigator as much

15  information as you could?

16  A.      Yes, I knew by seeing my son in the hospital

17  that that just didn't happen because he slipped and

18  fell.

19  Q.      Okay.  And so when did you finally find out

20  that this was because of some abuse that occurred to

21  him?

22  A.      It would have to have been after the Tennessee

23  Bureau investigator had told me.

24  Q.      Okay.  And so after you figured out what all

25  was going on, did you get Nathan situated and -- and

1    back home?

2    A.        Yes, sir, 22 days later.

3    Q.        Okay.  Was he in ICU for 22 days?

4    A.        Yes, sir.

5    Q.        And what would -- what is your understanding of

6    his medical treatment?

7    A.        Nathan had multiple contusions throughout his

8    body.  He had reconstructive surgeries on his face, on

9    his shoulder.  He had a collapsed lung and multiple

10   brain bleeds and reconstruction to his whole entire

11   eye -- eye socket.

12   Q.        And after he was released after the 22 days in

13   ICU, do you know what his treatments have been?

14   A.        Yes, it's been in and out of doctors' offices.

15             MR. KNIGHT:  Your Honor, I object.  I know

16   she's his mother.  I object.  If he wants to detail his

17   treatment, he could have deposed somebody in Michigan.

18             MR. SEATON:  She can give her general

19   observations.

20             THE COURT:  It's --

21             MR. KNIGHT:  That's fine.

22             THE COURT:  It's -- it's overruled.  But,

23   again, let's stick --

24             MR. SEATON:  Right.

25             THE COURT:  Just her own observations.  No

1  opinion.

2          MR. SEATON:  Right.  Yeah.  Yeah.

3  BY MR. SEATON:

4  Q.       So what the judge is saying is that we don't

5  want your opinion about what you think happened.  We

6  want your -- we want to know what you saw in terms of

7  him getting treatment.  And so -- so go ahead.

8  A.       We had taken him to doctors, psychiatric

9  hospital, University of Michigan, and multiple

10 medications that he was put on in order for him to

11 sleep.

12 Q.       Is he still undergoing treatment --

13 A.       Yes.

14 Q.       -- at the University of Michigan?

15 A.       Yes.

16 Q.       Do you assist him getting to medical

17 appointments and things?

18 A.       Yes, he's unable to drive due to his eyes.

19 Q.       Do you have trouble with him making

20 appointments and --

21 A.       Yes.

22 Q.       Why?

23 A.       Because he gets confused.

24 Q.       Is he living with you and Eric now?

25 A.       Off and on.

1  Q.        Okay.  He lives in an apartment sometimes and

2  then sometimes he comes and lives with you all?

3  A.        Yes.

4  Q.        How old is he now?  24?

5  A.        22.

6  Q.        22.  Let's see.  That doesn't compute.  He was

7  19 in 2019, so that would be -- it would be five years

8  later.  He'd be about 24.

9  A.        He'll be 23 this year.

10 Q.        Okay.  Well, you're his mother.  I won't argue

11 with that.

12           So how is he doing now?

13 A.        Nathan recently just got out of a psychiatric

14 hospital that he stayed for approximately a week.

15 Q.        All right.

16 A.        He admitted himself --

17 Q.        Okay.

18 A.        -- because of the multiple times that we have

19 spoken, and I told him you really need to get some help.

20 He had -- he needed the right medications.

21 Q.        Is that why he's not here today?

22 A.        Nathan -- yes.  Nathan is a fighter.  In his

23 mind, he feels he's -- he's okay.  But when you look at

24 him and you know him, he's not.

25 Q.        Tell us what's different.

1  A.        He has like a 10-minute personality.  For 10

2  minutes, he may be loving and caring, and then the next

3  minute, he's off spacing out, running around going from

4  one room to the next room.  Can't sit down.  He can't

5  relax.  He's trying to stay focused, but he's unable to.

6  Q.        Has he attempted jobs?

7  A.        Yes.

8  Q.        Tell us about that.

9  A.        They last for probably a week or so.

10 Q.        Why is that?

11 A.        'Cause he's unable to stay focused due to his

12 traumatic brain injury.

13 Q.        Does he continue with treatment other than --

14 well, you said he -- he's treated at the University of

15 Michigan?

16 A.        Yes.

17 Q.        What -- what all is he treated for?

18 A.        Traumatic brain injury, unstableness,

19 dizziness, lightheadedness, vertigo, stress, PTSD.  I

20 can go on and on.

21 Q.        And so how are you all navigating those issues?

22 A.        It's very hard.

23 Q.        Well, give me an example.

24 A.        I will come over to pick up my son and take

25 him.  It is an argumentative situation just getting him

1  to go.  He says he doesn't want to go.  He says, "Mom,

2  I'm tired of all these doctors."

3  Q.      Does he have any social activity or social life

4  at all?

5  A.      No, he has a social disorder.

6  Q.      Did he --

7  A.      He'd be in a room with a lot of people and --

8  Q.      Now, when you say he has a "social disorder,"

9  is that resulting from this, or did he have that before?

10 A.      From -- from the incident.

11 Q.      All right.  I want to show you, if I could --

12 could we pull up Exhibit 35.

13         And tell us what that is.

14 A.      That is my son, Nathan.

15 Q.      All right.  That's --

16 A.      That's when he was happy.

17 Q.      -- a photograph that you provided to me?

18 A.      Yes.

19         MR. SEATON:  All right.  So we would move

20 Exhibit 35 into evidence, Your Honor.

21         MR. KNIGHT:  No objection.

22         THE COURT:  So ordered.

23         (Plaintiff's Exhibit 35

24         received into evidence.)

25 BY MR. SEATON:

1  Q.      So this is Nathan at what age?

2  A.      I'd say about 9 --

3  Q.      Okay.

4  A.      -- 10.

5  Q.      And let's show Exhibit 36.  Is that a photo of

6  him also?

7  A.      Yes.

8          MR. SEATON:  We would move that into -- exhibit

9  into evidence, Your Honor.  Exhibit 36.

10         MR. KNIGHT:  No objection.

11         THE COURT:  So ordered.

12         (Plaintiff's Exhibit 36

13         received into evidence.)

14 BY MR. SEATON:

15 Q.      So is this a year or so later?

16 A.      Yes.

17 Q.      All right.  And so let's go to Exhibit 37.

18         When was this taken?

19 A.      Right before graduation.

20         MR. SEATON:  All right.  We would move that

21 into evidence, Your Honor.  37.

22         Is that right?

23         MR. KNIGHT:  No objection.

24         THE COURT:  So ordered.

25         (Plaintiff's Exhibit 37

 1          received into evidence.)

 2    BY MR. SEATON:

 3    Q.      So right -- this is right before graduation?

 4    A.      Yes.

 5    Q.      And so when this incident occurred in -- June

 6    the 1st of 2019 -- when -- when did Nathan graduate from

 7    high school?  Do you recall?

 8    A.      It was September --

 9    Q.      Of the year before?

10    A.      -- of 20- -- of 20- -- of 2018.

11    Q.      All right.  So he graduates September 2018, and

12    this occurred like about nine, ten months later?

13    A.      Yes, sir.

14    Q.      All right.  So he was just barely out of high

15    school?

16    A.      Yes.

17    Q.      All right.  Let's pull up Exhibit Number 38.

18            Is this a photograph of -- of Nathan with his

19    diploma?

20    A.      Yes, I took that picture.

21            MR. SEATON:  All right.  We would move that

22    into evidence, Your Honor.

23            MR. KNIGHT:  No objection.

24            THE COURT:  So ordered.

25            (Plaintiff's Exhibit 38

1          received into evidence.)

2    BY MR. SEATON:

3    Q.       And so you -- you say you took this picture of

4    him right after he graduated?

5    A.       Yes, sir.

6    Q.       Did he do okay in school?

7    A.       He was amazing in school.

8    Q.       Well -- but he -- he also had some issues,

9    didn't he?

10   A.       Yes, he had some issues.

11   Q.       He got in quite a bit of juvenile trouble?

12   A.       Yes, he did.

13   Q.       He was on juvenile probation?

14   A.       Yes.

15   Q.       Tell them -- tell -- tell them about Nathan's

16   history.

17   A.       Nathan and his biological father did not get

18   along very well.  His father remarried.  And Nathan and

19   him had an altercation, and his father had called the

20   police on Nathan.  I wasn't there, so I'm not sure --

21   Q.       All right.

22   A.       -- exactly what happened.

23   Q.       But in terms of his -- his juvenile charges,

24   were they anything very serious that you knew of?

25   A.       No.

1  Q.      All right.  Based upon altercations with his

2  biological father?

3  A.      Yes, sir.

4  Q.      All right.  Was he living with you before he

5  came down to Tennessee?

6  A.      Yes.

7  Q.      All right.  And did you know he was coming?

8  A.      Yes.

9  Q.      You knew he was coming to Tennessee?

10 A.      Not Tennessee.

11 Q.      Okay.

12 A.      I knew he was coming to live with me.

13 Q.      No, what I'm -- my bad.  That was a bad

14 question.

15         So did you know that he had left Michigan to go

16 to -- to -- he was going to Florida; right?

17 A.      Yes, sir.

18 Q.      Did you know he had left to do that?

19 A.      Yes.

20 Q.      All right.  And did you know that he was going

21 to go in Caitlin's grandfather's car without permission?

22 A.      I didn't know it was without permission 'cause

23 I've seen her drive it before.

24 Q.      All right.  Let's look at Exhibit Number 39.

25 And is this a photograph of Nathan and his sister?

1  A.      Yes.

2          MR. SEATON:  All right.  We would publish that,

3  Your Honor.

4          THE COURT:  What exhibit is it?

5          MR. SEATON:  39.

6          MR. KNIGHT:  No objection.

7          THE COURT:  So ordered.

8          (Plaintiff's Exhibit 39

9          received into evidence.)

10 BY MR. SEATON:

11 Q.      And so this is his sister who lives in

12 Falmouth, Michigan too; right?

13 A.      She lives in Houghton Lake, Michigan.

14 Q.      Houghton Lake.  That's right.  I remember us

15 driving to that.

16         And so that's the last good picture that you

17 had of him before this incident occurred?

18 A.      Yes.

19 Q.      All right.  So you said that he had just gotten

20 out of a psychiatric hospital?

21 A.      Yes.

22 Q.      And you say that that's why he's not here now?

23 A.      Correct.

24 Q.      Tell the ladies and gentlemen of the jury why.

25 I mean, what are the issues that he can't be in our

1  courtroom and he --

2          MR. KNIGHT:  Again, Your Honor.  This would

3  require a doctor to say why.

4          MR. SEATON:  It's just --

5          MR. KNIGHT:  He's been here twice.  Once for

6  Crabtree's sentencing; once for this deposition.  Plenty

7  of people around.  I think that --

8          MR. SEATON:  It's just her observations.

9          MR. KNIGHT:  -- it's --

10          MR. SEATON:  He doesn't need to make a speaking

11  objection.

12          THE COURT:  Hold on a minute.  Hold on a

13  minute.  Gentlemen, speak one at a time.

14          MR. SEATON:  Right.  I just -- I want to object

15  to the speaking objection.

16          MR. KNIGHT:  Okay.

17          THE COURT:  So listen, your -- your objection's

18  overruled at this time.

19          However, stick to personal observations --

20          MR. SEATON:  Right.

21          THE COURT:  -- only.

22          MR. SEATON:  Right.

23          THE COURT:  No opinion, Mr. Seaton.

24          MR. SEATON:  I understand.

25          THE COURT:  And I understand the relevance of

1  some of this testimony, but, again, let's -- let's move

2  on.

3  BY MR. SEATON:

4  Q.      All right.  So -- so what -- what do you --

5  what have you observed in Nathan immediately before

6  this?  Because you see what's coming up.  He's been to a

7  deposition.  He's been to another court hearing.

8  But -- but what's the difference between that and this

9  trial?

10          MR. KNIGHT:  Same objection, Your Honor.

11 BY MR. SEATON:

12 Q.      What you've observed.

13          THE COURT:  Overruled.  If she knows, that's --

14          MR. SEATON:  Fair enough.

15 BY MR. SEATON:

16 Q.      Do you know?

17 A.      Yes.

18 Q.      Tell us.

19 A.      New medications.

20 Q.      Okay.

21 A.      He had a complete outburst due to the fact that

22 all this is coming to -- hopefully to a close.  It's

23 very stressful on him trying to relive that night that

24 this took place, which caused him to have a mental

25 breakdown.

 1              MR. KNIGHT:  Again, Your Honor, relevance.

 2  They've abandoned their psychiatric claims in this case.

 3              MR. SEATON:  I don't think that's true.

 4              THE COURT:  Overruled.

 5  BY MR. SEATON:

 6  Q.      That's all the questions I have.  Answer any

 7  questions that this lawyer has, please.

 8              THE COURT:  All right.  Cross-examination?

 9                    CROSS-EXAMINATION

10  BY MR. KNIGHT:

11  Q.      You said you knew that they were going to

12  Florida; correct?

13  A.      Yes.

14  Q.      Does it surprise you to know that Ms. McDaniel

15  had no driver's license?

16  A.      No, I didn't know nothing about her driving

17  record.

18  Q.      Neither did your son have a driver's license;

19  correct?

20  A.      Correct.

21  Q.      And some of the things that he told me during

22  his deposition was that he got his high school diploma

23  through a juvenile drug program.  Do you recall that?

24  A.      It was not a juvenile drug program.

25  Q.      It was not.  So your son was wrong about that?

1  A.      They have juvenile drug programs at the
2  facility that he was at.
3  Q.      He was at a facility when he got --
4  A.      Yes.
5  Q.      -- his diploma?
6  A.      Doesn't matter where he got his diploma.  At
7  least he graduated.
8  Q.      Vassar, Michigan?
9  A.      Yes, Wolverine.
10 Q.      Wolverine?  That's the facility?
11 A.      Yes.
12 Q.      He's been in and out of that, hasn't he?
13 A.      Once.
14 Q.      Your son indicated to me that he'd been
15 incarcerated before.  You agree with that?
16 A.      Juvenile.
17 Q.      You agree that he'd been charged with running
18 from the police?
19 A.      Yes.
20 Q.      Did you tell Stoney Love that you knew that he
21 would run when he was found to have warrants in
22 Michigan?
23 A.      No.  I don't recall.
24 Q.      Okay.  He also told me he has been accused --
25 well, charged with domestic violence; is that correct?

1   A.      I already stated that.

2   Q.      Okay.  Fighting?

3   A.      I already stated that.

4   Q.      Assault?

5   A.      I already stated that he had an altercation

6   with his father.

7   Q.      And had spent some time at a place called

8   Calumet?

9   A.      That's the placement that you go to before you

10  go to Wolverine.

11  Q.      Okay.  Still an incarceration.  Is that not

12  correct?

13  A.      It's a juvenile facility.

14  Q.      He was incarcerated.  He wasn't allowed to

15  leave; is that correct?

16  A.      Correct.

17  Q.      Now, your son informed me that it was Justin

18  Crabtree that caused his injuries?

19  A.      I don't know what he had informed you.

20  Q.      Would it surprise you -- has he ever told you

21  that -- that he testified under oath that Justin

22  Crabtree caused his -- well, I'm sorry -- Justin

23  Crabtree caused his brain damage?

24  A.      I'm not a doctor.

25  Q.      Oh.  Well --

1  A.      I wasn't there.

2  Q.      -- did you accompany him to Justin Crabtree's

3  sentencing hearing?

4  A.      No.

5  Q.      I don't remember seeing you at his deposition.

6  You weren't there, were you?

7  A.      No, I was not asked to go.

8  Q.      What is your background?  I forgot.  I think

9  you --

10  A.      I never told you.

11  Q.      I thought you said you were a --

12  A.      I'm a medial --

13  Q.      I thought --

14  A.      -- assistant.

15  Q.      -- you told Mr. Seaton you were a caregiver or

16  something.

17  A.      Yes, I'm a caregiver.

18  Q.      You ever been to medical school?

19  A.      Yes.

20  Q.      You ever obtained a medical degree?

21  A.      Medical assisting.

22  Q.      Medical assisting?

23  A.      Yes, sir.

24  Q.      That's not diagnosing, is it?

25  A.      I'm not here to diagnose.

1    Q.       Well, I don't know about that.  But just

2    answering my question, that's just helping people, just

3    assisting people medically; correct?

4    A.       Correct.

5    Q.       Anything above medical assistant school?

6    A.       No, sir.

7             MR. KNIGHT:  Okay.  Thank you.

8             THE COURT:  All right.  Thank you.

9             Any redirect?

10            MR. SEATON:  No, Your Honor.

11            THE COURT:  All right.

12            MR. SEATON:  You can come down.

13            THE COURT:  Thank you.

14            THE WITNESS:  Thank you.

15            MR. SEATON:  Our next -- our next witness, Your

16   Honor, is -- is -- is by deposition.  It's Dr. Startup's

17   deposition.

18            THE COURT:  Okay.  And is this a videotaped

19   deposition?

20            MR. SEATON:  It is a videotaped deposition.  We

21   would move it into evidence as -- as well as the

22   exhibits that were in -- entered in that deposition.

23            THE COURT:  And you want to play it for the

24   jury?

25            MR. SEATON:  Yes, Your Honor.

```
 1                THE COURT:  Okay.  Any objection?
 2                MR. KNIGHT:  No, Your Honor.
 3                THE COURT:  Okay.
 4                MR. SEATON:  And this would be Exhibit 58.
 5                THE COURT:  Exhibit 58.
 6                MR. SEATON:  Right.
 7                THE COURT:  All right.  Ladies and gentlemen of
 8    the jury, you're going to hear a videotaped deposition
 9    of -- of a witness, and you -- you treat it just like
10    the witness was here today.
11                MR. SEATON:  This is about an hour -- a little
12    over an hour.  So just forge through?  I was going to
13    give you a heads-up.
14                THE COURT:  Ladies and gentlemen, do you want
15    to take a little bit of a break now, or do you want to
16    wait till after the deposition?
17                A JUROR:  After's fine.
18                A JUROR:  After.
19                A JUROR:  After.
20                THE COURT:  All right.  Let's go ahead.
21                (The video was played in open court, and the
22                proceedings continued as follows:)
23                MR. SEATON:  Do you want to break?
24                THE COURT:  Would you all like to take a break
25    before we continue?
```

```
 1              A JUROR:  Sure.

 2              THE COURT:  Okay.  Let's take -- let's take

 3    about a 15-minute break and stretch our legs, and then

 4    we'll conclude the deposition.

 5              (Brief recess.)

 6              (The proceedings were held outside the

 7              presence of the jury, as follows:)

 8              THE COURT:  All right.  Ms. Laster, would you

 9    bring our jury back in.

10              THE COURTROOM DEPUTY:  Yes, sir.

11              (The proceedings were held in the presence of

12              the jury, as follows:)

13              THE COURT:  All right.  Please be seated.

14              Ms. Laster, please resume playing the exhibit.

15              (The video was played in open court, and the

16              proceedings continued as follows:)

17              THE COURT:  Is that the entire deposition,

18    Mr. Seaton?

19              MR. SEATON:  Yes, Your Honor.

20              THE COURT:  Okay.  All right.  So what is --

21    what is your next witness?

22              MR. SEATON:  It would be Mr. Michael Beehan.

23              THE COURT:  Okay.  And how long will that take?

24              MR. SEATON:  I -- I'm hoping we can be through

25    at noon.
```

1        THE COURT:  Okay.  Call your next witness.

2        MR. SEATON:  All right.  Michael Beehan.

3        (The witness was duly sworn.)

4                    MICHAEL BEEHAN,

5    called as a witness at the instance of the parties,

6    having been first duly sworn, was examined, and

7    testified as follows:

8                    DIRECT EXAMINATION

9    BY MR. SEATON:

10   Q.        State your full name for the -- the Court, sir.

11   A.        My name is Michael Corcoran Beehan.

12             For the benefit of the court reporter, my

13   middle name is spelled C-o-r-c-o-r-a-n.

14   Q.        Okay.  And what do you do?

15   A.        I'm an attorney.

16   Q.        And you where do you practice?

17   A.        I practice at Fox, Farley, Willis & Burnett in

18   Clinton.

19   Q.        All right.  And that practice -- you're not

20   affiliated with me or the Garza Firm or anything, are

21   you?

22   A.        I'm not.

23   Q.        All right, sir.  And so as a lawyer, have you

24   ever served as a guardian ad litem before?

25   A.        I have not.  This is my first appointment as

1  guardian ad litem.

2  Q.      And how did the appointment come about?  Do you

3  recall?

4  A.      So, Mr. Knight, defense counsel, filed a motion

5  to have a guardian ad litem appointed, and both parties

6  agreed to have -- proposed me as being appointed as

7  guardian ad litem, and the Court put down an order doing

8  so.

9  Q.      And can you enlighten us about what a guardian

10  ad litem is?

11  A.      Yes.  So my job is to look out for the best

12  interest of Mr. Ling and make decisions in his best

13  interest.  Because he had -- has been diagnosed with a

14  TBI, all parties and the Court thought it would be best

15  to have somebody appointed to do that for Mr. Ling.

16  Q.      And that's just for purposes of this case;

17  right?

18  A.      Yes, that's just for this case.

19  Q.      All right.  You're not making any financial

20  decisions or anything like that?

21  A.      No, I'm not making any financial decisions for

22  Mr. Ling.

23  Q.      And so do you stand in his shoes and you

24  represent Mr. Ling, or are you Mr. Ling, I guess, for --

25  for the week?

1  A.        Right.  For -- for purposes of this trial, I'm

2  standing in Mr. Ling's shoes since he cannot be here.

3  Q.        All right.  And have you -- have you

4  interviewed Mr. Ling and talked with him?  Tell me --

5  tell -- just tell the ladies and gentlemen of the jury,

6  what all have you done?

7  A.        Okay.  So I -- I have spoken with Mr. Ling by

8  phone on several occasions.  I was scheduled to meet

9  with him back in November.  He was going to come down

10 for a proceeding.  He -- he did not make it down, and so

11 I went up to Michigan in December to speak with Mr. Ling

12 and meet with some of his family members.

13 Q.        So the event that he was supposed to come down

14 for, do you know what happened, what occurred?  Why

15 didn't he make it?

16 A.        Okay.  Yes.  So Mr. Ling was scheduled to fly

17 down on his own from Detroit to Knoxville.  He missed

18 his flight -- I'm sorry.  Excuse me.  He got on the

19 flight from Detroit to Atlanta.  In Atlanta, he became

20 confused, for some reason thought that he needed to --

21 to get his luggage before boarding the flight from

22 Atlanta to Knoxville, and he missed his flight from

23 Atlanta to Knoxville.

24 Q.        And so what happened?

25 A.        In terms of -- so Mr. Ling ended up going back

1    to Michigan at that point, and I was not able to meet

2    with him in Knoxville.

3    Q.       Okay.  And so then did you make a special trip

4    to Michigan?

5    A.       Yes, I did.  And so I went up to -- to Michigan

6    so I could have a chance to meet with Mr. Ling, and I

7    was able to -- I spoke with Mr. Ling.  I spoke with his

8    mother, Traci Swanson.  And I also spoke with his

9    sister, Erica.

10   Q.       And have you since spoken with his brother

11   sitting back here?  Yeah.

12   A.       Yes.  Yes.  I've also had a chance to speak

13   with Mr. Justin back there, his brother, yes.

14   Q.       Okay.  And so tell -- tell us -- the ladies and

15   gentlemen of the jury what your discussion -- we don't

16   want to talk about the discussion, but what your

17   conclusions were about whether he should be at trial.

18   A.       Right.  So --

19           MR. KNIGHT:  Your Honor, just to the extent

20   this relies on hearsay, we would object.

21           THE COURT:  Sustained.

22           MR. SEATON:  It's -- I'm not asking him to what

23   extent it -- or to -- how he made that determination

24   based upon hearsay.  I'm asking him based upon his

25   determination from interviewing everyone, including

1    Mr. -- Mr. Ling.

2            THE COURT:  Well, isn't that the same thing?

3            MR. SEATON:  Not in my opinion.  I mean, I'm

4    not asking him to add -- to -- to introduce any

5    statements -- any out-of-court statements.

6            THE COURT:  What is it you're seeking to -- to

7    introduce?

8            MR. SEATON:  Well, he -- he's -- he's -- he's

9    questioned -- defense counsel has questioned the fact

10   that Mr. Ling is not here, and his mother has testified

11   that Mr. Ling just got out of a mental hospital.  I'd

12   like to ask him, you know, what are his observations in

13   terms of Mr. Ling's abilities to function.

14           THE COURT:  Well, he can -- he can answer that.

15           MR. SEATON:  Okay.

16           THE COURT:  What he's personally observed.

17           MR. SEATON:  Certainly.

18           THE COURT:  And -- and that -- yes.

19           MR. SEATON:  All right.  Thank you, Your Honor.

20   BY MR. SEATON:

21   Q.      Can you tell us how -- in your experience

22   with -- with Nathan Ling, how he's functioning, how he's

23   communicating?

24   A.      Right.  So in -- in going up to visit Mr. Ling,

25   just in my conversations with him, I could sense that he

 1    was very anxious.  Part of that was he would repeat the

 2    same questions over and over again, and kind -- kind of

 3    tying in with that, I noticed that he would -- in

 4    repeating his questions, and I would give him the same

 5    answer that I would have given him -- I don't know --

 6    half an hour, an hour ago, it -- it appeared that he

 7    didn't -- didn't retain that information that -- that I

 8    was giving him.  And I could tell that he -- he had

 9    difficulty focusing.

10        Again, it kind of goes back to in conversation,

11    asking questions to him, he -- he would maybe begin to

12    answer the question, go off on a tangent.  I'd kind of

13    rein him back in, say, hey, I really need you to give me

14    the answer.  He would start and go off on another

15    tangent.  And so, you know -- and I -- I could tell that

16    his -- his -- again, his ability to focus was an issue.

17        He was a very anxious person, and I thought,

18    based on that, it would be difficult -- very difficult

19    for him to sit through this trial.  You know, I thought

20    it would not be in his best interest to do so.

21    Q.    All right.  If you would answer any questions

22    that Mr. -- Mr. Knight has.

23    A.    Thank you.

24                    CROSS-EXAMINATION

25    BY MR. KNIGHT:

1   Q.      Mr. Beehan, how old are you?

2   A.      I am 38 years old.

3   Q.      Okay.  And how long have you been practicing at

4   Fox & Farley?

5   A.      I've been practicing there for -- I believe

6   it's about eight years now.

7   Q.      Okay.  And you graduated from law school when?

8   A.      It would have been 2015, and I would have

9   started practice January 2016.

10  Q.      Okay.  And what type of lawyer -- what type of

11  law do you practice?

12  A.      I represent folks who have been seriously

13  injured.  Some call it "personal injury work."  I'm a

14  plaintiff's lawyer, trial lawyer.

15  Q.      Any of your clients ever -- your clients

16  understand that they're suing for money; correct?

17  A.      Correct.

18  Q.      And any of your clients ever try to slight

19  things their way whether or not you think it's a good

20  idea or a bad idea?

21  A.      What do you mean "slight things their way"?

22  Q.      Like try to make things more serious than they

23  are.

24  A.      Certainly seen it at times.  Of course, my

25  advice is always just tell it how it is.

1   Q.      Uh-huh.

2           I know from your -- the report that you

3   filed -- and you correctly noted that I was the one who

4   asked that you represent -- that -- that you make the

5   decisions whether or not -- concerning this case

6   concerning Mr. Ling; correct?

7   A.      That's correct.

8   Q.      So you've reviewed the pleadings; right?

9   A.      That's correct.

10  Q.      Have you reviewed -- and you reviewed the video

11  that everybody's seen?

12  A.      Correct.

13  Q.      And have you reviewed the depositions?

14  A.      I've reviewed Mr. Ling's deposition.

15  Q.      Okay.  Did you review his testimony to the

16  criminal court on Justin Crabtree?

17  A.      I have not reviewed his -- his statement in

18  criminal court.  My understanding is that was a victim

19  impact statement and he was not subject to

20  cross-examination.

21  Q.      Okay.  You understand that.  Have you seen

22  that?

23  A.      I -- I have not seen that, no.

24  Q.      Okay.  Did you know that he had come down for

25  that?

1 A.       Yes, I did know he came down for that.

2 Q.       Okay.  I guess I'm wondering, is there --

3 you -- you -- you came to the conclusion that Mr. Ling

4 was diagnosed -- was anxious.  You're not a doctor;

5 correct?

6 A.       I'm not a doctor, no, sir.

7 Q.       And you're not diagnosing him with any form of

8 anxiety, are you?

9 A.       Absolutely not.

10 Q.       And you're not form -- diagnosing him with any

11 form of memory loss; correct?

12 A.       I'm not.

13 Q.       In fact, you're not qualified to do so as I'm

14 not qualified.

15 A.       I'm not qualified to do so.  Just stated what I

16 observed when I met with Mr. Ling.

17 Q.       Okay.  And, of course, you took Mr. Ling at his

18 word; correct?

19 A.       That's correct.

20 Q.       He was able to talk to you on the telephone?

21 A.       That's correct.

22 Q.       And he was able to have a virtual visit with

23 Dr. Startup I think we all just heard; correct?

24 A.       Correct.

25 Q.       And so the story that -- well, the -- you

1    weren't in the Atlanta airport with Mr. Ling, were you?

2    A.        I was not.

3    Q.        So when he was telling you why he missed his

4    flight or if he missed his flight or even if he got on

5    the flight, you were relying on what he told you;

6    correct?

7    A.        That's correct.

8    Q.        And with regard to his symptoms, you're relying

9    on him; correct?

10   A.        That's correct.

11   Q.        Did you perform a criminal history of Mr. Ling?

12   A.        I'm sorry.  What was your question?

13   Q.        Did you perform a criminal history check of

14   Mr. Ling?

15   A.        No, I did not.

16   Q.        Did you perform a substance or alcohol history

17   of Mr. Ling?

18   A.        I did not.

19             MR. KNIGHT:  Thank you.

20             THE COURT:  Any redirect?

21                    REDIRECT EXAMINATION

22   BY MR. SEATON:

23   Q.        Have you ever done that for a client?

24   A.        A criminal --

25   Q.        A substance check or criminal history check?

1    A.        I have not done those for clients, no.

2    Q.        You ever known a lawyer that did?

3    A.        Not that I know of.

4              MR. SEATON:  Thank you.

5                    RECROSS-EXAMINATION

6    BY MR. KNIGHT:

7    Q.        Wouldn't it be helpful to know Mr. Ling prior

8    to this incident and what he had done and what he was

9    capable of for your purposes?

10   A.        He -- he did speak to me a little bit about how

11   he had been charged as a juvenile and -- and how he was

12   on probation for that charge, you know.  Beyond that,

13   you know, maybe it would have been helpful, but, you

14   know, I don't know.

15   Q.        And you are the guardian ad litem.  Is there

16   any -- would there be any problem if Mr. Ling just came

17   and sat and testified and then left if this was so much

18   for him?

19   A.        Well, the issue with -- with coming and

20   testifying is that, again, I thought it would just cause

21   him immense anxiety based on what I saw when I met with

22   him.  And the difference here being that he would be

23   subject to cross-examination in a very formal

24   proceeding, whereas the sentencing of Mr. Crabtree,

25   again, he just essentially read a statement and left

1  court without being cross-examined.

2  Q.      Well, he was deposed by me; correct?

3  A.      That's correct.  Of course, depositions

4  are -- are technically a formal proceeding but much more

5  informal that what we're here on today.

6  Q.      They're in a conference room; correct?

7  A.      Correct.

8  Q.      Your conduct's not evaluated by a judge or

9  jury, is it?

10  A.      That's correct.

11  Q.      And I'm not Mr. Ling's lawyer, am I?

12  A.      You are not.

13  Q.      And he was able -- and he was able to come from

14  Michigan through Atlanta and find his way to Marcos

15  Garza's office and give a deposition; correct?

16  A.      Not sure how he got there, but that is correct

17  that he did arrive there.

18          MR. KNIGHT:  Thank you.

19          MR. SEATON:  That's --

20          THE COURT:  Thank you, gentlemen.

21          MR. SEATON:  That's all.

22          THE COURT:  Thank you.

23          Thank you, sir.

24          THE WITNESS:  Thank you, Your Honor.

25          THE COURT:  All right.  Mr. Seaton, it's ten

1    till 12:00.  It's a good time for to us take our lunch

2    break.

3          Ladies and gentlemen, let's -- let's take our

4    lunch break, and we'll come back at 1:05.  Enjoy your

5    lunch.  Remember what I said to you yesterday, the

6    instructions not to discuss the case with anyone, not to

7    discuss it amongst yourselves, no independent research,

8    and no looking at news media.  You all remember all of

9    that.

10          So enjoy your lunch.  Thank you.

11          (The proceedings were held outside the

12          presence of the jury, as follows:)

13          THE COURT:  All right.  Gentlemen, anything

14    before we break for lunch?

15          MR. SEATON:  No, Your Honor.

16          MR. KNIGHT:  No, Your Honor.

17          THE COURT:  Okay.  Enjoy your lunch.

18          MR. SEATON:  Thank you, Your Honor.

19          MR. KNIGHT:  Thank you, Your Honor.

20          (Luncheon recess.)

21          (Subsequent proceedings were heard but

22          not requested to be transcribed herein.)

23          (The proceedings were held in the presence of

24          the jury, as follows:)

25          THE COURT:  All right.  Thank you, gentlemen.

1    Have a seat, please.

2            All right.  Mr. Seaton, we're ready for your

3    next witness.

4            MR. SEATON:  It would be Agent John Hannon.

5            THE COURT:  Okay.

6            (The witness was duly sworn.)

7                    JOHN HANNON,

8    called as a witness at the instance of the parties,

9    having been first duly sworn, was examined, and

10   testified as follows:

11                  DIRECT EXAMINATION

12   BY MR. SEATON:

13   Q.      You're Agent John Hannon?

14   A.      Yes, sir.

15   Q.      And who are you employed by?

16   A.      The Tennessee Bureau of Investigation.

17   Q.      And how long have you been employed by them?

18   A.      Since 2013.

19   Q.      Tell us a little bit about your background

20   before you -- you became a TBI agent.

21   A.      Before I became a TBI agent, I was a uniformed

22   officer with our uniformed division in TBI.

23   Q.      I'm sorry.  Say it again?

24   A.      A uniformed officer.

25   Q.      With the TBI?

1   A.      Yes, sir.

2   Q.      And when did you start doing that?

3   A.      That was in 2013.

4   Q.      Okay.  And then what does a uniformed --

5   uniformed officer do versus what you're doing now?

6   A.      So basically, a uniformed officer is mostly

7   primarily responsible for security as well as background

8   investigations and supportive of special agents of the

9   agency.

10  Q.      And so you did that for how long until you

11  became this?

12  A.      Approximately a year.

13  Q.      Okay.  And what are you doing now?

14  A.      I'm a special agent criminal investigator.

15  Q.      You're a special agent criminal investigator?

16  A.      Yes, sir.

17  Q.      And so, generally speaking, when are you called

18  out for -- to do things?

19  A.      Generally at the request of a district attorney

20  general or in -- in some instances, at the request of a

21  local agency, sheriff or chief of police.

22  Q.      And what type of things do they call you out to

23  investigate?

24  A.      Criminal investigations.  Those could range

25  from violent crime to official misconduct, things of --

 1   homicides or things of that nature.

 2   Q.        Okay.  So anything that's really, I guess,

 3   heavy duty for a small law enforcement department?

 4   A.        Generally, yeah.  We're very supportive of our

 5   local agencies that don't have the resources and support

 6   that they need in rural counties.

 7   Q.        And then you also -- are you called out to do

 8   investigations that involve official oppression or -- or

 9   official misconduct, that type of thing?

10   A.        Yes, sir.

11   Q.        And can you give us an idea of -- of how much

12   of that you do?

13   A.        Not as much anymore.  I -- I transitioned to a

14   different role sometime ago within our agency, but prior

15   to transferring, that was something I did quite a bit.

16   Q.        Okay.  And was there a lot of that?

17   A.        I won't say a lot, but it would come at times.

18   Q.        All right, sir.  And so, generally speaking,

19   was it the district attorneys that would call you to do

20   official misconduct-type cases?

21   A.        Yes.

22   Q.        And would anybody else call you other than a

23   district attorney?

24   A.        Most of the time, I would say it would be the

25   district attorney general.

1  Q.      All right, sir.  And so -- so drawing your

2  attention to this Nathan Ling issue, you did a

3  full-scale investigation of this, didn't you?

4  A.      Yes, sir.

5  Q.      Well, you want to tell them what -- how you

6  first got called and what your responsibilities were?

7  A.      Yes.  So I was initially requested by the

8  district attorney general in Campbell County -- that

9  would be Jared Effler -- back in 2019, and it was

10  reported to me that there had been an alleged assault

11  that occurred at the Campbell County Jail.  The victim

12  in this case was named as Nathan Ling.

13         I was to report to Campbell County to begin my

14  investigation by collecting video evidence to review as

15  well as a list of witnesses, employees, and other

16  individuals that may have been a witness or party to

17  this alleged incident.

18  Q.      All right.  And so let's talk about the scope

19  of what you're called out to do.  I mean, because you're

20  not doing a full investigation of the department, are

21  you?

22  A.      No, I'm not.

23  Q.      What are you -- what -- what is it that

24  you're -- what -- what's the scope of what you -- what

25  they're asking you to do?

1   A.      Specifically, like I said before, the

2   allegations alleged in this request from the district

3   attorney general was to look into the allegations that

4   Mr. Ling had been assaulted at the Campbell County Jail

5   by employees of the Campbell County Sheriff's Office.

6   Q.      So is that what you investigated is -- was

7   whether or not the employees of the Campbell County

8   Sheriff's Department assaulted him and committed a

9   crime?

10   A.      Correct.

11   Q.      All right.  And then once you come to your

12   findings, do you then present those to the district

13   attorney for him to make decisions?

14   A.      Yes, I do.

15   Q.      All right.  So -- so you don't make any

16   decisions.  You -- you -- you basically put stuff

17   together and hand it to the district attorney general?

18   A.      Yes, sir.  I -- I gather the facts of the

19   investigation, and then I present that to the district

20   attorney general for them to make their determination.

21   Q.      And then the district attorney general decides

22   solely on whether or not certain officers are going to

23   be charged criminally; right?

24   A.      Correct.

25   Q.      All right.  And did that occur in this case?

1   A.      It did.

2   Q.      All right, sir.  So I want to go back to how

3   long -- how long did -- or when was it that you were

4   first called to do this investigation?

5   A.      It would have been around mid-July.  I believe

6   July 15th --

7   Q.      Okay.

8   A.      -- of 2019.

9   Q.      All right.  We reviewed that the other day,

10  didn't we?

11  A.      We did.

12  Q.      All right.  So you were called out July 15th.

13  This happened on June the 1st or 2nd; right?

14  A.      That's correct.

15  Q.      So it's about a month and a half later?

16  A.      Yes.

17  Q.      And when you first did your investigation, did

18  you go to see the people in the sheriff's department?

19  A.      Initially, I did.

20  Q.      Okay.  And did you ask them, can you give me

21  the investigation that you've done so far?

22  A.      I did.

23  Q.      And what investigation had they done so far?

24  A.      There had not been any thus far.

25  Q.      There had not been any investigation?

1    A.        Correct.

2    Q.        All right, sir.  And did they tell you -- or

3    did you find out whether or not there was going to be

4    any investigation by them?

5    A.        I did not.

6    Q.        Okay.  So how long did you spend doing this

7    investigation of the officers at Campbell County?

8    A.        As I said, I began around July -- mid-July of

9    2019, and I believe it was around December when they

10   were formally charged.

11   Q.        Okay.  So -- so five months?

12   A.        Yes, sir.

13   Q.        So did -- did that -- during that five-month

14   investigation, was -- were you working on other cases,

15   or was this primarily what you did?

16   A.        I -- I was working on other cases, but

17   primarily this was my focus.

18   Q.        Okay.  And when you did your investigation, did

19   you -- you got -- you said you got that videotape off

20   the sheriff's department; right?

21   A.        I did.

22   Q.        All right.  And did you -- you interview most

23   all the witnesses?

24   A.        I did.

25   Q.        How many witnesses would you say just ballpark

1  that you interviewed?

2  A.        I would say 10 -- 10 to 12.

3  Q.        You think that's all?

4  A.        Initially.

5  Q.        Okay.  But -- yeah, I mean the whole

6  investigation.

7  A.        Throughout the investigation?

8  Q.        Five months.

9  A.        20, 25.

10 Q.        Okay.  And you actually even flew up to

11 Michigan to see Mr. Ling; right?

12 A.        I did.

13 Q.        All right.  What else did you do?

14 A.        Flew to Michigan to see Mr. Ling, interviewed

15 him as well as his fiancee at the time, came back to

16 Tennessee, continued the investigation, spoke with

17 doctors, other staff of the -- the sheriff's office

18 prior to this case being presented to a grand jury.

19 Q.        All right, sir.  And did you compile a 482-page

20 report?

21 A.        I did.

22 Q.        And is that -- you have a copy of that there?

23 A.        Yes, I do.

24 Q.        All right, sir.  And is that -- is that the

25 report that you put together?

1    A.       Yes, sir, it appears to be.

2    Q.       All right.  Now, it's got all kinds of what we

3    call "legal hearsay" in it.  It's got dates of birth.

4    It's got Social Security numbers.  So we're not going to

5    put that into the record.

6             But you did do a summary of your investigation,

7    didn't you?

8    A.       I did.

9    Q.       And that's a six-page summary?

10   A.       Yes, sir.

11            MR. SEATON:  That would be Exhibit Number 55.

12            Can we pull that up, Joseph.

13   BY MR. SEATON:

14   Q.       And does that appear to be a copy of your

15   six-page summary?

16   A.       Yes, it does.

17            MR. SEATON:  All right.  Can we make that

18   Exhibit 55 and publish that, Your Honor?

19            MR. KNIGHT:  No objection.

20            THE COURT:  So ordered.

21            (Plaintiff's Exhibit 55

22            received into evidence.)

23   BY MR. SEATON:

24   Q.       So while we have that up -- do you have control

25   of that?  Let's pull up -- there you go.

1    Let's -- I don't want you to read it page by

2  page, but if you could kind of glance at it and then

3  just give us a big summary of what the summary is.

4  A.    Basically, as explained previously, this is

5  what we call a "summation of the investigation."  This

6  is a basic snapshot of what I've done from the moment of

7  the inception of the case in July up until the moment of

8  the end of the investigation prior to presenting this

9  case to a grand jury.

10    As -- as noted here, it references when

11  Campbell County Sheriff's Office responded to an address

12  in LaFollette during early morning hours of June 2nd,

13  2019.  Initially, there were two officers that responded

14  to calls of a suspicious vehicle.  Once they arrived,

15  they encountered Mr. Ling and two other individuals.

16  Shortly thereafter, Mr. Ling fled from that vehicle.  A

17  short pursuit ensued, and he was later taken into

18  custody shortly thereafter.

19    Other late -- later other deputies responded.

20  Mr. Ling was taken into custody.  From there, after an

21  ambulance had arrived for evaluation, once he was

22  evaluated, he was then taken from the arrest location to

23  the Campbell County Jail.

24  Q.    Let -- let me stop you right there.  And you

25  tell us if -- when we need to scroll through this thing.

1    A.        Okay.

2    Q.        We can scroll it.

3              But did you uncover --

4              THE COURT:  Mr. Seaton.

5              MR. SEATON:  I'm sorry?

6              THE COURT:  Mr. Seaton, I've admitted this.

7    But have you reviewed this for PII so it complies with

8    the local rules --

9              MR. SEATON:  I think so, Your Honor.

10             THE COURT:  -- for anything --

11             MR. SEATON:  Yes.

12             THE COURT:  Do you --

13             MR. SEATON:  Let me double-check.  I remember

14   that I had, but I'm always leery of my memory.  I don't

15   see any --

16             THE COURT:  Okay.

17             MR. SEATON:  -- dates of birth.

18             THE COURT:  I'm going to go ahead and admit it

19   and let you all -- but review it again closely for the

20   final version.

21             MR. SEATON:  I will.  But -- yeah.

22             THE COURT:  Okay.

23             MR. SEATON:  Yeah.  And I appreciate --

24             THE COURT:  Ladies and gentlemen, all documents

25   filed in court, dates of birth, personal identifying

1   information, such as Social Security numbers, things

2   like that are always redacted.

3           MR. SEATON:  Thank you, Your Honor.

4   BY MR. SEATON:

5   Q.      So did you uncover any evidence of the fact or

6   the allegation that Nathan Ling had run into a truck?

7   A.      I did not.  I'd been told that, but I did not

8   uncover any evidence suggesting that that had occurred.

9   Q.      Did you interview any witness who said that

10  they saw him run into a truck?

11  A.      I did not.

12  Q.      So it was speculation that you'd heard?

13  A.      Yes.

14  Q.      All right, sir.

15          All right.  Go ahead.

16  A.      As I said, Mr. Ling was transported to the

17  Campbell County Jail as well as Ms. McDaniel, his

18  fiancee at the time.  When he was at the jail, he was

19  released from his vehicle and escorted inside by Deputy

20  Crabtree.  During that time, you could see in the video

21  recording that Deputy Crabtree had placed Mr. Ling's

22  body up against the door -- the entrance door to the

23  booking area very aggressively.

24          If y'all care to scroll down.

25          Shortly thereafter, he went inside where there

1  were other deputies waiting on him.  At some point after

2  arriving into the booking area, it was alleged that

3  Mr. Ling had become combative.  At that point, he was

4  taken to the ground by Deputy Crabtree.  Mr. Ling was in

5  handcuffs at this time.

6      And just so we have that, he was also pepper

7  sprayed prior to being transported into this area at the

8  arrest location.

9      So they get him inside.  Deputy Crabtree takes

10 him to the ground.  Mr. Ling falls to his back still

11 handcuffed, and he's punched in the face three times.

12 Q.    You saw that on the video?

13 A.    Yes.

14 Q.    Okay.  Go ahead.

15 A.    Later other corrections officers from the jail

16 enter into this booking area where Mr. Ling is located

17 to try to get him under control.  During this time, he

18 was pepper sprayed again.  There was some additional

19 strikes by a corrections officer that was there at the

20 jail.

21     After several minutes, he was then taken from

22 an area -- from the booking area to a shower where he

23 was decontaminated.  From this decontamination area, he

24 was taken to a one-man cell where he remained from

25 approximately 12:45 until the next morning.

1  Q.      And so was it your understanding that during

2  this entire time he was handcuffed behind his back?

3  A.      That's correct.

4  Q.      Including the two times that he was pepper

5  sprayed?

6  A.      Correct.

7  Q.      All right, sir.  And that included the times

8  that he was abused in the -- in the garage as well as in

9  the sally -- or in the trap room?

10  A.      That's correct.

11  Q.      All right, sir.  Go ahead.

12  A.      As I said, he went to the one-man cell,

13  remained there for the duration of the night.  It was

14  told to me that he was checked on periodically

15  throughout the night via a camera.  Occasionally the

16  door would open so folks could look in to see that he --

17  ensure that he was breathing, but it appeared nobody

18  came in and physically went into the room to check on

19  him.

20          It wasn't until that next morning that morning

21  shift came on that the nurse and some additional

22  corrections officers did go in to check on him and saw

23  that Mr. Ling appeared that he needed more medical

24  attention than could be provided at the jail, so they

25  transported him to LaFollette Medical Center.

1  Q.        Were you made aware of how he was transported

2  to the LaFollette Medical Center?

3  A.        I was.

4  Q.        So did they call 9-1-1 and transport him in an

5  ambulance?

6  A.        They did not.

7  Q.        How did they transport him?

8  A.        So the corrections officers, with the

9  assistance of the nurse, got Mr. Ling dressed, got his

10  clothes changed out.  They placed him into a county

11  vehicle, and he was transported to the hospital by a

12  deputy.

13  Q.        So he was placed in the back of a patrol car,

14  seat belt buckled in; right?

15  A.        Correct.

16  Q.        And did you determine whether or not he was

17  conscious at the time?

18  A.        Based off of the statements that I -- that I

19  had taken, he was conscious, but he had to have

20  assistance from the -- from the staff there.  It was as

21  if he could not walk on his own.  I believe they had to

22  use a wheelchair to get him to that car.

23  Q.        All right.  And do you recall any statements of

24  the fact that he was not making any coherent statements,

25  he was grunting, and just --

1    A.        That's correct.  That's correct.

2    Q.        -- guttural-type sounds?

3    A.        Yes, sir.

4    Q.        All right, sir.  Go ahead.

5    A.        As I said, he was transferred to LaFollette

6    Medical Center.  And due to his injuries, he had been

7    airlifted to UT Medical Center.  As it related to a

8    brain bleed as well as other injuries, he was

9    transported to UT Medical Center.  Once there, it was

10   determined he had a brain bleed but that would not

11   require surgery.  He appeared to have fractures to his

12   face as well as a broken bone in the shoulder.

13   Q.        Go ahead.

14   A.        Can you scroll down, please?

15             During this time that he's at LaFollette

16   Medical Center, his -- his mother did come down from

17   Michigan to see about him and learned that he had been

18   in the hospital and saw the extent of his injuries.  And

19   he was transported there on June 2nd and remained there

20   until the end of June at UT Medical Center.

21             As I stated before, I continued to interview

22   other employees of the jail as well as witnesses to the

23   arrest itself.  The nurse that was on shift that morning

24   that assisted with getting Mr. Ling to the vehicle had

25   informed me about him being brought in the previous

night and talked about a conversation that she had with

Deputy Crabtree, the deputy that punched Mr. Ling in the

nose.  According to her, Mr. Crabtree told her that

Mr. Ling may have a fractured nose and that was courtesy

of him.

Q.      What did that indicate to you?

A.      That indicates to me that Mr. Crabtree's

actions caused Mr. Ling's nose to be injured.

Q.      And that -- what did it indicate to you that he

made that kind of a comment to -- to the nurse?

A.      I'll assume, like, he was bragging about it.

Q.      All right.  Go ahead.

A.      As well as the other party in the car,

Ms. McDaniels [sic], I interviewed her during my trip to

Michigan to see Mr. Ling.  She did confirm some of the

things that had been told early on, that Mr. Ling fled

from the vehicle they were in to an area down the hill

from where the vehicle was parked.  She was aware he did

have some warrants out of Michigan, which caused him to

flee from the vehicle.  When she did see him after that

short pursuit when the deputies brought him back to the

front yard, she said that he was handcuffed.  She tried

to intervene and was -- was later detained and placed in

a patrol car herself.

As I mentioned earlier, paramedics responded to

1  the area to evaluate Mr. Ling.  During this time, it's

2  said that Mr. Ling was -- was out -- out of

3  consciousness when he was transported from the back yard

4  to the front yard.  And as the paramedics were there

5  evaluating him, he became combative, began to kick,

6  bite, spit at the deputies and the EMTs.  After they did

7  their evaluations, they decided to clear him for the

8  transport to the jail ultimately.

9  Q.      What does that mean?

10 A.      What does what mean, sir?

11 Q.      What does it mean that they cleared him to go

12 to jail as opposed to the hospital?

13 A.      They determined that he was not having any

14 medical issues at the time and that he was suitable to

15 be transported to the jail.

16 Q.      And did you have any evidence from any of the

17 witnesses or any evidence otherwise that he had had any

18 serious trauma before they put him into the patrol car?

19 A.      I did not.

20 Q.      All right.  All right.  Go ahead.

21 A.      Okay.  Getting back to Ms. McDaniel, she did

22 allege that Mr. Ling was -- remained in the jail for

23 some time and that she had saw him in a wheelchair

24 sitting there for days.  We determined that was an

25 inaccurate statement based off of the -- the video

1   evidence that we had reviewed.

2           Afterwards, we -- I interviewed a Sergeant

3   Owens, who was one of the deputies that responded to the

4   arrest location that night after the call went out that

5   Mr. Ling had fled on foot, and he had confirmed some of

6   the story that had been alleged.  At the time he said

7   that when he got there, Mr. Ling was combative.  He was

8   kicking, biting, trying to swipe at the deputies and the

9   EMTs there.

10          Ms. McDaniels became combative.  She did have

11  to be placed in the back of a patrol car separate from

12  Mr. Ling to try and get her to calm down.  She was also

13  pepper sprayed, but it appeared that the contact from

14  the pepper spray was not direct to her, so it was as if

15  it had no effect.

16          If you can scroll down, please.

17          Also, Sergeant Owens had said that once the

18  EMTs performed the sternum rub of Mr. Ling when he

19  became combative, they again said that he was not having

20  any medical issues.  Due to being so combative, they

21  allowed him to be transported to the jail by the

22  deputies, and they went on about their night.

23          If you can scroll down a bit.

24  Q.      There was a lot of talk about the fact that he

25  was kicking at the windows of the patrol car.  Did you

1  find any evidence of windows being kicked out of the

2  patrol car?

3  A.        I didn't.  By the time I got involved in my

4  investigation, it was sometime after this incident had

5  occurred.

6  Q.        Yes.

7  A.        The only information I had on that was just

8  what I was told during the interviews.

9  Q.        But did any officer tell you that he had kicked

10  out a window of a patrol car?

11  A.        Not that he'd kicked the window out, but he was

12  kicking while he was being transported --

13  Q.        He was --

14  A.        -- in the patrol car.

15  Q.        Okay.  All right.  Go ahead.

16  A.        Mr. Crabtree was interviewed by myself, and he

17  did say -- once he got to the jail with Mr. Ling, walked

18  through what happened.  He stated that he interlocked

19  his arm with Mr. Ling's arm to get him out of the back

20  of the vehicle.  He placed his body against a door and

21  got him into the booking area.

22        He said once he got him into the booking area,

23  there appeared to be an issue with him.  He turned

24  around, they went to the ground, and with the least

25  amount of force, he struck him three times or multiple

 1    times in the nose.  When asked why he did that, he said

 2    he felt like this was the best way to get his attention

 3    and to get him to stop what he was doing.

 4    Q.        All right.

 5    A.        I asked also Mr. Crabtree if he had taken a

 6    picture of Mr. Ling.  That was something that we

 7    determined had happened at -- at some point during this

 8    incident was that a photo was taken by Mr. Crabtree as

 9    they are in this booking area with Mr. Ling while he's

10    bleeding on the ground.

11    Q.        Why was that important to you?

12    A.        One, we could see it on the camera.  During our

13    review of the video surveillance footage, you could see

14    him take -- take his phone out of his pocket and snap a

15    picture of Mr. Ling, which was just odd.  So I wanted to

16    ask him about that, wanted to see if he still did have

17    that, and if so, why he had that in his possession.

18    Q.        And why was that odd?

19    A.        That's not something you see a deputy do,

20    especially after something like that has occurred.

21    Q.        All right.  So did you recover the picture?

22    A.        I did.

23    Q.        Okay.  And did you recover text messages?

24    A.        Yes.

25    Q.        And did you recover text messages between

1  Justin Crabtree and his supervisor, Michael Owens?

2  A.       I did.

3  Q.       But that's how those text messages got out is

4  you actually subpoenaed them or -- or got an order to

5  get those; right?

6  A.       That's correct.

7  Q.       All right.  And we've already looked at that.

8  We've gone through all of those text messages between --

9  between Crabtree and -- and his supervisor.

10         But, also, how did you get the picture off of

11  Crabtree's phone?

12  A.       It was saved within his phone.  He thought he'd

13  deleted it and, in fact, told me he had deleted it, but,

14  in fact, it was still saved.

15  Q.       And did you figure out how many people he had

16  sent that picture to?

17  A.       There were -- there were multiple, multiple

18  people that it was sent to.

19  Q.       All within the department; right?

20  A.       Correct.

21  Q.       And a lot of supervisors, weren't there?

22  A.       Yes, sir.

23  Q.       All right, sir.  And I don't guess you know

24  whether or not they reported any of that to their -- to

25  the sheriff?

1   A.      It -- it appeared it had not been reported.  I

2   believe the chief deputy was aware.

3   Q.      Okay.

4   A.      But I -- I don't think the sheriff was.

5   Q.      Okay.  So you think it went through a lot of

6   the department as high as the chief deputy?

7   A.      Correct.

8   Q.      Okay.  And you think that that's not an

9   appropriate thing for any police officer to do?

10  A.      That's correct.

11  Q.      All right, sir.  Go ahead.

12  A.      Also, after the interview of Mr. Crabtree, I

13  also interviewed Sean Brown, who was the corrections

14  officer.  He was one of the supervisors on shift the

15  night that Mr. Ling came into custody.  He was one of

16  the corrections officers that you could see strike

17  Mr. Ling on his side.  He was also the corrections

18  officer that pepper sprayed Mr. Ling once he was brought

19  into the facility.

20  Q.      And he was the supervisor of the jail; right?

21  A.      Correct.

22  Q.      And did you -- were you -- or did you become

23  aware at some point in time he was 20 years old?

24  A.      I did, during that interview.

25  Q.      Okay.  And did he -- during that interview, did

1    you find out whether or not he had been trained to be a

2    supervisor of a 250-plus jail?

3    A.        I did, and he had not been trained properly to

4    be a supervisor of that jail.

5    Q.        Okay.  Go ahead.

6    A.        During the interview with Mr. Brown, he did

7    report that he had only been a supervisor for a short

8    amount of time.  The extent of his training was

9    basically for basic first aid, pepper spray training,

10   and the basic training that each corrections officer

11   receives when they're hired as an employee by the

12   sheriff's office.

13             MR. SEATON:  Okay.  Can you scroll?

14             THE WITNESS:  Yes, sir.  As stated earlier,

15   talking about the photo that was sent around, the photo

16   was sent to other employees of the sheriff's office to

17   include Mr. Crabtree's direct supervisor, lieutenants.

18   At some point, the chief deputy became aware of it.  I'm

19   sure at some point the sheriff became aware of it.

20             MR. KNIGHT:  Objection to speculation, Your

21   Honor.  Objection to speculation.

22             THE COURT:  Sustained.

23   BY MR. SEATON:

24   Q.        Go ahead.

25             THE COURT:  I sustained the objection.

1    MR. SEATON:  I -- I know, but I'm not asking

2    him to repeat the answer.  I'm just saying go ahead with

3    the testimony.

4    THE WITNESS:  The other employees that were on

5    the other shifts that did not work that night shift with

6    Mr. Brown and others reported the picture was

7    circulating through -- through other employees as well

8    as text messages about that night.  We did interview

9    Corporal Warden -- or I'm sorry -- Corporal Walden,

10   Katherine Walden, and she said she had seen text

11   messages, had text messages between herself and Sean

12   Brown about this incident.  She did allow me to look at

13   the text messages and go through those for our review.

14   As stated earlier, the EMTs that responded to

15   the arrest location to evaluate -- evaluate Mr. Ling, we

16   were able to interview them.  Both James Fogarty and

17   Phyllis Byrge said that while they were at the arrest

18   location, they did not see any of the deputies do

19   anything inappropriate at that time.  They did confirm

20   that Mr. Ling was combative at that time to the point

21   where he was trying to bite them and strike them, spit

22   on them, as had been said previously.

23   And if you'll keep scrolling.

24   And -- and, lastly, just to summarize, on

25   Mr. Crabtree's phone, as stated earlier, we did retrieve

1    that photo.  During my interview with him, I did ask if

2    I could have consent to obtain that photo.  He declined

3    for his phone to be searched; however, I did follow up

4    with a search warrant and was able to obtain the

5    photograph and some text messages through that search

6    warrant.

7    Q.       Let's go to Exhibit 8.  Was that the picture

8    that you obtained from the -- from the phone of Justin

9    Crabtree?

10   A.       That's correct.

11   Q.       All right.  And that probably may not have ever

12   come out had you not gone and got the search warrant for

13   that?

14           MR. KNIGHT:  Objection.

15           THE COURT:  Sustained.

16   BY MR. SEATON:

17   Q.       Okay.  Do you have any idea of -- if anybody

18   else -- or did Justin Crabtree offer that photograph to

19   anybody else that you know -- you said that he -- he

20   refused to give it to you; right?

21   A.       Correct.

22   Q.       All right.  Is there any -- any way else that

23   you could have gotten it?

24   A.       Without a search warrant, I don't believe there

25   would have been another way I would have received it.

1    Q.        All right, sir.  Now, is it your opinion that

2    you did a very thorough investigation?

3    A.        I think so.

4    Q.        All right, sir.  And you published that

5    investigation; right?

6    A.        Yes.

7    Q.        You gave it to the Eighth District District

8    Attorney General?

9    A.        That's correct.

10   Q.        All right, sir.  And were there charges filed

11   as a result of your investigation and the determinations

12   of the district attorney general?

13   A.        There were.

14   Q.        And what do you recall those being?

15   A.        Those being aggravated assault, official

16   misconduct, official oppression.

17   Q.        And who were those charges filed against?

18   A.        Justin Crabtree and Sean Brown as well as

19   Dakota Williams.

20   Q.        And were you aware that the charges against

21   Dakota Williams were dropped?

22   A.        Yes.

23   Q.        All right.  And so were you aware of what

24   the -- the final outcome -- Joseph, you can take that

25   down.  Sorry -- of -- of the -- were you aware of what

1  the final outcome of the charges against Sean Brown

2  were?

3  A.      Yes.  He was ultimately convicted of the

4  official oppression, and the final outcome of that was

5  probation.

6  Q.      So the official oppression, was that a class C

7  felony?

8  A.      Correct.

9  Q.      And that carries what?  Three to five years?

10  A.      Yes, sir.

11  Q.      I'm not a criminal lawyer.  I'm going to ask

12  you.  Okay?

13          And so the final bottom line was he did no

14  time, just got probation?

15  A.      That's correct.

16  Q.      And then Justin Crabtree?

17  A.      He did receive some time.

18  Q.      Were you made aware he did 91 days?

19  A.      That's correct.

20  Q.      And he did that on work release at the county

21  of his choosing?

22  A.      Correct.

23  Q.      All right, sir.  Is there anything important

24  about your investigation -- oh, let me -- let me back

25  up.

1      So after you did the investigation, you gave

2  the report to district attorney -- is it Jared?

3  A.      Yes, Jared Effler.

4  Q.      Oh, District Attorney General Effler?

5  A.      Yes, sir.

6  Q.      Did anyone from Campbell County ever sit down

7  with you and say hey, tell us what all -- what your

8  findings were?

9  A.      They did not.

10 Q.      Would you have been allowed to do that?

11 A.      No.

12 Q.      Okay.  Did the district attorney general say to

13 you or -- or ask you at any point in time --

14         MR. KNIGHT:  Objection.  Hearsay.

15         MR. SEATON:  Well, "Did he ask you at any

16 point?"  It's just --

17         MR. KNIGHT:  The DA can be called as a witness

18 if he wants to call him.

19         THE COURT:  What are you trying to get to,

20 Mr. Seaton?

21         MR. SEATON:  Did he -- well, let me ask the

22 question.  Then you can rule.

23 BY MR. SEATON:

24 Q.      Did the -- did the DA ever ask you to do any

25 further investigation beyond determining whether or not

1  these individuals had committed a crime?

2  A.        No.

3  Q.        All right.  All right.  Is there anything

4  important that I haven't covered about your

5  investigation?

6  A.        I don't think so.

7  Q.        All right, sir.  Answer any questions that

8  Mr. Knight has.

9                    CROSS-EXAMINATION

10  BY MR. KNIGHT:

11  Q.        Good afternoon, Agent.

12  A.        Good afternoon, sir.

13  Q.        Exhibit 55 was a six-page summary based upon

14  this 480-page report that you were shown; is that

15  correct?

16  A.        That's correct.

17  Q.        And you've gone through it?

18  A.        Yes, sir.

19  Q.        Fairly in detail; correct?

20  A.        Yes, sir.

21  Q.        Are you satisfied that your summary is an

22  accurate reflection of the 480 pages?

23  A.        I would say for -- for a detailed reflection of

24  the investigation, you can obviously look through it,

25  but I believe that our summation that we have surmised

1  of my investigation is an accurate representation of

2  that.

3  Q.       Okay.  And did you have any other agents

4  helping you in this case?

5  A.       I did.

6  Q.       Okay.

7  A.       Yes, sir.

8  Q.       Who were the other agents?

9  A.       I believe Special Agent Sanders -- Chris

10 Sanders helped with some of the interviews as well as

11 Special Agent Brandon Elkins.

12 Q.       Okay.  And other than Justin Crabtree not

13 wanting to give you Exhibit 8, that photograph, without

14 a search warrant, anybody else withhold information from

15 you?

16 A.       Not that I'm aware of.

17 Q.       Okay.  Now, just so we're clear, you were asked

18 by the Eighth Judicial District DA, Jared Effler, to do

19 a criminal investigation; correct?

20 A.       That's right, yes, sir.

21 Q.       Not a civil investigation, a criminal

22 investigation?

23 A.       Correct.

24 Q.       And you were given carte blanche authority

25 to -- to investigate wherever that may lead you;

1  correct?

2  A.        Correct.

3  Q.        And do you feel that you were able to do that?

4  A.        I do.

5  Q.        And as a result, you generated Exhibit 55, but

6  you also, I guess, met with District Attorney Jared

7  Effler; correct?

8  A.        Yes, sir.

9  Q.        And it was district attorney -- the district

10 attorney's office of the Eighth Judicial District who

11 determined who to charge and to -- what to charge them

12 with; correct?

13 A.        Yes.

14 Q.        And it was up to them to determine what the

15 pleas would be; correct?

16 A.        Yes.

17 Q.        Or the sentences would be?

18 A.        Yes.

19 Q.        Okay.  So when Justin Crabtree pleads guilty

20 and serves time, that's the decision by the district

21 attorney; correct?

22 A.        That's correct.

23 Q.        And when Sean Brown pleads guilty, gets

24 probation for whatever reason, that's a decision by the

25 district attorney along -- amongst counsel; correct?

1  A.       Yes, sir.

2  Q.       You mentioned that you actually went up to

3  Michigan to meet with Mr. Ling?

4  A.       I did.

5  Q.       And when you met with Mr. Ling, did he tell you

6  that he thought that Justin Crabtree had caused his

7  injuries?

8  A.       He didn't say that specifically, no.

9  Q.       Did he say that he had caused him any brain

10  damage?

11  A.       He didn't say that specifically, no.

12  Q.       Did he -- what did he say specifically?

13  A.       To be honest, Mr. Ling could not -- could not

14  recall a lot of that night.

15  Q.       Okay.  That's what he told you?

16  A.       Yes, he told me that.

17  Q.       You were allowed to look at the video; correct?

18  A.       Yes, sir.

19  Q.       And you saw Justin Crabtree strike Mr. Ling

20  three times in the face; correct?

21  A.       Yes, sir.

22  Q.       And you also saw Justin Crabtree in the sally

23  port area, in the search trap area; correct?

24  A.       Yes.

25  Q.       And you saw him take a picture; correct?

1    A.      Yes.

2    Q.      Other than -- are you still a TBI agent?

3    A.      Yes, sir.

4    Q.      Okay.  How long have you been a TBI agent?

5    A.      Since 2014.

6    Q.      Were you in law enforcement prior to that?

7    A.      Just with our uniformed division.  Not as a

8    road deputy or patrol officer, no.

9    Q.      Did you have to get trained to do that?

10   A.      Yes.

11   Q.      Did you have to go through the POST training

12   certification?

13   A.      Yes.

14   Q.      Do you recall anything in your POST training or

15   anything in your training since that would authorize an

16   officer to strike another person with his fist as you

17   observed Mr. Crab- --

18   A.      As I observed Mr. Crabtree --

19   Q.      Yes.

20   A.      -- strike Mr. Ling?  No.

21   Q.      During your tenure as a TBI agent, have you

22   investigated other counties, agencies, cities?

23   A.      Yes.

24   Q.      Same parameters?  Just investigating, doing

25   interviews?  Wherever the facts lead you, that's where

1  you go?

2  A.        Yes, sir.

3  Q.        You were asked some questions about the

4  picture, which was surprising to me.  That was clearly

5  on the video, was it not?

6  A.        The picture being taken?

7  Q.        Yes.

8  A.        Yes, sir, it was on video.

9  Q.        And then you were asked to talk about how many

10 people had viewed the video or who may have viewed the

11 picture -- who may have viewed the picture, that kind of

12 thing?

13 A.        Yes.

14 Q.        Do you recall those questions?

15 A.        I do.

16 Q.        You don't know the reason why they viewed the

17 picture, do you?

18 A.        No.

19 Q.        Is it possible, Agent, that it could be

20 something that other people in the department wanted

21 other people to see as to what not to do?

22         MR. SEATON:  I'm going to object to that.

23 That's pure speculation.

24         THE COURT:  Sustained.  It's -- it's

25 speculating.

1          MR. KNIGHT:  That's all I have.

2          MR. SEATON:  Nothing further.  Thank you,

3   Agent.

4          THE COURT:  Thank you.

5          (Subsequent proceedings were heard but not

6          requested to be transcribed herein.)

7          MR. SEATON:  Our next witness is Zach Farrar.

8          THE COURT:  All right.

9          MR. KNIGHT:  Can we have a sidebar, Your Honor?

10         THE COURT:  Yes.

11         (A sidebar discussion was held between the

12         Court and counsel, outside the hearing of

13         the jury, as follows:)

14         MR. KNIGHT:  I'm moving to -- the guardian ad

15   litem -- or Mr. Farrar is a trustee.  What he knows

16   about this is beyond me.

17         THE COURT:  Trustee of what?

18         MR. KNIGHT:  I don't know.

19         MR. SEATON:  He -- he is the trustee.

20         MR. KNIGHT:  To manage the money that they

21   think they're getting.

22         MR. SEATON:  Appointed by the Court.  You know,

23   it will be five, ten minutes.  He's the trustee.

24         THE COURT:  Trustee of Campbell County?

25         MR. SEATON:  No.  No.  Trustee of Nathan Ling.

1          THE COURT:  Okay.  I'm sorry.  I understand.

2          Okay.  So what --

3          MR. SEATON:  And what does he do as a trustee?

4  What does a trustee do?  And that's it.  Nothing about

5  the facts.

6          THE COURT:  Okay.

7          MR. KNIGHT:  Managing money, Your Honor.

8          THE COURT:  He's -- I don't -- yeah.  I mean,

9  help me out here, Mr. Seaton.  Why -- why do you need

10  him?

11          MR. SEATON:  Well, the Court appointed him.  I

12  mean --

13          THE COURT:  Okay.  Well, the Court does a lot

14  of things.

15          MR. SEATON:  But, you know, the Court -- based

16  upon his motion, the Court appointed the guardian ad

17  litem and the trustee.

18          Your motion was for the trustee.

19          So I just want to get it into -- into the

20  record that he is the trustee, that he's there, and what

21  does a trustee do, and that's it.

22          THE COURT:  Okay.  I'll allow that.

23          MR. SEATON:  Okay.

24          THE COURT:  But --

25          MR. SEATON:  I'm not going into anything.

1          THE COURT:  Okay.

2              (At the conclusion of the sidebar conference,

3              the proceedings continued in open court as

4              follows:)

5              (The witness was duly sworn.)

6                          ZACH FARRAR,

7   called as a witness at the instance of the parties,

8   having been first duly sworn, was examined, and

9   testified as follows:

10                      DIRECT EXAMINATION

11  BY MR. SEATON:

12  Q.         Tell us your name, sir.

13  A.         My name is Clayton Zachary Farrar.  I'm known

14  as Zach Farrar.  That's what I go by.

15  Q.         All right, sir.  And what do you do?

16  A.         I work at Regions Bank.  In that capacity, I

17  serve as a senior vice president at Regions in the trust

18  department.  I'm a senior trust advisor with Regions

19  Bank here in the East Tennessee area, specifically

20  Knoxville.

21  Q.         And as a trust officer, what does a trustee do

22  in terms of operations when -- when you're appointed as

23  a trustee over someone?

24  A.         Yes, sir.  Routinely I serve in the capacity

25  of -- as a trustee, if you will.  It's a fiduciary.  A

1  fiduciary is someone who owes the utmost financial
2  obligations to their -- to their client.  We always put
3  the interest of the client ahead of any personal or any
4  institutional interest that we might have.  In fact, we
5  have to by law.  We take care and custody of assets that
6  may be ascribed to the client or the individuals, and we
7  maintain those assets.  We invest them in a prudent
8  manner on their behalf.

9           We routinely handle requests from, in this
10  case, maybe a beneficiary regarding healthcare,
11  medication, maintenance and support of the individuals.
12  We do so with an eye towards making those assets last
13  for that individual's lifetime.  Sometimes that's not --
14  you know, depending on the size of the assets, it's a
15  difficult task, but we do so in a prudent manner and a
16  reasonable manner.
17  Q.      And so have you been appointed as a trustee for
18  someone with traumatic brain injury before?
19  A.      Yes.  Regions routinely serves in those
20  purposes, court appointed or sometimes family members
21  themselves will -- will appoint us.  We serve in various
22  capacities depending on the court and the jurisdiction,
23  but guarding of the property, conservator of the
24  property, trustee of the property.  So yes, sir, they --
25  the answer is quite often.

1  Q.       And based upon the motion of the defense, the

2  Court has appointed you to be the trustee for Nathan

3  Ling?

4  A.       Yes, sir, that is my understanding.

5  Q.       All right.  That's all the questions I have.

6  Answer any questions Mr. Knight has.

7  A.       Thank you, sir.

8          THE COURT:  Do you have --

9          MR. KNIGHT:  I have no questions.

10          THE COURT:  -- any cross-examination?

11          MR. KNIGHT:  No questions.

12          THE WITNESS:  Thank you.

13          Your Honor, may I be excused?

14          THE COURT:  Yes.  Thank you, sir.

15          THE WITNESS:  Thank you.  Thank you.

16          THE COURT:  Mr. Seaton, call your next witness.

17          MR. SEATON:  We'll call Sean Brown, Your Honor.

18          THE COURTROOM DEPUTY:  Sir, if you'll come up

19  here to this box.

20          MR. BROWN:  I'm sorry.

21          (The witness was duly sworn.)

22                      SEAN BROWN,

23  called as a witness at the instance of the parties,

24  having been first duly sworn, was examined, and

25  testified as follows:

1           DIRECT EXAMINATION

2    BY MR. SEATON:

3    Q.      Tell the ladies and gentlemen of the jury who

4    you are.

5    A.      My name is Sean Brown.

6    Q.      And, Mr. Brown, you worked previously for the

7    Campbell County Sheriff's Department?

8    A.      That is correct.

9            MR. SEATON:  And can we pull up Exhibit 56.

10   BY MR. SEATON:

11   Q.      And is this an adequate representation of the

12   chain of command of the Campbell County Sheriff's

13   Department back in 2019?

14   A.      I believe so, yes.

15   Q.      All right.  And you would have been in the far

16   right corner just right up above Joshua Miller; right?

17   A.      That is correct.

18   Q.      So you were the corporal in charge of the jail;

19   right?

20   A.      Of that night on that shift, yes.

21   Q.      Of that night.  Right.

22           Okay.  And so when you first went to work for

23   Campbell County Sheriff's Department, do you recall how

24   old you were?

25   A.      Either 18 or 19.

1  Q.      All right, sir.  And what were the requirements

2  to go to work there?

3  A.      You had to have a high school diploma and you

4  had to pass a psych eval and have a physical.

5  Q.      Okay.  And -- and did you have to have a high

6  school degree?

7  A.      What do you mean by that?

8  Q.      Didn't you have to have a high school diploma?

9  A.      Yes.  Yes, the high school --

10 Q.      Okay.

11 A.      -- diploma.

12 Q.      And be 18 years of age?

13 A.      That is correct.

14 Q.      All right, sir.  And when you first began

15 working there, what -- what was your starting pay?

16 A.      I don't remember.

17 Q.      Okay.

18 A.      It was low.

19 Q.      I think you told me when I took your deposition

20 it was like $11 per hour?

21 A.      Something like that.

22 Q.      All right, sir.  And what was going on in the

23 Campbell County Sheriff's Department that caused all of

24 these young people to be on the late night shifts?  Do

25 you know?

1    A.       The senior guys went to first shift, and so

2    third shift kind of got stuck with all the new people.

3    Q.       Okay.  And did -- was that generally what was

4    going on in the department?

5    A.       Yes.

6    Q.       And would they -- well, who was the staffing

7    person, I guess, would be a good question?

8    A.       Like, who did the hiring and firings?

9    Q.       Yeah.  No.  No.  No.  Who did the staffing?

10   Who -- who would say, Sean, you're going to work on --

11   or, Mr. Brown, you're going to work on such and such

12   shift, and, you know, Mr. -- Mr. Crabtree, you're going

13   to work on such and such shift?

14   A.       I can't speak for Crabtree and his side, but as

15   far as I was aware in corrections, that was Mallory

16   Campbell.

17   Q.       Okay.  So she -- she set up the shifts -- the

18   people who were going to work the shifts?

19   A.       Yes, that's correct.

20   Q.       All right, sir.  And how did you feel about the

21   staffing and the -- and the training that you received

22   at Campbell County?

23   A.       I thought that the staffing was pretty

24   inadequate and as well as the training.  You can't

25   really do too much with the amount of hours of training

 1   that they gave us.

 2   Q.      So you had -- what type of training did you

 3   have?

 4   A.      I had the TCI basic, which is a 40-hour

 5   course --

 6   Q.      Uh-huh.

 7   A.      -- and whatever they gave us during

 8   orientation --

 9   Q.      Okay.

10   A.      -- along with our qualifications that we do.

11   Q.      So that was a 40-hour course; right?

12   A.      Yes.

13   Q.      All right.  And that's just to be an officer --

14   I mean, a jail officer?

15   A.      As far as I'm aware, the only reason we use

16   that was to do transports.

17   Q.      Okay.

18   A.      We had to be TCI certified because it was some

19   kind of grant or something that was allotted through

20   TCI.

21   Q.      And did they train you to -- did they train you

22   all -- or I'm -- I'm sorry.  Lost my train of thought.

23          Did they train you how to be a supervisor of

24   the jail?

25   A.      The training that I received was here's your

1  paperwork, make sure it's all signed and in this order,

2  and then put it in a stack, as far as supervisory went.

3  Q.      Did you -- did you -- well, in the papers that

4  they gave you, were they -- was there training in those

5  papers, or was it just --

6  A.      It was just like our logs and things like that

7  for, like, cell checks.  If we had, like, the hours out

8  for our maximum security that was on 23 and one, we

9  would have that all documented.  And at the end of the

10 shift, it would come up to the front, it would get

11 signed and placed in a file.

12 Q.      Okay.  And do you know why they put you in

13 charge of the jail at night at that time if you didn't

14 have any training?

15 A.      I had applied for the position assuming that I

16 would be trained to do so, but that's why I was placed

17 in that position.  But as far as the shift goes, I'm

18 unaware.

19 Q.      So when you were working that late shift,

20 how -- how long -- how many -- or for how long of a

21 period of time had you been working that late shift

22 before this occurred on June the 1st of 2019?

23 A.      As a corporal?

24 Q.      Yeah.

25 A.      I don't recall.

1  Q.      Well, was it -- was it weeks or months, or was
2  it a year?
3  A.      It might have been maybe a month and a half,
4  two months, if --
5  Q.      All right.
6  A.      -- I were to guess.
7  Q.      Okay.
8  A.      I truly don't recall, though.
9  Q.      All right, sir.  And what was the turnover rate
10 in the jail?
11 A.      It was pretty high.
12 Q.      And why do you say that?
13 A.      From personal experience, just not getting
14 acknowledged by your management.  And so if you had a
15 problem, they would say, hey, come to me, and you would
16 go to them, and then nothing would get done about it.
17 Q.      And so did that create turnover?
18 A.      I believe it did.
19 Q.      All right, sir.  And did you do any hiring, or
20 did you just -- were you just --
21 A.      No.
22 Q.      -- assigned -- assigned officers?
23 A.      No.  I was given a set of officers, and they
24 said, here you go.
25 Q.      Okay.  What about your supervision?  Tell us

1  about what kind of supervision you have there.

2  A.        What do you mean by that?

3  Q.        Well, was your supervision adequate?  I mean,

4  did you have somebody you could always turn -- or

5  somebody you could always ask questions to or somebody

6  that -- that helped oversee you, make sure that --

7  that -- that you were getting everything that you

8  needed?

9  A.        On the shift itself, no.

10 Q.        Well, I mean, as a -- as -- as a corporal of

11 the -- of the department.

12 A.        I could speak to Catie Wilson, who was the

13 sergeant above me --

14 Q.        Uh-huh.

15 A.        -- if she had time, and she would say, okay,

16 well, we'll figure it out, and that was kind of the end

17 of the road for that as --

18 Q.        Okay.

19 A.        -- as far as any questions or inquiries that I

20 had.

21 Q.        Okay.  Was it a good work atmosphere?

22 A.        I don't think corrections in general is a good

23 work atmosphere.  The people -- as far as the officers

24 went, you know, you kind of deal with them and see them

25 more than your family, so you sort of build a family

1  there.  But outside of the guys that you work with

2  immediately, I would not say that it was a good

3  atmosphere.

4  Q.      Did you have good interaction with Mallory

5  Campbell, who was the lieutenant above Catie Wilson

6  there?

7  A.      I didn't have too many interactions with her.

8  There was never an argument, but it was one of those

9  things where I would try to steer clear of her.

10  Q.      Did you tell me in your deposition that you had

11  little to no interaction with her?

12  A.      Yes, that is correct.

13  Q.      All right.  What about with Stoney Love?  Now,

14  Stoney Love was the chief jailer; right?

15  A.      He was the captain at the time, yes.

16  Q.      Okay.  And was -- did you know whether or not

17  Stoney Love was underneath the chief deputy, or was he

18  just underneath the sheriff on the jail side?

19  A.      I just naturally assumed that he was under the

20  chief deputy and the sheriff.

21  Q.      All right.  And so did you have interaction or

22  training from -- from Stoney Love?

23  A.      No training.  I've seen him in passing, but

24  there wasn't a whole lot of interactions with him

25  outside of that.

1  Q.      All right, sir.  And I think you told me that
2  you had no training at all from Catie Wilson?
3  A.      That is correct.
4  Q.      All right.  And I think you said the general
5  supervision of your job responsibilities was poor?
6  A.      That is correct.
7  Q.      All right.  Now, when you were in charge of the
8  jail every night, you were on the shift; right?
9  A.      Outside of my days off, yes.
10 Q.      All right, sir.  And so you would be working
11 five to six nights per week?
12 A.      That is correct.
13 Q.      All right.  And as you worked through your job,
14 did you -- were you ever offered any additional training
15 or support?
16 A.      We would have things like suicide prevention --
17 Q.      Uh-huh.
18 A.      -- pepper spray, and OC training, things of
19 that nature that were offered on an annual basis.
20 Q.      Uh-huh.
21 A.      But outside of that, there was nothing extra.
22 Just the things that I assume were required.
23 Q.      Such as?
24 A.      Such as your suicide prevention, your OC, and
25 spray qualifications, things like that.

1  Q.      All right.  And so were you trained to

2  intervene if another officer was abusing someone?

3  A.      Not trained formally, no.

4  Q.      Okay.  Were you trained to provide medical

5  assistance -- or -- or let me -- let me back up.

6          Were you -- were you trained to -- or to assess

7  people to determine if they were medically cleared to

8  stay in the jail?

9  A.      No.

10  Q.      Were you trained to -- to transport people if

11  they needed to go to the hospital and they had serious

12  medical conditions?

13  A.      I wouldn't necessarily call it training.  They

14  would tell you get in the car and drive.  A little bit

15  after that incident, they hosted an EVOC class, which is

16  an emergency vehicles operations course that teaches you

17  how to drive.  But outside of that, no.

18  Q.      All right.  So when you were on -- when this

19  Ling incident happened, you had been placed on that

20  night shift.  You -- you said that you think you'd been

21  working about -- you'd been doing that night shift about

22  a month and a half?

23  A.      Yes.

24  Q.      All right, sir.  And I think in -- in your

25  deposition, you said something to the effect of you

```
 1   weren't old enough to be the corporal?
 2   A.        I don't know if they've changed the policy
 3   since, but the policy stated that you were supposed to
 4   be 21 to be a corporal, if I'm not mistaken.  I was
 5   either 19 or 20 --
 6   Q.        Okay.
 7   A.        -- when I was promoted to corporal.
 8   Q.        All right, sir.  And when your first encounter
 9   with Nathan Ling -- and I -- I don't want to -- you and
10   I have watched that video during deposition.  They've
11   seen the video.  So I'm going to try to stay -- not go
12   through that entire video again.
13             But you remember the video -- the 13-minute
14   video; right?
15   A.        Yes.
16   Q.        And I think that you told me that when all of
17   this first occurred, you were standing in the sally port
18   of the garage waiting for Ling -- waiting for Crabtree
19   to bring Ling into the garage?
20   A.        That is correct.
21   Q.        And you were there with Alexander Standridge?
22   A.        Yes.
23   Q.        All right.  And so you all had gotten a call
24   that you got somebody coming in that's -- that's
25   combative; right?
```

1    A.       That is correct.

2    Q.       And so you got some other officers to -- to go

3    to the garage to help put him in; right?

4    A.       It was myself, Alex Standridge, and Joshua

5    Miller --

6    Q.       All right.

7    A.       -- if I remember correctly.

8    Q.       And then when you -- when they got there,

9    wasn't it your job as the supervisor that once they

10   crossed the threshold of the jail to take control or

11   command of Nathan Ling?

12   A.       As far as I was instructed, it was they are not

13   in our care or in our, I guess for a lack of a better

14   word -- word, control until the paper's signed.  There

15   was an intake sheet that the officers would have to sign

16   and fill out, and it listed their name, a few other

17   personal items, and then their charges.

18   Q.       So you were trained that you didn't -- you

19   didn't take custody or control of the detainee until

20   they've signed off on the paperwork?

21   A.       That is correct.

22   Q.       All right.  And so if the -- if your higher-ups

23   here, you know, the -- the sheriff and your chief jailer

24   and your chief deputy say no, as soon as you -- as soon

25   as they cross the threshold of the jail, was that just a

1  misunderstanding on your part?

2  A.        As I said, it could have been just me operating

3  under assumption.

4  Q.        Okay.

5  A.        But that's how I'd always operated since the

6  time that I started at the jail.

7  Q.        All right.

8  A.        All of the officers that trained me said, hey,

9  so that we can refuse if there's some sort of issue,

10  they need to sign that intake sheet.  When they sign

11  that intake sheet, then they're officially ours, but

12  until then, they're not.

13  Q.        So what kind of issue would there be that you

14  would -- you could refuse?

15  A.        It could be medical.  It could be like if they

16  have dialysis, stuff like that.  The -- that's -- as far

17  as I was aware, medical and dialysis.  I'm sure there

18  was more, but I don't remember off the top of my head.

19  Q.        And that particular evening -- or that

20  particular time, the sheriff's department did not staff

21  the jail with any medical personnel?

22  A.        That is correct.

23  Q.        All right.  So if you had someone that came in

24  with a medical issue, what were you supposed to do?

25  A.        We would have to refuse them and have the

1  officer transport them to the hospital --

2  Q.        Okay.

3  A.        -- or have EMS evaluate them.

4  Q.        Okay.  So when they brought Nathan Ling in, I

5  think that you told me that there -- he didn't have any

6  blood on him; right?

7  A.        That is correct.

8  Q.        And he didn't have any abrasions or anything

9  like that that you -- that you knew of?

10  A.        That is correct.

11  Q.        He didn't appear to be disoriented or

12  unconscious or anything like that?

13  A.        Correct.

14  Q.        All right.  And he was -- he -- he was not

15  under the influence of any drugs or alcohol?

16  A.        I didn't see a tox screen, so I couldn't tell

17  you that.

18  Q.        Well, I thought you told me in your deposition

19  that he was not under the influence of drugs or alcohol?

20  A.        I don't recall speaking of that.

21  Q.        Let me see if I can find it for you.

22            MR. SEATON:  How do I operate -- okay.  Thank

23  you.

24            MR. KNIGHT:  Can I have a page and line,

25  please?

1          MR. SEATON:  Yeah.  I'm sorry.  Page 89,

2   line 1.

3   BY MR. SEATON:

4   Q.      Okay.  So what I want to do is -- I asked you,

5   "Let's go back to that.  You all had no reason to

6   believe that he was under the influence of alcohol or

7   drugs, did you?"

8          And you said, "They didn't say anything to me";

9   right?

10  A.      Correct.

11  Q.      All right.  So is that still true that you had

12  no reason to believe he had any alcohol or drugs in his

13  system?

14  A.      Not until after the issue arose.  The thought

15  came in because of the way he was so combative and

16  nonverbal.  But other than that, there was no signs or

17  anything stating that he --

18  Q.      You didn't smell -- I didn't mean to --

19  A.      As far as smelling, no, I did not.

20  Q.      And you didn't see him staggering or anything

21  like that?

22  A.      No.

23  Q.      All right.

24  A.      No.

25  Q.      You were -- you all were just speculating,

1  gosh, if he's got a lot of energy, maybe he's --

2  A.       Yes, correct.  It was --

3  Q.       -- on something?

4  A.       -- under an assumption.

5  Q.       Thank you.

6         When you were in the jail, did you see Crabtree

7  slamming his face up against the wall as -- before he

8  took him into the trap room?

9  A.       I didn't see that until after I'd watched the

10  video.

11  Q.       Okay.  All right.  So you didn't see him do it

12  while you were standing there with him?

13  A.       If I did, my memory has blocked it out, and I

14  don't recall that.

15  Q.       All right.  And did you agree with Alexander

16  Standridge and Joshua Miller that Nathan Ling was not

17  resisting when he was in the sally port?

18  A.       In the sally port --

19         MR. KNIGHT:  Objection.  Argumentative.  He can

20  testify as to what he observed.

21         THE COURT:  Sustained.

22         MR. SEATON:  That's fine.  I'll ask him.

23  BY MR. SEATON:

24  Q.       Did you observe -- 'cause -- got it.

25         Did you observe whether or not he was resistive

 1  in the sally port?

 2  A.        In the sally port, I did not.

 3  Q.        All right.  You didn't observe him, or he was

 4  not resisting?

 5  A.        I didn't observe him resisting.

 6  Q.        All right.  Let me ask you to look at page 83,

 7  and this will be on line 5.  Line 5.

 8            "And if Joshua Miller and Alexander Standridge

 9  both said that he was never resisting, he was at

10  most" -- "at most trying to survive, would you disagree

11  with that?"

12            You said, "Looking at it now, no."

13            True?

14  A.        Correct.

15  Q.        All right.  And was that true the entire time

16  he was in the sally port as well as in the trap or the

17  search room?

18  A.        What was true?

19  Q.        That he was not resisting and was just trying

20  to survive.

21  A.        To a certain degree, yes.  So when you are

22  instructed to stand still while I search you and I ask

23  you if you have anything that is going to poke, stick,

24  or stab me and you start to reach for something, I will

25  take that as resisting me because I don't know if you

 1  were trying to reach for something or trying to cause

 2  any harm.

 3  Q.      So you're going to hit me?

 4  A.      I did not hit him there.

 5  Q.      Okay.  Where did you hit him?

 6  A.      When he was on the floor grabbing at my belt

 7  and I instructed him to stop --

 8  Q.      All right.

 9  A.      -- and he did not.

10         MR. SEATON:  Let's go ahead and pull up the

11  video real quick.  And let's just zoom -- or

12  fast-forward to the trap room.

13         THE COURT:  What exhibit is this, Mr. Seaton?

14         MR. SEATON:  This is Exhibit Number 48.

15         (Off-the-record discussion between

16         plaintiff's counsel.)

17         (The video was played in open court, and the

18         proceedings continued as follows:)

19  BY MR. SEATON:

20  Q.      So is this you pulling his arms up behind his

21  back and putting him on the floor?

22  A.      Yes.

23  Q.      All right.  Was there a need for that at the

24  time?  Was he resisting you then?

25  A.      He was trying to push off when I was asking him

```
 1   if he had anything that was going to poke, stick, or

 2   stab me.

 3           MR. SEATON:  Okay.  So let's back up just a

 4   minute, Joseph.

 5           (The video was played in open court, and the

 6           proceedings continued as follows:)

 7           MR. SEATON:  Back up just a little bit more.

 8           (The video was played in open court, and the

 9           proceedings continued as follows:)

10           MR. SEATON:  All right.  That's good.

11   BY MR. SEATON:

12   Q.      All right.  So this is you -- Justin Crabtree's

13   in the green uniform there in the middle; right?

14   A.      Yes, that is correct.

15   Q.      And you're the first person to the right?

16   A.      Correct.

17           MR. SEATON:  All right.  Go ahead, Joseph.

18           (The video was played in open court, and the

19           proceedings continued as follows:)

20   BY MR. SEATON:

21   Q.      So you're saying he was trying to grab at you?

22   A.      No, not here.

23   Q.      Okay.  So what was the purpose of throwing --

24   putting his arms up behind his back while he was

25   handcuffed behind his back like that?
```

1  A.      That was when I'd asked him if he was going --

2  or if he had anything that was going to poke, stick, or

3  stab me.

4  Q.      Okay.

5  A.      And then he started to reach.  I felt him

6  reach, and so to prevent him from doing so, I had placed

7  his arms up.

8  Q.      And then you took him to the ground?

9  A.      Correct.

10 Q.      All right.  And so then while he was on the

11 ground wiggling, I guess, for lack of a better word, is

12 it your testimony that he was -- he was resisting at

13 that point in time or that he was surviving at that

14 point in time?

15 A.      At this point, looking back at it, yes, he was

16 surviving.

17 Q.      All right.  Did he ever spit at you?

18 A.      Not at me directly, but he was spitting.

19 Q.      Did you see him spit on anyone specifically?

20 A.      I don't recall.

21 Q.      Do you recall whose decision it was to put a

22 spit mask on him?

23 A.      That was my decision.

24 Q.      And was that because he was bleeding so much,

25 y'all didn't want blood on you, or was it because he was

1  spitting?

2  A.        A mixture of both.  So he was spitting and he

3  was bleeding.  If I do recall correctly, we'd instructed

4  him several times, hey, stop spitting.  If you're going

5  to spit, spit on the floor.  And each time he would

6  raise back up.  And so I don't know with him coming in

7  not knowing him, not having a medical history on him, if

8  he had any type of diseases that are bloodborne.  And to

9  prevent the spread of that, I had placed a spit mask on

10  him.

11  Q.        All right.  And so the spit mask is like --

12  like a nylon mask going all the way over his face?

13  A.        There was like a little netting that was here

14  for the eyes, so it wasn't like a total, like, blackout

15  blindfold-type thing.  And then I'm assuming -- I guess

16  the fabric would be nylon.  I'm not entirely certain to

17  be honest with you what nylon even is.

18  Q.        Okay.  So as he's on the ground, you said that

19  he -- that you hit him because you felt that he was

20  grabbing at your belt or something?

21  A.        That is correct.

22  Q.        All right.  Was there any other time that you

23  felt that he was resisting?

24  A.        In the moment or looking back at it?  Because

25  in the moment, I felt that he was resisting.  Looking

1    back --

2    Q.       Okay.

3    A.       -- at it, I see that he was not.

4    Q.       Well, let's go to looking back at it, and then

5    we can go back to the moment.

6    A.       If we're looking back at it, I felt that the

7    entire time he was on the floor he was resisting because

8    he wasn't listening to any verbal commands.

9    Q.       And I thought you said at the moment, you felt

10   like he was resisting, but looking back on it, he was

11   not?

12   A.       That's what I said.

13   Q.       Okay.  I'm sorry.  I may be slow.  Bear with

14   me.

15           So after he's -- after he is taken from the

16   trap room, he's taken to the -- to the solitary cell;

17   right?

18   A.       I instructed Standridge and Miller to go get

19   him cleaned off in the shower that was located in

20   booking.

21   Q.       Okay.  But then he went -- yeah.  So he went to

22   the shower.  Dakota Williams went into the shower with

23   those two; right?

24   A.       Not initially.  Not until they started hooting

25   and hollering.

1    Q.       Okay.  And then y'all put him into the --

2    A.       That is correct.

3    Q.       -- solitary cell?

4             And all this occurred over a period of about an

5    hour?

6    A.       Give or take, yes.

7    Q.       Okay.  And so at what point in time did you or

8    did your jurisdiction, for lack of a better word -- at

9    what point in time did you feel that it was now your

10   responsibility?

11   A.       Once he was placed in the cell and dressed out,

12   once we had him secure --

13   Q.       Okay.

14   A.       -- and contained.

15   Q.       So as far as you were concerned, it was not

16   your responsibility to control him.  It was the road

17   officer's responsibility until you got him into the

18   cell?

19   A.       That is what I was operating under as an

20   assumption, yes.

21   Q.       Okay.  And was that a bad assumption?

22   A.       Looking back, yes, but that was how I was

23   trained.

24   Q.       All right.

25   A.       So I was just reverting to what I did know.

1  Q.      Okay.  And you weren't aware of his major

2  injuries, were you?

3  A.      No.

4  Q.      You saw when we went through the video how all

5  the blood started -- he started bleeding excessively all

6  over the floor?

7  A.      Yes.

8  Q.      And the road officers as well as the jail

9  officers were still involved; right?

10 A.      At what time?

11 Q.      When he's in the trap room.

12 A.      Yes.

13 Q.      All right.  And as a matter of fact, there was

14 even another female that had walked in watching all that

15 was going on?

16 A.      If I remember correctly, she was trying to find

17 a spit mask.

18         MR. SEATON:  All right.  So let's stop right

19 there.

20 BY MR. SEATON:

21 Q.      Do you know who that woman was?

22 A.      I did at the time, but I don't remember her

23 name.

24 Q.      Was she just a jail officer, or was she a -- a

25 corporal or a supervisor?

 1  A.       No, I was the only supervisor on that night.

 2  She was just an officer, and I don't believe she was

 3  even on my shift.

 4  Q.       Okay.  But she came in for a while, didn't she?

 5  A.       Yeah, she was trying to talk and figure out

 6  where the spit mask was.

 7  Q.       Okay.  And did -- while she was there, you've

 8  got -- let's see -- this unknown officer you've got at

 9  the top with -- with the green.  You've got -- that's

10  Dakota Williams; right?

11  A.       Yes.

12  Q.       And then here would be Joshua Miller?

13  A.       Yes.

14  Q.       And this is Justin Crabtree right -- right

15  here; right?

16  A.       Yes.

17  Q.       And which one of those is you?

18  A.       I'm in the middle.

19  Q.       You're in the middle.  Okay.  So that's you.

20           And then this is Alexander Standridge over to

21  the left?

22  A.       Yes.

23  Q.       All right.  And so did -- y'all saw the blood

24  flying.  Did anybody attempt to -- to intervene while

25  Mr. Ling is getting --

1    A.       No.

2    Q.       -- beat?

3             "No"?

4    A.       No.

5    Q.       Did anybody suggest we better call 9-1-1?

6    A.       No.

7    Q.       Or we better call an ambulance?

8    A.       No.

9    Q.       Or we need to get him medically assessed?

10   A.       No.

11   Q.       So Ling is there on the floor, and, you know,

12   y'all get him back up.  And we've gone through the video

13   where once he gets back up and you -- he -- he -- he's

14   put across the counter, he's staggering; right?

15   A.       Correct.

16   Q.       He was very, very unstable on his feet; right?

17   A.       Correct.

18   Q.       And you decided at that point in time we're

19   just going to put him in the solitary cell?

20   A.       Correct.

21   Q.       You didn't call the on-call nurse?

22   A.       That is correct.

23   Q.       You didn't have -- and I -- I know I've been

24   over this.  But there was nobody -- there was no medical

25   personnel there?

1    A.        That is correct.

2    Q.        And ordinarily, you all had this Nurse

3    Willoughby who was your medical person on call?

4    A.        I don't know who was on call.  She may have

5    been.

6    Q.        All right.

7    A.        That is correct.

8    Q.        But I think you told me in deposition that

9    you'd had a lot of trouble in the past with getting

10   those folks on the line; right?

11   A.        Yes, that is correct.

12   Q.        Would you tell the ladies and gentlemen of the

13   jury about that.

14   A.        So we have -- during morning shift and in

15   evening shift -- I don't remember the times off the top

16   of my head, but we would have a nurse or an LPN on shift

17   for that entire duration.  And so any kind of issue, any

18   fight, altercation, anything like that, medical was

19   there if there was any sort of issue that they could

20   come to.

21            On night shift, they did not have that as well

22   as being the most unmanned, for lack of a better term,

23   shift that we have to smoothly operate that jail.  I

24   think you had to have, like, seven people minimum.  And

25   three of those people were in spots that they couldn't

 1    leave, and so I had four to roam roughly.  And that

 2    night I actually had to have people hold over because I

 3    didn't even have a full staff.

 4           But trying to contact medical on that shift is

 5    almost impossible because they say we have an on-call

 6    nurse, but when you call them, they just go straight to

 7    voicemail.  They don't answer.  And when I bring that up

 8    to management, they were like, okay, we'll figure it

 9    out, and it never got figured out.  So eventually I just

10    stopped trying with it.

11    Q.     So on how many occasions do you think that you

12    tried to call an on-call nurse for somebody else's

13    medical condition and they didn't respond?

14    A.     At least a handful of other times potentially.

15    Q.     When you say "handful," are you saying five?

16    A.     Give or take.

17    Q.     Okay.

18    A.     That's a supervisor's responsibility.  So as an

19    employee, I didn't really have to, unless the corporal

20    was like, hey, you go make that call while I take care

21    of this or I do that.

22    Q.     All right.  And I think you told me in your

23    deposition there would have been no downside to this

24    whole situation of getting medical help, would there

25    have been?

1  A.        No.

2  Q.        And I think Alexander Standridge, the officer

3  underneath you, had said that you all didn't get medical

4  help because you were worried about what the first shift

5  would say?

6  A.        I wouldn't necessarily say getting medical

7  help, but, like, if I had to call an ambulance or box to

8  come check out, you know, the inmate, there's going to

9  be some kind of yelling or argument through the

10  management, and they're going to be like, well, why

11  didn't you call me?  It's like, okay, when I do call

12  you, I get yelled at anyway, so what's -- what's the

13  difference there?

14        It was always an argument with any decision

15  that most of us made, and so we eventually just kind of

16  stopped.

17        MR. SEATON:  Let's go back to 56.

18  BY MR. SEATON:

19  Q.        So any -- your first line in the chain of

20  command is Catie Wilson; right?

21  A.        That is correct.

22  Q.        And was she not responsive to you if you needed

23  to -- or would she fuss at you if you got medical care,

24  called for an ambulance?

25  A.        I've never had her fuss at me because I've

 1  never done it.  But with the past -- just the smaller

 2  things that were arguments, I would assume as much.

 3  Q.      Okay.  But what was the concern of first shift?

 4  Why is it that y'all put Nathan Ling in the solitary

 5  cell and you were worried about what first shift would

 6  say?

 7  A.      That's the shift that Catie Wilson is on.

 8  Q.      So you were worried about what she would say?

 9  A.      Yes.

10  Q.      And what was the worry?  Was it that you didn't

11  call for medical help or that y'all had beat the crap

12  out of somebody?

13  A.      I -- I don't know exactly what the worry was

14  looking back.  That was close to four years ago.

15  Q.      Sure.

16  A.      But if I were to assume, it was just she -- she

17  was very condescending, and so there was a way that you

18  could have the best idea and she would make you feel

19  very small and incompetent with that idea.  So it was

20  just one of those things that pretty much anybody in the

21  jail was like don't tell Catie.  Hey, let's -- let's --

22  uh-uh.  Uh-uh.  You know, we would try to get things

23  squared away on our own before even having to go to

24  Catie for anything.

25  Q.      All right.  But on that evening before you put

1 Nathan Ling in the floor of the solitary cell, he was in

2 serious need of medical treatment, wasn't he?

3 A.       That is correct.

4 Q.       And nobody, including yourself, suggested let's

5 call for medical treatment?

6 A.       That is correct.

7 Q.       And is it your testimony that you weren't

8 trained to respond to a situation like that?

9 A.       That is correct.

10 Q.       Had you been trained appropriately and

11 properly, do you think that this situation would have

12 been different?

13 A.       I absolutely do.

14 Q.       What do you think would have been different had

15 you been trained properly?

16 A.       I think initially, I would have been able to

17 identify that hey, there's no need to hit him; right?

18 Q.       So intervene?

19 A.       And be able to intervene.

20 Q.       All right.

21 A.       And if that didn't work because you can see in

22 the video the size between me and Justin, you know, I

23 can do some sort of, you know, separation of the inmate

24 from him, you know, to that degree.

25          And then if I had the training, I could have

 1  gotten him medical help and started the chain with

 2  calling, you know, my chain of command to get Justin

 3  out, to do whatever we needed to do.

 4  Q.      I think you told me in your deposition that

 5  after you all put him into the solitary room, he laid

 6  there in the same position all night long?

 7  A.      Pretty much, yes.

 8  Q.      No one opened the door to look at him and to

 9  see if he was responsive, did they?

10  A.      That is correct.

11  Q.      And there's protocol even in the sheriff's

12  department that if you got somebody with serious medical

13  needs that you check on them every -- at least every

14  hour, isn't there?

15  A.      Suicide watches.  And then if medical places

16  them on a med watch, yes.

17  Q.      And you're supposed to keep a log of someone

18  that has serious medical needs of the officer checking

19  on them at least every hour?

20  A.      That is correct.

21  Q.      And there was no log on Nathan Ling that night,

22  was there?

23  A.      Not that I recall.

24  Q.      All right, sir.  When -- and you left -- you

25  left that spit mask on his face all night long, didn't

1  you?

2  A.        Yes.

3  Q.        Was there a need to do that if he's in the

4  cell?

5  A.        If I remember correctly, the idea behind that

6  was that he can take it off when, you know, we clear the

7  room, but he did not do that.

8          MR. SEATON:  Let's go back to the video, 56 --

9  no, 48.  And speed up all the way to the end.  All

10 right.  Yeah, just go ahead and let it roll from there.

11         (The video was played in open court, and the

12         proceedings continued as follows:)

13 BY MR. SEATON:

14 Q.        So here you're taking the cuffs off of him;

15 right?

16 A.        Correct.

17 Q.        He isn't moving, is he?

18 A.        No.

19 Q.        He's not responsive, is he?

20 A.        No.

21 Q.        Was he unconscious?

22 A.        Not that I remember.  I don't believe that he

23 was.

24         MR. SEATON:  Would you go back just a hair,

25 Joseph.  Thank you.  All right.  That's good.  No.  No.

1    Play forward.

2              (The video was played in open court, and the

3              proceedings continued as follows:)

4    BY MR. SEATON:

5    Q.      And you see his arm just dangle down; right?

6    A.      Yes.

7    Q.      Would that indicate to you he's very

8    unresponsive?

9    A.      I am not trained in assessing, so I would not

10   know.  It just looked to me that he was moving his arm,

11   but I could be wrong.

12   Q.      So if he's unresponsive lying there in that

13   position, how could he have ever taken that nylon mask

14   off?

15   A.      He couldn't.

16   Q.      So then why was it left on him?

17   A.      Because the idea was that he would take it off.

18   Q.      Okay.  So if the sheriff told these folks that

19   the reason that he -- that it appeared that the reason

20   he got put into the solitary cell was for punishment,

21   would you disagree with that?

22   A.      I would disagree.

23              MR. KNIGHT:  Argumentative.

24              MR. SEATON:  Pardon?

25              THE WITNESS:  I would disagree.

1          THE COURT:  If we have an objection --

2          MR. KNIGHT:  Argumentative.

3          THE COURT:  Mr. --

4          MR. KNIGHT:  Argumentative.

5          THE COURT:  Thank you.  I understand,

6  Mr. Knight.

7          It is a little argumentative.  Ask a question,

8  get an answer.

9          Gentlemen, when you have an objection, stand,

10  speak into the microphone, state the grounds for your

11  objection so I can hear it.

12          Don't --

13          MR. SEATON:  I understand.

14          THE COURT:  -- ask -- don't ask questions --

15          MR. SEATON:  I understand.

16          THE COURT:  -- until I rule on the objection.

17          Gentlemen, this is not your first rodeo.  Okay?

18          MR. SEATON:  Correct.

19          THE COURT:  All right.

20          MR. SEATON:  Apologies, Your Honor.

21  BY MR. SEATON:

22  Q.      So, Mr. Brown, while he's laying there in

23  the -- in the solitary cell, you said that nobody

24  checked on him all night long; right?

25  A.      Not physically opened the door, correct.

1   Q.      All right.  And you stayed on shift until what?

2   7:00 a.m.?

3   A.      Yes.

4   Q.      All right.  And I think Nurse Willoughby is

5   going to tell us that she came to work at 6:00 a.m.?

6   A.      That is correct.

7   Q.      Okay.  And so when she came to work, did you go

8   and tell her you need to go check on Mr. Nathan Ling or

9   the -- the fella that's in the solitary cell?

10  A.      As soon as she came through the door, I

11  explained the situation to her, and she said, okay, I

12  will be back in a few minutes.  I'm going to my office.

13  And then it was around day shift when medical made their

14  way back.

15  Q.      It was what now?

16  A.      It was in day shift.  Like first shift --

17  Q.      Uh-huh.

18  A.      -- when medical made their way back to the

19  front.

20  Q.      So medical -- when you -- when you say

21  "medical," you're talking about Nurse Willoughby; right?

22  A.      Yes.

23  Q.      I mean, that's the whole medical department,

24  isn't it?

25  A.      Roughly, yes.

1  Q.      All right.  So you say that when you first got
2  to work, you told her what was going on?
3  A.      When she first got to work, yes.
4  Q.      All right.  I agree.  When she first got to
5  work, you said we've got somebody in solitary; right?
6  A.      Yes.
7  Q.      And what did you say his condition was?
8  A.      I don't recall.
9  Q.      Okay.  Did you just say I think I've got a guy
10 in there with a busted nose?
11 A.      I don't recall.  I do recall telling her the
12 story of what had -- what had happened.  I explained
13 that he was combative and that he was in the -- I forgot
14 what the cell was called.
15 Q.      It's a neg cell?
16 A.      The neg cell.
17 Q.      And so did you tell her that he had been
18 bleeding as much as he had been bleeding?
19 A.      She saw the blood on Justin's pants, and that
20 was what her concern was.  She was like, what's the
21 blood?  And then I was like, well, we also have a
22 combative in that cell.  I said he did get struck, if I
23 recall correctly.
24 Q.      So the best information that Nurse Willoughby
25 had was that somebody's in the neg cell that had been

1  struck and had been combative the night before.  Is that

2  it?

3  A.      Yes.

4  Q.      All right.  So nobody had really told her how

5  much he had bled or how bad he looked?

6  A.      Correct.

7  Q.      All right.  And so it was an hour later that

8  she went in with Joel Boyer and James Paul White?

9  A.      That sounds about accurate, yes.

10 Q.      All right.  And did you know that when she went

11 in, she said she was shocked?

12 A.      No.

13 Q.      Did you see him after they had gotten him

14 cleaned up and gotten him in the patrol car to take to

15 the hospital?

16 A.      No.

17 Q.      So you never checked on him at all?

18 A.      Not during the shift, no.

19 Q.      All right.  You weren't concerned about it?

20 You just didn't think there was anything wrong with him?

21 A.      If I don't -- or excuse me.  If I recall

22 correctly, we did have the camera up in the booking area

23 so that we could observe him.  But no, I -- I genuinely

24 thought that he just had a nosebleed.  Like, I thought

25 he had a broken nose.  But --

1   Q.      But if he -- I'm sorry.

2   A.      Go ahead.

3   Q.      But if he doesn't move from that same position

4   all night long, wouldn't that raise your antenna?

5   A.      It should have, yes.

6   Q.      But it didn't; right?

7   A.      Correct.

8   Q.      All right.  The department had a 450-page

9   policy manual.  Were you trained on it?

10  A.      What do you mean was I trained on it?  Did they

11  sit me down and make me --

12  Q.      Well --

13  A.      -- read it?

14  Q.      Well, tell me, did they give you a copy of the

15  450-page manual?

16  A.      If they didn't -- I don't remember getting it.

17  I remember signing a form saying that we would go over

18  it.

19  Q.      Okay.  Did you ever go over it with anybody?

20  A.      Not that I recall.  I would have to go on the

21  computer itself and pull up the policy to look at it if

22  I needed to look at policy.

23  Q.      But nobody ever actually went over it with you

24  to instruct you about it?

25  A.      Not that I'm aware, no.

1  Q.      And you were never trained to intervene in the

2  event another officer was using excessive force?

3  A.      No.

4  Q.      And then after all of this occurred, were you

5  ever called out by any of the higher-ups?

6          Let's go back to 56.

7  A.      What do you mean "called out"?

8  Q.      Were you ever called -- I mean, were you ever

9  called out?  Were you ever said, hey, Sean, we need to

10 talk to you because we think there's been some abuse in

11 this case?

12 A.      No.

13 Q.      Did anybody in the department do any

14 investigation at all?

15 A.      I was told that there was an internal

16 investigation, but nobody spoke to me.  It was just kind

17 of one of those hearsay things.

18 Q.      Okay.  You weren't fired, you weren't

19 terminated, you weren't disciplined, and you -- you

20 weren't written up?

21 A.      No.

22 Q.      All right, sir.  And as a matter of fact, when

23 they -- they charged you criminally?

24 A.      Correct.

25 Q.      You were charged with class C felonies?

1    A.        Correct.

2    Q.        Three to five years?

3    A.        Correct.

4    Q.        Did you plead to something less than that?

5    A.        I'm on judicial diversion currently.

6    Q.        Okay.  What does that mean?

7    A.        It means that after two years of being on --

8    for lack of a better word, I have to report to

9    Probation, and so --

10   Q.        Uh-huh.

11   A.        -- the technicals are a little different as far

12   as probation goes from diversion, but the general

13   principle is I'm on probation for two years, and then I

14   can get my record expunged.

15   Q.        Okay.  And at the time that you worked there,

16   did you have any type of relationship with Robbie Goins?

17   Was he on -- was he a hands-on sheriff?

18   A.        I saw him once or twice on the floor --

19   Q.        Okay.

20   A.        -- doing tours.

21   Q.        Okay.  And were any -- other than the fact that

22   nobody -- did you know of anybody that was terminated or

23   disciplined because of this event?

24   A.        No.

25   Q.        All right.  To your knowledge, were any changes

1  made in any of the policies or procedures after this

2  event?

3  A.      Not that I'm aware.

4  Q.      All right, sir.  And do you feel that this

5  could happen again the way that Campbell County was run?

6  A.      If it is ran the same way with the

7  administration that it has now as it was in that current

8  administration -- or excuse me -- in the past

9  administration, then yes.

10 Q.      All right.  Thank you so much.  Answer any

11 questions Mr. Knight has.

12         THE COURT:  Any cross-examination?

13         I'll tell you what --

14         MR. KNIGHT:  Yes.

15         THE COURT:  -- let's -- let's take a break.  I

16 assume you've got quite a bit of cross-examination.

17         MR. KNIGHT:  Probably more than about

18 30 minutes.

19         THE COURT:  Yeah.  Let's -- let's take about a

20 15-minute break.  Then when we come back, we'll finish

21 out for the afternoon.

22         So excuse me, sir.  Stay there.  Stay there.

23         THE WITNESS:  Okay.

24         (The proceedings were held outside the

25              presence of the jury, as follows:)

```
 1              THE COURT:  All right.  Thank you.  Please have
 2   a seat.
 3              Sir, you're free to go out and go to the
 4   restroom, if you need to, or whatever.  Don't speak to
 5   anyone, and don't let anyone speak to you until
 6   you -- you come back and on the witness stand.
 7              THE WITNESS:  I'll just stay right here if
 8   that's okay.
 9              THE COURT:  You don't have to stay right there,
10   but --
11              THE WITNESS:  Yeah, I just -- I don't have to
12   go to the bathroom, so I'll just be walking.
13              THE COURT:  I'm going to -- let's take 15
14   minutes.
15              Can I see Mr. Knight and Mr. Seaton back here
16   for about two minutes?
17              MR. SEATON:  Certainly.
18              (Brief recess.)
19              THE COURT:  All right.  Gentlemen, are we ready
20   for our jury?
21              MR. SEATON:  Yes, Your Honor.
22              MR. KNIGHT:  Yes, Your Honor.
23              THE COURT:  All right.  Real quick, Mr. Seaton,
24   after this witness, what do we have?
25              MR. SEATON:  We have our -- our vocation rehab
```

1  person, Michael Galloway, we've got Lieutenant Wasson

2  from the department, and we've got -- you know, we've

3  got enough to keep full through the day.

4          THE COURT:  I know, but I'm -- I'm trying to

5  get a preview for tomorrow too.

6          MR. SEATON:  Tomorrow we have -- if I were

7  guessing, I'd say we'll be through by 1:00 or 2:00.

8          THE COURT:  Okay.

9          MR. SEATON:  That's -- you know, I didn't

10 expect this afternoon to go this long, but I'm trying to

11 gauge as best I can.

12         THE COURT:  All right.  Okay, Ms. Laster, bring

13 our jury in.

14         THE COURTROOM DEPUTY:  Yes, sir.

15         (The proceedings were held in the presence of

16         the jury, as follows:)

17         THE COURT:  Please be seated.

18         All right.  Mr. Knight, any cross-examination?

19         MR. KNIGHT:  Yes, Your Honor.

20         THE COURT:  All right.  Thank you.

21                    CROSS-EXAMINATION

22 BY MR. KNIGHT:

23 Q.      Mr. Brown, you were a corporal at the time you

24 were let go at Campbell County?

25 A.      That is correct.

1   Q.       And so you were a corrections officer before

2   that; correct?

3   A.       That is correct.

4   Q.       And I think you said you applied for that

5   position?

6   A.       For the corporal?

7   Q.       Yes.

8   A.       Yes.

9   Q.       Okay.  How long were you a correction officer?

10  A.       Maybe a year, if I remember.

11  Q.       A year?

12  A.       Roughly.

13  Q.       So you're not telling this jury that you don't

14  know how to make log checks or checks on inmates or

15  anything like that, do you -- are you?

16  A.       That's not what I -- I'm saying, no.

17  Q.       No.  I mean, a log is basically you initial

18  what time you check on somebody or check them in and you

19  write the time down, is it not?

20  A.       Correct.

21  Q.       It's not rocket science, is it?

22  A.       No.

23  Q.       You indicated that you were a graduate of high

24  school; correct?

25  A.       That is correct.

1  Q.       And you had -- the department sent you for a

2  psychological evaluation; correct?

3  A.       That is correct.

4  Q.       And you had a physical; correct?

5  A.       Yes, that is correct.

6  Q.       Let's go back to June 2nd, 2019.  It was in the

7  middle of the night; correct?

8  A.       Yes.

9  Q.       And you were in the sally port, I believe, with

10 Alex Standridge; is that correct?

11 A.       Yes.

12 Q.       And Justin Crabtree radioed that there was a

13 combative inmate coming into the jail; correct?

14 A.       No, dispatch called me.

15 Q.       Dispatch called you.  But --

16 A.       Yes.

17 Q.       -- you knew it was a combative inmate?

18 A.       Yes.

19 Q.       And when Justin Crabtree pulled in, could you

20 hear anything Mr. Ling was saying?

21 A.       As I stated earlier, Ling didn't speak.  He was

22 pretty much nonverbal the entire altercation the entire

23 time I saw him.

24 Q.       You saw Justin Crabtree drag him out of the

25 car; correct?

1  A.        Yes.

2  Q.        And you couldn't have intervened if you wanted

3  to, could you?

4  A.        No.

5  Q.        And did you see Mr. Ling do anything or -- or

6  resist or cause any commotion in -- when he was pulling

7  him from the sally port?

8  A.        What specific time are you -- like, when he was

9  pulling from the car?  Is that what you're referring to?

10 Q.        No.  When -- when he came in, could you hear

11 Mr. Ling in the back seat?

12 A.        No.

13 Q.        You couldn't?

14 A.        No.

15 Q.        So he was just sitting there doing nothing?

16 A.        They said that he was kicking the windows.

17 Justin did.  But outside of that, I couldn't hear

18 anything.  He was whipping it in, and by the time he

19 whipped it in, he got out, everything was done.  He

20 pulled him out.

21 Q.        Justin pulled him out; correct?

22 A.        Yes.

23 Q.        Justin put him in the search trap; correct?

24 A.        Yes.

25 Q.        You testified that you did not see him place

1    him on the counter; is that correct?

2    A.        If I did see him, my memory has blocked it out

3    and I don't remember it.

4    Q.        Okay.  You couldn't -- I mean, he had control

5    of Mr. Ling; correct?

6    A.        Correct.

7    Q.        And no matter -- or you couldn't have

8    intervened at that point at all, could you?

9    A.        Not at that point.

10    Q.        And when you all -- I mean, I'm not going to

11    play the video, but I assume that when all of you all

12    had -- were holding Mr. Ling on the ground, there was

13    movement going on from Mr. Ling?

14    A.        That is correct.

15    Q.        Regardless of his intent, you have to go on

16    what the movement is; correct?

17    A.        Correct.

18    Q.        I mean, he didn't stand up and say, hey, I'm

19    just trying to survive, did he?

20    A.        No.

21    Q.        So you could have interpreted that in the

22    moment as combative resistance; is that correct?

23    A.        That is how I interpreted it in the moment.

24    Q.        Okay.  And his -- his feet needed to be held

25    down and his torso needed to be held down, and he needed

1    to stop; is that correct?

2    A.        That is correct.

3    Q.        Have you had any combative inmates come in

4    before?

5    A.        Just in general or --

6    Q.        In general, when you're a corrections officer.

7    A.        In -- in -- yes, in general, I have.

8    Q.        And you've had to utilize force on occasion, I

9    assume?

10   A.        That would be correct.

11   Q.        And -- and the goal is -- is to get the inmate

12   under control or in this case, a pretrial detainee under

13   control; correct?

14   A.        Correct.

15   Q.        Because they're not always under control, are

16   they?

17   A.        That is correct.

18   Q.        And you indicated before under your testimony

19   from Mr. Seaton -- I mean, questioning from Mr. Seaton,

20   that there was high turnover in corrections; correct?

21   A.        Yes, that is correct.

22   Q.        It's not a great job, is it?

23   A.        It's a horrible job.

24   Q.        I mean, you have to deal with some pretty

25   difficult people, don't you?

1   A.      Yes.

2   Q.      They cuss at you?

3   A.      Yes.

4   Q.      They spit at you?

5   A.      Yes.

6   Q.      They try to assault you?

7   A.      Yes.

8   Q.      They try to sneak in contraband?

9   A.      Yes.

10  Q.      And you're there to prevent that, are you not?

11  A.      That is correct.

12  Q.      So as we sit here today, could there be a

13  reason for the high turnover rate?

14  A.      I think that plays a pretty big part of it --

15  Q.      I mean --

16  A.      -- as well.

17  Q.      -- you don't get paid very much, do you?

18  A.      No.

19  Q.      And you have to deal with these sorts of people

20  every day, don't you?

21  A.      Correct.

22  Q.      And when Mr. Ling came in, you would agree with

23  me that he was displaying a lot of energy, was he not?

24  A.      At what point?

25  Q.      At any point.

1  A.      I -- I don't necessarily agree with that.  I
2  think that there was some altitude of energy where he
3  was more heightened, and I think that was when he was on
4  the floor with his movement.  There were, like the
5  videos's shown, five of us on him.
6  Q.      Uh-huh.
7  A.      And like you said, we could not control him.
8  And in the moment, I felt that he was resisting.  So in
9  that point, I think that there was a lot of energy.
10 Q.      And -- and you've dealt with inmates who
11 display a lot of energy before, haven't you?
12 A.      That is correct.
13 Q.      And sometimes those inmates are on something,
14 are they not?
15         MR. SMITH:  Objection, Your Honor.
16         THE WITNESS:  That's correct.
17         MR. SMITH:  That's irrelevant to this case --
18         THE COURT:  Overruled.
19         MR. SMITH:  -- what other --
20         THE COURT:  Overruled.
21 BY MR. KNIGHT:
22 Q.      It came up in Mr. Seaton's questioning that --
23 I think he even impeached you with your deposition about
24 you had no reason to believe that he was under illicit
25 drugs.  But you had not been asked to do a test;

1  correct?

2  A.      That is correct.

3  Q.      There was no time to do a test, was there?

4  A.      No.

5  Q.      You just knew that you couldn't control him;

6  correct?

7  A.      That's correct.

8  Q.      And neither could four or five other people;

9  correct?

10 A.      Correct.

11 Q.      And you were just trying to get him into the

12 facility, were you not?

13 A.      Yes.

14 Q.      You indicated that you were TCI certified.  Is

15 that not correct?

16 A.      That is correct.

17 Q.      And you were a corrections officer for over a

18 year and then a corporal for one and a half or two

19 months.  You knew how basically a jail is supposed to

20 work or inmate to inmate; correct?

21 A.      Correct.

22 Q.      I mean, when you book them in, you check them,

23 you take them to court, you feed them, you dispense

24 medicine.  You knew how to do that, didn't you?

25 A.      Correct.

Q.      And if somebody was attacking you, you knew how
to defend yourself, didn't you?

A.      Not by any training or anything like that.
They tried to give us defensive tactics-type --

Q.      Yeah.

A.      -- deal during orientation.  And it was hey,
you grab their wrist and you twist, and if that doesn't
work, then you need to run out and go get backup --

Q.      Okay.

A.      -- and that -- that was the general --

Q.      But you have to -- I'm sorry.  Go ahead.

A.      That -- that was just the general
generalization of that training.  They kept talking
about well, we're going to get a defensive class.  We're
going to get a defensive class.  But there -- in the
time that I was there, I never saw that class.

Q.      And over -- in over a year, did you ever have
to defend yourself from an inmate?

A.      Yes.

Q.      Were you able to do that?

A.      Yes.

Q.      Apparently the job was okay with you 'cause you
applied to be a supervisor; correct?

A.      Are you saying the job was okay as far as
corrections as a whole or the corporal's position?

1  Q.      Well, you applied to be a corporal in the

2  corrections department.

3  A.      Yes.

4  Q.      Correct?

5  A.      Yes.

6  Q.      I assume that meant more responsibility?

7  A.      Correct.

8  Q.      And more money?

9  A.      Correct.

10 Q.      And you knew that; correct?

11 A.      Correct.

12 Q.      And, you know, a lot has been said that younger

13 individuals got the night shift.  That's generally how

14 it works everywhere, isn't it?  If you have more

15 seniority, you get the better choice of shift?

16 A.      I would assume, yes.

17 Q.      You would assume, or do you know?

18 A.      I don't know.

19 Q.      You don't know if you have a 10-year veteran

20 and -- and they would rather work the day shift versus a

21 one-month veteran or a six-month veteran -- are you

22 going to sit here and tell this jury that 10-month

23 veteran is -- his seniority is not going to count in

24 terms of his choice of shift?

25         MR. SEATON:  Objection.  Argumentative.

1          THE COURT:  Sustained.  Sustained.

2          If you've got a question, ask him.  He can

3   answer.

4   BY MR. KNIGHT:

5   Q.      So in the moment, again, when you were --

6   Mr. Ling was taken to be decontaminated, you ordered

7   that; correct?

8   A.      That is correct.

9   Q.      And you ordered Mr. Standridge and Mr. Miller

10  to do that; correct?

11  A.      That is correct.

12  Q.      Or Officer Standridge and Officer Miller;

13  correct?

14  A.      That is correct.

15  Q.      And you said under questioning by Mr. Seaton

16  that you could hear whooping and hollering, did you not?

17  A.      That is correct.

18  Q.      And that was coming from Mr. Ling, was it not?

19  A.      No, that was coming from the officers.

20  Q.      'Cause they were not able to handle Mr. Ling,

21  were they?

22  A.      From my understanding, no, they were not.

23  That's why Mr. -- or Deputy Williams had to step in.

24  Q.      And if you cannot handle or control a detainee,

25  is that an indication to you that the detainee or

 1   arrestee may not want to be controlled?

 2   A.        Yes.

 3   Q.        You said a lot about the nurse that -- well,

 4   the agency that the county -- the county contracted with

 5   an agency; correct?

 6   A.        Yes.

 7   Q.        And there are various nurses assigned to the

 8   agency; correct?

 9   A.        Various what?

10   Q.        Nurses that may --

11   A.        Yes.

12   Q.        -- or may not -- and during day shift, they

13   would be onsite and they were supposed to provide 24/7

14   coverage; is that correct?

15   A.        During their shift, yes.

16   Q.        And you knew that, did you not?

17   A.        Yes.

18   Q.        And you knew that you could call 9-1-1 --

19   A.        Yes.

20   Q.        -- didn't you?

21             And you -- did you come to have any

22   understanding that night that they had -- that the

23   officers had called an ambulance out to the scene to

24   evaluate Mr. Ling?

25   A.        That's what Justin had told me, yes.

1  Q.        Okay.  And that didn't work out too well, did
2  it?
3  A.        Not after he made it to the jail.
4  Q.        And you could have called the ambulance back,
5  couldn't you have?
6  A.        I could have.
7  Q.        But that didn't happen, did it?
8  A.        No.
9  Q.        This happened in the middle of the night;
10 correct?
11 A.        Yes.
12 Q.        You were working 11:00 to 7:00?  That was your
13 shift?
14 A.        Yes.
15 Q.        At no time during that night did you make a
16 phone call to either a medical provider, 9-1-1, or an
17 ambulance; correct?
18 A.        Correct.
19 Q.        Nor did you take Mr. Ling in a vehicle, I
20 guess, or a vehicle available to take Mr. Ling somewhere
21 if he needed to go?
22 A.        Correct.
23 Q.        It's my understanding from your testimony that
24 despite the -- the presence of blood, you did not
25 consider -- or no one considered that Mr. Ling had a

1  serious medical injury?

2  A.        That is correct.

3  Q.        Thought he had a busted nose?

4  A.        Correct.

5  Q.        And that was courtesy of Mr. Crabtree's

6  punching --

7  A.        Yes.

8  Q.        -- him?

9          And did the fact that Mr. Ling was bleeding

10 from his -- was he bleeding from his nose?

11 A.        It appeared to just be his nose.  That's why I

12 didn't have such a high --

13 Q.        Okay.

14 A.        -- concern about it.

15 Q.        Okay.  And -- and despite the blood or the

16 blood coming from his nose or around his nose or

17 whatever, while he was on the floor, he was still

18 moving; correct?

19 A.        Yes.

20 Q.        So did -- was that an indication to you that he

21 perhaps had not sustained a serious injury?

22 A.        Yes.

23 Q.        You don't have any medical training, do you?

24 A.        No.

25 Q.        I mean, you have not been to medical school;

1  correct?

2  A.        Correct.

3  Q.        Nursing school?

4  A.        No.

5  Q.        Do you -- I think you testified that -- to

6  Mr. Seaton you had first aid; is that --

7  A.        Yeah.  I mean, how to put a Band-Aid on

8  somebody.

9  Q.        I assume that if Mr. Ling had showed up with a

10 broken arm or a broken leg, you would have been able to

11 identify that?

12 A.        Correct.

13 Q.        It's a little bit more difficult when we're

14 talking about a brain bleed or -- would you agree with

15 me about that?

16 A.        Yes.

17 Q.        It's a little bit more difficult to identify a

18 busted nose from a brain bleed?

19 A.        Yes.

20 Q.        I'm going to ask you based on a couple of

21 questions that Mr. Seaton asked you, there was a

22 concern, was there not, as to what the day shift would

23 say when they saw Mr. Ling; correct?

24 A.        Correct.

25 Q.        And you talked about that; correct?

1    A.        I did.

2    Q.        And it's my understanding that after Mr. Ling

3    was put in the negative pressure cell, he was not

4    checked every hour as required by Tennessee law;

5    correct?

6    A.        Correct.

7    Q.        And you knew, did you not, Mr. Brown, that

8    that's what Tennessee law required?

9    A.        From my understanding, it was a -- a TCI

10   standard, not a law.  I did not know until today that

11   that was a law.

12   Q.        TCI standard or law, you knew he was supposed

13   to be checked every -- every hour; correct?

14   A.        Correct.

15   Q.        And he wasn't, was he?

16   A.        Correct.

17   Q.        He was just left there.  Was that the concern

18   that everyone had about day shift?

19   A.        No.

20   Q.        That he not been checked and he had been in a

21   drunk tank?

22   A.        No.

23   Q.        That was not the concern?

24   A.        No.

25   Q.        You weren't worried about that at all?

1  A.        No.

2  Q.        Okay.  Isn't it true, Mr. Brown, that you were

3  never going to call for any medical assistance that

4  night for Mr. --

5  A.        I was not going to call.  I was waiting for

6  medical to show up that morning.

7  Q.        That morning you were waiting for her to show

8  up; correct?

9  A.        Correct.

10  Q.        And she showed up one hour before her shift was

11  supposed to start; correct?

12  A.        Correct.

13  Q.        And you gave her the information that you told

14  Mr. Seaton about; correct?

15  A.        Correct.

16  Q.        So as far as she knew, she had a combative

17  inmate in the drunk tank who had assaulted Justin

18  Crabtree; correct?

19  A.        Correct.

20  Q.        You knew all of this was on videotape; correct?

21  A.        Correct.

22  Q.        That just about -- well, the shower part of the

23  facility is not -- does not have a camera for privacy

24  concerns --

25  A.        Correct.

1    Q.        -- I assume.  But the -- the search trap, the

2    sally port, that area, the booking area, they all have

3    cameras; correct?

4    A.        Correct.

5    Q.        And that was all provided to the TBI when they

6    were doing their investigation; correct?

7    A.        Correct.

8    Q.        And you gave a statement to the TBI, did you

9    not?

10   A.        Yes, I did.

11   Q.        And at some point, you were charged with some

12   offenses by the Eighth Judicial District; is that

13   correct?

14   A.        I'm not sure if that's where it was charged.

15   It was --

16   Q.        The district attorney?

17   A.        Yes.

18   Q.        And you ended up pleading guilty to what?

19   A.        Official oppression.

20   Q.        Anything else?

21   A.        No.

22   Q.        Okay.  And you received judicial diversion,

23   which would allow your record to be clean as long as you

24   stay out of trouble; correct?

25   A.        Correct.

1  Q.        As long as you are cooperative; correct?

2  A.        That is correct.

3  Q.        As far as -- Mr. Seaton's last question was

4  about this happening again.  It never happened before,

5  had it?

6  A.        I'm unaware.

7  Q.        You're unaware.

8            It hasn't happened since then, has it?

9  A.        I'm also unaware.

10 Q.        You're not -- so unaware.  You haven't heard of

11 anything happening like this?

12 A.        No.

13 Q.        Even though Mikey Owens, who is -- has been --

14 been made a big deal is now the jail administrator, it

15 has not happened since that you've heard of; correct?

16 A.        That is correct.

17 Q.        As far as you know, that jail is TCI certified;

18 correct?

19 A.        As far as I'm aware.

20 Q.        It was TCI certified when you were there,

21 wasn't it?

22 A.        Yes.

23 Q.        And TCI performs surprise inspections and

24 points out every little deficiency that they can find.

25 Is that not correct?

1  A.        That is correct.

2  Q.        And then they give you a plan of action or a

3  plan of correction, and they tell you to come -- they're

4  coming back and you better have it fixed; isn't that

5  correct?

6  A.        That is correct.

7  Q.        And that's to remain certified; correct?

8  A.        Yes, that is correct.

9  Q.        And as far as the Campbell County Jail is

10 concerned, it has been certified; correct?

11 A.        That is correct.

12 Q.        And you don't know anything any different, do

13 you?

14 A.        No.

15 Q.        I'm going to ask you something really quickly.

16 Mr. -- Mr. Brown, you saw that videotape when Justin

17 Crabtree hit Mr. Ling fairly -- would you describe that

18 as a fairly quick series --

19 A.        Yes.

20 Q.        -- of punches?

21 A.        Yes.

22 Q.        Is it fair to say that you could not have

23 intervened in that period of time and stopped any of

24 those punches?

25 A.        I didn't even realize he had hit him until

1  after he'd hit him.

2  Q.      Okay.  You have to observe something and you

3  have to know the context to intervene.  Would you agree

4  with that?

5  A.      I would, yes.

6  Q.      I mean, there may be very good reasons why

7  certain officers are doing certain things to arrestees

8  or detainees; is that correct?

9  A.      That is correct.

10 Q.      I mean, you wouldn't want to be evaluated in

11 isolation when you had a really good reason for -- I

12 don't know -- deploying some sort of defensive tactic

13 and then somebody intervenes and causes a situation that

14 would not have occurred, would you?

15 A.      I don't understand your question.

16 Q.      You wouldn't want somebody intervening in

17 something that you were doing lawfully if you had a good

18 reason for doing it?

19 A.      That is correct.

20      MR. KNIGHT:  May I have a second, Your Honor?

21      THE COURT:  Yes.

22 BY MR. KNIGHT:

23 Q.      You were asked by Mr. Seaton a lot of questions

24 about hindsight.  Do you recall that?

25 A.      Yes.

1    Q.       There's a lot of things that we would rather do

2    in hindsight; is that correct?

3    A.       Yes.

4    Q.       There may be questions that I wanted to ask

5    that I forgot to ask but, in hindsight, I should have

6    asked.  Do you understand that?

7    A.       Yes.

8    Q.       You understand the concept of Monday morning

9    quarterbacking?

10   A.       Yes.

11   Q.       Thank you.

12            THE COURT:  Any redirect?

13            MR. SEATON:  Yes, Your Honor.

14                      REDIRECT EXAMINATION

15   BY MR. SEATON:

16   Q.       Mr. Brown, are you telling the ladies and

17   gentlemen of the jury that all the force used against

18   Nathan Ling was justified?

19   A.       I don't think so.

20   Q.       Well, that's kind of what it sounded in his

21   cross-examination.  Can you see why I would think that?

22   A.       I suppose.  I -- I -- I'm not so certain.

23   Q.       Okay.  You pled guilty?

24   A.       Yes.

25   Q.       Why did you plead guilty -- or what did you

1    plead guilty to?

2    A.        Official oppression.

3    Q.        And why did you plead guilty to that?

4    A.        For judicial diversion.

5    Q.        Well, I understand that that was for -- for the

6    deal.  But, I mean, did you plead guilty because you

7    were, in fact, guilty?

8    A.        Yes.

9    Q.        All right.  And what were you guilty of?

10   A.        I should have, in fact, called 9-1-1 or EMS and

11   provided him with medical care at some degree.

12   Q.        Okay.

13   A.        So -- and because of that, I do believe that I

14   had subjected him to, you know, beating and whatnot.

15   Q.        So you felt like you did wrong in not calling

16   for medical care; right?

17   A.        Correct.

18   Q.        And did you feel like you had done wrong for

19   not intervening and stopping all of the abuse?

20   A.        Well, like Mr. Knight said, you know, you can

21   Monday night quarterback it.  I wish that I could have.

22   But he did make good points.  You have to be able to

23   understand the context.  And so looking at the context

24   now versus then, it's two totally different things.

25            I -- I'm 25 now, and I've seen things and I've

1    been able to be in the court system and hear it from

2    many other aspects and angles; right?  Whereas, I was 19

3    or 20 and I didn't understand that yet; right?  I was

4    just going with the flow, so to speak.  I wasn't really

5    expecting somebody who had multiple hours upon hours of

6    training in comparison to me to do something that wasn't

7    lawful, and so that was my mistake for assuming.

8    Q.        So am I understanding what you're telling us is

9    that at 19 or 20 years old, you didn't feel like you

10   were mature enough to handle these situations?

11   A.        Looking back now, that is exactly what I'm

12   saying.

13   Q.        All right.

14   A.        But at the time, I think everybody, you know,

15   thinks they're extremely mature, unless they are very

16   self-aware, which I was not at that age.

17   Q.        I don't think any of us were at that age.  I

18   appreciate that.

19             And do you also feel that in addition to being

20   immature to be -- to be in that kind of a position, that

21   you weren't trained, you just didn't know what to do?

22   A.        Yeah.  I mean, I -- I really -- I had no idea

23   what I was doing.

24   Q.        Okay.

25   A.        I don't know exactly any 19- or 20 -year-old

1  who knows what they're doing with themselves, let alone

2  multiple other adults, and so --

3  Q.      Well, given all that authority of the

4  government --

5  A.      Correct.

6  Q.      -- to detain people and to put them in jail

7  cells and things like that?

8  A.      Correct.

9  Q.      I heard when you were answering questions from

10  Mr. Knight that -- I was hearing that Nathan Ling was

11  resistive most of the time that he was there; is that

12  right?  Or was he not resistive?

13  A.      Looking back, I don't believe.  But in the

14  moment, the way that I had perceived it, yes, it was

15  resisting.

16  Q.      Okay.  Fair enough.

17  A.      And we were trying to stop it and contain it,

18  and it was not --

19  Q.      So --

20  A.      -- we could not.

21  Q.      -- would I be stretching if -- if I said --

22  does it appear that there was kind of a gang mentality?

23  Justin Crabtree jerking him out, people beating on him,

24  and everybody else getting involved in it?

25  A.      I don't know.

1          MR. KNIGHT:  Objection as to mischaracterizing

2     the testimony.

3          MR. SEATON:  I'm just asking him --

4          THE COURT:  I'm going to allow it, but I

5     would -- don't go too far --

6          MR. SEATON:  Certainly.

7          THE COURT:  -- on this.

8          MR. SEATON:  Certainly.

9          THE WITNESS:  Could you ask that question

10    again?

11    BY MR. SEATON:

12    Q.        Well, I mean, does it appear that there was

13    this gang mentality?  You know, you see Justin Crabtree.

14    You know, they got to see the video --

15    A.        Correct.

16    Q.        -- and they get to make their own

17    determinations about what they saw on the video; right?

18    A.        Correct.

19    Q.        So, I mean -- and -- and all of you officers

20    have tried to help us to understand what we saw.  But we

21    can still see -- we can't hear what's going on, but --

22    A.        Correct.

23    Q.        -- we can still see what's going on; right?

24             And it -- it -- does it appear to you that

25    there's this gang mentality where Justin Crabtree is

1    grabbing him, jerking him out of the car?

2            You said that you didn't see him slamming his

3    face up against the wall; right?

4    A.      Correct.

5    Q.      But then you get him into the trap room, and

6    you got five people on him like he's a fish out of

7    water; right?

8    A.      Correct.

9    Q.      And there's people beating on him right in --

10           THE COURT:  Mr. Seaton, is there a question in

11   there?

12           MR. SEATON:  Yeah, I'm getting there.

13           THE COURT:  Well, no.  I mean -- no, you're

14   going to ask questions --

15           MR. SEATON:  Okay.

16           THE COURT:  -- not make statements.

17           MR. SEATON:  All right.

18           THE COURT:  If you've got a question --

19   BY MR. SEATON:

20   Q.      So as --

21           THE COURT:  Mr. Seaton, look at me.

22           MR. SEATON:  Yes, sir.

23           THE COURT:  I'm speaking to you.

24           MR. SEATON:  Yes, sir.

25           THE COURT:  Okay?  If you've got a question,

 1   ask a question.  Okay?  Don't go on.  All right?

 2   BY MR. SEATON:

 3   Q.      So as the people are beating on him, does it

 4   appear that there's a gang mentality going on?

 5   A.      I don't think that we were necessarily trying

 6   to beat on him.  I just -- I -- looking back, I don't

 7   think we knew what we were doing.

 8   Q.      All right.  That's fair enough.

 9           Let's pull up Exhibit 40- -- 48.

10           And I just want to show you one little portion

11   of this clip.

12           MR. SEATON:  Go ahead, Joseph.

13           (The video was played in open court, and the

14           proceedings continued as follows:)

15   BY MR. SEATON:

16   Q.      So this -- this -- hang on one second.

17           So this is -- this is where you're moving

18   Nathan Ling from the search or trap room into the shower

19   area?

20   A.      I believe so, yes.

21   Q.      All right.  So let's just watch a couple

22   seconds of that.

23           (The video was played in open court, and the

24           proceedings continued as follows:)

25   BY MR. SEATON:

1  Q.      And does it appear that he's very unsteady on

2  his feet?

3  A.      At that point, it looks like he was worn out,

4  yes.

5  Q.      And does it appear that it took two officers to

6  hold him up to walk him out of there?

7  A.      I don't know if they needed two officers, but

8  two officers did, in fact, carry him over there.

9  Q.      Well, you saw him almost fall, didn't you?

10 A.      And then he caught himself, yes.

11 Q.      Okay.  And there's a lot of blood in there;

12 right?

13 A.      Yes.

14 Q.      And I think I told you in deposition what all

15 the injuries were, didn't I?

16 A.      You did.

17 Q.      Right.

18         He had a shattered eye socket.  Remember that?

19 A.      Correct.

20 Q.      And remember he had a shattered nose?

21 A.      Correct.

22 Q.      Shattered jaw?

23 A.      Correct.

24 Q.      Broken shoulder?

25 A.      Correct.

1  Q.      Lung issues?

2  A.      Correct.

3  Q.      And the traumatic brain injury?

4  A.      Correct.

5  Q.      And so are you telling the ladies and gentlemen

6  of the jury that with those types of serious injuries,

7  you didn't recognize that he needed medical care?

8  A.      I'm telling everybody that with my level of

9  knowledge at that age, I had no idea how to identify or

10  assess anybody.  I saw that he had got punched in the

11  nose, and that's where the blood was coming from, so I

12  naturally assumed that it was just a broken nose.

13  Q.      Do you agree that all communities deserve to

14  have people treat inmates or detainees humanely?

15  A.      I do.

16  Q.      He wasn't treated humanely, was he?

17  A.      No.

18  Q.      He was beaten savagely, wasn't he?

19  A.      I -- I don't think it's -- "savagely" is the

20  right word for that.  I think the injuries he sustained

21  were brutal, but I don't think that it was a -- I'm just

22  going to go ground, pound, and, you know, beat somebody

23  until they're, you know, within an inch of their life,

24  you know, just cut up and everything else.  That's what

25  I imagine when you say "savagely," so no, I don't

1  believe that that word fits.

2  Q.       When did you find out that he had been slammed

3  up against the block wall?

4  A.       When you rewound the video.

5  Q.       Okay.  So you didn't know that that night?

6  A.       No.

7  Q.       All right.  And -- but you saw all of the blood

8  on the floor, so --

9  A.       Yes, I do remember the blood.

10  Q.       All right.  That's all.  Thank you, sir.

11          THE COURT:  All right.  Thank you.

12          Any recross?

13          MR. KNIGHT:  Yes, Your Honor.

14                    RECROSS-EXAMINATION

15  BY MR. KNIGHT:

16  Q.       Correct me if I'm wrong, Mr. Brown, 18 entitles

17  you to join the Armed Forces, doesn't it?

18  A.       Yes.

19  Q.       Entitles you to vote, doesn't it?

20  A.       Yes.

21  Q.       It's the age of majority in most states;

22  correct?

23  A.       Correct.

24  Q.       And you're going to sit up here and agree with

25  Mr. Seaton that 19 or 20 years old is immature?

1   A.      Were you as mature at 20?

2   Q.      I don't -- I may not be as mature at age 80.

3   I -- I don't know.

4   A.      I don't believe that I personally was mature at

5   that age, no.

6   Q.      But you applied for the job?

7   A.      I did, but --

8   Q.      And you sure know that some inmate didn't need

9   to get smacked in the face by Justin Crabtree; correct?

10  A.      Correct.

11  Q.      And you well knew that that inmate could have

12  been and should have been, by TCI standards, Tennessee

13  law, policies and procedures, whatever, checked hour

14  upon hour?

15  A.      Correct.

16  Q.      Thank you.

17          THE COURT:  All right.  Thank you.

18          MR. SEATON:  Nothing further.

19          THE COURT:  Thank you.

20          MR. SEATON:  You can go.

21          THE COURT:  Yes.  Thank you.

22          All right.  Mr. Seaton, call your next witness.

23          MR. SEATON:  We'll call Michael Galloway.

24          He'll need some assistance.

25          THE COURT:  Yes, we're ready.

1              (Court confers with courtroom deputy.)

2              THE COURT:  Ms. Laster, let's -- let's take

3    five minutes --

4              THE COURTROOM DEPUTY:  Okay.

5              THE COURT:  -- so we can accommodate this

6    gentleman --

7              THE COURTROOM DEPUTY:  Sure.

8              THE COURT:  -- and get ready.

9              So we're going to take a five-minute recess.

10             (Brief recess.)

11             THE COURT:  Okay.  Gentlemen, we're going to go

12   get our jury.  Are we ready?

13             MR. SMITH:  Yes, Your Honor.

14             THE COURT:  Okay.  When he's fished, we're

15   going to take another recess so we can get him off.

16   Okay?  A brief recess.

17             (The proceedings were held in the presence of

18             the jury, as follows:)

19             THE COURT:  All right.  Thank you.

20             Please be seated.

21             (The witness was duly sworn.)

22             THE COURT:  Please proceed.

23             MR. SMITH:  Thank you, Your Honor.

24                    MICHAEL GALLOWAY,

25   called as a witness at the instance of the parties,

1    having been first duly sworn, was examined, and

2    testified as follows:

3                    DIRECT EXAMINATION

4    BY MR. SMITH:

5    Q.      Good afternoon, sir.

6    A.      Good afternoon.

7    Q.      If you could please state your name for the

8    record.

9    A.      Michael Todd Galloway.

10   Q.      Mr. Galloway, what is it that you do?

11   A.      I work as a vocational consultant.

12   Q.      And what is a vocational consultant?

13   A.      My background is in vocational rehabilitation

14   counseling.  I work with individuals in various

15   capacities of disabilities, whether it be -- primarily,

16   in my line of work, that involves injuries that impact

17   employment and earnings.  A vocational consultant

18   is -- is a broader term because I end up doing a lot of

19   other type of work in my practice, not necessarily just

20   assessments.

21   Q.      Okay.  So it's true that we hired you as one of

22   our experts?

23   A.      Correct.

24   Q.      And is it true that we hired you to determine

25   Nathan Ling's ability to have gainful employment?

1  A.        Correct.

2  Q.        How long have you been doing this type of work?

3  A.        I've been in the field of vocational

4  rehabilitation -- it will be 30 years this coming month

5  actually.

6  Q.        30 years.

7            What did we ask you to do for the jury?

8  A.        Primarily I was asked to perform a

9  preinjury/postinjury earning assessment, and in order to

10  do that, I was supplied various medical records, the

11  records that I needed in order to come to opinions in

12  this case as it relates to what I've been asked to do.

13  Certainly we've looked at records and looked at data,

14  which we could get into, and it allowed me to formulate

15  an opinion on Mr. Ling's -- Ling's postinjury earning

16  capacity.

17  Q.        So you're able to do a preinjury assessment

18  before this incident ever happened and then take a look

19  postinjury at future employment opportunities that he

20  could do?

21  A.        Correct.

22  Q.        And putting aside the materials specifically

23  for this case, what materials do you use or does any

24  vocational expert use to come to your conclusions?

25  A.        I -- I use government data in various forms.

1  Things that I particularly look at are job definitions,

2  dictionary of occupational titles.  These are Department

3  of Labor publications.  They've been around for decades,

4  so they're -- they're valid, very relevant in my line of

5  work.

6          I look at employment numbers understanding the

7  kinds of jobs and employment that are in particular

8  labor markets.  I look at earnings information from

9  Bureau of Labor Statistics wage data, and that allows me

10 to be able to understand the type of earnings associated

11 with a person's ability to work, also taking in

12 consideration their education level, which also

13 influences earning capacity.

14 Q.      Specifically for this case, what materials of

15 Nathan Ling did we provide to you to review?

16 A.      The -- the records which I had available were

17 Campbell County's EMS critical care prehospital report,

18 UT LifeStar, LaFollette Medical Center, University of

19 Tennessee Medical Center, Garden City Hospital, Gillian

20 Clifford, nurse-practitioner, Western Wayne Family

21 Healthcare Centers, Michigan Medicine, University of

22 Michigan.

23         There was a medical chronology of Nathan Ling

24 that was provided.  I had the deposition of Dr. William

25 High, a voluntary detective interview was provided, and

1    I had Nathan Ling's 2021 tax return.  And then,

2    subsequently, I've -- I've been provided the depositions

3    of Dr. Waldron, also Dr. Startup, and then Dr. Abel.

4    Q.      What -- how did you come to your conclusions

5    about Nathan Ling's preinjury assessment?

6    A.      Based on the records that I had available, it

7    was my understanding from the records that he had

8    achieved a high school education, so he had to have a

9    high school diploma.  He was relatively young, so there

10   was a limited amount of work history that was performed

11   at the time of the injury.  And then that allowed me to

12   perform a preinjury vocational profile, if you will,

13   given the fact that he was high school educated, had a

14   high school diploma, and had some limited work history.

15   Q.      I guess in layman's terms, is it fair to say

16   that based on your education level and your physical

17   condition, there is a set level of jobs expectation and

18   earning capacity that the government considers you're

19   able to do?

20   A.      Yes, the Bureau of Labor Statistics, they do

21   continual studies in the relationship of education and

22   earnings, and so we have data that's available each and

23   every year that's put out that gives us an idea of

24   the -- the trends in employment based on earnings and

25   education levels.  So that gives us an idea of the

1  person's ability to earn money no matter what particular

2  job or career they might go into by nature of their

3  educational attainment.

4  Q.      And based on this methodology, these materials

5  you reviewed, knowing Mr. Ling's educational level, did

6  you come to a conclusion about the amount of money he

7  would have earned yearly preinjury?

8  A.      Yes.  Based on the -- the specific data which I

9  had just testified to from the Bureau of Labor

10 Statistics, based on an individual with a high school

11 diploma and based on the -- the wage data from the

12 Bureau of Labor Statistics, an individual with a high

13 school diploma could be expected, in median weekly

14 earnings, to have earned $809 median weekly, which, to

15 say it another way, would be $42,068 annually.  And

16 that's for a high school graduate.

17 Q.      Okay.  So preinjury -- I'm just going to label

18 it "pre" -- annually, what was the number he could have

19 been expected to earn preinjury?

20 A.      Preinjury on an annual basis, given a high

21 school education, was $42,068.

22 Q.      Okay.  $42,068?

23 A.      Correct.

24 Q.      Okay.  Based on your review of the materials,

25 the medical records, and -- well, let me go back a

1  little bit.

2          What's your understanding of Mr. Ling's

3  postinjury work history?

4  A.      My understanding is there was what appears to

5  be a work attempt at FedEx.  Didn't last very long.

6  That's -- that's a particularly heavy job.  He was

7  working in a warehouse.  The last job that I'm aware of

8  that he was working at was McDonald's.  He was working

9  in fast food.

10          It's my understanding that he was having

11  difficulty performing both jobs physically and mentally.

12  As well there is a medical record I looked at from one

13  of the orthopedics that at the time of the FedEx job, he

14  was having continued left shoulder problems, I believe.

15  And then he's -- he's having what I consider to be in

16  doing this type of work adjustment problems in returning

17  to work, and that seemed to be the case from McDonald's

18  as well.

19  Q.      So when Mr. Ling would attempt to get a job, it

20  just didn't last very long?

21  A.      Right.  That -- that seems to be what's

22  happening.  It's not that he cannot go and apply and

23  obtain a job.  It's just that he cannot maintain that

24  job, and that's essentially what's important for earning

25  capacity.

1  Q.      Are you familiar with the term "gainful

2  employment"?

3  A.      Yes.

4  Q.      What is gainful employment?

5  A.      Gainful employment is -- is substantial work

6  that a person performs for pay, and it's generally based

7  upon education, skills level as well to be substantially

8  gainfully employed.

9  Q.      And someone has to be -- hold a full-time job

10  for a certain amount of time to be able to be considered

11  gainfully employed?

12  A.      Correct.

13  Q.      Has Mr. Ling, from your review of -- of the

14  materials, been able to be gainfully employed?

15  A.      In my opinion, he has not been able to perform

16  gainful employment.  There -- there have been brief

17  attempts at work, and, you know, I -- I differ because

18  I -- I think when I look at the work that he's done, the

19  problems he's having, I think, in essence, they're work

20  attempts.  It doesn't seem that he's met a threshold of

21  passing perhaps like a 90-day requirement to -- to --

22  you know, to learn the job, to be able to sustain the

23  job beyond 90 days, and I -- I don't see that that's

24  happened.

25  Q.      So, Mr. Galloway, what are your conclusions

1  postinjury about Mr. Ling's ability to be gainfully

2  employed?

3  A.      It's -- it's my professional opinion that

4  Mr. Ling is unable to maintain gainful employment as

5  we've talked about, and I do not believe that he has any

6  reasonable earning capacity as a result.  And as I

7  indicate, if he is able to earn money at some point

8  postinjury, it seems to be -- it's going to be very

9  short duration, similar to what we have in the records.

10 But --

11 Q.      And --

12 A.      I'm sorry.

13 Q.      Oh, I'm sorry, sir.  I didn't mean to interrupt

14 you.

15 A.      Well, it's -- in my opinion, though, the

16 threshold is just not met for gainful employment.

17 Q.      Is it important in your analysis when you're

18 determining what jobs are available in the local and the

19 national economy that his physical and mental

20 limitations have to be taken into account?

21 A.      Yes.

22 Q.      And based on those physical and mental

23 limitations, is he employable to meet gainful

24 employment?

25 A.      In my opinion, he's not.  I've not seen

1    anything in the records that would indicate that -- that

2    he is able to maintain gainful employment -- employment

3    physically, mentally.  And I base that opinion upon the

4    medical records which I've looked at as well as the

5    depositions of -- of the doctors, their statements on

6    limitations.  And so based upon those factors,

7    it's -- it's my opinion that he's unable to maintain

8    gainful employment.

9    Q.       Is it your conclusion, sir, that postinjury, he

10   has an earning capacity of zero?

11   A.       That -- that's correct.

12   Q.       And is it your conclusion, sir, that

13   postinjury, there are no jobs available that Mr. Ling

14   could do for gainful employment?

15   A.       Correct.

16   Q.       Sir, you have -- did we ask you to provide a CV

17   for us?

18   A.       Yes, all of that's been provided.

19           MR. SMITH:  Can you pull up 31, please.

20   BY MR. SMITH:

21   Q.       Sir, does this look like your CV that you

22   provided to us?

23   A.       Yes, it is.

24   Q.       Okay.  And just briefly, you have -- looking at

25   it, you earned a bachelor of science what year?

1    A.         Bachelor of science was in 1993.

2    Q.         Which school did you go to to earn that degree?

3    A.         That was at Radford University in Virginia.

4    Q.         And have you earned a higher level of education

5    than just a bachelor's?

6    A.         Yes.  Upon graduating from Radford University,

7    I was accepted at the University of Tennessee here in

8    Knoxville and entered the rehabilitation program --

9    vocational rehabilitation program at the University of

10   Tennessee, which I graduated in December of 1994.  And

11   that's the highest level of education.

12            I've -- I have subsequent certifications beyond

13   that and continuing education.

14   Q.         And you currently do consulting at Galloway

15   Consulting Services here in Knoxville?

16   A.         Yes, that's -- that's my own company.

17   Q.         And how long -- when did you start that

18   company?

19   A.         1998, if I remember, yes.

20   Q.         And that is to present?

21   A.         To present, yes.

22            MR. SMITH:  Okay.  Your Honor, we would move to

23   admit Exhibit 31 into evidence.

24            MR. KNIGHT:  No objection.

25            THE COURT:  So ordered.

1          (Plaintiff's Exhibit 31

2          received into evidence.)

3   BY MR. SMITH:

4   Q.      Sir, that's all the questions I have for you.

5   Please answer any that Mr. Knight has.

6                   CROSS-EXAMINATION

7   BY MR. KNIGHT:

8   Q.      Mr. Galloway, I just have a few.

9          I got a letter that you wrote Mr. Seaton where

10  you kind of went through the prejudgment -- I'm sorry.

11  Prejudgment -- preinjury/postinjury earning capacity

12  assessment dated July 19th, 2023.

13  A.      Yes, correct.

14  Q.      And you have down here "deposition of

15  Dr. William High"?

16  A.      Correct.

17  Q.      There -- I've not seen a deposition of

18  Dr. William High.  Could that be just a misprint, or was

19  his deposition taken without --

20  A.      Well --

21  Q.      -- my notice?

22  A.      Well, if it's not a deposition, I've got --

23  I've got what looked to be testimony.  There's not a

24  cover page attached to it.

25  Q.      Okay.

1  A.        So I -- I could be mistaken whether it was a

2  deposition or not.

3  Q.        I --

4  A.        I do have something in a form.

5  Q.        You heard Mr. Smith indicate that they had

6  hired you; correct?

7  A.        Yes.

8  Q.        Mr. Seaton's firm hired you; correct?

9  A.        That's right.

10 Q.        At what rate?

11 A.        I try to flat rate most of what I do, which for

12 a complete assessment's 950.  We didn't -- since we

13 didn't do the interview, there ended up being time and

14 expenses.  But I -- I believe the total was about $1,500

15 for the record review report.

16 Q.        Okay.  And when you're talking about record

17 review, you're talking about medical records; correct?

18 A.        Well, the medical records as well as there was

19 some earnings records as well.

20 Q.        Okay.

21 A.        Brief information there, yes.

22 Q.        You indicated you did not do an interview, so

23 you did not do an interview of Mr. Ling?

24 A.        No.  No, I did not.

25 Q.        Do any interview of any of his family members

1  or anybody?  Friends?  Anything like that?

2  A.        No, I did not.

3  Q.        You talk to any of his employers, supervisors,

4  coworkers at any of these jobs?

5  A.        No, I have not.

6  Q.        Talk to any of Mr. Ling's doctors or asked any

7  of his doctors specific questions with regard to what

8  restrictions he may have?

9  A.        No, and that's not -- that's not really the

10  normal course.  We've got the records.  We've got the

11  depositions which I've looked at where they do go into

12  those limitations, and that's the normal course of

13  where -- where I would get that type of information.

14  It's never available for me to meet the doctor in a

15  case.

16  Q.        You -- you don't think it's beneficial to have

17  a one-on-one with a doctor, say, hey, what can we do

18  with this guy?  What can mitigate this?  Maybe stop

19  drinking, stop smoking, stop taking drugs, that kind of

20  thing?

21  A.        Well, no.  Those questions were asked in the

22  depositions.  And in 30 years, I've never had an

23  opportunity to sit down and talk to a medical doctor

24  directly.  That's generally your all's job when you take

25  depositions.

1  Q.      You're an expert witness; correct?

2  A.      Yes.

3  Q.      That's what you do mainly; correct?

4  A.      Based on my own professional background of

5  vocational rehab counseling, yes.

6  Q.      Law firm hires you.  You come up and testify;

7  correct?  Give a deposition or record review or whatever

8  it is you do do?

9  A.      Yes.  In this case, yes.

10  Q.      All right.  Thank you.

11          THE COURT:  All right.  Thank you.

12          MR. SMITH:  Very briefly, Your Honor.

13          THE COURT:  Okay.

14                    REDIRECT EXAMINATION

15  BY MR. SMITH:

16  Q.      Sir, you're a professional vocational

17  rehabilitation expert; correct?

18  A.      Correct.

19  Q.      And you do -- we have to pay you compensation

20  for your testimony; correct?

21  A.      That's right.

22  Q.      As all professionals would expect to be paid

23  for their testimony and -- and work?

24  A.      Correct.

25  Q.      Is it also true, sir, that we can't even talk

1  about vocational disability unless we hire someone like

2  you to -- to prove it?

3          MR. KNIGHT:  Objection.  Argumentative.

4          THE COURT:  Overruled.

5          THE WITNESS:  That's correct.  Individuals in

6  my line of work are typically the ones that deal in the

7  labor market, jobs, how people perform jobs, the

8  strength factors of those jobs, the mental demands

9  required in those jobs, the earnings.

10          So, you know, nurses or nurse practitioners,

11  medical doctors, they're not the ones that -- that deal

12  in that type of position.

13  BY MR. SMITH:

14  Q.      So to talk to the jury about this specific

15  issue, we had to hire someone like you?

16  A.      Correct.

17          MR. SMITH:  Thank you.  No further questions.

18          THE COURT:  Any recross?

19                    RECROSS-EXAMINATION

20  BY MR. KNIGHT:

21  Q.      The doctor's deposition is taken.  Sometimes a

22  lawyer or -- well, often a lawyer will ask what the

23  restrictions are, what physical restrictions are there

24  of a patient.  Is that not correct?

25  A.      Correct.

1    Q.        You've seen that, haven't you?

2    A.        Yes.

3    Q.        And sometimes the lawyers, if it's at issue,

4    will ask what mental restrictions there are; correct?

5    A.        Correct.

6    Q.        And that can impact your opinion.  Is that not

7    correct?

8    A.        Correct.

9    Q.        Thank you.

10             THE COURT:  All right.  Thank you.

11             Ms. Laster, do we need to take a recess to help

12   this gentleman or can we get him --

13             THE COURTROOM DEPUTY:  We should be fine.

14             THE COURT:  All right.  Thank you, sir.

15             All right.  Mr. Seaton, call your next witness.

16             MR. SEATON:  We call Lieutenant Matt Wasson.

17             THE COURTROOM DEPUTY:  Sir, this way.

18             THE COURT:  Thank you.

19             (The witness was duly sworn.)

20             THE COURT:  Please proceed, Mr. Seaton.

21                          MATT WASSON,

22   called as a witness at the instance of the parties,

23   having been first duly sworn, was examined, and

24   testified as follows:

25                       DIRECT EXAMINATION

1 BY MR. SEATON:

2 Q.        Tell us your full name, sir.

3 A.        Matthew Steven Wasson.

4 Q.        And what do you do?

5 A.        Currently I'm a lieutenant with the Campbell

6 County Sheriff's Office.

7 Q.        All right, sir.  How long have you worked

8 there?

9 A.        A little over 17 years now.

10 Q.        All right.  When you -- I think that when I

11 took your deposition, you told me that you had worked

12 your way through just about every position in the

13 department; right?

14 A.        Yes.

15 Q.        Correct?

16 A.        Yes.

17 Q.        And, you know, currently you are a lieutenant.

18 Were you a lieutenant back in 2019 when this occurred?

19 A.        Yes.

20 Q.        All right.  Would you look at the monitor.

21 We've got Exhibit Number 56.  Does that look like an

22 accurate depiction of the chain of command of the

23 sheriff's department at that time?

24          And I haven't tried to put all the officers in.

25 What I've tried to do is put the officers that were

1  involved, but then the --

2  A.        Yeah.

3  Q.        -- their supervisors ahead of them.

4  A.        It looks accurate to me, yes, sir.

5  Q.        All right, sir.  So you were the lieutenant at

6  that time; right?

7  A.        Yes.

8  Q.        Are you in the same position?

9  A.        Yes.

10  Q.        All right, sir.  Did you move around?

11  A.        During the year 2020, I got promoted to chief

12  deputy.

13  Q.        Okay.  And then did -- so after you were

14  promoted to chief deputy, did you get pulled back down?

15  A.        Yes.  After -- after election, yes.

16  Q.        Oh, you mean after the sheriffs changed?

17  A.        Yes.

18  Q.        All right, sir.  So you had worked in the

19  position there that Jeremy Goins was in; correct?

20  A.        Yes.

21  Q.        As chief deputy?

22  A.        Yes.

23  Q.        All right, sir.  And you were the lieutenant

24  over Mike Owens, Justin Crabtree, and Dakota Williams

25  when this occurred?

1    A.        Yes, I was.

2    Q.        All right, sir.  You weren't there the evening

3    that all this occurred?

4    A.        No, sir.

5    Q.        All right, sir.  You -- you were told about it

6    what?  Monday?

7    A.        Later on.  I -- I can't remember exactly when.

8    Q.        And --

9    A.        But it was several days later.

10   Q.        Did you look at the video?

11   A.        Say again?

12   Q.        Did you review the video that they had taken

13   from the system in the jail?

14   A.        Parts of it, yes.

15   Q.        You hadn't reviewed the whole thing?

16   A.        Not the whole thing.

17   Q.        All right, sir.  And what were your

18   determinations after you'd reviewed the video?

19   A.        I didn't know everything leading up to that

20   point.  Somebody had just -- I don't know how we even

21   acquired the video.  It was -- trying to think of the

22   words -- some type of altercation inside of our

23   correctional facility with it looked like several of our

24   deputies and -- and an individual.  I didn't know who it

25   was at the time.

1  Q.      And you felt that your officers were using

2  excessive force, didn't you?

3  A.      During parts of the altercation, yes.

4  Q.      All right, sir.  And you felt that the other

5  officers that were watching this excessive force had a

6  responsibility or a duty to intervene, didn't you?

7  A.      I do, for the ones that were present during the

8  entire altercation.

9  Q.      All right.

10  A.      I felt like there was maybe one that came in

11  after the initial altercation.

12  Q.      Well, there were five, weren't there, in the --

13  in the trap room or the search room?

14  A.      I -- I can't remember exactly.

15  Q.      Well, do you remember the officers that were

16  involved?

17  A.      I know the ones that were -- that fell

18  under -- under my chain of command, yes.

19  Q.      All right.  And do you see the other three on

20  the corrections chain of command?

21  A.      Yes.

22  Q.      So that would be Sean Brown, Alexander

23  Standridge, and Joshua Miller; right?

24  A.      Yes.

25  Q.      So you wouldn't have had any part of them.  You

1  would just -- you would have just been the supervisor

2  over Crabtree and Williams; right?

3  A.      Yes, sir.

4  Q.      All right, sir.  And so after you had viewed

5  that video, did you discuss that -- well, let's back up.

6          You were in the chain of command underneath

7  Jeremy Goins, chief deputy?

8  A.      Yes, sir.

9  Q.      And then he reported directly to the sheriff?

10  A.      Yes, sir.

11  Q.      All right.  And so when you reviewed the video,

12  did you have any conversations with Jeremy Goins, chief

13  deputy?

14  A.      I -- I can't remember if I did.  Honestly, I

15  don't even know who was present.  I can't even remember

16  who was present when we were watching the video

17  initially.

18  Q.      Okay.  But you and Jeremy Goins, the chief

19  deputy, went out the next day to go talk to neighbors;

20  right?

21  A.      Yes.

22  Q.      And the primary reason to go talk to the

23  neighbors was to see if Nathan Ling had actually hit his

24  head on the truck?

25  A.      Yes.

1    Q.        And you didn't find any evidence of him hitting

2    his head on the truck?

3    A.        We spoke with a -- a neighbor where the

4    truck -- truck was present, and all he could tell us

5    what that he had heard some loud noise during the night

6    that woke him up.

7    Q.        But it -- you looked at the truck?

8    A.        Yes.

9    Q.        Nothing on the truck?

10   A.        Not that I can see.

11   Q.        All right, sir.  And so was it Chief Goins that

12   had started that investigation?

13   A.        Yes.

14   Q.        And what else did you all do to investigate

15   this case?

16   A.        That is all that I remember being a part of

17   myself.

18   Q.        Okay.

19   A.        So I can't say where it progressed from there.

20   Q.        Well, who was responsible for doing an

21   investigation?  I mean, I see that you're in the middle

22   of the chain.  Is it the sheriff, is it the chief

23   deputy, or is it you?

24   A.        I -- I think our policy actually says the

25   sheriff or his designee.

1  Q.      Yes.

2  A.      Or it may even specify captain.  I'm not --

3  it's -- it's worded one way or the other.

4  Q.      Do you know if anyone did any investigation

5  beyond you and Jeremy Goins going out the next day?

6  A.      No.  Not -- not that I recollect, no.

7  Q.      Right.

8          And you knew that -- after all of this

9  occurred, you knew that this young man, Nathan Ling, had

10  been life-flighted to the University of Tennessee with a

11  traumatic brain injury?

12  A.      Now say that one more time.  I'm sorry.

13  Q.      Yeah.  I'm sorry.  Thank you.

14          You knew that this young man that had been in

15  your jail had been life-flighted to the University of

16  Tennessee with a traumatic brain injury?

17  A.      Yes.  Sometime after the incident, maybe a day

18  or two later, I found out.

19  Q.      Okay.

20  A.      I found out.

21  Q.      All right.  When you -- when you reviewed the

22  video, was it apparent that he got his injuries and

23  damages from the officers in the jail?

24  A.      I believe there was some injuries from that.

25  I -- I -- I'm not a medical professional.  I can't tell

1  you what happened prior to him coming to the jail.

2  Q.      But were you not interested in finding out what

3  caused all of his injuries or what caused the abuse that

4  occurred in your jail?

5  A.      At the time of finding out the information, the

6  information being told to me was during the course of

7  the arrest, he had ran full speed into a truck, so

8  that's where I thought a lot of the injuries come from

9  until I seen the video.  Then I -- obviously there

10 was -- some type of injuries came from the video -- from

11 the deputies.

12 Q.      Well, remember me going over the injuries he

13 had?  The facial injuries, broken eye socket, mouth,

14 nose, jaw --

15 A.      Yes.

16 Q.      -- broken shoulder --

17 A.      Yes.

18 Q.      -- ribs, and all that?

19         What do you think he got from running into a

20 truck versus what the officers did to him in those

21 videos?

22 A.      Once again, I'm not a medical doctor.

23 Q.      Well, you -- but just from viewing the video.

24 A.      Yeah.  From viewing the video, I can definitely

25 see -- from what I remember of the video, I -- I -- it's

1   been a very long time.  I remember him getting struck in

2   the face a few times by Deputy Crabtree.  I -- I don't

3   remember anything else.  As far as the injuries to the

4   sternum, I -- I don't know what exactly could have

5   caused that.

6           Now, the -- the -- the facial injuries, yeah --

7   yeah, absolutely, I think possibly could have been

8   caused by Deputy Crabtree striking him in the face.

9   Q.      Well, did you also know that Deputy Crabtree

10  slammed his face up against the block wall in the sally

11  port?

12  A.      In the sally port?

13  Q.      Yeah.

14  A.      I don't know that I've seen that.

15  Q.      Okay.  But you didn't investigate.  You don't

16  know why --

17  A.      I don't know.

18  Q.      -- do you?

19          All right.  All right.  Fair enough.

20          And so as a result of all this, no

21  investigation done; right?

22  A.      I believe an investigation was started by -- by

23  Chief Goins, and where it led to, I don't know.  I know

24  at some point, certain filings were turned over to the

25  district attorney's office, and I don't know how that

1  came about.  But --

2  Q.        Nobody got terminated underneath you?

3  A.        No, sir.

4  Q.        Nobody got disciplined?

5  A.        Well, Dakota Williams was placed off -- well,

6  that may have been once the TBI got involved, but in

7  that immediate time, no.

8  Q.        Okay.  Nobody got written up?

9  A.        No, sir.

10 Q.        All right, sir.  And you had received a copy of

11 the text picture of Nathan Ling laying down in the floor

12 of the search or the trap room?

13 A.        Yes, sir.

14 Q.        You got that; right?

15 A.        I did.

16 Q.        And you got that from Mike Owens?

17 A.        I -- I can't remember exactly, but that sounds

18 familiar.  I can't say for exactly sure.

19 Q.        Do you recall it just being circulated around

20 among the officers and the supervisors?

21 A.        I can't say that.  I can say that the message

22 would have come through early -- early one morning, and

23 then I didn't receive it until the next morning when I

24 was up starting around to get ready for work.

25 Q.        And when I took your deposition, you said you

1  didn't do anything about that picture of that inmate

2  being -- who -- who -- after he had been abused and the

3  bloody picture, you didn't do anything about that;

4  right?

5  A.      That is correct at that time, but at that time,

6  I had no context of what was going on.

7  Q.      Well, did you ever do anything about that

8  picture being circulated?

9  A.      Other than what I did with Chief Goins?

10 Q.      And that was just going to the house?

11 A.      That was just going to the house.  It was one

12 of those -- he kind of took the reins.  I was just

13 assisting him.

14 Q.      And you know that there were supervisors

15 involved in circulating this text; right?  You were -- I

16 mean, you weren't involved in circulating it?

17 A.      No.

18 Q.      But you were involved in receiving it; right?

19 A.      Yes.  Yes.

20 Q.      And Mikey Owens was involved in receiving it;

21 right?

22 A.      Yes.

23 Q.      And y'all have a responsibility to report that

24 to your higher-ups when -- when that -- that occurs?

25 A.      Yes.

1  Q.        And that didn't occur?

2  A.        It did not occur, although I don't remember

3  exactly when the investigation started by Chief Goins.

4  When -- when it actually started, I don't know if it was

5  within a day or two of what was going on.  So it's all

6  however long ago it's been.  It's been a pretty good

7  while now, so I don't remember exactly how it all played

8  out.

9  Q.        All right.  And when we talked in your

10 deposition, you said that there were numerous missteps

11 that were taken by the department; correct?

12 A.        I think you may have said that and I agreed.

13 Q.        Okay.  We talked about that one of the missteps

14 was the beating of an arrested person; correct?

15 A.        Yes.

16 Q.        He was savagely beaten -- beaten, wasn't he?

17 A.        He was -- he was definitely assaulted.  I don't

18 know what somebody's definition for "savagely" is, but

19 it was not -- obviously not pleasant.

20 Q.        And it was by numerous people who -- who failed

21 to intervene?

22 A.        From what I remember of the video, I remember

23 a -- a few of the deputies -- well, I mean, several of

24 the deputies with hands on Mr. Ling, but I just remember

25 specifically Mr. Crabtree going -- striking him in the

1  face.

2  Q.       Okay.  And if you go back to this Exhibit 56

3  that's on the screen, this shows the five people that

4  were involved.  Remember?

5  A.       Yes.

6  Q.       All right.  And so you remember seeing in that

7  search room all five of these people standing over top

8  of Nathan Ling; right?

9  A.       I remember -- I mean, you're telling me these

10  are the people that are involved.  A few of these people

11  I've not heard of or don't remember, so I -- yes, there

12  were five people involved.

13  Q.       Okay.  That's fair enough.

14  A.       Yeah.

15  Q.       That's fair enough.

16         And you saw that that -- when he's -- well, you

17  saw the -- the video where they -- where Justin Crabtree

18  jerked him out of the car with his hands cuffed behind

19  his back; right?

20  A.       Initially, no.  I think you -- you were

21  actually the one that showed me that.

22  Q.       Okay.  But you've seen it?

23  A.       Yeah.

24  Q.       And you saw in the trap room or in the search

25  room there were -- they were taking his arms up behind

1  his back and slamming his head into the counter and up

2  against the steel window casings; right?

3  A.      Yes, sir.  Yes.

4  Q.      And during all of that, as it was occurring,

5  there wasn't anybody intervening; correct?

6  A.      No, sir.

7  Q.      They had a duty to do that, didn't they?

8  A.      Yes.

9  Q.      And as a matter of fact, didn't you tell me

10  that "This was a black eye not only on our sheriff's

11  department but law enforcement community as a whole"?

12  A.      Yes.

13  Q.      And you still believe that?

14  A.      Oh, yes.

15  Q.      All right.  What have you done to change

16  things?

17  A.      Since that incident specifically involving the

18  assault, we have been working on updating our use of

19  force policy to include sections to -- for duty to

20  intervene and just kind of working more in depth on our

21  use of force policy to -- to help prevent situations

22  like this occurring again.

23  Q.      Have that -- has that been done?

24  A.      Not -- not currently, no.  It's -- we're still

25  in the process of going through everything.

1   Q.      We talked to numerous folks -- you all had a
2   450-page operations manual; right?
3   A.      Yes.
4   Q.      And we talked to numerous folks who said that
5   they had to sign off that they had received it, but
6   nobody instructed on them -- instructed them on the
7   operations manual?
8   A.      Yes.
9   Q.      Is that still the way that things are at the
10  Campbell County Sheriff's Department?
11  A.      We are currently with a program called
12  "PowerDMS" that manages our policy and procedures
13  manual.  That will be -- we're probably within a few
14  weeks of implementing that, and that will be a program
15  to where our policies and procedures will go out to
16  every employee and they can access that through --
17  through email or through an app on their phone.  And
18  they are required to digitally sign saying they've read
19  and understand the policies and procedures.  That --
20  that's just one step that we're working on.
21  Q.      So nothing has changed in terms of training
22  them on the operations manual at this point; right?
23  A.      Correct.
24  Q.      All right.  And we talked about the fact that
25  Sean Brown -- well, let's see.  Sean Brown is not under

```
1   your umbrella.  Let's not talk about him for right now.
2           And when I asked you how we can prevent
3   something like the Nathan Ling incident from happening
4   again, your response was what?
5   A.      Better training.
6   Q.      And what else?  Better supervision?
7   A.      Yes.
8           MR. SEATON:  All right, sir.  Thank you very
9   much.
10          THE COURT:  All right.  Thank you.
11          Any cross-examination?
12          MR. KNIGHT:  Yes, Your Honor.
13                  CROSS-EXAMINATION
14  BY MR. KNIGHT:
15  Q.      Lieutenant Wasson, you are still employed by
16  Campbell County; is that correct?
17  A.      Yes, sir.
18  Q.      I believe in your deposition to Mr. Seaton, you
19  indicated there's about 105 to 110 employees at the
20  Campbell County Sheriff's Department?
21  A.      Yes, sir.
22  Q.      You've been there for 16 or 17 years?
23  A.      Just a little over 17 now.
24  Q.      Okay.  And it's -- could you name some of the
25  positions that you have held?  I assume you started off
```

1    in the jail or as a reserve deputy?

2    A.        I started off as a corrections officer in 2006

3    and moved to -- as a patrol officer, then promoted to a

4    sergeant after a few years.  I've worked in our

5    investigations division.  I have worked in our training

6    division.  Well, I guess you could call it a division.

7    It's me and one other guy.  I've been a lieutenant the

8    first time over our patrol divisions and SRO divisions.

9    I've worked as the second in command as the chief

10   deputy.  And now under our new administration, I'm back

11   under the -- in my lieutenant's role.

12   Q.        Been all over the place?

13   A.        Oh, yeah.

14   Q.        I assume that when you were a deputy, you had

15   to arrest certain people; correct?

16   A.        Yes.

17   Q.        They don't want to be arrested, do they?

18   A.        Some of them, no.

19   Q.        Some of them will flee; correct?

20   A.        Yes.

21   Q.        Some of them happen to be injured; correct?

22   A.        Yes.

23   Q.        And just because there's an injury doesn't mean

24   an officer has done something wrong, has -- is there?

25   A.        Correct.

1  Q.      And some injuries involve blood; correct?

2  A.      Yes.

3  Q.      So the fact that you see a picture without the

4  context doesn't really tell you a whole lot, does it?

5  A.      No.  Not necessarily, no.

6  Q.      On page 54 of your deposition to Mr. Seaton,

7  you indicated that in 7- -- in over 17 years, you've

8  never heard of something like this happening; is that

9  correct?

10 A.      Since I have been at the Campbell County

11 Sheriff's Office, this is the first incident that I've

12 ever been directly involved with and I know of.

13 Q.      Okay.  And you weren't involved directly;

14 correct?

15 A.      Correct.

16 Q.      You just saw portions of the video?

17 A.      Yes.

18 Q.      You are -- you -- have you been in a position

19 to look at other agencies' manuals -- policy and

20 procedure manuals?

21 A.      No, sir.

22 Q.      No, you -- you've not?  Have you ever -- let me

23 ask you this:  Has it ever been proposed -- since we're

24 talking about -- since Mr. Seaton was asking you about

25 things that you may want to change, has it ever been

1  proposed that the manual be amended to allow an officer

2  to punch somebody as Justin Crabtree did --

3  A.        No.

4  Q.        -- in the search --

5  A.        No, sir.

6  Q.        Have you ever even heard of that?

7  A.        No, sir.

8  Q.        And in your POST training -- you went through

9  POST; correct?

10 A.        Yes.

11 Q.        In fact, every road deputy goes through POST,

12 do they not?

13 A.        Yes, sir.

14 Q.        And that's put on by the State?

15 A.        It is, yes, sir.

16 Q.        And that's to -- and if you pass, you're

17 certified.  And if you don't pass, then you're not

18 certified; is that correct?

19 A.        Correct.  Yes, sir.

20 Q.        And -- and in addition to that, the department

21 arranges for 40 hours of in-service training every year;

22 correct?

23 A.        That's correct.

24 Q.        Now, when you are in that POST training, it

25 goes over constitutional rights, constitutional law;

1   right?

2   A.          Yes, sir.

3   Q.          State law; correct?

4   A.          Yes.

5   Q.          Defensive tactics?

6   A.          Yes.

7   Q.          In any of these classes -- how long is that?

8   Is that an eight-week program still?

9   A.          Currently it's 12 weeks.  It's -- it's

10  alternated between eight and 12 weeks for a few years.

11  Q.          Okay.  When you went through it, was -- was

12  the -- I assume you had a defensive tactics instructor?

13  A.          Yes, sir.

14  Q.          Okay.  Telling you how to defend yourself?

15  A.          Yes.

16  Q.          Did your instructor ever indicate to you that

17  it was okay to just haul off and hit somebody?

18  A.          Not without cause, no.

19  Q.          Okay.  And that cause would be if you were in a

20  knockdown, drag-out fight, and you were ordering the

21  arrestee; is that correct?

22  A.          Yes.

23  Q.          And that's when all bets are off?

24  A.          I wouldn't say initially all bets are off, but

25  that's when you're -- it's okay to defend yourself.

1  Q.        Okay.  But in terms of what you observed with

2  Mr. Crabtree, that was never taught?

3  A.        No.  No, sir.

4  Q.        And certainly never condoned?

5  A.        Correct.

6  Q.        With respect -- well, you were a corrections

7  officer too, I assume, 17 years ago.  I'm sorry.  I

8  assume you knew to -- that -- were you or were you not

9  TCI certified?

10  A.        Say that one more time.  I'm sorry.

11  Q.        Were you not TCI certified?

12  A.        TCI certified?

13  Q.        Yes, sir.

14  A.        Yes, I was.

15  Q.        Okay.  So at least as far as back then,

16  corrections officers were supposed to make hourly

17  checks; correct?

18  A.        Correct.

19  Q.        And log in when they've done so; correct?

20  A.        Correct, yes, sir.

21  Q.        And if medical needed to be called, arrange for

22  medical; correct?

23  A.        Correct.

24  Q.        That's just been in existence as long as you

25  can remember.  Is that not correct?

1    A.        For me, yes.

2    Q.        So for somebody to come up here and say that,

3    you know, they didn't know or that they weren't trained,

4    that's not something that -- that -- you wouldn't have

5    the job.  That's -- that's the job, isn't it?

6    A.        That is, yes.

7    Q.        Thank you.

8    A.        Thank you.

9              THE COURT:  All right.  Any redirect?

10             MR. SEATON:  No, sir.  No, sir.

11             THE COURT:  All right.  Thank you, sir.

12             MR. SEATON:  May I approach?

13             THE COURT:  What is it?

14             MR. SEATON:  Pardon?

15             THE COURT:  What is it?

16             MR. SEATON:  I've got three things I need to

17   ask you.

18             THE COURT:  Do you want --

19             MR. SEATON:  To approach, yeah.

20             THE COURT:  -- a conference?

21             MR. SEATON:  Yes, a conference.  I'm sorry.

22             THE COURT:  Okay.  All right.

23             (A sidebar discussion was held between the

24             Court and counsel, outside the hearing of

25             the jury, as follows:)

```
 1              MR. SEATON:  I'm assuming -- I'm assuming --
 2              THE COURT:  Wait.
 3              MR. SEATON:  Oh, I'm sorry.
 4              I'm assuming this was a juvenile name.
 5              THE COURT:  These are date -- dates of birth.
 6              MR. SEATON:  Oh, I didn't see those.  Okay.
 7    I've -- I've gone through those.  I'm brain dead.  Okay.
 8              Okay.  I'll keep looking.
 9              THE COURT:  Yes.
10              MR. SEATON:  Verdict form, you all have got
11    "training" here twice, two and four.
12              THE COURT:  We'll handle that in the charge
13    conference and go over whatever corrections --
14              MR. SEATON:  Okay.
15              THE COURT:  -- we need.
16              MR. SEATON:  So what I was going to show you --
17              THE COURT:  Is it okay if I give him that copy?
18              MR. SEATON:  Sure.  Yeah.
19              I was just going to show you we have these --
20    these witnesses tomorrow, and then it's -- so I'm -- I'm
21    still optimistic we'll get finished.
22              THE COURT:  Okay.  Okay.
23              MR. SEATON:  I've got -- right now I thought we
24    could do a video doctor's deposition and be done.  Does
25    that work?
```

```
1              THE COURT:  Absolutely.  I mean, we're not --
2    yeah, let's do it.
3              MR. KNIGHT:  He was going to call Dakota
4    Williams but then dismissed him.
5              THE COURT:  Sure.
6              MR. SEATON:  Yeah.
7              MR. KNIGHT:  He was on the schedule.
8              THE COURT:  Okay.
9              (At the conclusion of the sidebar conference,
10             the proceedings continued in open court as
11             follows:)
12             THE COURT:  All right.
13             MR. SEATON:  Our next witness will be Dr. Abel
14   by deposition -- by video deposition, and this one's a
15   lot shorter than the other one.
16             THE COURT:  All right.  And, ladies and
17   gentlemen, just real quickly, again, let me remind you a
18   video deposition is just the same as if the witness were
19   here to testify.  All right?
20             All right.  Please -- please play the -- the
21   video deposition.
22             MR. SEATON:  Oh, and then I -- I assume that I
23   need to go ahead and admit that into evidence as well as
24   the exhibits.
25             MR. KNIGHT:  No objection, Your Honor.
```

```
 1            THE COURT:  Yes.
 2            MR. SEATON:  That would be Exhibit Number 27,
 3    and then his deposition would be doctor 57 -- excuse
 4    me -- Number 57.
 5            THE COURT:  All right.  No objections?
 6            MR. KNIGHT:  No objection, Your Honor.
 7            THE COURT:  All right.  So ordered without
 8    objection.
 9            (Plaintiff's Exhibits 27 and 57
10            received into evidence.)
11            (The video was played in open court, and the
12            proceedings continued as follows:)
13            THE COURT:  Is that the complete video --
14            MR. SEATON:  Yes, Your Honor.
15            THE COURT:  -- deposition?
16            All right.  Thank you.
17            All right.  Ladies and gentlemen, it's a little
18    after 5:00.  You all want to go home?  Not getting any
19    resistance.
20            All right.  We're going to -- we're going to
21    adjourn for the day.  We're going to stay a little bit
22    and work on a few things and be ready for you tomorrow
23    morning at 9:00 a.m.  Thank you so much.
24            Remember what I told you.  Don't discuss the
25    case, not with your family, your spouse, anyone.  Don't
```

1   do any research.  Have a nice evening.  And I'll see you

2   in the morning.  Thank you.

3           (Subsequent proceedings were heard but

4           not requested to be transcribed herein.)

5           END OF PROCEEDINGS

1          (Prior proceedings were heard but not

2          requested to be transcribed herein.)

3          THE COURT:  Mr. Seaton, call your first

4   witness, please.

5          MR. SMITH:  Dr. Robert Bohm.

6          THE COURT:  All right.

7          THE COURTROOM DEPUTY:  I'll have you come up to

8   the box, sir.

9          (The witness was duly sworn.)

10          THE COURT:  All right.  Whenever you're ready.

11                    ROBERT BOHM, Ph.D.,

12   called as a witness at the instance of the parties,

13   having been first duly sworn, was examined, and

14   testified as follows:

15                    DIRECT EXAMINATION

16   BY MR. SMITH:

17   Q.      Good morning, sir.

18   A.      Good morning.

19   Q.      If you could please state your name.

20   A.      Robert Allan Bohm, B- as in boy -o-h-m as in

21   Mary.

22   Q.      Thank you, sir.

23          And what is it that you do?

24   A.      (No audible response.)

25   Q.      What is it that you do?

1    A.       Well, I'm an economist.  And right now what

2    I -- I'm doing is what I do, I guess, and I -- over the

3    last several years, I've worked with lawyers in court

4    cases to determine lost earning capacity of their

5    clients in various situations.  Wrongful death, personal

6    injury, or wrongful termination.  There are basically

7    three kind I work on.  I don't know if there are

8    anymore, but that's -- and I determine whether or not

9    there's a loss of earnings.

10   Q.       And if you could just explain to the ladies and

11   gentlemen of the jury, what is loss of earning capacity?

12   A.       Well, in this case particularly, you get -- you

13   get a good feel for it because it's basically loss of

14   earning capacity is what we're after, not actual loss of

15   earnings, and -- and that's the potential of a person to

16   earn money.  So what they lose is that potential, in

17   this case in particular.  So loss of earning capacity,

18   think potential earnings.

19   Q.       And have you been an economist and done this

20   work very long?

21   A.       I started doing this in 1987.

22   Q.       And I don't want to go too far into your

23   educational background, but did you used to be a

24   professor?

25   A.       Well, I'm still a professor.

1  Q.        Where -- where are you a professor?

2  A.        Only it's called a "professor emeritus."  Well,

3  what it means is you don't have to do anything, but they

4  don't pay you anymore when you sort of retire from

5  full-time teaching.  You -- if you've been there long

6  enough and they -- and didn't make too many people mad,

7  they make you a professor emeritus, which sounds real

8  gorgeous.  And it does have some benefits.  You know,

9  they give -- they give you a parking place.  That's the

10  most -- most lucrative one, I guess.

11         But I was -- I was a faculty member at the

12  University of Tennessee for 44 years from 1968 to 19- --

13  whatever 44 years is.  Ten years ago, 2013.

14  Q.        Which department did you work in at UT?

15  A.        Economics.

16  Q.        And did you -- what was the highest position

17  you held at the economics department?

18  A.        Well, I was a professor, which is what we like

19  to think of as the highest, but I was also the chairman

20  of the department for the last 10 years.

21         And I don't know if you asked me about my

22  education.  I -- I have a Ph.D. in economics from

23  Washington University in St. Louis.

24  Q.        All right, sir.  And so what did we ask you to

25  do for the jury?

1  A.       Well, you asked me to evaluate what I told you

2  I do.  The title of my report to you was "Lost Earning

3  Capacity of Nathan Ling" in -- in the suit of Ling

4  versus Campbell County, et al.

5  Q.       Okay.  And we would give you -- when you do

6  your -- your conclusions -- your opinions, you have both

7  materials that you review for every case and materials

8  that we would give you specifically for this case?

9  A.       Both.  Both.

10 Q.       Let's start off with the materials that you use

11 for any case.  What are some of those materials you rely

12 upon?

13 A.       Well, you're -- you're looking for -- for data.

14 It's like, for example, the -- what -- what -- what I'm

15 doing in this case is -- what you could say is it's a

16 matter of time and money.  How long would this person

17 have worked, and how much potential earnings did he

18 lose?  Time and money.

19          So, for example, you don't provide me with life

20 tables.  I look -- I -- I just go and get them off the

21 Internet.  But I found -- one of the things -- first

22 things I do is look up a person's life expectancy.  I

23 also find out his worklife expectancy.  And I -- I

24 usually put in -- this is -- this has nothing -- nothing

25 specific, but I usually look to see when the person, if

1   he was born after 1960, will be 67 years old.  As some

2   of you know, that is the day you're eligible for full

3   Social Security benefits if you were born after 1960.

4   Before, it's a little shorter.  So that was -- those are

5   sort of the basic things I -- I -- I look for from

6   outside.

7             And I also look for, of course, you know, I

8   guess you could say wage tables, the various things you

9   hear about when you hear the word "economist," like the

10  consumer price index.  Sometimes I have to use that.  So

11  a number -- just a number of things.  I -- I'll

12  mention -- it's easier for me to mention them as I go

13  through what I do.

14            For the money part, we get most of that data

15  from you.  So the "how long" I look up in tables.  The

16  "how much" I get from data from you.  Normally from --

17  from the lawyer I'm talking about, not you personally.

18  But -- and those things that you'd be looking for would

19  be W-2 forms and income tax returns and things of

20  that -- things that, as you know from hearing

21  Mr. Galloway, I'm sure, are pretty scarce in this case.

22  Q.        Do you -- do you rely on Mr. Galloway for your

23  opinions?

24  A.        Yes.  When you do a wrongful -- when you --

25  when you do a personal injury case, you -- you always

1  require a vocational expert.

2  Q.      Why is that?

3  A.      Well, their -- their expertise is in

4  determining the degree of disability of someone and how

5  much they would be able to command in the market, the

6  wage rate they could -- where they fit in the market

7  versus in terms of their skills and how much they could

8  earn.  And I'm sure that's what he -- what he told you.

9  He told you whether -- whether the person in -- in -- in

10  question was -- how disabled and how much, and he also

11  told you how much he could command in the market,

12  what's -- what his -- what his earnings would be.

13  Q.      And in this case specifically, were you able to

14  review the determination by Mr. Galloway of preinjury

15  earnings that Mr. Ling would have -- was capable --

16  A.      That's correct.

17  Q.      -- of earning?

18  A.      Well, that's -- well, that's the key.  You

19  have -- from Mr. Galloway's report, you -- well, there's

20  no -- I might as well say it.  He determined that Mr. --

21  Mr. Ling would -- would -- is 100 percent disabled.

22  That means his lost earning capacity is everything he

23  would have earned in his lifetime in his work life.

24          So -- so that's -- and then he pointed out that

25  his earning capacity was that of -- what he -- what he

1 could actually earn, his earning capacity, would be that

2 of a high school graduate, and I believe he probably

3 gave us a number there.

4 Q.        Dr. Bohm, when I went through with

5 Mr. Galloway, we heard testimony that Nathan Ling's

6 preinjury ability to earn income was $42,068 preinjury?

7 A.        That's -- that's -- that's correct.  I used

8 that exact number.

9 Q.        And then postinjury, his ability to earn income

10 or able to be -- have gainful employment is zero?

11 A.        Zero, correct.

12 Q.        And you agree with that?

13 A.        Yes.  Yes, I -- I -- if Mr. Galloway says

14 something like that, I always agree with him.  I think

15 he's -- I think he's a superb vocational expert.

16 Q.        Thank you, sir.

17          Now, you created, I believe, four tables; is

18 that correct?

19 A.        Okay.  I -- I never counted them, but yes.

20 Yes, I did.

21 Q.        Okay.

22 A.        I'll take your word for it.

23 Q.        Yes, sir.

24          Joseph, can you pull 30A.

25          Can you see that on the screen, Dr. Bohm?

1    A.        Uh-huh, I see it.

2    Q.        What am I looking at here?

3    A.        You're looking at my estimated pretrial loss of

4    wage and salary earnings for Nathan J. Ling, 2- -- 2019

5    to 2024, 4.66 years.

6              MR. SMITH:  Your Honor --

7              THE WITNESS:  Can -- can -- can --

8              MR. SMITH:  -- we move to admit 30A into

9    evidence.

10             THE WITNESS:  Is the jury able to see that?

11             THE COURT:  Excuse me, sir.  Answer questions

12   when you're asked and -- and --

13             THE WITNESS:  Okay.  I just --

14             THE COURT:  All right.  Thank you.

15             So I'm sorry.  You moved to admit?

16             MR. SMITH:  30A.

17             THE COURT:  Yes.  Is there an objection?

18             MR. KNIGHT:  No, Your Honor.

19             THE COURT:  All right.  So ordered without

20   objection.

21             (Plaintiff's Exhibit 30A

22             received into evidence.)

23   BY MR. SMITH:

24   Q.        Okay.  Doctor, the jury can now see 30A.  Can

25   you just explain to us what these numbers are?

1    A.        Well, if you look at this table, you'll see the

2    third one down is the number you wrote up there, I

3    believe.  That's 2021.  The data that Mr. Galloway

4    looked up for the earnings of a high school graduate

5    were -- well, he -- he looked at a 2002 report with

6    numbers that were for 2021.  That's why I put it in

7    2021.  Now, that's -- that's only his -- that's only the

8    potential earnings of a high school graduate in 2021.

9            So as we know, wages go up by both inflation

10   and productivity.  So I looked at an index, the

11   occupational employment index, as a way to calculate

12   from the -- the 2020 earnings to 2000- -- or the 2021

13   earnings.  Excuse me.  The ratio of 2020 to 2021

14   earnings is 4,000- -- 40,469, so that would be my

15   estimate of his earnings in 2020, if he had any.

16           And, likewise with 2019, 2022, -3, and -4.

17   They're all just adjusted for wage inflation

18   essentially.

19   Q.        So from 2019 to 2024, what is the total number

20   for lost wage and salary earnings?

21   A.        Well, you can see the second -- the third

22   column over is my percent of year lost, and so 2019 was

23   a partial year that he went back into and -- into the

24   labor force that year, I believe.  No, that's when he

25   was -- that's when he was hurt.  That's from May on.

1          And then 2024 is -- we're here.  That's today.
2     And -- and so he could have worked 58 percent.  He
3     wasn't -- in -- in 2019 and 8 percent this year, so
4     that's -- that's why that's there.  And then I just
5     multiplied the two columns together to get his estimated
6     lost wage and salary earnings for the pretrial period.
7          In -- in -- in this kind of case, we divide the
8     world into before the trial and after the trial.  And so
9     his estimated total loss of earnings -- his -- his lost
10    earning capacity during the pretrial period is 100- --
11    $199,999.
12    Q.    But we're aware, sir, that after his injury, he
13    did attempt employment?
14    A.    Correct.
15    Q.    And you're aware of that?
16    A.    Yes, I -- I gave him credit for that in the
17    next table.
18    Q.    All right.  Let's talk about that.
19          Joseph, can you please pull up 30B.
20          Can you see that on the screen, sir?
21    A.    I can see it.  Well, there you go.
22    Q.    What is this --
23    A.    Okay.  So --
24    Q.    -- that we're looking at?
25    A.    So we -- we saw his earning potential in --

1  in -- in the previous table.  In this table, I -- I

2  estimate his net wage and salary earning potential after

3  we give him credit for what are called "mitigating wages

4  and salaries," and that's -- that's the amount of money

5  he earned trying to work.

6          Now, he didn't -- as -- as I think Galloway

7  said -- 'cause I know I said it in my report -- Mr. Ling

8  didn't have any trouble finding a job.  He just had

9  trouble keeping it.  And that was attributed by

10  Mr. Galloway to his severe injuries that he suffered on

11  June the 2nd, 2019.

12  Q.      All right, sir.

13          MR. SMITH:  Your Honor, at this time, we'd like

14  to move 30B into evidence.

15          MR. KNIGHT:  No objection, Your Honor.

16          THE COURT:  All right.  So ordered without

17  objection.

18          (Plaintiff's Exhibit 30B

19          received into evidence.)

20  BY MR. SMITH:

21  Q.      All right, sir.  Now, 30B, just explain briefly

22  to the jury what this is showing them.

23  A.      Where are you now?

24  Q.      30- -- Table 2.

25  A.      Table 2.  Well, this is, as it says in the

1    title, it says "Net Pretrial Loss of Earning Capacity."

2    In that last column, I -- what -- all I've done is

3    subtract an estimate based on information that mostly

4    was provided by him and -- and with -- and -- well,

5    mostly provided by him, and I subtracted that.

6        So you can see for the period in which he got

7    back into the labor force in -- in 2021.  Actually, in

8    May of 2021.  He made $18,177 in -- in -- in --

9    essentially, about $6,000 a year.  One -- starting --

10   first one's 5500, but the $6,000 number came from him,

11   Mr. -- Mr. Ling.  But I went back and tried to compute

12   it myself, and I said that was pretty much as close as

13   you could get.

14       He -- he did have a job in -- in -- in 2021

15   with FedEx.  That was his only -- only income tax form

16   that we had, which was about half of that number, 5510.

17   And he was working from September to December for about

18   $25,000.

19       So he wasn't -- you know, he wasn't -- he

20   wasn't able to work really full time.  And what I

21   understand from the -- from some of the evidence that we

22   got from -- from him and through counsel, he had -- he

23   had trouble holding the job for two reasons:  Either it

24   was because of an injured arm -- that would have been

25   like the FedEx job where he couldn't carry stuff and

1    move boxes around -- and -- and then jobs like working

2    at McDonald's where he -- his -- his brain injury was in

3    the direction of making him hard to relate to other

4    people.

5    Q.      Okay.  So, sir, is it fair to say that Table 2

6    is showing that you have mitigated -- so the earnings

7    you are aware of is deducted from Table 1?

8    A.      That's right.

9    Q.      So where Table 1 is $199,999, Table 2 is

10   showing a mitigation of that from what he earned down to

11   $181,822?

12   A.      That's correct.

13   Q.      Okay.  Is -- Joseph, let's -- let's pull up

14   30C.

15           This is Table 3.  Do you see that, sir?

16   A.      I've got it.

17   Q.      Okay.  What -- what is Table 3?

18   A.      Well, now we're into the -- into the posttrial

19   period, so -- and this is -- this is a pretty long

20   period that we're talking about.  I computed his lost

21   earning capacity in two cases.  One -- one I call

22   "worklife expectancy," and that's a statistical

23   calculation of how long he would be either employed or

24   looking for work.  That's worklife expectancy.  Okay?

25   And I also computed the loss -- so I computed the loss

1  in the future beyond today for worklife expectancy and

2  also for age 67.  So you have two.  You have a choice.

3  Q.      Okay.

4  A.      And he -- and the future number of years he

5  worked were in the worklife expectancy case 32.5 and for

6  age 67, 44.3.  If you look at this table --

7  Q.      All right, sir.  Let me get this into evidence

8  first.  Then we'll talk about it.

9          MR. SMITH:  Your Honor, at this time, we'd like

10  to move Exhibit 30C into evidence.

11          MR. KNIGHT:  No objection, Your Honor.

12          THE COURT:  So ordered without objection.

13          (Plaintiff's Exhibit 30C

14          received into evidence.)

15  BY MR. SMITH:

16  Q.      Okay.  Dr. Bohm, if you could briefly explain

17  to the jury what they are looking at with Table 3.

18  A.      Okay.  Well, it -- in the future, we have to

19  take his earnings, which is related to what we just saw

20  covered put -- put in the back there -- the earnings

21  that he had in the -- in the -- in the before trial

22  period and project them into the posttrial period.  And

23  so what I have to do is adjust the last number in

24  Table 1 for the next year and then the next year and the

25  next year and the next year, and that -- and that's

1  called "adjusting for wage inflation and discounting to
2  present value."  So what I show with this table is the
3  result of doing that.

4          Now, let -- I -- I should explain what those
5  two terms mean.  I mean, I don't think you have trouble
6  with "adjusting for wage inflation."  I'm -- I'm
7  increasing his wage every year at an appropriate rate
8  based on what wages would be doing or projected to do in
9  that time period both by the Congressional Budget Office
10 and the Social Security Administration.  The second one
11 is a little more difficult.

12         Obviously, if you -- if we adjust for wage
13 inflation, his loss -- potential loss goes up, but we
14 have to do one other thing in the -- in the posttrial
15 period.  It's required actually in Tennessee that we do
16 something called "discount to present value."  Now,
17 that -- that usually is not something most people have
18 any familiarity with just walking around town, you know.
19 So let me just give you -- can I give a brief
20 explanation?
21 Q.      Yes, sir.
22 A.      Okay.  The way to become an expert on this is
23 to think about it like this:  Suppose you have a dollar
24 and you put it in the bank at -- they offer you an
25 interest rate of 6 percent.  How much would you have at

1   the end of the year?  A dollar six; right?  Okay.

2   Suppose you have a dollar six, and you'd like -- in --

3   in deposit somewhere, and you'd like to -- but it's only

4   available a year from now; right?  So you have that

5   dollar six, but it's only available a year from now.

6   You have to wait a year.

7        Well, maybe how much would it be worth to you

8   to have somebody buy it from you?  How much would you

9   want to have?  How much would you -- would you not lose

10  any money if you accepted that offer?  What's the --

11  that would be the present value of a dollar six.

12       Well, we know how you got to a dollar six.

13  What about if you take it away?  What's the present

14  value of a dollar six?  It's -- it's 6 percent.  It's a

15  dollar; right?  So you just -- ta-da -- discount it to

16  present value.  So when you discount to present value,

17  you're taking away the interest you would have earned on

18  the balance.  So it's a number that would be in today's

19  terms.

20       So I do both of those things.  You know, one

21  you're multiplying to make it bigger; one you're

22  multiplying to make it small.  And the -- the -- then in

23  this particular case, if the future wage inflation rate

24  is 3.41 percent -- that's -- that's how wages would --

25  are projected to grow over a -- a period similar to his

 1    work life -- and the discount rate is 4.50 -- now, the

 2    fact that the -- the getting bigger one is smaller -- is

 3    smaller than the getting larger one will tell you that

 4    the -- the -- the -- the amount that you're going to get

 5    each year is going to go down a little bit; right?

 6    That's -- and that's why it's called "discounting"

 7    because when you get present value, you have a smaller

 8    number than you started with.  Okay?  So that's what I

 9    do in this table.

10         And these are the calendar years that we're

11    looking at out into the future.  2057 is -- is the end

12    of worklife expectancy, and 2068 is the -- is age 67.

13    The number of years we're discounting are -- are 32.5

14    and 44.32, and then the last number gives the result of

15    doing -- doing the math.  I guess you'd say computing

16    and making a computation.  So that lost earning capacity

17    at the end of worklife expectancy that he made after the

18    trial is $1,329,157.

19    Q.      Okay.

20    A.      So that's basically taking that number we had

21    over there and looking at how it would grow in the

22    future and then discounting it back to the date of

23    trial.

24    Q.      Okay.

25    A.      And the other number, age 67, is 1,710,735.

1  Q.      Okay.  Thank you, sir.

2          MR. SMITH:  Let's pull up 30D.

3          THE WITNESS:  Yeah.

4  BY MR. SMITH:

5  Q.      Okay.  You see the Table 4, sir?

6  A.      No.  I -- I can see it.  Had a little trouble

7  with that one.

8  Q.      Very good.

9          What is Table 4 showing?

10 A.      Well, this is the summary of the whole shebang,

11 and there's a couple things we left out while we were

12 doing -- doing it -- doing it, so we put those in here.

13 See at the top, the table, it says "Type of Earnings

14 Lost" and then "Case 1: Worklife Expectancy" and then

15 "Case 2: Works to Age 67."  And the first set of numbers

16 says "Wage and Salary Earnings" before today and after

17 today.  I'm -- I'm using 1/30 as today, January 30th.

18 And those are -- those are the numbers we looked at in

19 Tables 2 and 3.

20 Q.      All right, sir.

21 A.      Table --

22 Q.      Before you go further, let me get this into

23 evidence for the jury --

24 A.      Okay.

25 Q.      -- to see.

1          MR. SMITH:  Your Honor, we'd move 30D into

2     evidence.

3          MR. KNIGHT:  No objection, Your Honor.

4          THE COURT:  So ordered without objection.

5          (Plaintiff's Exhibit 30D

6          received into evidence.)

7     BY MR. SMITH:

8     Q.     Okay.  Dr. Bohm, if you could continue, please.

9     A.     Uh-huh.

10    Q.     Continue.

11    A.     Okay.  So the first set of numbers are his wage

12    and salaries, which is what we've been talking about.

13    So there's his earnings before the -- the trial,

14    $199,999, and his earnings during a period after the

15    trial, the work life to the end of worklife expectancy

16    and to age 67.  That's the 1,329,157 and the 1,710,735.

17    Then I subtract the mitigation that we saw that we've

18    talked about, $18,177.  Then we have his total net wage

19    and salary earnings.  Okay?

20    Q.     Okay.

21    A.     So that's just wages and salary, though.  Turns

22    out there are a couple of other things that come along

23    with losing -- having a lost earning potential of wages

24    and salaries.  The first thing is your employer is going

25    to be paying half of -- half of your Social Security to

1    the Social Security Administration.  That's additional

2    earnings.  It's not -- it's not income that you can put

3    in your pocket, but it's -- it certainly costs your

4    employer money, and he would -- he would count it on --

5    for part of your earnings.

6            And that amount is -- in this case, it's --

7    we're -- we're at a fairly -- well, I wouldn't say low,

8    but fairly low salary.  It's 7.65 percent of your wages

9    and salary.  All right?  There's an employer share and

10   there's a -- an employee share.  You -- you look at your

11   paycheck.  Every time you look at your paycheck, you'll

12   see somebody took out 7- -- 7.65 percent of your pay.

13   That goes to Social Security from you personally, and

14   then your employer pays an equal amount.

15           So we have to account for that addition from

16   the employer, so -- and that's -- well, using -- on the

17   wages before today, which would be $15,230 and on wages

18   earned after today, that would be 100- -- $101,681 for

19   the work expect -- work -- worklife expectancy case, and

20   the higher number, of course, for age 67.  And then I

21   subtracted the 7.65 percent on the wages that he earned

22   that he mitigated.  So what we have is -- is total net

23   employer contributions is Social Security and Medicare

24   of -- for worklife expectancy, 115,520, and for work --

25   age 67, 144,710.

1          Now, about 70 percent, I think -- the last time

2   I looked -- of all employment has what are called

3   "benefits coverage" by their employer.  That includes

4   things like life insurance, health insurance, disability

5   insurance, and a retirement plan.  So I've added that in

6   as well in the next section.  There's -- there's data

7   available from the Bureau -- there's data available from

8   the Bureau of Labor Statistics that tells us on average

9   how much these things are.

10          The big ones to note are health insurance.

11   It's about 7.65 percent of your salary.  So that would

12   be a big -- you know, if you made -- if you were --

13   well, if you're making $100,000, that would be

14   $7,000-something, you know.  That's -- this is money

15   your -- your employer's putting into -- sometimes

16   sharing with you, but putting into an account for you.

17          Usually health insurance is split.  You know,

18   the employee pays something and -- and the -- and the

19   employer pays something.  And usually with health

20   insurance, the employer pays the lion's share.

21          Life insurance is usually totally paid -- paid

22   by the employer, but not always.

23          And I often have trouble finding the disability

24   ones because they're almost -- more than almost --

25   I -- I -- I -- more than almost always paid by the

1    employer.  And these are computed here as a percentage

2    by -- by taking a percentage of your -- of your salary.

3          Life insurance, short-term disability, and

4    long-term disability, you can see the percentage of your

5    salary is fairly small.  A lot of people get excited

6    about having a $50,000 life insurance policy paid for by

7    their employer, but it doesn't cost them very much.

8    That's what this shows, whereas health insurance costs

9    them a lot.

10          And in this -- in this particular example, I

11   think our -- our retirement number is -- for -- for an

12   employer contribution, the average is about 2.4 percent.

13   The way those usually work is the employee puts in

14   something, and there's some formula that will dictate

15   how much the employer will match.  Like a common one

16   would be if you put in 6 percent, the employer will put

17   in half of that, 50 cents on the dollar up to 6 percent.

18   If you put in 7 percent, the seventh percent you're on

19   your own.  The -- so for 1 percent, you're on your own.

20   And for 6, he's matching it 50 cents on the dollar.

21   That's the most common one I've encountered.

22          If -- if -- if you had a contribution by the

23   employer of about 2.4 percent and -- and you put -- and

24   that was based on a -- double that amount, it would be

25   five something.  Then you would put in -- so -- so

1   these -- these are -- these -- this -- this is something

2   that appears quite often in -- in -- in my reports with

3   regard to someone who's working that -- and losing their

4   entire earning potential.  I -- I -- I provide the

5   estimates for what would -- what he would earn --

6   potentially earn from his -- for his financed --

7   employer-financed benefits.

8   Q.        Okay.  So his worklife expectancy based on this

9   table, if he had worked 37.16 years, your opinion is

10  that based on all these numbers, his loss of earning

11  capacity is 1,779,261?

12  A.        That's correct.

13  Q.        And then if he had worked to age 67, which is

14  48.98 years, his loss of earning capacity is $2,228,150?

15  A.        -150, right.

16  Q.        Right.

17            Is that accurate based on your --

18  A.        Huh?

19  Q.        -- your opinions, your calculations?

20  A.        Yes, that -- that -- the -- the first number

21  read was 1,779,261.  It's -- it's actually -- I'll just

22  get it from -- from my -- from my table.  And the second

23  number -- the first number is 1,779,261.  That's his

24  total loss after -- total loss period both before and

25  after trial.  1,779,261.  That's from the date of injury

1  to the end of worklife expectancy.

2          And then the second number you -- you read off

3  is $2,228,150, and that's his total loss before and

4  after the trial if he works till age 67.

5          Now, the worklife expectancy number is -- is

6  a -- is a statistical number that a group of economists

7  measure as -- as his likely work life, how long he would

8  be looking -- how many -- how many years he would be

9  looking for work and -- and/or employed.  That's the

10 difference from age 67.  That's just a year that happens

11 to have significance.

12 Q.      All right, sir.  And you said that these

13 numbers -- these tables already account for present cash

14 value?

15 A.      I'm sorry?

16 Q.      The -- the numbers you gave us here already

17 account for what the -- the present cash value would be?

18 A.      Yes.

19 Q.      Okay.

20 A.      Yeah, this -- this is -- that's your total lost

21 earning capacity, so that's your -- that's the potential

22 he lost.  And I did subtract from that the -- the

23 mitigation, the 18,000.  So this is his total potential

24 earnings that he would have that he lost by -- as a

25 result of the injury.

1    Q.        Okay, sir.  And did you prepare a CV for us?

2    A.        A curriculum vitae?

3    Q.        Yes.

4    A.        I didn't bring one.  I'm sorry.  I thought -- I

5    thought I sent you one.

6    Q.        You -- you prepared this on -- 29, Joseph,

7    please.

8              All right, sir.  Is -- is --

9    A.        I did think about it right on I-40.  I --

10   Q.        And does -- does this on the screen accurately

11   look like your current --

12   A.        That looks like my resume, yeah, or vita, as we

13   say in --

14   Q.        Right.  Right.

15   A.        -- universities.

16             MR. SMITH:  Your Honor, we'd move 29 into

17   evidence.

18             MR. KNIGHT:  No objection.

19             THE WITNESS:  This one's a little --

20             MR. KNIGHT:  No objection.

21             THE WITNESS:  -- old, though.

22             THE COURT:  So ordered without objection.

23             (Plaintiff's Exhibit 29

24             received into evidence.)

25   BY MR. SMITH:

1  Q.      All right.  Thank you, sir.  Please answer any

2  questions that Mr. Knight has.

3                    CROSS-EXAMINATION

4  BY MR. KNIGHT:

5  Q.      Dr. Bohm, you're an economist; correct?

6  A.      Correct.

7  Q.      You charge for your services?

8  A.      I do.

9  Q.      How much have you charged Mr. -- Mr. Seaton's

10  firm?

11  A.      Jeez, I didn't look that up either.

12  Q.      You didn't look it up?

13  A.      I -- huh?

14  Q.      You didn't look up what you had charged

15  Mr. Seaton's --

16  A.      Before I came here?  No, I didn't.  Sorry.

17  Q.      Well, what --

18  A.      I'd have --

19  Q.      -- do you --

20  A.      -- to look.

21  Q.      What do you estimate?

22  A.      Huh?

23  Q.      What do you estimate?

24  A.      $4,000.

25  Q.      $4,000.

1          I mean, you -- you've asked Mr. Smith to

2   contact me about paying you for your deposition on an

3   invoice you never sent me.  So you're concerned about

4   money, aren't you?

5          MR. SMITH:  Objection, Your Honor.

6   Argumentative.

7          THE WITNESS:  I don't understand what you

8   just --

9          THE COURT:  Overruled.

10         THE WITNESS:  -- said.  Actually, I just mailed

11  you another copy of that bill.

12  BY MR. KNIGHT:

13  Q.      Another copy?

14  A.      Well --

15  Q.      Maybe it was the first one?

16  A.      Well, I'm sure I -- I -- I just copied the

17  first one.

18         If you want to fight about this, why don't we

19  go outside?

20         THE COURT:  Okay.  All right.

21         All right.  We're going to take a brief recess.

22         Ms. Laster, would you send the jury out.

23         THE COURTROOM DEPUTY:  Yes.

24         (The proceedings were held outside the

25              presence of the jury, as follows:)

1          THE COURT:  Please be seated.

2          Mr. Knight, ask your questions and wait for an

3  answer before you ask your next one so the court

4  reporter can get it.

5          Dr. Bohm, I want you to answer your questions.

6          THE WITNESS:  I will.

7          THE COURT:  If your counsel doesn't think the

8  question's appropriate, they'll object.  I want you -- I

9  want no more extraneous comments.  Do you understand?

10          THE WITNESS:  Sure.

11          THE COURT:  All right.

12          THE WITNESS:  I'm sorry.

13          THE COURT:  And, Mr. Smith --

14          MR. SMITH:  Yes.

15          THE COURT:  -- I want you to get to the point.

16          MR. SMITH:  Yes, sir.

17          THE COURT:  All right.  Mr. Seaton, we're going

18  to get to the point in this trial.

19          MR. SEATON:  I --

20          THE COURT:  We've spent 40 minutes on 10

21  minutes' worth of information.  All right?  Do you

22  understand me?

23          MR. SEATON:  Yes, sir.

24          THE COURT:  All right.  Ms. Laster, bring our

25  jury in.

1          THE COURTROOM DEPUTY:  Yes, sir.

2          (The proceedings were held in the presence of

3          the jury, as follows:)

4          THE COURT:  All right.  Everyone please be

5   seated.

6          Mr. Knight, resume your cross-examination,

7   please.

8   BY MR. KNIGHT:

9   Q.       Dr. Bohm, under Mr. Smith's examination, he

10  basically asked you to run numbers based on what

11  Mr. Galloway said; correct?

12  A.       Well -- but Mr. Galloway has a controlling

13  interest in -- in what I do in a case like this.

14  Q.       But that's what he asked you to do.  You ran

15  numbers; correct?

16  A.       Well, yeah, I guess I -- I don't usually think

17  of it that way.  But yeah, I ran the numbers.  That's

18  right.

19  Q.       Okay.  Well, you came up with 1.7 million and

20  2 --

21  A.       Right.

22  Q.       -- something million.  That's numbers; correct?

23  A.       Correct.

24  Q.       You're not telling this jury to award that, are

25  you?

1    A.        I -- I think I am.

2    Q.        You are?

3              You don't know what -- what caused Mr. Ling's

4    situation, do you?

5    A.        I read the -- the -- what's it called?  The

6    complaint.

7    Q.        The complaint that was drafted by Mr. Seaton?

8              MR. SEATON:  Objection, Your Honor.

9              THE WITNESS:  Okay.

10             MR. SEATON:  This is outside the scope of

11   what --

12             THE COURT:  Overruled.  Overruled.

13   BY MR. KNIGHT:

14   Q.        You've never talked to Mr. Ling by telephone

15   personally; correct?

16   A.        No.

17   Q.        Never emailed him; correct?

18   A.        No.

19   Q.        Never met with him; correct?

20   A.        No.

21   Q.        Never met with any of his employers, have you?

22   A.        The what?

23   Q.        His employers, have you?

24   A.        Well, I don't know what that is, but that --

25   Q.        You don't know what an employer is?

```
 1   Somebody --

 2   A.        Yes, an employer -- I --

 3   Q.        -- who is an employer --

 4   A.        -- just didn't understand --

 5             (The reporter requests only one person

 6             speak at a time.)

 7             THE COURT:  Hold on a minute.  Mr. Knight, ask

 8   your question.

 9   BY MR. KNIGHT:

10   Q.        Under --

11             THE COURT:  Wait for a response.

12             Wait till he finishes with his question,

13   Dr. Bohm.

14             THE WITNESS:  Okay.

15             THE COURT:  Then answer with the response,

16   gentlemen.  Okay?

17             Please proceed.

18   BY MR. KNIGHT:

19   Q.        You talked with Mr. Seaton and Mr. Seaton's

20   staff; is that correct?

21   A.        Yes.

22   Q.        That's how you got your information; correct?

23   A.        That's how I always get my information.

24   Q.        Okay.  That's how you always get your

25   information?
```

1  A.      Yes.

2  Q.      When you're coming up here to testify as an

3  expert witness; correct?

4  A.      I'm sorry.  I didn't understand.

5  Q.      And that -- when you're coming to testify up

6  here as an expert witness, you're getting your

7  information from the law firm; correct?

8  A.      Yes.

9  Q.      And as you indicated under Mr. Smith's

10 questioning, that's what you do.  You testify; correct?

11 A.      I testify if it's -- if it goes to trial, yes.

12 Q.      Right.

13         And you charge for that; correct?

14 A.      Yes.

15 Q.      You don't know anything about Mr. Ling's

16 history, do you, Dr. Bohm?

17 A.      I know what I read, which was given -- which

18 was provided to me by Mr. Seaton.

19 Q.      Did you do an investigation as to anything

20 prior to June of 2019 when this incident happened about

21 Mr. Ling?  You know anything about Mr. Ling prior to

22 that?

23 A.      No.  I know he graduated from high school.

24 Q.      Did you know he graduated from high school in a

25 juvenile detention facility?

1  A.        I'm sorry.  I didn't understand.

2  Q.        Did you know he graduated from high school

3  through a juvenile detention facility?

4  A.        I just saw the school.  I didn't -- he

5  graduated in October.  I thought that was odd.  But I

6  didn't know what kind of facility it was.  It said it

7  was a high school --

8  Q.        Okay.

9  A.        -- on the piece of paper.

10  Q.        Right.

11          And high school diploma; right?

12  A.        That's correct.

13  Q.        So you don't know anything about his history in

14  terms of his socialization, his ability to follow rules,

15  his ability to follow instructions, or anything like

16  that, do you?

17  A.        I think, as you pointed out, I'm an economist.

18  Q.        Is that an answer to my question?

19  A.        Well, I don't have the skills to do that.

20  Q.        Okay.

21  A.        I -- I -- if you ask me about economics,

22  I'll -- I'll be able to answer you, but I can't answer

23  you about that long list of skills that I don't have.

24  Q.        So the skills that you have are coming up with

25  numbers based upon what Mr. Seaton and Mr. Galloway tell

1  you?

2  A.        You might -- you might put it that way.

3  Q.        Okay.  Let me ask you a couple -- did you ever

4  talk with any of Mr. Ling's medical providers?

5  A.        No.

6  Q.        As to what he could or couldn't do?

7  A.        I never talked to --

8  Q.        Any restrictions or --

9  A.        -- any of --

10            (The reporter requests only one person

11            speak at a time.)

12            THE COURT:  Listen --

13            THE WITNESS:  My -- my -- my --

14            THE COURT:  Hold on, Dr. Bohm.  Hold on.  Hold

15  on just a minute.  I'm speaking now.  There's one rule.

16  When I'm speaking, absolutely no one else speaks.  Do

17  you understand that, sir?

18            THE WITNESS:  I got -- I got it.  Thank you.

19  I'm sorry.

20            THE COURT:  Now, Mr. Knight, let's wait for him

21  to finish before we ask our next question.  Our court

22  reporter can't keep up.  Okay?

23            MR. KNIGHT:  I understand.

24            THE COURT:  Dr. Bohm, don't start answering

25  until he's finished with his question.  I can't make

```
 1   this any simpler.  And let's get on with this.  Okay?
 2              MR. KNIGHT:  Okay.
 3              THE COURT:  Thank you.
 4              MR. KNIGHT:  That's all I have.
 5              THE COURT:  Thank you.
 6              MR. SMITH:  Nothing further.
 7              THE COURT:  Thank you, Dr. Bohm.
 8              MR. SEATON:  Our next witness is -- is Nurse
 9   Allison Willoughby.
10              THE COURT:  Mr. Smith, would you move the easel
11   out of the --
12              MR. SMITH:  Yes.
13              THE COURT:  -- well, please.
14              (The witness was duly sworn.)
15                      ALLISON WILLOUGHBY,
16   called as a witness at the instance of the parties,
17   having been first duly sworn, was examined, and
18   testified as follows:
19                      DIRECT EXAMINATION
20   BY MR. SEATON:
21   Q.       Good morning.
22   A.       Good morning.
23   Q.       Tell the ladies and gentlemen of the jury your
24   name.
25   A.       My name is Allison Willoughby.
```

1  Q.      And what do you do?

2  A.      I am a nurse.

3  Q.      Okay.  And where do you currently work?

4  A.      I work at Summit View of Rocky Top, a nursing

5  facility rehab.

6  Q.      All right.  And the type of nursing that you

7  do -- you're an LPN?

8  A.      Yes, sir.

9  Q.      All right.  And that's as opposed to an RN.

10 You have -- tell us what training you have as an LPN.

11 A.      As an LPN, the difference between LPN is -- and

12 an RN is there are certain medications that we cannot

13 give like through IV.  We can't deal with port placement

14 and stuff like that.

15 Q.      All right.

16 A.      But we pass medications, do catheters, you

17 know.

18 Q.      All right.  And drawing your attention to June

19 the 1st of 2019, you were working for a contracting

20 company as a nurse in the Campbell County Jail?

21 A.      Yes, sir.

22 Q.      All right.  And what was the name of your

23 contracting company?

24 A.      I believe -- I'll be honest with you.  I don't

25 know what company 'cause we switched like three

1  different times.  I believe it was Correctional

2  Healthcare.

3  Q.       All right.  And so how -- how does that come

4  about?  What -- what do they have you do?

5  A.       When we have -- according to what shift you

6  work, you have a med pass.  Any type of emergencies that

7  come up, you'd report to those.  You deal with

8  diabetics.  You know, we give withdrawal medications.

9  Just anything that they need at that time.

10  Q.       All right.  And so did they have you working at

11  the Campbell County Jail --

12  A.       Yes.

13  Q.       -- at that time?

14           Okay.  And do you recall how many other nurses

15  were working the jail?

16  A.       I'm really not for sure who was working at that

17  time.

18  Q.       All right.  Do you remember what shifts that

19  you were working?

20  A.       I worked day shift 'cause we didn't have night

21  shift at that time.

22  Q.       All right.  So when you say that you worked day

23  shift, from when to when did you work?

24  A.       From 6:00 -- I want to think -- I can't be

25  certain.  At that time, I think it was 6:00 to 6:00

1    'cause I worked so many different shifts when I was at

2    the jail.

3    Q.        All right.  And so someone else would come

4    in -- if you came in at 6:00 a.m. and left at 6:00 p.m.,

5    then someone else would come in at 6:00 p.m.?

6    A.        No, sir.

7    Q.        "No"?

8    A.        We would turn our keys in to the front booking

9    area --

10   Q.        Uh-huh.

11   A.        -- and then somebody wouldn't be back in till

12   the next morning.

13   Q.        So I thought that there would be a nurse on

14   staff until 11:00 p.m. at night?

15   A.        There may -- there may have been at that time.

16   Q.        Uh-huh.

17   A.        But when I first started working there, there

18   wasn't.  So there may have been somebody there from like

19   3:00 to 11:00.  I'm not certain.

20   Q.        Okay.

21   A.        But whoever -- there was no night shift nurse.

22   Whoever left the last shift put their keys in the

23   booking area.

24   Q.        All right.  And this was a jail that generally

25   housed about 250 people?

1    A.        Yes, sir.

2    Q.        All right.  And so when you worked there,

3    I -- I think that you told me that you worked for Fast

4    Access; is that right?

5    A.        That might have been one of the companies too.

6    Q.        Okay.  Okay.  And that there were -- I think

7    you told me that there were about four other nurses that

8    worked in 2019?

9    A.        Possibly.  I --

10   Q.        Okay.

11   A.        Like I said, I don't really remember how

12   many -- who was there at that time 'cause they switched

13   over.  We had a lot of turnover with nurses in

14   correctional.

15   Q.        All right.  And so as a -- as a LPN nurse,

16   would you be the only medical person there on your

17   shift?

18   A.        Yes, sir.

19   Q.        All right.  And so how often would a doctor

20   come in?

21   A.        He would come in once a week.

22   Q.        All right.  And so what did you do for the

23   people in the jail at Campbell County?

24   A.        When I first would get there, we would set --

25   we would deal with any diabetics or any medicine that

1  needed to be given before breakfast, or if there was

2  anything that the officers wanted me to address at

3  first.  And then after that, we would set up medications

4  and pass that.  And then, of course, there was paperwork

5  we had to do.

6      There was physicals for any new intakes that

7  had to be -- the State required within 14 days, and then

8  just anything that came up emergency-wise.  Like if

9  there was a fight or somebody had cut theirself,

10  anything like that, we dealt with.

11  Q.    All right.  And would you be called upon to

12  assess people before they actually even came into the

13  jail?

14  A.    If I was there, yes, sir.

15  Q.    All right.

16  A.    Like if they had a wound or something that they

17  wanted to know if they could take them or if they were

18  intoxicated or --

19  Q.    Okay.

20  A.    -- you know.

21  Q.    But was it your responsibility to assess --

22  A.    I would -- I would assess them, and I would

23  have to call the doctor, and they would decide whether

24  they were able to come -- stay at the facility or not.

25  Q.    All right.  But my question is:  Was it your

1    responsibility to assess and make certain that someone

2    was in a medically fit condition to go into -- before

3    they went into the jail?

4    A.        Yes, if I was there.

5    Q.        All right.  If you were there.

6              So drawing your attention to -- to this event

7    June the -- I think it was -- June the 2nd of 2019 was

8    the Sunday.  The -- the event happened around midnight

9    June the 1st, 2019.  Is that what you recall?

10   A.        I wasn't there, so I could not tell you what

11   time he came into the jail.

12   Q.        Okay.  But let's -- let's -- we'll -- I mean,

13   we've all looked at those videos and the time stamps and

14   things on them.

15   A.        Okay.

16   Q.        But just assume that he came in on a Saturday

17   night on June --

18   A.        Uh-huh.

19   Q.        -- the 1st of 2019.  Had you -- did you work

20   until 6:00 p.m. that -- that -- June the 1st, or do you

21   know?

22   A.        I do not recall.

23   Q.        All right.  But you did come in on Sunday

24   morning --

25   A.        Yes.

1   Q.       -- right?

2           All right.  And what -- what -- tell the ladies

3   and gentlemen of the jury -- jury, what time did you

4   come into work?

5   A.       I believe it was 6:00 a.m. that morning.

6   Q.       All right.  And so when you first got there,

7   did anybody tell you that there was --

8   A.       When I first got there in the -- where the

9   officers would pull in, where they would bring an

10  inmate, there was Officer Crabtree and another officer.

11  I can't recall his name right now.  And Crabtree told me

12  that he had chased an inmate or, you know, somebody and

13  that he may possibly have a broken nose courtesy of him.

14  Q.       And what did he mean by "courtesy of him"?

15  A.       I'm assuming that he meant that he gave it to

16  him.

17  Q.       Well, I mean -- but was that kind of a

18  smart-aleck remark that --

19           MR. KNIGHT:  Objection.

20           THE WITNESS:  I'll be honest with you.  I --

21           THE COURT:  Sustained.

22  BY MR. SEATON:

23  Q.       Well, how did you take it?  How did you take

24  the remark?

25  A.       I honestly did not take this as him being a

1   smart-aleck.

2   Q.      Okay.  So did he tell you that the -- that the

3   inmate was in critical condition?

4   A.      No.

5   Q.      Did he tell --

6   A.      Because if he would have told me he was in

7   critical condition, I would have went to him

8   immediately.  There was my -- when I come in, there's

9   no -- like at 6:00 a.m., there's no other medical people

10  there.  So what I go by is what the officers that are

11  there tell me.  You know, you need to look at this

12  person, you need to look at that person, or whatever.

13          Because I didn't -- I was not given any

14  information that I needed to go to this inmate

15  immediately until Boyer, the day shift corporal, come

16  in, and he come to me and told me you need to come look

17  at this inmate, and that's when I went to him

18  immediately and looked at him.

19  Q.      So when you went into work at 6:00 a.m., was

20  Sean Brown, the corporal --

21  A.      Yes.

22  Q.      -- was he there?

23  A.      He was there.

24  Q.      And did he tell you that there was an inmate

25  that really needed to be seen?

1  A.      No.  Well, he told me that there was an

2  incident with the officer like -- and he was kind of

3  nonchalant about it like Crabtree 'cause, like I said,

4  if anybody would have told me the severity of this, I

5  would have went immediately to him.  But I was going --

6  when I would set up pills, the first stop you would make

7  would be into the booking area, whether it was the

8  negative, tank 1, tank 2, and then we would go --

9  usually go to female and then male housing to pass meds.

10          So he was going to -- I would have seen him

11 when I started passing meds that morning.  And, like I

12 said, until Boyer come to me and he said, "Allison, I

13 need you to come look at this inmate" --

14 Q.      All right.  Now -- so Sean Brown was the -- was

15 the corporal supervisor when you got to work; right?

16 A.      I believe so, yes.

17 Q.      And he was about 20 years old?

18 A.      I think he's in -- I think he was in his 20s.

19 Q.      Okay.  And then do you know what time he

20 rotated off shift?  Was it 7:00?

21 A.      I'm not positive what their shift -- probably.

22 It was probably around that time.  I don't know exactly

23 what time they --

24 Q.      And so you mentioned this new corporal coming

25 on shift called Joel Boyer?

1    A.        Yes, sir.

2    Q.        And he was about 21?

3    A.        He's in his 20s also, I -- I believe.

4    Q.        And he would have been in charge of the jail at

5    that point?

6    A.        At that point in time, yes.

7    Q.        All right.  And so what did Joel Boyer --

8    Corporal Joel Boyer tell you about the condition?

9    A.        He just said, "I really need you to come look

10   at the inmate in the neg cell."

11   Q.        All right.  And so this is about 7:00 a.m.?

12   A.        I don't recall exactly what time it was, but it

13   was early.

14   Q.        Okay.  But -- but had you been at work for

15   about an hour?

16   A.        Possibly.

17   Q.        All right.  And so who all went to the -- to

18   the neg cell to check on Nathan Ling?

19   A.        I know that Boyer and myself -- and there was

20   another officer, but I don't recall what -- who it was.

21   Q.        Was it John Paul -- I want to say Campbell --

22   White?  John Paul White?

23   A.        Possibly.  I don't recall for sure.

24   Q.        Okay.  And so the two of them came with you to

25   go check on Nathan Ling; right?

1   A.      I believe so, yes.

2   Q.      All right.  And so what happened?

3   A.      We went in, and I immediately -- as soon as I

4   saw him, I said he is going to the hospital because

5   he -- he was in the fetal position, and he began to

6   void, which means urinate on himself.  And at that time,

7   I didn't know if it was -- 'cause I didn't know what all

8   had went on.  I didn't see the video until I was in

9   court in Campbell County.  And to be honest with you,

10  when I -- I saw a very brief moment of it, and I turned

11  my head.  I didn't watch it.

12  Q.      You couldn't watch it?

13  A.      No.  No, sir.  I could not watch it.

14  Q.      Because?

15  A.      So --

16  Q.      Because why?

17  A.      Because the severity -- the severity of it.  I

18  didn't -- it's not something I could watch.

19  Q.      All right.

20  A.      So when I saw him laying there, like I said, I

21  didn't know 'cause at that point in time, I didn't know

22  any -- anything that had went on.  But I knew the

23  officer had told me he may have a fractured nose, so I

24  knew there was involvement there between an officer and

25  an inmate.  I -- he had bruises on his arms, and I

1   didn't know how that had gotten there.

2          And I told him -- I said, he's going to the

3   hospital.  I was going to get stuff to take vitals on

4   him to make sure he was stable enough for us to take

5   him, and plus I wanted to get him changed because he had

6   wet -- you know, he was wet and stuff.

7   Q.     So you said that he had bruises on -- he's

8   laying on the floor in the fetal position?

9   A.     Uh-huh.

10  Q.     And he urinated on himself?

11  A.     Yes.

12  Q.     What does that mean?  What -- what is the

13  significance of someone that can't hold their urination

14  and they urinate on themselves?

15  A.     Well, it's -- I mean -- I mean, at that point

16  in time, I didn't know why because I'm still thinking

17  honestly that the urination is that he was under the

18  influence of something at that point in time 'cause that

19  was the majority of what come into the correctional

20  facility.

21  Q.     All right.  But did you ever have any

22  indications that he had had any drugs or alcohol in his

23  system at all?

24  A.     Just from his presence and how he was acting.

25  That was my first initial thought.

```
 1  Q.       That was your thought.  But -- but actually,
 2  did you ever find any evidence of the fact that he had
 3  any alcohol --
 4  A.       No.
 5  Q.       -- or drugs in his system?
 6  A.       'Cause once he went to the hospital and were
 7  released from our care, that's about -- I mean, I
 8  can't -- it's not my business to pull up somebody's
 9  records.
10  Q.       Okay.  Sure.
11  A.       They're not under my care.
12  Q.       Sure.
13           But -- but assuming that he had no alcohol or
14  drugs in his system, what is -- what -- what does it
15  show to you that somebody's urinated on themselves?
16  A.       Well, I -- he could have been under some type
17  of -- I didn't know if he was a diabetic, if he could
18  have had some type -- I know you're -- I -- I know he
19  ended up having a brain -- like a brain bleed.  I
20  believe that could have been an indication of that.  You
21  know, it could have been multiple medical issues.
22  Q.       Well, when you went into the cell with John
23  Paul White and with Corporal Boyer --
24  A.       Uh-huh.
25  Q.       -- he was conversant?  Did you talk to him?
```

1  A.        He talked a little, and he was able to get up

2  and sit on the bench --

3  Q.        Okay.

4  A.        -- and get -- you know, get dressed.  I mean,

5  we -- the officer assisted him, but he was able to get

6  up, and he would converse a little bit.  But what he was

7  saying didn't make -- you know, he wasn't answering

8  questions correctly the whole time.

9  Q.        So he wasn't making any sense?

10 A.        No.

11 Q.        And would that indicate to you that he had a

12 serious condition?

13 A.        Yes.  And it's not right of me to assume, but

14 at the same time, like I said, most of our -- is drug

15 related or alcohol.  And that's what I was thinking why

16 he was -- because I have had inmate after inmate that

17 couldn't converse with you, that didn't make sense.

18 Q.        All right.  And so what was the condition

19 of him physically?

20 A.        Well, like I said, he -- the bruises on his

21 arms at that time was what I -- what stuck out in my

22 mind.

23 Q.        What about his face?

24 A.        I would -- to be honest with you, I do not --

25 right now I do not recall what his face looked like.

 1          MR. SEATON:  Can we pull up Exhibit Number --
 2  let's look at 51.
 3  BY MR. SEATON:
 4  Q.      This is a picture of him.  Well, let's -- let's
 5  go to -- Joseph, if we could, let's go to 52.
 6          All right.  Do you recognize that?  Did that
 7  look like the condition that he was in?  'Cause this --
 8  this is him in ICU.
 9  A.      I -- honestly, looking at this picture, I could
10  not tell you if I've ever seen that man before in my
11  life --
12  Q.      Okay.
13  A.      -- 'cause I --
14  Q.      You just don't recall?
15  A.      I don't know if I blocked it 'cause, like I
16  told you, I couldn't watch the video.  But I do not
17  recall.  Like, I don't -- I would not be able to tell
18  you who that was.
19  Q.      Okay.  Fair enough.
20          MR. SEATON:  You can take that down.
21          THE WITNESS:  Is this bad?  Yes, it is.
22  BY MR. SEATON:
23  Q.      Pardon?
24  A.      I said, is that picture bad?  Yes, it is.
25  Q.      But -- but what -- what I'm trying to figure

1  out is, was that the condition that he was in when you

2  found him?

3  A.       I cannot recall.  I mean, I cannot tell you

4  that.

5  Q.       Okay.  Did you tell me when I took your

6  deposition that when you first walked into that cell,

7  you were shocked?

8  A.       I was.  And like I said, his arms is what

9  really -- I -- for some reason, his arms stuck out to

10 me.

11 Q.       Did he still have the -- the spit mask or the

12 nylon mask over his face, or do you know?

13 A.       I do not recall him having anything on his

14 face.

15 Q.       Okay.  Did you -- did you consider just calling

16 9-1-1 and letting the experienced folks transport him to

17 the hospital?

18 A.       No, because once we were able -- once he was

19 able to actually stand up and sit down and dress him and

20 I did take vitals on him, I -- we -- we transported him.

21 Q.       All right.

22 A.       'Cause I'll be honest with you, sometimes us

23 getting somebody to a hospital is a lot faster than us

24 waiting on an ambulance if they're not available.

25 Q.       Okay.  But you had a medical center -- you

1    really didn't -- you had the LaFollette --

2    A.        Yes.

3    Q.        A small medical center?

4    A.        I would send him to the closest medical center

5    possible.

6    Q.        Okay.

7    A.        And if an ambulance would have picked him up,

8    they would have taken him to the closest medical center.

9    Q.        All right.  And so were you aware that once he

10   got there that they loaded him up and med flighted him

11   over to --

12   A.        I did find that out later, but I don't know how

13   much later.

14   Q.        Okay.  And I think that I asked you in

15   deposition if you agreed with Sheriff Goins when he said

16   he felt that most of his injuries after looking at the

17   video --

18             MR. KNIGHT:  Objection.  Argumentative.

19             MR. SEATON:  It's not.

20             THE COURT:  I'm going to overrule it as being

21   argumentative.  But if you have -- you know, frame your

22   questions out of depositions, you -- you ask a question.

23   If they don't answer the same -- the same way as they

24   did in the deposition, then you can impeach them.

25             MR. SEATON:  Fair enough.

1    THE COURT:  That's -- that's the rule.

2    MR. SEATON:  Right.  Right.

3    THE COURT:  And -- and so now you haven't had a

4    lot of objecting on this issue, but we haven't had a lot

5    of following that.

6    MR. SEATON:  We haven't had a lot of what?

7    THE COURT:  You haven't been following --

8    MR. SEATON:  Okay.

9    THE COURT:  -- the rule.

10   BY MR. SEATON:

11   Q.    So -- so did you feel that his -- that most, if

12   not all, of his injuries were caused from the abuse that

13   he received at the jail?

14   A.    At what time?  Like when I first saw him?

15   Q.    Yeah.

16   A.    No, because I didn't know that all that went

17   on.

18   Q.    Okay.

19   A.    I didn't know of the circumstances of what --

20   all I knew was that he had -- had chased him on -- by

21   car and that he ran, and they chased him on foot.

22   Q.    All right.  But after you -- I know you said

23   that you didn't watch the whole video.  But do you --

24   after knowing what all had happened inside the jail, do

25   you feel like most of his injuries were caused from the

1    abuse he received at the jail?

2         MR. KNIGHT:  Objection, Your Honor.  No

3    disclosure.  She's an LPN.

4         THE COURT:  I'm going to overrule it.

5    BY MR. SEATON:

6    Q.    You can answer.

7    A.    I also was told that while he was running that

8    he hit a vehicle -- I found that out -- head on.  So if

9    you're inquiring to his -- the brain, that possibly

10   could be from hitting that vehicle.  Any type of

11   fractures on his face, yes, I do believe that was from

12   what happened at the jail.

13   Q.    Okay.  And were you -- were you aware that when

14   he got to the jail, he had no bleeding and no abrasions

15   on his face?

16   A.    No, because I was not there, and I didn't see

17   the video till I had to go to court in Campbell County.

18   Q.    All right.  That's fair enough.

19         And you left the sheriff's department?

20   A.    Yes, I did.

21   Q.    And why did you leave?

22   A.    I went to -- I went to a nursing home.

23   Q.    But didn't you tell me that you had differences

24   with --

25   A.    I -- I don't feel why I left the jail was

1  any -- has any -- I mean, my personal life, why I would

2  leave a job should have nothing to do why -- with this

3  case.

4  Q.      I -- I'm not trying to get into your personal

5  life.

6  A.      Well, then why -- I mean, I don't understand

7  why I'm being --

8          THE COURT:  Hold on.  Ask the question.

9          MR. SEATON:  Okay.

10         THE COURT:  Answer the question --

11         THE WITNESS:  Okay.

12         THE COURT:  -- please.  And if there's an

13 objection --

14         THE WITNESS:  I did not --

15         THE COURT:  Hold on.  I'm still --

16         THE WITNESS:  Sorry, sir.  Sorry, sir.

17         THE COURT:  It's okay.

18         If there's an objection, object.

19         MR. SEATON:  Okay.

20         MR. KNIGHT:  Relevance, Your Honor.

21         THE COURT:  It is -- it's -- let's move on,

22 Mr. -- sustained.  Let's move on.

23         MR. SEATON:  May I have a sidebar then?  'Cause

24 I'd like to make an offer of proof on that then.

25         THE COURT:  Okay.

1          (A sidebar discussion was held between the

2          Court and counsel, outside the hearing of

3          the jury, as follows:)

4          MR. SEATON:  All she's going to do is say that

5  she left the jail because of differences with the

6  administration, with Stoney Love and the -- the

7  superintendent.

8          THE COURT:  It sounds to me like she thinks

9  you're getting into her personal business --

10         MR. KNIGHT:  Yes.

11         THE COURT:  -- and doesn't want to answer the

12  question at all.

13         MR. SEATON:  I understand that.

14         MR. KNIGHT:  What does that have to do --

15         THE COURT:  What -- hold on just a minute.

16         I tell you what, now, if you -- if you ask her

17  the question, if you want to impeach her with her

18  deposition testimony, you can do that.

19         MR. SEATON:  Right.

20         THE COURT:  But, Mr. Seaton, handle your own

21  case however you want.  She doesn't appear to be too

22  favorable right now.

23         MR. SEATON:  No, I understand that.  But I

24  think the fact that -- that they violated her

25  confidences and would not provide her with support goes

1   to the ultimate issue of what's going on in this case.

2           THE COURT:  I don't -- no.  I don't -- Court

3   disagrees with you on that --

4           MR. SEATON:  That's fine.

5           THE COURT:  -- and -- and overrules it.  Now --

6   now -- now, the issue here, of course, is failure -- the

7   allegations of failure to train.

8           MR. SEATON:  Right.

9           THE COURT:  Failure to train on two different

10  issues.

11          MR. SEATON:  Right.

12          THE COURT:  And I -- I do not see that as

13  pertaining to that issue.

14          MR. SEATON:  But the failure to train goes

15  through the entire department.  If -- if they're not

16  providing resources and they're not training her and

17  they're not giving all those resources, I mean,

18  it's -- it's a full thread all the way through.

19          THE COURT:  She doesn't work for the

20  department, Mr. Seaton.

21          MR. SEATON:  But -- but it just shows

22  the -- the malfunctioning of the department.

23          THE COURT:  Okay.  Court's going to overrule --

24  I mean, Court's going to sustain the objection.

25          MR. SEATON:  Okay.

1  THE COURT:  Mr. Seaton, I -- I think I

2  understand what you're saying --

3  MR. SEATON:  Yeah.

4  THE COURT:  -- and everything else, but this

5  lady is a contractor that works for a company that --

6  MR. SEATON:  Right.

7  THE COURT:  -- they contracted.

8  MR. SEATON:  Right.

9  THE COURT:  Now, I've given you quite a bit of

10  leeway on her, what she saw, encountered.  There's quite

11  a bit of testimony in the record about the extent of the

12  injuries.

13  MR. SEATON:  Right.

14  THE COURT:  All, I think, relevant.

15  MR. SEATON:  Right.

16  THE COURT:  We need to know -- we're dealing

17  with these issues.  But why she -- you know, why she

18  went to work for a nursing home, it -- it is not

19  relevant.  And -- and, look, we're not here to

20  completely beat up the county and the department.  We're

21  here to try the case.  Okay?

22  MR. SEATON:  Yes, sir.

23  THE COURT:  All right?  And you've walked on

24  that line quite a bit.  I've given you quite a bit of

25  flexibility, but you can't go over that line.  Does that

1 make sense?

2          MR. SEATON:  Yeah.  And I'll not make an offer

3 of proof on this one, but -- but, I mean, I -- I think

4 these -- these issues are very important.

5          THE COURT:  I -- I understand.  And --

6          MR. SEATON:  Okay.

7          THE COURT:  -- you've been -- been given quite

8 a bit of flexibility --

9          MR. SEATON:  I understand that.

10          THE COURT:  -- on these issues.

11          MR. SEATON:  You're doing a good job.

12          THE COURT:  But let's -- let's -- let's move

13 on.  Okay?

14          MR. SEATON:  I know.  Clipping pretty good.

15          (At the conclusion of the sidebar conference,

16          the proceedings continued in open court as

17          follows:)

18 BY MR. SEATON:

19 Q.      Thank you, ma'am.  Answer any questions that

20 Mr. Knight has.

21 A.      Yes, sir.

22                  CROSS-EXAMINATION

23 BY MR. KNIGHT:

24 Q.      Good morning, Nurse Willoughby.

25 A.      Good morning.

```
 1   Q.        You're an LPN; correct?

 2   A.        Yes, sir.

 3   Q.        And we've established what that is.

 4             The -- when you were at Campbell County, you

 5   had 24/7 coverage; correct?

 6   A.        Not at that time, we did not.

 7   Q.        I mean, on call.

 8   A.        Yes, they do call us with anything at

 9   nighttime.

10   Q.        Okay.  And they could call 9-1-1?

11   A.        Yes.

12   Q.        And they could certainly call an ambulance;

13   correct?

14   A.        Yes.  Yes, sir.

15   Q.        Now, it was interesting to me that when you

16   arrived at your shift, you were encountered by Corporal

17   Boyer.  And he was 21 years old; correct?

18   A.        I don't know his age.  I believe he was in his

19   20s.

20   Q.        Okay.  And he was a corrections officer;

21   correct?

22   A.        Yes, sir.

23   Q.        And he said, hey, come look at this guy;

24   correct?

25   A.        Yes, sir, he did.
```

1  Q.      And -- and we think -- I know that we can't say
2  definitively.  Do you know a John Paul White?
3  A.      If I saw him, possibly.  The name -- do I -- I
4  don't remember -- recall the name.
5  Q.      But you -- the other person that went with you
6  with Corporal Boyer was a corrections officer; correct?
7  A.      Yes, he was.  Yes.
8  Q.      And -- and they knew where to go; correct?
9  A.      Yes.
10 Q.      They knew what to recognize; correct?
11 A.      Yes.
12 Q.      And then when you went into that cell, you
13 checked Mr. Ling's vitals; correct?
14 A.      Yeah, I went back and got my stuff and came
15 back and checked them.  Yes.
16 Q.      Okay.  And then you arranged for, I guess, a
17 cruiser since it would be faster to get him to a --
18 A.      Before I even went and got my vitals, I told
19 them he -- we're sending him to the hospital.
20 Q.      Okay.  And you thought it would be faster by
21 cruiser; correct?
22 A.      Yes, because I have dealt with waiting on
23 ambulances before.
24 Q.      And -- and then we know that he went to
25 LaFollette Medical Center and he went to UT Hospital?

1   A.        Yes.

2   Q.        Which is a trauma center.  You understand that;

3   correct?

4   A.        Yes.

5             MR. SEATON:  Thank you.

6             THE COURT:  Any redirect?

7             MR. SEATON:  No, Your Honor.

8             THE COURT:  All right.  Thank you, ma'am.

9             THE WITNESS:  Thank you.

10            MR. SEATON:  Call Courtney Whatley.

11            THE COURT:  Courtney Whatley.

12            THE COURTROOM DEPUTY:  Up to the box, ma'am.

13            (The witness was duly sworn.)

14                      COURTNEY WHATLEY,

15  called as a witness at the instance of the parties,

16  having been first duly sworn, was examined, and

17  testified as follows:

18                    DIRECT EXAMINATION

19  BY MR. SMITH:

20  Q.        Good morning, ma'am.

21  A.        Good morning.

22  Q.        Can you please state your name for the record.

23  A.        Yes, Courtney Whatley.

24  Q.        Ms. Whatley, if you could, what is it that you

25  do?

1  A.       Yes.  So I'm a life care planner, and so what

2  that does is I create reports that outlines the needs

3  for someone with a disability.  And so what it does, it

4  goes through and looks at what the person's disability

5  is and develops a plan of care for what they might need

6  medically, like recreationally, and just daily to live

7  with their disability with the most independence as

8  possible.

9  Q.       So is it fair to say that a -- and what did we

10 ask you to put together for the jury?

11 A.       Oh, yes, sir.  Yeah.  So I put together what's

12 called a "life care plan report," and so in that report,

13 like I said, it outlines the plan of care for medical

14 needs, personal needs, independence needs.  And then it

15 also outlines the cost that's associated with that care

16 throughout the person's lifetime.  So from the -- now

17 until their estimated time of departure, so -- yeah.

18 Q.       So putting that all together, you create a cost

19 analysis putting together all the needs, medical, future

20 care, and you can calculate what that all is through the

21 future?

22 A.       Yes.

23 Q.       Okay.  Thank you.

24 A.       Uh-huh.

25 Q.       Now, is it true that you use both specific

1  materials to this case and materials that should be

2  standard for every life care planner when you make your

3  opinions?

4  A.        Yeah.  So whenever I write the life care plan,

5  the -- the standards of practice is to use what is given

6  for this case, which are medical records.  So I reviewed

7  the individual's medical records.  I did an interview

8  with the medical, with the individual.  And then what's

9  really good practice and standard practice is to use

10 what's in the literature, so I did a lot of research

11 based off of his condition and based off of what is

12 likely to occur from his condition.  And so those are

13 peer-reviewed articles.

14        Those are standards of practice, standards of

15 care in the medical -- so I -- I use those as well to

16 develop my plan.

17 Q.        Now, you're fairly new as a life care planner;

18 correct?

19 A.        Correct.

20 Q.        But you use the same materials that any life

21 care planner should use to come up with their analysis?

22 A.        Oh, for sure.  So -- yeah, although I'm a --

23 new as a life care planner to have the training and the

24 certifications and the background to -- to develop this

25 plan -- and, you know, this is a newer plan -- but I

1  would use the same resources and the same things that I

2  use today as I would use on the 50th or the 500th plan

3  because they're really standard; right?

4          I'm always going to review the medical records,

5  I'm always going to interview the person when I have

6  access to them, and I'm always going to use the research

7  that's out there.  So the information comes from -- from

8  material that has been researched, and that's always

9  going to be the case.

10 Q.     Now, specifically for this case --

11 A.     Sure.

12 Q.     -- you looked at the medical records?

13 A.     Uh-huh.

14 Q.     What other things of Mr. Ling did you review or

15 interview or do to prepare your report?

16 A.     Yeah.  So I looked at medical records, you

17 know, I was able to look at his deposition, and then I

18 also interviewed with him.  That's a very big important

19 part of it because I've got to understand how his

20 disability's impacting him and what his needs are

21 because life care plans are individualized.  And so I

22 just needed to know what he's doing on a daily basis and

23 what his needs are and what his goals are for the

24 future.

25 Q.     Okay.  And based on that, you were able to come

1   up with two cost summaries --

2   A.        I -- yes, I was.

3   Q.        -- correct?

4           Now, each of those -- before I put these on for

5   the jury, let's just go ahead and pull up 34A.

6           Before we admit this, each one of these items

7   comes with a justification; is that correct?

8   A.        Correct.

9   Q.        And what do you justify each one of those by?

10  A.        Can you -- can you clarify?

11  Q.        So each one of these -- do you use your

12  interviews, the medical records, and things to justify

13  each category?

14  A.        Oh, yes, of course.  So my justifications come

15  from interview, the peer-reviewed research.  So a lot of

16  times in my justifications, it will be cited from

17  research.  And then I also use his medical records.

18  That's a really big part of the -- part of the plan and

19  the justifications.

20  Q.        Okay.  Now, why are there two summaries?

21  A.        That's a very good question.  And so we -- so I

22  developed this plan for the future, and in the future

23  for older age, I have two breakdowns for one where he

24  might need home in the care with aging and then one

25  where he might go into a care facility.  I break those

1  down because, you know, right now you might not know if

2  you want to have care in the home from a nursing staff

3  or if you would like to go into a facility.  They end up

4  being around the same cost.

5          But, like I said, the life care plan is also a

6  plan of care for the individual, so it gives them a

7  roadmap of what might be needed in the future so that

8  then they can look at it, and it just gives them the

9  option of being able to decide down the road if -- if

10  they would like home in the -- care in the home or if

11  they would like a facility.  Yeah.

12          MR. SMITH:  Okay.  So, Your Honor, at this

13  time, we'd like to introduce 34A.

14          MR. KNIGHT:  No objection, Your Honor.

15          THE COURT:  So ordered without objection.

16          (Plaintiff's Exhibit 34A

17          received into evidence.)

18  BY MR. SMITH:

19  Q.      Okay.  Ms. Whatley, you've already explained to

20  the jury just why your summaries are different.

21  And -- and I apologize.  It's -- it's marked "34B" even

22  though it is 34A.  So there's a little confusion.

23          But this is option 2; correct?

24  A.      Uh-huh.

25  Q.      And so we're going to start with option 2

 1   first.  And if you could, what's -- is this your more

 2   conservative estimate or the additional estimate, the

 3   one that has more on it?

 4   A.       So both the estimates, I would say, are -- are

 5   fairly conservative, but let me just look back.  This

 6   one is more conservative than the option number 1.  And

 7   like I said, they're similar in price, but this just has

 8   a little bit less.  And it just comes down to later on

 9   in life how much it might cost for --

10   Q.       And --

11   A.       -- for care.

12   Q.       -- if you -- if you could, Ms. Whatley, for

13   option 2, what is the total amount of the plan?

14   A.       Just so that way I get you the right amount,

15   I'm going to read it off for you.  Okay?  It's

16   $2,841,953.51.

17   Q.       Okay.  Okay.  Thank you.

18            MR. SMITH:  Let's go to 34B, please.

19            (Off-the-record discussion between counsel.)

20   BY MR. SMITH:

21   Q.       Okay.  Are -- are we looking at option 1?

22   A.       Yes.

23   Q.       Your first cost summary?

24   A.       Yes.

25            MR. SMITH:  Okay.  Your Honor, we'd ask to move

1   34B into evidence.

2           MR. KNIGHT:  No objection, Your Honor.

3           THE COURT:  All right.  So ordered without

4   objection.

5           Now, let's see.  This one's actually marked A,

6   and B was A and -- okay.

7           MR. SMITH:  There was a -- yeah, it was a -- it

8   was our fault.  Yeah.

9           THE COURT:  Okay.  All right.  So ordered

10  without objection.

11          (Plaintiff's Exhibit 34B

12          received into evidence.)

13  BY MR. SMITH:

14  Q.      Okay.  And, Ms. Whatley, what was the -- just

15  very briefly, what was the difference from option 1

16  versus option 2?

17  A.      Sure.  So the only difference is the end of

18  life care or the elder care.  And so once he gets a

19  little bit older, like I said, in the first option, we

20  have skilled nursing in the home to care for somebody.

21  And in the last option, we have facility care because

22  research shows that someone, you know, with a brain

23  injury will probably require extensive care.

24          So, like I said before, I gave those two

25  options where you can either have them -- that care in

1    the home or the care in a facility.  And the first one's

2    the care in the home.

3    Q.        And if you could just tell us what the total

4    number for option 1 is?

5    A.        Sure.  And I'm going to read it off again.  So

6    it's 2,983,230.22.

7    Q.        -230?

8    A.        Yes.

9    Q.        Okay.

10   A.        And then 22 cents.

11   Q.        Oh, 22.

12             Ms. Whatley, you said these are conservative

13   estimates.  You could have added more?

14   A.        Yeah.  And so if you look at my plan, you

15   notice that I took the average as much as possible, so I

16   didn't go with the most expensive or the least

17   expensive.  I -- I did take the average of -- of care

18   as -- as much as I could.  You know, I used the

19   50 percentile mark when I looked at costing.

20             Sometimes I looked at -- to see -- for example,

21   like case management services, the hours that I use were

22   very conservative.  And so, you know, I never want to go

23   in trying to sway one way or the other.  I try and use

24   the average.  If you think about it, this is for the

25   entirety of his life, so this is from now until the end

1   of -- end of life care is what this number is.  So this

2   is -- this is pretty conservative.

3   Q.      And is it your opinion that option 2, the more

4   conservative option, that is necessary care for Nathan

5   Ling for the rest of his life?

6   A.      Oh, yes.

7           MR. SMITH:  Okay.  Pull up Exhibit 33, please.

8   BY MR. SMITH:

9   Q.      Ms. Whatley, did you prepare a CV for us?

10  A.      I did.

11  Q.      Okay.  Are you looking -- is this an accurate

12  reflection of your CV on screen?

13  A.      It is.

14          MR. SMITH:  Your Honor, we'd ask to move

15  Exhibit 33 into evidence.

16          MR. KNIGHT:  No objection, Your Honor.

17          THE COURT:  So ordered.

18          (Plaintiff's Exhibit 33

19          received into evidence.)

20          (Off-the-record discussion between counsel.)

21  BY MR. SMITH:

22  Q.      All right.  Ms. Whatley, that is all the

23  questions I have for you.  Please answer any questions

24  that Mr. Knight has.

25                    CROSS-EXAMINATION

1  BY MR. KNIGHT:

2  Q.      Ms. Whatley -- is it Whatley or Whatley?  I'm

3  sorry.  I didn't hear.

4  A.      It's fine.  It's Whatley.

5  Q.      Okay.  Whatley?

6  A.      Yes.

7  Q.      Good afternoon -- good morning, ma'am.

8  A.      Good morning.

9  Q.      There are -- I just have a couple of things

10 that interested me when I was looking at your report.

11 You went in -- you actually interviewed Mr. Ling;

12 correct?

13 A.      Correct.

14 Q.      On July the 8th, 2023.  Is that accurate?

15 A.      I'm going to just make sure I get the right --

16 yes, sir.

17 Q.      So about five or six months ago?

18 A.      Correct.

19 Q.      And you were able to do that via Zoom or some

20 other mechanism --

21 A.      Correct.

22 Q.      -- like Zoom?

23 A.      Yes.

24 Q.      The other thing that -- and you -- and I think

25 you described that as a big important part to talk to

 1  the participant; is that correct?

 2  A.         Correct.

 3  Q.         The other thing that I found interesting

 4  that -- that -- under recreational history of your

 5  report, you indicated that Mr. Ling reported a previous

 6  passion for automotive activities.  Are you -- were you

 7  aware that he did not even have a driver's license?

 8  A.         So he indicated that he liked to work on cars.

 9  Q.         Uh-huh.

10  A.         Yes.

11  Q.         Did he tell you --

12  A.         Obviously --

13  Q.         I'm sorry.

14  A.         So -- yeah.  So he indicated that he liked to

15  work on cars, whether it be his car or someone else's

16  car.  That's just something that he liked to do.

17  Q.         Did he tell you that he liked to work on stolen

18  cars?

19  A.         That's not something --

20             MR. SEATON:  Objection, Your Honor.  That's

21  improper.

22             THE COURT:  Well --

23  BY MR. KNIGHT:

24  Q.         What's his passion?

25             THE COURT:  Sustained.

1   BY MR. KNIGHT:

2   Q.      Did he ever tell you that he liked to drive

3   cars?

4   A.      I don't think that was a -- that was something

5   that was mentioned.

6   Q.      All right.  Thank you.

7   A.      Yeah, no problem.

8   Q.      Appreciate it.

9           MR. SMITH:  Nothing further.

10          THE COURT:  All right.  Thank you, ma'am.

11          THE WITNESS:  Yeah.  Thank you.

12          MR. SEATON:  Do you want a break, or do you

13   want to keep --

14          THE COURT:  Do you all want to take your

15   restroom break?  Yeah.

16          Let's take about -- about 10, 12 minutes, and

17   we'll come back and then do our -- the rest of our

18   morning session.

19          (Brief recess.)

20          (The proceedings were held outside the

21          presence of the jury, as follows:)

22          THE COURT:  All right.  Are we ready for our

23   next witness?

24          MR. SEATON:  Yes, Your Honor.

25          THE COURT:  Who is it?

1          MR. SEATON:  Catie Wilson.

2          THE COURT:  Catie Wilson.

3          And who do we have after that?

4          MR. SEATON:  We have Lieutenant Goins.  We have

5    our expert, Greg Winston.  We have Corporal Joel Boyer,

6    who was mentioned.  And then the last witness is -- is

7    Joshua Miller, who is the -- the other -- the heavyset

8    fella that's involved in the video.

9          THE COURT:  Okay.  All right.  Bring our jury

10   in.

11          (The proceedings were held in the presence of

12          the jury, as follows:)

13          THE COURT:  Please be seated.

14          All right.  Mr. Seaton, call your next witness.

15          MR. SEATON:  Catie Wilson, Your Honor.

16          THE COURT:  Catie Wilson.

17          (The witness was duly sworn.)

18                        CATIE WILSON,

19   called as a witness at the instance of the parties,

20   having been first duly sworn, was examined, and

21   testified as follows:

22                     DIRECT EXAMINATION

23   BY MR. SEATON:

24   Q.      Good morning.

25   A.      Good morning.

1   Q.      Tell us your full name.

2   A.      My name is Catie Elizabeth Wilson.

3   Q.      All right.  Where do you work?

4   A.      I work at Campbell County Sheriff's Department.

5   Q.      And how long have you been there?

6   A.      I've been there 10 years.

7   Q.      Okay.  And I think that when you first started

8   there, you said -- or you were -- you had on-the-job

9   training with Mallory Campbell?

10  A.      Yes.

11  Q.      And then you did the -- the weeklong thing with

12  TCI?

13  A.      Yes.

14  Q.      And I want to show you Exhibit Number 56.  We

15  have introduced this earlier as the Campbell County

16  Sheriff's Department chain of command.

17  A.      Yes.

18  Q.      Do you recognize your picture in there?

19  A.      Yes.

20  Q.      And what it shows is that you are Catie Wilson,

21  the sergeant; right?

22  A.      Yes.

23  Q.      And that's on the corrections side?

24  A.      Yes.

25  Q.      And so you reported to Mallory Campbell, who

1  reported to Stoney Love?

2  A.      Yes.

3  Q.      Right?

4          And then Sean Brown reported to you?

5  A.      Yes.

6  Q.      All right.  And so as the sergeant there, did

7  you have any special training to become the sergeant

8  over all of the corporals and the rest of the officers?

9  A.      No.

10  Q.      All right.  And I think that you told me that

11  the job of the sergeant is to make sure that all of the

12  officers and inmates are taken care of day to day and to

13  maintain the jail?

14  A.      Yes.

15  Q.      All right.  And then the -- the job of Mallory

16  Campbell there is to do the training of the staff?

17  A.      Yes.

18  Q.      You didn't do any of the training?

19  A.      No.

20  Q.      All right.  Did you do any of the hiring?

21  A.      I helped with some of the hiring.

22  Q.      Okay.  But you didn't have the ultimate --

23  A.      No.

24  Q.      -- decision-making authority to do the hiring?

25  A.      No.

1    Q.        And I think you told me when I took your

2    deposition that it's the responsibility -- I mean, in

3    terms of giving medical needs to inmates or officers or

4    whomever, it's first the responsibility of the medical

5    staff; right?

6    A.        Yes.

7    Q.        And then it's the responsibility of you?

8    A.        Yes.

9    Q.        And then it's the responsibility of the

10   corporal on staff; right?

11   A.        (No audible response.)

12   Q.        Right?

13   A.        Yes.

14   Q.        And were you the person that actually would

15   staff the jail, do -- do the shifts and things like

16   that?

17   A.        Yes.

18   Q.        You did that?

19   A.        Me and Mallory Campbell.

20   Q.        Okay.  And so were you all the ones that

21   decided to leave Sean Brown in charge of the jail?

22   A.        Yes.

23   Q.        And Sean Brown had been there how long?  Do you

24   recall?

25   A.        I don't recall that.

1  Q.      Do you recall he was about 20 years old?

2  A.      Yes.

3  Q.      All right.  And do you know if he had any

4  specialized training at all?

5  A.      He had the TCI training.

6  Q.      He had that weeklong course?

7  A.      Yes, uh-huh.

8  Q.      All right.  And -- excuse me.  So after --

9  well, let me back up just a second.

10         So Sean Brown was the corporal who was in

11 charge of all the rest of the jailers and the jail the

12 evening of June the 1st --

13 A.      Yes.

14 Q.      -- 2019.  And my understanding is that

15 following his shift -- his shift ended 7:00 p.m. -- or

16 7:00 a.m. the next morning?

17 A.      7:00 a.m.

18 Q.      And then following that, another 21-year-old

19 person by the name of Joel Boyer became the corporal and

20 over charge -- or over top of the jail; right?

21 A.      Yes.

22 Q.      All right.  What time did you ordinarily go in?

23 A.      I didn't work on the weekends.  I worked Monday

24 through Friday around 8:00 to 4:00.

25 Q.      So you'd had a 20-year-old in charge of it at

1  night, then a 21-year-old in charge of it in the day?

2  A.      Yes.

3  Q.      All right.  And do you know if they had any

4  special training to -- to -- to be a supervisor over all

5  the jail?

6  A.      No.

7  Q.      They did not?

8  A.      No.

9  Q.      All right.  Now, when this event occurred, you

10 were first made aware of it Monday morning when -- or

11 excuse me -- Sunday morning?

12 A.      Sunday morning.

13 Q.      Sunday morning on the 2nd when Joel Boyer

14 called you?

15 A.      Yes.

16 Q.      All right.  And he was your second corporal

17 that came in; correct?

18 A.      Yes.

19 Q.      All right.  And the first thing that you were

20 told was we've got a -- we've got an inmate that's going

21 to -- getting life-flighted to the University of

22 Tennessee trauma center?

23 A.      Yes.

24 Q.      All right.  And you didn't know why?

25 A.      No.

1  Q.      All right.  So -- and nobody had reported to

2  you that -- that all of this -- this fight and

3  everything had occurred, had they?

4  A.      No.

5  Q.      Sean Brown never called you?

6  A.      No.

7  Q.      Never said he's struggling or never said that

8  any of the abuse had happened; right?

9  A.      No.

10 Q.      All right.  So what did you and Joel Boyer talk

11 about in terms of -- you know, did you say, why do we

12 have an inmate going --

13 A.      Yes.

14 Q.      -- by LifeStar?

15 A.      He told me there was an incident the night

16 before on third shift.  I came down to the jail and

17 pulled footage and watched the video.

18 Q.      So when you say "pulled footage," just -- just

19 to be clear, what you did was you got on the camera

20 system of the jail and pulled that footage to -- to

21 watch it; right?

22 A.      Yes.

23 Q.      And that was Sunday morning?

24 A.      Yes.

25 Q.      All right.  And so Sunday morning, what -- what

1  time?

2  A.       Probably 9:00.

3  Q.       All right.  And then did you -- are you the one

4  that texted Stoney Love when he was in church?

5  A.       I think I called Mallory Campbell.

6  Q.       Uh-huh.

7  A.       And she might have been the one -- I don't

8  recall if I -- I -- I text him or not.

9  Q.       All right.  And so were you told that they

10 wanted to see the video Monday morning?

11 A.       Yes.

12 Q.       They weren't concerned with it that

13 afternoon --

14 A.       No.

15 Q.       -- or that morning?

16 A.       No.

17 Q.       All right.  Were you concerned with it?

18 A.       Yes.

19 Q.       And why?

20 A.       Because I watched an officer hit an inmate two

21 to three times with a closed fist.

22 Q.       Okay.  Did you watch more than one officer --

23 A.       There was different officers there, but there

24 was only one that struck him that I saw.

25 Q.       Okay.  Did you watch that video very closely?

1   A.      Yes.

2   Q.      So you didn't see the other officers holding

3   him down and striking him?

4   A.      I didn't see them striking him.  I seen the --

5   I think that's what concerned me the most, so that's

6   what my focus was on, the -- where he got struck two to

7   three times.

8   Q.      And you weren't happy because he had been hit

9   while he's handcuffed behind his back; right?

10  A.      No, I was not.

11  Q.      And you weren't happy because you weren't

12  notified about that; right?

13  A.      I wasn't.

14  Q.      And when you watched that video, you saw him

15  laying in the floor wiggling and squirming with -- with

16  five other officers on him?

17  A.      Yes.

18  Q.      And -- and you never saw anybody intervening,

19  did you?

20  A.      No.

21  Q.      Were -- were officers trained to intervene?

22  A.      Yes.

23  Q.      And how were they trained?  Do you know?

24  A.      Not at -- no.

25  Q.      Okay.  That's fair enough.

1    But it's every officer's duty to intervene in

2  the event that they see some abuse going on?

3  A.    Yes.

4  Q.    Correct?

5  A.    Yes.

6  Q.    All right.  And there was a -- there was a

7  female jailer that came in and watched for a period of

8  time.  Did you see --

9  A.    Yes.

10 Q.    -- that on the video?

11        Do you know who that was?

12 A.    I do not recall.

13 Q.    Okay.  And you felt like -- I mean, after you

14 saw the blood flying, you felt like he should have

15 gotten immediate medical attention.  True?

16 A.    Yes.

17 Q.    All right.

18 A.    The officer should have been made to leave.

19 Q.    All right.  And so the -- at 7:00 a.m., Nurse

20 Willoughby came in, and she had him sent to the

21 LaFollette Medical Center; right?

22 A.    Yes.

23 Q.    And he was transported by Joel Boyer,

24 the -- the corporal; right?

25 A.    Yes.

1  Q.        And so after Joel Boyer transported him to the

2  LaFollette Medical Center, then Joel Boyer got on the

3  helicopter with him when he got helicoptered to

4  Knoxville; right?

5  A.        Yes.

6  Q.        And stayed with him; right?

7  A.        Yes.

8  Q.        And stayed with him about 12 hours?

9  A.        Yes.

10  Q.        Till his shift ended; right?

11  A.        Yes.

12  Q.        And then after Joel Boyer's shift ended, they

13  sent Sean Brown back to sit with -- with Nathan Ling;

14  right?

15  A.        Yes.

16  Q.        And we knew that Sean Brown was involved in a

17  lot of this abuse, didn't we?

18  A.        Yes.

19  Q.        And when I asked you about that in the -- in

20  the deposition, you said that doesn't sound right?

21  A.        No.

22  Q.        And you felt that that slipped through the

23  cracks, didn't you?

24  A.        Yes, I did.

25  Q.        Look at the bottom of Exhibit Number 56.  You

1    see that officer there by the name of Joshua Miller?

2    A.        Yes, I do.

3    Q.        And he was just a general correction officer

4    under Corporal Brown; right?

5    A.        Yes.

6    Q.        And so the chain of command is if he had a

7    problem or a beef or whatever, he would go to -- to Sean

8    Brown; right?

9    A.        Yes.

10   Q.        And if he had a problem with Sean Brown, he had

11   to come to you; right?

12   A.        Yes.

13   Q.        And you don't recall him coming to you saying,

14   hey, there was a problem the other night when -- when --

15   when they were abusing this inmate?

16   A.        No, I do not.

17   Q.        You don't recall that?

18   A.        No.

19   Q.        And so if he says he -- he says I went to Catie

20   Wilson and she said I'll get to it later, you don't

21   recall that?

22   A.        No, I do not.

23   Q.        And so when you -- when all -- after all this

24   occurred, you say that you reported to Mallory Campbell

25   and to Stoney --

1    A.      Yes.

2    Q.      -- Love; right?

3            And did any of them discuss with you

4    disciplining or terminating any of these individuals?

5    A.      I don't recall.

6    Q.      Okay.  Did you have any involvement in

7    disciplining or terminating any of the individuals --

8    any of the individuals?

9    A.      I'm not sure.

10   Q.      Or do you -- you don't know if any of them were

11   terminated because of this event?

12   A.      None of them was terminated for this event.

13   Q.      And they weren't even written up, were they?

14   A.      I don't think they were.

15   Q.      Okay.  Did Stoney Love or Mallory Campbell have

16   conversations with you?  Hey, we got to do something

17   about this?  We've got to change this?

18   A.      No.

19   Q.      No.

20           Did you just leave it up to Mallory Campbell

21   and Stoney Love?

22   A.      Yes.

23   Q.      All right.  All right.  That's all the

24   questions I have.  Thank you so much.  Answer any

25   questions that Mr. Knight has.

CROSS-EXAMINATION

BY MR. KNIGHT:

Q.      Good morning, Sergeant Wilson.

A.      Good morning.

Q.      I think you said that you've worked at the
Campbell County Sheriff's Department for 10 years?

A.      Yes.

Q.      And went through TCI training; is --

A.      Yes.

Q.      -- that correct?

        And you were asked about the medical staff
dispensing care.  I mean, is it -- is it the medical
staff -- do they have more knowledge about medicine than
a correction officer?

A.      Yes.

Q.      With respect to corrections officers, let's --
let's talk about Corporal Boyer first.  He was a
correction officer before he became a corporal; correct?

A.      Yes.

Q.      And he had to apply to become a corporal?

A.      Yes.

Q.      And did you have to apply to become a sergeant?

A.      Yes.

Q.      And do you have any idea how long Boyer was a
correction officer before he became a corporal?

1   A.      I don't recall.

2   Q.      Okay.  He knew his job; correct?

3   A.      Yes, he did.

4   Q.      And what are some of the duties of a

5   corrections officer?

6   A.      Corrections officers, you make sure all the

7   inmates are taken care of, the facility's running well,

8   and the security and safety of the -- the facility.

9   Q.      Okay.  In your experience, you see all kinds of

10  arrestees and -- that are incarcerated; correct?

11  A.      Yes.

12  Q.      And things change moment by moment; correct?

13  A.      Yes, they do.

14  Q.      And describe for the jury some of the things

15  you've witnessed the incarcerated do.

16  A.      Most of the time they come in high, fighting,

17  cussing, screaming, don't know where they're at.  You

18  have to take care of them, make sure that their safety

19  is the first thing.

20  Q.      Okay.  And when you viewed the videotape, you

21  said, I believe, under questioning by Mr. Seaton that

22  your problem was the officer -- I believe it was Justin

23  Crabtree striking Mr. Ling in the nose; correct?

24  A.      Yes.

25  Q.      The officers that were holding Mr. Ling down

1  was not the abuse you were talking about --

2  A.      No.

3  Q.      -- correct?

4          In fact, that happens quite a bit, doesn't it?

5  A.      Yes.

6  Q.      Having to hold someone down?

7  A.      Yes.

8  Q.      'Cause they don't want to be there, do they?

9  A.      No, they don't.

10 Q.      And it's not unusual for them to resist in the

11 search trap, and you have to use force by holding them

12 down?

13 A.      Yes.

14 Q.      In your experience, do inmates always do what

15 you ask them to do?

16 A.      No, they don't.

17 Q.      And your -- based on what you reviewed of the

18 video and the rest of what you told Mr. Seaton, you had

19 an issue with what Officer Crabtree did; correct?

20 A.      Yes, I did.

21 Q.      And Sean Brown knew better than to leave

22 someone unchecked --

23 A.      Yes.

24 Q.      -- in the negative pressure cell, didn't he?

25 A.      Yes, he did.

1  Q.      And do you think that's the reason that he may
2  have been a little concerned when the day shift arrived?
3  A.      Yes.
4  Q.      Because they -- day shift -- Corporal Boyer
5  being 21 -- do you remember who else was on shift that
6  morning?
7  A.      I don't recall.
8  Q.      You know if John Paul White is a correction
9  officer?
10 A.      I'm not sure.
11 Q.      Okay.  The correction officers under your
12 supervision, they know how to check in inmates; correct?
13 A.      Yes.
14 Q.      They know how to check inmates to make sure
15 they're okay?
16 A.      Yes.
17 Q.      They can -- they recognize when an inmate needs
18 medical care?
19 A.      Yes.
20 Q.      And on this particular night, Sean Brown just
21 didn't do it, did he?
22 A.      No, he didn't.
23 Q.      All right.  Thank you.
24         THE COURT:  Any redirect?
25         MR. SEATON:  Yes, Your Honor.

1                   REDIRECT EXAMINATION

2   BY MR. SEATON:

3   Q.       So you don't know if Nathan Ling was resisting

4   or not, do you?

5   A.       No, I do not.

6   Q.       We can all make our own determinations watching

7   that video, can't we?

8   A.       Yes, we can.

9   Q.       All right.  And I think that some of the

10  officers are -- did -- did you do any investigation in

11  this?

12  A.       No, I'm not the jail investigator.  Mallory

13  Campbell was.

14  Q.       Okay.  Did she do a jail investigation?

15  A.       I don't know.

16  Q.       You don't -- you don't know?

17  A.       No.

18  Q.       You never saw one?

19  A.       No.

20          MR. SEATON:  All right.  And if we can pull up

21  Exhibit 48.  Yeah.  Okay.

22  BY MR. SEATON:

23  Q.       So do you recognize these folks in here?

24  A.       Some of them, yes.

25  Q.       All right.  Now, you say that you don't know

1    the woman on the left?

2    A.        No.

3    Q.        All right.  And then you got Justin Crabtree

4    standing there on -- on top of -- or with his foot on

5    top of Nathan Ling; right?

6    A.        Yes.

7    Q.        And then you have Joshua Miller just right off

8    his right elbow?  Heavyset fella?

9    A.        Yes.

10   Q.        And then you have Dakota Crabtree [sic] with

11   the green outfit and the black harness?

12   A.        Dakota Williams.

13   Q.        Yeah.

14             And then you have Sean Brown in the middle?

15   A.        Yes.

16   Q.        Black -- black outfit?

17   A.        Yes.

18   Q.        And then you had Alexander Standridge; right?

19   A.        Yes.

20   Q.        And so when -- when Mr. Knight said Sean Brown

21   knew better than to put him in the neg cell all night

22   long, what about the rest of these people?  Do you think

23   they knew better too?

24   A.        They did too.

25   Q.        Pardon?

1  A.      They did too.  They knew better.

2  Q.      So if there was just no conversation at all

3  about getting him medical treatment, you think that all

4  of these officers were wrong?

5  A.      Yes.

6  Q.      All right.  And do you think that all of these

7  officers were wrong to not intervene when they saw

8  Nathan Ling getting struck and all this blood flying?

9  A.      Yes.

10  Q.      All right.  Thank you.

11          THE COURT:  Any -- any recross, Mr. Knight?

12          MR. KNIGHT:  Very briefly.

13                  RECROSS-EXAMINATION

14  BY MR. KNIGHT:

15  Q.      Are you aware that Justin Crabtree was

16  criminally charged and went to jail?

17  A.      Yes.

18  Q.      And you're aware that Sean Brown was criminally

19  charged and got probation?

20  A.      Yes.

21  Q.      After an investigation by the TBI?

22  A.      Yes.

23  Q.      Is it fair to say, Sergeant Wilson, that a lot

24  of these encounters with inmates, whether they be in the

25  search trap, cell, sally port, whatever, you're there

1  moment by moment without the benefit of 20/20 hindsight?

2  A.      Yes.

3  Q.      Thank you.

4          THE COURT:  All right.  Thank you.

5          MR. SEATON:  We'll call Corporal Joel Boyer.

6          THE COURT:  Joel Boyer.

7          MR. SEATON:  Yes, sir.

8          THE COURT:  All right.  Is it Joe or Joel?

9          MR. SEATON:  Joel, J- -- J-o-e-l.

10         THE COURT:  Okay.

11         (The witness was duly sworn.)

12                          JOEL BOYER,

13  called as a witness at the instance of the parties,

14  having been first duly sworn, was examined, and

15  testified as follows:

16                   DIRECT EXAMINATION

17  BY MR. SMITH:

18  Q.      Hello, sir.

19  A.      Yes.

20  Q.      Please state your name.

21  A.      Joel Boyer.

22  Q.      All right.  Mr. Boyer, what is it that you

23  currently do?

24  A.      I'm a patrol deputy for the Campbell County

25  Sheriff's Department.

1   Q.      Patrol deputy?

2   A.      Yes.

3   Q.      Okay.  Now, you recall this incident,

4   June 2019?

5   A.      Yes.

6   Q.      And do you recall what position you held at

7   that time?

8   A.      I was a corrections officer at that time.

9           MR. SMITH:  Okay.  Please pull up 56.

10  BY MR. SMITH:

11  Q.      Were you a supervisor?

12  A.      I was a supervisor on the shift.

13  Q.      Corporal?

14  A.      Yes, sir, at that time.

15  Q.      You see this image, sir?  The "chain of

16  command" we've been calling it.

17  A.      Okay.

18  Q.      Which position would you have held?  I know

19  your picture's not even here.  But where would you have

20  been located?

21  A.      The three other corporals under Sergeant Catie

22  Wilson, sir.

23  Q.      Okay.  So the same position as Sean Brown held?

24  A.      Yes, sir.

25  Q.      Okay.  And, in fact, you came in the next

 1  morning to replace --

 2  A.       Yes, I was his relief the next morning.  My

 3  shift was --

 4  Q.       Okay.  What time was it that you came in?

 5  A.       A little before 7:00 in the morning, I believe.

 6  Q.       Okay.  As a corporal, how old were you at the

 7  time?

 8  A.       21, I believe.

 9  Q.       21?

10  A.       Yes.

11  Q.       And you were actually older than Sean Brown

12  was?

13  A.       I guess.  I don't know how old Sean was at the

14  time.

15  Q.       Okay.  Was that pretty standard for the

16  supervisor corporal rank to be that young?

17  A.       It was up to the jail administrator who got

18  promoted.  I had no say in that, sir.

19  Q.       What do you recall happening when you got to

20  the jail that next morning?

21  A.       That morning I come in like normal.  Sean Brown

22  had stopped me to speak to me and informed me that we

23  had had a male that had been arrested the night before

24  that had been combative, tried to fight, and that he had

25  been placed in one of our single-person cells in our

1  booking area.

2          So at that point in time, I just went over to

3  check on him, check on all the inmates that were up

4  there, and I noticed an inmate laying behind the door

5  inside of that single-person cell.

6  Q.       So let's go back to your interaction with

7  Sean --

8  A.       Okay.

9  Q.       -- Sean Brown.  Was he nonchalant?  Was he

10  stressed?

11  A.       He just told me that they'd had a combative

12  male come in, that they placed him in a cell.  He didn't

13  really seem, I guess, out of the ordinary or

14  distressed --

15  Q.       Matter --

16  A.       -- or anything.  Just letting me know.

17  Q.       Matter of fact?

18  A.       Yeah.

19  Q.       And he told you that Mr. Ling had been

20  combative?

21  A.       Yes.

22  Q.       And he was put in a cell?

23  A.       Yes.

24  Q.       Anything else?

25  A.       No, sir.

1  Q.      Did he tell you he was in serious need of
2  medical attention?
3  A.      No, sir.
4  Q.      Did he say he had gotten injured in any way?
5  A.      Not -- not to my knowledge.
6  Q.      Didn't tell you he had a busted nose or
7  anything?
8  A.      Uh-uh.
9  Q.      Okay.  So all you're aware of is that this
10 inmate's in this negative pressure cell, and that's it?
11 A.      Yes, sir.
12 Q.      How long until you went and checked on him?
13 A.      I honestly don't recall.  I know it was fairly
14 soon after I walked into booking, though.
15 Q.      Okay.  What happens next?
16 A.      I -- at that point, I believe I went and got
17 another one of the officers and maybe the nurse to go
18 check on him just to see what was -- condition he was
19 since he was laying on the floor.
20 Q.      So let's go to when you first see him.  You
21 check on him.  Is there anything unusual or alarming to
22 you?
23 A.      Not that I could notice from the door before I
24 went in there to see him.
25 Q.      'Cause he's lying against --

1  A.       He's lying down on the floor, yes, sir.

2  Q.       Was he sitting against the door?  Was he

3  laying --

4  A.       He was laying on his side, if I recall

5  correctly.

6  Q.       Okay.  What do you recall after -- you went to

7  the nurse?

8  A.       Yes.

9  Q.       Okay.  And had she already been there for some

10 time when you arrived?

11 A.       I believe she had been there for a little bit,

12 but I don't know exactly what time she came in or how

13 long she had been there.

14 Q.       Okay.  Why did you go get the nurse?

15 A.       I -- just because he was laying on the floor,

16 and I tried to get him to talk to me for a minute and

17 get his attention, but he couldn't really look up or

18 move to look at me.  So just out of precaution, I went

19 to get her in case it was something medical.

20 Q.       You tried to communicate with him, and he's

21 essentially nonresponsive?

22 A.       At that point, he just wasn't answering me, so

23 I didn't know what condition he was actually in.

24 Q.       And was that unusual?

25 A.       We have inmates that would sleep, but normally

 1  they weren't sleeping by the door.  They'd be on the

 2  bench or back away from the door.

 3  Q.       Okay.  So you got the nurse and I believe --

 4  was it James Paul White that was with you?

 5  A.       I -- I cannot recall his name, but I did get

 6  another officer to go with us.

 7  Q.       Okay.  Tell me what happens next.

 8  A.       We went in, we got him up off the floor, set

 9  him on the bench inside of the cell.  At that point, I

10  did observe some injuries to his face.  And Nurse

11  Willoughby and I decided that we needed -- he needed to

12  go to the hospital for medical attention.

13  Q.       All right.  Let's go to when you first -- when

14  the door --

15  A.       Okay.

16  Q.       -- was first opened.  Who enters first?

17  A.       I don't remember.  I can't recall that.

18  Q.       All right.  Think it could have been Nurse

19  Willoughby that --

20  A.       It might --

21  Q.       -- enters first?

22  A.       -- have been.

23  Q.       Okay.  Do you recall Nurse Willoughby's

24  reaction to seeing him in that condition?

25  A.       No, sir, I don't.

1  Q.       You don't recall her being shocked by his

2  condition?

3  A.       No, sir, I don't.

4  Q.       What did you think of his condition?

5  A.       I -- I was thinking that he did need some

6  medical assistance.

7  Q.       What gave you that idea?

8  A.       The bruising on his face.

9  Q.       On his face?

10 A.       Yes.

11 Q.       Anywhere else?

12 A.       That was the first thing I noticed.  And

13 that -- at that point, what I was more focused on was

14 his injuries to his face.

15 Q.       Okay.  What happens next?

16 A.       We got him up.  He was moving around a little

17 bit, and he was able to sit up on his own once we got

18 him on the bench.  And then I believe Nurse Willoughby

19 went to call her supervisor.  Part of, I believe, maybe

20 her protocol.  I'm not sure there.  I wasn't part of the

21 medical staff.  And we waited to see what Nurse

22 Willoughby said --

23 Q.       Okay.

24 A.       -- was going to be the course of treatment for

25 him at that time.

1  Q.      Was it apparent that Mr. Ling, besides just

2  having bruises, he had also urinated on himself?

3  A.      I didn't notice that, no, sir.

4  Q.      Okay.  Did you ever notice that?

5  A.      I believe we changed uniforms before we left,

6  but when we first got him up, I hadn't noticed anything

7  like that.

8  Q.      If Nurse Willoughby has testified that he had

9  urinated on himself, would you disagree with that?

10  A.      No, I wouldn't disagree.

11         MR. KNIGHT:  Objection.  Argumentative.

12         THE COURT:  Look, if he knows, he knows.  If he

13  doesn't -- what -- what somebody else testified to is

14  not relevant.  Let's move on, Mr. Smith.

15         MR. SMITH:  Yes, Your Honor.

16  BY MR. SMITH:

17  Q.      Who made the ultimate decision that Nathan Ling

18  should go to the hospital?

19  A.      Nurse Willoughby and myself did.

20  Q.      Okay.  So what happens at that point?  You

21  change him.  What happened next?

22  A.      We got him put in one of our jail

23  transportation cars, and I drove him to LaFollette

24  Medical Center for treatment for his injuries.

25  Q.      How is Nathan Ling acting at this time?

1  A.        He wasn't talking to me, but he was breathing

2  and holding himself up.  But I was more focused on just

3  getting him to the hospital to get medical treatment at

4  that point.

5  Q.        Was he coherent?  Was he talking?

6  A.        He wasn't talking to me, no, sir.

7  Q.        Were you shocked by his condition?

8  A.        I was a little surprised, yes, sir.

9  Q.        And nobody had told you he was in this type of

10  shape --

11  A.        Not -- not --

12  Q.        -- correct?

13  A.        No, sir, not other than that they had a

14  combative person come in and had to fight him.

15  Q.        Did you ever mention this to Corporal Brown or

16  anyone else?  Why didn't you tell me that he's in this

17  condition?

18  A.        I never talked to Corporal Brown.  After that I

19  was more focused on keeping the inmate safe and getting

20  him medical treatment.  That was my job duties.

21  Q.        Okay.  Now, is he placed in a wheelchair?

22  A.        I believe we used a wheelchair to get him to

23  the patrol car or transportation car, but I can't fully

24  recall.

25  Q.        So he's taken to -- is it a cruiser?  What type

1  of vehicle is it?

2  A.        It was a white Impala with a transportation

3  cage in the back of it was the car we had at that time.

4  Q.        Did you get him into the vehicle, or did

5  somebody else get him in the vehicle?

6  A.        I believe Officer White and I were able to help

7  get him set down in the car and get him in there.

8  Q.        Okay.  You buckle him in?

9  A.        Yes, sir.

10  Q.        And who drives him to the hospital?

11  A.        I drove him to the hospital.

12  Q.        LaFollette Medical Center?

13  A.        LaFollette Medical Center.  The only hospital

14  that's in town there.

15  Q.        What happens then?

16  A.        We got there.  They took him back to an exam

17  room.  The nurses got all of -- did their -- their jobs,

18  got the IV stuff put into him.  Then they took him for a

19  scan.  I don't remember if it was a CT or MRI, but they

20  took him back for a scan.

21          And at that point in time was when one of the

22  other nurses had come into the room where the computers

23  that run the machine are and said that LifeStar was on

24  their way to take him to UT Medical Center.  And that

25  was the extent of what I'd been told by them.

1   Q.      All right.  Let me back up real quick.

2   A.      Okay.

3   Q.      You get him into the cruiser --

4   A.      Uh-huh.

5   Q.      -- to have him transported to LaFollette

6   Medical Center?

7   A.      Yes, sir.

8   Q.      Is he handcuffed at that point?

9   A.      I'm -- we may have put handcuffs in the front,

10  but I don't fully recall if we did or not.

11  Q.      Would that be standard procedure --

12  A.      That would be --

13  Q.      -- to handcuff --

14  A.      -- standard procedure for transporting an

15  inmate.

16  Q.      No matter what his condition would be?

17  A.      If we're starting to transport him, yes, sir.

18  Q.      During this entire time you're interacting --

19  or at least in the presence of Nathan Ling --

20  A.      Yes, sir.

21  Q.      -- is he talking to you at all?

22  A.      No, sir.

23  Q.      Is he conscious?

24  A.      I -- I'm not a medical professional.  I don't

25  know the definition for "conscious."  But he was

1  breathing and he was able to hold himself up when I had

2  interactions with him.

3  Q.      I mean, did you hear any sounds that he was

4  making?

5  A.      He groaned a few times, I believe.

6  Q.      Meaning groaning?

7  A.      Yeah, moaning and groaning.  But that was the

8  extent of it.

9  Q.      How long was Nathan Ling at LaFollette Medical

10  Center before he gets life-flighted to UT Medical?

11  A.      I couldn't give you an exact time, but it

12  wasn't very long, I believe, 'cause they put him -- they

13  took him pretty quickly back to get the scan done, and

14  it was while they were getting the scan done that they

15  came into the room and informed me he was going to be

16  taken by LifeStar to UT Medical Center.

17  Q.      And they -- they made a very quick

18  determination --

19  A.      They did.

20  Q.      -- that he needed to be life-flighted?

21  A.      Yes, sir.

22  Q.      Okay.  Now, you're on the Life Flight

23  helicopter?

24  A.      I did fly with him and the paramedics in -- in

25  the helicopter, yes, sir.

1  Q.        Okay.  What happens next?

2  A.        They got him to UT Medical Center.  They got

3  him -- him off the LifeStar helicopter, took him into, I

4  believe, their trauma triage area just to assess his

5  injuries.  At that point in time, I think the hospital

6  put soft restraints on him just so they could work on

7  him and try to assess his injuries and then took him to

8  the ICU unit.

9  Q.        And you stayed with him?

10 A.        Yes, sir, until, I think, about 7:00 that night

11 when my shift was over.

12 Q.        Were you by yourself with him?

13 A.        Yes, in the hospital, I was.

14 Q.        All right.  Now, you -- your shift ends at

15 7:00 p.m.?

16 A.        Correct, sir.  That's when I left.

17 Q.        Who replaces you?

18 A.        I think Sean Brown was the one who was sent to

19 relieve me.

20 Q.        So Sean Brown, who was involved in this

21 incident the night before --

22 A.        Yes, sir.

23 Q.        -- is the one who replaces you?

24 A.        Yes, sir.

25 Q.        And he's by himself with Nathan Ling?

1  A.        He would have been with the hospital staff in

2  the ICU unit, yes, sir.

3  Q.        Do you think it's appropriate that Nathan --

4  that Sean Brown was the one that replaced you?

5  A.        That -- that wasn't my decision, sir.  I just

6  was -- they sent whoever they sent to relieve me, and I

7  went home at that point.

8  Q.        The -- the higher-ups at the jail?

9  A.        The administration did, yes, sir.

10 Q.        And just during the entire time even through to

11 UT Medical Center, did you ever notice that Nathan Ling

12 was conscious, coherent, able to speak normally,

13 anything?

14 A.        He was not able to speak.  But, again, he was

15 breathing on his own, and he was able to move his arms

16 still until they got him to the hospital.

17 Q.        That's all the questions I have --

18 A.        Okay.

19 Q.        -- sir.  Thank you.

20 A.        Thank you.

21          THE COURT:  Any cross-examination?

22          MR. KNIGHT:  Briefly, Your Honor.

23                    CROSS-EXAMINATION

24 BY MR. KNIGHT:

25 Q.        Is it Deputy Boyer now?

1   A.      Yes, sir.

2   Q.      How long has it been Deputy Boyer?

3   A.      I -- when I started at the sheriff's office in

4   2018, I was a corrections officer.  The title is still

5   deputy.

6   Q.      When did you -- have you been to the police

7   academy?

8   A.      I did.  I went to Walter State Police Academy

9   in January of 2021 and graduated March of 2021.

10  Q.      Okay.  So how long have you been on the road?

11  A.      I spent two years as a school resource officer,

12  and in August of last year, I transferred to our patrol

13  division.

14  Q.      Okay.  And prior to that, you were a

15  corrections officer; correct?

16  A.      Yes, sir, from 2018 till I went to the police

17  academy in January of 2021.

18  Q.      Three years?

19  A.      Roughly.

20  Q.      How long were you a corrections officer before

21  you became a corporal?  Do you remember?

22  A.      I don't fully remember, no, sir.

23  Q.      Were you -- could it have been -- was it a year

24  or longer?

25  A.      It was less than a year, sir.

1   Q.        Okay.  While you were a corrections officer --

2   A.        Yes, sir.

3   Q.        -- whether you're a corporal or corrections

4   officer, I assume that you came into contact with

5   various incarcerated individuals?

6   A.        Oh, yes, sir.

7   Q.        And could you describe for the jury some of the

8   duties that you had with regard to the -- dealing with

9   incarcerated individuals.

10  A.        I -- it depended on what area of the jail

11  you're working in.  In our booking area, your main

12  responsibility is searching inmates when they're

13  arrested, booking them into our roster system in the

14  jail.  If you're working in male housing where they were

15  housed, you're performing checks in the cells and

16  checking on the inmates and feeding and various duties

17  like that.

18  Q.        And in checking on the inmates --

19  you're -- you're required to check on inmates --

20  A.        Yes, sir.

21  Q.        -- correct?

22            And you're required to record when you check --

23  A.        Yes, sir.

24  Q.        -- inmates; correct?

25            And you knew that; correct?

1   A.      Yes, sir.

2   Q.      And I assume that you dealt with incarcerated

3   people charged with various crimes?

4   A.      Oh, yes, sir.

5   Q.      And -- and -- and encountered -- came into the

6   jail in various states?

7   A.      Yes, sir.

8   Q.      Correct?

9           Have you ever had to defend yourself?

10  A.      Yes, sir, I've had a few inmates attempt to

11  assault me and had to restrain them at that point.

12  Q.      Okay.  Have you ever had more than one

13  individual have to help you restrain an inmate?

14  A.      Some, yes, sir.

15  Q.      Okay.  That's not unusual, is it?

16  A.      No, sir.

17  Q.      You say you went to the police academy.  Let me

18  ask you this:  Have you watched the video?

19  A.      No, sir.

20  Q.      Okay.  When you went to the police academy, I

21  assume that they instructed you in defensive tactics?

22  A.      Yes, sir.

23  Q.      And various holds; correct?

24  A.      Yes, sir.

25  Q.      Force continuum; correct?

1  A.      Yes, sir.

2  Q.      Basically, you have to use what force is

3  reasonably necessary?

4  A.      Yes, sir.

5  Q.      No more; correct?

6  A.      Yes, sir.

7  Q.      And with respect to when you came on shift

8  on -- to relieve Sean Brown, you -- did you say you

9  arrived at 6:00 or 7:00?

10 A.      A little before 7:00, I believe.  Somewhere

11 between 6:50-ish, 6:55.

12 Q.      And you were 21 years old?

13 A.      Yes, sir.

14 Q.      And you knew to go check on Mr. Ling; correct?

15 A.      I -- I -- not him specifically, but just

16 inmates that were in booking in general is part of our

17 job.

18 Q.      You wanted to go check on the inmates?

19 A.      Yeah.  Yes, sir.

20 Q.      And when you checked on the inmate --

21 A.      Yes, sir.

22 Q.      -- on Mr. Ling, you noticed that he may need

23 medical attention?

24 A.      After Nurse Willoughby and I and the other

25 officer went in there, yes.

1 Q.        That's why you brought Nurse Willoughby in;

2 correct?

3 A.        Yes.

4 Q.        And was the other officer you brought in John

5 Paul white?

6 A.        I believe that was his name, but I do not fully

7 recall.

8 Q.        Okay.  You say "was his name."  Is he no

9 longer --

10 A.        Oh, I -- I honestly don't know.  I've not

11 talked to him in a long time.  Several years since he

12 left the jail.

13 Q.        Any idea approximately what his age was at the

14 time?

15 A.        Not exactly, no, sir.

16 Q.        Okay.

17 A.        I know he was older than me is all I can

18 remember.

19 Q.        Is it fair to say it was common sense for you

20 to go in and check on Mr. Ling and the other inmates?

21 A.        Yes, sir.

22 Q.        Part of doing your job; correct?

23 A.        Yes, sir.

24 Q.        Part of ensuring the safety of inmates and

25 officers; correct?

1   A.      Yes, sir.

2   Q.      I know you haven't watched the video.  Have you

3   heard anything about this Ling incident?

4   A.      No, sir, not other than what's --

5   Q.      That he was injured?

6   A.      Yeah.

7   Q.      And you -- and you don't recall whether or not

8   he was restrained or not?

9   A.      No, I don't know if he was restrained or not at

10  the time of the incident.

11  Q.      And I -- I assume you -- when you say

12  "protocol," I assume that there are other inmates that

13  are transported to the hospital that are fully capable

14  of being restrained behind their back?

15  A.      Yes, sir.  Our typical protocol if they were

16  being transported is they were placed in hand restraints

17  behind their back or using what they call a "belly

18  chain" to hold their handcuffs in place where they

19  couldn't move them.

20          With Mr. Ling, we just simply placed hand

21  restraints on him with his hands in the front.

22  Q.      Okay.  What's the thinking behind placing

23  someone behind -- cuffing someone behind their back?

24  A.      It limits their mobility and ability to attempt

25  to fight you and resist and swing at you.

1  Q.      Have you ever had any inmates attempt to fight

2  you or resist?

3  A.      Oh, absolutely, yes, sir.

4  Q.      Have you ever had any inmates refuse to do what

5  you ask them to do?

6  A.      Yes, sir.

7  Q.      With respect to Mr. Ling, when you went into

8  negative pressure cell -- did you say 1?

9  A.      I -- it was the single -- the only negative

10  pressure cell we had in --

11  Q.      Okay.

12  A.      -- our booking area.

13  Q.      If you were the corporal on the previous shift,

14  you would have checked on him; correct?

15  A.      Yes, sir, I would have.

16  Q.      You would have possibly sent -- you would have

17  seen if he needed medical care; correct?

18  A.      Yes, sir.

19  Q.      You would have called the on-call nurse;

20  correct?

21  A.      Yes, sir.

22  Q.      You would have -- if you couldn't get her, you

23  would have tried to call 9-1-1; correct?

24  A.      If not, due to a possible -- depending on his

25  condition, there's also a chance we would have just made

1    the decision ourself to take him to the hospital

2    directly instead of calling for EMS.

3    Q.       Certainly a possibility; correct?

4    A.       Yes, sir, absolutely.

5    Q.       And that's often faster than calling --

6    A.       Depending on how busy our EMS department is and

7    how many available -- available ambulances they have,

8    yes, sir.

9    Q.       You transported him to LaFollette Medical

10   Center?

11   A.       Yes, sir.

12   Q.       And you stayed with him there?

13   A.       Yes, sir.

14   Q.       And did I hear you say that you were on

15   the -- the Life Flight to UT Medical Center?

16   A.       Yes, sir, I was.

17   Q.       And you stayed with him there?

18   A.       Yes, sir.

19   Q.       And I assume you let the doctors and nurses do

20   whatever they needed to do?

21   A.       Yes, sir.  I didn't -- I -- we're just there to

22   make sure the inmate does not try to leave.

23   Q.       Do you have any information that Sean Brown did

24   not let the doctors and nurses do whatever they needed

25   to do for Mr. Ling?

1  A.       No, sir.  I've not heard anything like that.

2  Q.       Thank you.

3           THE COURT:  All right.

4           Any redirect?

5           MR. SMITH:  No, Your Honor.

6           THE COURT:  All right.  Thank you.

7           THE WITNESS:  Thank you, sir.

8           MR. SEATON:  Call Jeremy Goins.

9           THE COURT:  Jeremy Goins.

10          MR. SEATON:  Thank you, sir.

11          (The witness was duly sworn.)

12                      JEREMY GOINS,

13  called as a witness at the instance of the parties,

14  having been first duly sworn, was examined, and

15  testified as follows:

16                  DIRECT EXAMINATION

17  BY MR. SEATON:

18  Q.       Good morning.  State your name for the record.

19  A.       Roger Jeremy Goins.

20  Q.       And what do you currently do?

21  A.       I'm an investigator with the Campbell County

22  Sheriff's Office.

23  Q.       Okay.  So you're originally from Campbell

24  County; right?

25  A.       Yes, sir.

1  Q.      And you went to high school there?

2  A.      I did.

3  Q.      And you went straight into law enforcement

4  right after that --

5  A.      Yes.

6  Q.      -- right?

7          And you've worked through the department in a

8  lot of different capacities?

9  A.      Yes.  Yes, sir.

10 Q.      I think that when I took your deposition, you

11 said that you worked for four different sheriffs?

12 A.      Yes.  Four sheriffs, yes.

13 Q.      And that you've worked both as a road officer

14 and as a corrections officer?

15 A.      Yes.

16 Q.      And now you're an investigator?

17 A.      Yes.

18 Q.      And -- but back in June -- on June the 1st of

19 2019, you were the chief deputy?

20 A.      Yes.

21 Q.      Correct?

22          And if you would look at this Exhibit

23 Number 56, and what I did is I prepared a chain of

24 command based upon what you and the sheriff and Stoney

25 Love had told me.

1          Does that look accurate?

2    A.        Yes.

3    Q.        And, basically, what we did is, you know, in

4    terms of the lower level, we just included the officers

5    that were involved in the Ling event; correct?

6    A.        Yes, sir.

7    Q.        All right.  So there's been a little bit of

8    discussion about whether or not you were over Stoney

9    Love or Stoney Love reported directly to the sheriff.

10   What was your understanding?

11   A.        In -- in previous years with a different jail

12   administrator, it was different.  But from my

13   understanding of it, he would technically be under me.

14   But I don't know if that was ever clarified on paper,

15   so --

16   Q.        So you really didn't know if -- if you were

17   over -- over Stoney Love or not; right?

18   A.        Pretty much, yes, sir.

19   Q.        All right.  And the sheriff never made that

20   clear?

21   A.        No.

22   Q.        All right, sir.  So sheriff -- let's see.  In

23   essence, we do know that you were over all of the road

24   officers?

25   A.        Yes.  Yes, sir.

1  Q.      All right.  And so were you over all of the

2  jail people too?

3  A.      As far as daily responsibility, no, that's --

4  that's -- that wasn't necessarily my assignment at that

5  time.

6  Q.      Okay.  And I think that you told me -- may I

7  hand him --

8          THE COURT:  Ms. Laster will -- what is it that

9  you want to show him?

10         MR. SEATON:  The -- the policy manual.

11         Thank you.

12 BY MR. SEATON:

13 Q.      I'm showing you what we have previously marked

14 as Exhibit Number 1 and introduced to the jury.  Is that

15 the policy manual that you all operated under in June

16 of 2019?

17 A.      It appears to be the same policy, yes.

18 Q.      All right, sir.  And I think that you told me

19 when I asked you that you pretty much put a lot of this

20 together?

21 A.      This -- this was originally purchased by a

22 previous -- well, the administration prior to my being

23 there.  We've changed things inside of the -- of the

24 manual as time went on, you know.  Just amendments and

25 changes.

1  Q.      All right.  But did you tell me that you had --

2  you had gotten this manual from some other source and

3  then you made changes to it?

4  A.      We -- we were in the process of making changes

5  to another manual.  This manual was in place.  This one

6  that I have here was in place prior to me getting there.

7  But we made changes to this manual trying to get to --

8  to the -- the new policy.

9  Q.      But for the most part, you were the person that

10  was in charge of the policy or the operations manual of

11  the sheriff's department?

12  A.      Yes.

13  Q.      All right, sir.  And I think you told me that

14  this manual was not taught to the officers?

15  A.      It -- portions of it maybe, but it was also

16  given to them, and they were assigned -- assigned a

17  manual to -- to review.

18  Q.      So we've had a lot of testimony to where they

19  said -- a lot of them said that they hadn't received it,

20  but the ones that did say they received it, they got a

21  copy of -- of the policy manual and just had to sign for

22  it?

23  A.      A receipt, yes, of -- of getting the manual.

24  Yes.

25  Q.      All right.  But in terms of sitting them down

 1  and going through the policy manual and instructing

 2  them, that --

 3  A.        Not the entire manual.  Maybe parts of -- of

 4  the -- the manual.

 5  Q.        All right, sir.  Now, I want to go back to what

 6  happened with -- with -- with Nathan Ling.  You were not

 7  on duty at the time?

 8  A.        No, sir.

 9  Q.        Right?

10            And you were contacted about this; right?

11  A.        Yes.

12  Q.        And, you know, again, just to refresh your

13  memory, this was on a Saturday, June the 1st.

14  A.        Sounds --

15  Q.        Were -- were you contacted on Sunday or Monday?

16  Do you know?

17  A.        I -- I don't remember.  It was at night, so I'm

18  not sure.  I don't -- I -- I know -- I can tell you I

19  was at work.

20  Q.        And you first saw the video on that following

21  Monday; right?

22  A.        I believe so, yes.

23  Q.        All right.  And you watched it with Stoney

24  Love?

25  A.        I -- I -- yes, I think Stoney Love and maybe

1  Sheriff Goins.  I'm not sure if he was present or not at

2  the time.

3  Q.        All right.

4  A.        But I -- I believe it was with Stoney, yes.

5  Q.        And you had a disagreement with the sheriff

6  about what that actually showed, didn't you?

7  A.        I -- I think what our disagreement was is not

8  necessarily what had happened.  It's what -- the cause

9  of it as far as the injury because the information that

10  we had gotten from the officers and the reports is that

11  he had ran into a truck, and that seemed to me at the

12  time more -- more of a relevant thing for the injury

13  compared to what -- what we had saw in the video.

14  I think that was necessarily more the disagreement, that

15  he, I guess, thought otherwise, so --

16  Q.        I'm not following you because -- are you saying

17  that you thought that that -- or that you needed to

18  clarify whether or not Mr. Ling had -- had hit a truck

19  versus gotten all the trauma from the jail personnel?

20  A.        Yes.  Yes.  Yes, sir.

21  Q.        So that was your concern?

22  A.        That -- that was just the first observations

23  after I heard about the injury, the extent of the

24  injury, which I didn't actually know the extent of the

25  injury in the end.

1  Q.      Okay.  But did you -- did you disagree with the

2  sheriff about whether or not the officers were off the

3  rails?

4  A.      No, I -- we never really had necessarily an

5  in-depth conversation about that.  Maybe towards the end

6  when we had spoke later, but nothing -- nothing that I

7  recall of that.

8  Q.      Okay.  So when you first saw the video, did you

9  agree that these officers had used unlawful force?

10 A.      I felt like where he was struck was -- was --

11 made it very unreasonable to strike somebody there with

12 handcuffs.  That's what we had discussed.

13 Q.      And did anybody ever teach them not to strike

14 people with handcuffs on?

15 A.      We -- they're not taught to strike people with

16 handcuffs, period, as far as in the facial area or

17 anything like that.  You know, sometimes when you're

18 trying to restrain somebody in the car, it takes a

19 little force if they're handcuffed or something like

20 that.  As far as striking someone, I don't know of

21 anything that -- any training that would teach that part

22 of that, no.

23 Q.      Okay.  Did they not know any better?

24 A.      I -- I -- I would think common sense would tell

25 you not to -- to do that.  But from the same -- no,

1    they -- they should -- they should know that.  I mean,

2    that's -- that's things that are probably -- I mean,

3    it's been years since I've been in police academy -- are

4    taught in the academy at this point or prior years of

5    when they attended.

6    Q.       Well, all these folks didn't go to the police

7    academy, did they?

8    A.       The -- as far as the road officers, yes.

9    Q.       Okay.

10   A.       From my -- I'd have to look.  Yes.  No.  The

11   corrections staff, no.

12   Q.       They hadn't had any training, had they?

13   A.       As far -- I -- I can't speak for them

14   individually, but the requirement was TCI training for

15   them and the in-field training program, and they do an

16   orientation, I guess, in -- more in-depth training with

17   Mallory Smith or Campbell.  I don't remember.

18   Q.       Campbell?

19   A.       Yeah.  She conducted their training for them.

20   Q.       All right.  But you said TCI training.

21   That's -- that's a weeklong training by the State?

22   A.       I know it's the State training.  I don't know

23   the length of it anymore.  But yeah, it is.  That's what

24   TCI is.

25   Q.       And were you aware that Alexander Standridge

1  nor Joshua Miller had had any of that training?

2  A.        No, I was not.

3  Q.        All right, sir.  Now, you -- you -- I think you

4  told me that you felt that all of these individuals that

5  were involved in this had a duty to intervene and stop

6  any abuse by police officers?

7  A.        Any -- I think the State said that as well.

8  Now, we -- we -- we have to intervene, yes, as a law

9  enforcement officer.

10 Q.        It's a duty, isn't it?

11 A.        It is.

12 Q.        All right, sir.  But it wasn't taught?

13 A.        Not at that time, no.

14 Q.        All right, sir.  And as a matter of fact, you

15 all had in your policy manual a -- a requirement that in

16 the event any unlawful force was ever used, they had to

17 do a report; right?

18 A.        Yes, I believe so, about that.  Yes.

19 Q.        And nobody involved in this incident ever

20 submitted to you a report, did they?

21 A.        I -- I received two, and I -- I don't know what

22 they're called now, but use -- they were, I think,

23 called "use of force reports."  I think one was from

24 Dakota Williams and one was from Justin Crabtree.

25 That's the only two that I saw.

1    Now, if the jail staff had -- had any reports

2 that -- I did not -- no, I didn't see those.

3 Q.    I thought you told me in deposition that you

4 hadn't received any.  Let's look at your deposition on

5 page 43, line 21.

6    And I asked you, "And did they ever submit any

7 reports to you that there was" -- "that there was an

8 unlawful abuse?"

9 A.    No.  I -- I misunderstood you.  I apologize.  I

10 misunderstood your question.  They submitted use of

11 force reports, not unlawful abuse reports.  It was the

12 initial contact with -- with Mr. Ling, I guess, when --

13 but it wasn't -- it didn't say anything about unlawful

14 in the report.  It was just what they -- their actions

15 were.  I'm sorry.  I misunderstood that.

16 Q.    Tell -- and that's fine.  I'm not trying to --

17 A.    Right.

18 Q.    -- trip you up, you know.

19    Just -- just tell me -- tell us what the

20 difference is.

21 A.    Well, in this, it just -- what was stated in

22 there -- and I can't really go into the details 'cause I

23 don't have it.  But it was basically their actions and

24 what happened, the scenario, the narrative of what

25 happened, the -- that's, I guess, from their point of

1  view.

2       But I don't -- I didn't see anything as far as

3  someone reporting abuse in the report.  That's not --

4  that's what I misunderstood.

5  Q.     All right.  But there was abuse; right?

6  A.     I -- I think it was very unreasonable,

7  unlawful, yes.

8  Q.     And so they were required to report that abuse?

9  A.     By manual, yes.

10 Q.     And it did not occur?

11 A.     No.

12 Q.     All right.

13 A.     It wasn't -- it wasn't in any of those reports,

14 no.

15      MR. SEATON:  All right.  So can we pull up

16 Exhibit Number 8.

17 BY MR. SEATON:

18 Q.     And before we talk about this Exhibit Number 8,

19 you were kind of the top man at the totem pole, weren't

20 you?

21 A.     So to speak.  I mean, other than Sheriff Goins,

22 yes.  I mean, yeah.

23 Q.     But Sheriff Goins wasn't a real hands-on

24 sheriff, was he?

25 A.     It was, I guess, situational depending on --

1    but not -- not super hands-on, no.

2    Q.       All right.  So anything operational that needed

3    to be addressed, you addressed it; right?

4    A.       Yes.

5    Q.       The buck kind of stopped with you unless there

6    was something really big, and then you went to the

7    sheriff; right?

8    A.       Well, I kept him informed of, you know,

9    everything.  I mean, I guess over time, you know what to

10   bother your supervisor with and what not --

11   Q.       Sure.

12   A.       -- to with -- with time.

13   Q.       Sure.

14   A.       But, I mean, I -- I would notify him with

15   things that -- that -- that was required, yes.  But it

16   came to me, yes.

17   Q.       And you received a -- or you found out that

18   there had been a picture taken of Nathan Ling by Justin

19   Crabtree?

20   A.       I -- I did.  I don't remember when I found that

21   out, just to be honest, right offhand, but --

22   Q.       Okay.

23   A.       Yes.

24   Q.       And that was a serious violation of policy,

25   wasn't it?

1    A.       That -- yes.

2    Q.       Do you have -- is there -- is there a specific

3    policy that says that you don't take pictures of --

4    A.       I -- I don't know without -- without looking.

5    Q.       All right.  But it was also -- it was also

6    unprofessional?

7    A.       Yes.

8    Q.       Inappropriate?

9    A.       Yes.

10   Q.       And unacceptable?

11   A.       Yes.

12   Q.       Did anybody ever -- once you found out that

13   that picture had been circulated -- you -- you knew that

14   it got circulated among supervisors, didn't you?

15   A.       I -- I don't think I knew that until after TBI

16   did -- I -- I just -- I can't remember honestly when

17   I -- when that was -- was told to me 'cause I was told

18   in the middle of the night.  And, of course, I did not

19   receive anything like that, you know.

20   Q.       Okay.

21   A.       But I -- I don't -- I really don't remember.

22   Q.       That's fair enough.

23            So -- so you didn't know that Justin Crabtree

24   first sent the picture to his sergeant, Mike Owens?

25   A.       Later on, I did, yes.  I just don't know when I

1    did find out about it.  Yes.

2    Q.      All right.  And did -- did you respond or react

3    to the fact that you had an officer that was -- and a

4    supervisor that were sending these pictures out?

5    A.      I -- I don't -- I think I had a discussion with

6    the sheriff at some point about it, but I don't -- I

7    don't remember my actual reaction, no.

8           MR. SEATON:  Okay.  Let's go ahead and take

9    that down.

10   BY MR. SEATON:

11   Q.      And I think that you told us that you had an

12   absolute -- or that these officers had an absolute

13   responsibility to assess Mr. Ling's medical condition,

14   didn't they?

15   A.      Absolutely, yes.

16   Q.      And they didn't do that, did they?

17   A.      Not that I'm aware of, no.

18   Q.      And you don't even know if they had training to

19   do that; correct?

20   A.      As far as medical, first -- I mean, in -- in

21   law enforcement academy, yes.  Yes, they did.  It's

22   not -- I forgot what they call it now, but they do give

23   basic first -- first aid training, yes.

24   Q.      But that's -- that's the road officers that go

25   to the academy?

1   A.      Correct.

2   Q.      Right?

3   A.      Yes.  When you say "officers," that's where my

4   mind -- I apologize.

5   Q.      I'm sorry.  I'm sorry.

6           So -- but that's different than these

7   correctional officers; right?

8   A.      Yes.

9   Q.      And once someone is brought into that jail

10  across the threshold, it's the jail administration's

11  responsibility to assess their medical condition; right?

12  A.      Absolutely, yes.

13  Q.      All right.  And you were aware that Mr. Ling

14  never got any medical treatment which --

15  A.      I -- I knew that he was taken to the -- one of

16  the medical centers -- local medical center -- actually,

17  the local medical center at some point.  But other than

18  that, no, not that I'm aware of.

19  Q.      Before he was taken to the medical center, you

20  knew he was placed in the solitary cell?

21  A.      I think I found that out after, yes.  But I was

22  aware of that later on.

23  Q.      And that was -- he was placed there for six

24  hours; right?

25  A.      I did not know that, no.

1    Q.        Okay.  And when I talked with you at

2    deposition, you said that was horrible?

3    A.        That's -- that's not very good judgment, no.

4    Q.        All right, sir.

5    A.        Not -- not when he needs medical treatment.

6    It's not good judgment.

7    Q.        All right, sir.  So when you first found out

8    about this, you said that your -- your biggest concern

9    was to go and find out if maybe he had hit a truck and

10   the injuries were caused by hitting -- hitting a truck;

11   right?

12   A.        Well, I -- I went to the -- the actual scene of

13   where it happened.  He'd already -- from my

14   understanding, at the time, he was already at the

15   medical center up in Knoxville at the time of -- of

16   that.  That's when I went there.  I went -- I guess I

17   just went to find out and see where it happened, who was

18   present, things like that.

19   Q.        But you knew at that point in time he had a

20   traumatic brain injury?

21   A.        I did not know that.

22   Q.        Okay.

23   A.        I knew it was -- it was a severe injury.  I

24   didn't know what the injury was.

25   Q.        Okay.  But you knew he had been life-flighted

1   to the trauma center?

2   A.      I -- I did later, yes.

3   Q.      All right, sir.  And so you started an

4   investigation at that point; right?

5   A.      Yes.

6   Q.      And had you discussed with the sheriff starting

7   an investigation?

8   A.      I -- I spoke with him and I asked him

9   what -- who he wanted, you know, and he -- it ended up

10  in the conversation at some point it was me to go do

11  that.  And that's where I started was at the location of

12  the -- the incident.

13  Q.      So that was -- what? -- on a Monday or Tuesday?

14  A.      It was the -- I don't know without -- sir, but

15  it was possibly --

16  Q.      A couple days?

17  A.      Yes.

18  Q.      All right.  And so you and Matt Wasson, the

19  lieutenant --

20  A.      Yes.

21  Q.      -- went out to the neighbor's house; right?

22  A.      Yes.  Where the location was, yes.

23  Q.      And you interviewed the neighbor?

24  A.      We -- we spoke with two neighbors, I think, at

25  the --

1  Q.      All right.

2  A.      -- time, yes.

3  Q.      And you inspected their truck?

4  A.      Yes, where they said that he was.  He ran

5  and -- actually, it was told that it was through a -- a

6  garden that the neighbor had had, and there was a truck

7  sitting beside it.  And that's where we had walked down

8  to.

9  Q.      But nobody saw him run into a truck, did they?

10 A.      Not that I -- not -- someone said they heard

11 something that sounded like a collision like that,

12 I -- I -- I think, looking back -- or thinking back on

13 it, but I don't -- I don't think anyone said they saw

14 him, no.

15 Q.      All right.  And you -- you found no evidence on

16 the truck.  There's no dent or scuff mark or anything

17 like that on the truck?

18 A.      There -- there were a few.  To be able to

19 identify what it was, no.  It -- I could tell you it was

20 an older truck that was an actual metal body truck.  I

21 don't know how much evidence would be on that

22 technically, but it's not like a newer vehicle that was

23 sitting there.  So I -- as far as -- as identifying

24 anything, no, I wasn't able to.

25 Q.      So did you have the knowledge -- at that point

1  in time, you'd already watched the video; right?

2  A.        I think so.  I'm not -- I don't -- I don't know

3  with 100 percent certainty.

4  Q.        Okay.  But you did have the knowledge at that

5  point in time that an inmate had been severely abused?

6  A.        No, I don't think -- I don't think I knew

7  that -- the severity of it at the time, no.

8  Q.        Okay.  When did you find out the severity of

9  the abuse from the officers?

10  A.        I don't -- I don't remember.

11  Q.        Was it within a week?

12  A.        I don't know.  I don't recall the exact time

13  frame.

14  Q.        Okay.  And so -- I mean, was it a week, or

15  would it -- could it have been six months or --

16  A.        It wasn't six months.  I don't know that it was

17  a week.  I -- I don't know.  I -- I don't recall the

18  exact time frame.  It would have been -- it wouldn't

19  have been six months, but I -- I don't -- I don't know

20  exactly the exact time frame.

21  Q.        Sure.

22            Well -- well, let -- let me see if I can help

23  jog your memory because it's like if -- you watched the

24  video; right?

25  A.        Yes.

1    Q.        And the video was pretty clear that -- that the

2    inmate was being abused; right?

3    A.        Yes.

4    Q.        Very clear?

5    A.        It was clear, yes.

6    Q.        All right, sir.  So you knew that that had

7    occurred; right?

8    A.        Yes, at some point, but I don't know when that

9    was.

10   Q.        And were you concerned about getting to the

11   bottom of what all occurred, in other words, the root

12   cause of the problem?

13   A.        That -- that was the initial -- why I started

14   the investigation to figure out exactly what happened,

15   if -- if -- if that happened as far as the truck rolling

16   out, rolling in, whatever, and go from there.  That

17   was --

18   Q.        So you -- go ahead.

19   A.        I'm sorry.

20             That -- that was the -- that was the -- the

21   process of it.

22   Q.        Right.  That's what I'm trying to figure out.

23   You know, I'm trying to figure out, did you know -- had

24   you seen that video and knew of the abuse before you

25   started this investigation?

1  A.       I -- I don't remember if I -- I don't know if I

2  went up there that next morning immediately or came and

3  watched it.

4  Q.       Okay.

5  A.       I -- I don't know.

6  Q.       All right.  But you went to the neighbor's

7  office -- neighbor's house; right?

8  A.       Yes, the two -- there -- there -- the houses

9  are basically -- there's a field and a garden dividing

10 both of these homes.

11 Q.       Okay.  And what investigation did you do after

12 that?

13 A.       I'll be honest with you.  I don't know the

14 100 percent time frame.  I -- I took off a few days --

15 days and turned over the file to Lieutenant Long at some

16 point --

17 Q.       To who?

18 A.       Lieutenant John Long.

19          MR. SEATON:  Can we pull up 56?

20          THE WITNESS:  -- and came back, and then I -- I

21 think TBI was involved in it at some -- I don't exactly

22 remember the time frame of -- of -- of that at all.

23 BY MR. SEATON:

24 Q.       Okay.  'Cause this is the first time I've heard

25 the -- the name Lieutenant John Long.

1  A.      I -- well, that's -- that's who I gave it to,
2  but I don't think -- I don't think we talked about that
3  previously.
4  Q.      So would he have been on this chain of command?
5  Would he have been on par there or on the same line with
6  Matt Wasson?
7  A.      Yes.  Yes.
8  Q.      Okay.
9  A.      He was more over the investigative division, I
10 guess you could say, as far as the sheriff's office.
11 Matt was more patrol oriented.
12 Q.      Okay.  Okay.  So you say that you went to the
13 people's houses, and then you handed the file to this
14 Lieutenant Matt Long -- or John Long?
15 A.      John.  John, yes.
16 Q.      And you did nothing further in terms of
17 investigation?
18 A.      No.
19 Q.      Did you follow up with Lieutenant Long to
20 figure out if there was any further investigation?
21 A.      And I don't know the time frame or the time
22 delay in between 'cause I don't -- I'm trying to recall.
23 By the time that we -- I got back with Lieutenant Long,
24 TBI was involved in -- in the -- in the case.  They did
25 start an investigation, and I don't know that -- that

 1   time frame off the top of my head.

 2   Q.       Well, let me help you.  I want you to assume --

 3   you know, of course, this happened on June the 1st,

 4   2019.  I want you to assume that the TBI agent has

 5   testified that he didn't start his investigation until

 6   July the 15th.  That's a month and a half later; right?

 7   A.       Yes.

 8   Q.       So what investigation was going on before TBI

 9   got involved?

10   A.       I -- I don't know, no.

11   Q.       Did you have any conversations with the sheriff

12   or with Lieutenant Long or with Lieutenant Wasson or

13   Chief Jailer Stoney Love about we need to figure out

14   what happened so that this doesn't happen again?

15   A.       Not that I recall, no.

16   Q.       Okay.  So the investigation just dropped?

17   A.       It sounds like it, yes, sir.

18   Q.       All right, sir.  And then -- so what you did at

19   that point in time was just let TBI do their thing;

20   right?

21   A.       Yes.

22   Q.       And after TBI investigated for months -- I

23   think the officer said he investigated from July until

24   December, wrote a 482-page report.  Did you see that?

25   A.       No, sir, I -- I think I -- I -- I don't know.

1  I may have already been not with the sheriff's office at

2  that point.  I don't know the time frame of that.

3  Q.      Did you tell me when I asked you in deposition

4  that none of the policies or procedures of Campbell

5  County changed after the Ling incident?

6  A.      I -- I -- not -- not by me, no.

7  Q.      All right, sir.  And did you tell me --

8  A.      And I -- I know they're -- I think I -- I'm not

9  sure, but I think I told you the use of force policy did

10 change at some point.  But I don't -- I think it was

11 required by the State, so I don't know the time frame,

12 if they changed it or not.

13 Q.      All right.  When I asked you what could stop

14 this from happening again, from repeating itself, what

15 did you tell me?  Do you recall?

16 A.      I don't recall, no, sir.

17 Q.      I said -- let me show that to you.  That's

18 going to be on page 57, line 15 -- no, that's not right.

19 Yes, it is.

20         I said, "What do you think" -- "If you were

21 reinstated as the chief deputy of Campbell County

22 tomorrow, what do you think should change, if anything,

23 to stop something like this from ever happening again?"

24         Would you read your answer.

25 A.      It says, "Well, to be honest with you, it's

1　definitely a training issue in that situation.  You

2　know, as more" -- "as we talk, it would be definitely a

3　culture issue.  And the more we talk about the" -- "the

4　more we talk about this, a more defined policy and

5　officer understanding, and the supervision at the

6　midlevel" -- "at midlevel."

7　　　　　That -- that's what I said.

8　Q.　　　Okay.

9　A.　　　Can't recall verbatim what the --

10　Q.　　　There's the rest of that.

11　　　　　"And supervision also and changes in the upper

12　administration also"?

13　A.　　　Yes.

14　Q.　　　All right, sir.  So you're no longer involved

15　in the policy or the operations manual?

16　A.　　　No, sir.

17　Q.　　　Right?

18　　　　　All right, sir.  Thank you, sir.  Answer any

19　questions Mr. Knight has.

20　A.　　　Yes.  Thank you.

21　　　　　THE COURT:  Mr. Knight, I think -- I think I'm

22　going to take our lunch.

23　　　　　MR. KNIGHT:  Okay.

24　　　　　THE COURT:  Ladies and gentlemen, we're going

25　to take our lunch break now.  It's about 10 till 12:00.

```
 1   We'll come back at 1:05.  Enjoy your lunch.

 2              (Luncheon recess.)

 3              (Subsequent proceedings were heard but

 4              not requested to be transcribed herein.)

 5              THE COURT:  All right.  Mr. Knight, are you

 6   ready to proceed with --

 7              MR. KNIGHT:  Yes, Your Honor.

 8              THE COURT:  -- cross-examination?

 9              MR. KNIGHT:  Yes, Your Honor.

10                      CROSS-EXAMINATION

11   BY MR. KNIGHT:

12   Q.      Mr. Goins, are you employed anywhere right now?

13   A.      Yes.

14   Q.      Where are you employed?

15   A.      Campbell County Sheriff's office.

16   Q.      Where -- what is your --

17   A.      I'm an investigator there.

18   Q.      Okay.  And you're a former chief deputy;

19   correct?

20   A.      Yes.

21   Q.      What other positions have you held at Campbell

22   County Sheriff's Department?

23   A.      Sergeant.  I was a corrections officer many

24   years ago.  Sergeant, deputy, lieutenant, captain.  I

25   was a K9 handler and then chief deputy at the -- at the
```

1  last part.

2  Q.      Okay.  So not -- but you've -- you're an

3  investigator; correct?

4  A.      Yes.

5  Q.      And in June of 2019, you were an investigator?

6  A.      I -- I was not classified as an investigator,

7  no.  I was a chief deputy.

8  Q.      But you were charged with investigating;

9  correct?

10 A.      That's -- yes.

11 Q.      And I assume that's based on some experience

12 that you had had?

13 A.      Yes.

14 Q.      And as an investigator, you were charged with

15 determining what in the heck happened on June the 2nd,

16 2019; correct?

17 A.      Yes.

18 Q.      And what was the trauma, source of the trauma,

19 whatever, with regard to Mr. Ling; is that correct?

20 A.      Yes.

21 Q.      Now, Mr. Goins, when were you a corrections

22 officer?

23 A.      2003.  Early 2000- -- I don't know the exact

24 date.  It was -- it was -- that was probably the year.

25 Q.      One year?

1   A.      Not even a year, I don't think.

2   Q.      Okay.

3   A.      Eight months, nine months.  Something like that

4   possibly.

5   Q.      Okay.  And when you -- I assume you're POST

6   certified?

7   A.      Yes.

8   Q.      Okay.  And did -- have you received training on

9   the correction side also?

10  A.      It -- it was in-house training back then.  I

11  don't know what the actual requirements were.  Like when

12  we talked about TCI, I don't know what -- not really.  I

13  mean, honestly, it would probably have been in-house

14  training or something like that at that point.  I don't

15  know what the requirements were in 2003.

16  Q.      Let me get right to it.  On -- when you viewed

17  that videotape, you and the sheriff, I -- I -- I gather

18  that your concern may have been the source of the

19  trauma?

20  A.      Right.

21  Q.      Whether it was the punch or the pickup truck or

22  something else; is --

23  A.      Right.

24  Q.      -- that right?

25  A.      Yes.

1   Q.      And you thought that that needed to be looked
2   into?
3   A.      Yes.
4   Q.      When you -- and as part of that, you looked at
5   the video; correct?
6   A.      Yes.
7   Q.      And when you described to Mr. Seaton the abuse
8   that you saw in the video, you were -- would you agree
9   with me that you were talking about Justin Crabtree's
10  punches?
11  A.      Yes.
12  Q.      And, you know, realizing that Dakota Williams
13  was also there?
14  A.      Right.
15  Q.      And had one leg strike, I think?
16  A.      I -- I know it was a leg strike, but I don't
17  recall how many or -- yeah, I think it was a leg strike.
18  Yes.
19  Q.      And there were corrections officers there
20  holding Mr. Ling down; correct?
21  A.      I think -- I know that there were three.  I
22  don't know -- that were present there with him, yes.
23  Q.      Okay.  Did you see Mr. Ling moving?
24  A.      I don't recall if he was moving right off --
25  Q.      Okay.  We've all seen the videotape.  It's

1    been -- I take it it's been a while since you've --

2    A.        It's been a while, yes.

3    Q.        Okay.  Now, I think the -- Mr. Ling was in the

4    hospital at UT throughout the month of June; is that

5    correct?

6    A.        That seems correct, yes.  I don't know.

7    Q.        And then the TBI got involved or was asked to

8    get involved in performing an investigation in

9    mid-July --

10   A.        That's --

11   Q.        -- of 2019.  Does that sound correct?

12   A.        That sounds right from the conversation

13   earlier, yes.

14   Q.        And they generated a fairly large report?

15   A.        Right.

16   Q.        Correct?

17   A.        That's what I saw earlier, yes.

18   Q.        Yes.  I think 480 pages is what the TBI agent

19   indicated.

20   A.        Right.

21   Q.        And that there was more than one TBI agent

22   involved; correct?

23   A.        I have to assume, yes, with that, yes.

24   Q.        Okay.  And are you aware of any instance where

25   Campbell County withheld any document or other tangible

1    thing from the TBI?

2    A.       No, not at all.  No.

3    Q.       Did the -- the video that the TBI got to watch

4    was a video that was recorded by Campbell County.  Is

5    that not correct?

6    A.       It was from the -- the jail cameras from my

7    understanding, yes.

8    Q.       Okay.  And as a result of the TBI's extensive

9    investigation, three of the officers were charged?

10   A.       Yes.

11   Q.       Justin Crabtree?

12   A.       Yes.

13   Q.       And it's your understanding that he pled guilty

14   and went to jail?

15   A.       Yes.

16   Q.       Sean Brown?

17   A.       Yes.

18   Q.       And I think he pled guilty, and I think he's on

19   probation of some sort?

20   A.       I'm -- I'm not sure about him.

21   Q.       Okay.  And Dakota Williams was also charged,

22   but then the DA nolle prossed the charges and dismissed

23   the charges or --

24   A.       That's --

25   Q.       -- dropped --

1  A.        -- correct, yes.

2  Q.        Anybody else you're aware of after all this

3  investigation that was conducted by the TBI charged with

4  any crime?

5  A.        Not that I'm aware of, no.  I mean, I've not

6  seen that report obviously or I would probably know

7  that.

8  Q.        Well, are you aware, as a citizen of Campbell

9  County, as to whether or not -- well -- and employed by

10  the sheriff's department as to whether or not either

11  anyone else other than Justin Crabtree or Sean Brown has

12  been charged and pled guilty to a criminal offense --

13  A.        I'm not aware of anyone.

14  Q.        -- arising out of this?

15  A.        No, not aware.

16  Q.        You were asked by Mr. Seaton -- and this is not

17  his words, but my phrase -- as to whether or not you

18  acted as a functional sheriff?

19  A.        Me as the sheriff?

20  Q.        Yes.

21  A.        I wasn't the sheriff, but, I mean, I'm -- I was

22  the chief deputy.  I don't know.

23  Q.        Okay.  And under -- and you were the chief

24  deputy under Sheriff Goins?

25  A.        Yes.

1  Q.      And he was the sheriff.  He was elected by the

2  citizens; correct?

3  A.      Yes.

4  Q.      Not you?

5  A.      No.

6  Q.      And I think you indicated that you -- well,

7  Sheriff -- Sheriff Goins, he -- he goes back what?  12

8  years?

9  A.      I think he -- he was -- his term -- it was a

10 term of sheriff for 12 -- not a term, but he was

11 re-elected to three terms, which would be 12 years, yes.

12 Q.      Okay.  And you indicated that you had worked

13 for three other sheriffs other than --

14 A.      I would have to count.  I tried to do it in my

15 head quickly earlier, but it's been three -- yeah, three

16 to four.  Yes.

17 Q.      Okay.  So you've been an employee for quite

18 some time?

19 A.      I was with the City of Jackboro as a patrol

20 there for a while and chief of police over there a few

21 years ago.

22 Q.      You're a POST-certified officer?

23 A.      Yes.

24 Q.      And you viewed the video.  Could you think of

25 any excuse whatsoever that Justin Crabtree had for

1    punching Mr. Ling in the face?

2    A.        No.  Yeah, I -- you know, some things are

3    reactions, but repetitiveness is not, so --

4    Q.        And with respect to Sean Brown, could you think

5    of any reason -- I mean, you were a corrections officer.

6    I assume you dealt with other corrections officers --

7    that -- that a corrections officer would leave someone

8    in a negative pressure cell for over six hours?

9    A.        No.

10   Q.        That was a concern of yours; correct?

11   A.        I'll be honest with you.  I didn't know that

12   till later on, and then I think that goes back to the

13   jail part of the -- the -- the chain of command issue

14   there that we talked about.  The jail had an

15   investigator that handled things internally, so I -- I

16   guess it was a -- a communication there.  I -- I'm more

17   focused on the external part of it, not in the jail.

18   Q.        You've been on the road; correct?

19   A.        Yes.

20   Q.        You've arrested people; correct?

21   A.        Yes.

22   Q.        You've arrested people who would be considered

23   to be combative; correct?

24   A.        Yes.

25   Q.        You have arrested people who have -- have you

1    arrested people who have assaulted you?

2    A.        Yes.

3    Q.        Spit at you?

4    A.        Yes.

5    Q.        Cussed at you?

6    A.        Yes.

7    Q.        Fled from you?

8    A.        Yes.

9    Q.        These are often moment by moment decisions that

10   you have to make on the spot; correct?

11   A.        The response to it, yes.

12   Q.        And oftentimes these judgments are split

13   second; correct?

14   A.        Some, yes.

15   Q.        And your job as a deputy and ultimately, I

16   assume, as a correction officer, is to get that

17   individual under control?

18   A.        Yes.  In a reasonable way, yes.

19   Q.        Yes.

20             But the goal is to get him under control

21   reasonably and constitutionally?

22   A.        Yes.

23             MR. KNIGHT:  That's all I have, Your Honor.

24             THE COURT:  All right.  Thank you.

25             Any redirect?

1          MR. SEATON:  Yes, Your Honor.

2                    REDIRECT EXAMINATION

3     BY MR. SEATON:

4     Q.       And you agree that they were using unreasonable

5     force to get Mr. Ling --

6     A.       The strike to the head, yes.

7     Q.       All right, sir.  Well, there was more than

8     that, wasn't there?

9     A.       I -- I -- when -- when -- are you talking about

10    in the jail?  Is that what you're asking me?

11    Q.       Are you familiar with everything that they did

12    to Nathan Ling?

13    A.       I think I am, yes.

14    Q.       Were you familiar with -- did you watch the

15    video when they jerked him out of the patrol car?

16    A.       Yes, that -- that -- absolutely.  I did.  I'm

17    sorry.  Yes, I did see that.

18    Q.       And --

19    A.       That's pretty aggressive and unreasonable, yes.

20    Q.       Okay.  And did you know that they had slammed

21    his face up against the block wall?

22    A.       I did not know that, no.  That would -- that

23    would be very unreasonable, yes.

24    Q.       Yes.

25              MR. KNIGHT:  Object to the word "they," Your

1   Honor.

2           MR. SEATON:  Well, I'll -- I'll clarify that.

3   BY MR. SEATON:

4   Q.      So you --

5           THE COURT:  Sustained.

6           MR. SEATON:  Sure.

7   BY MR. SEATON:

8   Q.      So -- so you were aware that -- that Justin

9   Crabtree had pulled him out of the vehicle; right?

10  A.      Yes.

11  Q.      And you were aware that Sean Brown was standing

12  by?

13  A.      I -- I -- I was aware he was in there, yes.

14  I --

15  Q.      And Alexander Standridge?

16  A.      I -- yes.  I -- I didn't -- I didn't know him

17  by name, no.

18  Q.      All right.  And then Justin Crabtree slammed

19  his head up against the wall?

20  A.      See, I did not know that.  I -- I -- I -- when

21  I watched the video, I -- I saw them bring him out of --

22  pull him out of the car and then come onto the counter

23  of the -- I guess the booking area -- one of my booking

24  areas.  The "search area," I guess, is what it's called.

25  Q.      That was unreasonable, wasn't it?

1    A.       Yes.

2    Q.       And they slammed his head up against

3    the -- the -- the metal window casing?

4    A.       I didn't see -- I don't recall seeing that, but

5    I do recall seeing the other --

6    Q.       Did you see them pulling his arms up back

7    behind his back like that?

8    A.       No, I did not.

9    Q.       You didn't see that?

10           Do you think that could break a man's shoulder?

11   A.       It could -- it could harm someone, yes.

12   Q.       Okay.  And were you aware that Mr. Ling had a

13   broken shoulder --

14   A.       No.

15   Q.       -- because of his injuries?

16           Okay.  So you weren't really fully aware of all

17   the injuries he had?

18   A.       No.

19   Q.       You weren't aware that he had the shattered eye

20   socket?

21   A.       No, sir.

22   Q.       The broken nose?  Broken mouth?  Broken --

23   A.       No, sir.

24   Q.       Broken shoulder?

25   A.       No, sir.

1  Q.      Rib fractures?

2  A.      No.

3  Q.      So you understand, you know, we're here not

4  just about whether or not Justin Crabtree hit him once

5  or twice?

6  A.      Right.

7  Q.      We're here about the fact that nobody

8  intervened; right?

9  A.      Right.

10 Q.      And there was at least six officers that could

11 have intervened?

12 A.      Correct, yes.

13 Q.      Right?

14         And we're -- we're also here about the fact

15 that he was never given any medical treatment?

16 A.      Right.  And I wasn't aware of that --

17 Q.      Okay.

18 A.      -- till after -- way after.

19 Q.      All right.  And you were aware that after all

20 this occurred, Supervisor Owens texted Justin Crabtree

21 and said, "Welcome to Tennessee.  Play stupid games" --

22 did you never see those text --

23 A.      No, sir.

24 Q.      -- messages?

25 A.      I never saw those, no, sir.

1  Q.        Okay.  But you never looked at any of the

2  investigation; right?

3  A.        No.  No, not at all.

4  Q.        So you weren't aware that the TBI got the text

5  messages from your supervisor, Mikey Owens?

6  A.        No.

7  Q.        Okay.  And you weren't aware that he was

8  telling Justin Crabtree that "We're covering our asses"?

9  A.        No.  No, sir.

10  Q.        If you had known that, would you have taken

11  some action?

12  A.        Absolutely, yes.

13  Q.        All right, sir.  And you were aware that they

14  were taking pictures; right?  Or that Justin Crabtree

15  had taken pictures?

16  A.        I was told that after -- way after the fact

17  there was a picture or a -- that's what I was told.

18  Q.        And what did you do about that?

19  A.        I -- I'm not -- so I can't remember if TBI had

20  the -- the case at that time or not.  Nothing.  I -- I

21  did nothing.

22  Q.        And were you aware that Sean Brown had directed

23  Joshua Miller, who's going to testify next, as well as

24  Alexander Standridge to change their official reports?

25  A.        No, I don't -- I don't know Joshua Miller, so

1  I -- I don't know who that is.  No, I --

2  Q.      Okay.

3  A.      -- was not.

4  Q.      All right.  Would you have acted on something

5  like that?

6  A.      Absolutely, yes.

7  Q.      All right, sir.  Now, you said that -- you said

8  when Mr. Knight was asking you questions that the next

9  day you went out to the scene to figure out what could

10  possibly be the source of trauma other than what

11  happened in the jail?

12  A.      Yes.

13  Q.      Right?

14  A.      Yes.

15  Q.      And so once you had seen the video and once you

16  had known that he was life-flighted and once you had

17  known he had a traumatic brain injury and all these

18  other injuries and that a lot of the abuse had at least

19  been caused by the jail -- right?

20  A.      I would assume, yes.  Yeah.

21  Q.      Once you knew all of that, when did you attempt

22  to contact Nathan Ling's mother, Traci -- Traci Swanson,

23  about what all that happened?

24  A.      I -- I did not.

25  Q.      Whose responsibility was that?

1  A.      I -- him being in custody, it would have

2  been -- it would have been Mallory Smith -- Campbell.  I

3  can't remember -- or Stoney Love would be the -- the

4  jail staff -- the other administration.  I did not

5  contact anyone.

6  Q.      Well, let's go back to 56.

7          You were the chief deputy?

8  A.      Yes.

9  Q.      And you were the one doing the investigation;

10 right?

11 A.      Yes.

12 Q.      And everybody else points to you and says, hey,

13 Jeremy Goins was the one that was going to do the

14 investigation, including the sheriff; right?

15 A.      Yes.

16 Q.      All right.  So wouldn't it be your

17 responsibility to have contacted Nathan Ling's mother

18 and said, let me tell you what happened in our jail?

19 A.      Yes.

20 Q.      And when did you do that?

21 A.      I did not.

22 Q.      Ever?

23 A.      No.

24 Q.      Why?

25 A.      I -- I think at some point, Captain Love had

1    contacted her, and I -- I just didn't.  I didn't do it.

2    I have no reason why.

3    Q.       Did you check to see if it had been done?

4    A.       No.  We -- I think we had a conversation.  He

5    had spoken with her -- or his -- I can't remember at the

6    time the -- who he spoke with, but we had a conversation

7    about it.  But I don't -- I don't remember what parent

8    or who he spoke with.

9    Q.       And you were aware that he had stayed in the

10   ICU for 22 days with the traumatic brain injury?

11   A.       I -- yeah, I didn't know the length of time,

12   but -- yes.

13   Q.       Okay.

14   A.       It was -- it was a while, yes.

15   Q.       And would you think it's important that you

16   contact his next of kin?

17   A.       Yes.

18   Q.       And let them know that the jail was the cause

19   of that?

20   A.       Yes.

21            MR. SEATON:  All right.  That's all I have.

22   Thank you.

23            THE COURT:  All right.  Any -- any more cross?

24                      RECROSS-EXAMINATION

25   BY MR. KNIGHT:

1  Q.        Causation is ultimately an issue -- let's talk

2  about Sean Brown asking people to change reports.  You

3  don't know if he's actually -- you don't know if Sean

4  Brown actually asked someone to falsify a report, do

5  you?

6  A.        I -- I don't know whether he did or not.

7  I -- I don't know that.

8  Q.        It could have been because of grammar.  Would

9  you agree with me?

10  A.        I mean, everything's a possibility, I guess.

11  I -- I don't know.  I don't know.

12  Q.        Or filled out a form incorrectly?

13  A.        That's a possibility.

14  Q.        Okay.  And on this cause on the shoulder where

15  you're told that this is the cause of a broken shoulder

16  or possibly the cause of a broken shoulder, Justin

17  Crabtree also pulled Mr. Ling from the vehicle; correct?

18  A.        Yes.

19  Q.        And in the video, Justin Crabtree could be seen

20  as stomping on a shoulder.  Do you remember that?

21  A.        I don't specifically -- no, I don't.

22  Q.        Okay.  Now, the TBI, that's an outside agency;

23  correct?

24  A.        Yes.

25  Q.        They were called in by the district attorney;

1  correct?

2  A.       Correct, to my understanding, yes.

3  Q.       And all of their findings to the district

4  attorney, as far as you're concerned, that was their

5  duty?

6  A.       That's generally what they do, yes.

7  Q.       And the district attorney decided who to charge

8  and what the sentence is to be?

9  A.       Yes.

10         MR. KNIGHT:  That's all I have, Your Honor.

11  Thank you.

12         THE COURT:  All right.  Thank you.

13         MR. SEATON:  That's all.

14         THE COURT:  Thank you, sir.

15         MR. SEATON:  Next witness is Joshua -- wait a

16  minute.

17         (Off-the-record discussion between

18         plaintiff's counsel.)

19         MR. SEATON:  I'm sorry.  Greg Winston.

20         THE COURT:  Craig Winston?  Greg Winston.

21         MR. SEATON:  Yes, Greg Winston.

22         THE COURT:  Yes.

23         (The witness was duly sworn.)

24                    GREG WINSTON,

25  called as a witness at the instance of the parties,

 1    having been first duly sworn, was examined, and

 2    testified as follows:

 3                        DIRECT EXAMINATION

 4    BY MR. SMITH:

 5    Q.        Good afternoon, sir.

 6    A.        Afternoon.

 7    Q.        If you could please state your name.

 8    A.        My name is Gregory Winston.

 9    Q.        Mr. Winston, what is it that you do?

10    A.        I'm retired.  I'm a retired jail

11    superintendent --

12    Q.        Okay.

13    A.        -- from the Commonwealth of Virginia.

14    Q.        And are you currently -- I know you said

15    "retired."  Are you still on faculty with the

16    university?

17    A.        Yes, Radford University.  I'm on the graduate

18    faculty for criminal justice.

19    Q.        Okay.  How long have you been doing that?

20    A.        Several years.

21    Q.        And what do you teach?

22    A.        I'm currently teaching correctional theory.

23    Q.        Okay.  And are you able to do that, in part,

24    due to your long history in law enforcement?

25    A.        Yes, sir.

1  Q.        Can you briefly describe for the jury your

2  history in law enforcement.

3  A.        Sure.  So I -- originally, I went to college at

4  the George Washington University School of Medicine and

5  Health Science, became a paramedic, was hired as a

6  deputy sheriff in 1994 in the Commonwealth of Virginia

7  in Roanoke.  I was hired primarily as a deputy assigned

8  to the corrections division where I was responsible for

9  taking care of the healthcare of the prisoners in

10 custody, about a 300-bed local jail.  From there, I was

11 promoted to the rank of sergeant, took over the security

12 team, and then I worked as a shift supervisor for

13 several years.

14         I went to the Criminal Justice Training Academy

15 where I was made an instructor, so I'm a Department of

16 Criminal Justice Services instructor in the Commonwealth

17 of Virginia, teach to -- well, taught at the police

18 academy.  I was then moved to the rehabilitation

19 division of the corrections bureau where I was

20 responsible for home electronic incarceration, all the

21 rehabilitative programs, taking care of volunteers,

22 religious programs, school for the inmates in the -- in

23 the facility.

24         From there, I was transferred once again back

25 to the security team as a sergeant.  I was appointed to

1    the S.W.A.T. team where I eventually became S.W.A.T.

2    commander for about six years, teaching at the academy.

3    I was a Department of Criminal Justice Services firearms

4    instructor, was also an urban patrol rifle instructor,

5    use of force instructor, constitution law instructor,

6    inmates' rights for just general law enforcement

7    foundation at the Criminal Justice Academy.

8           At that point, I was eventually promoted to

9    chief of services where I was responsible for all the

10   inmate programming as well as all the support services.

11   That means inmate work programs, laundry services.  All

12   the medical services were -- were my responsibility.  I

13   was in charge of all -- all medical services as well.

14          And then after about 14 years at the sheriff's

15   office, I was hired as part of an 11-man transition team

16   to build and to open a 700- -- 805-bed regional

17   correctional facility in Western Virginia.  There was 11

18   of us, and I was initially hired as services chief.  My

19   responsibility was to negotiate all of the medical

20   services contracts, the telephone contracts, the

21   commissary contracts, build the facility maintenance

22   plan, create all the -- purchase all the supplies, bring

23   up the jail management networking infrastructure.

24          And then -- then I was transferred as chief of

25   security when we started hiring staff.  I was

1    responsible for the entire security division, hired 146
2    new corrections officers, responsible for getting them
3    through the training academy as well.  We were ACA
4    accredited.  We're -- we're accredited by the American
5    Correctional Association.  So I monitor those standards
6    and -- assuring that we're in compliance on the security
7    side with the -- with those standards.  So I spent -- I
8    brought that up.  I was responsible for inmate
9    transportation, inmate records, all of the tactical
10   operations, and all the security for the entire
11   facility.  And then I spent about six years there.

12           And then I went back to the sheriff's side of
13   the house as the chief deputy of -- of operations for
14   the Roanoke Sheriff's Office in Roanoke where I was
15   responsible for all three of the sheriff's divisions --
16   daily operations of the sheriff's divisions, court --
17   court security, as well as the jailhouse as -- jail
18   operations as -- as well as support services operations.
19   Spent two years as chief deputy in the city.

20           And then I was hired as the superintendent of
21   the New River Valley Regional Jail, a 1200-bed local
22   adult correctional facility in Western Virginia where I
23   spent six years before my retirement.
24   Q.      Thank you, sir.
25           So you have worked pretty much in every phase

1    of correctional and police department work from lowest

2    level of corrections up to deputy chief?

3    A.        Yes, sir.

4    Q.        Okay.  You're familiar with both medical --

5    you've actually got education as a paramedic?

6    A.        Yes, sir.

7    Q.        And you were a supervisor in charge of medical?

8    A.        Correct, both privatized and self-operated.

9    Q.        And you said you've been an instructor on

10   constitutional law?

11   A.        Yes, sir.

12   Q.        And, actually, you've done quite a bit of work

13   for the Department of Justice?

14   A.        Yes.  So I -- I -- I'm a Department of Justice

15   certified PREA auditor.  My main function for them is to

16   go around and make sure that prisons and jails are in

17   compliance with the Federal Prison Rape Elimination Act

18   of 2003.  I'm also an American Correctional Association

19   certified auditor for adult correctional institutions as

20   well as adult local correction facilities.

21   Q.        So according to federal law, jails need to be

22   audited from time to time, and you would be a jail

23   auditor for that?

24   A.        Correct.

25   Q.        And you would go and -- how -- what would you

1  do when you go and do a jail audit?

2  A.        So it's a formal jail audit.  It's -- it's a

3  structured audit where I would go and evaluate their

4  compliance with 45 standards that are written as part of

5  a compliance depending on the type of audit.  I do

6  functional audits for them as well where they'll bring

7  me in and say, are we ready for an ACA audit?  Are we

8  ready for a DOJ audit?  So I do some work on that side

9  of it as well.  Just go and evaluate their operation

10 depending what they're asking me to take a look at.

11 They maybe have certain areas where they need to focus

12 on or want to improve on or need ideas on or need some

13 consultation on how do they improve their jail

14 operations or come into compliance with some federal

15 standard or constitutional standard or anything.

16 Q.        All right, sir.  Mr. Winston, is all of your

17 career in law enforcement and your accomplishments

18 listed in your CV that you've provided to us?

19 A.        Yes, sir.  My education's in there as well.

20        MR. SMITH:  Exhibit 32, please.

21 BY MR. SMITH:

22 Q.        All right, sir.  What you're looking at, is

23 that an accurate reflection of your CV?

24 A.        Yes, sir.

25        MR. SMITH:  All right.  Your Honor, we would

1    ask to move Exhibit 32 into evidence.

2              MR. KNIGHT:  No objection, Your Honor.

3              THE COURT:  So ordered.

4              (Plaintiff's Exhibit 32

5              received into evidence.)

6              MR. SMITH:  Okay.  All right.  All right.  You

7    can take that down.

8    BY MR. SMITH:

9    Q.        All right.  Now, Mr. Winston, we have delved

10   into the -- into -- for the jury -- some safety rules.

11   I'm going to show you -- can you see this?

12   A.        No, sir.

13   Q.        Okay.

14             THE COURT:  Can you see it, Mr. Knight?

15             MR. SMITH:  I'll put it over here.

16             MR. KNIGHT:  Okay.  Is it okay if I stand just

17   to look at it?

18   BY MR. SMITH:

19   Q.        All right.  Can you see that, Mr. Winston?

20   A.        Yes, sir.

21   Q.        Okay.  And you see our first safety rule that

22   we developed is, "Our communities have a right to expect

23   law enforcement departments to train their officers in

24   order to protect us all from serious injury or death."

25             Do you agree that that's a requirement and a

1    right?

2    A.        Yes, sir.

3    Q.        Okay.  And we created a checklist here to see

4    if this right was violated or if it wasn't.

5              You understand in this case that Campbell

6    County does provide an operations manual?

7    A.        Yes, sir.

8    Q.        Okay.  And we said here that, "You have to

9    provide training to intervene when someone is abusing

10   another."

11             Is that absolutely necessary?

12   A.        Yes, sir.

13   Q.        Okay.  "Provide training to recognize serious

14   medical conditions."

15             Is that absolutely necessary?

16   A.        Yes, sir.

17   Q.        And "Provide medical assistance to those in

18   need."

19             Is that absolutely necessary by Campbell

20   County?

21   A.        Yes, sir.

22   Q.        Okay.  If three of those four are not done,

23   does this indicate to you that the rule has been

24   violated?

25   A.        Yes, sir.

1  Q.      All right.  And our second safety rule is, "Our

2  communities have a right to expect all law enforcement

3  departments to treat all persons within their custody

4  humanely in order to protect us all from serious injury

5  or death."

6          Is that absolutely a requirement by a county?

7  A.      Yes, sir.

8  Q.      Okay.  And we wrote here that, "You use only

9  reasonable force."

10         Is that absolutely necessary?

11 A.      Yes, sir.

12 Q.      And we have here, "Provide healthcare or

13 transport to a hospital when needed."

14         Is that absolutely required by a county jail?

15 A.      Yes, sir.

16 Q.      And, finally, we said, "You don't humiliate,

17 abuse, or excessively punish those in custody."

18         Is that true?  Does Campbell County have to

19 follow that?

20 A.      Yes, sir.

21 Q.      Okay.  If those are not done in this case, has

22 this rule been violated?

23 A.      Yes, sir.

24 Q.      Thank you.

25         What do we -- and you're one of our hired

 1  experts?

 2  A.        Yes, sir.

 3  Q.        What did we ask you to do for the jury?

 4  A.        You gave me the materials for the case and

 5  asked me to give you an objective evaluation, analysis

 6  of the case.

 7  Q.        Is it --

 8  A.        And --

 9  Q.        Is it important that it was objective?

10  A.        Yes, sir.

11  Q.        Why?

12  A.        Well, it's fundamental to me.  I have no

13  inherent bias as to what's going on with the case.  I

14  have no dog in the fight, so to speak.  I'm here to

15  evaluate the behaviors in the case that were presented

16  to me, and -- and my obligation is to give you an

17  objective analysis because that's what's fundamentally

18  fair.

19  Q.        How much work for a plaintiff's side have you

20  done?

21  A.        None.

22  Q.        None.

23            How much work for a defense side have you done?

24  A.        A lot.

25  Q.        In fact, were you hesitant to do work for us?

1  A.      Yes.

2  Q.      Why?

3  A.      In my experience, in some cases, it's been --

4  sort of been negative, and so I -- I was very thankful

5  when I had an opportunity to speak to you guys and know

6  that, you know, it -- you were fair and balanced and

7  weren't -- weren't, you know, trying to bully anybody or

8  get me to say something I -- I wouldn't say.  If it's

9  wrong, it's wrong.  If it's wrong, it's wrong.  And so

10 that's not always been my experience.

11 Q.      You said you reviewed materials in this case.

12 Do you recall specifically what you reviewed to come to

13 your conclusions?

14 A.      I reviewed the policy and procedures, the TCI

15 standards.  I reviewed all the depositions as well as

16 all the videotape associated with the -- the incident as

17 it occurred and unfolded as well as the -- the final

18 report from the state police.

19 Q.      The Tennessee Bureau of Investigation?

20 A.      Correct, and that included the medical report

21 as well.

22 Q.      Okay.  And you believe that was sufficient to

23 help you -- assist you reach these conclusions?

24 A.      Yes, sir.

25 Q.      Now, since you have stated that you have

1    experience as an -- instructing on constitutional law,

2    did you see that certain constitutional rights were

3    violated in this case?

4    A.        Yes, sir.

5    Q.        Which ones specifically did you see?

6    A.        Well, I -- I -- based upon my analysis, I feel

7    as if he wasn't provided medical attention, that there

8    was not a recognition of a serious medical need.

9    Nothing was done about it.  It was ignored for a period

10   of time -- a lengthy period of time.

11             In addition to that, he was -- they used

12   excessive force, in my opinion.

13   Q.        And what did you see to help you come to that

14   conclusion?  Just the video or anything else?

15   A.        The video and reading the reports.

16   Q.        All right.  I first want to focus on the

17   training on intervention.  Okay?  Is it important for a

18   county to train its jail staff to intervene when they

19   see an abuse by a fellow officer?

20   A.        Well, it's -- it's absolutely fundamental to

21   any use of force program to have a component if that --

22   where they're trained on how and when to intervene for a

23   couple of different reasons.

24             Do you want me to expand on that?

25   Q.        Please.

1  A.        First and foremost, it provides an opportunity

2  to immediately defend someone whose rights are being

3  violated, to stop the actions or behaviors that are, you

4  know, wrong and excessive.

5        In addition to that, duty to intervene, or DTI,

6  programs as part of a fundamental use of force program

7  is an absolute minimum requirement because it also

8  allows certain minimum -- minimum standards established

9  by the county in terms of expectations.  But it can also

10  be a tool for supervisors to use to recognize early

11  warning signs of individuals that may need more training

12  in use of force so that it doesn't get to the point

13  where they're abusive and violating civil rights of the

14  detainees or the prisoners.

15  Q.        Now, this jury has heard a lot of testimony

16  about the TCI training that certain correctional

17  officers receive.  Do you understand what the TCI

18  training is?

19  A.        It's -- it's -- it's -- it's an introductory

20  level training exposing new detention staff to the

21  operations of local jails.  It's a universal training.

22  It's done by the Tennessee Correction Institute.  And I

23  believe it has to be done within a year.  And they're

24  based upon familiarizing new detention staff with the

25  jail standards and the operations of local jails.  And

1  it's -- it's universal.  It's not site specific.

2  Q.       Now, if the TCI doesn't train on certain areas,

3  shall we say, such as intervention, whose job is it to

4  train them on those standards?

5  A.       The locality, the municipality, the -- the --

6  the county itself.  They have to -- you know, one of the

7  things they have to do as part of your evaluation when

8  you're bringing folks into -- to your operation to

9  ensure that they're minimally trained and they're

10 adequately trained is you've got to evaluate the

11 training that they went through and see if it's

12 sufficient.

13          And then if it's not sufficient or

14 constitutionally minimally sufficient, then you -- it's

15 your obligation to provide that additional training to

16 ensure that they're able to do the job technically, but

17 also in accordance with the law and in accordance with

18 the constitution.

19          So it's -- it's the obligation of the county

20 to -- to ensure that they're getting that minimum

21 training.

22 Q.       So Campbell County was -- had a duty to train

23 its officers on any areas that were deficient in terms

24 of the jail staff?

25 A.       Correct.

1  Q.      All right.  Now, from the materials that you've

2  seen, what training did Campbell County provide its jail

3  staff to intervene when they see abuse by fellow

4  officers?

5  A.      I wasn't able to find any -- any training that

6  was provided for duty to intervene.

7  Q.      And if the TCI doesn't train to intervene, that

8  would be the responsibility and the duty of Campbell

9  County to do so?

10 A.      Yes, sir.

11 Q.      In -- in your opinion, sir, from what you've

12 seen in this case materials, was Campbell County's

13 training adequate on when and how to intervene when a

14 fellow employee is abusing a detainee?

15 A.      No.

16 Q.      Now, I want to go into an area -- the jury's

17 going to hear about this, but they need to understand.

18 Do you -- do you understand the term "deliberate

19 indifference"?

20 A.      Yes, sir.

21 Q.      Okay.  So what -- in your opinion, what is

22 deliberate indifference?

23 A.      Well, if you knew or should have known a

24 serious risk, whether it be a medical risk or a security

25 risk or -- or risk of violence to an inmate or risk of

1    harm -- serious harm and you don't do anything, you

2    ignore it, and thus, the outcome is inevitably harm or

3    serious injury or -- again, you know, it's an obligation

4    to -- to protect folks, you know, who are in your

5    custody.

6            If you know or should have known and you failed

7    to act, that's acting with deliberate indifference.

8    Just ignoring it, doing nothing.

9    Q.      All right, sir.  This -- there's been testimony

10   in this case where certain things are common sense, that

11   we don't need to train on them.  What do you believe

12   about that?

13   A.      Well, I -- I think certain people are blessed

14   with common sense.  I'm thankful for that.  But at the

15   end of the day, it's -- it's irresponsible to rely on

16   common sense without formalized training to ensure that

17   your common sense is consistent with the county's common

18   sense or the sheriff's common sense or the federal

19   court's common sense, you know.

20           So it's incredibly important that you -- if

21   somebody does have common sense, we're very thankful for

22   that.  But at the end of the day, there must be some

23   formalized training in some way to ensure that

24   everyone's consistently applying the common sense.

25   Q.      Sir, is dealing with a person who is a

1  combative detainee supposed -- is that a fairly common

2  thing in a jail setting?

3  A.      Yes, sir.

4  Q.      Is it fairly common for people who are

5  considered to be combative to be arrested?

6  A.      Yes, sir.

7  Q.      So it would have been a fairly common routine

8  for Campbell County Jail staff to encounter people that

9  would be combative?

10 A.      Yes, sir.

11 Q.      So was it an obvious needed training for

12 Campbell County deputies to be trained on when to

13 intervene when an officer is abusing a detainee?

14 A.      Yes.

15 Q.      Obviously needed training?

16 A.      Without any question.

17 Q.      When a county fails to train its employees to

18 intervene, what are the consequences of that failure?

19 A.      Well, the inevitable consequence is somebody

20 can be hurt or the county can -- you know, somebody can

21 violate somebody else's civil rights.  I mean, that's

22 inevitable.  You know, the circumstances presented are

23 so common in that area that failing to provide that

24 training almost ensures that there's going to be a

25 negative outcome.

1    Q.      Well, if the argument's made, well, this -- you

2    know, in the jail setting, we don't know of prior

3    incidents, we don't need to do it now, what would you

4    say to that?

5    A.      I'm -- sir, I -- I don't understand the

6    question.  I apologize.

7    Q.      So if the argument is made that, well, we don't

8    know of prior incidents at the jail of abusing a

9    detainee, why should we need to train on it, what --

10   A.      Well, just because you don't know of any prior

11   instance -- hopefully there's never -- an incident of

12   abuse never occurs in the facility.  There may be a lack

13   of reporting that -- that incident.  But you do have a

14   minimum obligation to ensure that everybody understands

15   that if it hasn't happened, great.  It's not going to

16   happen.  There's zero tolerance.  And it's -- it's

17   your -- your requirement that if you do see this, not

18   only should it be matched with a DTI, or a duty to

19   intervene, training, but also a duty to report.  You

20   know, those things go hand in hand.

21   Q.      In your opinion, sir, when a county fails to

22   provide training to intervene against abuse, is

23   excessive force a foreseeably -- foreseeable result of

24   that failure to train?

25   A.      Repeat the question again?

1  Q.       Sure.

2            When a county fails to train on --

3            MR. KNIGHT:  Relevance.  Excessive force has

4  been --

5            THE COURT:  Say that again?

6            MR. KNIGHT:  Objection.  Relevance on the

7  excessive force.

8            MR. SMITH:  Your Honor, we have to show that

9  this was a foreseeable result.  I'm just asking about

10 that.

11           MR. KNIGHT:  He also used the term "excessive

12 force," which has been --

13           THE COURT:  Which has been what?

14           MR. KNIGHT:  Dismissed.

15           MR. SMITH:  It -- it goes hand in hand with

16 what we have to prove, Your Honor.  Not -- not the

17 excessive force, but the constitutional violations.

18           THE COURT:  Okay.  I want you to rephrase it.

19 Can you rephrase your question?

20           MR. SMITH:  Sure.  Yes, sir.

21           THE COURT:  Okay.

22 BY MR. SMITH:

23 Q.       Mr. Winston, when a county fails to train on

24 intervening, is it reasonably foreseeable that

25 constitutional violations will occur or can occur?

1   A.      Yes.

2   Q.      And should it have been reasonably foreseeable

3   to Campbell County that if they failed to train to

4   intervene that constitutional violations like what

5   happened to Nathan Ling would happen?  Should they have

6   been foreseeable?

7   A.      Yes.

8   Q.      Okay.  Now, you've seen the video of this

9   entire incident?

10  A.      I have.

11  Q.      I'm not going to show the entire video, but I'd

12  like to pull up Exhibit 48.  We're just going to play a

13  portion of it.  All right?

14          (The video was played in open court, and the

15          proceedings continued as follows:)

16  BY MR. SMITH:

17  Q.      Do you recognize this, sir, as the sally port?

18  A.      Yes, sir.

19  Q.      Okay.

20          MR. SMITH:  Okay.  Go ahead and play that,

21  Joseph.

22          (The video was played in open court, and the

23          proceedings continued as follows:)

24          MR. SMITH:  All right.  Stop.  Go back to the

25  beginning of the video, please.

1          (The video was played in open court, and the

2          proceedings continued as follows:)

3   BY MR. SMITH:

4   Q.        Okay.  Mr. Winston, in your opinion, when was

5   the first time excessive force was used against Nathan

6   Ling?

7   A.        In my opinion, when they drug him out of the

8   car onto the concrete floor.

9          MR. SMITH:  Can you go to that moment, Joseph.

10          (The video was played in open court, and the

11          proceedings continued as follows:)

12          MR. SMITH:  Okay.  Stop.

13   BY MR. SMITH:

14   Q.        So right there?

15   A.        Yes, sir.

16   Q.        And you see you've got two jail staff -- Sean

17   Brown, Alexander Standridge -- standing right there?

18   A.        Yes, sir.

19   Q.        That should have been the first sign that they

20   should have recognized that this was excessive force?

21   A.        Yes, sir.

22   Q.        What should have happened at that point if they

23   had been properly trained on recognizing and reacting to

24   be able to intervene?  What should have happened here?

25   A.        In this particular circumstance, you have to

1    appreciate the fact that, number one, he's in mechanical

2    restraints, so he's not a sufficient threat.

3    There's -- there's no indication in the video that he's

4    kicking or trying -- attempting to assault anyone.  So

5    this is also an important idea of had they been properly

6    trained, at this point, he -- they could have -- he

7    could have been placed prone on the ground.  Two

8    deputies -- one could have gotten on each arm.  The

9    exigency stopped; right?  There was no rush to intervene

10   in that particular case.

11           He's -- he's confined at the sally port.  He's

12   in mechanical restraints.  He could have simply been

13   forced prone to the ground, one deputy on each arm, and

14   brought him up to his feet.  But there was no -- no rush

15   to be able to -- to move him quickly into the sally

16   port.  He's -- he's in restraints.

17   Q.      So when Corporal Brown and Deputy Standridge,

18   when they see or should have seen this abuse, what

19   should they have done right then and there?

20   A.      They should have just told the law enforcement

21   deputy that -- hey, get him on the ground.  We'll take

22   him from here.

23   Q.      They should have physically separated the two?

24   A.      They should have at least told him to stop,

25   we'll take him from here.  Depending on how you enforce

1    your policy, some policies call for physical

2    intervention when something -- when abuse is occurring.

3    Some policies use a code word.  Red, yellow, green,

4    whatever it may be, depending on -- and that's -- that's

5    where the training comes into play.  They're all one --

6    one organization, so, you know, had -- had the county

7    provided a universal training system for all the

8    deputies in -- in the area in the -- in the

9    organization, they would have known, okay, red means

10   stop or green means, you know, slow down or yellow, stop

11   doing it, whatever it may be.  Then they would know.

12           It gets complicated when you have

13   cross-jurisdictional -- like if the state police brought

14   somebody and they started showing off.  They don't --

15   they don't train, so they may not know.  You may have to

16   either physically stop them or tell them you need to

17   stop.  So it just depends on your policy and how you

18   train.

19   Q.       And should that have been an obvious indicator

20   of abuse by the way that Deputy Crabtree pulled Nathan

21   Ling out of that vehicle?

22   A.       Yes, that's -- that's not a trained technique,

23   let's say.

24   Q.       Now, there's been an argument made that there's

25   no possible way they could have intervened to prevent

1  Nathan Ling from being forced up against the wall after

2  this.  Is that true?

3  A.        No.

4  Q.        Why not?

5  A.        Well, there was two deputies there, and he was

6  in mechanical restraints.  It would have been -- it's

7  easy to just one deputy grab one -- one arm and one

8  deputy grab the other and just tell the -- tell the law

9  enforcement that hey, we've got him.  He was obviously,

10 in my opinion, based on his behavior, irritated, which

11 is a red flag.

12 Q.        Now, we've only seen this part of the video

13 right here, but you move into the booking area of the

14 trap area, and the abuse continues from there; right?

15 A.        Correct.

16 Q.        And there's a lot more jail staff there than

17 there are road officers?

18 A.        Correct.

19 Q.        And any one of them should have been trained on

20 intervening?

21 A.        Yes.

22 Q.        And would have been able to react and intervene

23 in the case to protect this detainee or had a duty to?

24 A.        Correct.

25 Q.        There was time for --

1    A.        Yeah.

2    Q.        -- all of them to do so?

3    A.        Yes.  Like I said, once -- once he's confined,

4    it does minimize the exigency.  It's not as if he's free

5    to go.  And so you can typically -- in -- in

6    correctional use of force, time's on the side of the

7    actor -- the corrections officers to plan and prepare

8    and try to mitigate use of force, you know.  Their --

9    their obligation here is not -- not to be abusive.  It's

10   to do what they can to mitigate the need to use force.

11   You know, the idea is not -- we're not looking for a

12   fight.

13            Proper training would tell you that we've got

14   time.  He's -- he's not going anywhere.  And if you got

15   to hold him in the prone position for a few minutes till

16   he calms down if he's yelling or screaming or whatever

17   it may be, you got time to wait.  Get enough people

18   there so that you can control him without having to be

19   abusive.

20   Q.        And isn't it true, sir, that this is a -- one

21   of the road officers that started this abuse, isn't that

22   more imperative that your jail staff is trained to

23   intervene because it's a fellow officer?

24   A.        They have an obligation to do that.  Like I

25   mentioned before, duty to intervene policies do a couple

1   of things to prevent immediate abuse, but they also

2   allow -- it's a protective measure for your -- your

3   coworkers to say, whoa, whoa, hang on a second.  You

4   know, we got this.  Take -- take a step back.  And then,

5   you know, reporting that behavior.

6           Again, it's a red flag.  Theoretically, this is

7   foundational.  Duty to intervene is foundational, and

8   that's why it's required training because you can

9   prevent future instances of abuse or save somebody's

10  career.

11  Q.      So we have the supervisor, Sean Brown, over the

12  entire jail that night failing to intervene?

13  A.      Yes, sir.

14  Q.      Did you have any evidence whatsoever that you

15  determined that he had even been trained on -- to

16  intervene?

17  A.      No, sir.

18  Q.      Is that important to the lower level officers

19  when a supervisor hasn't had that training?

20  A.      It's -- it's a foundation of their

21  responsibilities to ensure that they're properly trained

22  to recognize instances of abuse or potential instances

23  of abuse.  They have an obligation running the

24  jailhouse.  You're obligated to protect not just the

25  staff and the property and maintain order, but you're

1  also obligated to provide protective measures for the

2  detainees.

3       And preventing abuse by having -- by being

4  properly trained in use of force as well as duty to

5  intervene is fundamental to providing that

6  constitutional right of protection for the prisoners.

7  And there's -- there's -- they just didn't.  They failed

8  that.

9  Q.      Now, there's been testimony here from the

10 sheriff, from the higher-ups, all -- chief deputy,

11 sheriff, but also Sean Brown conflicting on who actually

12 has control over Nathan Ling when he gets to jail.  The

13 sheriff has testified that it's immediately the jail's

14 authority.  Sean Brown says he didn't know that -- until

15 the paperwork was signed that he had authority over the

16 inmate.

17      What's -- what's the correct answer there?

18 A.      Well, so I will tell you that depending on the

19 state, there are multiple correct answers.  In this

20 particular case, my analysis is that signing the

21 commitment documents, in some cases, is required before

22 you turn over custody.  In this particular case, my

23 analysis is that they're the same organization, so

24 there's no issue with who does this prisoner belong to.

25 He belongs to the sheriff's office, and they all work

1    for the sheriff's office.  So if I step up and say,

2    okay, I got him, you need to go to the bathroom, I got

3    this, that's not an issue.

4            So the commitment documents themselves being

5    signed -- you know, the right answer is when they come

6    into the jailhouse, which includes the sally port or

7    jail transportation vehicle, they belong to the jailers.

8    And, ultimately, the supervisor or jail chief is

9    responsible once they enter the jail for the care,

10   custody, and control of those inmates, period.

11           And him not being able to recognize due to a

12   lack of training that he is -- what his role was

13   is -- is a problem.

14   Q.      So it's a problem that the person in charge of

15   the entire jail has testified he was trained that way to

16   not know that he was in charge of that inmate when they

17   were brought to the jail?

18   A.      Correct.

19   Q.      That's a problem?

20   A.      That's a problem.

21   Q.      Okay.  Do you have an opinion, sir, for if this

22   lack of training to intervene, was that the main reason

23   why these constitutional violations happened to Nathan

24   Ling?

25   A.      There's no indication in -- in the record or --

1  that it would have gone any farther had an intervention

2  occurred --

3  Q.        So you --

4  A.        -- based upon the behavior of -- of Mr. Ling.

5  The behavior of the detainee should drive the

6  inevitability of the use of force.  Or if there are any

7  indications that he was behaving poorly or trying to

8  assault staff or destroy property or being disorderly,

9  then -- then -- then maybe.  But there's no indication

10 in the record that anything else would have occurred had

11 intervention -- if -- if they had intervened and stopped

12 the abuse or, I guess, as you put him on the ground

13 outside.

14 Q.        So if Corporal Sean Brown, Alexander

15 Standridge, Joshua Miller, all of the other jail staff,

16 if they had just received this training on recognizing

17 abuse and intervening when they observed it, none of

18 this would have happened?

19 A.        That's my opinion.  None of it would have

20 happened.

21 Q.        Is it that failure of the county not to train

22 on that, is that the moving force behind why this

23 happened?

24 A.        Yes.

25 Q.        Thank you, sir.

1      And do you believe, sir, that Mr. Ling's

2  injuries were actually caused or related to this failure

3  to train?

4  A.      Yes.

5  Q.      Let's move on to the medical care, recognizing

6  medical situations and providing medical care.  What

7  medical professionals were at the jail, to your

8  understanding, when Nathan Ling arrived?

9  A.      None.

10  Q.      Now, is it important that a county train its

11  jail staff to provide medical care and recognize when

12  people are experiencing serious medical conditions?

13  A.      Yes, it's fundamental.

14  Q.      Why?

15  A.      Because as -- as the jail -- you know,

16  obviously, Mr. Ling can't call out.  He can't go to the

17  doctor by himself.  He's in confinement.  But the

18  jailers have a constitutional obligation to provide

19  medical care to folks who -- who are -- have a serious

20  medical need.  You can't do that if you haven't been

21  trained how to recognize what a serious medical need

22  looks like.  You just can't.

23          There's no -- without that training, then it

24  inevitably stops there.  You know that -- that there

25  will be a constitutional violation because at minimum,

1    you don't even have the training to recognize that

2    there's a problem.

3    Q.       And they don't even have the recognition to

4    call 9-1-1?

5    A.       Correct.

6    Q.       'Cause they don't even know that there's a

7    problem?

8    A.       They don't know it's a serious medical problem

9    he's got going on.

10   Q.       I mean, anyone can dial 9-1-1?

11   A.       Correct.

12   Q.       They just don't have any idea that it needs to

13   happen?

14   A.       That's right.

15   Q.       Have you seen any evidence whatsoever that

16   Campbell County provided its jail staff to recognize

17   serious medical conditions and provide medical care?

18   A.       No.

19   Q.       In your opinion, was Campbell County's training

20   on providing medical care and recognizing serious

21   medical conditions adequate?

22   A.       No.

23   Q.       Is it also absolutely necessary for a county to

24   do?

25   A.       Absolutely necessary, because as I said

 1   before -- I'm going to restate it again -- is that

 2   the -- the folks in the jailhouse, the supervisor and

 3   all the -- the detention staff have a constitutional

 4   obligation to provide healthcare -- access to healthcare

 5   if somebody has a serious medical need.

 6           And if you don't -- if you have not been

 7   trained on what is a serious medical need, then

 8   inevitably you will fail at meeting the constitutionally

 9   minimum requirements for providing access to healthcare.

10   Q.      And, again, the term "common sense" has been

11   passed around.  Even as -- even if it is common sense,

12   is it an obvious training that has to be provided by the

13   county?

14   A.      Yes, you can't leave that up to common sense.

15   Q.      Because you've got people who depend on their

16   care.  They can't just leave.

17   A.      Correct.

18   Q.      They can't go to the doctor.  It's up to the

19   jail staff to give them that care?

20   A.      Correct.

21   Q.      Is it an obvious consequence of this failure to

22   train that a person will be deprived of medical care and

23   their condition will go untreated?

24   A.      Yes.

25   Q.      And is it your opinion that this was very

1    foreseeable by Campbell County by failing to train that

2    this result would happen?

3    A.       Yes.

4    Q.       And in your opinion, based on the videos that

5    you've seen, when is the first time that these jail

6    staff should have recognized, hey, this guy needs

7    medical care, needs medical attention?

8    A.       I believe, in my opinion, once he got into

9    the -- the search area and was confronted by -- you

10   know, dropped to the floor by the staff and his -- his

11   head started to bleed; right?  I mean, that's obvious.

12           You -- you know, again, not -- not common

13   sense, but you have to know that's a serious problem.

14   It's -- it's clearly outside of their bailiwick in terms

15   of able to -- able to intervene.  You know, they

16   couldn't take care of that.  They needed -- they needed

17   somebody else with more training to take care of that.

18   They should have known that, but they -- they

19   obviously had -- they didn't have sufficient training to

20   recognize boy, we better do something here.

21   Q.       Now, after the abuse happens and Nathan Ling is

22   put in the shower and then in the negative pressure

23   cell -- you're aware of that?

24   A.       Correct.

25   Q.       For many hours?

1    A.        Yes.

2    Q.        Until the -- until the nurse comes in the next

3    morning; correct?

4    A.        Correct.

5    Q.        If Campbell County had provided adequate

6    training on recognizing these conditions and providing

7    care, would he have been placed alone in that negative

8    pressure cell?

9    A.        No, he would have been provided medical

10   treatment.

11   Q.        And based on the testimony in this case, based

12   on what you reviewed, is the reason he was put in that

13   negative pressure cell and not taken to the emergency

14   room immediately mainly because they didn't train anyone

15   to do that?

16   A.        Correct.

17   Q.        Would this have happened if they had actually

18   trained them to do that?

19   A.        They would have recognized the need for medical

20   attention and intervened.

21   Q.        And, sir, is it your opinion that Campbell

22   County's failure to train on this specific instance

23   recognizing serious medical conditions, getting --

24   providing medical care, is related or proximately caused

25   to his own injuries?

1    A.        It delayed his treatment.  I mean, I don't want

2    to speculate as to how -- how -- you know, how serious,

3    you know, the time -- the difference in the time that,

4    you know, he needed medical attention and was provided

5    medical attention.  I'm not a physician.  But I can tell

6    you that it contributed to the seriousness of his

7    condition.

8             MR. KNIGHT:  Objection, Your Honor.  He said he

9    speculated.  He's speculating.  And he's not a

10   physician.

11            THE COURT:  It's sustained.

12            MR. SMITH:  Okay.

13            THE COURT:  I mean, he -- he's answered what he

14   knows and what he doesn't, so let's move on.

15            MR. SMITH:  Yes, sir.

16   BY MR. SMITH:

17   Q.        And, in fact, sir, he wouldn't have even needed

18   that medical care if they had actually intervened;

19   correct?

20   A.        Correct, if there had been no abuse.

21   Q.        That's all the questions I have.  Thank you,

22   sir.

23            THE COURT:  Okay.  Any cross-examination?

24            MR. KNIGHT:  Yes, Your Honor.

25                          CROSS-EXAMINATION

 1  BY MR. KNIGHT:

 2  Q.        Good afternoon, Mr. Winston.

 3  A.        Good afternoon, sir.

 4  Q.        You're familiar with TCI?

 5  A.        Yes, sir.

 6  Q.        And what TCI does, in addition to providing

 7  some training, they also inspect facilities; correct?

 8  A.        Yes, sir.

 9  Q.        And they note deficiencies and then give the

10  facility an opportunity to correct the deficiencies?

11  A.        Yes, sir.

12  Q.        And then whether or not they correct them, they

13  certify them; correct?

14  A.        Correct.

15  Q.        Are you aware of -- I mean, you've testified at

16  length here today about training and this, that, the

17  other.  You were a jail superintendent; correct?

18  A.        Yes, sir.

19  Q.        Hold any other positions -- you went through a

20  little bit too fast for me -- other than being a jail

21  superintendent supervising other employees?

22  A.        Yes, sir, I did.  I -- up to 400 at one time,

23  supervisors as well as, you know, line staff.

24  Q.        Is it fair to say, Mr. Winston, just because

25  you train someone or because it's written down somewhere

1    that this is what you should do doesn't mean it's going

2    to be done?

3    A.       That's true.  That's fair.

4    Q.       You have quite a bit of experience in

5    corrections.  I believe we all can see that.

6            An officer would have to have the ability to

7    intervene.  Wouldn't you agree with me?

8    A.       Yes, sir.

9    Q.       And, I mean, you're -- you're from Virginia;

10   correct?

11   A.       Yes, sir.

12   Q.       And that's a different, I think, circuit,

13   but --

14   A.       Fourth.

15   Q.       Fourth Circuit?

16   A.       Yes.

17   Q.       We're in the Sixth Circuit.  The Sixth Circuit

18   indicates that if something is going on and it's less

19   than a few seconds, then there's no constitutional duty

20   imposed upon an individual officer to intervene --

21   A.       Okay.

22   Q.       -- because it's impossible.

23   A.       Right.

24   Q.       Does the Fourth Circuit have a similar rule?

25   A.       No.  In fact, it -- the Commonwealth of

```
 1   Virginia just passed a couple of justice reform laws
 2   that codified the requirement to train on intervention
 3   and the obligation to intervene in times of excessive
 4   use of force.
 5   Q.       If I went over there and punched Mr. --
 6           MR. SEATON:  Smith.
 7   BY MR. KNIGHT:
 8   Q.       -- Smith in the face, could you intervene with
 9   that?
10   A.       No, sir.  I'd let the bailiff do that.
11   Q.       Yeah, that -- could the bailiff intervene?
12   Could he have stopped the punch?
13   A.       No, sir.
14           Not questioning your ability to intervene in
15   the fistfight, but --
16   Q.       Oh -- oh, I was getting to -- you had quite a
17   bit of experience in corrections.  A lot of these
18   individuals are combative; correct?
19   A.       Yes, sir.
20   Q.       A lot of them spit at you; correct?
21   A.       Correct.
22   Q.       Cuss at you?
23   A.       Yes, sir.
24   Q.       Yell at you?
25   A.       Yes, sir.
```

1  Q.      They don't want to be there?

2  A.      That's right.

3  Q.      And they'll do anything not to be there?

4  A.      Correct.

5  Q.      And a lot of times that -- when you're in

6  corrections, you don't always know what went on at the

7  arrest scene; correct?

8  A.      Correct.

9  Q.      You may just be notified that you have a

10 combative inmate coming in, and you don't know: One,

11 what that inmate -- what -- what that arrestee has done

12 or what that arrestee has ingested or what that arrestee

13 has hid or not hid or anything like that?

14 A.      Yes, sir.

15 Q.      Have you performed an audit of the statistics

16 of the arrestees coming in and out of the Campbell

17 County Jail?

18 A.      No, sir.

19 Q.      So when you say that it's obvious that

20 something like this is going to happen again, during the

21 administration of Mr. -- of Sheriff Goins, which -- he

22 was the sheriff in 2019 -- and subsequently with Sheriff

23 Barton, are you aware of any other type of incidents?

24 A.      No, sir.

25         MR. KNIGHT:  That's all I have.

1          THE COURT:  Thank you.

2          Any redirect?

3          MR. SMITH:  One question.

4          And, I mean, I would not be able to avoid that

5   punch.

6                    REDIRECT EXAMINATION

7   BY MR. SMITH:

8   Q.     So, Mr. Winston, based on what you've seen of

9   the video in this case, this lasted a lot longer than

10  just a second or two; correct?

11  A.     Yes, sir.

12  Q.     Now, getting dragged out of a car, that's a

13  second?

14  A.     Yes, sir.

15  Q.     Right?

16         We're not saying that they could have

17  intervened in -- in dragging out of the car?

18  A.     No, sir.

19  Q.     It's everything else after that?

20  A.     Correct.

21  Q.     So the moment he is on the ground, they have

22  witnessed him violently dragged out of that car.

23  A.     Correct.

24  Q.     Okay.  That's the second or two; right?

25  A.     Yes, sir.

1  Q.        Everything else after that, their training
2  should have kicked in, if they had received it, to
3  recognize that's not okay?
4  A.        Yes, and that was the time to intervene
5  because -- yeah, I -- I can elaborate, if you'd like.
6  But, you know, what I said before is in corrections,
7  there are circumstances where violence occurs abruptly,
8  without warning, and that's -- that's not avoidable.
9  However, once staff arrives on the scene and they begin
10 to -- whether it be quell, whatever the circumstances
11 are.
12            But in this particular case, the reason I say
13 that -- that intervention point ended the exigency -- so
14 what I -- what I mean by that is at that point, once
15 he's removed from the vehicle, that's a very dangerous
16 time.  I know that, you know, you guys are not law
17 enforcement officers, and I understand that and I
18 appreciate that.  Removing someone from a vehicle is
19 dangerous.  It's not as easy as it looks.  That's a
20 dangerous time for the law enforcement personnel.  And,
21 theoretically, that's why if they were concerned, they
22 had additional deputies in the sally port waiting on him
23 to arrive.  It's just a very dangerous time.  You don't
24 know what you're getting into.
25            But the point at which he's removed and placed

 1   prone on the cement floor and you can observe that he

 2   was in mechanical restraints, there was no -- there was

 3   no rush at that point; right?  Intervention can occur

 4   then.  There was no rush to get him to his -- spring him

 5   to his feet and push him in the search room.  That's the

 6   point at which, had they been properly trained, they

 7   would have intervened.  They would have recognized this

 8   is a pinch point.  This is where we can take a deep

 9   breath, stop the abuse, and let -- let's take this -- we

10   can take custody of this prisoner, and let's change

11   the -- the tempo because you don't want -- it's not

12   uncommon.

13           I'll -- I'll -- I want to elaborate even more

14   on this, but it's not uncommon for an adversarial

15   relationship between the law enforcement officer and the

16   arrestee when they come to jail.  You just took his

17   freedom or her freedom.  And in many cases with proper

18   training, you'll understand intervening and breaking

19   that cycle of frustration by just changing teams is

20   sufficient intervention.

21           But there was no training to recognize that

22   this is the time to intervene to break that cycle of

23   frustration.  But there was time after he was removed

24   from the vehicle, if that answers your question, sir.

25   Q.      Yeah.

1  Because these jail staff are aware that they've
2  got a combative person coming; right?
3  A.      I'm not exactly -- I'm not exactly sure what
4  the words were, how it was transmitted from dispatch.
5  But clearly by virtue of the fact they were waiting
6  inside the sally port, there was evidence that they were
7  suspicious of -- of what was coming in.
8  Q.      And it's reasonable that an officer who's been
9  involved in a pursuit and an arrest may be at a
10 different level of mindset than a jail staff who doesn't
11 know what's just happened?
12 A.      Correct.
13 Q.      And so there is a reasonably foreseeable --
14 it's foreseeable that that officer might be agitated?
15 A.      Frustrated, yes.
16 Q.      Because he's just had to be with this person
17 for however long it takes to get to the jail?
18 A.      I've witnessed it, yes, sir.
19 Q.      And so that's reasonable that the jail staff
20 anticipate that hey, the officer may be in an agitated
21 state as well as the detainee?
22 A.      And that's part of the training.
23 Q.      Thank you, sir.
24 A.      Yes, sir.
25                  RECROSS-EXAMINATION

1  BY MR. KNIGHT:

2  Q.        You're unaware of either of these jail

3  individuals knowing anything about Mr. Ling; correct?

4  A.        I'm sorry, sir.  Say that again?

5  Q.        You're -- you're unaware of any -- either of

6  these corrections officers knowing anything about

7  Mr. Ling, what he had done, what he had ingested, what

8  he had hid, or anything; correct?

9  A.        No, sir.

10 Q.        Is it fair to say that arrestees are different

11 and react differently to different situations?

12 A.        Yes.

13 Q.        I mean, what may make one arrestee stop, say

14 hey, they're changing teams, I'm going to be okay and

15 another arrestee is going to say, hey, I'm going to keep

16 fighting?

17 A.        Right.

18 Q.        Thank you.

19 A.        Yes, sir.

20           THE COURT:  Thank you, sir.

21           THE WITNESS:  Yes, sir.  Thank you, Judge.

22           MR. SEATON:  Our -- our last witness is Joshua

23 Miller.

24           THE COURT:  All right.  That's your final

25 witness?

```
 1              MR. SMITH:  Yes, Your Honor.

 2              (Off-the-record discussion between counsel.)

 3              MR. KNIGHT:  Your Honor, can we take a brief

 4    recess?

 5              THE COURT:  Okay.  How much --

 6              MR. KNIGHT:  I anticipate as a last witness he

 7    may take a little longer --

 8              THE COURT:  Okay.

 9              MR. KNIGHT:  -- and we may run into 4:00.

10              THE COURT:  Okay.

11              MR. KNIGHT:  I'm not sure.

12              THE COURT:  All right.  Let's take -- 10

13    minutes enough?  Let's take about 10 minutes, ladies and

14    gentlemen.

15              (Brief recess.)

16              (Subsequent proceedings were heard but

17              not requested to be transcribed herein.)

18              THE COURT:  Thank you all.  Please be seated.

19              All right.  Mr. Seaton, call your next witness.

20              MR. SEATON:  Joshua Miller, Your Honor.

21              THE COURT:  Okay.

22              (The witness was duly sworn.)

23                        JOSHUA MILLER,

24    called as a witness at the instance of the parties,

25    having been first duly sworn, was examined, and
```

1    testified as follows:

2                        DIRECT EXAMINATION

3    BY MR. SEATON:

4    Q.        Tell the ladies and gentlemen of the jury your

5    name, sir.

6    A.        Joshua Miller.

7    Q.        And, Mr. Miller, did you previously work for

8    Campbell County Sheriff's Department?

9    A.        Yes, I did.

10   Q.        And where do you work now?

11   A.        I work at LMU.

12   Q.        Okay.  What do you do?

13   A.        I work in distribution.

14   Q.        Okay.  So looking at this Exhibit Number 56, is

15   this you in the far right corner?

16   A.        Yes.

17   Q.        On the bottom?

18   A.        Yes, sir.

19   Q.        And you were a corrections officer for Campbell

20   County; right?

21   A.        Yes, sir.

22   Q.        You'd been there what?  Two months?  Three

23   months?

24   A.        Like right at a month.

25   Q.        Okay.  And you had come from Claiborne County?

1   A.      Yes.

2   Q.      And you -- you worked Claiborne County

3   corrections for what?  Two weeks?

4   A.      Yeah.

5   Q.      And did you have any training there?

6   A.      No.

7   Q.      All right, sir.  So when you got to Campbell

8   County, did you know any of these individuals that you

9   were involved with that evening?

10  A.      When I first started?

11  Q.      Yes.

12  A.      No.

13  Q.      Or did you -- did you know them as you began

14  working with them?

15  A.      Yes.

16  Q.      All right, sir.  I thought that you had said

17  that you didn't know Crabtree and had never met Brown;

18  is that right?

19  A.      Before working there, I had never met any of

20  them.  But I did know -- I never had met Crabtree

21  before, but I knew Brown, who was the corporal on my

22  shift.

23  Q.      Okay.  And so tell us just real briefly what

24  you recall happened that evening.

25  A.      I just remember getting a call over the radio

 1   that there would be a combative person coming into the

 2   intake and that I would be needed up front.  I was in

 3   male housing.  And whenever I got to the front to the

 4   sally port door, I went to open it, and that's where I

 5   was met with Crabtree and Mr. Ling and everyone else

 6   that was already up in the front.

 7         And I recall them bringing him into the --

 8   Dakota and Brown bringing him in and was on each side of

 9   him.  And I was standing behind of him.  And all I

10   recall was Brown saying that they would have to take him

11   to the ground because he wasn't listening to anything

12   they were saying, so they put him on his back.  And I

13   was told to hold one of his legs until he calmed down.

14   And I was just doing that.

15         And I -- I recall Crabtree coming back into the

16   trap and just hammer fisting him in the face three times

17   and then just continued to hold one leg while we tried

18   to keep him still.  And Brown had told Crabtree to

19   leave.  And after a little bit had went by, I remember

20   we were told by Brown to -- me and Standridge -- to take

21   him into the shower and try to let him rinse off.

22         And after he had calmed down and when we was in

23   there, Standridge had taken -- he had a spit mask on

24   him, and he had took the spit mask off of him.  And I

25   remember Brown saying that he didn't want him to have

1  the spit mask off, so he was trying to put another one

2  back on him.  And that was -- that was when the

3  altercation with Dakota and all of that happened in the

4  shower.  And they finally got him out of the shower and

5  just put him in the cell.

6          And after that, I went back to male housing and

7  stayed the rest of the night.

8  Q.      All right.  Let -- let me back you up quite a

9  few steps.

10  A.      Okay.

11  Q.      Were you in the sally port when Justin Crabtree

12  took Nathan Ling out of the patrol car?

13  A.      No, sir.

14  Q.      Okay.  Were you in the sally port when Justin

15  Crabtree slammed his face up against the -- the block

16  wall?

17  A.      No, I did -- me -- like, he did push him into

18  the door whenever I tried to open the door.  He had,

19  like, slammed him into the door, and it shut back.  And

20  I had to push the door back open.

21  Q.      All right.  So the first encounter you had was

22  once you were in the trap room or the search room?

23  A.      Yes.

24  Q.      Is that right?

25  A.      Yeah.

1  Q.        All right.  And we have seen the video

2  and -- and seen you, you know, involved in that.

3            When -- the first time that you saw Nathan

4  Ling, was he resistive?

5  A.        He was.  Yes, he was.

6  Q.        I thought you told me that -- when I took your

7  deposition that he was not resistive.  You didn't think

8  he was combative, and he was squirming in the floor?

9  A.        Initially, the -- initially, when he came into

10 the trap, he was.  But once he was -- once we were in

11 the trap, he just was standing there.  And they kept

12 telling him to do something, and he wasn't doing it.

13 And that's when they took him to the floor.

14 Q.        Well -- but did you tell me that he was --

15 he -- you didn't think he was being combative in the

16 trap room?

17 A.        No, I -- I don't believe he was.

18 Q.        Okay.  And you said that he was squirming in

19 the floor trying to survive?

20 A.        I -- I do not recall saying that, but I do

21 recall him just kind of squirming.  He wasn't really --

22 seemed like he was trying to attack anyone, which he

23 probably couldn't due to him still being handcuffed and

24 on his back.  But he was just kind of kicking his legs

25 around, and I was just told to hold a leg until he

1   calmed down.

2   Q.        All right.  And that's all you did was hold a

3   leg; right?

4   A.        Yes.

5   Q.        You never hit him?

6   A.        No.

7   Q.        All right, sir.  And after all of this

8   occurred, what was his condition?

9   A.        From what I observed, it was pretty poor.

10  Like, he -- I just remember them putting him into the

11  cell, and he just stayed in the floor until we backed

12  out of the cell.

13           And then I -- after that, I -- I think I went

14  up to booking one time during the night and -- just to

15  look in, to check on him, and he was just still laying

16  in the floor.  And I'd asked Brown about it, and he

17  didn't really have much to say.

18  Q.        Did anybody suggest that he get medical

19  treatment?

20  A.        I'm not 100 percent sure.

21  Q.        You said that as you put him into the neg cell

22  or the -- or the solitary cell, he was just mumbling and

23  kind of groaned the whole time?

24  A.        Yeah.

25  Q.        Could he make any complete sentences, or do you

 1  recall?

 2  A.        I don't really recall.  I don't think he did

 3  make any full sentences.

 4  Q.        And you think that -- you said that he was

 5  scared, swollen, and had peed on himself?

 6  A.        Yes.  That next morning when I went to leave, I

 7  had stopped by because the nurse had finally come in,

 8  and I was seeing how he was doing.  And that's what she

 9  said had occurred and how he appeared that morning.

10  Q.        And that morning you said that it was clear

11  that it -- that he had been brutally beaten?

12  A.        Yes.

13  Q.        All right.  You said that a day or so later

14  that Sean Brown and -- and Justin Crabtree were gloating

15  about the incident?

16  A.        Yes, sir.

17  Q.        In what way?  Tell us.

18  A.        It was kind of like -- I -- I don't really know

19  how to put it.  It wasn't -- it wasn't like they were

20  just up and proud about it, but they were just kind of

21  like -- I know that there had been words saying that

22  someone had taken a picture of him and was, like,

23  showing it around and was like -- kind of like, oh,

24  well, look what -- look what happened and look what we

25  did, and this and that.  That's all that I really recall

1    about it.

2    Q.       Well, you said that you -- you didn't feel

3    right about this whole situation and being involved in

4    it; right?

5    A.       Yeah.

6    Q.       And so what did you do about that?

7    A.       I remember I'd spoken to the day shift

8    corporal, but it wasn't much of a conversation due to it

9    being shift change, and she didn't really know anything

10   about what had happened.

11   Q.       Did you approach your sergeant, Catie Wilson?

12   A.       I believe I did.  I can't -- I don't really

13   recall, though.

14   Q.       And do you recall -- well, let's look at this

15   Exhibit 56.

16            Sean Brown was your immediate supervisor;

17   right?

18   A.       Yes.

19   Q.       And you were reporting to Catie Wilson about

20   the whole event because you'd already tried to talk with

21   Sean Brown?

22   A.       I don't think I did talk to Sean much about it

23   just because of the way he was acting about the whole

24   situation.  I didn't feel like it was -- I felt like it

25   had to go a little bit further 'cause I wouldn't have

1  gotten anywhere with him.

2  Q.        So you -- you went -- you went up the chain of

3  command to -- to Sergeant Catie Wilson; right?

4  A.        Yeah.

5  Q.        And do you recall approaching her about the

6  incident?

7  A.        I vaguely do remember going and talking to her

8  in her office about it, but I'm not 100 percent sure.

9  And I don't really remember what was said.

10 Q.        Okay.  Let me show you on page 40 of your

11 deposition, on line 15 -- Joseph, if you'd pull that

12 down.  She's going to change the app here.

13        I asked you this question.  I said, "What did

14 you say to Catie Wilson" -- "Sergeant Catie Wilson?"

15        And you said, "I just said that there was a bad

16 incident, and I was just" -- "didn't know what to do or

17 say anything about it.  I was like" -- "It was just a

18 lot had happened, and I didn't necessarily agree with it

19 and didn't know how to talk to her about it.

20        "And she just" -- "She was like, well, I'll

21 talk to you a little bit later about it, and she was

22 like" -- "and then just kind of walked out of her office

23 'cause that's when the new corporal came in.

24        "And the nurse were [sic] in there checking on

25 him.  And so I just walked out of the office, and I went

1   over to the cell to see how he was doing and to ask the

2   nurse like" -- "like how he was, and he seemed very

3   scared of anyone as of the nurse" -- "anyone.  And he

4   was, I mean, swelled up.  He peed on himself when he was

5   laying in the floor and not making full sentences."

6           So you had approached Catie Wilson; right?

7   A.      Yeah.

8   Q.      All right.  Does that refresh your memory?

9   A.      Yes, it does.

10  Q.      All right, sir.  And I asked you on page 41,

11  "What time was that?

12          "A little after 7:00.

13          "Okay.  And so" -- "So Sergeant Catie Wilson,

14  she just said, 'I'll take care of it?'"

15          That was my question.  "And so Catie Wilson,

16  she just said, 'I'll take care of it?'"

17          And your answer was, "She just said that she

18  would talk to me later about it."

19          And then your answer was, "And I never heard

20  from her, never talked to her.  She had" -- "she was" --

21  "she" -- "we had never" -- "I don't" -- "she will say

22  that she never" -- "that she had something against me,

23  but I feel she was the main reason why I left Campbell

24  County to begin with.  Like, we was" -- "We never saw

25  eye to eye with anyone, it seemed."

1              Right?

2    A.        Yeah.

3    Q.        So is that the reason that you left there?

4    A.        Mainly that and then just a lot of overtime and

5    just wanted to be closer to home.

6    Q.        Let me just switch -- switch gears with you for

7    just a second.

8              And do you remember after all of this occurred

9    and you were asked to do an incident report; correct?

10   A.        Yes.

11   Q.        And who asked you to do that?

12   A.        Brown.

13   Q.        Okay.  And did he tell you how he wanted you to

14   do it?

15   A.        To an extent, yes.

16   Q.        All right.  And then after you did it, did he

17   call you back and say I want you to come back and change

18   the report?

19   A.        I do recall that, yeah.

20   Q.        All right, sir.  And did you think that was

21   appropriate?

22   A.        No.

23   Q.        All right.  I asked you a little bit about just

24   the violence in the corrections department.  And what

25   did you tell me about that?  Do you recall?

1  A.      I do recall that they -- I brought up there

2  being a few officers who kind of seemed like they looked

3  forward to having altercations with inmates.

4  Q.      And who was that?

5  A.      One was Brown, and I cannot remember the other

6  guy's name.

7  Q.      Was it Mr. Fox?

8  A.      Yes.

9  Q.      All right.  And did you tell me that they had

10 made a game of using force to where they -- if they

11 didn't use -- or if they used force at least once a

12 week, then they congratulated each other or some -- did

13 some sort of --

14 A.      Yes.

15 Q.      What did they do?  I don't want to put words in

16 your mouth.

17 A.      I just remember that they would say that they

18 would have to get themselves a treat or something, and

19 that was all --

20 Q.      Okay.

21 A.      -- honestly.

22 Q.      So how long after this Ling incident happened

23 did you leave Campbell County?

24 A.      I had -- I believe it was two years, two and a

25 half years.

1    Q.        You stayed there for two and a half years?

2    A.        Yes.

3    Q.        Okay.  And so now you've left law enforcement

4    altogether?

5    A.        Yes.

6    Q.        All right, sir.  Thank you so much.  Answer any

7    questions Mr. Knight has.

8                         CROSS-EXAMINATION

9    BY MR. KNIGHT:

10   Q.        Good afternoon, Mr. Miller.

11             You started out at the Claiborne County

12   Sheriff's Department; correct?

13   A.        Yes.

14   Q.        And as a corrections officer?

15   A.        Yes, sir.

16   Q.        And that's closer to your home?

17   A.        Yes.

18   Q.        Where do you live?

19   A.        Cumberland Gap --

20   Q.        And --

21   A.        -- Tennessee.

22   Q.        -- is that in Claiborne County?

23   A.        Yes.

24   Q.        And I think you said you stayed there a couple

25   of weeks?

1    A.       Yes.

2    Q.       And then you left and went to Campbell County

3    and stayed for two and a half years?

4    A.       Yes.

5    Q.       And then after that, you went back to Claiborne

6    County, didn't you?

7    A.       Yes.

8    Q.       In their sheriff's department?

9    A.       Yeah, doing corrections.

10   Q.       And how long did you stay that stint?

11   A.       I would -- I believe it was less than a year.

12   Q.       And now you're working distribution at LMU,

13   which is in Harrogate in Claiborne County?

14   A.       Yes.

15   Q.       Where is the -- where -- where is the Claiborne

16   County jail?

17   A.       It's in New Tazewell.

18   Q.       New Tazewell?

19   A.       Yes.

20   Q.       I think you told me previously that the

21   training -- the -- any training you got, you got at

22   Campbell County; correct?

23   A.       Yes.

24   Q.       And Campbell County ensured that you were TCI

25   certified; correct?

1    A.       Yes.

2    Q.       And trained you how to book individuals, log,

3    check?

4    A.       Yes.

5    Q.       You could recognize when somebody needed

6    medical care, couldn't you?

7    A.       Yes.

8    Q.       And that's from your training at Campbell

9    County; correct?

10   A.       Yes.

11   Q.       And -- and I think you told me that when you

12   went to -- you left after two and a half years, went

13   back to the Claiborne County jail.  Because of the

14   training that you had gotten at Campbell County, you

15   were made a sergeant in Claiborne County?

16   A.       Yes.

17   Q.       And so you were supervising other individuals?

18   A.       Yes, sir.

19   Q.       Back to corrections.  That's a fairly tough

20   job, isn't it?

21   A.       Yeah, I don't plan on going back.

22   Q.       Yeah.

23            I mean, it's -- in distribution, you're passing

24   out mail?

25   A.       Yes.

1  Q.      And in corrections, you're dealing with

2  arrestees; correct?

3  A.      Yes, sir.

4  Q.      Sometimes they're combative?

5  A.      Yes.

6  Q.      Sometimes they don't do what you ask them to

7  do?

8  A.      No, they don't.

9  Q.      Sometimes they're under the influence; correct?

10 A.      Yes.

11 Q.      Sometimes they may have sustained injuries

12 elsewhere; correct?

13 A.      Yes.

14 Q.      Sometimes they assault correction officers;

15 correct?

16 A.      Yes.

17 Q.      They just simply don't want to be there;

18 correct?

19 A.      Yes.

20 Q.      I certainly don't want to play the video, but I

21 can't remember.  In your deposition, did Mr. Seaton play

22 the video for you?

23 A.      I don't believe so.

24 Q.      Okay.  And your involvement -- you weren't --

25 you weren't in the sally port where Justin Crabtree

 1  pulled Mr. Ling from the vehicle; correct?

 2  A.      No, sir.

 3  Q.      And your first involvement with Mr. Ling was in

 4  the search trap; correct?

 5  A.      Yes, sir.

 6  Q.      Mr. Justin Crabtree brought Mr. Ling into the

 7  search trap; correct?

 8  A.      Yes, sir.

 9  Q.      And did you -- Justin Crabtree had a handle on

10  him; correct?  Had him physically?

11  A.      Yes.

12  Q.      And pushed, slammed, however you want to call

13  it, Mr. Ling up against the counter; correct?

14  A.      Yes.  Yes.

15  Q.      And then he went to the ground; correct?

16  A.      Yes.

17  Q.      And it took several individuals simply to hold

18  Mr. Ling in place; correct?

19  A.      Yes, sir.

20  Q.      'Cause he didn't want to go anywhere, did he?

21  A.      No, sir.

22  Q.      He was moving around; is that correct?

23  A.      Yes.

24  Q.      And whatever his subjective intent was, you

25  couldn't read his mind; correct?

1 A.   No, sir.

2 Q.   You just had to assume that the movement meant

3 that he wasn't -- you would have left him alone if he'd

4 have stayed still; is that correct?

5 A.   Yes, sir.

6 Q.   But you held his feet; correct?

7 A.   Yes, sir.

8 Q.   Which indicates to me that his feet were

9 moving; correct?

10 A.   Yes, sir.

11 Q.   Whether they were kicking, moving, they weren't

12 doing what you wanted, what needed to happen; correct?

13 A.   Yes, sir.

14 Q.   Other than being told that you had a combative

15 coming in, do you know anything that had happened out at

16 the arrest scene with Mr. Ling?

17 A.   No, sir.

18 Q.   Didn't know anything about Mr. Ling, how strong

19 he was, what he had taken, if he was injured, what he

20 had said to the officers, what he'd done to ambulance

21 personnel, anything?  You didn't know any of that, did

22 you?

23 A.   No, sir.

24 Q.   So when you saw Mr. Ling, you would just say

25 that is the combative that they were telling us about

1    coming into our facility; correct?

2    A.        Yes, sir.

3    Q.        And that's something that you needed to get

4    control of; correct?

5    A.        Yes, sir.

6    Q.        Thank you.

7              THE COURT:  Any redirect?

8              MR. SEATON:  Yes, Your Honor.

9                    REDIRECT EXAMINATION

10   BY MR. SEATON:

11   Q.        So I want to talk about your training just a

12   minute, you know.  And I know this has been a long time

13   ago.  And I think your deposition was -- let me look --

14   was July 26 of 2022.  But you said to me when I first

15   asked you questions that you had only been there a

16   couple of months?

17   A.        Yes, I had been there just -- I think just shy

18   of a month or just over a month.

19   Q.        So you hadn't had an opportunity to go to TCI,

20   had you?

21   A.        No, sir.

22   Q.        Okay.  You didn't have that training on June --

23   June the 1st?

24   A.        No, sir.

25   Q.        All right, sir.  And as a matter of fact, when

1    you first went to Campbell County, Mallory Campbell did

2    a four-day training?

3    A.      Yes, sir.

4    Q.      And that's all the training you had?

5    A.      Yes.

6    Q.      Right?

7            And you had no training on how to do the job.

8    That's what you told me?

9    A.      I feel like I had minimal training to know what

10   I was getting into.

11   Q.      Okay.  You had no training on use of force?

12   A.      No, sir.

13   Q.      You had no training on dealing with a combative

14   individual?

15   A.      No, sir.

16   Q.      You had minimal training on an inmate's medical

17   needs?

18   A.      Yes, sir.

19   Q.      All right.  And you had no training in the

20   event an officer was abusing another inmate to

21   intervene; right?

22   A.      No, sir.

23   Q.      All right.  Thank you so much.

24                     RECROSS-EXAMINATION

25   BY MR. KNIGHT:

1  Q.        But you had the presence of mind to check on

2  Mr. Ling; correct?

3  A.        Yes.

4  Q.        'Cause -- to check on his medical condition;

5  correct?

6  A.        Yes, sir.

7  Q.        And you also had the presence of mind to take

8  the matter up with your sergeant; correct?

9  A.        Yes, sir.

10 Q.        And she said she would get back to you;

11 correct?

12 A.        Yes, sir.

13 Q.        And Brown was leaving shift, and Corporal Boyer

14 was coming on shift; correct?

15 A.        Yes.

16 Q.        You were likewise leaving shift also; correct?

17 A.        Yes, sir.

18 Q.        You were working the night shift, and the day

19 shift was coming on?

20 A.        Yes.

21 Q.        Correct?

22           And did you come to find out that -- that

23 Corporal Boyer had ensured that the -- and another

24 officer had ensured that Mr. Ling was, in fact, examined

25 by the nurse?

1   A.      Yes.

2   Q.      And that they did take Mr. Ling to the

3   hospital -- LaFollette Hospital and then later to UT?

4   A.      Yes, sir.

5   Q.      As far as training, you felt like you could go

6   to work at a jail; correct?  I mean, you had been at

7   Claiborne County?

8   A.      Yeah.

9   Q.      And you knew how to book individuals; correct?

10  A.      Yes, sir.

11  Q.      You knew that you were supposed to check

12  individuals; correct?

13  A.      Yes, sir.

14  Q.      And you were -- you were supposed to inform

15  whoever you needed to, and that just may be you taking

16  it upon yourself if you thought an inmate needed some

17  sort of medical care; correct?

18  A.      Yes, sir.

19  Q.      Oh, one other question.  Mr. Seaton asked you

20  if Sean Brown asked you to change your report and you

21  felt it was inappropriate.  Are you telling this jury

22  that you falsified the report -- any report concerning

23  Nathan Ling?

24  A.      No, sir.  It -- it wasn't falsified, but it --

25  it was up to Brown's standards.

1   Q.      Okay.  And that could have been grammar?

2   A.      Yes, sir.

3   Q.      And it could have been the way the form was

4   filled out; correct?

5   A.      Yes.

6   Q.      Thank you.

7           THE COURT:  All right.  Thank you, sir.

8           THE WITNESS:  You're welcome.

9           MR. SEATON:  Plaintiff rests.

10          THE COURT:  Sorry.  Mr. Seaton, you said

11  plaintiff rests his case?

12          MR. SEATON:  Yes, Your Honor.

13          THE COURT:  All right.  Ladies and gentlemen,

14  the plaintiff has rested his case.  We are going to take

15  just a minute and do a couple of things.  I'm going to

16  ask you to step out and -- but we won't be long.

17          Thank you.

18          (Subsequent proceedings were heard but

19          not requested to be transcribed herein.)

20          THE COURT:  Thank you.  Please be seated.

21          All right.  Ladies and gentlemen, plaintiff has

22  rested his case.

23          Mr. Knight, do you have any witnesses?

24          MR. KNIGHT:  Call Mr. Beehan, please.

25          THE COURT:  All right.

1  BY MR. KNIGHT:

2  Q.      Mr. Beehan, we had previously --

3          THE COURT:  All right.  Hold on.

4          MR. KNIGHT:  Oh, I'm sorry.

5          THE COURT:  You're reminded you're still under

6  oath.

7          THE WITNESS:  Yes, Your Honor.

8                      MICHAEL BEEHAN,

9  recalled as a witness at the instance of the parties,

10 having previously been duly sworn, was examined, and

11 testified as follows:

12                    DIRECT EXAMINATION

13 BY MR. KNIGHT:

14 Q.      Okay.  Mr. Beehan, we had previously had a

15 discourse; correct?

16 A.      I'm sorry?

17 Q.      We had previously had a discourse; correct?

18 A.      Yes.  Yes, we have.

19 Q.      Okay.  And you indicated you're the guardian ad

20 litem and that you're standing in the shoes of Nathan

21 Ling; is that correct?

22 A.      That's correct.

23 Q.      And the reason for that is it's plaintiff's

24 position that he cannot travel to Knoxville; correct?

25 A.      Correct.

1  Q.       Even though he appeared at a deposition with

2  me; correct?

3  A.       Correct.

4  Q.       And appeared at Justin Crabtree's sentencing

5  hearing; correct?

6  A.       Correct.

7  Q.       And you said that he had difficulty in an

8  airport.  But he didn't have any difficulty during those

9  times, did he?

10  A.       That's correct.  My understanding is that for

11  the -- the sentencing hearing and the deposition, he had

12  a girlfriend at the time who was driving him down who

13  he's no longer with.

14  Q.       Okay.  And he has a couple of family members

15  here today; correct?

16  A.       Correct.

17  Q.       And I believe that it was one of plaintiff's

18  experts, Ms. Whatley, who said that she had done an

19  in-person interview of Mr. Ling; correct?

20  A.       I don't recall if she said it was in person or

21  by Zoom.

22  Q.       I mean, by Zoom.

23  A.       Yes.

24  Q.       And that was something that you said that he

25  had difficulty doing; correct?

1   A.      Yes, he had difficulty.  So the -- the one time

2   we spoke by Zoom, he did have difficulty signing on,

3   yes.  And --

4   Q.      Okay.  Do you know if Mr. Ling goes by Nathan

5   Thomas?

6   A.      Not that I'm aware of.

7   Q.      Do you know what Mr. Ling looks like?

8   A.      Yes, I do.

9   Q.      Do you know whether or not he posts on social

10  media?

11  A.      Not aware of -- I haven't seen any social media

12  accounts.

13  Q.      Okay.  But you did read his deposition;

14  correct?

15  A.      Yes, I did.

16  Q.      And do you remember the date of that

17  deposition?

18  A.      Not off the top of my head, no.

19  Q.      Okay.  Would it surprise you that it was April

20  the 11th, 2022?

21  A.      It -- that would not surprise me, no.

22  Q.      Okay.  And -- and during that deposition, he

23  blamed all of his injuries on Justin Crabtree; correct?

24  A.      I believe so.

25          MR. KNIGHT:  Okay.  Sidebar, Your Honor?

1          THE COURT:  Okay.

2          MR. KNIGHT:  Briefly.

3          (A sidebar discussion was held between the

4          Court and counsel, outside the hearing of

5          the jury, as follows:)

6          MR. KNIGHT:  I forgot to ask him one question.

7          THE COURT:  Hold on.

8          MR. KNIGHT:  I forgot to ask him one question.

9          THE COURT:  Let Mr. Seaton --

10         MR. KNIGHT:  I'm sorry.

11         I forgot to ask him one question, but he did

12  indicate that he would recognize Mr. Ling.

13         THE COURT:  He did.

14         MR. KNIGHT:  Is that --

15         THE COURT:  Well, I mean, you can show him the

16  photograph and see if he knows him --

17         MR. KNIGHT:  Okay.

18         THE COURT:  -- and -- and -- and if it appears

19  to be -- and -- and you can ask him if he has access to

20  his Facebook account and if he's seen --

21         MR. SEATON:  He said he's not seen the Facebook

22  account.

23         MR. KNIGHT:  Right.  He knows what he looks

24  like.

25         THE COURT:  Show him the proof and ask him and

1   see, and then we'll go from there.

2            MR. KNIGHT:  Okay.  Thank you.

3            (At the conclusion of the sidebar conference,

4            the proceedings continued in open court as

5            follows:)

6   BY MR. KNIGHT:

7   Q.       In functioning as -- in your role as guardian

8   ad litem and attempting to -- well, investigating

9   Mr. Ling and his circumstances, were you aware whether

10  or not he was taking college classes?

11  A.       Yes, we did discuss that.

12  Q.       Okay.  And that he was enrolled in real estate

13  classes?

14  A.       Is your question whether the college courses

15  were real estate classes --

16  Q.       Well --

17  A.       -- or separate --

18  Q.       -- he was involved in real estate classes and

19  in other classes?

20  A.       I was aware he was enrolled in college classes.

21  I wasn't aware if it was real estate or not.

22  Q.       Let me ask you to look at this picture of

23  Mr. Ling.  Is that Mr. Ling?

24  A.       Yes, that is Mr. Ling.

25  Q.       That's him standing in Market Square beside two

1 police officers?

2          MR. SEATON:  Objection, Your Honor, because if

3 he's going to narrate the -- the photograph -- I mean, I

4 thought the question was going to be, "Have you seen

5 this before?" and -- and introduce it that way.

6          THE COURT:  You -- you can ask him if he

7 recognizes Mr. Ling and he can identify him in that and

8 if he's seen the photograph before and if he knows

9 anything about it.

10          MR. KNIGHT:  Okay.

11 BY MR. KNIGHT:

12 Q.      Mr. Ling?

13 A.      Yes, that is Mr. Ling.

14 Q.      Okay.  And have you seen this photograph

15 before?

16 A.      Yes, I have seen this photograph before.

17 Q.      Okay.  Well, since you've seen this photograph

18 before, is it your understanding that this photograph

19 was taken April the 11th in Market Square?

20 A.      So I -- I can't speak as to the date it was

21 taken, but I do understand it was taken in Market Square

22 here in Knoxville.

23 Q.      Next to two police officers?

24 A.      Correct, next to two police officers.

25 Q.      Thank you.

1  A.      Thank you.

2          MR. KNIGHT:  That's all that I have of this

3  witness.

4          THE COURT:  Do you have anything?

5          MR. SEATON:  No, Your Honor.

6          THE COURT:  Okay.  Are we finished?

7          Okay.  Thank you, sir.

8          THE WITNESS:  Thank you, Your Honor.

9          MR. KNIGHT:  Your Honor, I -- may I have five

10 minutes outside?  I may be done.

11         THE COURT:  Okay.  You need five minutes?

12         MR. KNIGHT:  Yes.

13         THE COURT:  Okay.  Ladies and gentlemen, we're

14 going to take five minutes.

15         (Brief recess.)

16         (The proceedings were held outside the

17         presence of the jury, as follows:)

18         THE COURT:  All right.  Are we ready for our

19 jury?

20         MR. KNIGHT:  Yes, Your Honor.

21         THE COURT:  Okay.  Is there another witness?

22         MR. KNIGHT:  Yes, one more, Your Honor.

23         THE COURT:  Okay.  And so we'll -- we'll

24 have -- how long do we anticipate on that one?

25         MR. KNIGHT:  I'm not going to take longer than

1    five, possibly ten minutes.

2            THE COURT:  Okay.  And so after that, you'll

3    rest your proof?

4            MR. KNIGHT:  Yes.

5            THE COURT:  You intend to renew your motion?

6            MR. KNIGHT:  Your Honor, I think I have to

7    procedurally.

8            THE COURT:  Okay.  And then I want you to rest

9    in front of the jury -- rest everything.

10           Do you -- do you anticipate any rebuttal?

11           MR. SEATON:  No, Your Honor.

12           THE COURT:  Okay.  And then -- just thinking

13   about timing.  Okay.

14           All right.  Let's bring them in.

15           (The proceedings were held in the presence of

16           the jury, as follows:)

17           THE COURT:  Okay.  Thank you.  Please be

18   seated.

19           All right.  Mr. Knight, please call your next

20   witness.

21           (The witness was duly sworn.)

22                   MALLORY CAMPBELL,

23   called as a witness at the instance of the parties,

24   having been first duly sworn, was examined, and

25   testified as follows:

1                    DIRECT EXAMINATION

2   BY MR. KNIGHT:

3   Q.       Could you state your name for the record,

4   please.

5   A.       Mallory Campbell.

6   Q.       And where are you employed?

7   A.       I'm currently employed by the LaFollette Police

8   Department.

9   Q.       Okay.  Were you previously employed with

10  Campbell County Sheriff's Department?

11  A.       Yes, sir.

12  Q.       How long were you employed with the Campbell

13  County Sheriff's Department?

14  A.       From December of 2012 up until September

15  of '22.

16  Q.       Okay.  So you were employed in June of 2019;

17  correct?

18  A.       Correct.

19  Q.       And do you recall this Nathan Ling incident?

20  A.       I do.

21  Q.       And at the time, were you a lieutenant --

22  A.       I was.

23  Q.       -- at Campbell -- okay.  And as part of your

24  duties as lieutenant, were you on the patrol side, or

25  were you on the jail side?

1    A.       I was -- my main duty was the jail corrections.

2    Q.       So you supervised Catie Wilson; correct?

3    A.       Correct.

4    Q.       You supervised the four corporals; correct?

5    A.       Correct.

6    Q.       And you supervised the numerous corrections

7    officers that were under you; correct?

8    A.       Correct.

9    Q.       And did you play any role in selecting or

10   hiring any new correction officers?

11   A.       Yes.

12   Q.       Okay.  Could you briefly describe for the jury

13   how -- if I wanted to be a correction officer in

14   Campbell County, Tennessee -- you were still a

15   lieutenant there -- what kind of training would I expect

16   to receive?

17   A.       So once you're hired on, we did TCI, which is

18   the Tennessee Corrections Institute.  It has categories

19   that we do have to cover like these certain topics and

20   then whatever else you deem necessary, which is policy

21   and procedure and all those types of things.  So I would

22   do anywhere between 18 and 20 hours of classroom

23   training where it's just me and our new hires and we're

24   going over all those things that TCI wants us to go --

25   go over and then our policy.

1           For the next week and a half to two weeks, they

2    are simply shadowing.  So they're following another

3    correction officer around.  I did not want my new hires

4    who were still in the training phase to be active in

5    anything, so they -- whatever the corrections officers

6    got into within that week-and-a-half period, they would

7    just kind of be following along.

8    Q.       What were some of the topics that you covered

9    in training, whether it be in the classroom or

10   shadowing?

11   A.       You know, you want to try to cover everything,

12   so, I mean, I can't -- just all of our policy.  We did

13   use of force.  We did, you know -- 'cause in the jail,

14   you're -- you're taking care of someone's daily needs

15   every single day, so, I mean, you're -- you're going

16   over how to do a meal pass, how to do a med pass, how to

17   book people in, book people out.  You're dealing with

18   the court system.

19           So, I mean, it's a lot to get in in -- in a

20   two-week period.  But, you know, we try to cover as much

21   as -- what TCI requires of us and then the day-to-day

22   type of things.

23   Q.       How long were you in corrections?

24   A.       I was in corrections for the -- the entire time

25   that I worked there, which is 10 years, and then I

1    also -- I went to the police academy in 2018 to become

2    certified.  So I did some narcotics investigations for

3    the sheriff's office part time as well.

4    Q.      Okay.  Were you always a lieutenant?

5    A.      Like my entire time employed there?

6    Q.      Yes.

7    A.      No, sir, I started as a corrections officer.

8    Q.      Okay.  You started as a correction officer?

9    A.      Uh-huh.

10   Q.      Okay.  You started as a correction officer.

11   A.      Uh-huh.

12   Q.      Did you possess the rank of corporal?

13   A.      I -- I did.

14   Q.      Sergeant?

15   A.      And then sergeant, yes.

16   Q.      Lieutenant?

17   A.      Yes.

18   Q.      Okay.  Is it fair to say that in corrections,

19   some of the arrestees that are brought in that you're

20   to put -- to -- to provide, as you said, their daily

21   needs for are not really wanting to be confined?

22   A.      I don't think anyone wants to be confined.

23   Q.      Have you ever experienced an arrestee that was

24   combative?

25   A.      Yes, sir.

1  Q.      Have you ever experienced an arrestee scream at
2  you?
3  A.      Yes, sir.
4  Q.      Cuss at you?
5  A.      Yes, sir.
6  Q.      Spit at you?
7  A.      Yes, sir.
8  Q.      Have you ever been assaulted by an arrestee?
9  A.      Yes, sir.
10 Q.      Have you seen other corrections officers who
11 have experienced what you have described?
12 A.      And worse, yes.
13 Q.      And what do you mean "worse"?
14 A.      Well, I -- I -- I've never been assaulted to
15 where I've needed emergency medical care, but I have
16 seen officers who have.
17 Q.      Okay.  Now, I want to shift gears on some
18 training because it's been alleged that Campbell County
19 has no training whatsoever with regard to intervening
20 when another officer is doing something
21 unconstitutional.
22         Do you agree or disagree with that?
23 A.      I disagree.
24 Q.      Why do you disagree with it?
25 A.      Because I personally -- I was personally the

1   one who taught them to intervene.  It was -- I mean, in

2   my training catalog, you won't find "duty to intervene"

3   'cause it's -- they didn't really have a -- you know,

4   you have to teach duty to intervene at that time.  But

5   it was, you know, when you see an officer who is either

6   going too far or emotionally invested, you know, it is

7   your duty to tell them to leave your area, you know, tap

8   them out and -- for the sake of you and the inmate, you

9   know.  So I -- I personally taught them better than

10  that.

11  Q.       Have you had to perform internal investigations

12  concerning this issue?

13  A.       This issue?

14  Q.       Yes.

15  A.       No, sir.

16  Q.       Have you had to perform internal investigations

17  in general?

18  A.       Yes, I did the IAs that were required in -- in

19  the jail.  I conducted those IAs.

20  Q.       And you would do an IA in the jail.  That would

21  be -- the subject of the IA would be someone who was

22  employed on the jail side of the sheriff's department?

23  A.       Correct.

24  Q.       Is that correct?

25  A.       Correct.

1  Q.       And do you or do you not take -- did you or did

2  you not take complying with your training and the

3  policies of the jail seriously?

4  A.       Yes, sir.

5  Q.       With respect to this Nathan Ling situation,

6  when did -- it happened in the middle of the night;

7  correct?

8  A.       Correct, to my understanding.

9  Q.       And when did you first find out about it?

10 A.       I want to think that this happened over the

11 weekend, if I'm not mistaken.  I remember coming into

12 work, and he was -- he was -- already had left the

13 facility.  And I was informed of it when I got to work

14 that morning.

15 Q.       Okay.  And what did you do, if anything,

16 concerning Mr. Ling?  Did you start an IA investigation?

17 A.       I did.  I -- I started to gather -- I hadn't

18 started the investigation, per se.  I was getting ready

19 to start it.  So I was gathering video, trying to find

20 out -- you know, gathering logs, trying to find out who

21 was where and all those types of things.  Just getting

22 my ducks in a row, I guess you would say.

23 Q.       And you were told that someone else would

24 handle that; correct?

25 A.       Correct.  So when I was gathering everything

1  together, Chief Goins come in and said that he was going

2  to take over the IA, that he had more training and was

3  just better suited to do it.  And so I gave him -- I

4  think by that time, I had the video pulled and I -- I'd

5  given him names of people I knew was there.

6  Q.      Okay.

7  A.      That's pretty -- I think that's about all that

8  I had at that time.

9  Q.      Did you have any contact -- well, concerning

10 the TBI, you understood that the TBI -- that the -- an

11 outside agency had come in to investigate this incident;

12 correct?

13 A.      Yes, sir.

14 Q.      Did you ever or do you know of anyone who ever

15 withheld a document or anything from the TBI concerning

16 this incident?

17 A.      Not to my knowledge.

18         MR. KNIGHT:  Thank you.  That's all I have.

19         THE COURT:  All right.  Did you have any

20 cross-examination?

21                    CROSS-EXAMINATION

22 BY MR. SEATON:

23 Q.      Ms. Campbell, we've never met; correct?

24 A.      Not to my knowledge.

25 Q.      I -- I haven't -- I haven't taken your

 1  deposition; correct?

 2  A.        No, sir.

 3  Q.        All right, sir [sic].  And I want to show you

 4  what we have put together as the chain of command at

 5  the -- at the Campbell County Sheriff's Department.  Is

 6  that -- is that accurate at the time, 2019?  I'm sorry.

 7  A.        It looks -- it looks to be.  I don't know what

 8  Sergeant Owens -- like, I don't know if he was sergeant

 9  at the time, but --

10  Q.        Okay.  I mean --

11  A.        But it looks -- on my side, yes.

12  Q.        Okay.  Fair enough.  That's all I ask.

13            So on your side, this -- this was the chain of

14  command; right?

15  A.        Yes, sir.

16  Q.        All right.  And Catie Wilson said that she

17  took -- took over the jail and would -- would -- her job

18  was to take care of the needs of the inmates and the

19  officers?

20  A.        Okay.

21  Q.        Right?

22  A.        Yes.

23  Q.        And that your job was to train?

24  A.        One of my jobs, yes.

25  Q.        What else was your job?

1    A.        I did -- like I was saying, I did the IAs

2    inside the jail.  I also -- after I went to the

3    police -- graduated the police academy, I was in charge

4    of doing any narcotics things that we had that would

5    start at the jail and lead to other -- otherwise, so --

6    Q.        I'm not a police officer.

7    A.        I'm sorry?

8    Q.        What's -- what's an "IA"?

9    A.        An internal investigation.  So --

10   Q.        All right.

11   A.        -- if we had an officer inside the jail who we

12   thought were doing illegal things or just inappropriate

13   things, I would be the one investigating them.

14   Q.        All right.  So you're the primary one that

15   would have -- be assigned the task of doing the internal

16   things if you had officers going off the rails, doing --

17   A.        Yes, sir.

18   Q.        -- bad things; right?

19   A.        Yes, sir.

20   Q.        All right.  And as you recall, on this -- on

21   this Nathan Ling incident, the jail side -- on your

22   side, the officers that were involved were Sean Brown,

23   Alexander Standridge, and Joshua Miller; right?

24   A.        I believe so.

25   Q.        All right.  And then on the road side was

1  Justin Crabtree and Dakota Williams; right?

2  A.       I believe so.

3  Q.       And so is it your testimony that you trained

4  Alexander Standridge and Joshua Miller?

5  A.       Yes.

6  Q.       And if they said that you gave them four days

7  of training, that's all the training that they received,

8  would that be about right?

9  A.       No.  Like me -- like -- so like I said

10 previously, they'll get 18 to 20 hours with me in a

11 classroom and then two weeks of shadowing.

12 Q.       Okay.  But the 18 to 20 hours, that's --

13 what? -- about three days?  Three to four days?

14 A.       Uh-huh.

15 Q.       All right.  So that's -- and I -- that's

16 consistent with what they're saying, that they got --

17 A.       Uh-huh.

18 Q.       -- three to four days of training -- classroom

19 with you; right?

20 A.       Uh-huh, yes, sir.

21 Q.       And then they walked around with other

22 officers, what we call "on-the-job training"?

23 A.       Yes, sir.

24 Q.       All right.  But that was the extent of their

25 training; right?

1  A.      Yes, sir.

2  Q.      All right.  And neither Alexander Standridge or

3  Joshua Miller had gone to this TCI for the 40 hours of

4  training, had they?

5  A.      That I -- I can't -- I don't know when they

6  would have went to that --

7  Q.      Okay.

8  A.      -- if it would have happened before or after

9  this.

10 Q.      And during the three to four days of classroom

11 training that you would train them on, did you train

12 them with -- on the 450-page operations manual?

13 A.      (No audible response.)

14 Q.      Would you like to see it?

15 A.      Yes, sir.

16 Q.      Okay.  That's Exhibit Number 1 to --

17 A.      Okay.

18 Q.      -- to our trial.  Do you recognize that?

19 A.      Yes, sir.

20 Q.      And is that the operations manual that you all

21 used?

22 A.      Yes, this is the policy and procedure.  This

23 looks like it's the -- yes.

24 Q.      And during the time that people would come in

25 as a new hire, would you all basically hand them this

1  policy manual, ask them to sign for it?

2  A.       Yes, sir.

3  Q.       And is it your testimony in three to four days

4  you were able to go through that, or did you go through

5  that whole -- the entire manual with them?

6  A.       This is patrol's policy and procedure, but

7  they're a little bit different, but -- yes.

8  Q.       So how big is your all's?

9  A.       I mean, I would say it was similar in size.

10  Q.       Okay.  And would it be your testimony that you

11  went over the entire policy and procedures manual with

12  these people in three to four days?

13  A.       Did I read this out loud to them?  No.

14  Q.       Okay.  Or did you walk through them and -- and

15  walk through things such as use of force and that type

16  of thing?

17  A.       Yes, sir.

18  Q.       All right.  And did anybody ever evaluate your

19  training program?

20  A.       The sheriff and my captain have to sign off on

21  it.  Do I ever -- I know that a lieutenant had come in

22  and sat in on a couple of classes with me.

23  Q.       Okay.

24  A.       But as a formal evaluation, I don't believe so.

25  Q.       And if these officers have testified that they

1  didn't feel that they were adequately trained, you

2  dispute that?

3  A.      Yes.  I mean, I hate that they feel that way.

4  They did -- at the end of training, they did sign off

5  that they felt comfortable.  There's a list that went in

6  their training file, and it was all the high points that

7  TCI wants you to cover, and they signed that they felt

8  comfortable.

9          And part of my speech was if you don't feel

10  comfortable signing this, we will go over -- don't sign

11  it.  We will go over it till you feel comfortable after

12  this class is over.

13  Q.      So you're the head person that they come to for

14  the internal investigations, you said?

15  A.      The sheriff's office, yes.

16  Q.      Or for -- for the jail?

17  A.      For the jail, correct.

18  Q.      All right.  All right.  So -- and so you

19  started an internal investigation over this Ling matter;

20  correct?

21  A.      Correct.

22  Q.      And why did you start an internal

23  investigation?

24  A.      I think use of force to that degree, I just

25  feel that it would be necessary.

1  Q.      To what degree?

2  A.      To a degree that an inmate had to go to the

3  hospital.

4  Q.      And be airlifted to a --

5  A.      Correct.

6  Q.      -- trauma center?

7  A.      Yes.

8  Q.      And so you started the investigation; right?

9  A.      Yes, sir.

10 Q.      How far did you get?

11 A.      I got maybe the video pulled and was trying to

12 get names of who was actually there.  That's about all

13 that I got -- I can recall getting done.  I didn't get

14 much done.

15 Q.      So did you get a day's worth done?

16 A.      No, I got hours.

17 Q.      Okay.  And then you said that -- who came to

18 you and said, stop, I'm going to do it myself?

19 A.      The chief deputy.

20 Q.      Okay.  And did you work under the chief deputy,

21 or did you work under Stoney Love?

22 A.      My direct was Stoney Love.

23 Q.      Okay.  So how does that -- I mean, why would

24 the chief deputy be able to tell you --

25 A.      I can't answer that.

1   Q.       Pardon?

2   A.       I can't answer that.  That's something you

3   would have to ask him.

4   Q.       All right.  So you stopped the complete

5   investigation; right?

6   A.       Yes, sir.

7   Q.       And did you find out whether or not the

8   department had done any investigation on its own?

9   A.       I mean, no, not -- I remember the chief deputy

10  saying he was working on it, but they didn't have to

11  tell me what they were doing.

12  Q.       Did you know that -- that there was no

13  investigation done?

14  A.       No.

15  Q.       Pardon?

16  A.       No.

17  Q.       You never knew that?

18  A.       No.

19  Q.       Weren't you --

20           MR. KNIGHT:  Objection.  Mischaracterizing the

21  testimony, Your Honor.

22           THE COURT:  Sustained.

23  BY MR. SEATON:

24  Q.       Okay.  Were you concerned that there was --

25  well -- okay.  Let's -- I don't mean to mischaracterize

1    the testimony.

2         I -- I think that Chief Goins came in here

3    earlier and said he did -- he went out the next day one

4    day and -- and talked with -- with the neighbors.  But

5    other than that, he stopped.  Okay?

6         Were you aware of that?

7    A.      No, sir.

8    Q.      Were you concerned that there was no

9    investigation done in the department?

10   A.      I just said I didn't know that there wasn't.  I

11   trusted my superiors were doing what they told me they

12   were going to do.

13   Q.      Were you aware -- or -- or did you have any

14   conversation with your superiors or Catie Wilson about

15   terminating any of these people that had used unlawful

16   force?

17   A.      I can't remember if I did.  You know, I talked

18   to the sergeant about a lot of things.  Again, I was

19   told this was being investigated and that I didn't need

20   to concern myself with it, so I didn't.

21   Q.      Okay.  So you didn't concern yourself with

22   terminating anybody that was acting outside of their

23   training?

24   A.      The chief deputy told me he was handling the

25   investigation.  If the chief deputy wanted someone

1  terminated, I would assume that that would go to Stoney

2  Love and then to me.

3  Q.      All right.  So you're just saying that it's not

4  my job, push it on up, and so it's not my concern

5  anymore?

6  A.      Correct.  I mean, I believe that is my job

7  to -- my superiors told me to stand down, and that's

8  what I did.  They were handling it.

9  Q.      All right.  And so wouldn't you have been --

10  well -- well, let me -- let me back up.

11          So the officers that were involved from the

12  correction side, did you feel that they had done

13  anything wrong?

14  A.      As --

15  Q.      Did you watch the video?  I'm sorry.  I didn't

16  mean to interrupt you.  Did you watch the video?

17  A.      Yes, sir.

18  Q.      Okay.  So you saw the whole video of what

19  happened?

20  A.      Yes, sir.

21  Q.      And do you feel that any of your corrections

22  people did things wrong?

23  A.      I feel that after Mr. Ling was placed in a cell

24  that there should have been medical care probably

25  provided.

1    Q.        Okay.  And do you feel that they should have

2    intervened when all of this abuse was going on?

3    A.        From what I can remember, I don't know how much

4    the corrections officers could have intervened.  I think

5    that something should have been said, but I don't know

6    that they could have stopped Crabtree.

7              I just know that he should have been provided

8    medical care after he was placed in the cell, and that

9    did not happen.

10   Q.        So weren't you concerned as the lieutenant of

11   the department that you're going to continue to have

12   Sean Brown as your -- as your corporal after this Ling

13   incident happened?

14   A.        Again, my superiors told me that it was being

15   handled and investigated.

16             MR. SEATON:  All right.  Thank you.

17             THE COURT:  Any redirect?

18                    REDIRECT EXAMINATION

19   BY MR. KNIGHT:

20   Q.        45 days after this incident -- probably less

21   than 45 days after this incident, the TBI became

22   involved; correct?

23   A.        I do not know the time frame.  I do -- I do

24   know that they were involved.

25   Q.        And they performed an investigation?

1   A.      Yeah, I -- I'm assuming so.

2   Q.      And you -- you've already testified that you

3   did not interfere and you don't know anybody who did

4   interfere in that investigation?

5   A.      No, sir.

6   Q.      And as a result of that investigation, a report

7   was generated to the district attorney; correct?

8   A.      I would assume so.  I don't know.

9   Q.      You do know that Justin Crabtree was indicted?

10  A.      Yes, sir.

11  Q.      And pled guilty; correct?

12  A.      Yes, sir.

13  Q.      And so did Sean Brown; correct?

14  A.      Yes, sir.

15  Q.      That's all I -- oh, in -- in -- in a -- in

16  corrections, on occasion -- oh, every arrestee is

17  different.  Is that fair to say?

18  A.      Yes, sir.

19  Q.      And on occasion, there has to be more than one

20  correction officer to get control of that arrestee?

21  A.      Yes, sir.

22          MR. KNIGHT:  Thank you.

23          THE COURT:  All --

24          MR. SEATON:  Nothing --

25          THE COURT:  -- right.

1    MR. SEATON:  -- further.

2    THE COURT:  All right.  Thank you.

3    THE WITNESS:  Thank you.

4    THE COURT:  All right.  All right.  Mr. Knight,

5 call your next witness.

6    MR. KNIGHT:  Defense rests, Your Honor.

7    THE COURT:  Okay.  Defense rests.

8    All right.  Mr. Seaton, do you have any

9 rebuttal?

10    MR. SEATON:  No, Your Honor.

11    THE COURT:  Okay.  So plaintiff has rested.

12 Rested its entire case?

13    MR. SEATON:  Yes, sir.

14    (Subsequent proceedings were heard but

15    not requested to be transcribed herein.)

16    END OF PROCEEDINGS

17

         I, Stephanie Fernandez, do hereby certify that
18 I reported in machine shorthand the proceedings in the
   above-styled cause, and that this transcript is an
19 accurate record of said proceedings.

20                           s/Stephanie Fernandez
                             Stephanie Fernandez,
21                           Official Court Reporter

22

23

24

25