# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TENNESSEE
# AT KNOXVILLE

| | |
|---|---|
| NATHAN LING, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No.: 3:20-cv-00233 |
| ) | |
| CAMPBELL COUNTY, TENNESSEE, ) | Judge Atchley |
| et al., ) | |
| ) | Magistrate Judge McCook |
| Defendants. ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR NEW TRIAL AND/OR JUDGMENT NOTWITHSTANDING THE VERDICT AND/OR TO ALTER OR AMEND JUDGMENT**

Following a four-day trial, which included the testimony of over twenty witnesses and over fifty exhibits, the jury determined that the plaintiff had proven by a preponderance of evidence the elements of his 42 U.S.C. § 1983 claim of liability against Campbell County, Tennessee based on their failure to train its staff to intervene to protect jail detainees from abuse by other staff. During the trial, the jury heard the following uncontested expert proof:

1. Due to his injuries, the plaintiff did not have any reasonable earning capacity, and the plaintiff did not meet the threshold of gainful employment. (Mr. Galloway).

2. Plaintiff's lost earning capacity was between $1,779,261 and $2,228,150 (Dr. Bohm).

3. Plaintiff's life care plan was between $2,841,953.51 and $2,983,230.22 (Ms. Whatley).

Based on this uncontested expert testimony of economic damages being a maximum of $5,211,380.22, and having to decide the value for non-economic damages (permanent injury, pain & suffering, and loss of enjoyment of life), the jury awarded the plaintiff $6,000,000.

The defendant now seeks relief of this judgment pursuant to Rules 50 and 59, *Fed. R. Civ. P.* Plaintiff respectfully requests that the Court deny the defendant's motion for the following reasons:

1. The defendant has waived their right to relief pursuant to a motion for judgment notwithstanding the verdict;
2. There was sufficient evidence for the jury to find the defendant liable for failing to train their staff to intervene to stop abuse by fellow staff;
3. There was sufficient medical proof to establish causation regarding the plaintiff's injuries; and
4. The amount of the verdict is not excessive.

## LAW AND ARGUMENT[1]

**I.     The defendant waived their right to seek relief pursuant to a motion for judgment notwithstanding the verdict.**

At the close of the plaintiff's proof, the defendant made an oral motion for directed verdict; however, defense counsel stated that he was only making the motion regarding the plaintiff's second issue – whether Campbell County failed to train its staff to provide needed medical care for jail detainees. The defendant made the decision not to seek a directed verdict on the plaintiff's claim of failure to train on intervention. At the close of the defendant's proof, the same motion was raised, and the defendant again chose not to raise the motion as to the plaintiff's claim regarding the failure to train on intervention. Additionally, the defendant did not raise the issue of causation in the motion for directed verdict.

Rule 50(a)(2), Fed. R. Civ. P., provides that, "A motion for judgment as a matter of law

---

[1] The plaintiff has not yet received a copy of the trial transcript. If the Court requires supplementing with cites to the transcript, the plaintiff will do so once the transcript is obtained.

may be made at any time before the case is submitted to the jury. The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment." Additionally, Rule 50(b) provides:

> If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment—or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged—the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59….

Sixth Circuit case law has long required that an issue be raised in a motion for directed verdict in order for the trial court to consider it on a motion for judgment notwithstanding the verdict. *See American & Foreign Ins. Co. v. Bolt*, 106 F.3d 155, 160 (6th Cir. 1997) ("This rule has long been read to say that a motion for directed verdict made at the close of the evidence is a prerequisite to a motion for judgment as a matter of law on the same grounds.")(citing *Portage II v. Bryant Petroleum Corp.*, 899 F.2d 1514, 1522 (6th Cir. 1990)). This holding was more recently approved of by the Sixth Circuit in *Cranpark, Inc. v. Rogers Group, Inc.*, 821 F.3d 723 (6th Cir. 2016), wherein the Court stated:

> It is a "well-established proposition that a post-trial motion for judgment as a matter of law 'is not available at anyone's request on an issue not brought before the court prior to submission of the case to the jury.'" *Ford v. Cty. of Grand Traverse*, 535 F.3d 483, 491 (6th Cir. 2008) (quoting *Am. & Foreign Ins. Co. v. Bolt*, 106 F.3d 155, 160 (6th Cir. 1997)). When a party fails to raise an argument in its Rule 50(a) pre-verdict motion, it is precluded from making a Rule 50(b) post-verdict motion on that ground. *Sykes v. Anderson*, 625 F.3d 294, 304 (6th Cir. 2010).

*Id*. at 736.

