# JOSHUA MILLER

1  testified as follows:

2                    DIRECT EXAMINATION

3  BY MR. SEATON:

4  Q.        Tell the ladies and gentlemen of the jury your

5  name, sir.

6  A.        Joshua Miller.

7  Q.        And, Mr. Miller, did you previously work for

8  Campbell County Sheriff's Department?

9  A.        Yes, I did.

10 Q.        And where do you work now?

11 A.        I work at LMU.

12 Q.        Okay.  What do you do?

13 A.        I work in distribution.

14 Q.        Okay.  So looking at this Exhibit Number 56, is

15 this you in the far right corner?

16 A.        Yes.

17 Q.        On the bottom?

18 A.        Yes, sir.

19 Q.        And you were a corrections officer for Campbell

20 County; right?

21 A.        Yes, sir.

22 Q.        You'd been there what?  Two months?  Three

23 months?

24 A.        Like right at a month.

25 Q.        Okay.  And you had come from Claiborne County?

Case 3:20-cv-00233-CEA-JEM  Document 204  Filed 03/07/24  Page 648 of 699  PageID #:
Case 3:20-cv-00233-CEA-JEM   Document 210-2   Filed 04/05/24   Page 2 of 24
PageID #: 2983

1    A.       Yes.

2    Q.       And you -- you worked Claiborne County

3    corrections for what?  Two weeks?

4    A.       Yeah.

5    Q.       And did you have any training there?

6    A.       No.

7    Q.       All right, sir.  So when you got to Campbell

8    County, did you know any of these individuals that you

9    were involved with that evening?

10   A.       When I first started?

11   Q.       Yes.

12   A.       No.

13   Q.       Or did you -- did you know them as you began

14   working with them?

15   A.       Yes.

16   Q.       All right, sir.  I thought that you had said

17   that you didn't know Crabtree and had never met Brown;

18   is that right?

19   A.       Before working there, I had never met any of

20   them.  But I did know -- I never had met Crabtree

21   before, but I knew Brown, who was the corporal on my

22   shift.

23   Q.       Okay.  And so tell us just real briefly what

24   you recall happened that evening.

25   A.       I just remember getting a call over the radio

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 649 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM   Document 210-2   Filed 04/05/24   Page 3 of 24
PageID #: 2984

1   that there would be a combative person coming into the

2   intake and that I would be needed up front.  I was in

3   male housing.  And whenever I got to the front to the

4   sally port door, I went to open it, and that's where I

5   was met with Crabtree and Mr. Ling and everyone else

6   that was already up in the front.

7          And I recall them bringing him into the --

8   Dakota and Brown bringing him in and was on each side of

9   him.  And I was standing behind of him.  And all I

10  recall was Brown saying that they would have to take him

11  to the ground because he wasn't listening to anything

12  they were saying, so they put him on his back.  And I

13  was told to hold one of his legs until he calmed down.

14  And I was just doing that.

15         And I -- I recall Crabtree coming back into the

16  trap and just hammer fisting him in the face three times

17  and then just continued to hold one leg while we tried

18  to keep him still.  And Brown had told Crabtree to

19  leave.  And after a little bit had went by, I remember

20  we were told by Brown to -- me and Standridge -- to take

21  him into the shower and try to let him rinse off.

22         And after he had calmed down and when we was in

23  there, Standridge had taken -- he had a spit mask on

24  him, and he had took the spit mask off of him.  And I

25  remember Brown saying that he didn't want him to have

Case 3:20-cv-00233-CEA-JEM  Document 204  Filed 03/07/24  Page 650 of 699  PageID #:
Case 3:20-cv-00233-CEA-JEM  Document 210-2  Filed 04/05/24  Page 4 of 24
PageID #: 2985

1  the spit mask off, so he was trying to put another one

2  back on him.  And that was -- that was when the

3  altercation with Dakota and all of that happened in the

4  shower.  And they finally got him out of the shower and

5  just put him in the cell.

6          And after that, I went back to male housing and

7  stayed the rest of the night.

