# MALLORY CAMPBELL

1   five, possibly ten minutes.

2           THE COURT:  Okay.  And so after that, you'll

3   rest your proof?

4           MR. KNIGHT:  Yes.

5           THE COURT:  You intend to renew your motion?

6           MR. KNIGHT:  Your Honor, I think I have to

7   procedurally.

8           THE COURT:  Okay.  And then I want you to rest

9   in front of the jury -- rest everything.

10          Do you -- do you anticipate any rebuttal?

11          MR. SEATON:  No, Your Honor.

12          THE COURT:  Okay.  And then -- just thinking

13  about timing.  Okay.

14          All right.  Let's bring them in.

15          (The proceedings were held in the presence of

16          the jury, as follows:)

17          THE COURT:  Okay.  Thank you.  Please be

18  seated.

19          All right.  Mr. Knight, please call your next

20  witness.

21          (The witness was duly sworn.)

22                    MALLORY CAMPBELL,

23  called as a witness at the instance of the parties,

24  having been first duly sworn, was examined, and

25  testified as follows:

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 678 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM   Document 210-3   Filed 04/05/24   Page 2 of 23
PageID #: 3007

1          DIRECT EXAMINATION

2    BY MR. KNIGHT:

3    Q.       Could you state your name for the record,

4    please.

5    A.       Mallory Campbell.

6    Q.       And where are you employed?

7    A.       I'm currently employed by the LaFollette Police

8    Department.

9    Q.       Okay.  Were you previously employed with

10   Campbell County Sheriff's Department?

11   A.       Yes, sir.

12   Q.       How long were you employed with the Campbell

13   County Sheriff's Department?

14   A.       From December of 2012 up until September

15   of '22.

16   Q.       Okay.  So you were employed in June of 2019;

17   correct?

18   A.       Correct.

19   Q.       And do you recall this Nathan Ling incident?

20   A.       I do.

21   Q.       And at the time, were you a lieutenant --

22   A.       I was.

23   Q.       -- at Campbell -- okay.  And as part of your

24   duties as lieutenant, were you on the patrol side, or

25   were you on the jail side?

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 679 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM   Document 210-3   Filed 04/05/24   Page 3 of 23
PageID #: 3008

1    A.        I was -- my main duty was the jail corrections.

2    Q.        So you supervised Catie Wilson; correct?

3    A.        Correct.

4    Q.        You supervised the four corporals; correct?

5    A.        Correct.

6    Q.        And you supervised the numerous corrections

7    officers that were under you; correct?

8    A.        Correct.

9    Q.        And did you play any role in selecting or

10   hiring any new correction officers?

11   A.        Yes.

12   Q.        Okay.  Could you briefly describe for the jury

13   how -- if I wanted to be a correction officer in

14   Campbell County, Tennessee -- you were still a

15   lieutenant there -- what kind of training would I expect

16   to receive?

17   A.        So once you're hired on, we did TCI, which is

18   the Tennessee Corrections Institute.  It has categories

19   that we do have to cover like these certain topics and

20   then whatever else you deem necessary, which is policy

21   and procedure and all those types of things.  So I would

22   do anywhere between 18 and 20 hours of classroom

23   training where it's just me and our new hires and we're

24   going over all those things that TCI wants us to go --

25   go over and then our policy.

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 680 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM   Document 210-3   Filed 04/05/24   Page 4 of 23
PageID #: 3009

1    For the next week and a half to two weeks, they

2  are simply shadowing.  So they're following another

3  correction officer around.  I did not want my new hires

4  who were still in the training phase to be active in

5  anything, so they -- whatever the corrections officers

6  got into within that week-and-a-half period, they would

7  just kind of be following along.

8  Q.      What were some of the topics that you covered

9  in training, whether it be in the classroom or

10  shadowing?

11  A.      You know, you want to try to cover everything,

12  so, I mean, I can't -- just all of our policy.  We did

13  use of force.  We did, you know -- 'cause in the jail,

14  you're -- you're taking care of someone's daily needs

15  every single day, so, I mean, you're -- you're going

16  over how to do a meal pass, how to do a med pass, how to

17  book people in, book people out.  You're dealing with

18  the court system.

19    So, I mean, it's a lot to get in in -- in a

20  two-week period.  But, you know, we try to cover as much

21  as -- what TCI requires of us and then the day-to-day

22  type of things.

