# ALEX STANDRIDGE

1    THE COURTROOM DEPUTY: Yes, sir.
2    (The proceedings were held in the presence of
3    the jury, as follows:)
4    THE COURT: All right. Please be seated.
5    Okay. Mr. Knight, whenever you're ready.
6                    CROSS-EXAMINATION
7  BY MR. KNIGHT:
8  Q.    Mr. Standridge, we're about to start your
9  cross-examination. Before I start, you had given a
10 deposition in this case; correct?
11 A.    Yes, sir.
12 Q.    And in the deposition, you had sworn to tell
13 the truth, the whole truth, and nothing but the truth;
14 correct?
15 A.    Yes, sir.
16 Q.    Just like you've done today; correct?
17 A.    Yes, sir.
18 Q.    Mr. Standridge -- it was up here. But when you
19 were questioned by Mr. Seaton, you testified that you
20 had two weeks of training, and Mallory Campbell was the
21 one who was -- Lieutenant Campbell was the one
22 conducting the training?
23 A.    Yes, sir.
24 Q.    Okay. And she is directly under -- was
25 directly under Stoney Love; correct?

1  A.     I believe so.
2  Q.     And now the administration has completely
3  changed.  We have a new sheriff, new jail administrator,
4  new -- all kinds of elected officials.  Would you agree?
5  A.     Well, I do with the sheriff.  I didn't know
6  they restructured the jail administration.
7  Q.     You knew there was a new mayor?
8  A.     Not -- honestly, I don't pay attention to
9  those.
10 Q.     Okay.  Now, when -- when the officers -- I
11 don't know who radioed in.  They radioed in they had a
12 combative individual; correct?
13 A.     Yes, sir.
14 Q.     And when you were in the sally port with Sean
15 Brown, you could hear Mr. Ling screaming, kicking,
16 yelling; correct?
17 A.     Yes, sir.
18 Q.     You had absolutely no idea what you were
19 facing, did you?
20 A.     No, sir.
21 Q.     And you had absolutely no idea what had
22 happened out at the scene; correct?
23 A.     No, sir.
24 Q.     And you had absolutely no idea what Mr. Ling
25 may or may not have on him; correct?

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 53 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM   Document 210-4   Filed 04/05/24   Page 3 of 18
22985
PageID #: 3031

1  A.      Correct.

2  Q.      And when Mr. -- when Deputy Crabtree pulled

3  Mr. Ling out of the sally port, you weren't going to

4  intervene, were you?

5  A.      No, sir.

6  Q.      I mean, that was -- Deputy Crabtree had ahold

7  of Mr. Ling and pushed him into the search trap;

8  correct?

9  A.      Yes, sir.

10 Q.      And he pushed him up against the counter;

11 correct?

12 A.      Yes, sir.

13 Q.      You weren't going to intervene at that point,

14 were you?

15 A.      No, sir.

16 Q.      I mean, there -- there was no way you could

17 have?

18 A.      No, sir.

19 Q.      Oh, as part of your training with Lieutenant

20 Campbell -- and -- and I think this was touched on with

21 Mr. Seaton about whatever gloves you use or not use.

22 They were concerned about correctional officers

23 protecting themselves; correct?

24 A.      I believe so.

25 Q.      Because inmates will fight you.  Is that not

1  correct?
2  A.   Yes, sir.
3  Q.   They will spit at you?
4  A.   Yes, sir.
5  Q.   They will cuss you?
6  A.   Yes, sir.
7  Q.   They will do whatever they can to be disruptive
8  to you; correct?
9  A.   Yes, sir.
10 Q.   Including disrespecting your authority;
11 correct?
12 A.   Yes, sir.
13 Q.   Not doing what you want them to do?
14 A.   Correct.
15 Q.   Have you ever had anybody show up that said,
16 wow, this is a great place to be. I'm going to do
17 everything that you want me to do?
18 A.   No, sir.
19 Q.   So just so I'm clear, the context -- when
20 Crabtree drives up, you have no idea what the context
21 was out there, what Mr. Ling's history was, what he had
22 done out there, if any officers had been injured out
23 there, or anything; correct?
24 A.   No, sir, not until it was over with.
25 Q.   Okay. And I was interested -- you are now a

