# SEAN BROWN

1    person, Michael Galloway, we've got Lieutenant Wasson

2    from the department, and we've got -- you know, we've

3    got enough to keep full through the day.

4            THE COURT:  I know, but I'm -- I'm trying to

5    get a preview for tomorrow too.

6            MR. SEATON:  Tomorrow we have -- if I were

7    guessing, I'd say we'll be through by 1:00 or 2:00.

8            THE COURT:  Okay.

9            MR. SEATON:  That's -- you know, I didn't

10   expect this afternoon to go this long, but I'm trying to

11   gauge as best I can.

12           THE COURT:  All right.  Okay, Ms. Laster, bring

13   our jury in.

14           THE COURTROOM DEPUTY:  Yes, sir.

15           (The proceedings were held in the presence of

16           the jury, as follows:)

17           THE COURT:  Please be seated.

18           All right.  Mr. Knight, any cross-examination?

19           MR. KNIGHT:  Yes, Your Honor.

20           THE COURT:  All right.  Thank you.

21                     CROSS-EXAMINATION

22   BY MR. KNIGHT:

23   Q.      Mr. Brown, you were a corporal at the time you

24   were let go at Campbell County?

25   A.      That is correct.

Case 3:20-cv-00233-CEA-JEM  Document 204  Filed 03/07/24  Page 364 of 699  PageID #:
Case 3:20-cv-00233-CEA-JEM    Document 210-5    Filed 04/05/24    Page 2 of 34
26609
PageID #: 3048

```
1   Q.      And so you were a corrections officer before
2   that; correct?
3   A.      That is correct.
4   Q.      And I think you said you applied for that
5   position?
6   A.      For the corporal?
7   Q.      Yes.
8   A.      Yes.
9   Q.      Okay.  How long were you a correction officer?
10  A.      Maybe a year, if I remember.
11  Q.      A year?
12  A.      Roughly.
13  Q.      So you're not telling this jury that you don't
14  know how to make log checks or checks on inmates or
15  anything like that, do you -- are you?
16  A.      That's not what I -- I'm saying, no.
17  Q.      No.  I mean, a log is basically you initial
18  what time you check on somebody or check them in and you
19  write the time down, is it not?
20  A.      Correct.
21  Q.      It's not rocket science, is it?
22  A.      No.
23  Q.      You indicated that you were a graduate of high
24  school; correct?
25  A.      That is correct.
```

1    Q.        And you had -- the department sent you for a

2    psychological evaluation; correct?

3    A.        That is correct.

4    Q.        And you had a physical; correct?

5    A.        Yes, that is correct.

6    Q.        Let's go back to June 2nd, 2019.  It was in the

7    middle of the night; correct?

8    A.        Yes.

9    Q.        And you were in the sally port, I believe, with

10   Alex Standridge; is that correct?

11   A.        Yes.

12   Q.        And Justin Crabtree radioed that there was a

13   combative inmate coming into the jail; correct?

14   A.        No, dispatch called me.

15   Q.        Dispatch called you.  But --

16   A.        Yes.

17   Q.        -- you knew it was a combative inmate?

18   A.        Yes.

19   Q.        And when Justin Crabtree pulled in, could you

20   hear anything Mr. Ling was saying?

21   A.        As I stated earlier, Ling didn't speak.  He was

22   pretty much nonverbal the entire altercation the entire

23   time I saw him.

24   Q.        You saw Justin Crabtree drag him out of the

25   car; correct?

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 366 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM      Document 210-5      Filed 04/05/24      Page 4 of 34
PageID #: 3050

```
 1   A.        Yes.

 2   Q.        And you couldn't have intervened if you wanted

 3   to, could you?

 4   A.        No.

 5   Q.        And did you see Mr. Ling do anything or -- or

 6   resist or cause any commotion in -- when he was pulling

 7   him from the sally port?

 8   A.        What specific time are you -- like, when he was

 9   pulling from the car?  Is that what you're referring to?

10   Q.        No.  When -- when he came in, could you hear

11   Mr. Ling in the back seat?

12   A.        No.

13   Q.        You couldn't?

14   A.        No.

15   Q.        So he was just sitting there doing nothing?

16   A.        They said that he was kicking the windows.

17   Justin did.  But outside of that, I couldn't hear

18   anything.  He was whipping it in, and by the time he

19   whipped it in, he got out, everything was done.  He

20   pulled him out.

21   Q.        Justin pulled him out; correct?

22   A.        Yes.

23   Q.        Justin put him in the search trap; correct?

24   A.        Yes.

25   Q.        You testified that you did not see him place
```

Case 3:20-cv-00233-CEA-JEM  Document 204  Filed 03/07/24  Page 367 of 699  PageID #:
Case 3:20-cv-00233-CEA-JEM    Document 210-5    Filed 04/05/24    Page 5 of 34
26122
PageID #: 3051

1   him on the counter; is that correct?

