# JUSTIN CRABTREE

```
 1                    CROSS-EXAMINATION
 2   BY MR. KNIGHT:
 3   Q.        Mr. Crabtree, what shift were you working that
 4   night?
 5   A.        Third shift.
 6   Q.        And third shift, that's 11:00 to 7:00?
 7   A.        11:00 to 7:00, yes, sir.
 8   Q.        11:00 p.m. to 7:00 a.m. in the morning?
 9   A.        Yes, sir.
10   Q.        And you were called to this residence; is that
11   correct?
12   A.        Yes, sir.
13   Q.        And you encountered a red Ford Focus; is that
14   correct?
15   A.        I don't recall what color and what type of
16   vehicle it was.
17   Q.        It -- it contained Mr. Ling, Ms. McDaniel, and
18   a juvenile; correct?
19   A.        Yes, sir.
20   Q.        And is it your understanding that the vehicle
21   came back stolen?
22   A.        Yes, sir, it did come back stolen.
23   Q.        And did it come to -- is it your understanding
24   that Mr. Ling, once he found out that you all knew that
25   he had charges against him in Michigan, fled on foot?
```

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 146 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM   Document 210-6   Filed 04/05/24   Page 2 of 19
PageID #: 3082

1  A.      He did.  The dispatcher notified them, and they
2  immediately after said he was running.
3  Q.      Okay.  And did you give chase?
4  A.      I did not give chase, no, sir.
5  Q.      Did you see John Minor give chase?
6  A.      I did not, sir.
7  Q.      Okay.  Now, at the time that you were on duty
8  in -- on third shift in June 2019, you were
9  POST-certified; correct?
10 A.      I was, yes, sir.
11 Q.      You had been to Walter State Police Academy;
12 correct?
13 A.      Yes, sir.
14 Q.      And you had done your 40 hours of in-service
15 training; correct?
16 A.      Yes, sir.
17 Q.      And that met all the requirements Tennessee law
18 spells out to be a police officer?
19 A.      Yes, sir.
20 Q.      Is that correct?
21 A.      Yes, sir, correct.
22 Q.      You're no longer a police officer, are you?
23 A.      No, sir.
24 Q.      You can't be a police officer, can you?
25 A.      No.  My POST certification is gone.  I -- I

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 147 of 699   PageID #:
                                  2392
Case 3:20-cv-00233-CEA-JEM   Document 210-6   Filed 04/05/24   Page 3 of 19
                              PageID #: 3083

1  surrendered it.
2  Q.   You are no longer certified?
3  A.   No, I surrendered my certification.
4  Q.   Okay. Now, I was looking at that video again.
5  And when you pulled Mr. Ling from the vehicle --
6  A.   Yes, sir.
7  Q.   -- would you please tell the jury what Mr. Ling
8  had done up until that point?
9  A.   At that point from when we put him into the
10 back of the vehicle and until the time that I'd got him
11 to the jail, he had kicked and screamed and -- do you
12 want me to say --
13 Q.   I want you to say what he said.
14 A.   "Fuck you. Let me out of here. Fuck you. Let
15 me out of here" and continued to kick and scream and
16 yell the whole way there, which, thus, is why he was
17 laying the way that he was when I pulled him out of the
18 vehicle.
19 Q.   Now, at some point out at the point of arrest,
20 I'll call it "out in the field," an ambulance was
21 called; correct?
22 A.   Yes, sir.
23 Q.   And I think there was some conjecture back and
24 forth whether or not Mr. Ling had run into the back of a
25 truck. Regardless, he had an abrasion on his forehead;

1    correct?
2    A.      By "abrasion," you mean like a bump, not --
3    Q.      Yeah, whatever.
4    A.      Yes, sir.  It wasn't bleeding, but it was
5    swelled up.  Yes, sir.
6    Q.      Okay.  And the ambulance was called to check
7    him out; correct?
8    A.      Yes, sir.
9    Q.      And did Mr. -- how did Mr. Ling react to the
10   ambulance coming to check him out?
11   A.      He wasn't very happy about it.  He kicked,
12   screamed, tried to bite them at one point, and I believe
13   that's when Sergeant Owens pepper sprayed him.
14   Q.      Okay.  And did you call the ambulance --
15   A.      I don't recall.
16   Q.      -- out to the scene, or do you remember?
17   A.      I -- I don't recall.
18   Q.      Okay.  Now, back to the sally port.  When you
19   were -- before you got to the sally port, was Mr. Ling
20   saying anything to you on the ride to the jail?
21   A.      Like I'd referred to earlier, he'd say, you
22   know, "fuck me.  Let me out of here.  Fuck me.  Let me
23   out of here" and continued to kick my windows.  But --
24   Q.      Okay.
25   A.      But in terms of like a personal conversation, I