Here, the defendant chose not to raise the issue of plaintiff's claim of failure to train on intervention, as well as causation of the plaintiff's injuries, in their motion for directed verdict. The Sixth Circuit has long held that an issue must be raised in a Rule 50(a) pre-verdict motion in

order raise the issue in a Rule 50(b) post-verdict motion. Because the defendant chose not to raise these issue in their motion for directed verdict, the defendant has waived their right to seek relief pursuant to Rule 50(b).

**II.** **<u>There was sufficient evidence for the jury to find the defendant liable for failing to train their staff to intervene to stop abuse by fellow staff.</u>**

The defendant seeks relief from the jury's verdict by asking this Court to grant a new trial by challenging the jury's finding that Campbell County is liable for failing to train their staff to intervene against abuse by other staff. The Sixth Circuit has recognized the following grounds that are appropriate for the Court to grant a new trial:

> A new trial is appropriate when the jury reaches a seriously erroneous result as evidenced by (1) the verdict being against the [clear] weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e. the proceedings being influenced by prejudice or bias. New trials are not to be granted on the grounds that the verdict was against the weight of the evidence unless that verdict was unreasonable.

*Id*. at 737 (internal citations omitted). To succeed, the defendant would have to show that the verdict was against the clear weight of the evidence. Here, the clear weight of the evidence supported the jury's finding that Campbell County failed to train their staff to intervene against abuse by fellow staff, and that this failure to train was the moving force behind the constitutional violations and Plaintiff's injuries.

During the trial, the jury heard testimony from correctional officers Alexander Standridge, Joshua Miller and Corporal Sean Brown. These officers testified that they received no training on when and how to intervene against a fellow staff member who was abusing an inmate. Other witnesses, including former Sheriff Robbie Goins and former Chief Deputy Jeremy Goins, dismissed the idea of providing training on this subject, and stated that it would simply be "common sense" for officers to intervene when they observed abuse. To the contrary,

Plaintiff's expert Greg Winston testified that it was critical for Campbell County to provide this training to its staff. Mr. Winston further testified that Campbell County's failure to provide this training amounted to deliberate indifference, that the failure to provide this training was the "moving force" for why the plaintiff suffered his injuries, and that this failure to train actually caused the plaintiff's injuries.

The only evidence that the jurors heard during the trial that Campbell County provided any training on intervention came from Lieutenant Mallory Campbell. However, Lt. Campbell offered no evidence to support this testimony. Lt. Campbell offered no documents or any other evidence to show that she had actually provided this training to the officers. Nor did Lt. Campbell provide any specific details as to what this alleged training consisted of. Additionally, Campbell County's operations manual is completely silent as to the duty to intervene. Therefore, the issue was a disputed issue of material fact, which was properly considered by the jury.

Importantly, during the testimony of Mr. Winston, he explained to the jury the exact moment when properly trained officers first could have, and should have, intervened. When Mr. Winston was shown the video of the incident in the sally port, he explained to the jury that intervention by trained staff would have occurred when the plaintiff was drug out of the car and fell to the ground. This happened only a few feet away from officer Standridge and Corporal Brown. Mr. Winston explained to the jury that if properly trained, Officer Standridge and Corporal Brown would have separated Deputy Crabtree from the plaintiff and would have taken primary custody of the plaintiff. Mr. Winston further explained that the actions by Deputy Crabtree in pulling the plaintiff from the car constituted excessive force, and properly trained jail staff would have recognized this as excessive force. This was confirmed by the testimony of

multiple witnesses, including Sheriff Goins, that the way Deputy Crabtree dragged the plaintiff out of the patrol car constituted excessive force.

Simply put, the jury's finding of liability against Campbell County was reasonable. The clear weight of the evidence supports the jury's verdict.

### III. There was sufficient medical proof to establish causation regarding the plaintiff's injuries.

The defendant spends a significant portion of their motion arguing that the plaintiff failed to establish causation regarding medical proof. As this issue was not raised in the defendant's motion for directed verdict, the defendant must show that the jury's finding was against the clear weight of the evidence. Here, the clear weight of the evidence supports the jury's finding that the plaintiff's injuries were caused by the defendant.

In Tennessee, causation "may be established by a combination of medical and lay testimony." *Pellicano v. Metro. Gov't of Nashville*, 2004 Tenn. App. LEXIS 110, *18-19 (Tenn. Ct. App. 2004). Before addressing the medical proof, it should be pointed out that most, if not all, of the plaintiff's injuries were caught on videotape at the Campbell County jail. Injuries such as the facial and rib fractures, were inflicted by the strikes to the plaintiff's face and ribs while he was being restrained on the floor of the intake area. The plaintiff's blood covered the floor of the intake area. The video also shows the plaintiff's head being driven into the intake room's metal window casing and the counter by Deputy Crabtree. Apart from the video evidence, witnesses testified about injuries they observed that were not captured on video. Specifically, Officer Alexander Standridge testified that while in the sally port, he witnessed Deputy Crabtree slam the plaintiff's head three or four times against the concrete wall.