8  Q.      All right.  Let -- let me back you up quite a

9  few steps.

10 A.      Okay.

11 Q.      Were you in the sally port when Justin Crabtree

12 took Nathan Ling out of the patrol car?

13 A.      No, sir.

14 Q.      Okay.  Were you in the sally port when Justin

15 Crabtree slammed his face up against the -- the block

16 wall?

17 A.      No, I did -- me -- like, he did push him into

18 the door whenever I tried to open the door.  He had,

19 like, slammed him into the door, and it shut back.  And

20 I had to push the door back open.

21 Q.      All right.  So the first encounter you had was

22 once you were in the trap room or the search room?

23 A.      Yes.

24 Q.      Is that right?

25 A.      Yeah.

Case 3:20-cv-00233-CEA-JEM  Document 204  Filed 03/07/24  Page 651 of 699  PageID #:
Case 3:20-cv-00233-CEA-JEM    Document 210-2    Filed 04/05/24    Page 5 of 24
2896
PageID #: 2986

1  Q.        All right.  And we have seen the video

2  and -- and seen you, you know, involved in that.

3            When -- the first time that you saw Nathan

4  Ling, was he resistive?

5  A.        He was.  Yes, he was.

6  Q.        I thought you told me that -- when I took your

7  deposition that he was not resistive.  You didn't think

8  he was combative, and he was squirming in the floor?

9  A.        Initially, the -- initially, when he came into

10  the trap, he was.  But once he was -- once we were in

11  the trap, he just was standing there.  And they kept

12  telling him to do something, and he wasn't doing it.

13  And that's when they took him to the floor.

14  Q.        Well -- but did you tell me that he was --

15  he -- you didn't think he was being combative in the

16  trap room?

17  A.        No, I -- I don't believe he was.

18  Q.        Okay.  And you said that he was squirming in

19  the floor trying to survive?

20  A.        I -- I do not recall saying that, but I do

21  recall him just kind of squirming.  He wasn't really --

22  seemed like he was trying to attack anyone, which he

23  probably couldn't due to him still being handcuffed and

24  on his back.  But he was just kind of kicking his legs

25  around, and I was just told to hold a leg until he

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 652 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM   Document 210-2   Filed 04/05/24   Page 6 of 24
PageID #: 2987

1  calmed down.

2  Q.      All right.  And that's all you did was hold a

3  leg; right?

4  A.      Yes.

5  Q.      You never hit him?

6  A.      No.

7  Q.      All right, sir.  And after all of this

8  occurred, what was his condition?

9  A.      From what I observed, it was pretty poor.

10  Like, he -- I just remember them putting him into the

11  cell, and he just stayed in the floor until we backed

12  out of the cell.

13          And then I -- after that, I -- I think I went

14  up to booking one time during the night and -- just to

15  look in, to check on him, and he was just still laying

16  in the floor.  And I'd asked Brown about it, and he

17  didn't really have much to say.

18  Q.      Did anybody suggest that he get medical

19  treatment?

20  A.      I'm not 100 percent sure.

21  Q.      You said that as you put him into the neg cell

22  or the -- or the solitary cell, he was just mumbling and

23  kind of groaned the whole time?

24  A.      Yeah.

25  Q.      Could he make any complete sentences, or do you

Case 3:20-cv-00233-CEA-JEM  Document 204  Filed 03/07/24  Page 653 of 699  PageID #:
Case 3:20-cv-00233-CEA-JEM    Document 210-2    Filed 04/05/24    Page 7 of 24
PageID #: 2988

1  recall?

2  A.        I don't really recall.  I don't think he did

3  make any full sentences.

4  Q.        And you think that -- you said that he was

5  scared, swollen, and had peed on himself?

6  A.        Yes.  That next morning when I went to leave, I

7  had stopped by because the nurse had finally come in,

8  and I was seeing how he was doing.  And that's what she

9  said had occurred and how he appeared that morning.

10  Q.        And that morning you said that it was clear

11  that it -- that he had been brutally beaten?