23  Q.      How long were you in corrections?

24  A.      I was in corrections for the -- the entire time

25  that I worked there, which is 10 years, and then I

Case 3:20-cv-00233-CEA-JEM  Document 204  Filed 03/07/24  Page 681 of 699  PageID #:
Case 3:20-cv-00233-CEA-JEM    Document 210-3    Filed 04/05/24    Page 5 of 23
PageID #: 3010

1   also -- I went to the police academy in 2018 to become

2   certified.  So I did some narcotics investigations for

3   the sheriff's office part time as well.

4   Q.      Okay.  Were you always a lieutenant?

5   A.      Like my entire time employed there?

6   Q.      Yes.

7   A.      No, sir, I started as a corrections officer.

8   Q.      Okay.  You started as a correction officer?

9   A.      Uh-huh.

10  Q.      Okay.  You started as a correction officer.

11  A.      Uh-huh.

12  Q.      Did you possess the rank of corporal?

13  A.      I -- I did.

14  Q.      Sergeant?

15  A.      And then sergeant, yes.

16  Q.      Lieutenant?

17  A.      Yes.

18  Q.      Okay.  Is it fair to say that in corrections,

19  some of the arrestees that are brought in that you're

20  to put -- to -- to provide, as you said, their daily

21  needs for are not really wanting to be confined?

22  A.      I don't think anyone wants to be confined.

23  Q.      Have you ever experienced an arrestee that was

24  combative?

25  A.      Yes, sir.

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 682 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM     Document 210-3    Filed 04/05/24     Page 6 of 23
PageID #: 3011

1  Q.      Have you ever experienced an arrestee scream at
2  you?

3  A.      Yes, sir.

4  Q.      Cuss at you?

5  A.      Yes, sir.

6  Q.      Spit at you?

7  A.      Yes, sir.

8  Q.      Have you ever been assaulted by an arrestee?

9  A.      Yes, sir.

10 Q.      Have you seen other corrections officers who
11 have experienced what you have described?

12 A.      And worse, yes.

13 Q.      And what do you mean "worse"?

14 A.      Well, I -- I -- I've never been assaulted to
15 where I've needed emergency medical care, but I have
16 seen officers who have.

17 Q.      Okay.  Now, I want to shift gears on some
18 training because it's been alleged that Campbell County
19 has no training whatsoever with regard to intervening
20 when another officer is doing something
21 unconstitutional.

22         Do you agree or disagree with that?

23 A.      I disagree.

24 Q.      Why do you disagree with it?

25 A.      Because I personally -- I was personally the

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 683 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM   Document 210-3   Filed 04/05/24   Page 7 of 23
PageID #: 3012

1   one who taught them to intervene. It was -- I mean, in

2   my training catalog, you won't find "duty to intervene"

3   'cause it's -- they didn't really have a -- you know,

4   you have to teach duty to intervene at that time. But

5   it was, you know, when you see an officer who is either

6   going too far or emotionally invested, you know, it is

7   your duty to tell them to leave your area, you know, tap

8   them out and -- for the sake of you and the inmate, you

9   know. So I -- I personally taught them better than

10  that.

11  Q.      Have you had to perform internal investigations

12  concerning this issue?

13  A.      This issue?

14  Q.      Yes.

15  A.      No, sir.

16  Q.      Have you had to perform internal investigations

17  in general?

18  A.      Yes, I did the IAs that were required in -- in

19  the jail. I conducted those IAs.

20  Q.      And you would do an IA in the jail. That would

21  be -- the subject of the IA would be someone who was

22  employed on the jail side of the sheriff's department?

23  A.      Correct.

24  Q.      Is that correct?

25  A.      Correct.

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 684 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM     Document 210-3    Filed 04/05/24     Page 8 of 23
PageID #: 3013

1  Q.      And do you or do you not take -- did you or did

2  you not take complying with your training and the

3  policies of the jail seriously?

4  A.      Yes, sir.

5  Q.      With respect to this Nathan Ling situation,

6  when did -- it happened in the middle of the night;

7  correct?

8  A.      Correct, to my understanding.

9  Q.      And when did you first find out about it?

10  A.      I want to think that this happened over the

11  weekend, if I'm not mistaken.  I remember coming into

12  work, and he was -- he was -- already had left the

13  facility.  And I was informed of it when I got to work

14  that morning.

15  Q.      Okay.  And what did you do, if anything,

16  concerning Mr. Ling?  Did you start an IA investigation?