1  member of the Campbell County Rescue Squad?
2  A.        In the process of joining.  Technically
3  LaFollette, but all of Campbell County, yes.
4  Q.        Okay.  Technically joined.  How long have you
5  been there?
6  A.        About two weeks.  Still going through
7  paperwork, getting everything straightened out with
8  that.
9  Q.        EMT or --
10 A.        No.  No, just volunteer service.
11 Q.        And that's in an ambulance; correct?
12 A.        No.
13 Q.        It's not?
14 A.        No.  Rescue squad is a -- basically, like
15 mountain rescues, things where EMTs and fire would need
16 extra help with.
17 Q.        Somebody needs help, you're going to be called
18 to -- you may be called to go help them; correct?
19 A.        Yes, sir.
20 Q.        And I'm sorry.  Did you say Campbell County or
21 LaFollette?
22 A.        They service all of Campbell County.  That's
23 just what I've called them.  But they're technically
24 LaFollette Rescue.
25 Q.        Okay.  And do they have ambulances?

```
 1  A.      No, sir.
 2  Q.      Have you ever seen an ambulance?
 3  A.      Yes, sir.
 4  Q.      Have you ever been inside an ambulance?
 5  A.      Yes, sir.  When I was in Williamsburg, I took
 6  EMT classes and done a lot of ride-alongs and worked
 7  with the city fire department.
 8  Q.      Williamsburg, Kentucky?
 9  A.      Yes, sir.
10  Q.      Okay.  And when you were in Williamsburg,
11  Kentucky doing ride-alongs, the ambulance personnel were
12  there to respond to people in aid; correct?
13  A.      Yes, sir.
14  Q.      Respond to check people out; correct?
15  A.      Yes, sir.
16  Q.      And they weren't there to abuse anybody, were
17  they?
18  A.      No, sir.
19  Q.      One thing struck me when I was looking at that
20  video.  There were times where -- well, there was one
21  time that you aren't even in the room; correct?
22  A.      Correct.
23  Q.      And I think I saw in that video where Mr. Ling
24  had actually pulled up off the counter.  I -- I know --
25  I don't know if you saw that or not.  But you weren't in
```

```
 1  the room?
 2  A.      Correct.
 3  Q.      But there are times wherein you, Josh Miller,
 4  Dakota Williams, and -- well, I'm sorry -- Sean Brown
 5  and Justin Crabtree were all on Mr. Ling; is that
 6  correct?
 7  A.      Yes, sir.
 8  Q.      And there were times where no one was on
 9  Mr. Ling; correct?
10  A.      Yes, sir.
11  Q.      Is it fair to say that during the times that
12  you all were on Mr. Ling -- whether holding his legs,
13  holding his head down -- that he was moving?
14  A.      Not the whole time.
15  Q.      So why would you be doing that?
16  A.      I was just following the others at that point.
17  Q.      I mean -- I mean, was he -- you said -- I think
18  you -- you said earlier in his direct that he was
19  squiggling around?
20  A.      Yes, sir.
21  Q.      Of course, Mr. Ling's not here, so we don't
22  know what his intent is.  And you didn't know his intent
23  at that time, did you?
24  A.      No, sir.
25  Q.      And, in fact, when you took him back to be
```

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 58 of 699   PageID #: 23103
Case 3:20-cv-00233-CEA-JEM   Document 210-4   Filed 04/05/24   Page 8 of 18
PageID #: 3036

1   decontaminated at the shower, you couldn't handle it by
2   yourself, could you?
3   A.      No, sir.
4   Q.      And Josh Miller, who's kind of a big size teddy
5   bear couldn't handle it either, could he?
6   A.      No, sir.
7   Q.      So you had to have Dakota Williams come in and
8   do a back strike to get him to comply to get pepper
9   spray off of him; correct?
10  A.      I remember Dakota assisting me in there. I'm
11  not sure what he had done to really help. It was --
12  Q.      But you needed him; correct?
13  A.      I did need him, yes.
14  Q.      Because the situation had escalated; correct?
15  A.      Yes, sir.
16  Q.      Meaning Mr. Ling had started to resist again;
17  correct?
18  A.      Yes, sir.
19  Q.      You said that -- I don't -- I don't envision
20  that pepper spray is any fun.
21  A.      I'm sorry?
22  Q.      I don't envision being sprayed with pepper
23  spray is any fun.
24  A.      No.
25  Q.      And I don't believe you had any fun having any

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 59 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM   Document 210-4   Filed 04/05/24   Page 9 of 18
PageID #: 3037

1  of it on you; correct?
2  A.    No. Thankfully, it wasn't the first time, so
3  it's something I could handle somewhat.
4  Q.    Okay. And I don't envision any officer would
5  want pepper spray being on any part on them.
6  A.    No, sir.
7  Q.    Correct?
8        So your understanding -- I believe you told
9  Mr. Seaton that it was designed to deescalate the
10 situation?
11 A.    From my understanding, yes.
12 Q.    There are also times in the video that I saw
13 that Joshua Miller had Mr. Ling's legs and you had his
14 head area?
15 A.    Correct.
16 Q.    Are you telling this jury that you were abusing
17 Mr. Ling at that time?
18 A.    I am not saying that.
19 Q.    You weren't abusing him, were you?
20 A.    No, sir.
21 Q.    And after you came back from the deescalation
22 from the shower, Mr. Ling was placed into what we'll
23 call the "negative pressure cell"; correct?
24 A.    Correct.
25 Q.    And you saw everything on film from the