2   A.      If I did see him, my memory has blocked it out

3   and I don't remember it.

4   Q.      Okay.  You couldn't -- I mean, he had control

5   of Mr. Ling; correct?

6   A.      Correct.

7   Q.      And no matter -- or you couldn't have

8   intervened at that point at all, could you?

9   A.      Not at that point.

10  Q.      And when you all -- I mean, I'm not going to

11  play the video, but I assume that when all of you all

12  had -- were holding Mr. Ling on the ground, there was

13  movement going on from Mr. Ling?

14  A.      That is correct.

15  Q.      Regardless of his intent, you have to go on

16  what the movement is; correct?

17  A.      Correct.

18  Q.      I mean, he didn't stand up and say, hey, I'm

19  just trying to survive, did he?

20  A.      No.

21  Q.      So you could have interpreted that in the

22  moment as combative resistance; is that correct?

23  A.      That is how I interpreted it in the moment.

24  Q.      Okay.  And his -- his feet needed to be held

25  down and his torso needed to be held down, and he needed

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 368 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM   Document 210-5   Filed 04/05/24   Page 6 of 34
PageID #: 3052

1   to stop; is that correct?

2   A.      That is correct.

3   Q.      Have you had any combative inmates come in

4   before?

5   A.      Just in general or --

6   Q.      In general, when you're a corrections officer.

7   A.      In -- in -- yes, in general, I have.

8   Q.      And you've had to utilize force on occasion, I

9   assume?

10  A.      That would be correct.

11  Q.      And -- and the goal is -- is to get the inmate

12  under control or in this case, a pretrial detainee under

13  control; correct?

14  A.      Correct.

15  Q.      Because they're not always under control, are

16  they?

17  A.      That is correct.

18  Q.      And you indicated before under your testimony

19  from Mr. Seaton -- I mean, questioning from Mr. Seaton,

20  that there was high turnover in corrections; correct?

21  A.      Yes, that is correct.

22  Q.      It's not a great job, is it?

23  A.      It's a horrible job.

24  Q.      I mean, you have to deal with some pretty

25  difficult people, don't you?

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 369 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM   Document 210-5   Filed 04/05/24   Page 7 of 34
PageID #: 3053

1    A.      Yes.

2    Q.      They cuss at you?

3    A.      Yes.

4    Q.      They spit at you?

5    A.      Yes.

6    Q.      They try to assault you?

7    A.      Yes.

8    Q.      They try to sneak in contraband?

9    A.      Yes.

10   Q.      And you're there to prevent that, are you not?

11   A.      That is correct.

12   Q.      So as we sit here today, could there be a

13   reason for the high turnover rate?

14   A.      I think that plays a pretty big part of it --

15   Q.      I mean --

16   A.      -- as well.

17   Q.      -- you don't get paid very much, do you?

18   A.      No.

19   Q.      And you have to deal with these sorts of people

20   every day, don't you?

21   A.      Correct.

22   Q.      And when Mr. Ling came in, you would agree with

23   me that he was displaying a lot of energy, was he not?

24   A.      At what point?

25   Q.      At any point.

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 370 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM      Document 210-5      Filed 04/05/24      Page 8 of 34
PageID #: 3054

1    A.       I -- I don't necessarily agree with that.  I

2    think that there was some altitude of energy where he

3    was more heightened, and I think that was when he was on

4    the floor with his movement.  There were, like the

5    videos's shown, five of us on him.

6    Q.       Uh-huh.

7    A.       And like you said, we could not control him.

8    And in the moment, I felt that he was resisting.  So in

9    that point, I think that there was a lot of energy.

10   Q.       And -- and you've dealt with inmates who

11   display a lot of energy before, haven't you?

12   A.       That is correct.

13   Q.       And sometimes those inmates are on something,

14   are they not?

15           MR. SMITH:  Objection, Your Honor.

16           THE WITNESS:  That's correct.

17           MR. SMITH:  That's irrelevant to this case --

18           THE COURT:  Overruled.

19           MR. SMITH:  -- what other --

20           THE COURT:  Overruled.

21   BY MR. KNIGHT:

22   Q.       It came up in Mr. Seaton's questioning that --

23   I think he even impeached you with your deposition about

24   you had no reason to believe that he was under illicit

25   drugs.  But you had not been asked to do a test;

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 371 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM    Document 210-5    Filed 04/05/24    Page 9 of 34
PageID #: 3055

1  correct?

2  A.      That is correct.

3  Q.      There was no time to do a test, was there?

4  A.      No.

5  Q.      You just knew that you couldn't control him;

6  correct?

7  A.      That's correct.

8  Q.      And neither could four or five other people;

9  correct?

10 A.      Correct.

11 Q.      And you were just trying to get him into the

12 facility, were you not?