1  don't recall.
2  Q.  Now, when you -- you saw the video where you
3  pulled him out of -- of the vehicle in the sally port;
4  correct?
5  A.  Yes, sir.
6  Q.  Were you upset?
7  A.  Yes, sir.
8  Q.  Were you mad at Mr. Ling?
9  A.  I -- I was pretty upset at the time, yes, sir.
10 Q.  Okay.  And there's no definitive showing of you
11 hitting Mr. Ling or -- or pushing Mr. Ling into the
12 wall.  There apparently is a red ladder there.  But my
13 understanding from your testimony is that it was a
14 possibility; correct?
15 A.  Yeah, but it wasn't his head.  I know for sure
16 I didn't put his head against that wall.
17 Q.  Okay.  You threw him in the search trap;
18 correct?
19 A.  Yes, sir.
20 Q.  And with regard to the corrections officers who
21 were waiting for you at the sally port, were you the one
22 who radioed to them to say that you had a combative
23 inmate on the way?
24 A.  Yes, sir, I let them know as I was pulling in.
25 Q.  Okay.  And you had control of Mr. Ling;

1  correct?
2  A.        Yeah, he couldn't go anywhere.  He was there in
3  the back seat of my car.
4  Q.        Those corrections officers, they weren't going
5  to intervene, were they?
6  A.        They didn't appear to, no.
7  Q.        Okay.  You wouldn't have let them intervene,
8  would you?
9  A.        If I could handle it on my own without them
10 having to worry about it, yes, sir, I -- I was going to
11 try and handle it myself.
12 Q.        And you did handle it on your own, didn't you?
13 A.        Yes, sir.
14 Q.        You handled it on your own when you went into
15 the search trap; correct?
16 A.        Yes, sir.
17 Q.        And when Mr. Ling's face or head went into the
18 counter, that was you; correct?
19 A.        Yes, sir.
20 Q.        And the officer -- the corrections officers
21 were there; correct?
22 A.        Yes, sir.
23 Q.        And is it fair to say that the -- well, the
24 corrections officers, they weren't on the scene;
25 correct?

152
Crabtree - Cross-Examination

```
 1  A.      No, sir.
 2  Q.      So they had no idea what they were going to
 3  expect?
 4  A.      No. No, sir.
 5  Q.      All right. You were asked a series of
 6  questions, whether or not you could have or should have
 7  called an ambulance at the jail. Do you recall that?
 8  A.      Yes, sir.
 9  Q.      And I believe we've talked about the last time
10  you tried to call an ambulance for Mr. Ling; correct?
11  A.      Yes, sir.
12  Q.      And as we sit here today, seeing that
13  videotape, is it your testimony that you only thought
14  that the blood was present because of the punches to the
15  nose?
16  A.      Yes, sir.
17  Q.      And how many punches to the nose did you give
18  Mr. Ling?
19  A.      Two.
20  Q.      That was inappropriate, wasn't it?
21  A.      Inappropriate?
22  Q.      Yes.
23  A.      Yes, sir.
24  Q.      You weren't trained to do that, were you?
25  A.      No, sir.
```