During the trial the jury was shown the video depositions of Dr. Todd Abel and Dr. Joshua Startup. The jury observed the following testimony from Dr. Abel:

6

Page 9

```
4        A.    Okay. So looking at a consult note,
5     June 2nd of 2019, the reason for consultation was a,
6     quote, "brain injury". The history was an
7     altercation the day before in the jail, and after the
8     consultation, he had a decline in his mental status
9     to the point where he needed further medical care and
10    was transferred to UT Medical Center. A CAT scan of
11    the head had been done prior to him coming to our
12    attention, and it showed a, what's called traumatic
13    intraprenchimal hemorrhage at several locations in
14    the brain, mainly a large or large for its location,
15    a thalamic hemorrhage and then several small frontal
16    hemorrhages. And our assessment was that they did
17    not need any surgery, they never needed surgery, so
18    we just kind of followed along for several days with
19    a few CAT scans to make sure that he didn't develop
20    any kind of life-threatening edema or that the
21    hemorrhages didn't become blossom, hemorrhage or
22    contusion or bruise, it's all the same thing, but the
23    contusions or hemorrhages didn't blossom or get to
24    the point where they would need surgery.
25           Q.    So you said that there were different
```

Page 10

```
1     hemorrhages, hemorrhages meaning bleeding in the
2     brain?
3            A.    Right. And I kinda used the terms
4     interchangeably, bleeding or contusions or
5     hemorrhages. In a traumatic scenario, I would say
6     hemorrhage and a bruise is really the same thing or a
7     contusion. There was one larger one in the thalamic
8     area, which is a little bit unusual. The frontal
9     ones are very classic for traumatic hemorrhages.
10    Hemorrhages in the white matter are very classic for
11    what's called diffuse axonal injury.
```

Page 12

```
18           Q.    So I want you to assume that some of
19    these deputies that had taken this young man in were
20    in their early 20s, and one has testified that as
21    soon as he gets to the, to the, what's called the
22    jail sally port, they slammed his head up against a
```

23      block wall three to four times. Would that be
24      consistent to cause these types of traumatic
25      injuries?

Page 13

1         A.    Yes.
2         Q.    Okay. And then I further want you to
3      assume that when they had him in the floor of -- this
4      is Exhibit Number 8, of the jail, that numerous
5      deputies in their early 20s had gotten on top of him
6      and had been hitting him in the head with their
7      fists. Would that also be consistent with that type
8      of injury?
9         A.    Yes.
10     Q.    Or, and I also further want you to
11     assume that at one point in time that they had him
12     standing up and pushed his head up against a solid
13     window casing, a solid metal window casing. Would
14     that also, could that also cause that type of a
15     traumatic injury?
16     A.    Yes.

Page 19

4         Q.    All this was to the left side. Did he
5      have a fracture of the left eye orbit?
6         A.    Correct.
7         Q.    Fracture of his nose?
8         A.    Yeah.
9         Q.    Fracture of his lip or part of his
10     mouth?
11     A.    Yeah.
12     Q.    His jaw?
13     A.    Yeah.
14     Q.    Fractured his shoulder?
15     A.    Yes.
16     Q.    And his ribs?
17     A.    Yes.
18     Q.    Would all that be consistent with
19     causing this type of a traumatic brain injury also?
20     A.    Well, I think that just speaks to the
21     forces, you know, and the amount of trauma that was
22     sustained. Certainly the facial fractures, those
23     damaged, injuries to area up here, all that is
24     consistent with the traumatic brain injury.

(Deposition of Dr. Abel, pages 9-10, 12-13, 19). Dr. Abel further testified about the affects of a traumatic brain injury:

> Page 20
>
> 21    Q.    Sure. So what kind of permanent
> 22    deficits can that type of a moderately severe
> 23    traumatic brain injury cause?
> 24    A.    It can cause, like the frontal lobes
> 25    deal with kind of initiative and planning. People
>
> Page 21
>
> 1    can generally have personality changes. They maybe
> 2    have like mental health, depression type issues.
> 3    Q.    Addiction issues?
> 4    A.    Post traumatic stress type issues.
> ….
> 25    Q.    Okay. Can the traumatic brain injury
>
> Page 22
>
> 1    cause vision issues or concentration issues, those
> 2    kinds of things?
> 3    A.    Yes.
> 4    Q.    All right, Sir. Long term?
> 5    A.    Yes.
> 6    Q.    Rest of his life maybe?
> 7    A.    Yes.
> 8    Q.    All right, Sir.
> 9    A.    Possibly could.
> 10   Q.    Headaches, that type thing?
> 11   A.    Yes.