12  A.        Yes.

13  Q.        All right.  You said that a day or so later

14  that Sean Brown and -- and Justin Crabtree were gloating

15  about the incident?

16  A.        Yes, sir.

17  Q.        In what way?  Tell us.

18  A.        It was kind of like -- I -- I don't really know

19  how to put it.  It wasn't -- it wasn't like they were

20  just up and proud about it, but they were just kind of

21  like -- I know that there had been words saying that

22  someone had taken a picture of him and was, like,

23  showing it around and was like -- kind of like, oh,

24  well, look what -- look what happened and look what we

25  did, and this and that.  That's all that I really recall

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 654 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM   Document 210-2   Filed 04/05/24   Page 8 of 24
PageID #: 2989

1  about it.

2  Q.      Well, you said that you -- you didn't feel

3  right about this whole situation and being involved in

4  it; right?

5  A.      Yeah.

6  Q.      And so what did you do about that?

7  A.      I remember I'd spoken to the day shift

8  corporal, but it wasn't much of a conversation due to it

9  being shift change, and she didn't really know anything

10  about what had happened.

11  Q.      Did you approach your sergeant, Catie Wilson?

12  A.      I believe I did.  I can't -- I don't really

13  recall, though.

14  Q.      And do you recall -- well, let's look at this

15  Exhibit 56.

16          Sean Brown was your immediate supervisor;

17  right?

18  A.      Yes.

19  Q.      And you were reporting to Catie Wilson about

20  the whole event because you'd already tried to talk with

21  Sean Brown?

22  A.      I don't think I did talk to Sean much about it

23  just because of the way he was acting about the whole

24  situation.  I didn't feel like it was -- I felt like it

25  had to go a little bit further 'cause I wouldn't have

Case 3:20-cv-00233-CEA-JEM  Document 204  Filed 03/07/24  Page 655 of 699  PageID #:
Case 3:20-cv-00233-CEA-JEM    Document 210-2    Filed 04/05/24    Page 9 of 24
PageID #: 2990

1  gotten anywhere with him.

2  Q.      So you -- you went -- you went up the chain of

3  command to -- to Sergeant Catie Wilson; right?

4  A.      Yeah.

5  Q.      And do you recall approaching her about the

6  incident?

7  A.      I vaguely do remember going and talking to her

8  in her office about it, but I'm not 100 percent sure.

9  And I don't really remember what was said.

10  Q.      Okay.  Let me show you on page 40 of your

11  deposition, on line 15 -- Joseph, if you'd pull that

12  down.  She's going to change the app here.

13          I asked you this question.  I said, "What did

14  you say to Catie Wilson" -- "Sergeant Catie Wilson?"

15          And you said, "I just said that there was a bad

16  incident, and I was just" -- "didn't know what to do or

17  say anything about it.  I was like" -- "It was just a

18  lot had happened, and I didn't necessarily agree with it

19  and didn't know how to talk to her about it.

20          "And she just" -- "She was like, well, I'll

21  talk to you a little bit later about it, and she was

22  like" -- "and then just kind of walked out of her office

23  'cause that's when the new corporal came in.

24          "And the nurse were [sic] in there checking on

25  him.  And so I just walked out of the office, and I went

Case 3:20-cv-00233-CEA-JEM  Document 204  Filed 03/07/24  Page 656 of 699  PageID #:
Case 3:20-cv-00233-CEA-JEM    Document 210-2    Filed 04/05/24    Page 10 of 24
2901
PageID #: 2991

1    over to the cell to see how he was doing and to ask the

2    nurse like" -- "like how he was, and he seemed very

3    scared of anyone as of the nurse" -- "anyone.  And he

4    was, I mean, swelled up.  He peed on himself when he was

5    laying in the floor and not making full sentences."

6         So you had approached Catie Wilson; right?

7    A.    Yeah.

8    Q.    All right.  Does that refresh your memory?

9    A.    Yes, it does.

10   Q.    All right, sir.  And I asked you on page 41,

11   "What time was that?

12        "A little after 7:00.