17  A.      I did.  I -- I started to gather -- I hadn't

18  started the investigation, per se.  I was getting ready

19  to start it.  So I was gathering video, trying to find

20  out -- you know, gathering logs, trying to find out who

21  was where and all those types of things.  Just getting

22  my ducks in a row, I guess you would say.

23  Q.      And you were told that someone else would

24  handle that; correct?

25  A.      Correct.  So when I was gathering everything

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 685 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM   Document 210-3   Filed 04/05/24   Page 9 of 23
PageID #: 3014

1  together, Chief Goins come in and said that he was going

2  to take over the IA, that he had more training and was

3  just better suited to do it. And so I gave him -- I

4  think by that time, I had the video pulled and I -- I'd

5  given him names of people I knew was there.

6  Q.      Okay.

7  A.      That's pretty -- I think that's about all that

8  I had at that time.

9  Q.      Did you have any contact -- well, concerning

10  the TBI, you understood that the TBI -- that the -- an

11  outside agency had come in to investigate this incident;

12  correct?

13  A.      Yes, sir.

14  Q.      Did you ever or do you know of anyone who ever

15  withheld a document or anything from the TBI concerning

16  this incident?

17  A.      Not to my knowledge.

18          MR. KNIGHT:  Thank you.  That's all I have.

19          THE COURT:  All right.  Did you have any

20  cross-examination?

21                    CROSS-EXAMINATION

22  BY MR. SEATON:

23  Q.      Ms. Campbell, we've never met; correct?

24  A.      Not to my knowledge.

25  Q.      I -- I haven't -- I haven't taken your

Case 3:20-cv-00233-CEA-JEM  Document 204  Filed 03/07/24  Page 686 of 699  PageID #:
Case 3:20-cv-00233-CEA-JEM    Document 210-3    Filed 04/05/24    Page 10 of 23
PageID #: 3015

1  deposition; correct?

2  A.       No, sir.

3  Q.       All right, sir [sic].  And I want to show you

4  what we have put together as the chain of command at

5  the -- at the Campbell County Sheriff's Department.  Is

6  that -- is that accurate at the time, 2019?  I'm sorry.

7  A.       It looks -- it looks to be.  I don't know what

8  Sergeant Owens -- like, I don't know if he was sergeant

9  at the time, but --

10  Q.       Okay.  I mean --

11  A.       But it looks -- on my side, yes.

12  Q.       Okay.  Fair enough.  That's all I ask.

13           So on your side, this -- this was the chain of

14  command; right?

15  A.       Yes, sir.

16  Q.       All right.  And Catie Wilson said that she

17  took -- took over the jail and would -- would -- her job

18  was to take care of the needs of the inmates and the

19  officers?

20  A.       Okay.

21  Q.       Right?

22  A.       Yes.

23  Q.       And that your job was to train?

24  A.       One of my jobs, yes.

25  Q.       What else was your job?

Case 3:20-cv-00233-CEA-JEM  Document 204  Filed 03/07/24  Page 687 of 699  PageID #:
Case 3:20-cv-00233-CEA-JEM    Document 210-3    Filed 04/05/24    Page 11 of 23
PageID #: 3016

1  A.      I did -- like I was saying, I did the IAs

2  inside the jail.  I also -- after I went to the

3  police -- graduated the police academy, I was in charge

4  of doing any narcotics things that we had that would

5  start at the jail and lead to other -- otherwise, so --

6  Q.      I'm not a police officer.

7  A.      I'm sorry?

8  Q.      What's -- what's an "IA"?

9  A.      An internal investigation.  So --

10 Q.      All right.

11 A.      -- if we had an officer inside the jail who we

12 thought were doing illegal things or just inappropriate

13 things, I would be the one investigating them.

14 Q.      All right.  So you're the primary one that

15 would have -- be assigned the task of doing the internal

16 things if you had officers going off the rails, doing --

17 A.      Yes, sir.

18 Q.      -- bad things; right?

19 A.      Yes, sir.

20 Q.      All right.  And as you recall, on this -- on

21 this Nathan Ling incident, the jail side -- on your

22 side, the officers that were involved were Sean Brown,

23 Alexander Standridge, and Joshua Miller; right?

24 A.      I believe so.

25 Q.      All right.  And then on the road side was

Case 3:20-cv-00233-CEA-JEM  Document 204  Filed 03/07/24  Page 688 of 699  PageID #:
Case 3:20-cv-00233-CEA-JEM   Document 210-3   Filed 04/05/24   Page 12 of 23
PageID #: 3017

1    Justin Crabtree and Dakota Williams; right?

2    A.        I believe so.

3    Q.        And so is it your testimony that you trained

4    Alexander Standridge and Joshua Miller?

5    A.        Yes.

6    Q.        And if they said that you gave them four days

7    of training, that's all the training that they received,

8    would that be about right?