1  negative pressure cell and the search trap. Were you
2  able to see that?
3  A.      Yes, sir.
4  Q.      And when Mr. Ling was placed in the negative
5  pressure cell, was anybody hitting him, laying on him,
6  waylaying him, anything like that?
7  A.      No, sir.
8  Q.      There's been a lot of talk -- in fact, the
9  claims against the county are there's no training. Do
10 you remember on page 39 and 40 of your deposition where
11 Sean Brown was a little concerned about what may happen
12 in the morning shift?
13 A.      I don't recall it too --
14 Q.      A little worried about what they may think of
15 what occurred that night?
16 A.      I don't recall it too -- too well.
17 Q.      Before I get to that, when he -- when Mr. Ling
18 was placed in the negative pressure cell, you felt like
19 that he had a serious medical condition; correct?
20 A.      Correct.
21 Q.      And previously you said that you had never been
22 trained about that, so how would you know he had a
23 serious medical condition?
24 A.      I know someone shouldn't be laying there that
25 long without moving.

1  Q.     And to your credit, periodically you would
2  check on him during the night; correct?
3  A.     Correct.
4  Q.     Okay.  And in the morning about 6:30, the nurse
5  came in; correct?
6  A.     I believe so.
7  Q.     And is it your understanding that he was taken
8  to LaFollette Medical Center, then to the University of
9  Tennessee?
10 A.     I knew he went to LaFollette.  I didn't know
11 what happened after.
12 Q.     Okay.  Let me just show you -- and I'm not
13 picking on you.  I just -- is it not showing up?
14 A.     I have no visual.
15        THE COURTROOM DEPUTY:  I switched the feed.  It
16 will be there in just a second.
17        MR. KNIGHT:  Okay.
18 BY MR. KNIGHT:
19 Q.     Question at line 15, paragraph -- or page 39,
20 line 15, "No, not at all.  Why?"
21        Answer:  "I'm unsure.  A lot of their worry was
22 what they were going to say in the morning when first
23 shift got there.  Brown, I believe, did not want to
24 make" -- "wake Sergeant Wilson.  I don't remember his
25 exact words, but I know he said the gist of it is she's

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 62 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM   Document 210-4   Filed 04/05/24   Page 12 of 18
PageID #: 3040

1  going to come in in the morning. Always [sic] he can
2  wait."
3         Doesn't that imply to you that Mr. Brown
4  certainly had some idea that he was going to have to
5  answer for what had -- what was laying in the negative
6  pressure cell?
7  A.     My understanding is he was worried about the
8  situation, but I was unaware how severe the situation
9  was going to get or --
10 Q.     Okay.
11 A.     -- could get.
12 Q.     And you don't like Mr. Brown, do you?
13 A.     It's an on and off friendship. He's one of the
14 very few that's been there for me my whole life and --
15 Q.     You had a falling out with him, though, didn't
16 you?
17 A.     A little bit, but it happens.
18 Q.     And I think that at some point he was bragging
19 about being with one of your ex-girlfriends or your
20 ex-wives, and you didn't appreciate that?
21 A.     Yes.
22 Q.     No doubt in your mind Sean Brown knew that he
23 could have called the on-call nurse; correct?
24 A.     I believe he could have, yes.
25 Q.     And there's no doubt in your mind that he could

```
 1  have called 9-1-1; correct?
 2  A.      I believe so, yes.
 3  Q.      And there's no doubt in your mind that he could
 4  have placed that man in a cruiser, if he wanted to, and
 5  taken him to LaFollette Hospital; is that correct?
 6  A.      I'm unsure if we had access to use cruisers
 7  like that.
 8  Q.      Anything -- any vehicle or have them come get
 9  him.  Any doubt in your mind that -- that Mr. Brown knew
10  that?
11  A.      I believe he could have done something.
12  Q.      He knew that, didn't he?  Otherwise, he
13  wouldn't have been where he was?
14  A.      Correct.
15  Q.      You agree?
16  A.      Yeah.
17          MR. KNIGHT:  Thank you.
18          THE COURT:  Are you finished, Mr. Knight?
19          MR. KNIGHT:  Yes.  I'm sorry.
20          THE COURT:  Do you have any redirect?
21          MR. SEATON:  Just a -- just a few questions,
22  Your Honor.
23                    REDIRECT EXAMINATION
24  BY MR. SEATON:
25  Q.      So you said that -- when he was asking you
```