13 A.      Yes.

14 Q.      You indicated that you were TCI certified.  Is

15 that not correct?

16 A.      That is correct.

17 Q.      And you were a corrections officer for over a

18 year and then a corporal for one and a half or two

19 months.  You knew how basically a jail is supposed to

20 work or inmate to inmate; correct?

21 A.      Correct.

22 Q.      I mean, when you book them in, you check them,

23 you take them to court, you feed them, you dispense

24 medicine.  You knew how to do that, didn't you?

25 A.      Correct.

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 372 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM     Document 210-5     Filed 04/05/24     Page 10 of 34
PageID #: 3056

1  Q.      And if somebody was attacking you, you knew how

2  to defend yourself, didn't you?

3  A.      Not by any training or anything like that.

4  They tried to give us defensive tactics-type --

5  Q.      Yeah.

6  A.      -- deal during orientation.  And it was hey,

7  you grab their wrist and you twist, and if that doesn't

8  work, then you need to run out and go get backup --

9  Q.      Okay.

10 A.      -- and that -- that was the general --

11 Q.      But you have to -- I'm sorry.  Go ahead.

12 A.      That -- that was just the general

13 generalization of that training.  They kept talking

14 about well, we're going to get a defensive class.  We're

15 going to get a defensive class.  But there -- in the

16 time that I was there, I never saw that class.

17 Q.      And over -- in over a year, did you ever have

18 to defend yourself from an inmate?

19 A.      Yes.

20 Q.      Were you able to do that?

21 A.      Yes.

22 Q.      Apparently the job was okay with you 'cause you

23 applied to be a supervisor; correct?

24 A.      Are you saying the job was okay as far as

25 corrections as a whole or the corporal's position?

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 373 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM      Document 210-5    Filed 04/05/24    Page 11 of 34
2618
PageID #: 3057

1   Q.      Well, you applied to be a corporal in the

2   corrections department.

3   A.      Yes.

4   Q.      Correct?

5   A.      Yes.

6   Q.      I assume that meant more responsibility?

7   A.      Correct.

8   Q.      And more money?

9   A.      Correct.

10  Q.      And you knew that; correct?

11  A.      Correct.

12  Q.      And, you know, a lot has been said that younger

13  individuals got the night shift.  That's generally how

14  it works everywhere, isn't it?  If you have more

15  seniority, you get the better choice of shift?

16  A.      I would assume, yes.

17  Q.      You would assume, or do you know?

18  A.      I don't know.

19  Q.      You don't know if you have a 10-year veteran

20  and -- and they would rather work the day shift versus a

21  one-month veteran or a six-month veteran -- are you

22  going to sit here and tell this jury that 10-month

23  veteran is -- his seniority is not going to count in

24  terms of his choice of shift?

25          MR. SEATON:  Objection.  Argumentative.

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 374 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM   Document 210-5   Filed 04/05/24   Page 12 of 34
PageID #: 3058

1    THE COURT:  Sustained.  Sustained.

2    If you've got a question, ask him.  He can

3  answer.

4  BY MR. KNIGHT:

5  Q.    So in the moment, again, when you were --

6  Mr. Ling was taken to be decontaminated, you ordered

7  that; correct?

8  A.    That is correct.

9  Q.    And you ordered Mr. Standridge and Mr. Miller

10  to do that; correct?

11  A.    That is correct.

12  Q.    Or Officer Standridge and Officer Miller;

13  correct?

14  A.    That is correct.

15  Q.    And you said under questioning by Mr. Seaton

16  that you could hear whooping and hollering, did you not?

17  A.    That is correct.

18  Q.    And that was coming from Mr. Ling, was it not?

19  A.    No, that was coming from the officers.

20  Q.    'Cause they were not able to handle Mr. Ling,

21  were they?

22  A.    From my understanding, no, they were not.

23  That's why Mr. -- or Deputy Williams had to step in.

24  Q.    And if you cannot handle or control a detainee,

25  is that an indication to you that the detainee or

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 375 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM   Document 210-5   Filed 04/05/24   Page 13 of 34
PageID #: 3059

1  arrestee may not want to be controlled?

2  A.        Yes.

3  Q.        You said a lot about the nurse that -- well,

4  the agency that the county -- the county contracted with

5  an agency; correct?

6  A.        Yes.

7  Q.        And there are various nurses assigned to the

8  agency; correct?

9  A.        Various what?

10  Q.        Nurses that may --

11  A.        Yes.

12  Q.        -- or may not -- and during day shift, they

13  would be onsite and they were supposed to provide 24/7

14  coverage; is that correct?

15  A.        During their shift, yes.

16  Q.        And you knew that, did you not?

17  A.        Yes.

18  Q.        And you knew that you could call 9-1-1 --

19  A.        Yes.

20  Q.        -- didn't you?

21         And you -- did you come to have any

22  understanding that night that they had -- that the

23  officers had called an ambulance out to the scene to

24  evaluate Mr. Ling?