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 152 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM   Document 210-6   Filed 04/05/24   Page 8 of 19
PageID #: 3088

```
 1   Q.        In fact, when you go through basic police
 2   school, you're trained in defensive tactics; correct?
 3   A.        Yes, sir.
 4   Q.        And that's the force continuum; correct?
 5   A.        Yes, sir.
 6   Q.        Explain to the jury what the force continuum
 7   is.
 8   A.        I don't recall what it was particularly at this
 9   time.  I mean, I --
10   Q.        Well, it -- does it include punching somebody
11   in the face?
12   A.        No, sir.
13   Q.        Officer presence?  Do you recall that?
14   A.        Yes, sir.
15   Q.        That if an officer is present, then some --
16   then the person ought to respect authority and follow
17   what the officer has to say; correct?
18   A.        Yes, sir.
19   Q.        Mr. Ling didn't do that, did he?
20   A.        No, sir.
21   Q.        And do you recall open hand controls?
22   A.        I don't, no, sir.
23   Q.        When you're using your open hand to -- or -- or
24   hitting on pressure points of someone's body?
25   A.        Oh, yeah, like when I lifted his arms up to
```

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 153 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM   Document 210-6   Filed 04/05/24   Page 9 of 19
                             PageID #: 3089

1  keep him from going backwards to keep him leaning
2  forward on the counter. Yes, sir.
3  Q.    Okay. And also in police school, you're
4  taught, you know, to respect people's constitutional
5  rights; correct?
6  A.    Yes, sir.
7  Q.    And respect the laws of the state of Tennessee
8  and United States; is that correct?
9  A.    Yes, sir.
10 Q.    And this is an eight-week course; correct?
11 A.    Yes, sir.
12 Q.    And you're continually trained throughout the
13 year for 40 hours; correct?
14 A.    Yes, sir.
15 Q.    On those -- whatever subjects are being taught;
16 correct?
17 A.    Yes, sir.
18 Q.    And that may be certification of the use of a
19 Taser or the use of pepper spray. You have to be
20 qualified on firearms, don't you?
21 A.    Yes, sir.
22 Q.    Now, Mr. Crabtree, after the TBI investigation,
23 you were criminally charged; correct?
24 A.    Yes, sir.
25 Q.    Aggravated assault; correct?

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 154 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM   Document 210-6   Filed 04/05/24   Page 10 of 19
PageID #: 3090

155
Crabtree - Cross-Examination

```
 1   A.      Yes, sir.
 2   Q.      And whether it was official misconduct or
 3   official oppression, we don't know; correct?
 4   A.      It was official oppression for sure.  I just --
 5   I don't know what the exact --
 6   Q.      Well, the prosecutor charged you; correct?
 7   A.      Yes, sir.
 8   Q.      And we're talking about a district attorney;
 9   correct?
10   A.      Yes, sir.
11   Q.      And he took it to a grand jury, and you were
12   charged; correct?
13   A.      Yes, sir.
14   Q.      And it was the prosecutor who decided on your
15   sentence; correct?
16   A.      Yes, sir, I believe.
17   Q.      It was the prosecutor who decided that you
18   spent 91 days in jail; correct?
19   A.      It was supposed to be 90.  They mistyped, I
20   think, and it was an extra day added on.
21   Q.      So you got one extra day?
22   A.      I got one extra day, yes, sir.
23   Q.      And it was the prosecutor who allowed you to
24   spend your time where you wanted to spend your time;
25   correct?
```

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 155 of 699   PageID #: 2490
Case 3:20-cv-00233-CEA-JEM   Document 210-6   Filed 04/05/24   Page 11 of 19   PageID #: 3091

```
 1  A.        Yeah, they agreed to that in the work release
 2  so I wouldn't lose my house and I was able to pay my
 3  bills.
 4  Q.        Okay.  Do you recall when you were sentenced,
 5  Mr. Crabtree?
 6  A.        Like what happened that day?
 7  Q.        Yeah.  Well, people testifying for and against
 8  you.
 9  A.        I do.
10  Q.        Mr. Ling was there, wasn't he?
11  A.        I believe so, yes, sir.
12  Q.        He's not here today, though, is he?
13  A.        I don't --
14  Q.        Do you see him?
15  A.        -- see him.  No, sir.  But he looked different
16  that day than what I recall him being.  So if he was
17  here, I'm -- I'm not sure I would recognize him.
18  Q.        So he was able to find the person that caused
19  all the damage and testify against you; correct?
20  A.        He did testify against me, yes, sir.
21  Q.        There was some mention of -- of illicit drugs,
22  methamphetamine or -- or something that may have been
23  ingested by Mr. Ling?
24  A.        Yes, sir.
25  Q.        Did Mr. Ling possess some -- some kind of
```