(Deposition of Dr. Abel, pages 20-22). The jury also observed the video deposition of Dr. Startup who testified as follows:

> Page 29
>
> 1    Q.    Do you have an opinion as to whether or
> 2    not the trauma that was caused from the events that I
> 3    described are going to cause him permanent effects?
> 4    A.    If he is still having concerns two years
> 5    after the injury, the likelihood of neurologic

9

```
 6     recovery is further neurologic -- anything that is
 7     neurologically mediated, there is low likelihood of
 8     further neurologic recovery. It is primarily
 9     adaptation at this point.
10         Q.    So, I understood your medical answer to
11     that.
12         A.    Sorry.
13         Q.    That's okay. But, so are you saying
14     that it's most likely permanent? It's a permanent
15     condition from this trauma?
16         A.    At this point, neurologic recovery --
17     yeah, neurologic recovery is low or next to nothing
18     after two years.
19         Q.    Okay. And it's been well over two
20     years, right?
21         A.    Yes.
```

(Deposition of Dr. Startup, page 29).

Although the plaintiff did not testify during the trial, the jury heard from the plaintiff's mother as to how his traumatic brain injury affects him on a daily basis. Among other conditions that she personally observed, she testified that he now has a "ten-minute personality" where his attitude and behavior dramatically change on a frequent basis. This was, of course, the reason why a guardian *ad litem* and trustee were agreed to by the parties and appointed by the Court.

The jury's finding of liability against Campbell County for causing the plaintiff's injuries was supported by witness testimony, video evidence, and medical proof. Based on this evidence, the jury's findings were reasonable. The clear weight of the evidence supports the jury's verdict.

## IV.   **The amount of the verdict is not excessive.**

The defendant's final argument is that the jury's verdict of $6,000,000 was excessive. However, based on the uncontested evidence of the plaintiff's damages, the jury's verdict was not excessive.

The Sixth Circuit has held that a jury has broad discretion to set damage amounts, and that verdict should only be interefered with in clearly excessive situations. *See Smith v. LexisNexis Screening Solutions, Inc.*, 837 F.3d 604, 612 (6th Cir. 2016) ("A district court is allowed to interfere with a jury's award 'only when, after reviewing all the evidence in the light most favorable to the prevailing party, [the court] is convinced that the verdict is clearly excessive; resulted from passion, bias, or prejudice; or is so excessive or inadequate as to shock the conscience of the court.'" *citing Am. Trim., L.L.C. v. Oracle Corp.*, 383 F.3d 462, 475 (6th Cir. 2004)).

Here, the jury's verdict is supported by the uncontested evidence of the plaintiff's damages, and it does not shock the conscience. Although we cannot know the jury's deliberations, if the jury awarded the full amount of the damages for the loss of earning capacity and the life care plan, that amount was $5,211,380.22. Deducting this amount from the total verdict leaves $788,619.78 for permanent injury, pain & suffering, and loss of enjoyment of life. Considering the severity and permanency of the plaintiff's injuries, it is arguable that the jury's verdict is conservative. Regardless, the jury's verdict is reasonable, it is supported by the evidence, and it does not shock the conscience.

## **CONCLUSION**

For the reasons stated above, the plaintiff respectfully requests that this Honorable Court deny the defendant's motion. The defendant has waived its right to seek relief pursuant to a judgment notwithstanding the verdict. The defendant's motion for a new trial should be denied as the evidence weighs in favor the jury's findings. Finally, the jury's verdict is reasonable and supported by the evidence.

Respectfully submitted this 14th day of March, 2024.

GARZA LAW FIRM, PLLC

*/s/ Tony Seaton*
Tony Seaton, BPR #7279
Thomas J. Smith, BPR #035331
118 E. Watauga Ave.
Johnson City, TN 37601
Phone: (423) 282-1041
Fax:    (423) 282-0967
Email:  tseaton@garzalaw.com
         tsmith@garzalaw.com

**CERTIFICATE OF SERVICE**

The plaintiff hereby certify that on the 14th day of March, 2024, a copy of the foregoing was filed electronically using the Court's ECF system. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U. S. Mail. Parties may access this filing through the Court's electronic filing system.

*/s/ Tony Seaton*
Counsel for Plaintiff