13        "Okay.  And so" -- "So Sergeant Catie Wilson,

14   she just said, 'I'll take care of it?'"

15        That was my question.  "And so Catie Wilson,

16   she just said, 'I'll take care of it?'"

17        And your answer was, "She just said that she

18   would talk to me later about it."

19        And then your answer was, "And I never heard

20   from her, never talked to her.  She had" -- "she was" --

21   "she" -- "we had never" -- "I don't" -- "she will say

22   that she never" -- "that she had something against me,

23   but I feel she was the main reason why I left Campbell

24   County to begin with.  Like, we was" -- "We never saw

25   eye to eye with anyone, it seemed."

Case 3:20-cv-00233-CEA-JEM  Document 204  Filed 03/07/24  Page 657 of 699  PageID #:
Case 3:20-cv-00233-CEA-JEM    Document 210-2    Filed 04/05/24    Page 11 of 24
PageID #: 2992

1       Right?

2   A.      Yeah.

3   Q.      So is that the reason that you left there?

4   A.      Mainly that and then just a lot of overtime and

5   just wanted to be closer to home.

6   Q.      Let me just switch -- switch gears with you for

7   just a second.

8           And do you remember after all of this occurred

9   and you were asked to do an incident report; correct?

10  A.      Yes.

11  Q.      And who asked you to do that?

12  A.      Brown.

13  Q.      Okay.  And did he tell you how he wanted you to

14  do it?

15  A.      To an extent, yes.

16  Q.      All right.  And then after you did it, did he

17  call you back and say I want you to come back and change

18  the report?

19  A.      I do recall that, yeah.

20  Q.      All right, sir.  And did you think that was

21  appropriate?

22  A.      No.

23  Q.      All right.  I asked you a little bit about just

24  the violence in the corrections department.  And what

25  did you tell me about that?  Do you recall?

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 658 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM   Document 210-2   Filed 04/05/24   Page 12 of 24
PageID #: 2993

1  A.       I do recall that they -- I brought up there

2  being a few officers who kind of seemed like they looked

3  forward to having altercations with inmates.

4  Q.       And who was that?

5  A.       One was Brown, and I cannot remember the other

6  guy's name.

7  Q.       Was it Mr. Fox?

8  A.       Yes.

9  Q.       All right.  And did you tell me that they had

10 made a game of using force to where they -- if they

11 didn't use -- or if they used force at least once a

12 week, then they congratulated each other or some -- did

13 some sort of --

14 A.       Yes.

15 Q.       What did they do?  I don't want to put words in

16 your mouth.

17 A.       I just remember that they would say that they

18 would have to get themselves a treat or something, and

19 that was all --

20 Q.       Okay.

21 A.       -- honestly.

22 Q.       So how long after this Ling incident happened

23 did you leave Campbell County?

24 A.       I had -- I believe it was two years, two and a

25 half years.

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 659 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM    Document 210-2    Filed 04/05/24    Page 13 of 24
PageID #: 2994

1    Q.        You stayed there for two and a half years?

2    A.        Yes.

3    Q.        Okay.  And so now you've left law enforcement

4    altogether?

5    A.        Yes.

6    Q.        All right, sir.  Thank you so much.  Answer any

7    questions Mr. Knight has.

8                        CROSS-EXAMINATION

9    BY MR. KNIGHT:

10   Q.        Good afternoon, Mr. Miller.

11             You started out at the Claiborne County

12   Sheriff's Department; correct?

13   A.        Yes.

14   Q.        And as a corrections officer?

15   A.        Yes, sir.

16   Q.        And that's closer to your home?

17   A.        Yes.

18   Q.        Where do you live?

19   A.        Cumberland Gap --

20   Q.        And --

21   A.        -- Tennessee.

22   Q.        -- is that in Claiborne County?

23   A.        Yes.

24   Q.        And I think you said you stayed there a couple

25   of weeks?