9    A.        No.  Like me -- like -- so like I said

10   previously, they'll get 18 to 20 hours with me in a

11   classroom and then two weeks of shadowing.

12   Q.        Okay.  But the 18 to 20 hours, that's --

13   what? -- about three days?  Three to four days?

14   A.        Uh-huh.

15   Q.        All right.  So that's -- and I -- that's

16   consistent with what they're saying, that they got --

17   A.        Uh-huh.

18   Q.        -- three to four days of training -- classroom

19   with you; right?

20   A.        Uh-huh, yes, sir.

21   Q.        And then they walked around with other

22   officers, what we call "on-the-job training"?

23   A.        Yes, sir.

24   Q.        All right.  But that was the extent of their

25   training; right?

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 689 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM      Document 210-3    Filed 04/05/24    Page 13 of 23
PageID #: 3018

1    A.        Yes, sir.

2    Q.        All right.  And neither Alexander Standridge or

3    Joshua Miller had gone to this TCI for the 40 hours of

4    training, had they?

5    A.        That I -- I can't -- I don't know when they

6    would have went to that --

7    Q.        Okay.

8    A.        -- if it would have happened before or after

9    this.

10   Q.        And during the three to four days of classroom

11   training that you would train them on, did you train

12   them with -- on the 450-page operations manual?

13   A.        (No audible response.)

14   Q.        Would you like to see it?

15   A.        Yes, sir.

16   Q.        Okay.  That's Exhibit Number 1 to --

17   A.        Okay.

18   Q.        -- to our trial.  Do you recognize that?

19   A.        Yes, sir.

20   Q.        And is that the operations manual that you all

21   used?

22   A.        Yes, this is the policy and procedure.  This

23   looks like it's the -- yes.

24   Q.        And during the time that people would come in

25   as a new hire, would you all basically hand them this

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 690 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM      Document 210-3    Filed 04/05/24    Page 14 of 23
PageID #: 3019

1   policy manual, ask them to sign for it?

2   A.      Yes, sir.

3   Q.      And is it your testimony in three to four days

4   you were able to go through that, or did you go through

5   that whole -- the entire manual with them?

6   A.      This is patrol's policy and procedure, but

7   they're a little bit different, but -- yes.

8   Q.      So how big is your all's?

9   A.      I mean, I would say it was similar in size.

10  Q.      Okay.  And would it be your testimony that you

11  went over the entire policy and procedures manual with

12  these people in three to four days?

13  A.      Did I read this out loud to them?  No.

14  Q.      Okay.  Or did you walk through them and -- and

15  walk through things such as use of force and that type

16  of thing?

17  A.      Yes, sir.

18  Q.      All right.  And did anybody ever evaluate your

19  training program?

20  A.      The sheriff and my captain have to sign off on

21  it.  Do I ever -- I know that a lieutenant had come in

22  and sat in on a couple of classes with me.

23  Q.      Okay.

24  A.      But as a formal evaluation, I don't believe so.

25  Q.      And if these officers have testified that they

Case 3:20-cv-00233-CEA-JEM  Document 204  Filed 03/07/24  Page 691 of 699  PageID #:
Case 3:20-cv-00233-CEA-JEM   Document 210-3   Filed 04/05/24   Page 15 of 23
PageID #: 3020

1    didn't feel that they were adequately trained, you

2    dispute that?

3    A.      Yes.  I mean, I hate that they feel that way.

4    They did -- at the end of training, they did sign off

5    that they felt comfortable.  There's a list that went in

6    their training file, and it was all the high points that

7    TCI wants you to cover, and they signed that they felt

8    comfortable.

9          And part of my speech was if you don't feel

10   comfortable signing this, we will go over -- don't sign

11   it.  We will go over it till you feel comfortable after

12   this class is over.

13   Q.      So you're the head person that they come to for

14   the internal investigations, you said?

15   A.      The sheriff's office, yes.

16   Q.      Or for -- for the jail?

17   A.      For the jail, correct.

18   Q.      All right.  All right.  So -- and so you

19   started an internal investigation over this Ling matter;

20   correct?