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 64 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM   Document 210-4   Filed 04/05/24   Page 14 of 18
PageID #: 3042

1  questions that Mr. Brown could have called 9-1-1, the
2  hospital, et cetera; right?
3  A.    Correct.
4  Q.    And you and Miller and Dakota Williams and
5  Justin Crabtree could have suggested you call 9-1-1 or
6  get him some medical treatment; right?
7  A.    We could have, yes.
8  Q.    But nobody did that, did they?
9  A.    No, sir.
10 Q.    Okay. And you say that you weren't trained to
11 do that; right?
12 A.    No, sir.
13 Q.    You were not trained to do that, were you? No?
14 A.    No, sir.
15 Q.    Okay. Now, in the video, was there ever any
16 place that we watched that we showed to the jury -- that
17 13-minute video -- was there any place where Nathan Ling
18 was resisting?
19 A.    In the video, the only thing I seen that could
20 have been resisting was when they pulled into the sally
21 port when he was brought out of the vehicle.
22 Q.    Okay. But what I saw when they pulled him out
23 of the vehicle is Justin Crabtree grabbing him by the
24 arms and jerking him out of the -- of the cruiser.
25       Did you --

1  A.     Correct.

2  Q.     -- feel that he was resisting when Justin
3  Crabtree was doing that?

4  A.     Not when he was being drug out.  Afterwards --

5  Q.     Okay.

6  A.     -- a little bit, yes.

7  Q.     So was there any other place in the 13-minute
8  video that you say that Nathan Ling was resisting that
9  we can see?

10 A.     I would not say he was resisting.

11 Q.     All right.  But you say that he was resisting
12 before he got to the jail and before we got on video;
13 right?  And --

14 A.     Word of mouth.

15 Q.     And then you say that he's resisting when
16 he's -- when he's in the shower room where there's no
17 video; right?

18 A.     Correct.

19 Q.     All right.  And when Mr. Knight asked you the
20 question of, well, gosh, you know, Justin Crabtree
21 brings him out of the car, you could have intervened, I
22 agree with that.  You couldn't have intervened when he
23 first jerks him out of the -- of the car.

24        But you could have -- at least at that point in
25 time, you or Mr. Brown or Mr. Miller could have said,

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 66 of 699   PageID #: 2341
Case 3:20-cv-00233-CEA-JEM   Document 210-4   Filed 04/05/24   Page 16 of 18
PageID #: 3044

1  let's stop mistreating this guy; right?
2  A.    Correct.
3  Q.    And then when he slammed his face up against
4  the block wall a couple times, you -- you sure could
5  have objected to that, couldn't you?
6  A.    Correct.
7  Q.    Yeah.
8        And then when he had -- had -- had him down on
9  the floor and they're pounding him with their fists and
10 he's not resisting, you could have intervened, couldn't
11 you?
12 A.    Correct.
13 Q.    All right.  And at no time did you suggest that
14 they stop?
15 A.    No, sir.
16 Q.    And at no time did you suggest that they get
17 him medical treatment?
18 A.    No, sir.
19       MR. SEATON:  All right.  Thank you so much.
20       THE COURT:  All right.  Any recross?
21       MR. KNIGHT:  Just briefly.
22                   RECROSS-EXAMINATION
23 BY MR. KNIGHT:
24 Q.    The reason there's no camera in the shower --
25 there's a privacy concern, is there not?

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 67 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM   Document 210-4   Filed 04/05/24   Page 17 of 18
PageID #: 3045

```
1    A.         I believe so.
2    Q.         And regardless -- and I guess we'll just have
3    to go on the video.  Is -- there's movement back and
4    forth by Mr. Ling; correct?
5    A.         Correct.
6    Q.         Whether you call it "resisting," "quiver,"
7    whatever you call it --
8    A.         Correct.
9    Q.         -- there's movement.  And that's why you're
10   there; correct?
11   A.         Correct.
12   Q.         And there's no way you could have either
13   prevented Justin Crabtree from hitting, pushing him into
14   the wall of the sally port or the counter, or the punch,
15   is there?
16   A.         With how new I was and the reputation road
17   officers had, I did not want to speak out of --
18   Q.         Did you think you were ever in a position to
19   stop that?
20   A.         Not entirely, no.
21              MR. KNIGHT:  Thank you.
22              THE COURT:  All right.  Thank you, sir.
23              Call your next witness.
24              MR. SEATON:  He -- he brought up one other
25   matter.  May I ask --
```