25  A.        That's what Justin had told me, yes.

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 376 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM      Document 210-5     Filed 04/05/24     Page 14 of 34
PageID #: 3060

1  Q.      Okay.  And that didn't work out too well, did

2  it?

3  A.      Not after he made it to the jail.

4  Q.      And you could have called the ambulance back,

5  couldn't you have?

6  A.      I could have.

7  Q.      But that didn't happen, did it?

8  A.      No.

9  Q.      This happened in the middle of the night;

10  correct?

11  A.      Yes.

12  Q.      You were working 11:00 to 7:00?  That was your

13  shift?

14  A.      Yes.

15  Q.      At no time during that night did you make a

16  phone call to either a medical provider, 9-1-1, or an

17  ambulance; correct?

18  A.      Correct.

19  Q.      Nor did you take Mr. Ling in a vehicle, I

20  guess, or a vehicle available to take Mr. Ling somewhere

21  if he needed to go?

22  A.      Correct.

23  Q.      It's my understanding from your testimony that

24  despite the -- the presence of blood, you did not

25  consider -- or no one considered that Mr. Ling had a

Case 3:20-cv-00233-CEA-JEM  Document 204  Filed 03/07/24  Page 377 of 699  PageID #:
Case 3:20-cv-00233-CEA-JEM    Document 210-5    Filed 04/05/24    Page 15 of 34
PageID #: 3061

1    serious medical injury?

2    A.        That is correct.

3    Q.        Thought he had a busted nose?

4    A.        Correct.

5    Q.        And that was courtesy of Mr. Crabtree's

6    punching --

7    A.        Yes.

8    Q.        -- him?

9              And did the fact that Mr. Ling was bleeding

10   from his -- was he bleeding from his nose?

11   A.        It appeared to just be his nose.  That's why I

12   didn't have such a high --

13   Q.        Okay.

14   A.        -- concern about it.

15   Q.        Okay.  And -- and despite the blood or the

16   blood coming from his nose or around his nose or

17   whatever, while he was on the floor, he was still

18   moving; correct?

19   A.        Yes.

20   Q.        So did -- was that an indication to you that he

21   perhaps had not sustained a serious injury?

22   A.        Yes.

23   Q.        You don't have any medical training, do you?

24   A.        No.

25   Q.        I mean, you have not been to medical school;

Case 3:20-cv-00233-CEA-JEM  Document 204  Filed 03/07/24  Page 378 of 699  PageID #:
Case 3:20-cv-00233-CEA-JEM    Document 210-5    Filed 04/05/24    Page 16 of 34
PageID #: 3062

1   correct?

2   A.      Correct.

3   Q.      Nursing school?

4   A.      No.

5   Q.      Do you -- I think you testified that -- to

6   Mr. Seaton you had first aid; is that --

7   A.      Yeah.  I mean, how to put a Band-Aid on

8   somebody.

9   Q.      I assume that if Mr. Ling had showed up with a

10  broken arm or a broken leg, you would have been able to

11  identify that?

12  A.      Correct.

13  Q.      It's a little bit more difficult when we're

14  talking about a brain bleed or -- would you agree with

15  me about that?

16  A.      Yes.

17  Q.      It's a little bit more difficult to identify a

18  busted nose from a brain bleed?

19  A.      Yes.

20  Q.      I'm going to ask you based on a couple of

21  questions that Mr. Seaton asked you, there was a

22  concern, was there not, as to what the day shift would

23  say when they saw Mr. Ling; correct?

24  A.      Correct.

25  Q.      And you talked about that; correct?

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 379 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM      Document 210-5    Filed 04/05/24    Page 17 of 34
PageID #: 3063

1   A.      I did.

2   Q.      And it's my understanding that after Mr. Ling

3   was put in the negative pressure cell, he was not

4   checked every hour as required by Tennessee law;

5   correct?

6   A.      Correct.

7   Q.      And you knew, did you not, Mr. Brown, that

8   that's what Tennessee law required?

9   A.      From my understanding, it was a -- a TCI

10  standard, not a law.  I did not know until today that

11  that was a law.

12  Q.      TCI standard or law, you knew he was supposed

13  to be checked every -- every hour; correct?

14  A.      Correct.

15  Q.      And he wasn't, was he?

16  A.      Correct.

17  Q.      He was just left there.  Was that the concern

18  that everyone had about day shift?

19  A.      No.

20  Q.      That he not been checked and he had been in a

21  drunk tank?

22  A.      No.

23  Q.      That was not the concern?

24  A.      No.

25  Q.      You weren't worried about that at all?

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 380 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM    Document 210-5    Filed 04/05/24    Page 18 of 34
PageID #: 3064

1  A.        No.

2  Q.        Okay.  Isn't it true, Mr. Brown, that you were

3  never going to call for any medical assistance that

4  night for Mr. --

5  A.        I was not going to call.  I was waiting for

6  medical to show up that morning.