157
Crabtree - Cross-Examination

```
 1  superhuman strength during this time?
 2  A.      Not that I'm aware of, but sometimes you deal
 3  with people that just -- they're -- they move around
 4  like that I guess is the way that I'd word it.  I
 5  mean --
 6  Q.      Was he strong?
 7  A.      I can't say if he was or not.  I mean, he -- he
 8  was able to move when we had ahold of him, so --
 9  Q.      Okay.  And I think at various times in that
10  video that we've seen over and over again, there are
11  periods of time where he's moving and when he's not
12  moving; correct?
13  A.      Yes.  Yes, sir.
14  Q.      Is it fair to say that when he's moving, it's
15  capable of being resistance; correct?
16  A.      Oh, yeah, 'cause he was moving the people that
17  was on top of him, which I think at the time was --
18  Q.      Of course, we don't know for sure because we
19  can't ask Mr. Ling what his intent was?
20  A.      No, sir.
21  Q.      But he was moving; correct?
22  A.      Yes, sir.
23  Q.      And that's your job in terms of you're there to
24  make sure everything is under control; is that correct?
25  A.      Yes, sir.
```

157

Crabtree - Cross-Examination

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 157 of 699   PageID #: 2402
Case 3:20-cv-00233-CEA-JEM   Document 210-6   Filed 04/05/24   Page 13 of 19   PageID #: 3093

```
 1   Q.       One of the exhibits that you were shown --
 2            (Off-the-record discussion between counsel.)
 3            MR. KNIGHT:  I can't remember the number of it.
 4            MR. SEATON:  56.
 5            MR. KNIGHT:  56.  I think it's been published
 6   to the jury.
 7   BY MR. KNIGHT:
 8   Q.       This is the former administration of Campbell
 9   County; is that correct?
10   A.       Yes, sir.
11   Q.       That's the former sheriff; correct?
12   A.       Yes, sir.
13   Q.       He was the sheriff at the time, but he's no
14   longer sheriff; correct?
15   A.       No, sir.
16   Q.       And when you're talking about deputy sheriffs,
17   officers, you're listed -- your picture's there, Dakota
18   Williams' picture is there.  But what we haven't seen is
19   that there are 12 other deputies; correct?
20   A.       Yes, sir.
21   Q.       And Mr. Owens, who is --
22            THE COURT:  Mr. Knight.
23   BY MR. KNIGHT:
24   Q.       -- who is a friend of yours --
25            THE COURT:  Mr. Knight.
```

Case 3:20-cv-00233-CEA-JEM   Document 204   Filed 03/07/24   Page 158 of 699   PageID #:
Case 3:20-cv-00233-CEA-JEM   Document 210-6   Filed 04/05/24   Page 14 of 19
24603   PageID #: 3094

```
 1              MR. KNIGHT:  I'm sorry.
 2              THE COURT:  If you'd like to bring that up
 3   closer to -- you can certainly do that.  It's also an
 4   exhibit that you can have published to them.  It's --
 5   there's an electronic version.  This is why we use the
 6   electronic system.
 7              MR. KNIGHT:  Okay.
 8              THE COURT:  You can bring the -- the easel up
 9   if you'd like.
10   BY MR. KNIGHT:
11   Q.         Okay.  Can you see that, Mr. Crabtree?
12   A.         Yes, sir.
13   Q.         This is Exhibit 55.
14              In addition to your friend, Mr. Owens, there
15   are three other sergeants; correct?
16   A.         Yes, sir.
17   Q.         And then above him, there's a lieutenant;
18   correct?
19   A.         Yes, sir.
20   Q.         And then above him, there is an unfilled
21   position of captain; correct?
22   A.         Yes, sir.
23   Q.         Then there's a chief deputy; correct?
24   A.         Yes, sir.
25   Q.         Then on the jail side, we've heard from
```