Case 3:20-cv-00233-CEA-JEM  Document 204  Filed 03/07/24  Page 660 of 699  PageID #:
Case 3:20-cv-00233-CEA-JEM    Document 210-2    Filed 04/05/24    Page 14 of 24
PageID #: 2995

1    A.        Yes.

2    Q.        And then you left and went to Campbell County

3    and stayed for two and a half years?

4    A.        Yes.

5    Q.        And then after that, you went back to Claiborne

6    County, didn't you?

7    A.        Yes.

8    Q.        In their sheriff's department?

9    A.        Yeah, doing corrections.

10   Q.        And how long did you stay that stint?

11   A.        I would -- I believe it was less than a year.

12   Q.        And now you're working distribution at LMU,

13   which is in Harrogate in Claiborne County?

14   A.        Yes.

15   Q.        Where is the -- where -- where is the Claiborne

16   County jail?

17   A.        It's in New Tazewell.

18   Q.        New Tazewell?

19   A.        Yes.

20   Q.        I think you told me previously that the

21   training -- the -- any training you got, you got at

22   Campbell County; correct?

23   A.        Yes.

24   Q.        And Campbell County ensured that you were TCI

25   certified; correct?

Case 3:20-cv-00233-CEA-JEM  Document 204  Filed 03/07/24  Page 661 of 699  PageID #:
Case 3:20-cv-00233-CEA-JEM    Document 210-2    Filed 04/05/24    Page 15 of 24
PageID #: 2996

1  A.      Yes.

2  Q.      And trained you how to book individuals, log,

3  check?

4  A.      Yes.

5  Q.      You could recognize when somebody needed

6  medical care, couldn't you?

7  A.      Yes.

8  Q.      And that's from your training at Campbell

9  County; correct?

10  A.      Yes.

11  Q.      And -- and I think you told me that when you

12  went to -- you left after two and a half years, went

13  back to the Claiborne County jail.  Because of the

14  training that you had gotten at Campbell County, you

15  were made a sergeant in Claiborne County?

16  A.      Yes.

17  Q.      And so you were supervising other individuals?

18  A.      Yes, sir.

19  Q.      Back to corrections.  That's a fairly tough

20  job, isn't it?

21  A.      Yeah, I don't plan on going back.

22  Q.      Yeah.

23          I mean, it's -- in distribution, you're passing

24  out mail?

25  A.      Yes.

Case 3:20-cv-00233-CEA-JEM  Document 204  Filed 03/07/24  Page 662 of 699  PageID #:
Case 3:20-cv-00233-CEA-JEM   Document 210-2   Filed 04/05/24   Page 16 of 24
PageID #: 2997

1    Q.      And in corrections, you're dealing with

2    arrestees; correct?

3    A.      Yes, sir.

4    Q.      Sometimes they're combative?

5    A.      Yes.

6    Q.      Sometimes they don't do what you ask them to

7    do?

8    A.      No, they don't.

9    Q.      Sometimes they're under the influence; correct?

10   A.      Yes.

11   Q.      Sometimes they may have sustained injuries

12   elsewhere; correct?

13   A.      Yes.

14   Q.      Sometimes they assault correction officers;

15   correct?

16   A.      Yes.

17   Q.      They just simply don't want to be there;

18   correct?

19   A.      Yes.

20   Q.      I certainly don't want to play the video, but I

21   can't remember.  In your deposition, did Mr. Seaton play

22   the video for you?

23   A.      I don't believe so.

24   Q.      Okay.  And your involvement -- you weren't --

25   you weren't in the sally port where Justin Crabtree

Case 3:20-cv-00233-CEA-JEM  Document 204  Filed 03/07/24  Page 663 of 699  PageID #:
Case 3:20-cv-00233-CEA-JEM    Document 210-2    Filed 04/05/24    Page 17 of 24
PageID #: 2998

1  pulled Mr. Ling from the vehicle; correct?

2  A.      No, sir.

3  Q.      And your first involvement with Mr. Ling was in

4  the search trap; correct?

5  A.      Yes, sir.

6  Q.      Mr. Justin Crabtree brought Mr. Ling into the

7  search trap; correct?