21   A.      Correct.

22   Q.      And why did you start an internal

23   investigation?

24   A.      I think use of force to that degree, I just

25   feel that it would be necessary.

Case 3:20-cv-00233-CEA-JEM  Document 204  Filed 03/07/24  Page 692 of 699  PageID #:
Case 3:20-cv-00233-CEA-JEM    Document 210-3    Filed 04/05/24    Page 16 of 23
PageID #: 3021

1  Q.      To what degree?

2  A.      To a degree that an inmate had to go to the

3  hospital.

4  Q.      And be airlifted to a --

5  A.      Correct.

6  Q.      -- trauma center?

7  A.      Yes.

8  Q.      And so you started the investigation; right?

9  A.      Yes, sir.

10 Q.      How far did you get?

11 A.      I got maybe the video pulled and was trying to

12 get names of who was actually there.  That's about all

13 that I got -- I can recall getting done.  I didn't get

14 much done.

15 Q.      So did you get a day's worth done?

16 A.      No, I got hours.

17 Q.      Okay.  And then you said that -- who came to

18 you and said, stop, I'm going to do it myself?

19 A.      The chief deputy.

20 Q.      Okay.  And did you work under the chief deputy,

21 or did you work under Stoney Love?

22 A.      My direct was Stoney Love.

23 Q.      Okay.  So how does that -- I mean, why would

24 the chief deputy be able to tell you --

25 A.      I can't answer that.

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 693 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM   Document 210-3   Filed 04/05/24   Page 17 of 23
PageID #: 3022

1  Q.        Pardon?

2  A.        I can't answer that.  That's something you

3  would have to ask him.

4  Q.        All right.  So you stopped the complete

5  investigation; right?

6  A.        Yes, sir.

7  Q.        And did you find out whether or not the

8  department had done any investigation on its own?

9  A.        I mean, no, not -- I remember the chief deputy

10  saying he was working on it, but they didn't have to

11  tell me what they were doing.

12  Q.        Did you know that -- that there was no

13  investigation done?

14  A.        No.

15  Q.        Pardon?

16  A.        No.

17  Q.        You never knew that?

18  A.        No.

19  Q.        Weren't you --

20            MR. KNIGHT:  Objection.  Mischaracterizing the

21  testimony, Your Honor.

22            THE COURT:  Sustained.

23  BY MR. SEATON:

24  Q.        Okay.  Were you concerned that there was --

25  well -- okay.  Let's -- I don't mean to mischaracterize

Case 3:20-cv-00233-CEA-JEM  Document 204  Filed 03/07/24  Page 694 of 699  PageID #:
Case 3:20-cv-00233-CEA-JEM   Document 210-3   Filed 04/05/24   Page 18 of 23
PageID #: 3023

1  the testimony.

2       I -- I think that Chief Goins came in here

3  earlier and said he did -- he went out the next day one

4  day and -- and talked with -- with the neighbors.  But

5  other than that, he stopped.  Okay?

6       Were you aware of that?

7  A.       No, sir.

8  Q.       Were you concerned that there was no

9  investigation done in the department?

10 A.       I just said I didn't know that there wasn't.  I

11 trusted my superiors were doing what they told me they

12 were going to do.

13 Q.       Were you aware -- or -- or did you have any

14 conversation with your superiors or Catie Wilson about

15 terminating any of these people that had used unlawful

16 force?

17 A.       I can't remember if I did.  You know, I talked

18 to the sergeant about a lot of things.  Again, I was

19 told this was being investigated and that I didn't need

20 to concern myself with it, so I didn't.

21 Q.       Okay.  So you didn't concern yourself with

22 terminating anybody that was acting outside of their

23 training?

24 A.       The chief deputy told me he was handling the

25 investigation.  If the chief deputy wanted someone

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 695 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM   Document 210-3   Filed 04/05/24   Page 19 of 23
PageID #: 3024

1   terminated, I would assume that that would go to Stoney

2   Love and then to me.

3   Q.      All right.  So you're just saying that it's not

4   my job, push it on up, and so it's not my concern

5   anymore?

6   A.      Correct.  I mean, I believe that is my job

7   to -- my superiors told me to stand down, and that's

8   what I did.  They were handling it.

9   Q.      All right.  And so wouldn't you have been --

10  well -- well, let me -- let me back up.

11         So the officers that were involved from the

12  correction side, did you feel that they had done

13  anything wrong?