7  Q.        That morning you were waiting for her to show

8  up; correct?

9  A.        Correct.

10 Q.        And she showed up one hour before her shift was

11 supposed to start; correct?

12 A.        Correct.

13 Q.        And you gave her the information that you told

14 Mr. Seaton about; correct?

15 A.        Correct.

16 Q.        So as far as she knew, she had a combative

17 inmate in the drunk tank who had assaulted Justin

18 Crabtree; correct?

19 A.        Correct.

20 Q.        You knew all of this was on videotape; correct?

21 A.        Correct.

22 Q.        That just about -- well, the shower part of the

23 facility is not -- does not have a camera for privacy

24 concerns --

25 A.        Correct.

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 381 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM      Document 210-5     Filed 04/05/24     Page 19 of 34
PageID #: 3065

1   Q.      -- I assume.  But the -- the search trap, the

2   sally port, that area, the booking area, they all have

3   cameras; correct?

4   A.      Correct.

5   Q.      And that was all provided to the TBI when they

6   were doing their investigation; correct?

7   A.      Correct.

8   Q.      And you gave a statement to the TBI, did you

9   not?

10  A.      Yes, I did.

11  Q.      And at some point, you were charged with some

12  offenses by the Eighth Judicial District; is that

13  correct?

14  A.      I'm not sure if that's where it was charged.

15  It was --

16  Q.      The district attorney?

17  A.      Yes.

18  Q.      And you ended up pleading guilty to what?

19  A.      Official oppression.

20  Q.      Anything else?

21  A.      No.

22  Q.      Okay.  And you received judicial diversion,

23  which would allow your record to be clean as long as you

24  stay out of trouble; correct?

25  A.      Correct.

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 382 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM      Document 210-5     Filed 04/05/24     Page 20 of 34
PageID #: 3066

1    Q.        As long as you are cooperative; correct?

2    A.        That is correct.

3    Q.        As far as -- Mr. Seaton's last question was

4    about this happening again.  It never happened before,

5    had it?

6    A.        I'm unaware.

7    Q.        You're unaware.

8              It hasn't happened since then, has it?

9    A.        I'm also unaware.

10   Q.        You're not -- so unaware.  You haven't heard of

11   anything happening like this?

12   A.        No.

13   Q.        Even though Mikey Owens, who is -- has been --

14   been made a big deal is now the jail administrator, it

15   has not happened since that you've heard of; correct?

16   A.        That is correct.

17   Q.        As far as you know, that jail is TCI certified;

18   correct?

19   A.        As far as I'm aware.

20   Q.        It was TCI certified when you were there,

21   wasn't it?

22   A.        Yes.

23   Q.        And TCI performs surprise inspections and

24   points out every little deficiency that they can find.

25   Is that not correct?

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 383 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM     Document 210-5     Filed 04/05/24     Page 21 of 34
PageID #: 3067

1    A.      That is correct.

2    Q.      And then they give you a plan of action or a

3    plan of correction, and they tell you to come -- they're

4    coming back and you better have it fixed; isn't that

5    correct?

6    A.      That is correct.

7    Q.      And that's to remain certified; correct?

8    A.      Yes, that is correct.

9    Q.      And as far as the Campbell County Jail is

10   concerned, it has been certified; correct?

11   A.      That is correct.

12   Q.      And you don't know anything any different, do

13   you?

14   A.      No.

15   Q.      I'm going to ask you something really quickly.

16   Mr. -- Mr. Brown, you saw that videotape when Justin

17   Crabtree hit Mr. Ling fairly -- would you describe that

18   as a fairly quick series --

19   A.      Yes.

20   Q.      -- of punches?

21   A.      Yes.

22   Q.      Is it fair to say that you could not have

23   intervened in that period of time and stopped any of

24   those punches?

25   A.      I didn't even realize he had hit him until

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 384 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM     Document 210-5    Filed 04/05/24    Page 22 of 34
PageID #: 3068

 1 | after he'd hit him.

 2 | Q.      Okay.  You have to observe something and you

 3 | have to know the context to intervene.  Would you agree

 4 | with that?

 5 | A.      I would, yes.

 6 | Q.      I mean, there may be very good reasons why

 7 | certain officers are doing certain things to arrestees

 8 | or detainees; is that correct?

 9 | A.      That is correct.

10 | Q.      I mean, you wouldn't want to be evaluated in

11 | isolation when you had a really good reason for -- I

12 | don't know -- deploying some sort of defensive tactic

13 | and then somebody intervenes and causes a situation that

14 | would not have occurred, would you?

15 | A.      I don't understand your question.

16 | Q.      You wouldn't want somebody intervening in

17 | something that you were doing lawfully if you had a good

18 | reason for doing it?

19 | A.      That is correct.