1  Mr. Standridge, and I believe Mr. Williams is on there.
2  But there are 27 other officers; correct?
3  A.     Yes, sir.
4  Q.     And there are three other corporals other than
5  Sean Brown; correct?
6  A.     Yes, sir.
7  Q.     And then there's -- Catie Wilson at the time
8  was a sergeant; correct?
9  A.     Yes, sir.
10 Q.     And then Lieutenant Mallory Campbell is above
11 Ms. Wilson; correct?
12 A.     Yes, sir.
13 Q.     And then the jail administrator at the time was
14 Stoney Love; correct?
15 A.     Yes, sir.
16 Q.     Okay.  Does that comprise the administration at
17 the time?
18 A.     Like, does that -- is that who was there?
19 Q.     Yes.
20 A.     Yes, sir.
21 Q.     Do you have any familiarity with what training
22 these correction officers went through or who did it?
23 A.     No, not really.
24 Q.     Okay.  This prosecution that you went through,
25 was it public?

| | | |
|---|---|---|
| 1 | A. | When I was prosecuted for my -- |
| 2 | Q. | Yes. |
| 3 | A. | -- charges?  Yes, sir.  I mean, it was -- |
| 4 | Q. | Was it before a judge? |
| 5 | A. | Yes, sir. |
| 6 | Q. | There's a district attorney there? |
| 7 | A. | Yes, sir. |
| 8 | Q. | You have a lawyer there? |
| 9 | A. | Yeah. |

10  Q.      And there are witnesses there for and against
11 you; correct?
12  A.      Yes, sir.
13  Q.      But it was out in the public just like we are
14 here; correct?
15  A.      Yes, sir.
16  Q.      So people knew -- people, if they wanted to,
17 knew that you were being sentenced that day; correct?
18  A.      Yes, sir.
19          MR. KNIGHT:  Thank you.
20          THE COURT:  Thank you, Mr. Knight.
21          Any redirect?
22                  REDIRECT EXAMINATION
23 BY MR. SEATON:
24  Q.      Mr. Crabtree, there was no evidence whatsoever
25 that Mr. Ling had ingested or was involved in any drugs

1  or alcohol that night, was there?
2  A.      Not that I'm aware of, no, sir.
3  Q.      Thank you.  Thank you.
4                    RECROSS-EXAMINATION
5  BY MR. KNIGHT:
6  Q.      He was never tested, was he?
7  A.      Not that I'm aware of, no, sir.
8          THE COURT:  Thank you.
9          THE WITNESS:  Thank you, Your Honor.
10         THE COURT:  All right.  Call your next witness,
11 please.
12         MR. SEATON:  Sheriff Robbie Goins, Your Honor.
13         THE COURT:  All right.
14         MR. KNIGHT:  Your Honor, may we have a quick
15 sidebar, please?
16         THE COURT:  Certainly.  Does it affect bringing
17 this witness in?  Let's go ahead and bring our witness
18 in, get him sworn, and then -- please be seated.
19         (The witness was duly sworn.)
20         (A sidebar discussion was held between the
21         Court and counsel, outside the hearing of
22         the jury, as follows:)
23         MR. KNIGHT:  We're quitting at 5:00?
24         THE COURT:  Thereabouts.  I mean, I'm not going
25 to go much past 5:00.

1   MR. KNIGHT: I mean, I don't know how long he's
2   going to take with Sheriff Goins, but we've got Stoney
3   Love out there, who's a former jail administrator.
4   MR. SEATON: I don't think we'll get to him
5   'cause the sheriff will be here a little while.
6   MR. KNIGHT: Should we let him go or -- Stoney,
7   or did they come together? I don't know.
8   THE COURT: It's --
9   MR. SEATON: Just have him come back.
10  THE COURT: You know, if -- if the witness is
11  almost finished and it goes past 5:00, then I'll let it
12  go so we can finish and -- and they can go about their
13  day, but if it's going to go a long time, we'll just
14  have to come back.
15  MR. SEATON: What he's saying is we're going to
16  call --
17  THE COURT: I understand --
18  MR. SEATON: Okay.
19  THE COURT: -- what he's saying.
20  MR. SEATON: Okay.
21  THE COURT: So I'm -- you know, but I -- I try
22  to quit around 5:00 'cause they've got stuff they need
23  to do.
24  MR. KNIGHT: Yeah. Sure. Thank you.
25  THE COURT: Thank you.