8  A.      Yes, sir.

9  Q.      And did you -- Justin Crabtree had a handle on

10  him; correct?  Had him physically?

11  A.      Yes.

12  Q.      And pushed, slammed, however you want to call

13  it, Mr. Ling up against the counter; correct?

14  A.      Yes.  Yes.

15  Q.      And then he went to the ground; correct?

16  A.      Yes.

17  Q.      And it took several individuals simply to hold

18  Mr. Ling in place; correct?

19  A.      Yes, sir.

20  Q.      'Cause he didn't want to go anywhere, did he?

21  A.      No, sir.

22  Q.      He was moving around; is that correct?

23  A.      Yes.

24  Q.      And whatever his subjective intent was, you

25  couldn't read his mind; correct?

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 664 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM   Document 210-2   Filed 04/05/24   Page 18 of 24
PageID #: 2999

1   A.      No, sir.

2   Q.      You just had to assume that the movement meant

3   that he wasn't -- you would have left him alone if he'd

4   have stayed still; is that correct?

5   A.      Yes, sir.

6   Q.      But you held his feet; correct?

7   A.      Yes, sir.

8   Q.      Which indicates to me that his feet were

9   moving; correct?

10  A.      Yes, sir.

11  Q.      Whether they were kicking, moving, they weren't

12  doing what you wanted, what needed to happen; correct?

13  A.      Yes, sir.

14  Q.      Other than being told that you had a combative

15  coming in, do you know anything that had happened out at

16  the arrest scene with Mr. Ling?

17  A.      No, sir.

18  Q.      Didn't know anything about Mr. Ling, how strong

19  he was, what he had taken, if he was injured, what he

20  had said to the officers, what he'd done to ambulance

21  personnel, anything?  You didn't know any of that, did

22  you?

23  A.      No, sir.

24  Q.      So when you saw Mr. Ling, you would just say

25  that is the combative that they were telling us about

Case 3:20-cv-00233-CEA-JEM  Document 204  Filed 03/07/24  Page 665 of 699  PageID #:
Case 3:20-cv-00233-CEA-JEM    Document 210-2    Filed 04/05/24    Page 19 of 24
PageID #: 3000

1  coming into our facility; correct?

2  A.        Yes, sir.

3  Q.        And that's something that you needed to get

4  control of; correct?

5  A.        Yes, sir.

6  Q.        Thank you.

7            THE COURT:  Any redirect?

8            MR. SEATON:  Yes, Your Honor.

9                    REDIRECT EXAMINATION

10 BY MR. SEATON:

11 Q.        So I want to talk about your training just a

12 minute, you know.  And I know this has been a long time

13 ago.  And I think your deposition was -- let me look --

14 was July 26 of 2022.  But you said to me when I first

15 asked you questions that you had only been there a

16 couple of months?

17 A.        Yes, I had been there just -- I think just shy

18 of a month or just over a month.

19 Q.        So you hadn't had an opportunity to go to TCI,

20 had you?

21 A.        No, sir.

22 Q.        Okay.  You didn't have that training on June --

23 June the 1st?

24 A.        No, sir.

25 Q.        All right, sir.  And as a matter of fact, when

Case 3:20-cv-00233-CEA-JEM  Document 204  Filed 03/07/24  Page 666 of 699  PageID #:
Case 3:20-cv-00233-CEA-JEM    Document 210-2    Filed 04/05/24    Page 20 of 24
PageID #: 3001

1  you first went to Campbell County, Mallory Campbell did

2  a four-day training?

3  A.        Yes, sir.

4  Q.        And that's all the training you had?

5  A.        Yes.

6  Q.        Right?

7            And you had no training on how to do the job.

8  That's what you told me?

9  A.        I feel like I had minimal training to know what

10 I was getting into.

11 Q.        Okay.  You had no training on use of force?

12 A.        No, sir.

13 Q.        You had no training on dealing with a combative

14 individual?

15 A.        No, sir.

16 Q.        You had minimal training on an inmate's medical

17 needs?