14  A.      As --

15  Q.      Did you watch the video?  I'm sorry.  I didn't

16  mean to interrupt you.  Did you watch the video?

17  A.      Yes, sir.

18  Q.      Okay.  So you saw the whole video of what

19  happened?

20  A.      Yes, sir.

21  Q.      And do you feel that any of your corrections

22  people did things wrong?

23  A.      I feel that after Mr. Ling was placed in a cell

24  that there should have been medical care probably

25  provided.

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 696 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM     Document 210-3     Filed 04/05/24     Page 20 of 23
PageID #: 3025

1    Q.        Okay.  And do you feel that they should have

2    intervened when all of this abuse was going on?

3    A.        From what I can remember, I don't know how much

4    the corrections officers could have intervened.  I think

5    that something should have been said, but I don't know

6    that they could have stopped Crabtree.

7            I just know that he should have been provided

8    medical care after he was placed in the cell, and that

9    did not happen.

10   Q.        So weren't you concerned as the lieutenant of

11   the department that you're going to continue to have

12   Sean Brown as your -- as your corporal after this Ling

13   incident happened?

14   A.        Again, my superiors told me that it was being

15   handled and investigated.

16           MR. SEATON:  All right.  Thank you.

17           THE COURT:  Any redirect?

18                     REDIRECT EXAMINATION

19   BY MR. KNIGHT:

20   Q.        45 days after this incident -- probably less

21   than 45 days after this incident, the TBI became

22   involved; correct?

23   A.        I do not know the time frame.  I do -- I do

24   know that they were involved.

25   Q.        And they performed an investigation?

Case 3:20-cv-00233-CEA-JEM  Document 204  Filed 03/07/24  Page 697 of 699  PageID #:
Case 3:20-cv-00233-CEA-JEM    Document 210-3    Filed 04/05/24    Page 21 of 23
PageID #: 3026

1   A.      Yeah, I -- I'm assuming so.

2   Q.      And you -- you've already testified that you

3 did not interfere and you don't know anybody who did

4 interfere in that investigation?

5   A.      No, sir.

6   Q.      And as a result of that investigation, a report

7 was generated to the district attorney; correct?

8   A.      I would assume so. I don't know.

9   Q.      You do know that Justin Crabtree was indicted?

10   A.      Yes, sir.

11   Q.      And pled guilty; correct?

12   A.      Yes, sir.

13   Q.      And so did Sean Brown; correct?

14   A.      Yes, sir.

15   Q.      That's all I -- oh, in -- in -- in a -- in

16 corrections, on occasion -- oh, every arrestee is

17 different. Is that fair to say?

18   A.      Yes, sir.

19   Q.      And on occasion, there has to be more than one

20 correction officer to get control of that arrestee?

21   A.      Yes, sir.

22         MR. KNIGHT: Thank you.

23         THE COURT: All --

24         MR. SEATON: Nothing --

25         THE COURT: -- right.

Case 3:20-cv-00233-CEA-JEM Document 204 Filed 03/07/24 Page 698 of 699 PageID #:
Case 3:20-cv-00233-CEA-JEM Document 210-3 Filed 04/05/24 Page 22 of 23
PageID #: 3027

1          MR. SEATON:  -- further.

2          THE COURT:  All right.  Thank you.

3          THE WITNESS:  Thank you.

4          THE COURT:  All right.  All right.  Mr. Knight,

5   call your next witness.

6          MR. KNIGHT:  Defense rests, Your Honor.

7          THE COURT:  Okay.  Defense rests.

8          All right.  Mr. Seaton, do you have any

9   rebuttal?

10          MR. SEATON:  No, Your Honor.

11          THE COURT:  Okay.  So plaintiff has rested.

12   Rested its entire case?

13          MR. SEATON:  Yes, sir.

14          (Subsequent proceedings were heard but

15          not requested to be transcribed herein.)

16          END OF PROCEEDINGS

17

18          I, Stephanie Fernandez, do hereby certify that
     I reported in machine shorthand the proceedings in the
     above-styled cause, and that this transcript is an
19   accurate record of said proceedings.

20                                    s/Stephanie Fernandez
                                      Stephanie Fernandez,
21                                    Official Court Reporter

22

23

24

25

Case 3:20-cv-00233-CEA-JEM  Document 204  Filed 03/07/24  Page 699 of 699  PageID #:
Case 3:20-cv-00233-CEA-JEM  Document 210-3  Filed 04/05/24  Page 23 of 23
PageID #: 3028