20 |         MR. KNIGHT:  May I have a second, Your Honor?

21 |         THE COURT:  Yes.

22 | BY MR. KNIGHT:

23 | Q.      You were asked by Mr. Seaton a lot of questions

24 | about hindsight.  Do you recall that?

25 | A.      Yes.

Case 3:20-cv-00233-CEA-JEM  Document 204  Filed 03/07/24  Page 385 of 699  PageID #:
Case 3:20-cv-00233-CEA-JEM    Document 210-5    Filed 04/05/24    Page 23 of 34
2630
PageID #: 3069

1   Q.     There's a lot of things that we would rather do

2   in hindsight; is that correct?

3   A.     Yes.

4   Q.     There may be questions that I wanted to ask

5   that I forgot to ask but, in hindsight, I should have

6   asked.  Do you understand that?

7   A.     Yes.

8   Q.     You understand the concept of Monday morning

9   quarterbacking?

10   A.     Yes.

11   Q.     Thank you.

12          THE COURT:  Any redirect?

13          MR. SEATON:  Yes, Your Honor.

14               REDIRECT EXAMINATION

15   BY MR. SEATON:

16   Q.     Mr. Brown, are you telling the ladies and

17   gentlemen of the jury that all the force used against

18   Nathan Ling was justified?

19   A.     I don't think so.

20   Q.     Well, that's kind of what it sounded in his

21   cross-examination.  Can you see why I would think that?

22   A.     I suppose.  I -- I -- I'm not so certain.

23   Q.     Okay.  You pled guilty?

24   A.     Yes.

25   Q.     Why did you plead guilty -- or what did you

Case 3:20-cv-00233-CEA-JEM  Document 204  Filed 03/07/24  Page 386 of 699  PageID #:
Case 3:20-cv-00233-CEA-JEM    Document 210-5    Filed 04/05/24    Page 24 of 34
PageID #: 3070

1    plead guilty to?

2    A.          Official oppression.

3    Q.          And why did you plead guilty to that?

4    A.          For judicial diversion.

5    Q.          Well, I understand that that was for -- for the

6    deal.  But, I mean, did you plead guilty because you

7    were, in fact, guilty?

8    A.          Yes.

9    Q.          All right.  And what were you guilty of?

10   A.          I should have, in fact, called 9-1-1 or EMS and

11   provided him with medical care at some degree.

12   Q.          Okay.

13   A.          So -- and because of that, I do believe that I

14   had subjected him to, you know, beating and whatnot.

15   Q.          So you felt like you did wrong in not calling

16   for medical care; right?

17   A.          Correct.

18   Q.          And did you feel like you had done wrong for

19   not intervening and stopping all of the abuse?

20   A.          Well, like Mr. Knight said, you know, you can

21   Monday night quarterback it.  I wish that I could have.

22   But he did make good points.  You have to be able to

23   understand the context.  And so looking at the context

24   now versus then, it's two totally different things.

25              I -- I'm 25 now, and I've seen things and I've

Case 3:20-cv-00233-CEA-JEM  Document 204  Filed 03/07/24  Page 387 of 699  PageID #:
Case 3:20-cv-00233-CEA-JEM   Document 210-5   Filed 04/05/24   Page 25 of 34
PageID #: 3071

1  been able to be in the court system and hear it from

2  many other aspects and angles; right?  Whereas, I was 19

3  or 20 and I didn't understand that yet; right?  I was

4  just going with the flow, so to speak.  I wasn't really

5  expecting somebody who had multiple hours upon hours of

6  training in comparison to me to do something that wasn't

7  lawful, and so that was my mistake for assuming.

8  Q.      So am I understanding what you're telling us is

9  that at 19 or 20 years old, you didn't feel like you

10  were mature enough to handle these situations?

11  A.      Looking back now, that is exactly what I'm

12  saying.

13  Q.      All right.

14  A.      But at the time, I think everybody, you know,

15  thinks they're extremely mature, unless they are very

16  self-aware, which I was not at that age.

17  Q.      I don't think any of us were at that age.  I

18  appreciate that.

19          And do you also feel that in addition to being

20  immature to be -- to be in that kind of a position, that

21  you weren't trained, you just didn't know what to do?

22  A.      Yeah.  I mean, I -- I really -- I had no idea

23  what I was doing.

24  Q.      Okay.

25  A.      I don't know exactly any 19- or 20 -year-old

Case 3:20-cv-00233-CEA-JEM  Document 204  Filed 03/07/24  Page 388 of 699  PageID #:
Case 3:20-cv-00233-CEA-JEM    Document 210-5    Filed 04/05/24    Page 26 of 34
PageID #: 3072

1  who knows what they're doing with themselves, let alone

2  multiple other adults, and so --

3  Q.       Well, given all that authority of the

4  government --

5  A.       Correct.

6  Q.       -- to detain people and to put them in jail

7  cells and things like that?