18 A.        Yes, sir.

19 Q.        All right.  And you had no training in the

20 event an officer was abusing another inmate to

21 intervene; right?

22 A.        No, sir.

23 Q.        All right.  Thank you so much.

24                    RECROSS-EXAMINATION

25 BY MR. KNIGHT:

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 667 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM     Document 210-2     Filed 04/05/24     Page 21 of 24
PageID #: 3002

1   Q.      But you had the presence of mind to check on

2  Mr. Ling; correct?

3   A.      Yes.

4   Q.      'Cause -- to check on his medical condition;

5  correct?

6   A.      Yes, sir.

7   Q.      And you also had the presence of mind to take

8  the matter up with your sergeant; correct?

9   A.      Yes, sir.

10   Q.      And she said she would get back to you;

11  correct?

12   A.      Yes, sir.

13   Q.      And Brown was leaving shift, and Corporal Boyer

14  was coming on shift; correct?

15   A.      Yes.

16   Q.      You were likewise leaving shift also; correct?

17   A.      Yes, sir.

18   Q.      You were working the night shift, and the day

19  shift was coming on?

20   A.      Yes.

21   Q.      Correct?

22          And did you come to find out that -- that

23  Corporal Boyer had ensured that the -- and another

24  officer had ensured that Mr. Ling was, in fact, examined

25  by the nurse?

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 668 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM   Document 210-2   Filed 04/05/24   Page 22 of 24
PageID #: 3003

1    A.       Yes.

2    Q.       And that they did take Mr. Ling to the

3    hospital -- LaFollette Hospital and then later to UT?

4    A.       Yes, sir.

5    Q.       As far as training, you felt like you could go

6    to work at a jail; correct?  I mean, you had been at

7    Claiborne County?

8    A.       Yeah.

9    Q.       And you knew how to book individuals; correct?

10   A.       Yes, sir.

11   Q.       You knew that you were supposed to check

12   individuals; correct?

13   A.       Yes, sir.

14   Q.       And you were -- you were supposed to inform

15   whoever you needed to, and that just may be you taking

16   it upon yourself if you thought an inmate needed some

17   sort of medical care; correct?

18   A.       Yes, sir.

19   Q.       Oh, one other question.  Mr. Seaton asked you

20   if Sean Brown asked you to change your report and you

21   felt it was inappropriate.  Are you telling this jury

22   that you falsified the report -- any report concerning

23   Nathan Ling?

24   A.       No, sir.  It -- it wasn't falsified, but it --

25   it was up to Brown's standards.

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 669 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM     Document 210-2     Filed 04/05/24     Page 23 of 24
PageID #: 3004

1  Q.      Okay.  And that could have been grammar?

2  A.      Yes, sir.

3  Q.      And it could have been the way the form was

4  filled out; correct?

5  A.      Yes.

6  Q.      Thank you.

7           THE COURT:  All right.  Thank you, sir.

8           THE WITNESS:  You're welcome.

9           MR. SEATON:  Plaintiff rests.

10          THE COURT:  Sorry.  Mr. Seaton, you said

11 plaintiff rests his case?

12          MR. SEATON:  Yes, Your Honor.

13          THE COURT:  All right.  Ladies and gentlemen,

14 the plaintiff has rested his case.  We are going to take

15 just a minute and do a couple of things.  I'm going to

16 ask you to step out and -- but we won't be long.

17          Thank you.

18          (Subsequent proceedings were heard but

19          not requested to be transcribed herein.)

20          THE COURT:  Thank you.  Please be seated.

21          All right.  Ladies and gentlemen, plaintiff has

22 rested his case.

23          Mr. Knight, do you have any witnesses?

24          MR. KNIGHT:  Call Mr. Beehan, please.

25          THE COURT:  All right.

Case 3:20-cv-00233-CEA-JEM  Document 204  Filed 03/07/24  Page 670 of 699  PageID #:
Case 3:20-cv-00233-CEA-JEM    Document 210-2    Filed 04/05/24    Page 24 of 24
PageID #: 3005