8  A.       Correct.

9  Q.       I heard when you were answering questions from

10 Mr. Knight that -- I was hearing that Nathan Ling was

11 resistive most of the time that he was there; is that

12 right?  Or was he not resistive?

13 A.       Looking back, I don't believe.  But in the

14 moment, the way that I had perceived it, yes, it was

15 resisting.

16 Q.       Okay.  Fair enough.

17 A.       And we were trying to stop it and contain it,

18 and it was not --

19 Q.       So --

20 A.       -- we could not.

21 Q.       -- would I be stretching if -- if I said --

22 does it appear that there was kind of a gang mentality?

23 Justin Crabtree jerking him out, people beating on him,

24 and everybody else getting involved in it?

25 A.       I don't know.

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 389 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM      Document 210-5    Filed 04/05/24     Page 27 of 34
PageID #: 3073

1    MR. KNIGHT:  Objection as to mischaracterizing

2   the testimony.

3    MR. SEATON:  I'm just asking him --

4    THE COURT:  I'm going to allow it, but I

5   would -- don't go too far --

6    MR. SEATON:  Certainly.

7    THE COURT:  -- on this.

8    MR. SEATON:  Certainly.

9    THE WITNESS:  Could you ask that question

10  again?

11  BY MR. SEATON:

12  Q.    Well, I mean, does it appear that there was

13  this gang mentality?  You know, you see Justin Crabtree.

14  You know, they got to see the video --

15  A.    Correct.

16  Q.    -- and they get to make their own

17  determinations about what they saw on the video; right?

18  A.    Correct.

19  Q.    So, I mean -- and -- and all of you officers

20  have tried to help us to understand what we saw.  But we

21  can still see -- we can't hear what's going on, but --

22  A.    Correct.

23  Q.    -- we can still see what's going on; right?

24        And it -- it -- does it appear to you that

25  there's this gang mentality where Justin Crabtree is

Case 3:20-cv-00233-CEA-JEM  Document 204  Filed 03/07/24  Page 390 of 699  PageID #:
Case 3:20-cv-00233-CEA-JEM    Document 210-5    Filed 04/05/24    Page 28 of 34
PageID #: 3074

1  grabbing him, jerking him out of the car?

2           You said that you didn't see him slamming his

3  face up against the wall; right?

4  A.       Correct.

5  Q.       But then you get him into the trap room, and

6  you got five people on him like he's a fish out of

7  water; right?

8  A.       Correct.

9  Q.       And there's people beating on him right in --

10          THE COURT:  Mr. Seaton, is there a question in

11  there?

12          MR. SEATON:  Yeah, I'm getting there.

13          THE COURT:  Well, no.  I mean -- no, you're

14  going to ask questions --

15          MR. SEATON:  Okay.

16          THE COURT:  -- not make statements.

17          MR. SEATON:  All right.

18          THE COURT:  If you've got a question --

19  BY MR. SEATON:

20  Q.       So as --

21          THE COURT:  Mr. Seaton, look at me.

22          MR. SEATON:  Yes, sir.

23          THE COURT:  I'm speaking to you.

24          MR. SEATON:  Yes, sir.

25          THE COURT:  Okay?  If you've got a question,

Case 3:20-cv-00233-CEA-JEM  Document 204  Filed 03/07/24  Page 391 of 699  PageID #:
Case 3:20-cv-00233-CEA-JEM    Document 210-5    Filed 04/05/24    Page 29 of 34
PageID #: 3075

 1  ask a question.  Okay?  Don't go on.  All right?

 2  BY MR. SEATON:

 3  Q.      So as the people are beating on him, does it

 4  appear that there's a gang mentality going on?

 5  A.       I don't think that we were necessarily trying

 6  to beat on him.  I just -- I -- looking back, I don't

 7  think we knew what we were doing.

 8  Q.      All right.  That's fair enough.

 9          Let's pull up Exhibit 40- -- 48.

10          And I just want to show you one little portion

11  of this clip.

12          MR. SEATON:  Go ahead, Joseph.

13          (The video was played in open court, and the

14          proceedings continued as follows:)

15  BY MR. SEATON:

16  Q.      So this -- this -- hang on one second.

17          So this is -- this is where you're moving

18  Nathan Ling from the search or trap room into the shower

19  area?

20  A.      I believe so, yes.

21  Q.      All right.  So let's just watch a couple

22  seconds of that.

23          (The video was played in open court, and the

24          proceedings continued as follows:)

25  BY MR. SEATON:

Case 3:20-cv-00233-CEA-JEM  Document 204  Filed 03/07/24  Page 392 of 699  PageID #:
Case 3:20-cv-00233-CEA-JEM    Document 210-5    Filed 04/05/24    Page 30 of 34
PageID #: 3076

1  Q.      And does it appear that he's very unsteady on

2  his feet?

3  A.      At that point, it looks like he was worn out,

4  yes.

5  Q.      And does it appear that it took two officers to

6  hold him up to walk him out of there?

7  A.      I don't know if they needed two officers, but

8  two officers did, in fact, carry him over there.

9  Q.      Well, you saw him almost fall, didn't you?

10  A.      And then he caught himself, yes.

11  Q.      Okay.  And there's a lot of blood in there;

12  right?

13  A.      Yes.

14  Q.      And I think I told you in deposition what all

15  the injuries were, didn't I?

16  A.      You did.

17  Q.      Right.

18         He had a shattered eye socket.  Remember that?

19  A.      Correct.

20  Q.      And remember he had a shattered nose?

21  A.      Correct.

22  Q.      Shattered jaw?

23  A.      Correct.

24  Q.      Broken shoulder?

25  A.      Correct.

Case 3:20-cv-00233-CEA-JEM  Document 204  Filed 03/07/24  Page 393 of 699  PageID #:
Case 3:20-cv-00233-CEA-JEM   Docu2638t 210-5   Filed 04/05/24   Page 31 of 34
PageID #: 3077

1    Q.        Lung issues?

2    A.        Correct.

3    Q.        And the traumatic brain injury?

4    A.        Correct.

5    Q.        And so are you telling the ladies and gentlemen

6    of the jury that with those types of serious injuries,

7    you didn't recognize that he needed medical care?

8    A.        I'm telling everybody that with my level of

9    knowledge at that age, I had no idea how to identify or

10   assess anybody.  I saw that he had got punched in the

11   nose, and that's where the blood was coming from, so I

12   naturally assumed that it was just a broken nose.

13   Q.        Do you agree that all communities deserve to

14   have people treat inmates or detainees humanely?

15   A.        I do.

16   Q.        He wasn't treated humanely, was he?

17   A.        No.

18   Q.        He was beaten savagely, wasn't he?

19   A.        I -- I don't think it's -- "savagely" is the

20   right word for that.  I think the injuries he sustained

21   were brutal, but I don't think that it was a -- I'm just

22   going to go ground, pound, and, you know, beat somebody

23   until they're, you know, within an inch of their life,

24   you know, just cut up and everything else.  That's what

25   I imagine when you say "savagely," so no, I don't

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 394 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM    Document 210-5    Filed 04/05/24    Page 32 of 34
PageID #: 3078

1  believe that that word fits.

2  Q.      When did you find out that he had been slammed

3  up against the block wall?

4  A.      When you rewound the video.

5  Q.      Okay.  So you didn't know that that night?

6  A.      No.

7  Q.      All right.  And -- but you saw all of the blood

8  on the floor, so --

9  A.      Yes, I do remember the blood.

10 Q.      All right.  That's all.  Thank you, sir.

11          THE COURT:  All right.  Thank you.

12          Any recross?

13          MR. KNIGHT:  Yes, Your Honor.

14                  RECROSS-EXAMINATION

15 BY MR. KNIGHT:

16 Q.      Correct me if I'm wrong, Mr. Brown, 18 entitles

17 you to join the Armed Forces, doesn't it?

18 A.      Yes.

19 Q.      Entitles you to vote, doesn't it?

20 A.      Yes.

21 Q.      It's the age of majority in most states;

22 correct?

23 A.      Correct.

24 Q.      And you're going to sit up here and agree with

25 Mr. Seaton that 19 or 20 years old is immature?

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 395 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM      Document 210-5     Filed 04/05/24     Page 33 of 34
PageID #: 3079

1  A.        Were you as mature at 20?

2  Q.        I don't -- I may not be as mature at age 80.

3  I -- I don't know.

4  A.        I don't believe that I personally was mature at

5  that age, no.

6  Q.        But you applied for the job?

7  A.        I did, but --

8  Q.        And you sure know that some inmate didn't need

9  to get smacked in the face by Justin Crabtree; correct?

10  A.        Correct.

11  Q.        And you well knew that that inmate could have

12  been and should have been, by TCI standards, Tennessee

13  law, policies and procedures, whatever, checked hour

14  upon hour?

15  A.        Correct.

16  Q.        Thank you.

17             THE COURT:  All right.  Thank you.

18             MR. SEATON:  Nothing further.

19             THE COURT:  Thank you.

20             MR. SEATON:  You can go.

21             THE COURT:  Yes.  Thank you.

22             All right.  Mr. Seaton, call your next witness.

23             MR. SEATON:  We'll call Michael Galloway.

24             He'll need some assistance.

25             THE COURT:  Yes, we're ready.

Case 3:20-cv-00233-CEA-JEM  Document 204  Filed 03/07/24  Page 396 of 699  PageID #:
Case 3:20-cv-00233-CEA-JEM    Document 210-5    Filed 04/05/24    Page 34 of 34
PageID #: 3080